# EXHIBIT A – PART 1

Case 1:24-cv-03142-UA Document 1-1 Filed 04/24/24 Page 2 of 331

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GUOTAIQIXING BIOMEDICAL
INTERNATIONAL (S) PTE. LTD.,

Plaintiff,

-against-

XUEFENG DAI,

Defendant.

Index No. _152210/2024_____

**AMENDED NOTICE OF MOTION FOR SUMMARY JUDGMENT IN LIEU OF COMPLAINT**

**PLEASE TAKE NOTICE** that upon the Summons, the Affirmation of Liang Calvin Hanwen, dated March 10, 2024, and the exhibits attached thereto, the Affirmation of Benjamin D. Bloodstein, dated March 11, 2024 and the exhibits attached thereto, the accompanying Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment in Lieu of Complaint dated March 11, 2024 (the "Memorandum of Law"), filed herewith, Plaintiff Guotaiqixing Biomedical International (S) Pte. Ltd. will move this Court at the Motion Submission Part, Room 130, at the Supreme Court Building, 60 Centre Street, New York, New York, on May 31, 2024, at 9:30 a.m., or as soon thereafter as counsel can be heard, for an Order pursuant to C.P.L.R. §§ 3213 and 5301 *et seq*., recognizing and enforcing a foreign country money judgment entered by the General Division of The High Court of the Republic of Singapore, in an amount detailed further in the Memorandum of Law, and award such other and further relief as the Court deems just and proper.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to C.P.L.R. § 3213, answering papers, if any, are required to be served upon the undersigned so as to be received at least ten (10) days before the return date of this Motion.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| GUOTAIQIXING BIOMEDICAL<br>INTERNATIONAL (S) PTE. LTD.,<br><br>Plaintiff,<br><br>-against-<br><br>XUEFENG DAI,<br><br>Defendant. | Index No. _____<br><br>Summons Filed: _____<br><br><br>**SUMMONS** |

To the above-named Defendant:

You are hereby summoned and required to serve upon Plaintiff's attorneys your answering papers on this motion within the time period in the notice of motion annexed hereto. In case of your failure to submit answering papers, summary judgment will be taken against you by default for the relief demanded in the notice of motion.

Plaintiff designates New York County as the place of trial. Venue for this action is proper in New York County under § 503 of New York's Civil Practice Law & Rules because neither party resides in the State and Plaintiff designates New York County.

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 4 of 331

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------

GUOTAIQIXING BIOMEDICAL
INTERNATIONAL (S) PTE. LTD.,

                                    Plaintiff,

                    -against-

XUEFENG DAI,

                                    Defendant.

---------------------------------------------------------

Index No. _____

**AFFIRMATION OF LIANG
HANWEN CALVIN**

Liang Hanwen Calvin affirms this 10th day of March, 2024, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the following is true, and understands that this document may be filed in an action or proceeding in a court of law:

1.      I am an Advocate and Solicitor of the Supreme Court of the Republic of Singapore and am duly licensed to practice before the Courts of Singapore. I am a founding member of Duxton Hill Chambers (Singapore Group Practice). My principal areas of practice are cross-border commercial disputes and white-collar crime. I appear before the Singapore Courts as well as in international arbitrations.

2.      I have served as instructed counsel for the Plaintiff, Guotaiqixing Biomedical International (S) Pte. Ltd. ("Plaintiff" or "GTQX"), before the General Division of The High Court of the Republic of Singapore (the "Singapore Court") in the Singapore proceedings which relate to the instant action before this Court (the "Singapore Action"), including the entry of judgment against Defendant Xuefeng Dai ("Dai," and the judgment, the "Singapore Judgment").

3.      I respectfully submit this affirmation in support of Plaintiff's motion for Summary Judgment in Lieu of Complaint pursuant to CPLR Sections 3213 and 5301 *et seq.*, for recognition and enforcement of the Singapore Judgment issued in favor of Plaintiff and

against Dai. I am fully familiar with the facts set forth herein based upon my personal knowledge obtained through my direct involvement with the matters described.

4. All exhibits submitted herewith and referred to as "certified" are scanned copies of official records in the form authorized by the laws of Singapore. The certified documents were obtained from and certified by the Assistant Registrar of the Supreme Court of Singapore, which is obliged by law to keep such documents. I have reviewed the original certified true copies, caused them to be scanned, and compared them to the scanned copies submitted herewith. I affirm that the scanned copies do not differ in any material fashion from their original versions.

### A. **The Singapore Action**

5. On October 27, 2020, GTQX filed a lawsuit in in the Singapore Court against Dai and two of Dai's associates to recover funds that had been improperly diverted from GTQX by Dai and his associates for their own benefit. Attached hereto as **Exhibit 1** is a true and correct copy of Plaintiff's Statement of Claim in the Singapore Action, dated October 27, 2020.

6. GTQX amended its claim in the Singapore Action on December 12, 2022 to clarify the relief sought. Attached hereto as **Exhibit 2** is a true and correct copy of Plaintiff's Amended Statement of Claim in the Singapore Action, dated December 12, 2022.

7. GTQX is a company incorporated in Singapore and is a wholly-owned subsidiary of Shenzhen Guotaiqixing Industry Investment Fund Management Centre LLP (the "Limited Partnership"), a limited partnership formed under the laws of the People's Republic of China. Attached hereto as **Exhibit 3** is a true and correct copy and a certified English translation of the Partnership Agreement which formed the Limited Partnership.

8. The Singapore Court is a court of general jurisdiction.

2

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 6 of 331

9.      Attached hereto as **Exhibit 4** is a true and correct copy of the first affidavit of GTQX Director Yingtong Sun, sworn to in the Singapore Action on October 26, 2020.[1]

10.     Dai initially appeared through counsel and filed an application to contest service and personal jurisdiction.  The parties tendered extensive written submissions to the Court on Dai's application, and the Singapore Court held two hearings thereon, on October 15, 2021 and November 15, 2021. At the second hearing on November 15, 2021, the Singapore Court dismissed Dai's application.  Attached hereto as **Exhibit 5** is a true and correct copy of the notes taken by the Singapore Court and filed publicly from the hearing in the Singapore Action on November 15, 2021.

11.     Dai appealed, and multiple hearings were held on that appeal, on January 11, 2022, March 15, 2022, and May 11, 2022. At the third hearing on May 11, 2022, the Singapore Court dismissed Dai's appeal in full and ordered Dai to pay costs to Plaintiff.  Attached hereto as **Exhibit 6** is a true and correct copy of the notes taken by the Singapore Court and filed publicly from the hearing in the Singapore Action on May 11, 2022.

12.     Dai filed his Defense in the Singapore Action on June 2, 2022, and filed a further amended Defense on June 17, 2022.  Attached hereto as **Exhibit 7** is a true and correct copy of Dai's Defense, dated June 2, 2022, and attached hereto as **Exhibit 8** is a true and correct copy of Dai's Defense (Amendment No. 1), dated June 17, 2022.

13.     In an affidavit sworn to and filed by Dai through his counsel on July 8, 2022, Dai conceded that he "transferr[ed] the monies from the Plaintiff to the various Khan entities." Attached hereto as **Exhibit 9** is a true and correct copy of Dai's Second Affidavit in the Singapore Action, dated July 8, 2022.

---

[1] Although Mr. Sun's first affidavit as filed in the Singapore Court contained 59 attachments and a total of over 1,500 pages, the version attached hereto is excerpted to contain only the sworn statement itself.

3

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 7 of 331

14.     The affidavit attached hereto as Exhibit 9 was filed in support of another application filed by Dai on July 8, 2022, seeking a stay on the basis that the Singapore Court was not a convenient forum for the dispute. The parties again tendered extensive written submissions to the Court on Dai's further application, and further hearings were held on September 9, 2022 and September 16, 2022, which Dai again attended through counsel.  At the second hearing, on September 16, 2022, the Singapore Court again dismissed Dai's application. Attached hereto as **Exhibit 10** is a true and correct copy of the notes taken by the Singapore Court and filed publicly from the hearing on Dai's stay application, dated September 16, 2022.

15.     On November 15, 2022 after GTQX discovered that Dai had, among other things, sold certain real property in New York, GTQX made an application to the Singapore Court for interim orders prohibiting the disposal of assets beneficially owned by GTQX and to freeze Dai's assets.  Attached hereto as **Exhibit 11** is a true and correct copy of GTQX's application for the interim order, dated November 15, 2022.

16.     Approximately one week before the hearing of GTQX's application, on December 1, 2022, GTQX discovered that Dai had sold a second piece of real property in New York. GTQX promptly notified the Singapore Court of that discovery.  Attached hereto as **Exhibit 12** is a true and correct copy of the Seventh Affidavit of Yingtong Sun, as initially filed in draft form on December 5, 2022 within the sworn Ninth Affidavit of instructing solicitor Eugene Jedidiah Low Yeow Chin.  Attached hereto as **Exhibit 13** is a true and correct copy of the final Seventh Affidavit of Yingtong Sun, sworn to on December 13, 2022 and filed in the Singapore Court on December 14, 2022.[2]

---

[2] Due to the COVID-19 Pandemic and related scheduling difficulties, the Seventh Affidavit of Yingtong Sun was initially filed in unsworn draft form and filed within affidavits to which instructing solicitor Eugene Jedidiah Low Yeow Chin contemporaneously swore.  Thereafter on December 14, 2022, Yingtong Sun affirmed his Affidavit before the Consulate-General of the Republic of Singapore and filed that version in the Singapore Action.

4

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 8 of 331

17.     Dai admitted that he was behind the sale of the second property but asserted that he remained the beneficial owner of the second property and that he owned and controlled the entities on both sides of the transaction.  Attached hereto as **Exhibit 14** is a true and correct copy of Dai's Fifth Affidavit, sworn to on December 7, 2022.

18.     Hours before the hearing of GTQX's application on December 8, 2022, GTQX discovered that Dai was attempting to sell a third property located in Florida.

19.     Throughout the pendency of Plaintiff's application, culminating in a hearing on December 8, 2022, although Dai's counsel raised eight objections, Dai's counsel never denied that Dai controls any of the real properties. Further, and as the Singapore Court recognized in its decision, Dai had failed to rebut the public records and primary evidence of Dai's ownership of the properties which GTQX had exhibited.   Attached hereto as **Exhibit 15** is a true and correct certified copy of Singapore Court's written decision, dated December 8, 2022, in which the Singapore Court lists Dai's eight objections.

20.     The December 8, 2022 hearing culminated with the Singapore Court granting "interim and temporary measures" to enjoin Dai from in any way disposing of, dealing with or diminishing the value of his assets, including the aforementioned real properties, up to the value of the Plaintiff's claims in the Singapore Action until a further hearing over Dai's objection.  *See* Exhibit 15.

**B.      Dai's Disengagement And The Final Singapore Judgment**

21.     From inception, Dai had pursued a vigorous defense in the Singapore Action with the assistance of three different sets of counsel.  On or around December 30, 2022, Dai opted to abruptly disengage following entry of the temporary injunction and freezing order. Attached hereto as **Exhibit 16** is a true and correct copy of the notes taken by the Singapore Court and filed publicly from the hearing in the Singapore Action on January 12, 2023.

5

22.	On January 12, 2023, the Singapore Court extended the interim and temporary measures made on December 8, 2022, and enjoined Dai from in any way disposing of, dealing with or diminishing the value of his assets in the aforementioned real properties, up to the value of the Plaintiff's claims in the Singapore Action pending final determination of the Singapore Action.  Attached hereto as **Exhibit 17** is a true and correct copy of the Singapore Court's January 17, 2023 Order extending the interim and temporary measures.

23.	The Singapore Court continued to give Dai opportunities to defend himself, but he declined to participate further.  Attached hereto as **Exhibit 18** is a true and correct copy of correspondence transmitted from the Singapore Court to all parties, dated February 2, 2023, and attached hereto as **Exhibit 19** is a true and correct copy of an Order of the Singapore Court giving Dai another 14 days to comply with various orders, dated April 14, 2023.

24.	On June 27, 2023, the Singapore Court ordered that the Singapore Judgment be entered in favor of GTQX and against Dai for $34,264,935.99 United States Dollars ("USD"), plus 290,153.97 Singapore Dollars ("SGD"), with pre-judgment interest on the aforesaid sums amounting to 13,626,721.72 USD and 99,768.80 SGD, respectively, as well as post-judgment interest from June 28, 2023 to the date of payment of the judgment (the order that the Singapore Judgment be entered, the "Order").  Attached hereto as **Exhibit 20** is a true and correct certified copy of the Singapore Judgment, dated June 27, 2023.

25.	Attached hereto as **Exhibit 21** is a true and correct certified copy of the Order, dated June 27, 2023.

26.	Also on June 27, 2023, the Singapore Court ordered that GTQX be granted an injunction prohibiting Dai, in relevant part, from disposing of his assets worldwide up to the value of USD $48,500,000 (the "Post-Judgment Freezing Order").  Attached hereto as **Exhibit 22** is a true and correct certified copy of the Post-Judgment Freezing Order, dated June 27, 2023.

27.     On July 13, 2023, the Singapore Court ordered Dai to pay the costs of the Singapore Action fixed at 100,000 SGD with post-judgment interest from June 28, 2023. Attached hereto as **Exhibit 23** is a true and correct certified copy of the order for costs, dated July 13, 2023.

28.     The Singapore Judgment is a valid Singapore judgment for the sum of money. The Singapore Judgment is a final judgment and presently enforceable.

29.     Dai was offered a full and fair opportunity to litigate the claims, defenses and allegations underlying the Singapore Judgment, and Dai did so on the merits with the assistance of three different Singapore law firms.

30.     Subject-matter jurisdiction was properly exercised over Dai in the Singapore Court.  GTQX alleged subject matter jurisdiction in its application for alternative service, and Dai, represented by counsel, did not challenge these grounds then or at any time.

31.     The Singapore Judgment has not been appealed, and there are no conflicting judgments.

32.     The Singapore Judgment remains unsatisfied.

Dated:      March 10, 2024
            Singapore

            _____
            Liang Hanwen Calvin

7

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 11 of 331

## <u>CERTIFICATION OF COUNSEL</u>

I hereby state that this document was prepared on a computer using Microsoft Word, and pursuant to the word count system in Microsoft Word, the total number of words exclusive of the caption and signature block is less than 7,000.

Dated:  March 12, 2024

*/s/ Benjamin D. Bloodstein*
Benjamin D. Bloodstein

8

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 12 of 331

# EXHIBIT 1

Case 1:24-cv-03142-UA    Document 1-1    Filed 04/24/24    Page 13 of 331

**IN THE HIGH COURT OF THE REPUBLIC OF SINGAPORE**

HC/S    /2020

Between

**GUOTAIQIXING BIOMEDICAL INTERNATIONAL (S) PTE. LTD.**
(UEN No. 20150039K)

... Plaintiff(s)

And

(1) **DAI XUEFENG**
(PRC Passport No. ████2878)

(2) **ZHANG JUNQI**
(PRC Passport No. ████9520)

(3) **XU XINMANNI**
(PRC Passport No. ████7254)

... Defendant(s)

# STATEMENT OF CLAIM

1. This Statement of Claim is without prejudice to the Plaintiff's right to amend its pleadings pending discovery, the administration of interrogatories, and any further findings of the ongoing investigations referred to in paragraph 8 herein.

A.    **PARTIES TO THESE PROCEEDINGS**

I.    **THE PLAINTIFF**

2. The Plaintiff is a company incorporated in Singapore on or about 9 November 2015. The Plaintiff's registered address is 60 Paya Lebar Road #11-01, Paya Lebar Square, Singapore 409051.

3. The Plaintiff is a wholly-owned subsidiary of 深圳国泰旗兴产业投资基金管理中心（有限合伙）(also known as Shenzhen Guotaiqixing Industry Investment Fund

Management Centre LLP "**Shenzhen Guotai**"), a limited partnership formed under the laws of the People's Republic of China ("**China**"). At all material times prior to 27 May 2019, the partners of Shenzhen Guotai were:

(a)   深圳前海国民投资管理有限公司 (also known as Shenzhen Qianhai Nations Investment Management Co., Ltd., "**Nations Investment**"), a corporation incorporated in China, as limited partner; and

(b)   北京旗隆医药控股有限公司 (also known as Beijing Khan Pharmaceutical Holdings Co., Ltd., "**Beijing Khan**"), a corporation incorporated in China, as general partner.

4.   Shenzhen Guotai was the vehicle into which Nations Investment invested an aggregate of some RMB 500 million which was to be managed by Beijing Khan pursuant to a joint venture between Nations Investment and Beijing Khan (the "**Joint Venture**"). The Joint Venture was formalised by:

(a)   a Partnership Agreement dated 23 November 2015 between Beijing Khan as general partner and Nations Investment as limited partner (the "**Partnership Agreement**"); and

(b)   an Agreement for Further Investment Regarding Shenzhen Guotaiqixing Industry Investment Fund Co., Ltd. (Limited Partnership) dated 25 March 2016 between Nations Investment, Beijing Khan and Shenzhen Guotai (the "**Further Investment Agreement**").

Of these monies, USD 34,639,399.87 (approximately RMB 226 million at the material time) was injected into the Plaintiff as share capital.

5.   Nations Investment was and is a wholly-owned subsidiary of 国民技术股份有限公司 (also known as Nations Technologies Inc, "**Nations**"), which was at all material times a company listed on the Shenzhen Stock Exchange. Nations Investment was primarily used as a vehicle for Nations to carry out investments.

6.   By a Judgment dated 14 February 2019, the People's Court of the Shenzhen Qianhai Co-operation Zone held that Beijing Khan had "*committed misconduct while implementing matters for the partnership*" , and ordered that Beijing Khan be removed as a partner of Shenzhen Guotai. By a Notice of Change dated 14 August 2019, Nations Investment was appointed the liquidator of Shenzhen Guotai.

7.   On or about 16 October 2019, Nations Investment as liquidator of Shenzhen Guotai removed, *inter alios*, the 1st Defendant from his position as director of the Plaintiff, and appointed new directors over the Plaintiff.

8.   Investigations into the misconduct of the 1st Defendant along with the misconduct of his associates, the 2nd and 3rd Defendants, are ongoing as of the date of this Statement of Claim, including computer forensics of devices used by the 1st and 2nd Defendants belonging to the Plaintiff.

## II.   THE DEFENDANTS

9.   The 1st Defendant is a citizen of China and presently resides in the United States of America (the "**US**"). The 1st Defendant is also known as "Eric".

10.   The 1st Defendant was a director of the Plaintiff at all material times from 9 November 2015 until 16 October 2019. Paragraph 7 herein is repeated.

11.   The 1st Defendant is the founder of, and at all material times controlled various entities in diverse territories including China, the British Virgin Islands, the Cayman Islands, the US and Singapore, which will be collectively referred to as the "**Khan Entities**". The Khan Entities included Beijing Khan, which is referred to in paragraphs 3(b) and 4 herein. The 1st Defendant is the ultimate beneficial owner of all or substantially all of each of the Khan Entities.

12.   The 2nd Defendant is a citizen of China and presently resides in the US. The 2nd Defendant is also known as "Alice" and "Alice Chung".

13.   The 2nd Defendant was the General Manager and an officer of the Plaintiff from 15 November 2015 until December 2017.

14.   The 2nd Defendant was at all material times a key member of the management of various Khan Entities.

15.   The 3rd Defendant is a citizen of China and presently resides in the US. The 3rd Defendant was at all material times a key member of the management of various Khan Entities. The 3rd Defendant is also known as "Sophie".

16.   At all material times, the 1st, 2nd and 3rd Defendants styled themselves as fund managers, and purported to issue funds and carry out fund management using the Khan Entities and other entities under their control (including the Plaintiff).

17.   The 1st, 2nd and 3rd Defendants conceived of and carried out a scheme, under which investment monies which were entrusted to Shenzhen Guotai and, by extension, the Plaintiff, pursuant to the Joint Venture, were diverted for their own benefit. As part of

the scheme, the 1st, 2nd and 3rd Defendants caused Shenzhen Guotai to inject USD 34,639,399.87 into the Plaintiff, and thereafter hollowed out the Plaintiff by diverting substantial amounts from the Plaintiff to the 2nd Defendant and the Khan Entities (the "**Diversion**").

18.   As a result of their misconduct, the 1st, 2nd and 3rd Defendants are on the wanted list for criminal fugitives pursuant to a warrant of arrest issued by the Shenzhen Municipal Public Security Bureau on or about 25 December 2018 for embezzlement.

19.   The Plaintiff's claims herein are for:

(a)   Loss and damage caused to the Plaintiff by the Diversion. The net amount of this claim is USD 34,264,935.99.

(b)   Loss and damage caused to the Plaintiff by the 1st, 2nd and 3rd Defendants procuring or permitting that Khan Fund Management Asia Pte. Ltd. ("**SGKFM**"), use the Plaintiff's office premises at 2 Shenton Way #17-02, SGX Centre 1, Singapore 068804 (the "**Plaintiff's Office Premises**") as its registered address, without payment to the Plaintiff. The amount of this claim is SGD 290,153.97.

**B.   DUTIES OWED BY THE 1ST AND 2ND DEFENDANTS TO THE PLAINTIFF**

**I.   DUTIES OWED BY THE 1ST DEFENDANT TO THE PLAINTIFF**

20.   Paragraph 9 herein is repeated. As a director of the Plaintiff, the 1st Defendant owed fiduciary duties (including statutory duties under section 157 of the Companies Act (Cap 50, 2006 Rev Ed)) to the Plaintiff that required him to:

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM    INDEX NO. 152210/2024
NYSCEF DOC. NO. 4    Case 1:24-cv-03142-UA    Document 1-1    Filed 04/24/24    Page 18 of 331    RECEIVED NYSCEF: 03/12/2024

6

(a)    act honestly and in the interests of the Plaintiff;

(b)    use reasonable diligence in the discharge of his duties owed to the Plaintiff;

(c)    act *bona fide* and in good faith in the interest of the Plaintiff in the discharge of all duties, powers, responsibilities, obligations and functions assigned to or vested in or attached to him;

(d)    ensure that each transaction that is undertaken by the Plaintiff is at arm's length and, in any event, not place or allow himself to be placed in a situation or position whereby any of his duties and obligations to the Plaintiff conflict or potentially may conflict directly or indirectly with his personal interests;

(e)    not make any secret profit or receive any secret payment;

(f)    disclose any breaches (on his part) of duties owed to the Plaintiff; and/or

(g)    not make improper use of his position as a director of the Plaintiff or any information acquired by virtue of his position as a director to gain, directly or indirectly, an advantage for himself or for any other person or to cause detriment to the Plaintiff.

## II.    DUTIES OWED BY THE 2ND DEFENDANT TO THE PLAINTIFF

21.    Paragraph 13 herein is repeated. The 2nd Defendant was employed in an executive capacity (see paragraphs 22 and 23 herein) and, *inter alia*, owed a contractual duty (implied as a matter of law) of mutual trust and confidence, and fidelity, to act faithfully in the best interests of the Plaintiff.

22.    Pursuant to the terms of her employment with the Plaintiff, the 2nd Defendant also owed express contractual duties to the Plaintiff and/or had the authority to:

(a) oversee the overall management, sales and operations of the Plaintiff, and formulate and implement business strategies and policies of the Plaintiff;

(b) do her utmost to maximise the financial returns of the Plaintiff by designing optimal development strategies;

(c) have general control and responsibility for the management of the business of the Plaintiff;

(d) do all in her power to promote, develop and extend the business of the Plaintiff;

(e) be the "*Legal Representative*" of the Plaintiff whether throughout Singapore or abroad and be entrusted with the direction and management of the company businesses;

(f) perform other legal and chartered functions and those assigned or delegated by the Board of Directors;

(g) not do or refrain from doing any act whereby her office as a General Manager is or becomes liable to be vacated;

(h) not do anything that would cause her to be disqualified from continuing to act as a General Manager;

(i) not do anything which may bring about disrepute to any holding company or subsidiary of the Plaintiff or any subsidiary of any holding company of the Plaintiff (other than the Plaintiff) (collectively, the "**Group**") or anything which infringes the laws and regulations of the countries in which the Group operates in; and

(j) declare all conflicts of interest and all direct and deemed interests (whether financial or otherwise) which she may have in any company or companies which are or which may from time to time be doing business with the Group or which are or which may from time to time be in direct or indirect competition with the Group (collectively the "**Connected Companies**") and to ensure that none of the Group Companies shall contract or deal with any Connected

Company save with the prior written/verbal consent of the Board; and in any event, without prejudice to the foregoing, any contract or transaction with any Connected Company or otherwise any dealings, negotiations or other transactions between the Group company and any Connected Company shall be on terms that are strictly normal commercial terms and arm's length and which have been entered into with the utmost good faith after due regard to the interests of the Group;

(k)   disclose and obtain the prior written consent of the Board of the Plaintiff, whether on her own, or jointly with others, or on behalf of any person, firm or company, or as manager, agent consultant or employee of any person, firm or company, directly or indirectly:

(i)   engage in any other business which is wholly or partly in competition with any business carried on by any Group Company by itself or themselves or in partnership, common ownership or as a joint venture with any third party; or

(ii)   be concerned or interested in any other business of a similar nature to or competitive with that carried on by any Group Company or by any supplier or customer of any Group Company; and

(l)   to perform according to the highest standards of business ethics.

These terms are recorded in an unsigned "Employment Contract" dated 9 February 2017 uncovered in the course of the investigations referred to at paragraph 8 herein (the "**2nd Defendant's Employment Contract**"). Thus far, the ongoing investigations have yet to uncover a signed version of the document.

23.   Further to paragraph 22 herein, the 2nd Defendant was:

9

(a)   a signatory to the Plaintiff's bank accounts held with DBS Bank Limited ("**DBS**");

(b)   identified in a letter from the Plaintiff to the Ministry of Manpower in Singapore ("**MOM**") as a "*crucial*" employee with "*substantial investment and management experience in the financial sector*" who had been "*tasked to transform [the Plaintiff] into a dynamic strategic investor*" (the "**Letter to MOM**"); and

(c)   purportedly conferred the power to sign "*subscription form related documents*" for the purpose of share subscriptions on the Plaintiff's behalf (see paragraph 51(3) herein).

24.   By reason of the matters pleaded in paragraphs 22 and 23 herein, the 2nd Defendant was an officer of the Plaintiff. As such, she also owed statutory duties under section 157(2) of the Companies Act to the Plaintiff to not make improper use of her position as an officer of the Plaintiff or any information acquired by virtue of his position as an officer to gain, directly or indirectly, an advantage for herself or for any other person or to cause detriment to the Plaintiff.

25.   By reason of the matters pleaded in paragraph 21 to 24 herein, at all material times, the 2nd Defendant also owed fiduciary duties to the Plaintiff.

26.   The 2nd Defendant's fiduciary duties (including her statutory duties under section 157(2) of the Companies Act) to the Plaintiff required her to:

(a)   act *bona fide* and in good faith in the interest of the Plaintiff in the discharge of all duties, powers, responsibilities, obligations and functions assigned to or vested in or attached to her;

Case 1:24-cv-03142-UA    Document 1-1    Filed 04/24/24    Page 22 of 331

(b)  ensure that each transaction that is undertaken by the Plaintiff is at arm's length and in any event, not place or allow herself to be placed in a situation or position whereby any of his duties and obligations to the Plaintiff conflict or potentially may conflict directly or indirectly with his personal interests;

(c)  not make any secret profit or receive any secret payment;

(d)  disclose any breaches (on her part) of duties owed to the Plaintiff; and/or

(e)  not make improper use of her position as an officer of the Plaintiff or any information acquired by virtue of her position as an officer to gain, directly or indirectly, an advantage for herself or for any other person or to cause detriment to the Plaintiff.

**C.**    **CIRCUMSTANCES LEADING TO THE PLAINTIFF'S CLAIMS**

**I.**    **THE KHAN ENTITIES**

27.    The Plaintiffs are aware of the following Khan Entities:

(a)  Genghis Khan Investment, Inc. ("**GKI**"), which was incorporated in or around February 2006 in the British Virgin Islands;

(b)  深圳市旗隆投资管理有限公司 (also known as Shenzhen Khan Investment Management Co. Ltd., "**SKI**"), which was incorporated in China in or around April 2006;

(c)  重庆市旗隆投资管理有限公司 (also known as Chongqing Khan Investment Management Co. Ltd., "**CQKIM**"), which was incorporated in China in or around July 2008;

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 23 of 331

11

(d) 深圳前海旗隆基金管理有限公司 (also known as Shenzhen Qianhai Genghis Khan Fund Management Co., Ltd. and Shenzhen Qianhai Khan Fund Management Co., Ltd., "**SQKFM**"), which was incorporated in China on or around 1 April 2014;

(e) Khan Funds Management America, Inc. ("**KFA**"), which was incorporated in the US under the laws of the State of New York on or about 15 October 2014;

(f) Beijing Khan, referred to in paragraph 3(b) herein, which was incorporated on or around 7 August 2015;

(g) Khan Funds Global Limited ("**KFG**"), which was incorporated in the Cayman Islands on or about 18 September 2015;

(h) Khan Funds Oriental Medicine Fund SPC ("**KOM**"), which was a segregated portfolio company incorporated in the Cayman Islands on or about 18 September 2015; and

(i) SGKFM, referred to in paragraph 19(b) herein, which was incorporated in Singapore on or about 31 March 2016.

28. GKI and SKI were incorporated in around 2006. According to marketing material issued by the Khan Entities (the "**Khan Marketing Material**") sometime in or after February 2017, the 1st Defendant used GKI and SKI to "*independently manage overseas funds*". In the Khan Marketing Material, the 1st Defendant held himself out as a specialist in investments in the biomedical industry, and aggressively promoted himself as a fund manager investing in companies with "*upright, honest, trustworthy people who have a passion for life*".

29. In around July 2008, the 1st Defendant incorporated CQKIM, which was used as a vehicle to:

(a)    raise investment monies through issuing funds in China ("**Khan-Issued Funds**");

(b)    carry out investment management of Khan-Issued Funds; and

(c)    carry out investment management of venture capital and funds issued by third parties including trust companies and investment banks ("**Third Party Funds**").

30.    In around 2009, the 2nd and 3rd Defendants joined the Khan Entities. During the material time:

(a)    the 2nd Defendant was a director in and held executive posts in various Khan Entities including Investment Director of SQKFM, Chief Investment Officer and Vice President;

(b)    the 3rd Defendant was a director in and held executive posts in various Khan Entities including Managing Director of GKI and General Manager of SQKFM; and

(c)    the 2nd and 3rd Defendants were key members of the management in various the Khan Entities alongside the 1st Defendant, and part of the 1st Defendant's inner circle.

## II.    EVENTS LEADING TO THE JOINT VENTURE

31.    By an Announcement No. 2013-010 titled "*Announcement of the Resolutions of the 8th Meeting of the 2nd Board of Directors*" dated 17 April 2013, Nations announced that it was considering possible avenues for investment of its "*spare monies*" by way of purchasing "*wealth management products*" ("**Nations Announcement 2013-010**"). The 1st Defendant was aware of Nations Announcement 2013-010, or was

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
NYSCEF DOC. NO. 4
INDEX NO. 152210/2024
RECEIVED NYSCEF: 03/12/2024
Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 25 of 331

13

otherwise aware that Nations was considering possible avenues for investment of its cash reserves by way of purchasing investment products. He thus sought to cultivate Nations to become a substantial investor in Khan-Issued Funds.

32. In around early-2014, the 1ˢᵗ Defendant was introduced to and met with Mr Luo Zhaoxue ("**Mr Luo**") (the "**First Meeting**"). At the time, Mr Luo was the Chief Executive Officer of Nations.

33. During the First Meeting, the 1ˢᵗ Defendant and Mr Luo discussed the prospects of making investments into the biomedical industry outside of China, and particularly in the US and Europe, through the purchase of investment products offered by Khan Entities.

34. After the First Meeting, the 1ˢᵗ Defendant continued to cultivate Nations to become a substantial investor in Khan-Issued Funds, and from time to time proposed various avenues for Nations to carry out investments through the purchase of Khan-Issued Funds.

35. On or about 1 April 2014, SQKFM was incorporated. The 1ˢᵗ, 2ⁿᵈ and 3ʳᵈ Defendants held the positions of "*President and Investment Decision Committee Chairman*", "*Investment Director & Head of Quantitative Trading*" and "*General Manager and Head of Macro Research*", respectively.

36. According to the Khan Marketing Material, the incorporation of SQKFM was to "*conduct[] private equity securities investment, equity investment, venture capital investment and other private equity fund businesses [and] to independently issue Khan-issued private equity funds*". After the incorporation of SQKFM, there was a

substantial increase in the number of Khan-Issued Funds. Pending discovery, the administration of interrogatories and any further findings of the ongoing investigations, to the Plaintiff's knowledge:

(a)   A total of four Khan-Issued Funds were issued in the 69 months between July 2008 and 31 March 2014.

(b)   At least 11 Khan-Issued Funds were issued in the 16 months between 1 April 2014 and 18 September 2015.

37.   On or about 15 October 2014, KFA was incorporated in the US. Pending discovery, the administration of interrogatories and any further findings of the ongoing investigations, to the Plaintiff's knowledge, the 1st Defendant was the sole shareholder of all of KFA's shares and the Chief Executive Officer of KFA. The 1st, 2nd and 3rd Defendants are and were at all material times members of KFA's "*Executive Team*".

38.   In around November 2014, Nations agreed to make a preliminary investment of RMB 200 million into a Khan-Issued Fund known as 前海旗隆量化分级基金 (also known as the Qianhai Khan Quantitative Diversified Fund, the "**Khan QD Fund**"). SQKFM was the fund management company of the Khan QD Fund. The 2nd Defendant managed SQKFM's quantitative funds and was "*responsible for the realisation and implementation of SQKFM's quantitative investment strategy*".

39.   After Nations' investment into the Khan QD Fund, the 1st Defendant continued to propose that Nations either increase its investments into Khan-Issued Funds, or make other investments through the Khan Entities into potential investment targets.

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024
NYSCEF DOC. NO. 4
Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 27 of 331
RECEIVED NYSCEF: 03/12/2024

15

40.    In around July or August 2015, Nations provisionally agreed to a proposal made by the 1st Defendant for Nations to invest further monies into a joint venture with 1st Defendant and one or more of the Khan Entities to invest in the biomedical industry, which the 1st Defendant had purportedly identified as a viable investment target. This was the Joint Venture, which was referred to in paragraph 4 herein.

41.    The Joint Venture was to be carried out through the formation of a limited partnership between Nations Investment (which was a wholly-owned subsidiary of Nations) and Beijing Khan, with the 1st, 2nd and 3rd Defendants acting as fund managers. This limited partnership was Shenzhen Guotai.

## III.    THE DIVERSION

42.    Paragraph 17 herein is repeated.

43.    On or about 6 November 2015, the Board of Directors of Nations resolved to invest RMB 300 million in the Joint Venture through Nations Investment.

44.    On or about 9 November 2015, the 1st, 2nd and/or 3rd Defendants incorporated the Plaintiff, or procured that the Plaintiff be incorporated, as a wholly-owned subsidiary of Shenzhen Guotai. At all material times, the Plaintiff's capital was USD 35 million divided into 35 million equal shares. Paragraphs 10 and 13 herein are repeated.

45.    In the course of negotiating the terms of the agreement to formalise the Joint Venture, Nations proposed that a custodian bank be appointed to take custody of the monies and assets invested by Nations Investment pursuant to the Joint Venture.

Nations proposed this arrangement as a safeguard against the risk of misappropriation of investment monies.

46. To facilitate the Diversion, the 1st Defendant resisted Nations' request for a custodian bank, and counter-proposed that SQKFM provide to Nations Investment a guarantee for the principal investment of RMB 300 million with a return on investment of 5% per annum which he represented would provide the same level of security.

47. Accordingly:

(a) By the Partnership Agreement dated 23 November 2015: (i) Nations Investment agreed to, *inter alia*, invest RMB 300 million into Shenzhen Guotai; and (ii) Beijing Khan agreed to, *inter alia*, invest RMB 500,000 into Shenzhen Guotai and to honestly and diligently maximise returns on the investment monies through equity, debenture and other investments. The Partnership Agreement conferred upon Beijing Khan, which was controlled by the 1st, 2nd and 3rd Defendants, the exclusive power to manage the operations of Shenzhen Guotai and to make all investment decisions without interference from Nations Investment.

(b) By a Supplemental Partnership Agreement Regarding Shenzhen Guotaiqixing Industry Investment Fund Co., Ltd. (Limited Partnership) dated 25 November 2015 between Nations Investment and SQKFM, SQKFM provided a guarantee to Nations Investment for the investment of RMB 300 million with a return on investment of 5% per annum.

(c) In pursuance of the Partnership Agreement, on or about 30 November 2015, Nations Investment paid the sum of RMB 300 million to Shenzhen Guotai (the "**RMB 300 Million Investment**").

Case 1:24-cv-03142-UA Document 1-1 Filed 04/24/24 Page 29 of 331

(d) On or about 23 December 2015, the 1st, 2nd and/or 3rd Defendants caused Shenzhen Guotai to transfer a substantial part of the RMB 300 Million Investment to the Plaintiff for subscription of the Plaintiff's shares. The sum of USD 34,639,399.87 was received by the Plaintiff in its USD-denominated account held with DBS in Singapore (the "**Plaintiff's DBS Account (USD)**"). As with the RMB 300 Million Investment, the USD 34,639,399.87 was transferred to the Plaintiff to be invested into equity, debenture and other investments.

(e) On or about 9 November 2015, Mr Luo was appointed as a director of the Plaintiff. Notwithstanding his directorship, Mr Luo was not involved in the operations of the Plaintiff and the 1st, 2nd and/or 3rd Defendants concealed the Diversion from him. The 1st, 2nd and/or 3rd Defendants forged Mr Luo's signature on at least one document in the course of concealing and concealing the nature of the Diversion, which is further particularised in paragraph 51 herein.

48. The 1st, 2nd and 3rd Defendants used the Khan Entities, including KFA, KFG, KOM and SGKFM, as conduits for funds transfers which ultimately benefited themselves.

### PARTICULARS

Pending discovery, the administration of interrogatories and any further findings of the ongoing investigations, these are the best particulars that the Plaintiff is able to provide based on the information uncovered from the investigations:

(1) The transfers made pursuant to the Diversion were without genuine commercial basis and not at arm's length.

(2) Paragraphs 11, 14, 16 and 30 herein are repeated.

(3)   Paragraph 37 herein is repeated. Four "*Research Consultancy Contract[s]*" between KFA and SQKFM, dated 15 November 2014, 14 January 2015, 3 June 2015 and 1 July 2015, which provided for substantial "*consultancy fee[s]*" of between USD 30,001 and USD 31,106 per month to be paid by SQKFM to KFA for a tenure of 6 months or 1 year (the "**Research Consultancy Contracts**"), were manufactured to provide justification for remittances to KFA. The 1st, 2nd and 3rd Defendants were employees of both KFA and SQKFM and there was no commercial basis for such "*consultancy fee[s]*", the tenure of the various Research Consultancy Contracts overlapped with each other, and the Plaintiff has not found any evidence that any services were provided under the Research Consultancy Contracts.

(4)   On 24 April 2017, a former employee of KFA, Mr Robert Polite ("**Mr Polite**") filed a Federal discrimination and whistleblower lawsuit against KFA in the District Court of the Southern District of New York. According to paragraph 12 of the Complaint filed by Mr Polite in that lawsuit, the 1st Defendant "*was pilfering company funds for his personal benefit - such as purchasing furniture and paying rent for an apartment*".

(5)   At the time of the incorporation of KFG and KOM, the 1st Defendant was the sole shareholder of all of the shares of KFG, and KFG was in turn the sole shareholder of all of the shares of KOM. The 1st, 2nd and 3rd Defendants were each directors of KFG and KOM.

(6)   On or about 18 December 2017, the 1st Defendant remitted USD 3 million to KFG from his personal JPMorgan Chase Bank, N.A. bank account, which was held with his ex-wife Liu Xiayu.

(7)   Between about 21 and 26 December 2017, five transfers of USD 900,000 each (*i.e.* an aggregate of USD 4.5 million) was transferred from SGKFM to Wang Guoli, who is the 1st Defendant's mother.

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 31 of 331

19

(8)   On or about 26 December 2017, the sum of USD 400,000 was transferred from KFG to Wang Jing, who is the 1st Defendant's sister.

(9)   On or about 26 December 2017, the 1st Defendant remitted to KFG USD 3.5 million from his personal JPMorgan Chase Bank, N.A. bank account, which was held with his ex-wife Liu Xiayu.

49.   The 1st, 2nd and 3rd Defendants effected the Diversion through multiple withdrawals made from time to time between 29 December 2015 and 6 April 2017 from the Plaintiff's DBS Account (USD). These sums were transferred to the 2nd Defendant, or to KFA, KFG or KOM as conduits for the Diversion. These entities were owned by the 1st Defendant and controlled by the 1st, 2nd and 3rd Defendants. The substantial withdrawals made from and deposits made into the Plaintiff's DBS Account (USD) were as follows:

## PARTICULARS OF DIVERSION

| Date of Withdrawal / Deposit | Recipient of Transfer | Sum Transferred out of / Returned to the Plaintiff (USD) | Bank Charges Incurred (USD) | Purported Reason for Transfer and Reference |
|---|---|---|---|---|
| 29 December 2015 Withdrawal | KOM | 33,600,000.00 | - | According to the 2016 Management Accounts: "*The Company had funded 3300 shares at the values of US$33 million in KHAN FUNDS ORIENTAL MEDICINE FUND on 29th Dec 2015 as 2% is the subscribe fee.*" |
| 6 January 2016 Withdrawal | KFA | 310,000.00 | 179.24 | Characterised as a "*loan [at] 3 years loan tenure and 3% per interest annum*" in the 2016 Management |

| Date of Withdrawal / Deposit | Recipient of Transfer | Sum Transferred out of / Returned to the Plaintiff (USD) | Bank Charges Incurred (USD) | Purported Reason for Transfer and Reference |
|---|---|---|---|---|
| | | | | Accounts and in an Excel spreadsheet recovered in the ongoing investigations |
| 30 August 2016 Withdrawal | KFA | 250,000.00 | 203.53 | Characterised as a "*loan [at] 3 years loan tenure and 3% per interest annum*" in the 2016 Management Accounts and in an Excel spreadsheet recovered in the ongoing investigations |
| 18 November 2016 Deposit | KOM | (10,000,000.00) | - | Characterised as a "*REDEMPTION OF 1,381.3223. SHARES*" in the relevant Transaction Advice and also a "*redemption [of] 1382 shares at the value of US$10 million so company loss US$3.82 million in investment [sic]*" in the 2016 Management Accounts |
| 18 November 2016 Withdrawal | KFG | 500,000.00 | - | Characterised as a "*loan [at] 3 years loan tenure and 3% per interest annum*" in the 2016 Management Accounts and in an Excel spreadsheet recovered in the ongoing investigations |
| 18 November 2016 Withdrawal | KFG | 500,000.00 | - | Characterised as a "*loan [at] 3 years loan tenure and 3% per interest annum*" in the 2016 Management Accounts and in an Excel spreadsheet recovered in the ongoing investigations |
| 1 December 2016 Withdrawal | KFG | 500,000.00 | - | Characterised as a "*loan [at] 3 years loan* |

| Date of Withdrawal / Deposit | Recipient of Transfer | Sum Transferred out of / Returned to the Plaintiff (USD) | Bank Charges Incurred (USD) | Purported Reason for Transfer and Reference |
|---|---|---|---|---|
| | | | | *tenure and 3% per interest annum*" in the 2016 Management Accounts and in an Excel spreadsheet recovered in the ongoing investigations |
| 1 December 2016 Withdrawal | KFG | 500,000.00 | - | Characterised as a "*loan [at] 3 years loan tenure and 3% per interest annum*" in the 2016 Management Accounts and in an Excel spreadsheet recovered in the ongoing investigations |
| 5 December 2016 Withdrawal | KFA | 550,025.00 | 195.18 | Characterised as a "*CONSULTANCY FEE*" with no further details in the relevant Transaction Advice and also a "*loan [at] 3 years loan tenure and 3% per interest annum*" in the 2016 Management Accounts and in an Excel spreadsheet recovered in the ongoing investigations |
| 27 December 2016 Withdrawal | KFA | 500,000.00 | 192.14 | Characterised as a "*loan [at] 3 years loan tenure and 3% per interest annum*" in the 2016 Management Accounts and in an Excel spreadsheet recovered in the ongoing investigations |
| 28 December 2016 Withdrawal | KFG | 6,000,000.00 | - | Characterised as a "*loan [at] 3 years loan tenure and 3% per interest annum*" in the 2016 Management Accounts and in an Excel spreadsheet |

22

| Date of Withdrawal / Deposit | Recipient of Transfer | Sum Transferred out of / Returned to the Plaintiff (USD) | Bank Charges Incurred (USD) | Purported Reason for Transfer and Reference |
|---|---|---|---|---|
| | | | | recovered in the ongoing investigations |
| 4 January 2017 Withdrawal | KFA | 400,000.00 | 192.48 | Characterised as a "CONSULTANCY FEE" with no further details in the relevant Transaction Advice |
| 22 February 2017 Withdrawal | 2nd Defendant | 353,356.89 | | Characterised as "BONUS" |
| 9 March 2017 Withdrawal | KFA | 200,000.00 | 195.75 | No stated reasons provided |
| 21 March 2017 Withdrawal | KFG | 100,000.00 | | No stated reasons provided |
| 6 April 2017 Deposit | KOM | (1,000,000.00) | - | No stated reasons provided |
| 6 April 2017 Withdrawal | KFA | 500,000.00 | 197.89 | No stated reasons provided |
| 6 April 2017 Withdrawal | KFA | 500,000.00 | 197.89 | No stated reasons provided |
| Sub-Totals: | | 34,263,381.89 | 1,554.10 | |
| Net Sum Misappropriated: | | 34,264,935.99 | | |

50. In truth, the transfers were not "*loans*", "*consultancy fee[s]*" or "*BONUS*" as falsely recorded in the Plaintiffs' records (see paragraphs 51(4) to 51(6) herein). By April 2017, the funds in the Plaintiff's DBS Account (USD) had been almost entirely depleted and only a balance of USD 5,793.53 remained as of 30 April 2017. After misappropriating these sums, the 1st, 2nd and 3rd Defendants absconded from China in late 2017. Thereafter, the 1st and 2nd Defendants also ceased to carry out duties or functions owed to the Plaintiff, and did not return to the Plaintiff's Office Premises.

51. The 1st, 2nd and 3rd Defendant took steps to conceal the nature and existence of the Diversion and gave the false impression that the monies transferred out of the

Plaintiff to the 2nd Defendant was for "*BONUS*", and that the monies transferred to KFA, KFG and KOM were being used in relation to genuine investments.

### PARTICULARS

Pending discovery, the administration of interrogatories and any further findings of the ongoing investigations, these are the best particulars the Plaintiff is able to provide:

(1)   In or around end-2015, the 1st, 2nd and/or 3rd Defendants created or caused to be created various documents which were designed to create the false impression that the Plaintiff had serious plans to be involved in research and development, technology and innovation in "*gene chip and peptide synthesis*" in Singapore. These documents included:

  (a)   A report assessing the viability of having the Plaintiff carry out these tasks, and setting out a breakdown of the Plaintiff's purported costs in

  (b)   doing so. This report did not and was never intended by the 1st, 2nd and/or 3rd Defendants to reflect their true intentions for using the USD 35 million that was injected into the Plaintiff. Paragraphs 17, 42 and 50 herein are repeated.

  (c)   Unsigned memoranda of understanding, letters of intent or agreements with fictitious research organisations such as the "Biopolis Bio-Medical Science Institute" and the "Singapore General Hospital Pathology Laboratory".

(2)   The 1st, 2nd and/or 3rd Defendants falsely recorded or caused that it be falsely recorded in the Plaintiff's records that the transfer of USD 33,600,000 to KOM on or around 29 December 2015 was for the subscription of 3,300 "*shares*" in KOM. There was no genuine agreement for the Plaintiff to subscribe to KOM's

shares, and no such agreement or share certificates have been uncovered in the Plaintiff's records in the course of the ongoing investigations.

(a)   Tthere was no commercial basis for the purported subscription of shares. KOM was incorporated shortly before the purported subscription on or about 18 September 2015 with a paid-up capital of USD 1.

(b)   According to an Investment Management Agreement dated 23 December 2015 signed by the 2nd Defendant on behalf of KOM and KFG ("**IMA**"), KFG was purportedly appointed as the "*Investment Manager*" of KOM. The date of the IMA was the same day on which USD 33,600,000 was transferred from the Plaintiff to KOM pursuant to the Diversion (paragraph 49 herein is repeated). Pursuant to clause 7.2, KFG would receive a monthly "*Management Fee*" that was "*equal to 1/12 x 2.5% of the Net Asset Value of [KOM form that month].*" Further, KFG would be remunerated regardless of its performance – the IMA provided for a separate "*Performance Fee*" under clause 7.3. For instance, according to the information uncovered from the ongoing investigations, for April 2016, KFG received a Management Fee of USD 78,784.74 and a Performance Fee of just USD 636.70. There is no apparent commercial justification for the Management Fee when KOM and KFG were both ultimately owned and controlled by the 1st Defendant. Paragraphs 17, 42 and 50 herein are repeated.

(3)   The 1st, 2nd and/or 3rd Defendants created or caused to be created a document titled "Authorized Person" dated 29 December 2015 which purported to confer upon the 2nd Defendant the power to sign "*subscription form related documents*" on the Plaintiff's behalf. This served to create the false impression that one or more of the transfers made pursuant to the Diversion was or were

for the purpose of share subscriptions. The aforesaid document was signed by the 1st Defendant and contained a forgery of Mr Luo's signature.

(4) The 1st, 2nd and/or 3rd Defendants falsely recorded or caused that it be falsely recorded in the Plaintiff's records that transfers of monies out of the Plaintiff were "*loan[s]*" to KFA (for an aggregate sum of as much as USD 1,610,025) and KFG (for an aggregate sum of as much as USD 8,000,000) or "*consultancy fee[s]*" paid to KFA (for an aggregate sum of as much as USD950,025). There were no genuine loan agreements or consultancy agreements between the Plaintiff and KFA or KFG, and no such agreements have been uncovered in the Plaintiff's records pursuant to the ongoing investigations.

(5) With regards to the purported "*loan[s]*" to KFA and KFG, according to the Plaintiff's management accounts for the financial year ended 31 December 2016 (the "**2016 Management Accounts**"), those loans had a "*3 years loan tenure and 3% interest per annum*". However, notwithstanding that the tenures for the purported loans have all expired, none of those purported loans have been repaid to-date and no interest has been paid to the Plaintiff thereon. Further, it appears from representations made by KFA itself that there was no commercial basis for KFA to be taking such a substantial loan (for an aggregate sum as much as USD 8,000,000 in aggregate): (i) in a letter from KFA dated 1 May 2016 that purported to authorise "*China Merchants Bank, New York Branch to search for pharmaceutical projects*", which was signed by the 1st Defendant, KFA represented that it had "*$2 billion assets under management*"; and (ii) according to the Khan Funds website, in 2015, KFA had "*signed a 15-year lease agreement with One World Trade Center*".

(6) The 1st, 2nd and/or 3rd Defendants falsely recorded or caused that it be falsely recorded in the Plaintiff's records that the transfer of USD 353,356.89

(approximately SGD 487,632.51 at an exchange rate off USD 1 to SGD 1.38) to the 2nd Defendant on 22 February 2017 was a "*BONUS*" payment. According to clause 5.1 of the 2nd Defendant's Employment Contract dated 8 February 2017, the 2nd Defendant's basic monthly salary was SGD 8,500 and was to be increased to SGD 12,000 after "*completing six months of employment*". According to clause 5.4 of the 2nd Defendant's Employment Contract, the Plaintiff also had the "*absolute discretion [to] pay the [2nd Defendant] a bonus in accordance with the bonus schemes or policies from time to time prevailing in the [Plaintiff]*". According to clause 4.3 of the Plaintiff's Employee Handbook: "*Employees who have completed one year's service as at 31st December may be paid an annual bonus each year. The quantum shall be at the absolute discretion of the Management and be based on the employee's last drawn basic salary as at 31st December of that year.*" The aforementioned transfer would have been equivalent to between 40.6 months (assuming a basic salary of SGD 12,000) and 57.4 months (assuming a basic salary of SGD 8,500) of bonus paid to the 2nd Defendant. Considering that there were no genuine investments being made by the Plaintiff, and in any event that the 2016 Management Accounts showed that the Plaintiff had incurred an operating loss of SGD 6,574,262.96 for the financial year ending 31 December 2016, it was unjustifiable for the 2nd Defendant to have been paid a bonus, much less a bonus of 40.6 to 57.4 months, and it is evident that the characterisation of the aforesaid payment as a "*BONUS*" was false and to justify or conceal the unjustified diversion of monies to benefit the 2nd Defendant. In any event, there were no board resolutions, payslips or other documents justifying or approving a "*BONUS*" payment to the 2nd Defendant, and no such documents have been uncovered in the Plaintiff's records pursuant to the ongoing investigations.

(7)    The 1st, 2nd and/or 3rd Defendants purported to commence negotiations with various purported investment targets in the biomedical industry in the US, which they alleged had to be prolonged due to complications relating to foreign exchange controls in China, changes to China's regulations on outbound investment monies, the global economic downturn and issues with corporate governance in the investment targets. No evidence of such negotiations have been uncovered in the Plaintiff's records pursuant to the ongoing investigations.

(8)    In the Letter to MOM that was drafted by, drafted under the supervision of, and/or reviewed and approved by, the 2nd Defendant and dated 29 January 2016, the 2nd Defendant caused the Plaintiff to falsely state that: "*Our [GTQX's] vision is to be the leading investor in biomedical science industry and intend to invest to shape the future-industries of Singapore in the demanding sectors of biomedical science. We encourage the development, expansion and revolution of successful industries to enhance economic progress and generate employment opportunities in Singapore.*" Paragraphs 17, 42, 50 and 51(1) herein are repeated.

(9)    On or about 18 November 2016, the 1st, 2nd and/or 3rd Defendants caused KOM to transfer the sum of USD 10 million to the Plaintiff. This was falsely recorded in the 2016 Management Accounts to be for the "*redemption*" of 1,832 shares of KOM. There was no genuine subscription or redemption of shares of KOM by the Plaintiff, and no agreements for the subscription or redemption of shares of KOM by the Plaintiff have been uncovered in the Plaintiff's records pursuant to the ongoing investigations. Paragraphs 51(2) and 51(3) herein are repeated.

(10)    In any event, even if the monies were in fact the proceeds from "*redemption*" of a fund that the Plaintiff had invested in through KOM, there was no

28

commercial basis for such a "*redemption*" and no documents evincing any possible commercial basis have been uncovered in the Plaintiff's records pursuant to the ongoing investigations. According to the Plaintiff's 2016 Management Accounts, the "*redemption*" (less than one year after the purported subscription) resulted in a loss of "*USD 3.82 million*" to the Plaintiff, which contributed to an overall "*Loss in investment loss*" of SGD 5,211,740 and an operating loss of SGD 6,574,262.96 for the financial year ending 31 December 2016. Further and in any event, substantially all of the proceeds of the purported "*redemption*" were transferred on the very same day (*i.e.*18 November 2016) from the Plaintiff to KFG and KFA for the purported "*loans*" referred to in paragraph 51(4) herein. Paragraph 49 herein is repeated.

(11) The 1st, 2nd and/or 3rd Defendants systematically effected the Diversion through numerous deposits into and withdrawals from the Plaintiff's DBS Account (USD) over more than 27 months between 29 December 2015 and 6 April 2017. Paragraph 49 herein is repeated. By April 2017, the funds in the Plaintiff's DBS Account (USD) had been almost entirely depleted and only a balance of USD 5,793.53 remained as of 30 April 2017. Paragraph 50 herein is repeated.

(12) On or about 12 December 2016, the 1st, 2nd and/or 3rd Defendants caused Shenzhen Guotai to resolve to distribute a "*bonus dividend*" of RMB 50 million to Nations Investment. Some part of the monies were in fact paid out of the RMB 200 Million Investment made by Nations Investment, and not genuine returns on genuine investment carried out by Beijing Khan through Shenzhen Guotai and, by extension, the Plaintiff.

## IV.   FURTHER INVESTMENT INTO SHENZHEN GUOTAI

52.   On or around 29 February 2016, the Board of Directors of Nations resolved to invest a further RMB 200 million into Shenzhen Guotai through Nations Investment.

53.   Accordingly:

    (a)   By a Further Investment Agreement dated 25 March 2016, Nations Investment agreed to, *inter alia*, invest a further RMB 200 million into Shenzhen Guotai on substantially similar terms as under the Partnership Agreement.

    (b)   By a Supplemental Partnership Agreement Regarding Shenzhen Guotaiqixing Industry Investment Fund Co., Ltd. (Limited Partnership) dated 25 March 2016 between Nations Investment and SQKFM, SQKFM provided a guarantee to Nations Investment for the further investment of RMB 200 million with a return on investment of 5% per annum.

    (c)   In pursuance of the Further Investment Agreement, on or about 4 July 2016, Nations Investment paid the sum of RMB 200 million to Shenzhen Guotai (the "**RMB 200 Million Investment**").

## V.   EVENTS LEADING TO THE 1ST, 2ND AND 3RD DEFENDANTS ABSCONDING IN NOVEMBER 2017

54.   Beginning in late 2016, evidence of the 1st, 2nd and 3rd Defendants' misconduct began to come to light.

55.   In around December 2016, Shenzhen Huilong Certified Public Accountants (General Partnership) ("**Huilong CPA**") carried out a routine audit of Shenzhen Guotai for the

period 1 January 2016 to 30 November 2016. Following the audit, Huilong CPA issued an Audit Report dated 21 December 2016, which bore the stamp of the 2nd Defendant as the legal representative of Shenzhen Guotai (the "**Audit Report**").

56. The audit revealed that;

   (a)   apart from its subscription to the Plaintiff's shares, Shenzhen Guotai had only invested RMB 120 million into derivatives trading through 中国国际期货有限公司 (also known as China International Futures Co., Ltd.);

   (b)   SQKFM owed RMB 196,344,553.50 to Shenzhen Guotai; and

   (c)   Shenzhen Guotai owed RMB 82,370,561.25 to SQKFM.

57. By an email dated 12 January 2017, Nations received a copy of the Audit Report from SQKFM. Thereafter, Nations sought clarification from the 1st, 2nd and/or 3rd Defendants as to:

   (a)   whether and which investments into the CROs in the US and EU that was the basis of the original proposal for investment had been made by the 1st Defendant; and

   (b)   the nature of the monies owed by SQKFM to Shenzhen Guotai and *vice versa*.

58. Nations did not receive any satisfactory clarification to its queries. Accordingly, in around mid-2017, Nations proposed that there be a change to the structure of its investment in Shenzhen Guotai to ensure better governance of its investment. In order to stall any action by Nations, the 1st Defendant purported to agree to Nations'

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM    INDEX NO. 152210/2024
NYSCEF DOC. NO. 4    Case 1:24-cv-03142-UA    Document 1-1    Filed 04/24/24    Page 43 of 331    RECEIVED NYSCEF: 03/12/2024

31

proposal, and represented that he would return to China in end-2017 to discuss further details of the proposal with Nations.

59.  Paragraph 48(4) herein is repeated. In the Complaint dated 24 April 2017, which was and is a publicly accessible document, Mr Polite asserted that the 1st Defendant had been using KFA's funds for his own personal use, such as paying rent and purchasing furniture, that contracts with foreign entities (*i.e.* outside of the US) were repeatedly breached by shortfalls in payments which KFA ignored, and that it appeared that KFA was being used for money laundering.

60.  As the evidence of their misconduct began to come to light, the 1st, 2nd and/or 3rd Defendants took steps to abscond from China and to reside in a jurisdiction outside of China.

**PARTICULARS**

(1)  On or about 21 November 2016, the 1st Defendant incorporated Daibenewise Limited in the Cayman Islands ("**Daibenewise**"). At all material times, the 1st Defendant was the sole shareholder and controller of Daibenewise. On or about, the 1st Defendant used Daibenewise as a vehicle to purchase the property at 249 Cleft Rd, Mill Neck, New York 11765-1003 (Nassau County) in the US. This is the property at which the 1st Defendant now resides. The 1st Defendant used Daibenewise to purchase the property in order to conceal his ownership of the property.

(2)  Beginning from around early-2017, the 1st, 2nd and/or 3rd Defendants carried out or caused to be carried out investigations into visa and immigration

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM INDEX NO. 152210/2024
NYSCEF DOC. NO. 4    Case 1:24-cv-03142-UA    Document 1-1    Filed 04/24/24    Page 44 of 331    RECEIVED NYSCEF: 03/12/2024

32

requirements for, and regulations surrounding the setting up of family trusts in, diverse territories including the US, Korea and New Zealand.

(a)     In around January 2017, the 2nd Defendant instructed an employee of the Plaintiff to carry out research on Korean citizenship requirements.

(b)     In around February 2017, a law firm in New York, Wildes & Weinberg, P.C., was engaged by the 1st, 2nd and/or 3rd Defendants to provide advice on how to obtain a visa for residence in the US, and to make one or more applications for the same.

(c)     In around May 2017, the 2nd Defendant instructed an employee of the Plaintiff to carry out research on immigration to the US.

(d)     In around July 2017, the 1st, 2nd and/or 3rd Defendants inquired with a law firm in New York, Kleinberg, Kaplan, Wolff & Cohen, P.C., as to setting up a domestic hedge fund in the US in order to obtain a visa for residence in the US.

(e)     In around September 2017, the 2nd Defendant instructed an employee of the Plaintiff to carry out research on how to set up an irrevocable family trust in the US, and to source for lawyers who would be able to carry out such work.

(f)     Notes on obtaining permanent residence in New Zealand were also found in an undated document recovered in the course of the ongoing investigations, from a computer seized from the Plaintiff's office that was used by the 2nd Defendant.

61.     In around July 2017, the 1st Defendant was issued with an EB-1 visa permitting him to reside in the US.

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 45 of 331

33

62. From around 3 to 16 November 2017, Nations wrote to the 2nd Defendant to request an update on the payment of investment returns for the year ending 2017. The 2nd Defendant falsely represented to Nations that Shenzhen Guotai was calculating the amount of investment returns to be paid.

63. On around 11 November 2017, the 1st Defendant announced that he would be shutting down a Wechat group which he used to communicate with investors and potential investors. Subsequently, the 1st Defendant became *in communicado* and could not be reached by Wechat or otherwise.

64. After around 16 November 2017, the 2nd and 3rd Defendants also became *in communicado* and could not be reached by Wechat or otherwise.

65. In around end-November 2017, Nations discovered that the Khan Entities including SQKFM and Shenzhen Guotai had vacated their offices in Shenzhen in early-November 2017.

66. The 1st and 2nd Defendants thereafter also ceased to carry out duties or functions owed to the Plaintiff, and did not return to the Plaintiff's Office Premises after around November 2017.

**D. SGKFM'S OCCUPATION OF THE PLAINTIFF'S PREMISES**

67. Paragraph 27(i) herein is repeated. At all material times:

    (a) the 1st, 2nd and 3rd Defendants were and are directors of SGKFM;

    (b) SGKFM's registered address was the Plaintiff's Office Premises; and

(c)   the 1st and 2nd Defendants transacted business for SGKFM from the Plaintiff's Office Premises.

68.   The 1st and 2nd Defendants did not require, and the 1st, 2nd and 3rd Defendants did not procure, that SGKFM pay the Plaintiff or any other person for the use of the Plaintiff's Office Premises. At all material times, the rental and service charges for the Plaintiff's Office Premises were entirely paid by the Plaintiff.

69.   The aggregate amount of rental and service charges paid by the Plaintiff for the period from 31 March 2016 to 30 November 2017 was SGD 290,153.97.

**PARTICULARS**

| Year | Month | Amount paid by the Plaintiff (SGD) |
|------|-------|-----------------------------------|
| **2016** | March (only 30th and 31st) | 932.97 (pro-rated) |
| | April | 14,461.05 |
| | May | 14,461.05 |
| | June | 14,461.05 |
| | July | 14,461.05 |
| | August | 14,461.05 |
| | September | 14,461.05 |
| | October | 14,461.05 |
| | November | 14,461.05 |
| | December | 14,461.05 |
| **2017** | January | 14,461.05 |
| | February | 14,461.05 |
| | March | 14,461.05 |
| | April | 14,461.05 |
| | May | 14,461.05 |

| Year | Month | Amount paid by the Plaintiff (SGD) |
|------|-------|-----------------------------------:|
|      | June | 14,461.05 |
|      | July | 14,461.05 |
|      | August | 14,461.05 |
|      | September | 14,461.05 |
|      | October | 14,461.05 |
|      | November | 14,461.05 |

### E.   THE PLAINTIFF'S CLAIMS AGAINST THE 1ST DEFENDANT: BREACHES OF DUTIES

70. By reason of the matters set out in paragraphs 27 to 66 herein (*i.e.* the Diversion), the 1st Defendant was in breach of his fiduciary duties (including statutory duties under section 157 of the Companies Act) to the Plaintiff. As a result, the Plaintiff has suffered loss and damage for which the 1st Defendant is liable.

**PARTICULARS**

(1)   The net amount of loss suffered by the Plaintiff in this respect is USD 34,264,935.99. Paragraph 49 herein is repeated.

71. By reason of the matters set out in paragraphs 67 to 69 herein (*i.e.* SGKFM's occupation of the Plaintiff's premises), the 1st Defendant was in breach of his fiduciary duties (including statutory duties under section 157 of the Companies Act) to the Plaintiff. As a result, the Plaintiff has suffered loss and damage for which the 1st Defendant is liable.

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 48 of 331

36

**PARTICULARS**

(1) The rental and service charges paid by the Plaintiff for the period from 31 March 2016 to 30 November 2017 that SGKFM should have paid for the use of the Plaintiff's Office Premises, amounting to SGD 290,153.97. Paragraph 68 herein is repeated.

**F. THE PLAINTIFF'S CLAIMS AGAINST THE 2ND DEFENDANT: BREACHES OF DUTIES**

72. By reason of the matters set out in paragraphs 27 to 66 herein (*i.e.* the Diversion), the 2nd Defendant was in breach of her contractual duties and/or fiduciary duties (including statutory duties under section 157(2) of the Companies Act) to the Plaintiff. As a result, the Plaintiff has suffered loss and damage for which the 2nd Defendant is liable.

**PARTICULARS**

(1) The net amount of loss suffered by the Plaintiff in this respect is USD 34,264,935.99. Paragraph 49 herein is repeated.

73. By reason of the matters set out in paragraphs 67 to 69 herein (*i.e.* SGKFM's occupation of the Plaintiff's premises), the 2nd Defendant was in breach of her contractual duties and/or fiduciary duties (including statutory duties under section 157(2) of the Companies Act) to the Plaintiff. As a result, the Plaintiff has suffered loss and damage for which the 2nd Defendant is liable.

**PARTICULARS**

(1)  The rental and service charges paid by the Plaintiff for the period from 31 March 2016 to 30 November 2017 that SGKFM should have paid for the use of the Plaintiff's Office Premises, amounting to SGD 290,153.97. Paragraph 68 herein is repeated.

**G.    THE PLAINTIFF'S CLAIMS AGAINST THE 2ND AND 3RD DEFENDANTS: DISHONEST ASSISTANCE**

74.  By reason of the matters set out in paragraphs 27 to 69 herein (*i.e.* the Diversion), the 2nd and 3rd Defendants dishonestly assisted the 1st Defendant's breaches of his fiduciary duties owed to the Plaintiff. The breaches of the 1st Defendant's fiduciary duties are set out in paragraphs 70 and 71 herein.

75.  The 2nd and 3rd Defendants had assisted in or procured the aforesaid breaches of the 1st Defendant's fiduciary duties in that:

(a)  As persons holding executive positions in or otherwise controlling Beijing Khan, Shenzhen Guotai, KOM, KFG and KFA, the 2nd and 3rd Defendants assisted in, procured and/or omitted to prevent the transfers made pursuant to the Diversion, which did not benefit but were detrimental to the Plaintiff. Paragraphs 9 to 18, 27 to 30, 47 to 50 and 51 herein are repeated.

(b)  The 2nd and 3rd Defendants took steps to conceal the nature and existence of the Diversion and gave the false impression that the monies transferred out of the Plaintiff to KFA, KFG and KOM were being used in relation to genuine investments. Paragraph 51 herein is repeated.

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 50 of 331

(c)    As persons holding executive positions or controlling the Plaintiff and SGKFM, the 2nd and 3rd Defendants assisted in having and/or procured that SGKFM occupy the Plaintiff's Office Premises without payment to the Plaintiff or any other person. Paragraphs 67 to 69 herein are repeated.

76.    The 2nd and 3rd Defendants' assistance in or procurement of the aforesaid breaches of the 1st Defendant were dishonest in that:

(a)    Paragraphs 75(a), 75(b) and 75(c) herein are repeated.

(b)    The 2nd and 3rd Defendants took steps to abscond from China and to reside in a jurisdiction outside China as evidence of their misconduct began to come to light. Paragraph 60 herein is repeated.

(c)    The 2nd and 3rd Defendants became *in communicado* since November 2017 and absconded from China in late 2017. Paragraphs 61 to 66 herein are repeated.

(d)    The 2nd Defendant thereafter also ceased to carry out duties or functions owed to the Plaintiff, and did not return to the Plaintiff's Office Premises after around November 2017. Paragraph 66 herein is repeated.

77.    As a result, the Plaintiff has suffered loss and damage.

**PARTICULARS**

(1)    The net amount of loss suffered by the Plaintiff in this respect is USD 34,264,935.99. Paragraph 49 herein is repeated.

(2)    The rental and service charges paid by the Plaintiff for the period from 31 March 2016 to 30 November 2017 that SGKFM should have paid for the use

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 51 of 331

of the Plaintiff's Office Premises, amounting to SGD 290,153.97. Paragraph 68 herein is repeated.

### H.   THE PLAINTIFF'S CLAIMS AGAINST THE 1ST AND 3RD DEFENDANTS: DISHONEST ASSISTANCE

78.   By reason of the matters set out in paragraphs 27 to 69 herein, the 1st and 3rd Defendants dishonestly assisted the 2nd Defendant's breaches her fiduciary duties against the Plaintiff. The breaches of the 2nd Defendant's fiduciary duties are pleaded in paragraphs 72 and 73 herein.

79.   The 1st and 3rd Defendants had assisted in or procured the aforesaid breaches of the 2nd Defendant in that:

(a)   As persons holding executive positions in or otherwise controlling the Plaintiff, Beijing Khan, Shenzhen Guotai, KOM, KFG and KFA, the 1st and 3rd Defendants assisted in, procured and/or omitted to prevent the transfers made pursuant to the Diversion, which did not benefit but were detrimental to the Plaintiff. Paragraphs 9 to 18, 27 to 30, 47 to 50 and 51 herein are repeated.

(b)   The 1st and 3rd Defendants took steps to conceal the nature and existence of the Diversion and gave the false impression that the monies transferred out of the Plaintiff to KFA, KFG and KOM were being used in relation to genuine investments. Paragraph 51 herein is repeated.

(c)   As person holding executive positions or controlling the Plaintiff and SGKFM, the 1st and 3rd Defendants assisted in having and/or procured that SGKFM occupy the Plaintiff's Office Premises without payment to the Plaintiff or any other person. Paragraphs 67 to 69 herein are repeated.

80. The 1st and 3rd Defendants' assistance in or procurement of the aforesaid breaches of the 2nd Defendant were dishonest in that:

(a) Paragraphs 79(a), 79(b) and 79(c) herein are repeated.

(b) The 1st and 3rd Defendants took steps to abscond from China and to reside in a jurisdiction outside China as evidence of their misconduct began to come to light. Paragraph 60 herein is repeated.

(c) The 1st and 3rd Defendants became *in communicado* since November 2017 and absconded from China in late 2017. Paragraphs 61 to 66 herein are repeated.

(d) The 1st Defendant thereafter also ceased to carry out duties or functions owed to the Plaintiff, and did not return to the Plaintiff's Office Premises after around November 2017. Paragraph 66 herein is repeated.

81. As a result, the Plaintiff has suffered loss and damage.

**PARTICULARS**

(1) The net amount of loss suffered by the Plaintiff in this respect is USD 34,264,935.99. Paragraph 49 herein is repeated.

(2) The rental and service charges paid by the Plaintiff for the period from 31 March 2016 to 30 November 2017 that SGKFM should have paid for the use of the Plaintiff's Office Premises, amounting to SGD 290,153.97. Paragraph 68 herein is repeated.

## I. THE PLAINTIFF'S CLAIMS AGAINST THE 1ST, 2ND AND 3RD DEFENDANTS: CONSPIRACY BY LAWFUL AND UNLAWFUL MEANS

### (1) Lawful Means Conspiracy

82. The 1st, 2nd and 3rd Defendants wrongfully and with the predominant purpose of injuring the Plaintiff conspired and combined together to injure the Plaintiff by lawful means by:

    (a) effecting the Diversion pleaded in paragraph 49 herein; and/or

    (b) assisting in having and/or procuring that SGKFM occupy the Plaintiff's Office Premises without payment to the Plaintiff or any other person as pleaded in paragraphs 67 to 69 herein.

83. The 1st, 2nd and 3rd Defendants intended to cause damage to the Plaintiff in that they intended that:

    (a) the monies that were transferred from Shenzhen Guotai to the Plaintiff for the subscription of the Plaintiff's shares referred to in paragraph 47(d) herein would not be used for the benefit of the Plaintiff but were to be diverted from the Plaintiff to the 2e Defendant or the various Khan Entities for their own benefit pursuant to the Diversion. Paragraphs 9 to 18, 27 to 30, 47 to 50 and 51 herein are repeated; and

    (b) the Plaintiff's Office Premises would not be used for the benefit of the Plaintiff but was to be used for the benefit of SGKFM and, by extension, the 1st, 2nd and/or 3rd Defendants' own benefit. Paragraphs 10, 16 and 30 herein are repeated.

84. The common intention of the 1st, 2nd and 3rd Defendants may be seen from the matters pleaded in paragraphs 27 to 69 herein. In particular:

(a) As persons holding executive positions or controlling the Plaintiff, Beijing Khan, Shenzhen Guotai, KOM, KFG and KFA, the 1st, 2nd and 3rd Defendants knew or ought to have known of the transfers made pursuant to the Diversion. Paragraphs 9 to 18, 27 to 30, 47 to 50 and 51 herein are repeated.

(b) The 1st, 2nd and 3rd Defendants took steps to conceal the nature and existence of the Diversion and gave the false impression that the monies transferred out of the Plaintiff to KFA, KFG and KOM were being used in relation to genuine investments. Paragraph 51 herein is repeated.

(c) The 1st, 2nd and 3rd Defendants took steps to abscond from China and to reside in a jurisdiction outside China as evidence of their misconduct began to come to light. Paragraph 60 herein is repeated.

(d) The 1st, 2nd and 3rd Defendants became *in communicado* since November 2017 and absconded from China in late 2017. Paragraphs 61 to 66 herein are repeated.

(e) The 1st, 2nd and 3rd Defendants thereafter also ceased to carry out duties or functions owed to the Plaintiff, and did not return to the Plaintiff's Office Premises after around November 2017. Paragraph 66 herein is repeated.

(f) As persons holding executive positions in or otherwise controlling the Plaintiff and SGKFM, the 1st, 2nd and 3rd Defendants knew or ought to have known that SGKFM was occupying the Plaintiff's Office Premises without payment to the Plaintiff or any other person. Paragraphs 67 to 69 herein are repeated.

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 55 of 331

43

**(2)**     **Unlawful Means Conspiracy**

85.    Further or in the alternative to paragraph 81(1) herein, the 1st, 2nd and 3rd Defendants wrongfully and with intent to injure the Plaintiff by unlawful means conspired and combined together to injure the Plaintiff by:

    (a)    effecting the Diversion pleaded in paragraph 49 herein; and/or

    (b)    assisting in having and/or procuring that SGKFM occupy the Plaintiff's Office Premises without payment to the Plaintiff or any other person as pleaded in paragraphs 67 to 69 herein.

86.    Paragraphs 83 and 84 herein are repeated.

87.    The unlawful means referred to in paragraph 85 are:

    (a)    the 1st Defendant's breaches of fiduciary duties (including statutory duties under section 157 of the Companies Act) to the Plaintiff, which are pleaded to in paragraphs 70 and 71 herein;

    (b)    the 2nd and 3rd Defendants' dishonest assistance of the 1st Defendant's breaches, which is pleaded to in paragraphs 74 and 77 herein;

    (c)    the 2nd Defendant's breaches of fiduciary duties (including statutory duties under section 157(2) of the Companies Act) to the Plaintiff, which are pleaded to in paragraphs 72 and 73 herein; and/or

    (d)    the 1st and 3rd Defendants' dishonest assistance of the 2nd Defendant's breaches, which is pleaded to in paragraphs 78 and 81 herein.

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 56 of 331

44

88.   By reason of the matters set out in paragraphs 82 to 87 herein, the Plaintiff has suffered loss and damage.

## PARTICULARS

(1)   The net amount of loss suffered by the Plaintiff in this respect is USD 34,264,935.99. Paragraph 49 herein is repeated.

(2)   The rental and service charges paid by the Plaintiff for the period from 31 March 2016 to 30 November 2017 that SGKFM should have paid for the use of the Plaintiff's Office Premises, amounting to SGD 290,153.97. Paragraph 68 herein is repeated.

## J.   RELIEFS

**AND THE PLAINTIFF CLAIMS:**

(1)   As against the 1st Defendant, for the breaches of the 1st Defendant's fiduciary duties (including statutory duties under section 157 of the Companies Act):

(a)   pursuant to paragraph 70 herein, the amount of **USD 34,264,935.99**;

(b)   pursuant to paragraph 71 herein, the amount of **SGD 290,153.97**; and

(c)   further or in the alternative to Reliefs 1(a) and 1(b) above, equitable compensation / damages to be assessed for breaches of the 1st Defendant's fiduciary duties (including statutory duties under section 157 of the Companies Act) owed to the Plaintiff.

(2)    As against the 2nd Defendant, for the breaches of the 2nd Defendant's contractual duties and/or fiduciary duties (including statutory duties under section 157(2) of the Companies Act):

(a)    pursuant to paragraph 72 herein, the amount of **USD 34,264,935.99**;

(b)    pursuant to paragraph 73 herein, the amount of **SGD 290,153.97**; and

(c)    further or in the alternative to Reliefs 2(a) and 2(b) above, equitable compensation / damages to be assessed for breaches of the 2nd Defendant's contractual duties and/or fiduciary duties (including statutory duties under section 157(2) of the Companies Act) owed to the Plaintiff.

(3)    As against the 2nd and 3rd Defendants, for the 2nd and 3rd Defendants' dishonest assistance of the 1st Defendant's breaches of fiduciary duties (including statutory duties under section 157 of the Companies Act):

(a)    pursuant to paragraphs 74 to 77 herein, the sums of **USD 34,264,935.99** and **SGD 290,153.97** for the 2nd and 3rd Defendants' dishonest assistance of the 1st Defendant's breaches; and

(b)    further or in the alternative to Relief 3(a) above, equitable compensation / damages to be assessed for the 2nd and 3rd Defendants' dishonest assistance of the 1st Defendant's breaches.

(4)    As against the 1st and 3rd Defendants, for the 1st and 3rd Defendants' dishonest assistance of the 2nd Defendant's breaches of fiduciary duties (including statutory duties under section 157(2) of the Companies Act):

(a)    pursuant to paragraphs 78 to 81 herein, the sums of **USD 34,264,935.99** and **SGD 290,153.97** for the 1st and 3rd Defendants' dishonest assistance of the 2nd Defendant's breaches; and

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 58 of 331

46

(b)   further or in the alternative to Relief 4(a) above, equitable compensation / damages to be assessed for the 1st and 3rd Defendants' dishonest assistance of the 2nd Defendant's breaches.

(5)   As against the 1st, 2nd and 3rd Defendants:

(a)   pursuant to paragraphs 82 to 84 and 88 herein, in the tort of conspiracy by lawful means, the sums of **USD 34,264,935.99** and **SGD 290,153.97**;

(b)   in the alternative to Relief 5(a) above, damages to be assessed for conspiracy by lawful means to injure the Plaintiff; and

(c)   further or in the alternative to Reliefs 5(a) and 5(b) above:

(i)   pursuant to paragraphs 85 to 88 herein, in the tort of conspiracy by unlawful means the sums of **USD 34,264,935.99** and **SGD 290,153.97**; and

(ii)   in the alternative to Relief 5(c)(i) above, damages to be assessed for conspiracy by unlawful means to injure the Plaintiff.

(6)   Further to Reliefs 1 to 5 above, as against the 1st, 2nd and 3rd Defendants:

(a)   interest;

(b)   costs; and

(c)   such further or other relief as this Honourable Court deems fit.

Dated this 27th day of October 2020

_____

**Solicitors for the Plaintiff**
**Ark Law Corporation**

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 59 of 331

# EXHIBIT 2

**IN THE GENERAL DIVISION OF THE HIGH COURT
OF THE REPUBLIC OF SINGAPORE**

HC/S <u>1027</u>/2020

Between

**GUOTAIQIXING BIOMEDICAL INTERNATIONAL
(S) PTE. LTD.**
(UEN No. 20150039K)

... Plaintiff(s)

And

(1)  **DAI XUEFENG**
     (PRC Passport No. ████2878)

(2)  **ZHANG JUNQI**
     (PRC Passport No. ████9520)

(3)  **XU XINMANNI**
     (PRC Passport No. ████7254)

... Defendant(s)

<table>
<tr><td>
Amended as underlined and deleted in black pursuant to Order of Court made on 12 December 2022

Dated this 12th day of December 2022

Solicitors for the Plaintiff
Ark Law Corporation
</td></tr>
</table>

# STATEMENT OF CLAIM (AMENDMENT NO. 1)

1.  This Statement of Claim is without prejudice to the Plaintiff's right to amend its pleadings pending discovery, the administration of interrogatories, and any further findings of the ongoing investigations referred to in paragraph 8 herein.

A.  **PARTIES TO THESE PROCEEDINGS**

I.  **THE PLAINTIFF**

2.  The Plaintiff is a company incorporated in Singapore on or about 9 November 2015. The Plaintiff's registered address is 60 Paya Lebar Road #11-01, Paya Lebar Square, Singapore 409051.

2

3.    The Plaintiff is a wholly-owned subsidiary of 深圳国泰旗兴产业投资基金管理中心
（有限合伙） (also known as Shenzhen Guotaiqixing Industry Investment Fund
Management Centre LLP "**Shenzhen Guotai**"), a limited partnership formed under
the laws of the People's Republic of China ("**China**"). At all material times prior to 27
May 2019, the partners of Shenzhen Guotai were:

(a)    深圳前海国民投资管理有限公司 (also known as Shenzhen Qianhai Nations
Investment Management Co., Ltd., "**Nations Investment**"), a corporation
incorporated in China, as limited partner; and

(b)    北京旗隆医药控股有限公司 (also known as Beijing Khan Pharmaceutical
Holdings Co., Ltd., "**Beijing Khan**"), a corporation incorporated in China, as
general partner.

4.    Shenzhen Guotai was the vehicle into which Nations Investment invested an
aggregate of some RMB 500 million which was to be managed by Beijing Khan
pursuant to a joint venture between Nations Investment and Beijing Khan (the "**Joint
Venture**"). The Joint Venture was formalised by:

(a)    a Partnership Agreement dated 23 November 2015 between Beijing Khan as
general partner and Nations Investment as limited partner (the "**Partnership
Agreement**"); and

(b)    an Agreement for Further Investment Regarding Shenzhen Guotaiqixing
Industry Investment Fund Co., Ltd. (Limited Partnership) dated 25 March 2016
between Nations Investment, Beijing Khan and Shenzhen Guotai (the
"**Further Investment Agreement**").

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 62 of 331

3

Of these monies, USD 34,639,399.87 (approximately RMB 226 million at the material time) was injected into the Plaintiff as share capital.

5. Nations Investment was and is a wholly-owned subsidiary of 国民技术股份有限公司 (also known as Nations Technologies Inc, "**Nations**"), which was at all material times a company listed on the Shenzhen Stock Exchange. Nations Investment was primarily used as a vehicle for Nations to carry out investments.

6. By a Judgment dated 14 February 2019, the People's Court of the Shenzhen Qianhai Co-operation Zone held that Beijing Khan had "*committed misconduct while implementing matters for the partnership*" , and ordered that Beijing Khan be removed as a partner of Shenzhen Guotai. By a Notice of Change dated 14 August 2019, Nations Investment was appointed the liquidator of Shenzhen Guotai.

7. On or about 16 October 2019, Nations Investment as liquidator of Shenzhen Guotai removed, *inter alios*, the 1st Defendant from his position as director of the Plaintiff, and appointed new directors over the Plaintiff.

8. Investigations into the misconduct of the 1st Defendant along with the misconduct of his associates, the 2nd and 3rd Defendants, are ongoing as of the date of this Statement of Claim, including computer forensics of devices used by the 1st and 2nd Defendants belonging to the Plaintiff.

II.    **THE DEFENDANTS**

9. The 1st Defendant is a citizen of China and presently resides in the United States of America (the "**US**"). The 1st Defendant is also known as "Eric".

10.     The 1st Defendant was a director of the Plaintiff at all material times from 9 November 2015 until 16 October 2019. Paragraph 7 herein is repeated.

11.     The 1st Defendant is the founder of, and at all material times controlled various entities in diverse territories including China, the British Virgin Islands, the Cayman Islands, the US and Singapore, which will be collectively referred to as the "**Khan Entities**". The Khan Entities included Beijing Khan, which is referred to in paragraphs 3(b) and 4 herein. The 1st Defendant is the ultimate beneficial owner of all or substantially all of each of the Khan Entities.

12.     The 2nd Defendant is a citizen of China and presently resides in the US. The 2nd Defendant is also known as "Alice" and "Alice Chung".

13.     The 2nd Defendant was the General Manager and an officer of the Plaintiff from 15 November 2015 until December 2017.

14.     The 2nd Defendant was at all material times a key member of the management of various Khan Entities.

15.     The 3rd Defendant is a citizen of China and presently resides in the US. The 3rd Defendant was at all material times a key member of the management of various Khan Entities. The 3rd Defendant is also known as "Sophie".

16.     At all material times, the 1st, 2nd and 3rd Defendants styled themselves as fund managers, and purported to issue funds and carry out fund management using the Khan Entities and other entities under their control (including the Plaintiff).

17. The 1st, 2nd and 3rd Defendants conceived of and carried out a scheme, under which investment monies which were entrusted to Shenzhen Guotai and, by extension, the Plaintiff, pursuant to the Joint Venture, were diverted for their own benefit. As part of the scheme, the 1st, 2nd and 3rd Defendants caused Shenzhen Guotai to inject USD 34,639,399.87 into the Plaintiff, and thereafter hollowed out the Plaintiff by diverting substantial amounts from the Plaintiff to the 2nd Defendant and the Khan Entities (the "**Diversion**").

18. As a result of their misconduct, the 1st, 2nd and 3rd Defendants are on the wanted list for criminal fugitives pursuant to a warrant of arrest issued by the Shenzhen Municipal Public Security Bureau on or about 25 December 2018 for embezzlement.

19. The Plaintiff's claims herein are for:

   (a) Loss and damage caused to the Plaintiff by the Diversion. The net amount of this claim is USD 34,264,935.99.

   (b) Loss and damage caused to the Plaintiff by the 1st, 2nd and 3rd Defendants procuring or permitting that Khan Fund Management Asia Pte. Ltd. ("**SGKFM**"), use the Plaintiff's office premises at 2 Shenton Way #17-02, SGX Centre 1, Singapore 068804 (the "**Plaintiff's Office Premises**") as its registered address, without payment to the Plaintiff. The amount of this claim is SGD 290,153.97.

**B.   DUTIES OWED BY THE 1ST AND 2ND DEFENDANTS TO THE PLAINTIFF**

**I.   DUTIES OWED BY THE 1ST DEFENDANT TO THE PLAINTIFF**

20.     Paragraph 9 herein is repeated. As a director of the Plaintiff, the 1st Defendant owed fiduciary duties (including statutory duties under section 157 of the Companies Act (Cap 50, 2006 Rev Ed)) to the Plaintiff that required him to:

(a)     act honestly and in the interests of the Plaintiff;

(b)     use reasonable diligence in the discharge of his duties owed to the Plaintiff;

(c)     act *bona fide* and in good faith in the interest of the Plaintiff in the discharge of all duties, powers, responsibilities, obligations and functions assigned to or vested in or attached to him;

(d)     ensure that each transaction that is undertaken by the Plaintiff is at arm's length and, in any event, not place or allow himself to be placed in a situation or position whereby any of his duties and obligations to the Plaintiff conflict or potentially may conflict directly or indirectly with his personal interests;

(e)     not make any secret profit or receive any secret payment;

(f)     disclose any breaches (on his part) of duties owed to the Plaintiff; and/or

(g)     not make improper use of his position as a director of the Plaintiff or any information acquired by virtue of his position as a director to gain, directly or indirectly, an advantage for himself or for any other person or to cause detriment to the Plaintiff.

## II.     DUTIES OWED BY THE 2ND DEFENDANT TO THE PLAINTIFF

21.     Paragraph 13 herein is repeated. The 2nd Defendant was employed in an executive capacity (see paragraphs 22 and 23 herein) and, *inter alia*, owed a contractual duty (implied as a matter of law) of mutual trust and confidence, and fidelity, to act faithfully in the best interests of the Plaintiff.

22. Pursuant to the terms of her employment with the Plaintiff, the 2nd Defendant also owed express contractual duties to the Plaintiff and/or had the authority to:

(a)   oversee the overall management, sales and operations of the Plaintiff, and formulate and implement business strategies and policies of the Plaintiff;

(b)   do her utmost to maximise the financial returns of the Plaintiff by designing optimal development strategies;

(c)   have general control and responsibility for the management of the business of the Plaintiff;

(d)   do all in her power to promote, develop and extend the business of the Plaintiff;

(e)   be the "*Legal Representative*" of the Plaintiff whether throughout Singapore or abroad and be entrusted with the direction and management of the company businesses;

(f)   perform other legal and chartered functions and those assigned or delegated by the Board of Directors;

(g)   not do or refrain from doing any act whereby her office as a General Manager is or becomes liable to be vacated;

(h)   not do anything that would cause her to be disqualified from continuing to act as a General Manager;

(i)   not do anything which may bring about disrepute to any holding company or subsidiary of the Plaintiff or any subsidiary of any holding company of the Plaintiff (other than the Plaintiff) (collectively, the "**Group**") or anything which infringes the laws and regulations of the countries in which the Group operates in; and

(j)   declare all conflicts of interest and all direct and deemed interests (whether financial or otherwise) which she may have in any company or companies which are or which may from time to time be doing business with the Group or

which are or which may from time to time be in direct or indirect competition with the Group (collectively the "**Connected Companies**") and to ensure that none of the Group Companies shall contract or deal with any Connected Company save with the prior written/verbal consent of the Board; and in any event, without prejudice to the foregoing, any contract or transaction with any Connected Company or otherwise any dealings, negotiations or other transactions between the Group company and any Connected Company shall be on terms that are strictly normal commercial terms and arm's length and which have been entered into with the utmost good faith after due regard to the interests of the Group;

(k)     disclose and obtain the prior written consent of the Board of the Plaintiff, whether on her own, or jointly with others, or on behalf of any person, firm or company, or as manager, agent consultant or employee of any person, firm or company, directly or indirectly:

(i)     engage in any other business which is wholly or partly in competition with any business carried on by any Group Company by itself or themselves or in partnership, common ownership or as a joint venture with any third party; or

(ii)     be concerned or interested in any other business of a similar nature to or competitive with that carried on by any Group Company or by any supplier or customer of any Group Company; and

(l)     to perform according to the highest standards of business ethics.

These terms are recorded in an unsigned "Employment Contract" dated 9 February 2017 uncovered in the course of the investigations referred to at paragraph 8 herein (the "**2nd Defendant's Employment Contract**"). Thus far, the ongoing investigations have yet to uncover a signed version of the document.

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 68 of 331

9

23. Further to paragraph 22 herein, the 2nd Defendant was:

(a) a signatory to the Plaintiff's bank accounts held with DBS Bank Limited ("**DBS**");

(b) identified in a letter from the Plaintiff to the Ministry of Manpower in Singapore ("**MOM**") as a "*crucial*" employee with "*substantial investment and management experience in the financial sector*" who had been "*tasked to transform [the Plaintiff] into a dynamic strategic investor*" (the "**Letter to MOM**"); and

(c) purportedly conferred the power to sign "*subscription form related documents*" for the purpose of share subscriptions on the Plaintiff's behalf (see paragraph 51(3) herein).

24. By reason of the matters pleaded in paragraphs 22 and 23 herein, the 2nd Defendant was an officer of the Plaintiff. As such, she also owed statutory duties under section 157(2) of the Companies Act to the Plaintiff to not make improper use of her position as an officer of the Plaintiff or any information acquired by virtue of his position as an officer to gain, directly or indirectly, an advantage for herself or for any other person or to cause detriment to the Plaintiff.

25. By reason of the matters pleaded in paragraph 21 to 24 herein, at all material times, the 2nd Defendant also owed fiduciary duties to the Plaintiff.

26. The 2nd Defendant's fiduciary duties (including her statutory duties under section 157(2) of the Companies Act) to the Plaintiff required her to:

(a)  act *bona fide* and in good faith in the interest of the Plaintiff in the discharge of all duties, powers, responsibilities, obligations and functions assigned to or vested in or attached to her;

(b)  ensure that each transaction that is undertaken by the Plaintiff is at arm's length and in any event, not place or allow herself to be placed in a situation or position whereby any of his duties and obligations to the Plaintiff conflict or potentially may conflict directly or indirectly with his personal interests;

(c)  not make any secret profit or receive any secret payment;

(d)  disclose any breaches (on her part) of duties owed to the Plaintiff; and/or

(e)  not make improper use of her position as an officer of the Plaintiff or any information acquired by virtue of her position as an officer to gain, directly or indirectly, an advantage for herself or for any other person or to cause detriment to the Plaintiff.

## C.   <u>CIRCUMSTANCES LEADING TO THE PLAINTIFF'S CLAIMS</u>

### I.   THE KHAN ENTITIES

27.  The Plaintiffs are aware of the following Khan Entities:

(a)  Genghis Khan Investment, Inc. ("**GKI**"), which was incorporated in or around February 2006 in the British Virgin Islands;

(b)  深圳市旗隆投资管理有限公司 (also known as Shenzhen Khan Investment Management Co. Ltd., "**SKI**"), which was incorporated in China in or around April 2006;

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 70 of 331

(c)  重庆市旗隆投资管理有限公司 (also known as Chongqing Khan Investment Management Co. Ltd., "**CQKIM**"), which was incorporated in China in or around July 2008;

(d)  深圳前海旗隆基金管理有限公司 (also known as Shenzhen Qianhai Genghis Khan Fund Management Co., Ltd. and Shenzhen Qianhai Khan Fund Management Co., Ltd., "**SQKFM**"), which was incorporated in China on or around 1 April 2014;

(e)  Khan Funds Management America, Inc. ("**KFA**"), which was incorporated in the US under the laws of the State of New York on or about 15 October 2014;

(f)  Beijing Khan, referred to in paragraph 3(b) herein, which was incorporated on or around 7 August 2015;

(g)  Khan Funds Global Limited ("**KFG**"), which was incorporated in the Cayman Islands on or about 18 September 2015;

(h)  Khan Funds Oriental Medicine Fund SPC ("**KOM**"), which was a segregated portfolio company incorporated in the Cayman Islands on or about 18 September 2015; and

(i)  SGKFM, referred to in paragraph 19(b) herein, which was incorporated in Singapore on or about 31 March 2016.

28.  GKI and SKI were incorporated in around 2006. According to marketing material issued by the Khan Entities (the "**Khan Marketing Material**") sometime in or after February 2017, the 1st Defendant used GKI and SKI to "*independently manage overseas funds*". In the Khan Marketing Material, the 1st Defendant held himself out as a specialist in investments in the biomedical industry, and aggressively promoted himself as a fund manager investing in companies with "*upright, honest, trustworthy people who have a passion for life*".

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 71 of 331

29.  In around July 2008, the 1st Defendant incorporated CQKIM, which was used as a vehicle to:

(a)  raise investment monies through issuing funds in China ("**Khan-Issued Funds**");

(b)  carry out investment management of Khan-Issued Funds; and

(c)  carry out investment management of venture capital and funds issued by third parties including trust companies and investment banks ("**Third Party Funds**").

30.  In around 2009, the 2nd and 3rd Defendants joined the Khan Entities. During the material time:

(a)  the 2nd Defendant was a director in and held executive posts in various Khan Entities including Investment Director of SQKFM, Chief Investment Officer and Vice President;

(b)  the 3rd Defendant was a director in and held executive posts in various Khan Entities including Managing Director of GKI and General Manager of SQKFM; and

(c)  the 2nd and 3rd Defendants were key members of the management in various the Khan Entities alongside the 1st Defendant, and part of the 1st Defendant's inner circle.

## II.   EVENTS LEADING TO THE JOINT VENTURE

31.  By an Announcement No. 2013-010 titled "*Announcement of the Resolutions of the 8th Meeting of the 2nd Board of Directors*" dated 17 April 2013, Nations announced

that it was considering possible avenues for investment of its "*spare monies*" by way of purchasing "*wealth management products*" ("**Nations Announcement 2013-010**"). The 1st Defendant was aware of Nations Announcement 2013-010, or was otherwise aware that Nations was considering possible avenues for investment of its cash reserves by way of purchasing investment products. He thus sought to cultivate Nations to become a substantial investor in Khan-Issued Funds.

32.    In around early-2014, the 1st Defendant was introduced to and met with Mr Luo Zhaoxue ("**Mr Luo**") (the "**First Meeting**"). At the time, Mr Luo was the Chief Executive Officer of Nations.

33.    During the First Meeting, the 1st Defendant and Mr Luo discussed the prospects of making investments into the biomedical industry outside of China, and particularly in the US and Europe, through the purchase of investment products offered by Khan Entities.

34.    After the First Meeting, the 1st Defendant continued to cultivate Nations to become a substantial investor in Khan-Issued Funds, and from time to time proposed various avenues for Nations to carry out investments through the purchase of Khan-Issued Funds.

35.    On or about 1 April 2014, SQKFM was incorporated. The 1st, 2nd and 3rd Defendants held the positions of "*President and Investment Decision Committee Chairman*", "*Investment Director & Head of Quantitative Trading*" and "*General Manager and Head of Macro Research*", respectively.

36.  According to the Khan Marketing Material, the incorporation of SQKFM was to "*conduct[] private equity securities investment, equity investment, venture capital investment and other private equity fund businesses [and] to independently issue Khan-issued private equity funds*". After the incorporation of SQKFM, there was a substantial increase in the number of Khan-Issued Funds. Pending discovery, the administration of interrogatories and any further findings of the ongoing investigations, to the Plaintiff's knowledge:

(a)  A total of four Khan-Issued Funds were issued in the 69 months between July 2008 and 31 March 2014.

(b)  At least 11 Khan-Issued Funds were issued in the 16 months between 1 April 2014 and 18 September 2015.

37.  On or about 15 October 2014, KFA was incorporated in the US. Pending discovery, the administration of interrogatories and any further findings of the ongoing investigations, to the Plaintiff's knowledge, the 1st Defendant was the sole shareholder of all of KFA's shares and the Chief Executive Officer of KFA. The 1st, 2nd and 3rd Defendants are and were at all material times members of KFA's "*Executive Team*".

38.  In around November 2014, Nations agreed to make a preliminary investment of RMB 200 million into a Khan-Issued Fund known as 前海旗隆量化分级基金 (also known as the Qianhai Khan Quantitative Diversified Fund, the "**Khan QD Fund**"). SQKFM was the fund management company of the Khan QD Fund. The 2nd Defendant managed SQKFM's quantitative funds and was "*responsible for the realisation and implementation of SQKFM's quantitative investment strategy*".

39.     After Nations' investment into the Khan QD Fund, the 1st Defendant continued to propose that Nations either increase its investments into Khan-Issued Funds, or make other investments through the Khan Entities into potential investment targets.

40.     In around July or August 2015, Nations provisionally agreed to a proposal made by the 1st Defendant for Nations to invest further monies into a joint venture with 1st Defendant and one or more of the Khan Entities to invest in the biomedical industry, which the 1st Defendant had purportedly identified as a viable investment target. This was the Joint Venture, which was referred to in paragraph 4 herein.

41.     The Joint Venture was to be carried out through the formation of a limited partnership between Nations Investment (which was a wholly-owned subsidiary of Nations) and Beijing Khan, with the 1st, 2nd and 3rd Defendants acting as fund managers. This limited partnership was Shenzhen Guotai.

### III.    THE DIVERSION

42.     Paragraph 17 herein is repeated.

43.     On or about 6 November 2015, the Board of Directors of Nations resolved to invest RMB 300 million in the Joint Venture through Nations Investment.

44.     On or about 9 November 2015, the 1st, 2nd and/or 3rd Defendants incorporated the Plaintiff, or procured that the Plaintiff be incorporated, as a wholly-owned subsidiary of Shenzhen Guotai. At all material times, the Plaintiff's capital was USD 35 million divided into 35 million equal shares. Paragraphs 10 and 13 herein are repeated.

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
NYSCEF DOC. NO. 5
INDEX NO. 152210/2024
RECEIVED NYSCEF: 03/12/2024
Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 75 of 331

16

45. In the course of negotiating the terms of the agreement to formalise the Joint Venture, Nations proposed that a custodian bank be appointed to take custody of the monies and assets invested by Nations Investment pursuant to the Joint Venture. Nations proposed this arrangement as a safeguard against the risk of misappropriation of investment monies.

46. To facilitate the Diversion, the 1st Defendant resisted Nations' request for a custodian bank, and counter-proposed that SQKFM provide to Nations Investment a guarantee for the principal investment of RMB 300 million with a return on investment of 5% per annum which he represented would provide the same level of security.

47. Accordingly:

    (a) By the Partnership Agreement dated 23 November 2015: (i) Nations Investment agreed to, *inter alia*, invest RMB 300 million into Shenzhen Guotai; and (ii) Beijing Khan agreed to, *inter alia*, invest RMB 500,000 into Shenzhen Guotai and to honestly and diligently maximise returns on the investment monies through equity, debenture and other investments. The Partnership Agreement conferred upon Beijing Khan, which was controlled by the 1st, 2nd and 3rd Defendants, the exclusive power to manage the operations of Shenzhen Guotai and to make all investment decisions without interference from Nations Investment.

    (b) By a Supplemental Partnership Agreement Regarding Shenzhen Guotaiqixing Industry Investment Fund Co., Ltd. (Limited Partnership) dated 25 November 2015 between Nations Investment and SQKFM, SQKFM provided a guarantee to Nations Investment for the investment of RMB 300 million with a return on investment of 5% per annum.

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 76 of 331

(c)   In pursuance of the Partnership Agreement, on or about 30 November 2015, Nations Investment paid the sum of RMB 300 million to Shenzhen Guotai (the "**RMB 300 Million Investment**").

(d)   On or about 23 December 2015, the 1st, 2nd and/or 3rd Defendants caused Shenzhen Guotai to transfer a substantial part of the RMB 300 Million Investment to the Plaintiff for subscription of the Plaintiff's shares. The sum of USD 34,639,399.87 was received by the Plaintiff in its USD-denominated account held with DBS in Singapore (the "**Plaintiff's DBS Account (USD)**"). As with the RMB 300 Million Investment, the USD 34,639,399.87 was transferred to the Plaintiff to be invested into equity, debenture and other investments.

(e)   On or about 9 November 2015, Mr Luo was appointed as a director of the Plaintiff. Notwithstanding his directorship, Mr Luo was not involved in the operations of the Plaintiff and the 1st, 2nd and/or 3rd Defendants concealed the Diversion from him. The 1st, 2nd and/or 3rd Defendants forged Mr Luo's signature on at least one document in the course of concealing and concealing the nature of the Diversion, which is further particularised in paragraph 51 herein.

48.   The 1st, 2nd and 3rd Defendants used the Khan Entities, including KFA, KFG, KOM and SGKFM, as conduits for funds transfers which ultimately benefited themselves.

**PARTICULARS**

Pending discovery, the administration of interrogatories and any further findings of the ongoing investigations, these are the best particulars that the Plaintiff is able to provide based on the information uncovered from the investigations:

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM INDEX NO. 152210/2024
NYSCEF DOC. NO. 5    Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 77 of 331   RECEIVED NYSCEF: 03/12/2024

18

(1)  The transfers made pursuant to the Diversion were without genuine commercial basis and not at arm's length.

(2)  Paragraphs 11, 14, 16 and 30 herein are repeated.

(3)  Paragraph 37 herein is repeated. Four "*Research Consultancy Contract[s]*" between KFA and SQKFM, dated 15 November 2014, 14 January 2015, 3 June 2015 and 1 July 2015, which provided for substantial "*consultancy fee[s]*" of between USD 30,001 and USD 31,106 per month to be paid by SQKFM to KFA for a tenure of 6 months or 1 year (the "**Research Consultancy Contracts**"), were manufactured to provide justification for remittances to KFA. The 1st, 2nd and 3rd Defendants were employees of both KFA and SQKFM and there was no commercial basis for such "*consultancy fee[s]*", the tenure of the various Research Consultancy Contracts overlapped with each other, and the Plaintiff has not found any evidence that any services were provided under the Research Consultancy Contracts.

(4)  On 24 April 2017, a former employee of KFA, Mr Robert Polite ("**Mr Polite**") filed a Federal discrimination and whistleblower lawsuit against KFA in the District Court of the Southern District of New York. According to paragraph 12 of the Complaint filed by Mr Polite in that lawsuit, the 1st Defendant "*was pilfering company funds for his personal benefit - such as purchasing furniture and paying rent for an apartment*".

(5)  At the time of the incorporation of KFG and KOM, the 1st Defendant was the sole shareholder of all of the shares of KFG, and KFG was in turn the sole shareholder of all of the shares of KOM. The 1st, 2nd and 3rd Defendants were each directors of KFG and KOM.

(6)  On or about 18 December 2017, the 1st Defendant remitted USD 3 million to KFG from his personal JPMorgan Chase Bank, N.A. bank account, which was held with his ex-wife Liu Xiayu.

(7)     Between about 21 and 26 December 2017, five transfers of USD 900,000 each (*i.e.* an aggregate of USD 4.5 million) was transferred from SGKFM to Wang Guoli, who is the 1st Defendant's mother.

(8)     On or about 26 December 2017, the sum of USD 400,000 was transferred from KFG to Wang Jing, who is the 1st Defendant's sister.

(9)     On or about 26 December 2017, the 1st Defendant remitted to KFG USD 3.5 million from his personal JPMorgan Chase Bank, N.A. bank account, which was held with his ex-wife Liu Xiayu.

49.     The 1st, 2nd and 3rd Defendants effected the Diversion through multiple withdrawals made from time to time between 29 December 2015 and 6 April 2017 from the Plaintiff's DBS Account (USD). These sums were transferred to the 2nd Defendant, or to KFA, KFG or KOM as conduits for the Diversion. These entities were owned by the 1st Defendant and controlled by the 1st, 2nd and 3rd Defendants. The substantial withdrawals made from and deposits made into the Plaintiff's DBS Account (USD) were as follows:

**PARTICULARS OF DIVERSION**

| Date of Withdrawal / Deposit | Recipient of Transfer | Sum Transferred out of / Returned to the Plaintiff (USD) | Bank Charges Incurred (USD) | Purported Reason for Transfer and Reference |
|---|---|---|---|---|
| 29 December 2015 Withdrawal | KOM | 33,600,000.00 | - | According to the 2016 Management Accounts: "*The Company had funded 3300 shares at the values of US$33 million in KHAN FUNDS ORIENTAL MEDICINE FUND on 29th Dec 2015 as 2% is the subscribe fee.*" |

| Date of Withdrawal / Deposit | Recipient of Transfer | Sum Transferred out of / Returned to the Plaintiff (USD) | Bank Charges Incurred (USD) | Purported Reason for Transfer and Reference |
|---|---|---|---|---|
| 6 January 2016 Withdrawal | KFA | 310,000.00 | 179.24 | Characterised as a "*loan [at] 3 years loan tenure and 3% per interest annum*" in the 2016 Management Accounts and in an Excel spreadsheet recovered in the ongoing investigations |
| 30 August 2016 Withdrawal | KFA | 250,000.00 | 203.53 | Characterised as a "*loan [at] 3 years loan tenure and 3% per interest annum*" in the 2016 Management Accounts and in an Excel spreadsheet recovered in the ongoing investigations |
| 18 November 2016 Deposit | KOM | (10,000,000.00) | - | Characterised as a "*REDEMPTION OF 1,381.3223. SHARES*" in the relevant Transaction Advice and also a "*redemption [of] 1382 shares at the value of US$10 million so company loss US$3.82 million in investment [sic]*" in the 2016 Management Accounts |
| 18 November 2016 Withdrawal | KFG | 500,000.00 | - | Characterised as a "*loan [at] 3 years loan tenure and 3% per interest annum*" in the 2016 Management Accounts and in an Excel spreadsheet recovered in the ongoing investigations |
| 18 November 2016 Withdrawal | KFG | 500,000.00 | - | Characterised as a "*loan [at] 3 years loan tenure and 3% per interest annum*" in the 2016 Management Accounts and in an Excel spreadsheet |

| Date of Withdrawal / Deposit | Recipient of Transfer | Sum Transferred out of / Returned to the Plaintiff (USD) | Bank Charges Incurred (USD) | Purported Reason for Transfer and Reference |
|---|---|---|---|---|
| | | | | recovered in the ongoing investigations |
| 1 December 2016 Withdrawal | KFG | 500,000.00 | - | Characterised as a "*loan [at] 3 years loan tenure and 3% per interest annum*" in the 2016 Management Accounts and in an Excel spreadsheet recovered in the ongoing investigations |
| 1 December 2016 Withdrawal | KFG | 500,000.00 | - | Characterised as a "*loan [at] 3 years loan tenure and 3% per interest annum*" in the 2016 Management Accounts and in an Excel spreadsheet recovered in the ongoing investigations |
| 5 December 2016 Withdrawal | KFA | 550,025.00 | 195.18 | Characterised as a "*CONSULTANCY FEE*" with no further details in the relevant Transaction Advice and also a "*loan [at] 3 years loan tenure and 3% per interest annum*" in the 2016 Management Accounts and in an Excel spreadsheet recovered in the ongoing investigations |
| 27 December 2016 Withdrawal | KFA | 500,000.00 | 192.14 | Characterised as a "*loan [at] 3 years loan tenure and 3% per interest annum*" in the 2016 Management Accounts and in an Excel spreadsheet recovered in the ongoing investigations |
| 28 December 2016 Withdrawal | KFG | 6,000,000.00 | - | Characterised as a "*loan [at] 3 years loan tenure and 3% per*" |

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM INDEX NO. 152210/2024
NYSCEF DOC. NO. 5  Case 1:24-cv-03142-UA  Document 1-1  Filed 04/24/24  Page 81 of 331  RECEIVED NYSCEF: 03/12/2024

22

| Date of Withdrawal / Deposit | Recipient of Transfer | Sum Transferred out of / Returned to the Plaintiff (USD) | Bank Charges Incurred (USD) | Purported Reason for Transfer and Reference |
|---|---|---|---|---|
| | | | | *interest annum*" in the 2016 Management Accounts and in an Excel spreadsheet recovered in the ongoing investigations |
| 4 January 2017 Withdrawal | KFA | 400,000.00 | 192.48 | Characterised as a "*CONSULTANCY FEE*" with no further details in the relevant Transaction Advice |
| 22 February 2017 Withdrawal | 2nd Defendant | 353,356.89 | | Characterised as "*BONUS*" |
| 9 March 2017 Withdrawal | KFA | 200,000.00 | 195.75 | No stated reasons provided |
| 21 March 2017 Withdrawal | KFG | 100,000.00 | | No stated reasons provided |
| 6 April 2017 Deposit | KOM | (1,000,000.00) | - | No stated reasons provided |
| 6 April 2017 Withdrawal | KFA | 500,000.00 | 197.89 | No stated reasons provided |
| 6 April 2017 Withdrawal | KFA | 500,000.00 | 197.89 | No stated reasons provided |
| | **Sub-Totals:** | 34,263,381.89 | 1,554.10 | |
| | **Net Sum Misappropriated:** | 34,264,935.99 | | |

50. In truth, the transfers were not "*loans*", "*consultancy fee[s]*" or "*BONUS*" as falsely recorded in the Plaintiffs' records (see paragraphs 51(4) to 51(6) herein). By April 2017, the funds in the Plaintiff's DBS Account (USD) had been almost entirely depleted and only a balance of USD 5,793.53 remained as of 30 April 2017. After misappropriating these sums, the 1st, 2nd and 3rd Defendants absconded from China in late 2017. Thereafter, the 1st and 2nd Defendants also ceased to carry out duties or functions owed to the Plaintiff, and did not return to the Plaintiff's Office Premises.

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 82 of 331

23

51.   The 1st, 2nd and 3rd Defendant took steps to conceal the nature and existence of the Diversion and gave the false impression that the monies transferred out of the Plaintiff to the 2nd Defendant was for "*BONUS*", and that the monies transferred to KFA, KFG and KOM were being used in relation to genuine investments.

**PARTICULARS**

Pending discovery, the administration of interrogatories and any further findings of the ongoing investigations, these are the best particulars the Plaintiff is able to provide:

(1)   In or around end-2015, the 1st, 2nd and/or 3rd Defendants created or caused to be created various documents which were designed to create the false impression that the Plaintiff had serious plans to be involved in research and development, technology and innovation in "*gene chip and peptide synthesis*" in Singapore. These documents included:

(a)   A report assessing the viability of having the Plaintiff carry out these tasks, and setting out a breakdown of the Plaintiff's purported costs in

(b)   doing so. This report did not and was never intended by the 1st, 2nd and/or 3rd Defendants to reflect their true intentions for using the USD 35 million that was injected into the Plaintiff. Paragraphs 17, 42 and 50 herein are repeated.

(c)   Unsigned memoranda of understanding, letters of intent or agreements with fictitious research organisations such as the "Biopolis Bio-Medical Science Institute" and the "Singapore General Hospital Pathology Laboratory".

(2)   The 1st, 2nd and/or 3rd Defendants falsely recorded or caused that it be falsely recorded in the Plaintiff's records that the transfer of USD 33,600,000 to KOM

on or around 29 December 2015 was for the subscription of 3,300 "*shares*" in KOM. There was no genuine agreement for the Plaintiff to subscribe to KOM's shares, and no such agreement or share certificates have been uncovered in the Plaintiff's records in the course of the ongoing investigations.

(a)   Tthere was no commercial basis for the purported subscription of shares. KOM was incorporated shortly before the purported subscription on or about 18 September 2015 with a paid-up capital of USD 1.

(b)   According to an Investment Management Agreement dated 23 December 2015 signed by the 2nd Defendant on behalf of KOM and KFG ("**IMA**"), KFG was purportedly appointed as the "*Investment Manager*" of KOM. The date of the IMA was the same day on which USD 33,600,000 was transferred from the Plaintiff to KOM pursuant to the Diversion (paragraph 49 herein is repeated). Pursuant to clause 7.2, KFG would receive a monthly "*Management Fee*" that was "*equal to 1/12 x 2.5% of the Net Asset Value of [KOM form that month].*" Further, KFG would be remunerated regardless of its performance – the IMA provided for a separate "*Performance Fee*" under clause 7.3. For instance, according to the information uncovered from the ongoing investigations, for April 2016, KFG received a Management Fee of USD 78,784.74 and a Performance Fee of just USD 636.70. There is no apparent commercial justification for the Management Fee when KOM and KFG were both ultimately owned and controlled by the 1st Defendant. Paragraphs 17, 42 and 50 herein are repeated.

(3)   The 1st, 2nd and/or 3rd Defendants created or caused to be created a document titled "Authorized Person" dated 29 December 2015 which purported to confer upon the 2nd Defendant the power to sign "*subscription form related documents*" on the Plaintiff's behalf. This served to create the false impression

that one or more of the transfers made pursuant to the Diversion was or were for the purpose of share subscriptions. The aforesaid document was signed by the 1st Defendant and contained a forgery of Mr Luo's signature.

(4) The 1st, 2nd and/or 3rd Defendants falsely recorded or caused that it be falsely recorded in the Plaintiff's records that transfers of monies out of the Plaintiff were "*loan[s]*" to KFA (for an aggregate sum of as much as USD 1,610,025) and KFG (for an aggregate sum of as much as USD 8,000,000) or "*consultancy fee[s]*" paid to KFA (for an aggregate sum of as much as USD950,025). There were no genuine loan agreements or consultancy agreements between the Plaintiff and KFA or KFG, and no such agreements have been uncovered in the Plaintiff's records pursuant to the ongoing investigations.

(5) With regards to the purported "*loan[s]*" to KFA and KFG, according to the Plaintiff's management accounts for the financial year ended 31 December 2016 (the "**2016 Management Accounts**"), those loans had a "*3 years loan tenure and 3% interest per annum*". However, notwithstanding that the tenures for the purported loans have all expired, none of those purported loans have been repaid to-date and no interest has been paid to the Plaintiff thereon. Further, it appears from representations made by KFA itself that there was no commercial basis for KFA to be taking such a substantial loan (for an aggregate sum as much as USD 8,000,000 in aggregate): (i) in a letter from KFA dated 1 May 2016 that purported to authorise "*China Merchants Bank, New York Branch to search for pharmaceutical projects*", which was signed by the 1st Defendant, KFA represented that it had "*$2 billion assets under management*"; and (ii) according to the Khan Funds website, in 2015, KFA had "*signed a 15-year lease agreement with One World Trade Center*".

(6) The 1st, 2nd and/or 3rd Defendants falsely recorded or caused that it be falsely recorded in the Plaintiff's records that the transfer of USD 353,356.89 (approximately SGD 487,632.51 at an exchange rate off USD 1 to SGD 1.38) to the 2nd Defendant on 22 February 2017 was a "*BONUS*" payment. According to clause 5.1 of the 2nd Defendant's Employment Contract dated 8 February 2017, the 2nd Defendant's basic monthly salary was SGD 8,500 and was to be increased to SGD 12,000 after "*completing six months of employment*". According to clause 5.4 of the 2nd Defendant's Employment Contract, the Plaintiff also had the "*absolute discretion [to] pay the [2nd Defendant] a bonus in accordance with the bonus schemes or policies from time to time prevailing in the [Plaintiff]*". According to clause 4.3 of the Plaintiff's Employee Handbook: "*Employees who have completed one year's service as at 31st December may be paid an annual bonus each year. The quantum shall be at the absolute discretion of the Management and be based on the employee's last drawn basic salary as at 31st December of that year.*" The aforementioned transfer would have been equivalent to between 40.6 months (assuming a basic salary of SGD 12,000) and 57.4 months (assuming a basic salary of SGD 8,500) of bonus paid to the 2nd Defendant. Considering that there were no genuine investments being made by the Plaintiff, and in any event that the 2016 Management Accounts showed that the Plaintiff had incurred an operating loss of SGD 6,574,262.96 for the financial year ending 31 December 2016, it was unjustifiable for the 2nd Defendant to have been paid a bonus, much less a bonus of 40.6 to 57.4 months, and it is evident that the characterisation of the aforesaid payment as a "*BONUS*" was false and to justify or conceal the unjustified diversion of monies to benefit the 2nd Defendant. In any event, there were no board resolutions, payslips or other documents justifying or approving a "*BONUS*" payment to the 2nd Defendant,

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 86 of 331

27

and no such documents have been uncovered in the Plaintiff's records pursuant to the ongoing investigations.

(7) The 1st, 2nd and/or 3rd Defendants purported to commence negotiations with various purported investment targets in the biomedical industry in the US, which they alleged had to be prolonged due to complications relating to foreign exchange controls in China, changes to China's regulations on outbound investment monies, the global economic downturn and issues with corporate governance in the investment targets. No evidence of such negotiations have been uncovered in the Plaintiff's records pursuant to the ongoing investigations.

(8) In the Letter to MOM that was drafted by, drafted under the supervision of, and/or reviewed and approved by, the 2nd Defendant and dated 29 January 2016, the 2nd Defendant caused the Plaintiff to falsely state that: "*Our [GTQX's] vision is to be the leading investor in biomedical science industry and intend to invest to shape the future-industries of Singapore in the demanding sectors of biomedical science. We encourage the development, expansion and revolution of successful industries to enhance economic progress and generate employment opportunities in Singapore.*" Paragraphs 17, 42, 50 and 51(1) herein are repeated.

(9) On or about 18 November 2016, the 1st, 2nd and/or 3rd Defendants caused KOM to transfer the sum of USD 10 million to the Plaintiff. This was falsely recorded in the 2016 Management Accounts to be for the "*redemption*" of 1,832 shares of KOM. There was no genuine subscription or redemption of shares of KOM by the Plaintiff, and no agreements for the subscription or redemption of shares of KOM by the Plaintiff have been uncovered in the Plaintiff's records pursuant to the ongoing investigations. Paragraphs 51(2) and 51(3) herein are repeated.

(10)  In any event, even if the monies were in fact the proceeds from "*redemption*" of a fund that the Plaintiff had invested in through KOM, there was no commercial basis for such a "*redemption*" and no documents evincing any possible commercial basis have been uncovered in the Plaintiff's records pursuant to the ongoing investigations. According to the Plaintiff's 2016 Management Accounts, the "*redemption*" (less than one year after the purported subscription) resulted in a loss of "*USD 3.82 million*" to the Plaintiff, which contributed to an overall "*Loss in investment loss*" of SGD 5,211,740 and an operating loss of SGD 6,574,262.96 for the financial year ending 31 December 2016. Further and in any event, substantially all of the proceeds of the purported "*redemption*" were transferred on the very same day (*i.e.*18 November 2016) from the Plaintiff to KFG and KFA for the purported "*loans*" referred to in paragraph 51(4) herein. Paragraph 49 herein is repeated.

(11)  The 1st, 2nd and/or 3rd Defendants systematically effected the Diversion through numerous deposits into and withdrawals from the Plaintiff's DBS Account (USD) over more than 27 months between 29 December 2015 and 6 April 2017. Paragraph 49 herein is repeated. By April 2017, the funds in the Plaintiff's DBS Account (USD) had been almost entirely depleted and only a balance of USD 5,793.53 remained as of 30 April 2017. Paragraph 50 herein is repeated.

(12)  On or about 12 December 2016, the 1st, 2nd and/or 3rd Defendants caused Shenzhen Guotai to resolve to distribute a "*bonus dividend*" of RMB 50 million to Nations Investment. Some part of the monies were in fact paid out of the RMB 200 Million Investment made by Nations Investment, and not genuine returns on genuine investment carried out by Beijing Khan through Shenzhen Guotai and, by extension, the Plaintiff.

## IV.    FURTHER INVESTMENT INTO SHENZHEN GUOTAI

52.    On or around 29 February 2016, the Board of Directors of Nations resolved to invest a further RMB 200 million into Shenzhen Guotai through Nations Investment.

53.    Accordingly:

(a)    By a Further Investment Agreement dated 25 March 2016, Nations Investment agreed to, *inter alia*, invest a further RMB 200 million into Shenzhen Guotai on substantially similar terms as under the Partnership Agreement.

(b)    By a Supplemental Partnership Agreement Regarding Shenzhen Guotaiqixing Industry Investment Fund Co., Ltd. (Limited Partnership) dated 25 March 2016 between Nations Investment and SQKFM, SQKFM provided a guarantee to Nations Investment for the further investment of RMB 200 million with a return on investment of 5% per annum.

(c)    In pursuance of the Further Investment Agreement, on or about 4 July 2016, Nations Investment paid the sum of RMB 200 million to Shenzhen Guotai (the "**RMB 200 Million Investment**").

## V.    EVENTS LEADING TO THE 1ST, 2ND AND 3RD DEFENDANTS ABSCONDING IN NOVEMBER 2017

54.    Beginning in late 2016, evidence of the 1st, 2nd and 3rd Defendants' misconduct began to come to light.

55.    In around December 2016, Shenzhen Huilong Certified Public Accountants (General Partnership) ("**Huilong CPA**") carried out a routine audit of Shenzhen Guotai for the

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024
NYSCEF DOC. NO. 5
Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 89 of 331
RECEIVED NYSCEF: 03/12/2024

30

period 1 January 2016 to 30 November 2016. Following the audit, Huilong CPA issued an Audit Report dated 21 December 2016, which bore the stamp of the 2nd Defendant as the legal representative of Shenzhen Guotai (the "**Audit Report**").

56.     The audit revealed that;

(a)     apart from its subscription to the Plaintiff's shares, Shenzhen Guotai had only invested RMB 120 million into derivatives trading through 中国国际期货有限公司 (also known as China International Futures Co., Ltd.);

(b)     SQKFM owed RMB 196,344,553.50 to Shenzhen Guotai; and

(c)     Shenzhen Guotai owed RMB 82,370,561.25 to SQKFM.

57.     By an email dated 12 January 2017, Nations received a copy of the Audit Report from SQKFM. Thereafter, Nations sought clarification from the 1st, 2nd and/or 3rd Defendants as to:

(a)     whether and which investments into the CROs in the US and EU that was the basis of the original proposal for investment had been made by the 1st Defendant; and

(b)     the nature of the monies owed by SQKFM to Shenzhen Guotai and *vice versa*.

58.     Nations did not receive any satisfactory clarification to its queries. Accordingly, in around mid-2017, Nations proposed that there be a change to the structure of its investment in Shenzhen Guotai to ensure better governance of its investment. In order to stall any action by Nations, the 1st Defendant purported to agree to Nations'

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 90 of 331

31

proposal, and represented that he would return to China in end-2017 to discuss further details of the proposal with Nations.

59.     Paragraph 48(4) herein is repeated. In the Complaint dated 24 April 2017, which was and is a publicly accessible document, Mr Polite asserted that the 1st Defendant had been using KFA's funds for his own personal use, such as paying rent and purchasing furniture, that contracts with foreign entities (*i.e.* outside of the US) were repeatedly breached by shortfalls in payments which KFA ignored, and that it appeared that KFA was being used for money laundering.

60.     As the evidence of their misconduct began to come to light, the 1st, 2nd and/or 3rd Defendants took steps to abscond from China and to reside in a jurisdiction outside of China.

**PARTICULARS**

(1)     On or about 21 November 2016, the 1st Defendant incorporated Daibenewise Limited in the Cayman Islands ("**Daibenewise**"). At all material times, the 1st Defendant was the sole shareholder and controller of Daibenewise. On or about, the 1st Defendant used Daibenewise as a vehicle to purchase the property at 249 Cleft Rd, Mill Neck, New York 11765-1003 (Nassau County) in the US. This is the property at which the 1st Defendant now resides. The 1st Defendant used Daibenewise to purchase the property in order to conceal his ownership of the property.

(2)     Beginning from around early-2017, the 1st, 2nd and/or 3rd Defendants carried out or caused to be carried out investigations into visa and immigration

requirements for, and regulations surrounding the setting up of family trusts in, diverse territories including the US, Korea and New Zealand.

(a)  In around January 2017, the 2nd Defendant instructed an employee of the Plaintiff to carry out research on Korean citizenship requirements.

(b)  In around February 2017, a law firm in New York, Wildes & Weinberg, P.C., was engaged by the 1st, 2nd and/or 3rd Defendants to provide advice on how to obtain a visa for residence in the US, and to make one or more applications for the same.

(c)  In around May 2017, the 2nd Defendant instructed an employee of the Plaintiff to carry out research on immigration to the US.

(d)  In around July 2017, the 1st, 2nd and/or 3rd Defendants inquired with a law firm in New York, Kleinberg, Kaplan, Wolff & Cohen, P.C., as to setting up a domestic hedge fund in the US in order to obtain a visa for residence in the US.

(e)  In around September 2017, the 2nd Defendant instructed an employee of the Plaintiff to carry out research on how to set up an irrevocable family trust in the US, and to source for lawyers who would be able to carry out such work.

(f)  Notes on obtaining permanent residence in New Zealand were also found in an undated document recovered in the course of the ongoing investigations, from a computer seized from the Plaintiff's office that was used by the 2nd Defendant.

61.  In around July 2017, the 1st Defendant was issued with an EB-1 visa permitting him to reside in the US.

62. From around 3 to 16 November 2017, Nations wrote to the 2nd Defendant to request an update on the payment of investment returns for the year ending 2017. The 2nd Defendant falsely represented to Nations that Shenzhen Guotai was calculating the amount of investment returns to be paid.

63. On around 11 November 2017, the 1st Defendant announced that he would be shutting down a Wechat group which he used to communicate with investors and potential investors. Subsequently, the 1st Defendant became *in communicado* and could not be reached by Wechat or otherwise.

64. After around 16 November 2017, the 2nd and 3rd Defendants also became *in communicado* and could not be reached by Wechat or otherwise.

65. In around end-November 2017, Nations discovered that the Khan Entities including SQKFM and Shenzhen Guotai had vacated their offices in Shenzhen in early-November 2017.

66. The 1st and 2nd Defendants thereafter also ceased to carry out duties or functions owed to the Plaintiff, and did not return to the Plaintiff's Office Premises after around November 2017.

**D.   SGKFM'S OCCUPATION OF THE PLAINTIFF'S PREMISES**

67. Paragraph 27(i) herein is repeated. At all material times:

   (a)   the 1st, 2nd and 3rd Defendants were and are directors of SGKFM;

   (b)   SGKFM's registered address was the Plaintiff's Office Premises; and

(c)   the 1st and 2nd Defendants transacted business for SGKFM from the Plaintiff's Office Premises.

68.   The 1st and 2nd Defendants did not require, and the 1st, 2nd and 3rd Defendants did not procure, that SGKFM pay the Plaintiff or any other person for the use of the Plaintiff's Office Premises. At all material times, the rental and service charges for the Plaintiff's Office Premises were entirely paid by the Plaintiff.

69.   The aggregate amount of rental and service charges paid by the Plaintiff for the period from 31 March 2016 to 30 November 2017 was SGD 290,153.97.

**PARTICULARS**

| Year | Month | Amount paid by the Plaintiff (SGD) |
|------|-------|-----------------------------------|
| **2016** | March (only 30th and 31st) | 932.97 (pro-rated) |
| | April | 14,461.05 |
| | May | 14,461.05 |
| | June | 14,461.05 |
| | July | 14,461.05 |
| | August | 14,461.05 |
| | September | 14,461.05 |
| | October | 14,461.05 |
| | November | 14,461.05 |
| | December | 14,461.05 |
| **2017** | January | 14,461.05 |
| | February | 14,461.05 |
| | March | 14,461.05 |
| | April | 14,461.05 |
| | May | 14,461.05 |

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 94 of 331

35

| Year | Month | Amount paid by the Plaintiff (SGD) |
|---|---|---|
| | June | 14,461.05 |
| | July | 14,461.05 |
| | August | 14,461.05 |
| | September | 14,461.05 |
| | October | 14,461.05 |
| | November | 14,461.05 |

## E.   THE PLAINTIFF'S CLAIMS AGAINST THE 1ST DEFENDANT: BREACHES OF DUTIES

70.   By reason of the matters set out in paragraphs 27 to 66 herein (*i.e.* the Diversion), the 1st Defendant was in breach of his fiduciary duties (including statutory duties under section 157 of the Companies Act) to the Plaintiff. As a result, the Plaintiff has suffered loss and damage for which the 1st Defendant is liable.

### PARTICULARS

(1)   The net amount of loss suffered by the Plaintiff in this respect is USD 34,264,935.99. Paragraph 49 herein is repeated.

70A. The 1st Defendant is liable, as a constructive trustee, to account to the Plaintiff for the sum of USD 34,264,935.99 received in the bank accounts set out above, on the ground of his breach of fiduciary duties as set out above.

70B. Further and/or alternatively, the Plaintiff is entitled to trace the sum of USD 34,264,935.99 received in the bank accounts set out above into any traceable

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 95 of 331

36

product and claims a beneficial interest in, alternatively an equitable lien over, that traceable product, which the 1st Defendant holds on trust for the Plaintiff.

71. By reason of the matters set out in paragraphs 67 to 69 herein (*i.e.* SGKFM's occupation of the Plaintiff's premises), the 1st Defendant was in breach of his fiduciary duties (including statutory duties under section 157 of the Companies Act) to the Plaintiff. As a result, the Plaintiff has suffered loss and damage for which the 1st Defendant is liable.

### PARTICULARS

(1) The rental and service charges paid by the Plaintiff for the period from 31 March 2016 to 30 November 2017 that SGKFM should have paid for the use of the Plaintiff's Office Premises, amounting to SGD 290,153.97. Paragraph 68 herein is repeated.

## F. THE PLAINTIFF'S CLAIMS AGAINST THE 2ND DEFENDANT: BREACHES OF DUTIES

72. By reason of the matters set out in paragraphs 27 to 66 herein (*i.e.* the Diversion), the 2nd Defendant was in breach of her contractual duties and/or fiduciary duties (including statutory duties under section 157(2) of the Companies Act) to the Plaintiff. As a result, the Plaintiff has suffered loss and damage for which the 2nd Defendant is liable.

**PARTICULARS**

(1)    The net amount of loss suffered by the Plaintiff in this respect is USD 34,264,935.99. Paragraph 49 herein is repeated.

73.    By reason of the matters set out in paragraphs 67 to 69 herein (*i.e.* SGKFM's occupation of the Plaintiff's premises), the 2nd Defendant was in breach of her contractual duties and/or fiduciary duties (including statutory duties under section 157(2) of the Companies Act) to the Plaintiff. As a result, the Plaintiff has suffered loss and damage for which the 2nd Defendant is liable.

**PARTICULARS**

(1)    The rental and service charges paid by the Plaintiff for the period from 31 March 2016 to 30 November 2017 that SGKFM should have paid for the use of the Plaintiff's Office Premises, amounting to SGD 290,153.97. Paragraph 68 herein is repeated.

G.    **THE PLAINTIFF'S CLAIMS AGAINST THE 2ND AND 3RD DEFENDANTS: DISHONEST ASSISTANCE**

74.    By reason of the matters set out in paragraphs 27 to 69 herein (*i.e.* the Diversion), the 2nd and 3rd Defendants dishonestly assisted the 1st Defendant's breaches of his fiduciary duties owed to the Plaintiff. The breaches of the 1st Defendant's fiduciary duties are set out in paragraphs 70 and 71 herein.

75.     The 2nd and 3rd Defendants had assisted in or procured the aforesaid breaches of
the 1st Defendant's fiduciary duties in that:

(a)     As persons holding executive positions in or otherwise controlling Beijing
Khan, Shenzhen Guotai, KOM, KFG and KFA, the 2nd and 3rd Defendants
assisted in, procured and/or omitted to prevent the transfers made pursuant to
the Diversion, which did not benefit but were detrimental to the Plaintiff.
Paragraphs 9 to 18, 27 to 30, 47 to 50 and 51 herein are repeated.

(b)     The 2nd and 3rd Defendants took steps to conceal the nature and existence of
the Diversion and gave the false impression that the monies transferred out of
the Plaintiff to KFA, KFG and KOM were being used in relation to genuine
investments. Paragraph 51 herein is repeated.

(c)     As persons holding executive positions or controlling the Plaintiff and SGKFM,
the 2nd and 3rd Defendants assisted in having and/or procured that SGKFM
occupy the Plaintiff's Office Premises without payment to the Plaintiff or any
other person. Paragraphs 67 to 69 herein are repeated.

76.     The 2nd and 3rd Defendants' assistance in or procurement of the aforesaid breaches
of the 1st Defendant were dishonest in that:

(a)     Paragraphs 75(a), 75(b) and 75(c) herein are repeated.

(b)     The 2nd and 3rd Defendants took steps to abscond from China and to reside in
a jurisdiction outside China as evidence of their misconduct began to come to
light. Paragraph 60 herein is repeated.

(c)     The 2nd and 3rd Defendants became *in communicado* since November 2017
and absconded from China in late 2017. Paragraphs 61 to 66 herein are
repeated.

(d) The 2nd Defendant thereafter also ceased to carry out duties or functions owed to the Plaintiff, and did not return to the Plaintiff's Office Premises after around November 2017. Paragraph 66 herein is repeated.

77. As a result, the Plaintiff has suffered loss and damage.

**PARTICULARS**

(1) The net amount of loss suffered by the Plaintiff in this respect is USD 34,264,935.99. Paragraph 49 herein is repeated.

(2) The rental and service charges paid by the Plaintiff for the period from 31 March 2016 to 30 November 2017 that SGKFM should have paid for the use of the Plaintiff's Office Premises, amounting to SGD 290,153.97. Paragraph 68 herein is repeated.

H.  **THE PLAINTIFF'S CLAIMS AGAINST THE 1ST AND 3RD DEFENDANTS: DISHONEST ASSISTANCE**

78. By reason of the matters set out in paragraphs 27 to 69 herein, the 1st and 3rd Defendants dishonestly assisted the 2nd Defendant's breaches her fiduciary duties against the Plaintiff. The breaches of the 2nd Defendant's fiduciary duties are pleaded in paragraphs 72 and 73 herein.

79. The 1st and 3rd Defendants had assisted in or procured the aforesaid breaches of the 2nd Defendant in that:

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
NYSCEF DOC. NO. 5
Case 1:24-cv-03142-UA    Document 1-1    Filed 04/24/24    Page 99 of 331
INDEX NO. 152210/2024
RECEIVED NYSCEF: 03/12/2024

40

(a)  As persons holding executive positions in or otherwise controlling the Plaintiff, Beijing Khan, Shenzhen Guotai, KOM, KFG and KFA, the 1st and 3rd Defendants assisted in, procured and/or omitted to prevent the transfers made pursuant to the Diversion, which did not benefit but were detrimental to the Plaintiff. Paragraphs 9 to 18, 27 to 30, 47 to 50 and 51 herein are repeated.

(b)  The 1st and 3rd Defendants took steps to conceal the nature and existence of the Diversion and gave the false impression that the monies transferred out of the Plaintiff to KFA, KFG and KOM were being used in relation to genuine investments. Paragraph 51 herein is repeated.

(c)  As person holding executive positions or controlling the Plaintiff and SGKFM, the 1st and 3rd Defendants assisted in having and/or procured that SGKFM occupy the Plaintiff's Office Premises without payment to the Plaintiff or any other person. Paragraphs 67 to 69 herein are repeated.

80.  The 1st and 3rd Defendants' assistance in or procurement of the aforesaid breaches of the 2nd Defendant were dishonest in that:

(a)  Paragraphs 79(a), 79(b) and 79(c) herein are repeated.

(b)  The 1st and 3rd Defendants took steps to abscond from China and to reside in a jurisdiction outside China as evidence of their misconduct began to come to light. Paragraph 60 herein is repeated.

(c)  The 1st and 3rd Defendants became *in communicado* since November 2017 and absconded from China in late 2017. Paragraphs 61 to 66 herein are repeated.

(d)  The 1st Defendant thereafter also ceased to carry out duties or functions owed to the Plaintiff, and did not return to the Plaintiff's Office Premises after around November 2017. Paragraph 66 herein is repeated.

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 100 of 331

41

81.   As a result, the Plaintiff has suffered loss and damage.

**PARTICULARS**

(1)   The net amount of loss suffered by the Plaintiff in this respect is USD 34,264,935.99. Paragraph 49 herein is repeated.

(2)   The rental and service charges paid by the Plaintiff for the period from 31 March 2016 to 30 November 2017 that SGKFM should have paid for the use of the Plaintiff's Office Premises, amounting to SGD 290,153.97. Paragraph 68 herein is repeated.

I.   **THE PLAINTIFF'S CLAIMS AGAINST THE 1ST, 2ND AND 3RD DEFENDANTS: CONSPIRACY BY LAWFUL AND UNLAWFUL MEANS**

(1)   **Lawful Means Conspiracy**

82.   The 1st, 2nd and 3rd Defendants wrongfully and with the predominant purpose of injuring the Plaintiff conspired and combined together to injure the Plaintiff by lawful means by:

(a)   effecting the Diversion pleaded in paragraph 49 herein; and/or

(b)   assisting in having and/or procuring that SGKFM occupy the Plaintiff's Office Premises without payment to the Plaintiff or any other person as pleaded in paragraphs 67 to 69 herein.

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 101 of 331

42

83.   The 1st, 2nd and 3rd Defendants intended to cause damage to the Plaintiff in that they intended that:

(a)   the monies that were transferred from Shenzhen Guotai to the Plaintiff for the subscription of the Plaintiff's shares referred to in paragraph 47(d) herein would not be used for the benefit of the Plaintiff but were to be diverted from the Plaintiff to the 2e Defendant or the various Khan Entities for their own benefit pursuant to the Diversion. Paragraphs 9 to 18, 27 to 30, 47 to 50 and 51 herein are repeated; and

(b)   the Plaintiff's Office Premises would not be used for the benefit of the Plaintiff but was to be used for the benefit of SGKFM and, by extension, the 1st, 2nd and/or 3rd Defendants' own benefit. Paragraphs 10, 16 and 30 herein are repeated.

84.   The common intention of the 1st, 2nd and 3rd Defendants may be seen from the matters pleaded in paragraphs 27 to 69 herein. In particular:

(a)   As persons holding executive positions or controlling the Plaintiff, Beijing Khan, Shenzhen Guotai, KOM, KFG and KFA, the 1st, 2nd and 3rd Defendants knew or ought to have known of the transfers made pursuant to the Diversion. Paragraphs 9 to 18, 27 to 30, 47 to 50 and 51 herein are repeated.

(b)   The 1st, 2nd and 3rd Defendants took steps to conceal the nature and existence of the Diversion and gave the false impression that the monies transferred out of the Plaintiff to KFA, KFG and KOM were being used in relation to genuine investments. Paragraph 51 herein is repeated.

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 102 of 331

43

(c) The 1st, 2nd and 3rd Defendants took steps to abscond from China and to reside in a jurisdiction outside China as evidence of their misconduct began to come to light. Paragraph 60 herein is repeated.

(d) The 1st, 2nd and 3rd Defendants became *in communicado* since November 2017 and absconded from China in late 2017. Paragraphs 61 to 66 herein are repeated.

(e) The 1st, 2nd and 3rd Defendants thereafter also ceased to carry out duties or functions owed to the Plaintiff, and did not return to the Plaintiff's Office Premises after around November 2017. Paragraph 66 herein is repeated.

(f) As persons holding executive positions in or otherwise controlling the Plaintiff and SGKFM, the 1st, 2nd and 3rd Defendants knew or ought to have known that SGKFM was occupying the Plaintiff's Office Premises without payment to the Plaintiff or any other person. Paragraphs 67 to 69 herein are repeated.

**(2)    Unlawful Means Conspiracy**

85.    Further or in the alternative to paragraph 81(1) herein, the 1st, 2nd and 3rd Defendants wrongfully and with intent to injure the Plaintiff by unlawful means conspired and combined together to injure the Plaintiff by:

(a) effecting the Diversion pleaded in paragraph 49 herein; and/or

(b) assisting in having and/or procuring that SGKFM occupy the Plaintiff's Office Premises without payment to the Plaintiff or any other person as pleaded in paragraphs 67 to 69 herein.

86.    Paragraphs 83 and 84 herein are repeated.

87.    The unlawful means referred to in paragraph 85 are:

(a)    the 1st Defendant's breaches of fiduciary duties (including statutory duties under section 157 of the Companies Act) to the Plaintiff, which are pleaded to in paragraphs 70 and 71 herein;

(b)    the 2nd and 3rd Defendants' dishonest assistance of the 1st Defendant's breaches, which is pleaded to in paragraphs 74 and 77 herein;

(c)    the 2nd Defendant's breaches of fiduciary duties (including statutory duties under section 157(2) of the Companies Act) to the Plaintiff, which are pleaded to in paragraphs 72 and 73 herein; and/or

(d)    the 1st and 3rd Defendants' dishonest assistance of the 2nd Defendant's breaches, which is pleaded to in paragraphs 78 and 81 herein.

88.    By reason of the matters set out in paragraphs 82 to 87 herein, the Plaintiff has suffered loss and damage.

**PARTICULARS**

(1)    The net amount of loss suffered by the Plaintiff in this respect is USD 34,264,935.99. Paragraph 49 herein is repeated.

(2)    The rental and service charges paid by the Plaintiff for the period from 31 March 2016 to 30 November 2017 that SGKFM should have paid for the use of the Plaintiff's Office Premises, amounting to SGD 290,153.97. Paragraph 68 herein is repeated.

## J.    RELIEFS

**AND THE PLAINTIFF CLAIMS:**

(1)    As against the 1st Defendant, for the breaches of the 1st Defendant's fiduciary duties (including statutory duties under section 157 of the Companies Act):

    (a)    pursuant to paragraphs 70, 70A and/or 70B herein,:

        (i)    a declaration that the 1st Defendant is liable to account to the Plaintiff for the sum of **USD 34,264,935.99** received in the bank accounts set out above, on the ground of his breaches of fiduciary duties;

        (ii)    an order that the 1st Defendant pay to the Plaintiff the amount of **USD 34,264,935.99**; and

        (iii)    further and/or alternatively, a declaration that the Plaintiff is entitled to trace the sum of USD 34,264,935.99 received in the bank accounts set out above into any traceable product and claims a beneficial interest in, alternatively an equitable lien over, that traceable product, which the 1st Defendant holds on trust for the Plaintiff;

    (b)    pursuant to paragraph 71 herein the amount of **SGD 290,153.97**;

    (c)    further or in the alternative to Reliefs 1(a) and 1(b) above, equitable compensation / damages to be assessed for breaches of the 1st Defendant's fiduciary duties (including statutory duties under section 157 of the Companies Act) owed to the Plaintiff.

(2)    As against the 2nd Defendant, for the breaches of the 2nd Defendant's contractual duties and/or fiduciary duties (including statutory duties under section 157(2) of the Companies Act):

    (a)    pursuant to paragraph 72 herein, the amount of **USD 34,264,935.99**;

    (b)    pursuant to paragraph 73 herein the amount of **SGD 290,153.97**; and

(c)    further or in the alternative to Reliefs 2(a) and 2(b) above, equitable compensation / damages to be assessed for breaches of the 2nd Defendant's contractual duties and/or fiduciary duties (including statutory duties under section 157(2) of the Companies Act) owed to the Plaintiff.

(3)    As against the 2nd and 3rd Defendants, for the 2nd and 3rd Defendants' dishonest assistance of the 1st Defendant's breaches of fiduciary duties (including statutory duties under section 157 of the Companies Act):

(a)    pursuant to paragraphs 74 to 77 herein, the sums of **USD 34,264,935.99** and **SGD 290,153.97** for the 2nd and 3rd Defendants' dishonest assistance of the 1st Defendant's breaches; and

(b)    further or in the alternative to Relief 3(a) above, equitable compensation / damages to be assessed for the 2nd and 3rd Defendants' dishonest assistance of the 1st Defendant's breaches.

(4)    As against the 1st and 3rd Defendants, for the 1st and 3rd Defendants' dishonest assistance of the 2nd Defendant's breaches of fiduciary duties (including statutory duties under section 157(2) of the Companies Act):

(a)    pursuant to paragraphs 78 to 81 herein, the sums of **USD 34,264,935.99** and **SGD 290,153.97** for the 1st and 3rd Defendants' dishonest assistance of the 2nd Defendant's breaches; and

(b)    further or in the alternative to Relief 4(a) above, equitable compensation / damages to be assessed for the 1st and 3rd Defendants' dishonest assistance of the 2nd Defendant's breaches.

(5)    As against the 1st, 2nd and 3rd Defendants:

(a)    pursuant to paragraphs 82 to 84 and 88 herein, in the tort of conspiracy by lawful means, the sums of **USD 34,264,935.99** and **SGD 290,153.97**;

(b)     in the alternative to Relief 5(a) above, damages to be assessed for conspiracy by lawful means to injure the Plaintiff; and

(c)     further or in the alternative to Reliefs 5(a) and 5(b) above:

     (i)     pursuant to paragraphs 85 to 88 herein, in the tort of conspiracy by unlawful means the sums of **USD 34,264,935.99** and **SGD 290,153.97**; and

     (ii)     in the alternative to Relief 5I(i) above, damages to be assessed for conspiracy by unlawful means to injure the Plaintiff.

(6)     Further to Reliefs 1 to 5 above, as against the 1st, 2nd and 3rd Defendants:

(a)     interest;

(b)     costs; and

(c)     such further or other relief as this Honourable Court deems fit.

~~Dated this 27th day of October 2020~~

Re-dated this 12th day of December 2022

**Solicitors for the Plaintiff**
**Ark Law Corporation**

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 107 of 331

# EXHIBIT 3

Date :        14 September 2020
Our ref.:     14744

# <u>Certification of Translation Accuracy</u>

To whom it may concern:

LINGUA TECHNOLOGIES INTERNATIONAL PTE LTD, an ISO 17100:2015 certified professional translation company, do hereby certify that the translation of the attached document(s) was executed by a professional translator competent to translate and review from Chinese into English in accordance with the requirements set out in the ISO 17100 standard (International Standard for Translation Services), and is to the best of our professional knowledge and belief, a true and faithful rendering of the original document(s) in Chinese.



_____
Loh Wai Wah
Corporate Development Manager
for and on behalf of LINGUA TECHNOLOGIES INTERNATIONAL PTE LTD

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 109 of 331

Shenzhen Guotaiqixing Industry Investment Fund Management Centre

(Limited Partnership)

# Partnership Agreement



Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 110 of 331

Signatories to the Agreement:


General Partner:

    Name:    Beijing Genghis Khan Pharmaceutical Holdings Co., Ltd

    Address:  0801-1, 8th Floor, Block 17, 17-A, 17-B, 17-C, 17-D, 17 Financial Street, Xicheng District, Beijing

    Legal Representative:  Huang Chao


Limited Partner (1):

    Name:    Shenzhen Qianhai Nations Investment Management Co., Ltd

    Address:  Room 201, Building A, No. 1, Qianwan 1st Road, Qianhai Shenzhen-Hong Kong Cooperation Zone, Shenzhen (with Shenzhen Qianhai Commerce Secretariat Co., Ltd.)

    Legal Representative:  Luo Zhaoxue



1.    **Definitions**

In this document, unless otherwise stated, the following terms shall have the respective definitions:

**This Agreement**: Refers to the Shenzhen Guotaiqixing Industry Investment Fund Centre (Limited Partnership) Partnership Agreement and its amendments or revised versions that have been approved through due process.

**Partnership or Limited Partnership**: Refers to the Limited Partnership established in This Agreement in accordance with the Partnership Enterprise Law.

**Cash Management**: Refers to all the cash assets of the Limited Partnership except for cash used for project investment purposes, including but not limited to investment monies, undistributed cash, and cash provisioned for expenses.

**Establishment Date**: With regards to this Agreement, the date of issuance of the Partnership's business license.

**Working Days**: Refers to days other than the statutory holidays and rest days in China.

**Related Party**: Refers to any person who has control, joint control, or significant influence over the entity, or who is controlled, jointly controlled, or significantly influenced by a person who is a related party. "Control" refers to having the right to determine the financial and operating policies of an enterprise, and being able to benefit from the business activities of the enterprise (for individuals, this refers to a relationship in which one party is accustomed to act in accordance with the instructions of another). "Joint control" refers to the shared control of an economic activity in accordance with the contract, which only exists when the important financial and operating decisions related to the economic activity require the unanimous consent of the investors who share control. "Significant influence" refers to the power to participate in the decision-making of an enterprise's financial and operating policies, but not the control or joint control of the formulation of these policies with other parties.



**Management Fee**: Refers to the payment for providing investment management services to the Partnership as a Manager, which is the remuneration that the Partnership pays to the Manager in accordance with the investment management agreement.

**Manager**: The investment manager hired by the General Partner, in accordance with this Agreement.

**Partnership Enterprise Law**: Refers to the *Partnership Enterprise Law of the People's Republic of China*, amended and adopted at the 23rd session of the Standing Committee of the 10th National People's Congress of the People's Republic of China on August 27, 2006. The amended *Partnership Enterprise Law of the People's Republic of China* was promulgated and came into force as of 1 June 2007.

**Partnership Rights**: Refers to all the rights and interest of the partners in this Partnership in accordance with this Agreement. With regards to the Limited Partner, this includes but is not limited to the subscribed capital contribution, the paid capital contribution, the financial contribution received based on the paid-in capital contribution, including the right to obtain distribution in accordance with this Agreement. With regards to the General Partner, this includes but is not limited to the subscribed capital contribution, the paid-in capital contribution, the financial contribution received based on the paid-in capital contribution, including the right to obtain distribution, and the administrative and management rights to the Partnership in accordance with this Agreement.

**Partner(s)**: Unless otherwise stated, refers to the General Partner and Limited Partner.

**Quarter**: Refers to a quarter in a calendar year.

**General Partner**: Refers to Beijing Genghis Khan Pharmaceutical Holdings Co., Ltd

**Executive Partner**: Refers to Beijing Genghis Khan Pharmaceutical Holdings Co., Ltd

**Limited Partner**: Upon acceptance and ratification of the capital contribution to the Partnership by the General Partner in accordance with this Agreement, refers to the partner who bears limited liability for the debt of the Partnership enterprise with the amount of the capital contribution, as well as partners who join by accepting the Partnership interests of the original Limited Partners of this Partnership according to this Agreement.



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024
NYSCEF DOC. NO. 6
RECEIVED NYSCEF: 03/12/2024
Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 113 of 331

81

**Person(s)**: Refers to natural persons, Partnerships, companies and other legal or economic entities.

**Subscribed Capital Contribution**: Refers to the contribution amount a Partner undertakes to pay to the Limited Partnership.

**Total Subscribed Capital**: Refers to the total amount of capital all Partners undertake to pay.

**Paid-in Capital Contribution**: Refers to the amount of capital contributions actually paid by the Partner to the Partnership, in accordance with the Agreement.

**Total Paid-in Capital**: Refers to the total amount of capital contributions actually paid by all Partners to the Partnership, in accordance with the Agreement.

**Investment Period**: Refers to the period commencing on the Establishment Date and expiring **20** years from the date. Upon expiry of the business period, said period can be extended in accordance with the management requirements of the Limited Partnership, with agreement from all Partners.

**Portfolio Company:** Refers to a company in which the Limited Partnership has invested directly or indirectly and holds its equity or other rights or interests.

**Escrow Agreement**: Refers to the agreement entered into by the Partnership, the Manager and the custodian institution determined in accordance with this Agreement, regarding the custody of the Partnership's enterprise funds (including the capital contributions paid by the partners to the Limited Partnership).

**Project Investment:** Refers to investments such as equity share investments made by the Limited Partnership.

**Partnership Expenses**: Refers to the expenses borne by the Partnership itself under this Agreement.

**Financial Terms**: Unless otherwise stated, the monetary currency is to be Renminbi (RMB).

In this Agreement, figures with the terms "above", "within" and "below" are inclusive of the figure mentioned; figures with the terms "not including", "excluding" and "higher than" are not inclusive of the figure mentioned.



Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 114 of 331

**2.    Partnership Establishment**

With the exception of the parties listed in this Agreement, newly joined partners and parties who have received a share of capital contribution are all parties to this Agreement and are bound by the terms of this Agreement, unless all partners have signed a separate partnership agreement.

2.1    Type of Partnership

All partners agree unanimously that the Partnership is a **Limited Partnership**, in accordance with the definition under the *Partnership Enterprise Law of the People's Republic of China*, comprising of a General Partner and Limited Partner. The General Partner has unlimited liability of the debt of the Partnership while the Limited Partner has limited liability of the Partnership debt, up to the amount of their investment.

2.2    Basic Details of the Partnership

2.2.1   Partnership Name: Shenzhen Guotaiqixing Industry Investment Fund Management Centre (Limited Partnership) (Working title; final name shall be in accordance with the business registration with the Department of Industry and Commerce).

2.2.2   Place of Business: Room 201, Block A, Qianhai Shenzhen-Hong Kong Cooperation Zone Management Bureau Office Building, 1 Liyumen Street, Qianwan 1st Road, Qianhai Shenzhen-Hong Kong Cooperation Zone, Shenzhen (with Shenzhen Qianhai Commerce Secretariat Co., Ltd.)

2.2.3   Business Scope: Investment management (excluding restricted projects), equity investment funds, equity investment fund management, investment and establishment in projects (specific projects to be reported separately), investment consulting (excluding restricted projects), investment consultant (excluding restricted projects).

2.2.4   Partnership period: The business period of the Partnership is **20** years. Upon expiry of the business period, the decision to extend as well as the duration of extension shall be determined through unanimous agreement from all Partners.



2.3     Partners

This Partnership shall comprise of not more than 50 Partners, with 1 General Partner, and no more than 49 Limited Partners.

2.3.1   General Partner

Name: Beijing Genghis Khan Pharmaceutical Holdings Co., Ltd

Address: 0801-1, 8th Floor, Block 17, 17-A, 17-B, 17-C, 17-D, 17 Financial Street, Xicheng District, Beijing

Document Name: Business License

Document Number: 11010102019662188

2.3.2   Limited Partner (1)

Name: Shenzhen Qianhai Nations Investment Management Co., Ltd

Address: Room 201, Building A, No. 1, Qianwan 1st Road, Qianhai Shenzhen-Hong Kong Cooperation Zone, Shenzhen (with Shenzhen Qianhai Commerce Secretariat Co., Ltd.)

Document Name: Business License

Document Number: 914403003498822023

2.4     Partnership Purpose

Share in the returns of the rapidly developing mergers and acquisitions (M&A) investment market by combining capital advantage and the advantages of professional investment and management.



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM INDEX NO. 152210/2024
NYSCEF DOC. NO. 6 Case 1:24-cv-03142-UA Document 1-1 Filed 04/24/24 Page 116 of 331 RECEIVED NYSCEF: 03/12/2024

84

2.5 Investment Purpose

The purpose of the Partnership is to invest in equity/debt and/or other investments that conform with legal regulations and this Agreement.

2.6 Basic Management Structure

2.6.1 Within the duration of the Partnership, the type of partnership cannot be changed; meetings of the Partnership will not have the right to resolve against this.

2.6.2 The General Partner and Limited Partner of this Partnership cannot be exchanged.

2.6.3 Cash Management Mechanism: With the exception of investments in projects to meet the investment target, all cash assets of the Limited Partnership (including but not limited to cash to be invested, cash to be distributed and cash reserved for expenses) shall only be managed in the form of cash, and cannot be used for other investments in fixed assets.

2.6.4 Investment Exit Mechanism: The Executive Partner and Manager shall strive to maximise the interests of the Partnership based on the principle of good faith, to arrange for the Partnership to withdraw from previously invested projects, as permitted by the law, before the expiration of the Partnership's business period. The investment exit strategies mainly involve investment project liquidation, equity transfer and equity repurchase. If the pre-determined exit strategies cannot be realised, the Executive Partner and Manager shall adopt other suitable exit strategy methods.

2.6.5 Independent Management Mechanism: The Executive Partner shall independently manage the daily operations of the Partnership, and the Limited Partners may not participate nor interfere.

2.6.6 Independent Investment Decision-Making Mechanism: The Executive Partner shall make investment decisions independently for the Partnership, and the Limited Partners may not participate nor interfere.



Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 117 of 331

### 3.    Investment

3.1    Total Investment

This Partnership aims to raise RMB **2** billion in total capital, of which:

the General Partner, Beijing Genghis Khan Pharmaceutical Holdings Co., Ltd undertakes to contribute RMB **500,000**;

and the Limited Partner (1), **Shenzhen Qianhai Nations Investment Management Co., Ltd** undertakes to contribute RMB **300 million**.

The remaining capital contribution shall be raised in instalments within **3** years through the operation and project investments of the Partnership.

3.2    Type of Investment

The capital contributions of all partners of this Partnership is in the form of currency, with the currency being Renminbi (RMB).

3.3    Subscription Agreement

The minimum subscribed capital of the Limited Partner is RMB 10 million, and may be increased in increments of RMB 1 million, but the General Partner may adjust the amount based on their independent judgement.

3.4    Payment Schedule

Upon signing this Agreement, the Partners shall pay the subscribed capital in a timely manner, within 7 working days after the Executive Partner sends the payment notice, in accordance with the time and payment amount specified in the payment notice.

Partners who fail to pay their contributions on time are given a 30-day grace period, with a late payment fee of 1/1000[th] of the amount overdue calculated daily for overdue charges. Those who have paid their contributions within the grace period are not liable for breach of contract.



The capital contribution of a new Partner should be paid in accordance with the terms agreed upon with the new Partner and at the request of the Executive Partner, after the General Partner had made the decision to approve the new Partner.

**4.     Limited Partner**

Refers to the Partner, whose capital contribution to the Partnership is accepted by the General Partner, and who signs this Agreement, with limited liability for the debt of the Partnership, based on the amount of capital contribution subscribed, through the transfer of the original Partner equity in accordance with this Agreement.

4.1     Rights of Limited Partners

4.1.1    To participate or appoint a representative to participate in a Partner Meeting and exercise their voting rights in accordance with the actual contributions.

4.1.2    To personally, or appoint a representative, review the meeting minutes and audit financial summaries.

4.1.3    To understand and supervise the operational status of the Limited Partnership, and make reasonable opinions.

4.1.4    To have rights to income distribution.

4.1.5    To transfer capital, but within the restrictions of this Agreement.

4.2     Obligations of Limited Partners

4.2.1    Limited Partners shall bear limited liability for the debts of the Partnership, up to the amount of their subscribed capital contributions.

4.2.2    To make full payment of the capital on time in accordance with the conditions and methods stated in this Agreement. If the Limited Partner is unable to make payment to the Partnership on time, the Limited Partner shall be liable for breach of contract in accordance with the relevant provisions of this Agreement, including but not limited to adjusting the proportion of capital contributions among the Partners accordingly.



4.2.3   Except when expressly stated within the rights and obligations of this Agreement, the Limited Partner shall not participate in or interfere in the normal operation and management of the Partnership.

4.2.4   Except as required by law, regulations and rules, the Limited Partner shall only use all information provided by the General Partner to Limited Partners for partnership-related matters, and shall not disclose such information to third parties or use it for business activities not related to the Partnership. The General Partner has the right to hold Limited Partners responsible for breaching confidentiality obligations in their own name or in the name of the Partnership.

4.2.5   The Limited Partner shall not be involved in the management of the Partnership.

4.3   Liability of the Limited Partner for Breach of Contract

4.3.1   If a Limited Partner conducts a transaction with another person in the name of the Partnership without authorisation and causes losses to the Partnership or other partners, the Limited Partner shall be liable for compensation.

4.3.2   The Limited Partner shall not represent the Partnership if not executing business pertaining to the Partnership. If a Limited Partner violates the terms of this Agreement and participates in business management, he shall bear unlimited joint and several liability for the Partnership debt with the General Partner on the participation matters.

4.3.3   The following acts of a Limited Partner shall not be regarded as executing Partnership matters:

1)   Participating in the decision of the joining and termination of the General Partner.

2)   Making reasonable suggestions for the management of the Partnership.

3)   Reviewing Partnership financial information, such as accounting books, in matters involving their own self-interest.

4)   Claiming their rights or filing lawsuits against the responsible Partner when the interests of the Partnership have been violated.



Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 120 of 331

88

5)    Urging the Executive Partner to exercise his rights when said Partner has neglected to exercise his rights.

6)    Provide guarantee to the Partnership, in accordance with the law.

**5.    Executive Partner**

5.1    The Executive Partner shall execute Partnership affairs on behalf of the Partnership, in accordance with this Agreement.

The Partnership authorises Managers to execute investment management, and shall pay management fees in accordance with this Agreement.

5.2    Requirements of the Executive Partner

5.2.1    The Partner shall be the General Partner of this Partnership

5.2.2    To be fully aware of investment risks and be willing to assume the rights and obligations of the Partnership for the duration of its existence.

5.2.3    Possess corresponding industry investment experience and good management capabilities.

5.2.4    Not be prohibited by law to be an Executive Partner.

5.3    Authority and Responsibilities of the Executive Partner

5.3.1    Executing investments and other businesses of the Partnership (including project investment and cash management).

5.3.2    Administering, maintaining and disposing of Partnership assets, including but not limited to investment assets, non-investment assets, intellectual property rights, etc.

5.3.3    Performing all actions necessary to maintain the legal existence of the Partnership and carrying out business activities in the name of the Partnership.



5.3.4    In accordance with the Agreement, opening and maintaining bank accounts in the name of the Partnership; issuing payment orders and other instruction from these accounts to the bank; receiving capital contributions from the Limited Partnership, investment income, cash generated from the disposal of project investments, and any amounts received by the Limited Partnership that is to be deposited into these accounts.

5.3.5    Employing, terminating and substituting professionals, intermediaries and consultancies (including independent audit institutions) in the provision of service to the Partnership, but the General Partner shall disclose relevant matters in accordance with this Agreement.

5.3.6    All Partners unanimously agree that the Executive Partner has the right, within reasonable judgement, to appoint a person who is not part of the Limited Partnership as a Manager, and enter into investment management agreements, but said Manager shall meet the conditions stipulated by the law and this Agreement.

5.3.7    Selecting a banking institution and entering into an account opening agreement (including account opening agreements entered into, on behalf of the Partnership, before the Partnership was established).

5.3.8    In the case where a Limited Partner transfer his Partnership interest, reviewing the transferee's qualifications and approving the transfer in accordance with the provisions of this Agreement.

5.3.9    Initiating or responding to litigation for arbitration purposes in the interest of the Partnership; entering into actions such as negotiations or reconciliations in disputes with third parties; taking all possible actions to protect the financial safety of the Partnership, and minimise risks to the Limited Partner, General Partner and property of the Partnership, arising from the activities of the Partnership.



Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 122 of 331

5.3.10   Managing matters regarding taxes of the Partnership in accordance with state taxation regulations.

5.3.11   Providing guarantee, assurance and compensation to investments that are in-progress, holding and clearance, which the General Partner deems necessary or appropriate.

5.3.12   Monitoring the performance of investment portfolio companies, and executing all rights of the Partnership related to the portfolio companies.

5.3.13   Compensating in accordance with this Agreement, but the General Partner shall disclose related matters in accordance with the regulations stipulated in this Agreement.

5.3.14   Distributing to Partners in accordance with the terms of this Agreement.

5.3.15   Taking the necessary actions to realise the Partnership objectives, and maintain and contest the rights of the Partnership.

5.3.16   Negotiating with other General Partners to determine the acceptance or rejection of all or part of the subscribed capital and become a limited, refunded Partnership, and to be liable for compensation according to law for any losses caused to the Partnership enterprise or other partners.

5.3.17   If an Executive Partner is found to have broken the law or the terms of this Agreement, and has brought losses to the investment projects of the Partnership, he shall bear the related responsibility and be liable to compensation.

5.3.18   The Executive Partner shall bear full liability for the Partnership if the Partnership suffers losses due to non-executive partnership affairs.

5.4   The Executive Partner shall be replaced if one of the following situations occurs:



Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 123 of 331

**91**

5.4.1    Removed for not performing duties.

5.4.2    Held criminally liable.

5.4.3    Death or loss of ability.

5.4.4    Business license revoked, ordered to be closed, revoked or declared bankrupt according to law.

5.4.5    Unable to make payments on time due to debts.

5.4.6    Cause serious losses to the Partnership.

5.5    The resolution to remove the Executive Partner shall be effective only after the unanimous consent of the other partners, and the resolution of removal shall be notified in writing to the person being removed. The removal shall become effective on the day the removed person receives notice of the removal, with the removed person withdrawn from the Partnership. If the removed person has objections to the resolution of removing, he may, within thirty (30) days from the date of receiving the removal notice, proceed with the dispute resolution process stipulated in this Agreement. After the Executive Partner is removed, the General Partner shall nominate other persons, who shall be elected in a Partner Meeting.

5.6    The Executive Partner can independently decide to replace its appointed representative, but the Partnership shall be informed of the replacement by writing, with the necessary corporate registrations completed to facilitate replacement. The Partnership shall inform the Limited Partners of the change of the representative of the Executive Partner in a timely manner.

6.    **Authority to Make Investment Decisions**

6.1    The Executive Partner and Manager shall exercise the investment decision-making authority of the Partnership.

6.2    The Executive Partner and Manager shall determine if the investment conditions of the projects are in line with the overall interest of the Partnership, and ultimately decide whether to invest.

6.3    The Executive Partner and Manager shall make decisions with regards to the transfer and disposition of the Partnership's investment assets, real estates held for various reasons, and intellectual property.



6.4    The Executive Partner and Manager shall make decisions with regards to other investment related matters of the Partnership.

**7.    Expenses of the Partnership**

Partnership expenses are borne by the Partnership. The total expenditure incurred by the Partnership includes but is not limited to the expenses relating to the establishment, operation, termination, disbandment and liquidation, and the following fees, cost and overheads.

1)    Partnership Start-up Expenses

Start-up expenses include the establishment of the Partnership with the General Partner, all reasonable expenses incurred, including opening expenditure, legal, accounting consultancy fees, but does not include expenditures incurred by the Limited Partners. Start-up expenses shall be borne by the Partnership. Expenses paid by the Manager, General Partner or any persons prior to the establishment of the Partnership shall be immediately reimbursed by the Partnership after establishment.

2)    Government taxes, fees and other expenditures on the Partnership's earning or transactions, or on the Partnership's earnings or assets.

3)    Management fees

4)    Fees incurred during the annual audit of the Partnership

5)    Bank account fees

6)    Expenses paid to third party for investment purposes

7)    Litigation and mediation costs

8)    Partnership daily operational overheads, based on market rates.



## 8.   Management Fees

8.1    As consideration for the management of the Partnership and other services provided by the Manager, the parties agree that the Partnership shall pay the Manager a management fee with the funds in the custody account of the custodian institution during its existence as follows:

The management fee is based on the total amount of capital contributed by the Partners and is drawn at an annual rate of **2.0%**.

The management fee is to be paid annually, and is charged starting on the day all partners fulfil their investment commitments, with a total of 365 days making up the year. The first management fee is to be paid within 10 days of all partners fulfilling their investment contributions, following which payments to the Manager shall be made on the 10th day after every 365 days.

8.2    The following expenses shall be borne by the General Partner or Manager, including the management fee charged:

1) Start-up expenses by the General Partner or Manager

2) Third party charges incurred by the General Partner or Manager during start-up

3) Personnel expenses of the management team, including payroll, bonuses and benefits, etc.

4) Office rental, property management fees, water and electricity, communications and office equipment costs for the General Partner and Manager.

5) Daily operational costs for the General Partner and Manager.

6) Costs associated with routine investigation for the purpose of investment projects, including but not limited to financial, legal and industrial investigations.



    7)    Partnership meeting expenses (Excluding travel expenses, accommodations and communication fees for all Limited Partners for the purposes of joining the meeting).

## 9.   Partnership Administration

9.1    The custodial and Executive Partner of this Partnership shall be **Beijing Genghis Khan Pharmaceutical Holdings Co., Ltd**, with **Huang Chao** as the Executive Representative. Other managers are to be independently appointed by Beijing Genghis Khan Pharmaceutical Holdings Co., Ltd, and no Limited Partners shall interfere.

9.2    Partner Meeting

Partner meetings can be classified as regular meetings and extraordinary meetings. Regular meetings are held once a year while extraordinary meetings can be convened by Executive Partners or more than 30% of Limited Partners. Partner meetings are to be convened and chaired by the Executive Partner. To convene a partner meeting, the Executive Partner shall inform all Partners 7 days before the meeting date, and shall send the meeting agenda and voting matters to all partners.

9.3    Partners shall vote on matters pertaining to the Partnership in accordance with the relevant provisions of the partner meeting. In the partner meeting, all Partners shall exercise their voting rights in accordance with the proportion of their respective capital contributions at the time of voting. Decisions made through voting during the Partner meeting must be passed with more than half the votes casts, unless otherwise stated according to the law, or in this Agreement.

9.4    Partners may exercise their rights by signing off on the Partners' decision (resolution) in writing, or in the form of an off-site meeting or on-site meeting. The partner meeting is a way for partners to exercise their rights under the Partnership Enterprise Law and Partnership Agreement, and is neither legally required nor a permanent fixture.



Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 127 of 331

**10.      Income Distribution and Loss Sharing**

10.1    Sources of Income

The Partnership sources of income come from investment project liquidation, equity transfer, equity repurchase and equity fund management.

10.2    Principles and Methods of Income Distribution and Loss Sharing

10.2.1   During the business period of the Partnership, the income can be distributed only under the premise of a realistic net profit. If there is no net profit, the income cannot be distributed.

10.2.2   Under the premise of realistic net profit, the profit distribution right of the Limited Partners has priority over the General Partners, and the Limited Partners shall distribute the income according to the proportion of paid-in capital.

10.2.3   Before the Limited Partner's annual investment yield reaches **20%**, the General Partner shall not participate in the Partnership's profit distribution. After the Limited Partner's annual investment return rate exceeds 20%, the Limited Partner and General Partner's income distribution ratio shall be **80%: 20%**

10.3    Loss Sharing

The losses of the Partnership within the total subscribed capital contribution shall first be borne by the General Partner's subscribed capital contribution. If the loss exceeds the General Partner's subscribed capital contribution, the Limited Partner shall bear the loss through their subscribed capital contribution

10.4    Non-Cash Distribution

There will be no non-cash distribution for the duration of the business period of the Limited Partnership.



Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 128 of 331

**96**

10.5    Upon expiry of the determined business period, if there remains unrealised assets, the partners shall discuss extending the business period appropriately, so that the Executive Partner can liquidate the assets of the Partnership, to distribute it according to the principles agreed upon.

10.6    Income Tax

All partners shall pay income tax in accordance with state taxation laws.

In accordance with the Partnership Enterprise Law, the Limited Partnership is not the subject of income tax. Partners are to pay income tax according to their individual profits from the Partnership, in accordance with state taxation laws, with the exception of payment held by the Limited Partnership by relevant authorities.

**11.    Procedure for New Partners**

The entry of a new Partner shall be agreed upon by the General Partner and the investor who intends to join, and the newly joined Limited Partner shall comply with the provisions of the laws and regulations on qualified investors, with an amount of capital contribution not less than the requirements of this Agreement.

Under the premise of not affecting the interests of the original Limited Partners, the General Partner may solely decide to accept the entry of the new Partner.

If the General Partner decides to accept the investment of the new Partner, they shall enter into a partnership agreement. During the confirmation of the partnership agreement, the General Partner shall truthfully inform the new Partner about the financial status of the Partnership and management outcome. The new Partner shall have the same rights as the original Limited Partner, as well as the same liability.

The new Limited Partner shall be liable for Partnership debts prior to the joining of the Partnership by the subscribed capital contribution.



The new Limited Partner shall make payment of the capital according to the conditions and stipulations stated in this Agreement, or shall be liable for breach of contract in accordance with the relevant provisions of this Agreement.

If the General Partners decide to amend the Partnership Agreement, the Partnership shall arrange for accounts adjustments, registration of the relevant changes with the Department of Industry and Commerce, as well as the registration of the changes in the share of assets held, in accordance with the decision of the General Partners.

**12. Withdrawal, Removal, Inheritance and Transfer of Rights**

12.1    A Partner may withdraw in the event of one of the following situations:

1)    The reason for withdrawal stated in this Agreement appears

2)    Unanimous agreement from all Partners

3)    Reasons which render a Partner unable to remain in partnership

4)    Other Partners have seriously violated their obligations under this Agreement.

12.2    Procedure for Withdrawal

The Limited Partner shall inform the other Partner of his decision to withdraw 30 days prior to withdrawal. Except for statutory or reasons agreed upon in this Agreement, Limited Partners may not withdraw within a year of their investment.

Unless force majeure occurs or the dissolution and liquidation procedures are started, the General Partner may not withdraw from the Partnership.

13.3    Automatic Withdrawal

A Partner is automatically withdrawn in the following situations:

1)    The Executive Partner is replaced in accordance with the terms of this Agreement

2)    The General Partner becomes unable to repay debts



Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 130 of 331

    3)    The Legal Person or other organisation acting as the Partner has their business license revoked, is ordered to shut down, or is declared bankrupt according to law.

    4)    A Partner loses qualifications which is a prerequisite in accordance with statutory requirements or in accordance with this Agreement.

    5)    All the property of a Partner is seized by a People's Court.

13.4    Delisting

If a Partner has any of the following situations, the other Partners can resolve to remove said Partner upon their unanimous agreement:

    1)    Does not perform their obligations as stipulated in his Agreement

    2)    Intentionally or unintentionally causes major loss to the Partnership

    3)    Conducts themselves inappropriately during the execution of Partnership operations

    4)    Occurrence of the reasons as stipulated in this Agreement

In the event of the abovementioned situations, the Partner shall be liable to compensate losses caused to other Partners.

The resolution to remove a partner shall be made in writing to the removed person. The removal shall become effective on the day the removed person receives the removal notice, with the removed person withdrawn from the Partnership. If the removed person has objections to the removal resolution, he may, within 30 days from the date of receiving the removal notice, proceed with the dispute resolution process stipulated in this Agreement.

13.5    Liability of Withdrawn or Removed Partners

After the Limited Partner withdraws from the Partnership or is removed, the Partner shall be liable for the debts of the Partnership that occurred for the reasons before the withdrawal of the Partnership, based on the property recovered from the Partnership when the Partner withdrew.



13.6     Disposal of Property of Withdrawn or Removed Partners

When a Partner withdraws or is removed, the Executive Partner shall appoint an accounting agency to perform an audit of the net assets of the Partnership at the point of withdrawal or removal, and return the aforementioned Partner's investment based on the investment ratio in the Partnership according to the audited net assets of the Partnership.

The auditing costs shall be borne by the withdrawing or removed Partner, and is to be paid out from the returned investment contributions at the point of withdrawal or removal.

The Partnership has the right to deduct all debts owed by the withdrawn or removed Partner to the Partnership and compensation due to the Partnership, prior to the return of investment contributions.

13.7     Transfer of Rights

The transfer of the rights of the Partner to the other Partners, shall be made known to all Partners within 30 days. If other Partners agree to the transfer, the transferee shall negotiate with the transferrer as equals. If the negotiation fails, they will be transferred separately according to the proportion of capital contribution and go through the industrial and commercial registration procedures.

Partners transferring capital contributions to parties outside of this Partnership, must obtain approval from more than half of the Partners. Under the same conditions, the other Partners have the priority to purchase the approved amount of capital for transfer. If multiple Partners exercise their priority, refer to the Agreement in the preceding paragraph.

## 13.     Accounting and Reporting

13.1     Book-keeping

The Executive Partner, within the statutory period, shall maintain the accounting books representing the investment portfolio of the Partnership, in accordance with the law, as the basis to report to the Limited Partners, and the financial statements submitted by the reporting department.



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
NYSCEF DOC. NO. 6
INDEX NO. 152210/2024
RECEIVED NYSCEF: 03/12/2024
Case 1:24-cv-03142-UA Document 1-1 Filed 04/24/24 Page 132 of 331
100

### 13.2 Fiscal year

The fiscal year shall correspond with the calendar year, with the first accounting period starting from the date of establishment of the Limited Partnership until 31 December 2016.

### 13.3 Audit and Financial Report

The General Partner shall appoint an accounting agency to perform an independent audit of the Partnership.

At the end of each fiscal year, the financial reports of the Partnership shall be audited by an independent audit agency.

After every half year period of a natural calendar year, the General Partner shall deliver the unaudited financial report within two months, in writing, fax, email or using other methods, to all Limited Partners. Within four months after the fiscal year, the General Partner shall deliver the following financial reports in writing, fax, email or other methods, to all Limited Partners:

1) Assets and Liabilities

2) Income Statement

3) Cash Flow Statement

### 13.4 Annual Report

Starting from the first full year of establishment of the Partnership, the General Partner shall deliver in writing, fax, email or other methods, to all Limited Partners the annual report before 30 April of every year. The report shall include the business report from the preceding year, and audited financial report from the preceding year.



Case 1:24-cv-03142-UA Document 1-1 Filed 04/24/24 Page 133 of 331

13.5    Access to Financial Records

Provided that written notice is issued five working days in advance, within a reasonable duration during the reasonable working hours, the Limited Partner shall have the right to personally or appoint a representative to inspect all Partnership financial records, in the interest of official business relating to the Partnership. When exercising this right, the Limited Partner shall follow the updated and revised confidentiality procedures and regulations of the Partnership. Furthermore, if the General Partner determines that it is necessary to protect the interests of the Partnership, the General Partner shall have the right to request the Limited Partner return or destroy the information obtained from the Partnership. All expenses incurred by the aforementioned actions shall be borne by the respective Partner.

## 14.    Information Disclosure

The Executive Partner shall disclose to all Partners in a timely manner, all executive administration related matters, and the business and financial situation of the Partnership.

All disclosure documents shall be submitted in writing (not limited to hard copy documents, electronic mail and website notifications).

The method of information disclosure shall include but is not limited to summary reports, periodic reports and interim reports.

## 15.    Partnership Dissolution and Liquidation

15.1    The Partnership shall be terminated and liquidated if any of the following situations occurs:

1)    The General Partner proposes a motion for the same that is passed by all Partners.

2)    Expiration of the Partnership business period.



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
NYSCEF DOC. NO. 6
INDEX NO. 152210/2024
RECEIVED NYSCEF: 03/12/2024

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 134 of 331

102

3)  A breach of Agreement by one or multiple Limited Partners, with the General Partner determining that the Partnership is unable to continue operations.

4)  Revocation of business license of the Partnership.

5)  Other reasons for dissolution as stipulated in the Partnership Enterprise Law or in this Agreement.

15.2   Liquidator

The Executive Partner shall execute the role of Liquidator.

All unrealised investments of the Partnership shall be managed by the liquidator. During the liquidation period, the Limited Partners shall pay the Manager reasonable liquidation costs, but shall not pay any management fees or other expenses to the Manager.

The main responsibilities of the liquidator are: liquidation of Partnership properties, compiling a balance sheet and a list of properties, managing and liquidating all unrealised matters related to the company, paying all taxes, paying all debts and claims, managing all reputational property of the Partnership after all debts have been paid, as well as representing the Partnership in litigation and arbitration activities.

15.3   Order of Liquidation

15.3.1 Upon the expiration or termination and liquidation of the Limited Partnership, after all expenses and fees have been accounted for, the partnership property shall be paid and allocated in the following order:

1)  Payment for all liquidation expenses;

2)  Payment for all staff wages, social insurance and statutory compensation;

3)  Payment for all taxes owed;



    4)    Liquidation of Limited Partnership debt;

15.3.2  Distribution among all Partners in accordance with the distribution principles and procedures of this Agreement

15.3.4  If the partnership property is insufficient to pay off the partnership debts, the General Manager shall assume unlimited joint liability for payment to creditors.

15.3.5  Upon completion of liquidation, the liquidator shall prepare a liquidation report that is signed or sealed by all Partners, and submit the liquidation report within 15 days to the business registration authority to apply to deregister the Partnership.

## 16. Liability for Breach of Contract

Any Partner in breach of the Partnership Agreement shall bear the corresponding liability for breach of contract in accordance with the law or in accordance with the provision of this Agreement.

If a Party breaches the contract and the Partnership Agreement cannot be fulfilled in whole or in part, the breaching party shall be liable for breach of contract. In the case of breach of contract by multiple parties, according to the actual situation, each party shall be responsible for its own liability.

## 17. Confidentiality

The Parties to this Agreement shall bear the highest level of responsibility for the confidentiality of the trade secrets of other parties made known through the negotiation, signing and execution of the Agreement. The Limited Partners shall also bear the highest level of responsibility for the confidentiality of the business information of the Partnership that they, as well as the members they have appointed, have learned through financial reports and partner meetings, and from investment and advisory committees. Despite the above provisions, each Partner has the right to disclose the information for which he has the responsibility of confidentiality as follows:



Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 136 of 331

1)   Disclosure to Related Parties who are their shareholders;

2)   Good faith disclosure to professional consultants and accountants;

3)   If laws, courts, rules of any relevant stock exchange, or any other regulatory authority with jurisdiction specifically require disclosure, the Partner shall notify the General Partner immediately after learning of the disclosure requirements. Each Partner with an obligation to disclose information shall make all reasonable efforts and always seek to avoid meeting such disclosure requirements or to minimise the scope of disclosure in accordance with relevant laws, regulations or policies.

**18.    Force Majeure**

"Force Majeure" refers to events that happen after the signing of the Agreement which cannot be predicted at the point of signing this Agreement, and whose occurrence and consequences cannot be prevented or overcome, prevents any Party or all Parties from fulfilling their obligations in part or in full. The above include earthquakes, typhoons, floods, fires, wars, international or domestic transport interruptions, government or public agency acts (including major legal changes or political changes), pandemics, riots, strikes and other events considered to be force majeure in general international business practice.

In the event of force majeure, which affects a Party in their fulfilling of obligations as stipulated in this Agreement, ceasing such obligations in the duration of the delay caused by the force majeure shall not be considered a breach of contract. The Party declaring force majeure shall inform the other Party as soon as possible, and within fifteen (15) days of force majeure occurring, provide complete proof of the force majeure and the duration.

In the event of force majeure, all Partners shall negotiate with each other to find a fair solution for all, and to make reasonable effort to minimise the impact of the force majeure.



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024

NYSCEF DOC. NO. 6
RECEIVED NYSCEF: 03/12/2024

Case 1:24-cv-03142-UA Document 1-1 Filed 04/24/24 Page 137 of 331

105

## 19.    Dispute Resolution

19.1    Negotiation

Any disputes arising from the obligations stipulated in this Agreement or that are related to this Agreement shall be settled through friendly negotiation between both parties.

19.2    Arbitration

If all parties in the Agreement are unable to reach a settlement within thirty (30) days, any party has the right to submit the dispute to the board of arbitration with jurisdiction over the Partnership for arbitration. The written decision of the arbitration shall be final and legally binding.

## 20.    Supplementary Provisions

20.1    Amendments

Except as stipulated elsewhere in this Agreement that the General Partner may unilaterally modify the terms, other amendments or supplements to this Partnership Agreement, as well as the formulation and implementations of conditions, requires the Partners to negotiate and come to an agreement.

Matters pertaining to changes to the registration of the Partnership and changes to other important terms shall require amendments to the Partnership Agreement. Amendments to the Agreement shall be made in accordance with the Partnership Enterprise Law and the regulations stipulated in this Agreement. With regards to amendments to the Agreement, a proposal to make changes to the terms to be revised or a resolution to make additions may be passed. Additionally, a new Partnership Agreement may be signed to replace this Partnership Agreement.

If any terms in this Agreement, or terms referring to persons or situations are found to be invalid, the effectiveness of the remaining terms or terms referring to other persons or situations are not affected.



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024
NYSCEF DOC. NO. 6
RECEIVED NYSCEF: 03/12/2024

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 138 of 331

106

20.2    Cancellation and Termination

Unless all parties to the Agreement agree to terminate this Partnership Agreement, no Party to the Agreement shall terminate this Partnership Agreement.

Upon expiry of the Partnership's business period, or if the Partnership is terminated for other reasons, this Agreement shall also cease.

20.3    Versions

This Agreement is made in <u>SIX</u> copies, with each copy having the same legal effect.

The annexe, and relevant supplementary agreements form an integral part of this Partnership Agreement and have the same legal effect.

20.4    Entry into Force

This Agreement shall come into force when the parties sign or seal this Agreement.

20.5    Other Matters

Matters not covered in the Partnership Agreement shall be negotiated by the parties in compliance with relevant national laws and regulations.

In the course of implementing this Agreement, if the national or local authority promulgates or revises the relevant laws and regulations, this Agreement will be revised in accordance with the new laws and regulations.  If conflicts, disputes or differences arise, they shall be handled in accordance with the principle of fairness.

(This is the last page of the document. Remaining pages contain only signatures and annexes.)



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024
NYSCEF DOC. NO. 6
RECEIVED NYSCEF: 03/12/2024

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 139 of 331

107

**Partnership Signature Page:**

This Agreement is signed by the following Partners on 23 November 2015.

**General Partner:**

> Name: Beijing Genghis Khan Pharmaceutical Holdings Co., Ltd

> Address:  0801-1, 8th Floor, Block 17, 17-A, 17-B, 17-C, 17-D, 17 Financial Street, Xicheng District, Beijing

> Legal Representative (or Authorised Nominee):

**Limited Partner (1):**

> Name: Shenzhen Qianhai Nations Investment Management Co., Ltd

> Address:  Room 201, Building A, No. 1, Qianwan 1st Road, Qianhai Shenzhen-Hong Kong Cooperation Zone, Shenzhen (with Shenzhen Qianhai Commerce Secretariat Co.,Ltd.)

> Legal Representative (or Authorised Nominee):

> *<Seal affixed>*
> Shenzhen Qianhai Nations Investment Management Co., Ltd
> [illegible]



**108**



Annexe 1: Table of Basic Information of Partners

| Number | Name or Title | Identification or Business License Number | Address | Subscribed capital contribution (RMB) | Paid-in Capital Contribution (RMB) | Investment Ratio | Type of Investment | Liability |
|---|---|---|---|---|---|---|---|---|
| 1 | Beijing Genghis Khan Pharmaceutical Co., Ltd | 2188 ▓▓▓ | 1080-1, 17-A, 17-B, 17-C, 17-D, 17 Financial Street, Xicheng District, Beijing | 500,000 | | | | Unlimited Liability |
| 2 | Shenzhen Qianhai Nations Investment Management Co., Ltd | 2023 ▓▓▓ | Room 201, Building A, No. 1, Qianwan 1st Road, Qianhai Shenzhen-Hong Kong Cooperation Zone, Shenzhen (with Shenzhen Qianhai Commerce Secretariat Co.,Ltd.) | 300 million | | | | Limited Liability |

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024
NYSCEF DOC. NO. 6
RECEIVED NYSCEF: 03/12/2024

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 141 of 331

**109**

# 深圳国泰旗兴产业投资基金管理中心

## （有限合伙）

# 合伙协议书



签署协议方：

普通合伙人：

名称：北京旗隆医药控股有限公司

住所（址）：北京市西城区金融大街 17 号，甲 17 号，乙 17 号，丙

17 号 17 号楼 8 层 0801-1

法定代表人：黄超

有限合伙人(之一)：

名称：深圳前海国民投资管理有限公司

住所（址）：深圳市前海深港合作区前海湾一路 1 号 A 栋 201 室（入

驻深圳市前海商务秘书有限公司）

法定代表人：罗昭学



第 1 页

## 一、释义

在本协议中，除非上下文另有说明，下列词语分别具有本条所指含义：

**本协议**：指《深圳国泰旗兴产业投资基金管理中心（有限合伙）合伙协议》及其经适当程序通过的修正案或修改后的版本。

**合伙企业或有限合伙**：指本协议各方根据《合伙企业法》及本协议共同设立的有限合伙企业。

**现金管理**：指除用于满足项目投资之外，有限合伙的全部现金资产，包括但不限于待投资、待分配及费用备付的现金。

**成立日**：对于本有限合伙而言，指合伙企业营业执照颁发之日。

**工作日**：指中国法定节假日、休息日之外的日期。

**关联人**：指对于任何人而言，指该人控制、共同控制或施加重大影响的，或与该人同受其他人控制、共同控制或重大影响的人。此处的"控制"是指有权决定一个企业的财务和经营政策，并能据以从该企业的经营活动中获取利益（对于个人而言，指通过惯常认为有支配力的关系支配个人活动的权力）；"共同控制"是指按照合同约定对某项经济活动所共有的控制，仅在与该项经济活动相关的重要财务和经营决策需要分享控制权的投资方一致同意时存在；"重大影响"是指对一个企业的财务和经营政策有参与决策的权力，但并不能够控制或者与其他方一起共同控制这些政策的制定。

**管理费:**指作为管理人向合伙企业提供投资管理服务的对价，而由合伙企业根据投资管理协议向管理人支付的报酬。

**管理人:**指由普通合伙人根据本协议聘任的投资管理人。

**《合伙企业法》:** 指《中华人民共和国合伙企业法》，由中华人民共和国第十届全国人民代表大会常务委员会第二十三次会议于 2006 年 8 月 27 日修订通过，自 2007 年 6 月 1 日起施行。

**合伙权:**指合伙人按照本协议的约定在合伙企业中享有的所有权利和利益；对有限合伙人而言，包括但不限于其认缴出资额、实缴出资额、其基于实缴出资额而在合伙企业中享有的财产份额，包括按照本协议的约定取得分配的权利；对于普通合伙人而言，包括但不限于其认缴出资额、实缴出资额、其基于实缴出资额而在合伙企业中享有的财产份额，包括按照本协议的约定取得分配的权利，以及其对合伙事务的执行及管理权。

**合伙人:**除非另有说明，指普通合伙人和有限合伙人。

**季度:**指一个日历季度。

**普通合伙人:**指北京旗隆医药控股有限公司。

**执行事务合伙人:**指北京旗隆医药控股有限公司。

**有限合伙人:** 指认缴本合伙企业出资被普通合伙人接受、并且签署本协议的、以其认缴出资额对合伙企业债务承担有限责任的合伙人，以及按照本协议约定通过受让本合伙企业原有限合伙人合伙权益而入伙的合伙人。

**人、人士:**指任何自然人、合伙企业、公司等法律或经济实体。

**认缴出资额:**指任何一个合伙人向有限合伙认缴的出资金额。

**认缴出资总额:**指全体合伙人认缴出资额的总和。

**实缴出资额:**指任何一个合伙人根据本协议约定实际向合伙企业缴付的现金金额。

**实缴出资总额:**指全体合伙人根据本协议约定实际向合伙企业缴付的现金总金额。

**投资期:**指自本有限合伙成立日起 **20** 年，经营期限届满后，根据有限合伙企业的经营需要，经全体合伙人同意可延长经营期限。

**投资组合公司:**指有限合伙以直接或间接方式对其进行了投资并持有其股权或对其拥有其他权利或利益的公司。

**托管协议:**指合伙企业、管理人及根据本协议确定的托管机构就合伙企业资金（包括合伙人向有限合伙所缴付的出资）托管事宜订立的协议。

**项目投资:**指有限合伙进行的股权等权益性投资。

**合伙企业支出:**指根据本协议由合伙企业自身承担的开支。

**元:**若非特别指出币种，指人民币元。

本合伙协议所称"以上"、"以内"、"以下"，都含本数；"不满"、"以外"、"高于"不含本数。



**二、合伙企业的创立**

除本协议所列当事人外，新入伙的合伙人和受让出资份额的当事人，均为本合伙协议的当事人，并受本合伙协议约束，但全体合伙人另行签订合伙协议的除外。

2.1　合伙企业的类型

合伙人一致同意创立的合伙企业为《中华人民共和国合伙企业法》规定的<u>**有限合伙企业**</u>，即合伙企业由普通合伙人和有限合伙人组成，普通合伙人对合伙企业债务承担无限连带责任，有限合伙人以其认缴的出资额为限对合伙企业债务承担责任。

2.2　合伙企业的基本情况

2.2.1　合伙企业名称：深圳国泰旗兴产业投资基金管理中心（有限合伙）（暂定名，最终以工商部门登记为准）

2.2.2　经营场所：深圳市前海深港合作区前湾一路鲤鱼门街 1 号前海深港合作区管理局综合办公楼 A 栋 201 室（入驻深圳市前海商务秘书有限公司）

2.2.3　经营范围：投资管理（不含限制项目）；股权投资基金；股权投资基金管理；投资兴办实业（具体项目另行申报）；投资咨询（不含限制项目）；投资顾问（不含限制项目）。

2.2.4　合伙期限：合伙企业的经营期限为 <u>20</u> 年。经营期限届满后，经

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
NYSCEF DOC. NO. 6
INDEX NO. 152210/2024
RECEIVED NYSCEF: 03/12/2024
Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 147 of 331
115

全体合伙人一致同意，确定是否延期及延期期限。

2.3　合伙人

本合伙企业合伙人不应多于 50 个，其中普通合伙人 1 人，有限合伙

人不应多于 49 个。

2.3.1 普通合伙人

名称：北京旗隆医药控股有限公司

住所（址）：北京市西城区金融大街 17 号，甲 17 号，乙 17 号，丙

17 号 17 号楼 8 层 0801-1

证件名称：营业执照

证件号码：11010102019662188

2.3.2 有限合伙人（之一）

名称：深圳前海国民投资管理有限公司

住所（址）：深圳市前海深港合作区前海湾一路 1 号 A 栋 201 室（入

驻深圳市前海商务秘书有限公司）

证件名称：营业执照

证件号码：914403003498822023

2.4　合伙目的

通过资金优势与专业投资及管理优势的结合，分享快速发展的并购投

资市场的回报。



2.5  投资目标

合伙企业的投资目标为对企业进行股权/债权投资和/或符合法律规定及本协议约定的其它投资。

2.6  基本管理机制

2.6.1 合伙企业存续期间,合伙企业类型不得转换,合伙人会议无权对此进行表决。

2.6.2 本合伙企业之普通合伙人与有限合伙人不得转换。

2.6.3 现金管理机制:除用于满足投资目标项目投资之外,有限合伙的全部现金资产,包括但不限于待投资、待分配及费用备付的现金,只能以现金管理方式进行管理,不能用于其他固定资产投资。

2.6.4 投资退出机制:执行事务合伙人、管理人应努力在合伙企业的经营期限届满前,基于诚实信用原则为合伙企业利益最大化的原则,在法律法规允许的前提下,安排合伙企业从已投资项目中的退出。项目的退出方式主要为投资项目清算、股权转让以及股权回购。如预先设定的退出机制无法实现,执行事务合伙人、管理人应采用其他适当的退出方式。

2.6.5 独立管理机制:执行事务合伙人独立管理合伙企业的日常运营,有限合伙人不得参与及干预。

2.6.6 投资业务独立决策机制:执行事务合伙人对合伙企业的投资业务独立决策,有限合伙人不得参与及干预。



### 三、出资

3.1 出资总金额

本合伙企业拟募集资金总额为 **20** 亿元，其中：

普通合伙人北京旗隆医药控股有限公司认缴出资 **50** 万元；

有限合伙人（之一）深圳前海国民投资管理有限公司认缴出资 **30,000**

万元。

剩余出资，由合伙企业根本合伙企业运营及项目投资需要在 **3** 年内分

期募集。

3.2 出资方式

本合伙企业全体合伙人的出资方式均为货币出资，币种为人民币。

3.3 认缴出资约定

有限合伙人最低认缴出资额为人民币 1000 万元，并按 100 万元整数

倍递增，但普通合伙人可依独立判断予以变更。

3.4 缴付期限

合伙人应于签署本协议后，并经执行事务合伙人发送缴款通知后 **7**

个工作日内按照缴款通知规定的时间和缴纳金额及时缴纳认缴的出资。

对于未能按约缴纳出资的合伙人给予 30 日的宽限期，同时对逾期缴

纳的出资每日计收逾期缴纳出资金额千分之一的滞纳金，宽限期出资到位

的不需承担违约责任。



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
NYSCEF DOC. NO. 6
INDEX NO. 152210/2024
RECEIVED NYSCEF: 03/12/2024
Case 1:24-cv-03142-UA Document 1-1 Filed 04/24/24 Page 150 of 331
118

新入伙合伙人的出资应在普通合伙人作出同意其入伙的决定后按照入伙协议的约定以及执行事务合伙人的要求缴纳。

**四、有限合伙人**

指认缴本合伙企业出资被普通合伙人接受、并且签署本协议的、以其认缴出资额对合伙企业债务承担有限责任的合伙人,以及按照本协议约定通过受让本合伙企业原有限合伙人合伙权益而入伙的合伙人。

4.1 有限合伙人的权利

4.1.1 参加或委托代表参加合伙人会议并依实缴出资额行使表决权。

4.1.2 有权自行或委托代理人人查阅会议记录,审计财务会计报表等资料。

4.1.3 有权了解和监督有限合伙企业的经营状况并提出合理意见。

4.1.4 收益分配权。

4.1.5 出资转让权,但应受到本协议约定之限制。

4.2 有限合伙人的义务

4.2.1 有限合伙人对合伙企业的债务以其认缴出资额为限承担有限责任。

4.2.2 按照本协议约定的条件和方式如期足额缴付出资。如有限合伙人对合伙企业的出资不能按期缴纳到位,按照本协议的相关约定承担违约责任,包括但不限于相应调整各合伙人之间的出资比例。



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024
NYSCEF DOC. NO. 6
Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 151 of 331
RECEIVED NYSCEF: 03/12/2024
119

4.2.3 除本协议明确规定的权利和义务外,有限合伙人不得参与也不得干预合伙企业的正常经营管理。

4.2.4 除法律、法规、规章规定所必须,有限合伙人仅将普通合伙人向有限合伙人所提供的一切信息资料用于合伙企业相关的事务,不得向第三方公开或用于与合伙企业无关的商业活动。普通合伙人有权以自己的名义或以合伙企业的名义对违反保密义务的有限合伙人追究法律上的责任。

4.2.5 有限合伙人不参与合伙企业的经营管理。

4.3 有限合伙人的违约责任

4.3.1 有限合伙人未经授权以合伙企业名义与他人进行交易,给合伙企业或者其他合伙人造成损失的,该有限合伙人应当承担赔偿责任。

4.3.2 有限合伙人不执行合伙事务,不得对外代表合伙企业。有限合伙人如违反本协议约定参与经营管理的,应与普通合伙人就参与事项一起对合伙债务承担无限连带责任。

4.3.3 有限合伙人的下列行为,不应视为执行合伙事务:

(1)参与决定普通合伙人入伙退伙。

(2)对企业的经营管理提出合理建议。

(3)对涉及自身利益的情况,查阅合伙企业财务会计账簿等财务资料。

(4)在合伙企业中的利益受到侵害时,向有责任的合伙人主张权利



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM INDEX NO. 152210/2024
NYSCEF DOC. NO. 6    Case 1:24-cv-03142-UA    Document 1-1    Filed 04/24/24    Page 152 of 331    RECEIVED NYSCEF: 03/12/2024

**120**

或者提起诉讼。

（5）执行事务合伙人怠于行使权利时，督促其行使权利。

（6）依法为本企业提供担保。

## 五、执行事务合伙人

5.1 执行事务合伙人依据本协议对外代表合伙企业执行合伙事务。

合伙企业委托管理人进行投资管理的，应按照本协议的约定向管理人支付管理费。

5.2 执行事务合伙人应具备的条件

5.2.1 应为本合伙企业的普通合伙人。

5.2.2 对投资风险有充分认知，愿意承担本合伙企业存续期间的权利与义务。

5.2.3 具有相应的行业投资经验和良好的管理能力。

5.2.4 不存在法律禁止担任执行合伙人的情形。

5.3 执行事务合伙人的权限和职责

5.3.1 执行合伙企业的投资业务及其他业务（包括进行项目投资和现金管理）。

5.3.2 管理、维持和处分合伙企业的资产，包括但不限于投资性资产、非投资性资产、知识产权等。

5.3.3 采取为维持合伙企业合法存续、以合伙企业名义开展经营活动



所必需的一切行动。

5.3.4 根据协议的要求，以合伙企业的名义开立并维持银行账户，向银行发出关于该等账户的付款指令和其他指令，收取有限合伙人提供的出资、投资收入、处置项目投资产生的金额和有限合伙收取的任何其他款项并存入该等账户。

5.3.5 聘用、解聘及替换专业人士、中介及顾问机构（包括独立审计机构）对合伙企业提供服务，但是普通合伙人应该就相关事项依照本协议进行披露。

5.3.6 全体合伙人一致同意执行事务合伙人有权根据其合理判断，另行指定本有限合伙人以外的人为管理人，并订立投资管理协议，但该管理人应符合法律和本协议约定的条件。

5.3.7 选择银行机构并与其订立账户协议（包括在合伙企业成立前代表合伙企业与银行机构订立账户协议）。

5.3.8 在有限合伙人转让其合伙权益的情况下，按本协议的规定对受让方资格进行合理审查并批准合格的转让。

5.3.9 为合伙企业的利益决定提起诉讼或应诉，进行仲裁；与争议对方进行妥协、和解等，以解决有限合伙与第三方的争议；采取所有可能的行动以保障有限合伙的财产安全，减少因合伙企业的业务活动而对有限合伙、普通合伙人及其财产可能带来的风险。



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM    INDEX NO. 152210/2024
NYSCEF DOC. NO. 6    Case 1:24-cv-03142-UA    Document 1-1    Filed 04/24/24    Page 154 of 331    RECEIVED NYSCEF: 03/12/2024

**122**

5.3.10 根据国家税务管理规定处理合伙企业的涉税事项。

5.3.11 为进行、持有或处置项目投资提供普通合伙人认为必要或适当的担保、保证和赔偿。

5.3.12 监督投资组合公司的业绩，并行使合伙企业的有关投资组合公司的所有权利。

5.3.13 根据本协议的规定进行补偿，但是普通合伙人应该就相关事项依照本协议的规定进行披露。

5.3.14 根据本协议的条款向合伙人进行分配。

5.3.15 采取为实现合伙目的、维护或争取有限合伙合法权益所必需的其他行动。

5.3.16 与其他普通合伙人协商确定接受或拒绝全部或部分认缴出资额并成为有限、退还合伙企业,给合伙企业或者其他合伙人造成损失的,依法承担赔偿责任。

5.3.17 执行事务合伙人如被证明违法或违反本合伙协议约定，给合伙企业的投资项目造成损失的,执行事务合伙人应负相关责任，并赔偿该项目损失。

5.3.18 执行事务合伙人因为非执行合伙事务的个人行为导致合伙企业遭受损失的，应当对合伙企业承担全部的赔偿责任。

5.4  执行事务合伙人有下列情形之一的，予以更换：



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM   INDEX NO. 152210/2024
NYSCEF DOC. NO. 6   Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 155 of 331   RECEIVED NYSCEF: 03/12/2024

**123**

5.4.1 因未履行出资义务而被除名。

5.4.2 被追究刑事责任的。

5.4.3 死亡或丧失行为能力。

5.4.4 依法被吊销营业执照、责令关闭、撤销或者被宣告破产。

5.4.5 因负债未能清偿到期债务。

5.4.6 给合伙企业造成严重损失的。

5.5　执行事务合伙人的除名决议应经其他合伙人一致同意方为有效，除名决议应当书面通知被除名人。被除名人接到除名通知之日，除名生效，被除名人退伙。被除名人对除名决议有异议的，可以自接到除名通知之日起三十日内，根据本协议约定的争议解决方式处理。执行事务合伙人被除名后，应当由普通合伙人另行提名人员，再由合伙人会议选举产生。

5.6 执行事务合伙人可独立决定更换其委派的代表，但更换时应书面通知合伙企业，并办理相应的企业变更登记手续。合伙企业应将执行事务合伙人代表的变更情况及时通知有限合伙人。

## 六、投资决策权

6.1 由执行事务合伙人、管理人行使合伙企业投资决策职权；

6.2 由执行事务合伙人、管理人就项目投资的投资条件是否符合合伙企业的整体利益以及最终是否进行投资作出决定；

6.3 由执行事务合伙人、管理人就转让和处分合伙企业的投资性资



产、因各种原因而持有的不动产、知识产权作出决定:

6.4 由执行事务合伙人、管理人决定其他与有限合伙投资相关的事项。

## 七、合伙企业的支出

合伙企业支出由合伙企业承担,合伙企业发生的总计支出包括但不限于与设立、运营、终止、解散、清算等相关的下列费用、成本和开支:

(1)合伙企业的开办支出。

开办支出指普通合伙人及合伙企业之组建、设立相关的合理支出,包括筹建支出,法律、会计等专业顾问咨询费用等,但不包括有限合伙人发生的支出。开办费由合伙企业承担。管理人、普通合伙人或其任何关联人在成立日前垫付的开办支出,由合伙企业在成立日后立即向其全额支付。

(2)政府部门对合伙企业的收益或资产,或对合伙企业的交易或运作收取的税、费及其它支出。

(3)管理费。

(4)合伙企业年度审计所发生的费用。

(5)银行账户费用。

(6)为取得项目所支付给第三方的相关费用。

(7)诉讼费和仲裁费。

(8)根据市场惯例或交易惯例应由有限合伙承担的日常运营费用。



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM     INDEX NO. 152210/2024
NYSCEF DOC. NO. 6     Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 157 of 331   RECEIVED NYSCEF: 03/12/2024

**125**

## 八、管理费

8.1 作为管理人对合伙企业提供管理及其他服务的对价,各方同意合伙企业在其存续期间应按下列规定以其在托管机构处的保管账户中的资金向管理人支付管理费:

管理费以合伙企业实收的合伙人出资总额为基数,每年按 **2.0%**的费率提取。

管理费按年支付,收费期间以合伙人完成出资义务之日为起点满 365 天为一年期计算,第一笔管理费于合伙人完成出资义务之日 10 日内支付;其后于每满 365 天后 10 日内向管理人支付。

8.2 下列支出由普通合伙人或管理人自行承担,包括以其自身收取的管理费承担:

(1)普通合伙人或管理人的开办支出。

(2)第三方为此次募集向普通合伙人或管理人收取的费用。

(3)管理团队的人事开支,包括工资、奖金和福利等费用。

(4)普通合伙人及管理人的办公场所租金、物业管理费、水电费、通讯费、办公设施费用。

(5)普通合伙人及管理人的其他日常运营经费。

(6)为对投资项目进行调查所进行的一般性的包括但不限于财务、法律、行业等尽职调查所发生的费用。



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM INDEX NO. 152210/2024
NYSCEF DOC. NO. 6 Case 1:24-cv-03142-UA Document 1-1 Filed 04/24/24 Page 158 of 331 RECEIVED NYSCEF: 03/12/2024

**126**

（7）合伙人会议费用（各有限合伙人为参加会议所支出的差旅费、住宿费、通讯费等费用除外）。

## 九、合伙事务执行

9.1 本合伙企业的管理人和执行事务合伙人为<u>北京旗隆医药控股有限公司</u>。执行事务代表为<u>黄超</u>，其他管理人员由北京旗隆医药控股有限公司独立委派，任何有限合伙人不得干预。

9.2 合伙人会议

合伙人会议分为定期会议和临时会议。定期会议每年一次，执行事务合伙人或30%以上的有限合伙人有权提议召开临时会议，合伙人会议由执行合伙人负责召集和主持。召开合伙人会议，执行合伙人应当提前 7 日通知全体合伙人，并将会议议题及表决事项通知全体合伙人。

9.3 合伙人按照合伙人会议的有关规定对合伙企业有关事项作出决议，合伙人会议由全体合伙人按照表决时各自实缴出资比例行使表决权，合伙人会议作出决议必须经持有过半数表决权的合伙人通过，但法律另有规定或本协议另有约定的除外。

9.4 合伙人可采取书面签署合伙人决定（决议）、非现场会议方式、现场会议等方式行使权利。本协议如无特殊说明，现场会议方式专指合伙人会议。合伙人会议是合伙人行使《合伙企业法》、《合伙协议》规定之权利的一种方式，并非法定、常设机关。



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM INDEX NO. 152210/2024
NYSCEF DOC. NO. 6   Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 159 of 331   RECEIVED NYSCEF: 03/12/2024

**127**

## 十、利润分配和亏损分担

### 10.1 收益来源

合伙企业的收益来源于投资项目清算、股权转让、股权回购、股权基金管理等。

### 10.2 收益分配与亏损分担的原则与方式

10.2.1 合伙企业在经营期间，在实现净利润的前提下，方可进行收益分配，没有实现净利润的，不得进行收益分配。

10.2.2 在合伙企业实现净利润的前提下，有限合伙人的利润分配权优先于普通合伙人，有限合伙人按照实缴出资比例进行收益分配。

10.2.3 在有限合伙人年度投资收益率达到 **20%** 之前，普通合伙人不参与合伙企业的利润分配。在有限合伙人年度投资收益率超过 20% 之后，有限合伙人和普通合伙人的收益分配比例为 **80%：20%**。

### 10.3 亏损分担

合伙企业在认缴出资总额之内的亏损先以普通合伙人的认缴出资承担，如亏损超出普通合伙人认缴出资的，再由有限合伙人以认缴出资额承担亏损。

超出合伙企业认缴出资总额的亏损由普通合伙人承担无限连带责任。

### 10.4 非现金分配

在有限合伙存续期内，不以非现金方式进行分配。



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM INDEX NO. 152210/2024
NYSCEF DOC. NO. 6    Case 1:24-cv-03142-UA    Document 1-1    Filed 04/24/24    Page 160 of 331    RECEIVED NYSCEF: 03/12/2024

**128**

10.5 设定的经营期限届满时仍有未变现资产，合伙人应协商适度延长经营期限以便于执行事务合伙人将有限合伙的资产变现并按照约定的原则进行分配。

10.6 所得税

有限合伙依照国家有关税收规定纳税。

根据《合伙企业法》之规定，有限合伙企业并非所得税纳税主体，合伙人自有限合伙企业所取得的收益，由各合伙人根据法律法规自行缴纳所得税，但主管机关要求有限合伙企业代扣代缴的除外。

**十一、新合伙人入伙的程序**

新合伙人入伙应由普通合伙人与拟入伙的投资人协商一致，新入伙的有限合伙人应当符合法律法规关于合格投资者的规定，同时出资额不得低于本协议的要求。

在不损害原有限合伙人的利益前提下，普通合伙人独立决定是否接纳拟入伙的投资人入伙。

如普通合伙人决定接纳拟入伙的投资人入伙，应与其签订入伙协议，订立入伙协议时，普通合伙人应当向新合伙人如实告知合伙企业的财务状况和经营成果。入伙的新合伙人与原有限合伙人享有同等权利，承担同等责任。

新入伙的有限合伙人对入伙前合伙企业的债务以其认缴的出资额为



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024
NYSCEF DOC. NO. 6
Case 1:24-cv-03142-UA Document 1-1 Filed 04/24/24 Page 161 of 331
RECEIVED NYSCEF: 03/12/2024
**129**

限承担责任。

新合伙人应按照入伙协议的约定及时缴纳出资,否则应承担相应的违约责任。

普通合伙人据此作出修改合伙协议的决定,合伙企业应根据普通合伙人的决定办理帐务调整、工商变更登记及财产份额托管变更登记事项。

## 十二、退伙、除名、继承及权益转让

12.1 有下列情形之一的, 合伙人可以退伙:

　　(1) 本协议约定的退伙事由出现。

　　(2) 经全体合伙人一致同意。

　　(3) 发生合伙人难以继续参加合伙的事由。

　　(4) 其他合伙人严重违反本协议约定的义务。

12.2 退伙的程序

有限合伙人退伙应当提前 30 日通知其他合伙人, 但除法定或本协议约定的原因外, 有限合伙人在出资一年内不得退伙。

除非发生不可抗力或进入解散、清算程序, 普通合伙人不得退伙。

13.3 当然退伙

出现下列事项时, 合伙人当然退伙:

　　(1) 执行事务合伙人按照本合伙协议的约定而被更换。

　　(2) 普通合伙人个人丧失偿债能力。



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024
NYSCEF DOC. NO. 6
Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 162 of 331
RECEIVED NYSCEF: 03/12/2024
**130**

（3）作为合伙人的法人或者其他组织依法被吊销营业执照、责令关闭、撤销或者被宣告破产。

（4）法律规定或者合伙协议约定合伙人必须具有相关资格而丧失该资格。

（5）合伙人在合伙企业中的全部财产份额被人民法院强制执行。

13.4　除名

合伙人有下列情形之一的，经其他合伙人一致同意，可以决议将其出除名：

（1）未按照本协议履行出资义务。

（2）因故意或重大过失给合伙企业造成重大损失。

（3）执行合伙事务时有不正当行为。

（4）发生本协议约定的事由。

合伙人存在上述情形的，还应当赔偿由此给其他合伙人造成的损失。

对合伙人的除名决议应当书面通知被除名人。被除名人接到除名通知后，除名生效，被除名人退伙。被除名人对除名决议有异议的。可以自接到除名通知之日起 30 日内根据本协议有关争议解决的规定解决。

13.5　退伙或者被除名人的责任

有限合伙人退伙或者被除名后，对基于退伙前的原因发生的本合伙企业债务，以其退伙时从本合伙企业中取回的财产承担责任。



### 13.6 合伙人退伙或被除名的财产处理方式

合伙人退伙或被除名的，由执行事务合伙人选聘会计师事务所对该名合伙人退伙或被除名时合伙企业的净资产进行审计，并根据审计后的合伙企业的净资产按照该名合伙人在合伙企业的出资比例对其予以退还。

评估费用由退伙或被除名的合伙人承担，合伙人退伙时其在合伙企业中的出资份额以货币方式退还。

合伙人退伙或被除名时，对其合伙企业负有赔偿责任的，合伙企业有权在向其退还财产之前扣除相应的应赔偿的款项。

### 13.7 权益转让

合伙人向本合伙企业的其他合伙人转让出资份额，应当在 30 日内通知其他全部合伙人，其他合伙人同时愿意购买的，应与受让方平等协商，协商不成的，按照出资比例分别受让，并办理工商登记手续。

合伙人向本合伙企业以外的人转让出资份额，应当取得其他合伙人过半数通过。经合伙人同意转让的出资份额，在同等条件下，其他合伙人有优先购买权，多名合伙人行使优先购买权的，参照前款约定处理。

### 十三、会计及报告

### 13.1 记账

执行事务合伙人应当在法定期间内维持符合有关法律规定的、反映合伙企业投资项目的会计账簿，作为向有限合伙人、备案主管部门提交财务



报表的基础依据。

13.2　会计年度

合伙企业的会计年度与日历年度相同,首个会计年度自有限合伙设立之日起到 2016 年 12 月 31 日。

13.3　审计及财务报告

普通合伙人应当挑选一家会计师事务所担任合伙企业的独立审计机构。

合伙企业应于每一会计年度结束之后,由独立审计机构对有限合伙的财务报表进行审计。

普通合伙人应在自然年度每半年结束后两个月之内以信件、传真、电子邮件或其他方式向有限合伙人提交未经审计的财务报表,并应在会计年度结束后四个月之内以信件、传真、电子邮件或其他方式向有限合伙人提交经审计的下列财务报表:

　　(1)　资产负债表;

　　(2)　损益表;

　　(3)　现金流量表;

13.4　年度报告

自合伙企业设立的第一个完整年度结束时起,普通合伙人应以信件、传真、电子邮件或其他方式向有限合伙人于每年 4 月 30 日前提交年度报



告。内容为上一年度业务报告及上一年度经审计的财务报告。

13.5 查阅财务帐簿

有限合伙人在提前五个工作日书面通知的前提下,有权在正常工作时间内的合理时限内亲自或委托代理人为了与其持有的合伙权益相关的正当事项查阅合伙企业的会计账簿。有限合伙人在行使本条项下权利时应遵守合伙企业不时制定或更新的保密程序和规定,且如经普通合伙人判断为保护合伙企业利益之必要,普通合伙人有权要求有限合伙人返还或销毁其从合伙企业取得的资料。所有因上述事宜而可能发生的费用,由该有限合伙人自行承担。

## 十四、信息披露

执行事务合伙人应当及时向全体合伙人披露其受托管理事务执行情况以及合伙企业的经营和财务状况。

所有信息披露文件应以书面(不限于纸质文件、电子邮件和网站公告)方式提交。

信息披露的方式包括但不限于简报、定期报告、临时报告。

## 十五、合伙企业的解散与清算

15.1 当下列任何情形之一发生时,有限合伙应被终止并清算:

(1)普通合伙人提议并经全部合伙人表决通过。

(2)合伙企业经营期限届满。



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
NYSCEF DOC. NO. 6
INDEX NO. 152210/2024
RECEIVED NYSCEF: 03/12/2024
**134**
Case 1:24-cv-03142-UA Document 1-1 Filed 04/24/24 Page 166 of 331

（3）有限合伙人一方或数方严重违约，普通合伙人判断有限合伙无法继续经营。

（4）合伙企业被吊销营业执照。

（5）出现《合伙企业法》及本协议规定的其他解散原因。

15.2 清算人

清算人由执行事务合伙人担任。

所有有限合伙未变现的资产由清算人负责管理。清算期内有限合伙应当向管理人支付公平价格的清算费用，但除此以外不再向管理人支付任何管理费或其他费用。

清算人的主要职责为：清理合伙企业财产，分别编制资产负债表和财产清单；处理与清算有关的合伙企业未了结的事务；清缴所欠税款；清理债权、债务；处理合伙企业清偿债务后的声誉财产；代表合伙企业诉讼、仲裁活动。

15.3 清算清偿顺序

15.3.1 有限合伙到期或终止清算时，合伙财产在支付清算费用后，按下列顺序进行清偿及分配：

（1）支付清算费用；

（2）支付职工工资、社会保险费用和法定补偿金；

（3）缴纳所欠税款；



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM   INDEX NO. 152210/2024
NYSCEF DOC. NO. 6   Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 167 of 331   RECEIVED NYSCEF: 03/12/2024

**135**

（4）清偿有限合伙债务；

15.3.2 根据本协议的分配原则和程序在所有合伙人之间进行分配。

15.3.4 有限合伙财产不足以清偿合伙债务的，由普通合伙人向债权人承担无限连带清偿责任。

15.3.5 清算结束后，清算人应当编制清算报告，经全体合伙人签名或盖章后，在 15 日内向企业登记机关报送清算报告，申请办理合伙企业注销登记。

## 十六、违约责任

合伙人违反合伙协议的,应当依法或依照本合伙协议的约定承担相应的违约责任。

由于一方违约,造成本合伙协议不能履行或不能完全履行时,由违约方承担违约责任。如属多方违约,根据实际情况,由各方分别承担各自应负的违约责任。

## 十八、保密

本协议各方均应对因协商、签署及执行本协议而了解的其他各方的商业秘密承担最高级别的保密责任。有限合伙人并应对其通过财务报告及合伙人会议、及其提名的成员在投资、咨询委员会中所了解到的合伙企业经营信息承担最高级别的保密责任。 尽管有上述规定，各合伙人有权将其负有保密责任的信息作如下披露：

（1）向作为其股东的关联人披露；

（2）向其善意的专业顾问和审计师披露；

（3）如果法律、法院、任何相关证券交易所的规章或任何有管辖权的其他监管机构特别要求披露，在获悉披露要求后，该合伙人应立即通知普通合伙人。有信息披露义务的各合伙人应当尽所有合理努力，根据相关法律法规或政策，始终寻求避免满足该等披露要求或尽量缩小披露的范围。

## 十八、不可抗力

"不可抗力"指在本协议签署后发生的、本协议签署时不能预见的、其发生与后果无法避免或克服的、妨碍任何一方全部或部分履约的所有事件。上述事件包括地震、台风、水灾、火灾、战争、国际或国内运输中断、政府或公共机构的行为（包括重大法律变更或政策调整）、流行病、民乱、罢工，以及一般国际商业惯例认作不可抗力的其他事件。一方单纯缺少资金不能视为不可抗力事件。

如果发生不可抗力事件，影响一方履行其在本合同项下的义务，则在不可抗力造成的延误期内中止履行，而不视为违约。宣称发生不可抗力的一方应迅速书面通知另一方，并在其后的十五天内提供证明不可抗力发生及其持续的充分证据。

如果发生不可抗力事件，各合伙人应立即互相协商，以找到公平的解

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM INDEX NO. 152210/2024
NYSCEF DOC. NO. 6      RECEIVED NYSCEF: 03/12/2024
Case 1:24-cv-03142-UA    Document 1-1    Filed 04/24/24    Page 169 of 331

**137**

决办法，并且应尽一切合理努力将不可抗力的后果减小到最低限度。

## 十九、争议解决办法

### 19.1　协商

因履行本合伙协议引起的或与本合伙协议有关的任何争议，各方应通过友好协商解决。

### 19.2　仲裁

如果协议各方在三十（30）天内无法达成一致，任何一方有权将争议提交合伙企业所在地仲裁委员会仲裁，仲裁的书面裁决具有终局性，对各方都具有约束力。

## 二十、附则

### 20.1　修改

除本合伙协议另有约定可以由普通合伙人单方修改的条款外，其他修改或者补充本合伙协议、制定实施细则均需全体合伙人协商一致。

合伙协议中涉及登记事项的变更及其它重要条款变动应当修改合伙协议，合伙协议的修改程序，应当符合《合伙企业法》及本合伙协议的规定。修改合伙协议，可以只对所修改条款作出修正案或作出补充决议，亦可签署新的合伙协议替换本合伙协议。

如本协议的任何条款或该条款对任何人或情形适用时被认定无效，其余条款或该条款对其他人或情形适用时的有效性并不受影响。



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024
NYSCEF DOC. NO. 6   Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 170 of 331   RECEIVED NYSCEF: 03/12/2024

**138**

20.2  解除和终止

除非协议各方一致同意解除本合伙协议，否则协议各方均不得解除本合伙协议。

合伙企业经营期限届满或因其他原因终止的，本协议亦同时终止。

20.3  文本

本合伙协议一式 六份，各份具有同等法律效力。

本合伙协议附件、相关补充协议作为本合伙协议不可分割的组成部分，具同等法律效力。

20.4  生效

本合伙协议经当事人签字或盖章之后生效。

20.5  其他事宜

本合伙协议未尽事宜，在遵从国家有关法律、法规规定下由当事人协商。

本协议履行过程中，如果国家或者地方颁布或者修改有关法律法规，本协议按照新的法律法规进行修订，如果出现冲突、争议或者分歧，应当按照公平原则处理。

（本页以下无正文，之后为本协议签章处和附件）



## 合伙人签署页：

本协议由以下合伙人于 2015 年 11 月 23 日签署：

**普通合伙人：**

名称：北京旗隆医药控股有限公司

住所（址）：北京市西城区金融大街 17 号，甲 17 号，乙 17 号，丙

17 号 17 号楼 8 层 0801-1

法定代表人（或授权人）：

**有限合伙人(之一)：**

名称：深圳前海国民投资管理有限公司

住所（址）：深圳市前海深港合作区前海湾一路 1 号 A 栋 201 室（入

驻深圳市前海商务秘书有限公司）

法定代表人（或授权人）：



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM

NYSCEF DOC. NO. 6

INDEX NO. 152210/2024

RECEIVED NYSCEF: 03/12/2024

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 172 of 331

140

附件一、合伙人基本信息表：

| 序号 | 姓名或名称 | 身份证号码或营业执照号码 | 住所 | 认缴出资额（万元） | 实缴出资额（万元） | 出资比例 | 出资方式 | 责任承担方式 |
|---|---|---|---|---|---|---|---|---|
| 1 | 北京旗隆医药控股有限公司 | 2188 | 北京市西城区金融大街17号、甲17号、乙17号、丙17号17号楼8层0801-1 | 50 | | | | 无限责任 |
| 2 | 深圳前海国民投资管理有限公司 | 2023 | 深圳市前海深港合作区前海湾一路1号A栋201室（入驻深圳市前海商务秘书有限公司） | 30,000 | | | | 有限责任 |
| | | | | | | | | |

This is the Tab in Exhibit "**SYT-1**" marked "**TAB 3**"

referred to in the

**AFFIDAVIT**

**OF**

**SUN YINGTONG**

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024

NYSCEF DOC. NO. 6
RECEIVED NYSCEF: 03/12/2024

Case 1:24-cv-03142-UA    Document 1-1    Filed 04/24/24    Page 174 of 331

**142**

Date :          14 September 2020
Our ref.:       14744

# Certification of Translation Accuracy

To whom it may concern:

LINGUA TECHNOLOGIES INTERNATIONAL PTE LTD, an ISO 17100:2015 certified professional translation company, do hereby certify that the translation of the attached document(s) was executed by a professional translator competent to translate and review from Chinese into English in accordance with the requirements set out in the ISO 17100 standard (International Standard for Translation Services), and is to the best of our professional knowledge and belief, a true and faithful rendering of the original document(s) in Chinese.



_____
Loh Wai Wah
Corporate Development Manager
for and on behalf of LINGUA TECHNOLOGIES INTERNATIONAL PTE LTD

# Shenzhen Guotaiqixing Industry Investment Fund Management Centre (Limited Partnership)

# Additional Investment Agreement

Time of Signature:

Location of Signature:



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM

NYSCEF DOC. NO. 6

INDEX NO. 152210/2024

RECEIVED NYSCEF: 03/12/2024

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 176 of 331

144

### Shenzhen Guotaiqixing Industry Investment Fund Management Centre (Limited Partnership)

### Additional Investment Agreement

This additional investment agreement (hereinafter referred to as "this Agreement") is signed by the undermentioned parties:

1. Beijing Genghis Khan Pharmaceutical Holdings Co., Ltd (hereinafter referred to as "Party A"), a limited company legally established in accordance with the laws of the People's Republic of China, registered capital: RMB 50 million, registered address: 0801-1, 8th Floor, Block 17, 17-A, 17-B, 17-C, 17-D, 17 Financial Street, Xicheng District, Beijing, legal representative: Huang Chao

2. Shenzhen Qianhai Nations Investment Management Co., Ltd (hereinafter referred to as "Party B"), a limited company legally established in accordance with the laws of the People's Republic of China, registered capital: RMB 500 million, registered address: Room 201, Building A, No. 1, Qianwan 1st Road, Qianhai Shenzhen-Hong Kong Cooperation Zone, Shenzhen (with Shenzhen Qianhai Commerce Secretariat Co.,Ltd.), legal representative: Luo Zhaoxue

3. Shenzhen Guotaiqixing Industry Investment Fund Management Centre (Limited Partnership) (hereinafter referred to as "Party C"), a limited partnership legally established in accordance with the laws of the People's Republic of China, total subscribed capital: RMB 300.5 million, registered address: Room 201, Building A, No. 1, Qianwan 1st Road, Qianhai Shenzhen-Hong Kong Cooperation Zone, Shenzhen (with Shenzhen Qianhai Commerce Secretariat Co., Ltd.),

Whereas:

1. Party C is a limited partnership legally established in accordance with the laws of the People's Republic of China, with two partners, namely Party A, with a capital contribution of RMB 500,000, as General Partner and Executive Partner, and party B, with a capital contribution of RMB 300 million, as Limited Partner.

2. Party A and Party B unanimously agree for Party B to increase their investment in Party C. In accordance with the terms of this Agreement, Party B shall invest an additional sum of RMB 200 million. Upon investment, the total subscribed capital contribution of Party B shall be RMB 500 million, who shall remain a Limited Partner.

In accordance with the *Contract Law of the People's Republic of China, Company Law of the People's Republic of China, Partnership Enterprise Law of the People's Republic of China* and related laws, regulations and government policies, after amicable negotiations between each of the Parties, they hereby agree upon the terms to the additional investment contributions from Party B to Party C as follows:



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM

NYSCEF DOC. NO. 6

INDEX NO. 152210/2024

RECEIVED NYSCEF: 03/12/2024

Case 1:24-cv-03142-UA Document 1-1 Filed 04/24/24 Page 177 of 331

145

## Section 1: Definitions

In this Agreement, unless otherwise stated, the terms are defined as below:

1.1    This Agreement: Refers to Shenzhen Guotaiqixing Industry Investment Fund Management Centre (Limited Partnership) Additional Investment Agreement and its annexes.

1.2    All Parties: Refers to Party A, Party B and Party C, all three parties collectively.

1.3    Additional Investment: Refers to the terms and procedures stated for the additional investment by Party B to Party C, as stated in Section 2 undermentioned.

1.4    Effective Date of This Agreement: Refers to the date when all legal representatives or authorised representatives have signed and sealed with their respective company stamps on This Agreement, in accordance with the laws and regulations as stated in This Agreement.

1.5    Tax: Refers to various forms of taxation and various types of charges levied by tax authorities and other relevant agencies, including but not limited to various taxes, fees and related fines, late fees, additional fees and interest.

1.6    RMB: Refers to Renminbi.

1.7    Day: Refers to working days with the exception of Saturdays, Sundays and statutory holidays as regulated by the People's Republic of China.

1.8    The headings of the articles and paragraphs in this agreement are only for ease of reference, and shall not be used for other interpretations intended to affect the contents of the terms of this agreement.

## Section 2: Definitions

2.1    Party B proposes to invest an additional RMB 200 million to Party C.

2.2    Upon the additional investment by Party B to Party C, the total subscribed capital contribution of Party C shall be increased to RMB 500.5 million, of which Party A's contribution shall remain at RMB 500,000, and who shall remain the General Partner and Executive Partner. The investment contribution from Party B shall increase to RMB 500 million, who is a Limited Partner.

2.3    Upon the additional investment by Party B, unless the proportion of investment between Party A and Party B changes, the terms stated in the Shenzhen Guotaiqixing Industry Investment Fund Management Center (Limited Partnership) Partnership Agreement (hereinafter referred to as "Partnership Agreement"), signed between Party A and Party B shall apply.



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM

NYSCEF DOC. NO. 6

INDEX NO. 152210/2024

RECEIVED NYSCEF: 03/12/2024

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 178 of 331

146

### Section 3: Additional Investment Payments and Industrial and Commercial Changes

3.1    Once This Agreement comes into effect, Party B shall, after fulfilment of the terms below, make payment of RMB 200 million according to the terms of This Agreement within 10 days, into the designated registered bank account of Party C.

      3.1.1  All Parties agree and sign on This Agreement;

      3.1.2  Party A and Party B shall amend the Partnership Agreement in accordance with the terms mentioned in This Agreement.

3.2    Party C, within 30 working days upon delivery, shall submit and complete updating proceedings of the increased investment to the Industry and Commerce Administration Bureau.

3.3    All Parties agree that, upon payment of the additional investment of RMB 200 million by Party B, as agreed in This Agreement, the investment obligations of Party C under This Agreement will be completed.

### Section 4: Tax and Related Expenses

4.1    The taxes incurred from This Agreement shall be undertaken by All Parties, in accordance with the country's laws, regulations and policies.

4.2    Unless otherwise stated, legal expenses incurred by All Parties and other intermediaries shall be borne by each Party respectively.

4.3    Party C shall be responsible for the respective  amendment procedures in respect of the Industry and Commerce Administration Bureau registration, and all expense incurred during the registration or preparation for registration shall be borne by Party C.

### Section 5: Warranties and Guarantees

5.1    Party B warrants and guarantees to follow the terms of This Agreement, and proceed with the legal proceedings to initiate payment of subscribed capital contribution in a timely manner.

5.2    For all the binding legal documents signed and to be signed by All Parties for this additional investment, all Parties have obtained the approval of the competent authority and all required internal authorisations according to the relevant regulations. The signatories of the legal documents are all legal representatives or authorised representatives of the Parties.

5.3    The obligations borne by all Parties are legal, and effective, the fulfilment of which shall not be in conflict with the fulfilment of the obligations of all Parties under other agreements, nor shall they be in violation of any laws and regulations.



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024
NYSCEF DOC. NO. 6
Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 179 of 331
RECEIVED NYSCEF: 03/12/2024

147

### Section 6: Liability for Breach of Agreement

6.1 If the Party in breach violates any obligations, responsibilities, commitments, statements and/or guarantees under this agreement, it shall be deemed as a breach of agreement, and the Party in breach shall compensate the non-breaching Party for all losses caused to the non-breaching Party resulting from the breach of agreement. For the purposes of This Agreement, "losses" shall refer to all actual losses (including all rights accorded to the non-defaulting Party, prior to the termination of This Agreement); however, Party A and Party C are not to be held responsible for any circumstances of Party C that are already known to Party B through due diligence.

6.2 In this Agreement, if Party B fails to pay the capital in full and on time in accordance with This Agreement, and if the Party that has paid the capital in full on time has made reminders, but Party B does not pay the capital within the time limit for the reminder, in addition to the timely payment of the corresponding payment to Party C, Party B shall also bear the responsibility for the breach of agreement to the Party that has made full payment on time. The liability for breach of agreement is that the Party in breach shall pay the non-breaching Party a penalty of 5/10000 of the amount of capital due.

6.3 Other than the breach of agreement terms as stated in Section 6.2, any Party involved in the undermentioned conditions shall be considered breach of agreement, and liable to breach of agreement penalty to the non-breaching Party.

6.3.1 Breach of terms and guarantees as stipulated in This Agreement

6.3.2 Termination of This Agreement without reason.

6.3.3 Other definitions of breach of Agreement activities, resulting in the inability to proceed with the additional investment

6.4 If any Party is in breach of the Agreement according to the conditions stated in Section 6.3, the non-breaching Party shall have the right to initiate the following one or multiple immediate actions to protect its rights:

6.4.1 Demand the Party in breach to continue fulfilling its obligations.

6.4.2 The non-breaching Party shall temporarily halt fulfilling obligations, until the Party in breach resumes obligations. The halting of obligations by the non-breaching Party in accordance to this condition shall not be deemed breach of Agreement.

6.4.3 Upon issuing reminders with a reasonable deadline, if the Party in breach fails to comply with the obligations stipulated, the non-breaching Party shall have the right to unilaterally terminate this contract.

6.4.4 Legal provisions and other remedies agreed in This Agreement.

6.5 Neither party to This Agreement shall be exempt from the liability for breach of contract under This Agreement due to the cancellation or termination of This Agreement.



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024
NYSCEF DOC. NO. 6
RECEIVED NYSCEF: 03/12/2024
Case 1:24-cv-03142-UA    Document 1-1    Filed 04/24/24    Page 180 of 331
148

## Section 7: Confidentiality

7.1   All Parties to This Agreement shall bear the highest level of confidentiality responsibility for information relating to this additional investment received from signing This Agreement, including but not limited to various types of written, actual and electronic information of the parties to this project, personnel information, organisational structure, all agreements, business transactions, transaction proceedings, negotiation details, terms in This Agreement and trade secrets of the Parties. Without prior agreement from all Parties, none of the Parties is allowed to divulge confidential information to parties not stipulated in This Agreement, nor make public statements to the public and media with regards to the signing of This Agreement and its obligations.

7.2   The disclosure of information in accordance with the requirements of laws and regulations, regulatory authorities with jurisdiction, or of work by the professional service agencies of each party, or upon written agreement by all Parties shall not be deemed a breach of confidentiality.

7.3   The Confidentiality clauses shall remain effective even after the cancellation or termination of this Agreement, and shall have no time limit.

7.4   Any Party to This Agreement in breach of this section shall be liable for the compensation accorded to the other Parties due to this breach.

## Section 8: Effectiveness, Amendment and Termination of Agreement

8.1   This Agreement shall come into effect on the date of the signing by the legal representatives or authorised representatives from All Parties, and sealed with the respective company seal from All Parties. This Agreement shall be legally binding from the effective date of This Agreement, and All Parties shall do their utmost, with reasonable endeavour, to fulfil their obligations stipulated in this additional investment agreement.

8.2   Amendments and alterations shall be made only upon agreement from All Parties, with written supplementary agreements.

8.3   Unless otherwise stated in This Agreement, This Agreement shall be terminated in the undermentioned conditions:

8.3.1  All Parties unanimously agree to terminate This Agreement.

8.3.2  Force Majeure events continue for a duration of more than 6 months, with no foreseeable resolution, resulting in the failure of This Agreement to be carried out.

8.3.3  If one Party breaches This Agreement, and fails to remedy the breach after the expiry of notice given by the non-breaching Party, the non-breaching Party shall have the right to terminate This Agreement.

8.4   This Agreement shall cease upon its termination.

8.5   This termination of this Agreement shall not affect the obligations to be borne by the Party in breach for breaching this Agreement, as well as the obligations to pay for the losses of the non-breaching Party.



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
NYSCEF DOC. NO. 6

INDEX NO. 152210/2024
RECEIVED NYSCEF: 03/12/2024

149

Case 1:24-cv-03142-UA    Document 1-1    Filed 04/24/24    Page 181 of 331

## Section 9: Force Majeure

9.1    "Force Majeure" refers to events that cannot be predicted and consequences that cannot be prevented or overcome, which directly affect the fulfilment of This Agreement.

9.2    If any Party to This Agreement is unable to fulfil part or all of the obligations stipulated in This Agreement due to force majeure, in accordance with the effects of the force majeure, said Party is exempted from part or all of obligations. However, they shall take all necessary measures as permitted by the conditions to minimise the losses resulting from force majeure. For any Party that encounters force majeure after being in breach of this agreement, said party is still liable for the breach of agreement.

9.3    Any Party that encounters force majeure shall provide written notification to the other parties as well as related proof of the force majeure within 10 days of its occurrence.

9.4    Any Party that encounters force majeure shall continue fulfilling their obligations under this agreement after the effects of the force majeure have been eliminated.

9.5    If force majeure results in the inability to continue fulfilling the obligations or achieve the goal of this agreement, any Party to this Agreement may terminate this Agreement. Regarding the parts of the agreement that have been fulfilled, the Parties to this agreement shall negotiate to resolve this logically and fairly, and shall make all reasonable efforts to minimise the negative outcomes caused by the force majeure in the fulfilling of this agreement.

## Section 10: Dispute Resolution

10.1    Disputes arising out of This Agreement, or related to This Agreement shall be settled through amicable negotiation between All Parties. If All Parties in This Agreement are unable to reach an agreement, any Party has the right to submit the dispute to the respective arbitration committee for the partnership for arbitration. The decision of the arbitration is final and legally binding on All Parties.

10.2    During the period of dispute, with the exception of the dispute matters, conditions not involving the dispute subject shall remain an effective part of the Agreement, and All Parties responsible for conditions stipulated.

10.3    The effectiveness of this article is not affected by the termination, cancellation, invalidity or withdrawal of This Agreement.

## Section 11: Others

11.1    This Agreement is made in eight copies, with each Party to hold two copies. The remaining two copies are used for approval, approval, filing, registration or other formalities involved in This Agreement. All original copies of This Agreement shall have the same legal effect.

11.2    If any condition in This Agreement is deemed invalid, the validity of the remaining conditions is not affected.

(No text below.)



(This page contains no text, and is the signature page for the Shenzhen Guotaiqixing Industry Investment Fund Management Centre (Limited Partnership) Additional Investment Agreement)

*<Seal affixed>*
Beijing Genghis
Khan Pharmaceutical
Holdings Co., Ltd
1101020161452

Party A: Beijing Genghis Khan Pharmaceutical Holdings Co., Ltd (Seal)
Legal Representative or Authorised Representative (Signature) *<Signature affixed>*

*<Seal affixed>*
Shenzhen Qianhai
Nations Investment
Management Co.,
Ltd4403050437308

Party B: Shenzhen Qianhai Nations Investment Management Co., Ltd (Seal)
Legal Representative or Authorised Representative (Signature) *<Signature affixed>*

*<Seal affixed>*
Shenzhen
Guotaiqixing
Industry Investment
Fund Management
Centre (Limited
Partnership)
[illegible]

Party C: Shenzhen Guotaiqixing Industry Investment Fund Management Centre (Limited Partnership) (Seal)
Legal Representative or Authorised Representative (Signature) *<Signature affixed>*

Date of Signature: 25 March 2016



Case 1:24-cv-03142-UA Document 1-1 Filed 04/24/24 Page 183 of 331

# 关于向深圳国泰旗兴产业投资基金管理中心

# （有限合伙）

# 追加投资的协议

签订时间：

签订地点：



关于向深圳国泰旗兴产业投资基金管理中心（有限合伙）

追加投资的协议

本追加投资协议（以下简称"本协议"）由下列各方签订：

1、北京旗隆医药控股有限公司（以下简称"甲方"），一家根据中华人民共和国法律合法成立并存续的有限公司，注册资本为人民币5000万元，注册地址：北京市西城区金融大街17号、甲17号、乙17号、丙17号17号楼8层0801-1，法定代表人为黄超。

2、深圳前海国民投资管理有限公司（以下简称"乙方"），一家根据中华人民共和国法律合法成立并存续的有限公司，注册资本为人民币5亿元，注册地址：深圳市前海深港合作区前湾一路1号A栋201室(入驻深圳市前海商务秘书有限公司)，法定代表人为罗昭学。

3、深圳国泰旗兴产业投资基金管理中心（有限合伙）（以下简称"丙方"），一家根据中华人民共和国法律合法成立并存续的有限合伙企业，总出资额为30050万元，注册地址：深圳市前海深港合作区前湾1号A栋201室（入驻深圳市前海商务秘书有限公司）。

鉴于：

1、丙方是一家根据中华人民共和国法律合法成立并存续的有限合伙企业，共有合伙人2个，一个是甲方，出资50万元，为普通合伙人和执行事务合伙人；另一个是乙方，出资3亿元人民币，为有限合伙人。

2、甲、乙双方一致同意由乙方向丙方追加投资，乙方将按照本协议约定的条件向丙方追加投资2亿元，乙方追加投资后，认缴出资为5亿元，仍作为有限合伙人。

根据《中华人民共和国合同法》、《中华人民共和国公司法》、《中华人民共和国合伙企业法》等相关法律、法规和政策规定，各方经友好协商，现就乙方向丙方追加投资事宜共同达成如下协议：

2



第一条　释义

本协议中，除文意明示另有所指外，下列术语具有如下含义：

1.1 **本协议**：指《关于向深圳国泰旗兴产业投资基金管理中心（有限合伙）追加投资的协议》及其附件。

1.2 **各方**：甲方、乙方、丙方，共三方。

1.3 **追加投资**：指本协议第二条所述乙方对丙方实施追加投资的具体方式及其操作步骤。

1.4 **本协议生效之日**：指本协议符合法律规定的要求和程序后，经各方法定代表人或授权代表签署并加盖各自公司公章之日。

1.5 **税费**：指税务机关及其他相关机构征收的各种形式的税项及各种性质的收费，包括但不限于各项税收、费用及相关的罚款、滞纳金、附加费用和利息。

1.6 **元**：指人民币。

1.7 **日**：指工作日，是除星期六、星期日及中华人民共和国政府规定的法定节假日以外的时间。

1.8 本协议的条款标题仅为了方便阅读，不应影响对本协议条款的理解。

第二条　追加投资的方式及追加投资后丙方的出资结构

2.1 乙方本次拟向丙方追加投资 2 亿元人民币。

2.2 乙方向丙方追加投资后，丙方总出资额将增加到 50050 万元，其中甲方出资仍为 50 万元，仍为普通合伙人和执行事务合伙人；乙方出资上升至 5 亿元，为有限合伙人。

2.3 乙方追加投资后，除甲方和乙方的出资占比发生了变化外，其他仍按照原甲方与乙方签订的《深圳国泰旗兴产业投资基金管理中心（有限合伙）合伙协议书》（以下简称"合伙协议书"）履行。

第三条　追加投资的缴付及工商变更

3



3.1 本协议生效后，乙方应在满足下列条件后 10 日内按照本协议要求将追加投资的 2 亿元认缴完毕，汇入两方工商登记专用账户。

3.1.1 各方同意并正式签署本协议;

3.1.2 甲、乙双方按照本协议的相关条款修改合伙协议书并签署。

3.2 两方应在交割日后 30 个工作日内，向工商局提交并办理完毕本次追加投资的工商变更登记手续。

3.3 各方同意，乙方按本协议约定支付完毕追加投资款 2 亿元后，两方在本协议项下的出资义务即告完成.

**第四条　税费及相关费用承担**

4.1 本协议项下追加投资所涉税费由各方依据我国相关法律法规之规定各自承担。

4.2 除本协议另有约定，各方聘请律师事务所等其他相关中介服务机构的费用各自承担。

4.3 由两方负责办理相应的工商登记变更手续，办理工商变更登记或备案手续所需费用由两方承担.

**第五条　承诺与保证**

5.1 乙方承诺并保证依照本协议约定及时办理缴付认缴出资的法律手续.

5.2 各方为本次追加投资事宜所签署的和即将签署的所有具有约束力的法律文件，各方已根据有关规定获得了有权审批机关的批准和所要求的一切内部授权，签署所有具有约束力的法律文件的签字人均为各方法定代表人或其授权代表.

5.3 各方在本协议中承担的义务是合法、有效的，其履行不会与各方承担的其它协议义务相冲突，也不会违反任何法律规定.

**第六条　违约责任**

4

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
NYSCEF DOC. NO. 6

INDEX NO. 152210/2024
RECEIVED NYSCEF: 03/12/2024

155

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 187 of 331

6.1 若违约方违反本协议项下任何义务、责任、承诺、声明及/或保证，均应视为违约，违约方应向非违约方赔偿因其违约所引致的对非违约方所造成的所有损失。为本协议之目的，"损失"系指所有实际损失（包括本协议项下在终止前非违约方应享有的任何权利），但对于丙方在本次投资前乙方通过尽职调查已经获悉的情况，甲方、丙方无需承担责任。

6.2 本协议中乙方未按约定按期足额缴纳出资的，经已按期足额缴纳出资的守约方催告后，仍不按催告期限缴纳出资的，除应当及时向丙方足额缴付相应出资外，还应向已按期足额缴纳出资的守约方承担违约责任。违约责任为，违约方应按其应缴出资额的万分之五向守约方支付违约金。

6.3 除本协议第 6.2 条所述违约行为外，本协议任何一方出现以下情况的，同样视为违约，违约方应向守约方支付违约金。

6.3.1 违反本协议项下的承诺和保证事项的。

6.3.2 无故提出终止本协议的。

6.3.3 其他不履行本协议约定之义务导致追加投资目的不能实现的行为。

6.4 本协议任何一方出现上述第 6.3 款违约情形的，守约方有权采取以下一种或多种救济措施维护其权利：

6.4.1 要求违约方继续履行相关义务。

6.4.2 暂时停止履行自身义务，待违约方违约情势消除后恢复履行。守约方根据此款规定暂停履行义务不构成守约方不履行或迟延履行义务。

6.4.3 催告并给予合理的宽限期后，违约方仍然不履行相关义务的，有权单方解除合同。

6.4.4 法律规定及本协议约定的其他救济方式。

6.5 本协议任何一方依据本协议应承担的违约责任不因本协议的解除或终止而免除。

第七条　保密

5

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM INDEX NO. 152210/2024
NYSCEF DOC. NO. 6 Case 1:24-cv-03142-UA Document 1-1 Filed 04/24/24 Page 188 of 331 RECEIVED NYSCEF: 03/12/2024

**156**

7.1 本协议各方对于因签署和履行本协议而获得的、与本次追加投资有关的信息应当严格保密，包括但不限于书面、实物、电子等形式的各类项目方资料、人员信息、组织结构、各类协议、交易方案、交易过程、谈判时间表等信息资料以及各方的商业秘密。未经其余各方一致同意，任何一方不得将秘密信息以任何方式泄漏给本协议外的其他方，也不得以任何方式向公众、媒体宣布本协议的签订和履行等情况。

7.2 因法律法规的规定、有管辖权的监管机构的要求、各方专业服务机构的工作需要或各方事先书面同意披露信息的，不被视为泄漏保密信息。

7.3 本协议解除或终止后保密条款仍然适用，不受时间限制。

7.4 本协议任何一方违反本条款的约定，应当赔偿由此给其余各方造成的损失。

第八条 协议的生效、变更与解除

8.1 本协议自各方法定代表人或授权代表签字并加盖公司公章之日起生效。本协议自生效之日起对各方具有约束力，各方应当各尽其职，采取有效措施促成本次追加投资事宜。

8.2 对本协议的修改和变更，须经各方一致同意，并达成书面补充协议。

8.3 除本协议另有约定外，本协议于下列情形之一发生时解除：

8.3.1 各方协商一致解除本协议。

8.3.2 不可抗力事件持续 6 个月并预计无法消除，致使本协议无法履行。

8.3.3 因一方违约，经守约方催告，在催告期限届满后，违约方仍不履行的，守约方有权解除本协议。

8.4 本协议解除时即终止。

8.5 本协议的解除不影响违约方依据本协议承担的违约责任以及赔偿守约方经济损失的责任。

第九条 不可抗力

6

9.1 不可抗力指任何一方无法预见的，且不可避免、不能克服的直接影响本协议履行的事件。

9.2 本协议任何一方由于不可抗力不能履行全部或部分本协议义务的，根据不可抗力的影响，免除全部或部分违约责任，但应在条件允许下采取一切必要措施以减少因不可抗力造成的损失。任何一方在违约行为之后发生不可抗力情形的，不免除该方违约责任。

9.3 遇有不可抗力的一方，应于不可抗力事件发生之日起 10 日内将不可抗力事件以书面形式通知其余各方并提交相关证明文件。

9.4 发生不可抗力的一方在不可抗力影响消除后应当继续履行本协议。

9.5 发生不可抗力事件导致本协议无法继续履行、不能实现本协议目的的，本协议任何一方均可解除本协议，对于本协议已经履行的部分，本协议各方应协商谋求合理公正的解决，并应尽所有合理的努力以减少该等不可抗力事件对履行本协议所造成的不良后果。

### 第十条　争议解决方式

10.1 因本协议发生的或与本协议有关的任何争议，各方首先本着友好协商的原则协商解决。协商不成的，则任何一方均可将争议提请深圳仲裁委员会，按照申请仲裁时该会现行有效的仲裁规则进行仲裁。该仲裁裁决为终局裁决，对各方均具有约束力。

10.2 在解决争议期间，除争议事项外，本协议其他不涉及争议的条款仍然有效，协议各方均应履行。

10.3 本条的效力不因本协议的终止、解除、无效或撤销受到影响。

### 第十一条　其他

11.1 本协议正本一式八份，各方留存两份，其余二份用于办理本协议项下所涉审批、核准、备案、登记或其他手续。各份正本具有同等法律效力。

11.2 如果本协议的任何条款被认定无效，其他条款的效力不受影响。

（以下无正文）

7

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
NYSCEF DOC. NO. 6    Case 1:24-cv-03142-UA    Document 1-1    Filed 04/24/24    Page 190 of 331

INDEX NO. 152210/2024
RECEIVED NYSCEF: 03/12/2024
158

（本页无正文，为《关于对深圳国泰旗兴产业投资基金管理中心（有限合伙）追加投资的协议》签字页）

甲方：北京旗隆医药控股有限公司（盖章）

法定代表人或授权代表（签字）：



乙方：深圳前海国民投资管理有限公司（盖章）

法定代表人或授权代表（签字）：

丙方：深圳国泰旗兴产业投资基金管理中心（有限合伙）（盖章）

执行事务合伙人或授权代表（签字）：

签署日期：2016 年 3 月 25 日

8



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024

NYSCEF DOC. NO. 6

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 191 of 331

RECEIVED NYSCEF: 03/12/2024

159

This is the Tab in Exhibit "**SYT-1**" marked "**TAB 4**"

referred to in the

**AFFIDAVIT**

**OF**

**SUN YINGTONG**

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 192 of 331

Date :        14 September 2020
Our ref.:     14744

# **Certification of Translation Accuracy**

To whom it may concern:

LINGUA TECHNOLOGIES INTERNATIONAL PTE LTD, an ISO 17100:2015 certified professional translation company, do hereby certify that the translation of the attached document(s) was executed by a professional translator competent to translate and review from Chinese into English in accordance with the requirements set out in the ISO 17100 standard (International Standard for Translation Services), and is to the best of our professional knowledge and belief, a true and faithful rendering of the original document(s) in Chinese.



_____
Loh Wai Wah
Corporate Development Manager
for and on behalf of LINGUA TECHNOLOGIES INTERNATIONAL PTE LTD

# EXHIBIT 4

## IN THE HIGH COURT OF THE REPUBLIC OF SINGAPORE

HC/S        /2020

Between

**GUOTAIQIXING BIOMEDICAL INTERNATIONAL (S) PTE. LTD.**
(UEN No. 20150039K)

... Plaintiff(s)

And

**(1)  DAI XUEFENG**
(PRC Passport No. ████2878)

**(2)  ZHANG JUNQI**
(PRC Passport No. ████9520)

**(3)  XU XINMANNI**
(PRC Passport No. ████7254)

... Defendant(s)

## <u>AFFIDAVIT</u>

I, Sun Yingtong (PRC Passport No. ████7101), care of Guotaiqixing Biomedical International (S) Pte. Ltd. of 60 Paya Lebar Road #11-01, Paya Lebar Square, Singapore 409051, do solemnly and sincerely affirm and say as follows:

1.    I am a Director of the Plaintiff and I am duly authorised to file this Affidavit on behalf of the Plaintiff in support of its application herein.

2.    Unless otherwise stated, the matters deposed to herein are within my knowledge and are true. Insofar as the matters deposed to herein are not within my knowledge, they are derived from the Plaintiff's documents and are true to the best of my information and belief.

3.    Owing to the circumstances of the Plaintiff's claims and the matters discussed in paragraphs 8 to 10 herein, the Plaintiff does not have a complete set of all of its

2

documents and records. Accordingly, some of the documents I refer to in this Affidavit are unsigned documents or fragments of documents which have been recovered in the course of the ongoing investigations referred to in paragraph 10 herein.

**A.**   **BACKGROUND TO THE PLAINTIFF'S CLAIMS**

**I.**   **PARTIES TO THE SUIT**

   **(a)**   **The Plaintiff**

4.   The Plaintiff is a company incorporated in Singapore on or about 9 November 2015. The Plaintiff's registered address is 60 Paya Lebar Road #11-01, Paya Lebar Square, Singapore 409051. A copy of the Plaintiff's Business Profile search is annexed hereto and marked "**TAB 1**" of Exhibit "**SYT-1**".

5.   The Plaintiff is a wholly-owned subsidiary of 深圳国泰旗兴产业投资基金管理中心（有限合伙） (also known as Shenzhen Guotaiqixing Industry Investment Fund Management Centre LLP "**Shenzhen Guotai**"), a limited partnership formed under the laws of the People's Republic of China ("**China**"). At all material times prior to 27 May 2019 the partners of Shenzhen Guotai were (as stated in clause 2.3 of the Partnership Agreement referred to in paragraph 6(a) herein):

   (a)   深圳前海国民投资管理有限公司 (also known as Shenzhen Qianhai Nations Investment Management Co., Ltd., "**Nations Investment**"), a corporation incorporated in China, as limited partner; and

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
NYSCEF DOC. NO.

INDEX NO. 152210/2024

RECEIVED NYSCEF: 03/12/2024

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 196 of 331

3

(b)    北京旗隆医药控股有限公司 (also known as Beijing Khan Pharmaceutical Holdings Co., Ltd., "**Beijing Khan**"), a corporation incorporated in China, as general partner.

6.    Shenzhen Guotai was the vehicle into which Nations Investment invested an aggregate of some RMB 500 million which was to be managed by Beijing Khan pursuant to a joint venture between Nations Investment and Beijing Khan (the "**Joint Venture**"). The Joint Venture was formalised by:

(a)    a Partnership Agreement dated 23 November 2015 between Beijing Khan as general partner and Nations Investment as limited partner (the "**Partnership Agreement**"); and

(b)    an Agreement for Further Investment Regarding Shenzhen Guotaiqixing Industry Investment Fund Co., Ltd. (Limited Partnership) dated 25 March 2016 between Nations Investment, Beijing Khan and Shenzhen Guotai (the "**Further Investment Agreement**").

Of these monies, USD 34,639,399.87 (approximately RMB 226 million at the material time) was injected into the Plaintiff as share capital. Copies of the Partnership Agreement and Further Investment Agreement are annexed hereto and marked "**TAB 2**" and "**TAB 3**" of Exhibit "**SYT-1**" respectively.

7.    Nations Investment was and is a wholly-owned subsidiary of 国民技术股份有限公司 (also known as Nations Technologies Inc, "**Nations**"), which was at all material times a company listed on the Shenzhen Stock Exchange. Nations Investment was primarily used as a vehicle for Nations to carry out investments

(see Part III of Announcement No. 2015-075 issued by Nations titled "*Announcement of Wholly Owned Subsidiary Company Participating in Establishment of Industrial Investment Fund*" dated 6 November 2015 ("**Nations Announcement 2015-075**"), a copy of which is annexed hereto and marked "**TAB 4**" of Exhibit "**SYT-1**").

8.　　By a Judgment dated 14 February 2019, the People's Court of the Shenzhen Qianhai Co-operation Zone held that Beijing Khan had "*committed misconduct while implementing matters for the partnership*", and ordered that Beijing Khan be removed as a partner of Shenzhen Guotai (the "**14 February 2019 Judgment**"). The 14 February 2019 Judgment was made pursuant to a Civil Complaint lodged by Nations Investment dated 5 February 2018 (the "**5 February 2018 Civil Complaint**"), seeking to remove Beijing Khan as a partner of Shenzhen Guotai. Copies of the 5 February 2018 Civil Complaint and 14 February 2019 Judgment are annexed hereto and marked "**TAB 5**" and "**TAB 6**" of Exhibit "**SYT-1**". By a Notice of Change dated 14 August 2019, Nations Investment was appointed the liquidator of Shenzhen Guotai. A copy of the aforesaid Notice of Change is annexed hereto and marked "**TAB 7**" of Exhibit "**SYT-1**".

9.　　On or about 16 October 2019, Nations Investment as liquidator of Shenzhen Guotai removed, *inter alios*, the 1st Defendant from his position as director of the Plaintiff, and appointed new directors over the Plaintiff. A copy of the resolution of the Extraordinary General Meeting dated 16 October 2019 is annexed hereto and marked "**TAB 8**" of Exhibit "**SYT-1**".

10.　　Investigations into the misconduct of the 1st Defendant along with the misconduct of his associates, the 2nd and 3rd Defendants, are ongoing as of the date of this Affidavit,

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
NYSCEF DOC. NO. Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 198 of 331

INDEX NO. 152210/2024

RECEIVED NYSCEF: 03/12/2024

5

including computer forensics of devices used by the 1st and 2nd Defendants belonging to the Plaintiff.

**(b)**     <u>**The Defendants and where they may be found**</u>

11.     The 1st Defendant, who is also known as Eric, is a citizen of China and his current residence is at 249 Cleft Rd., Mill Neck, NY 11765 in the United States of America (the "**US**"). A Memorandum dated 28 September 2020 prepared by Applied Facts, a US-based investigation firm, setting out information related to the residency, property ownership and employment of the 1st Defendant is annexed hereto and marked "**TAB 9**" of Exhibit "**SYT-1**" (the "**AF Memorandum (1st Defendant)**"). The Annex referred to in the aforesaid Memorandum is annexed hereto and marked "**TAB 10**" of Exhibit "**SYT-1**".

12.     The 1st Defendant was a director of the Plaintiff at all material times from 9 November 2015 until 16 October 2019. A copy of a People Profile search carried out on the 1st Defendant is annexed hereto and marked "**TAB 11**" of Exhibit "**SYT-1**".

13.     The 1st Defendant is the founder of, and at all material times controlled various entities in diverse territories including China, the British Virgin Islands, the Cayman Islands, the US and Singapore, which will be collectively referred to as the "**Khan Entities**". The Khan Entities included Beijing Khan, which is referred to in paragraphs 5(b) and 6 herein. The 1st Defendant is the ultimate beneficial owner of all or substantially all of each of the Khan Entities (this is further discussed at paragraphs 29 to 31(c) herein).

14.   The 2nd Defendant, who is also known as "Alice" and "Alice Chung", is a citizen of China and her current residence is at 2618 Sea Island Drive, Fort Lauderdale, FL 33301-1589 in the US. A Memorandum dated 28 September 2020 prepared by Applied Facts setting out information related to the residency, property ownership and employment of the 2nd Defendant is annexed hereto and marked "**TAB 12**" of Exhibit "**SYT-1**" (the "**AF Memorandum (2nd Defendant)**"). The Annex to the aforesaid Memorandum is at "**TAB 10**" of Exhibit "**SYT-1**".

15.   The 2nd Defendant was the General Manager and an officer of the Plaintiff from 15 November 2015 until around December 2017. Copies of:

(a)   an unsigned letter addressed to the Ministry of Manpower in Singapore that was drafted by, drafted under the supervision of, and/or reviewed and approved by, the 2nd Defendant in late January 2016, relating to the application for an employment pass for the 2nd Defendant (the "**Letter to MOM**"); and

(b)   an unsigned "Employment Contract" between the Plaintiff and the 2nd Defendant that was created on around 9 February 2017 (the "**2nd Defendant's Employment Contract**");

are annexed hereto and respectively marked "**TAB 13**" and "**TAB 14**" of Exhibit "**SYT-1**". These documents were recovered in the course of the ongoing investigations, from computers seized from the Plaintiff's office that were used during the 1st and/or 2nd Defendants' tenure with the Plaintiff. For the reasons set out in paragraphs 3 and 7 to 9 herein, the Plaintiff is unable to locate the engrossed and signed versions of the aforesaid documents.

16.     The 3rd Defendant, who is also known as "Sophie", is a citizen of China and her current residence is at 249 Cleft Rd, Mill Neck, NY 11765-1003 (Nassau County) in the US. A Memorandum dated 28 September 2020 prepared by Applied Facts setting out information related to the residency, property ownership and employment of the 3rd Defendant is annexed hereto and marked "**TAB 15**" of Exhibit "**SYT-1**" ("**AF Memorandum (3rd Defendant)**"). The Annex to the aforesaid Memorandum is at "**TAB 10**" of Exhibit "**SYT-1**".

17.     The 2nd and 3rd Defendants were at all material times key members of the management of various Khan Entities (this is further discussed at paragraphs 29 to 31(c) herein).

18.     At all material times, the 1st, 2nd and 3rd Defendants styled themselves as fund managers, and purported to issue funds and carry out fund management using the Khan Entities and other entities under their control (including the Plaintiff). A copy of marketing material issued by the Khan Entities sometime in or after February 2017, that was recovered in the course of the ongoing investigations, from a computer seized from the Plaintiff's office that was used during the 1st and/or 2nd Defendants' tenure with the Plaintiff (the "**Khan Marketing Material**"), is annexed hereto and marked "**TAB 16**" of Exhibit "**SYT-1**".

19.     The 1st, 2nd and 3rd Defendants conceived of and carried out a scheme, under which investment monies which were entrusted to Shenzhen Guotai and, by extension, the Plaintiff, pursuant to the Joint Venture, were diverted for their own benefit. As part of the scheme, the 1st, 2nd and 3rd Defendants caused Shenzhen Guotai to inject USD 34,639,399.87 into the Plaintiff, and thereafter hollowed out the Plaintiff by diverting

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM    INDEX NO. 152210/2024
NYSCEF DOC. NO.    Case 1:24-cv-03142-UA    Document 1-1    Filed 04/24/24    Page 201 of 331    RECEIVED NYSCEF: 03/12/2024

8

substantial amounts from the Plaintiff to the 2nd Defendant and the Khan Entities (the "**Diversion**").

20.  As a result of their misconduct, the 1st, 2nd and 3rd Defendants are on the wanted list for criminal fugitives pursuant to a warrant of arrest issued by the Shenzhen Municipal Public Security Bureau on or about 25 December 2018 for embezzlement. This was announced by Nations by an Announcement No. 2018-078 titled "*Announcement of Company Learning of the Warrant of Arrest for Employees Related to Qianhai Genghis Khan*" dated 28 December 2018 ("**Nations Announcement 2018-078**"), a copy of which is annexed hereto and marked "**TAB 17**" of Exhibit "**SYT-1**".

21.  The Plaintiff's claims in this Suit are for:

   (a)  Loss and damage caused to the Plaintiff by the Diversion. The net amount of this claim is USD 34,264,935.99, being the amount of USD 45,264,935.99 which was the subject of the Diversion less USD 11,000,000 which was returned to the Plaintiff.

   (b)  Loss and damage caused to the Plaintiff by the 1st, 2nd and 3rd Defendants procuring or permitting that Khan Fund Management Asia Pte. Ltd. ("**SGKFM**"), use the Plaintiff's office premises at 2 Shenton Way #17-02, SGX Centre 1, Singapore 068804 (the "**Plaintiff's Office Premises**") as its registered address, without payment to the Plaintiff. The amount of this claim is SGD 290,153.97.

I will elaborate on the Plaintiff's claims further in this Affidavit.

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
NYSCEF DOC. NO.
INDEX NO. 152210/2024
RECEIVED NYSCEF: 03/12/2024
Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 202 of 331

9

## II. DUTIES OWED BY THE 1ST AND 2ND DEFENDANTS TO THE PLAINTIFF

### (a)    Duties owed by the 1st Defendant to the Plaintiff

22.   As a director of the Plaintiff, the 1st Defendant owed fiduciary duties (including statutory duties under section 157 of the Companies Act (Cap 50, 2006 Rev Ed)) to the Plaintiff that required him to:

(a)   act honestly and in the interests of the Plaintiff;

(b)   use reasonable diligence in the discharge of his duties owed to the Plaintiff;

(c)   act *bona fide* and in good faith in the interest of the Plaintiff in the discharge of all duties, powers, responsibilities, obligations and functions assigned to or vested in or attached to him;

(d)   ensure that each transaction that is undertaken by the Plaintiff is at arm's length and, in any event, not place or allow himself to be placed in a situation or position whereby any of his duties and obligations to the Plaintiff conflict or potentially may conflict directly or indirectly with his personal interests;

(e)   not make any secret profit or receive any secret payment;

(f)   disclose any breaches (on his part) of duties owed to the Plaintiff; and/or

(g)   not make improper use of his position as a director of the Plaintiff or any information acquired by virtue of his position as a director to gain, directly or indirectly, an advantage for himself or for any other person or to cause detriment to the Plaintiff.

**(b)**     <u>Duties owed by the 2nd Defendant to the Plaintiff</u>

23.    The 2nd Defendant was employed in an executive capacity (see paragraphs 24 and 26 herein) and, *inter alia*, owed a contractual duty (implied as a matter of law) of mutual trust and confidence, and fidelity, to act faithfully in the best interests of the Plaintiff.

24.    Pursuant to the terms of her employment with the Plaintiff, the 2nd Defendant also owed express contractual duties to the Plaintiff and/or had the authority to:

     (a)    oversee the overall management, sales and operations of the Plaintiff, and formulate and implement business strategies and policies of the Plaintiff;

     (b)    do her utmost to maximise the financial returns of the Plaintiff by designing optimal development strategies;

     (c)    have general control and responsibility for the management of the business of the Plaintiff;

     (d)    do all in her power to promote, develop and extend the business of the Plaintiff;

     (e)    be the "*Legal Representative*" of the Plaintiff whether throughout Singapore or abroad and be entrusted with the direction and management of the company businesses;

     (f)    perform other legal and chartered functions and those assigned or delegated by the Board of Directors;

     (g)    not do or refrain from doing any act whereby her office as a General Manager is or becomes liable to be vacated;

     (h)    not do anything that would cause her to be disqualified from continuing to act as a General Manager;

(i)    not do anything which may bring about disrepute to any holding company or subsidiary of the Plaintiff or any subsidiary of any holding company of the Plaintiff (other than the Plaintiff) (collectively, the "**Group**") or anything which infringes the laws and regulations of the countries in which the Group operates in; and

(j)    declare all conflicts of interest and all direct and deemed interests (whether financial or otherwise) which she may have in any company or companies which are or which may from time to time be doing business with the Group or which are or which may from time to time be in direct or indirect competition with the Group (collectively the "**Connected Companies**") and to ensure that none of the Group Companies shall contract or deal with any Connected Company save with the prior written/verbal consent of the Board; and in any event, without prejudice to the foregoing, any contract or transaction with any Connected Company or otherwise any dealings, negotiations or other transactions between the Group company and any Connected Company shall be on terms that are strictly normal commercial terms and arm's length and which have been entered into with the utmost good faith after due regard to the interests of the Group;

(k)    disclose and obtain the prior written consent of the Board of the Plaintiff, whether on her own, or jointly with others, or on behalf of any person, firm or company, or as manager, agent consultant or employee of any person, firm or company, directly or indirectly:

    (i)    engage in any other business which is wholly or partly in competition with any business carried on by any Group Company by itself or themselves or in partnership, common ownership or as a joint venture with any third party; or

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
NYSCEF DOC. NO.

INDEX NO. 152210/2024

RECEIVED NYSCEF: 03/12/2024

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 205 of 331

12

(ii)    be concerned or interested in any other business of a similar nature to or competitive with that carried on by any Group Company or by any supplier or customer of any Group Company; and

(l)    to perform according to the highest standards of business ethics.

These terms are recorded in the 2nd Defendant's Employment Contract dated 9 February 2017 that is referred to at paragraph 15(b) herein and annexed as "**TAB 14**" of Exhibit "**SYT-1**", and in the Plaintiff's Employee Handbook, a copy of which is annexed hereto and marked "**TAB 18**" of Exhibit "**SYT-1**". Thus far, the ongoing investigations have yet to uncover a signed version of the document.

25.    Further to paragraph 24 herein, the 2nd Defendant was:

(a)     a signatory to the Plaintiff's bank accounts held with DBS Bank Limited ("**DBS**");

(b)    identified in the Letter to MOM as a "*crucial*" employee with "*substantial investment and management experience in the financial sector*" who had been "*tasked to transform [the Plaintiff] into a dynamic strategic investor*" (see "**TAB 13**" of Exhibit "**SYT-1**"); and

(c)    purportedly conferred the power to sign "*subscription form related documents*" for the purpose of share subscriptions on the Plaintiff's behalf (see paragraph 53(c) herein)

A copy of a resolution of the Board of Directors of the Plaintiff dated 9 November 2015, setting out signature requirements for operating the Plaintiff's bank accounts held with DBS, is annexed hereto and marked "**TAB 19**" of Exhibit "**SYT-1**".

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
NYSCEF DOC. NO.

INDEX NO. 152210/2024

RECEIVED NYSCEF: 03/12/2024

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 206 of 331

13

26.   By reason of the matters referred to in paragraphs 24 and 25 herein, the 2nd Defendant was an officer of the Plaintiff. As such, she also owed statutory duties under section 157(2) of the Companies Act to the Plaintiff to not make improper use of her position as an officer of the Plaintiff or any information acquired by virtue of his position as an officer to gain, directly or indirectly, an advantage for herself or for any other person or to cause detriment to the Plaintiff.

27.   By reason of the matters referred in paragraph 23 to 26 herein, at all material times, the 2nd Defendant also owed fiduciary duties to the Plaintiff.

28.   The 2nd Defendant's fiduciary duties (including her statutory duties under section 157(2) of the Companies Act) to the Plaintiff required her to:

   (a)   act *bona fide* and in good faith in the interest of the Plaintiff in the discharge of all duties, powers, responsibilities, obligations and functions assigned to or vested in or attached to her;

   (b)   ensure that each transaction that is undertaken by the Plaintiff is at arm's length and in any event, not place or allow herself to be placed in a situation or position whereby any of his duties and obligations to the Plaintiff conflict or potentially may conflict directly or indirectly with his personal interests;

   (c)   not make any secret profit or receive any secret payment;

   (d)   disclose any breaches (on her part) of duties owed to the Plaintiff; and/or

   (e)   not make improper use of her position as an officer of the Plaintiff or any information acquired by virtue of her position as an officer to gain, directly or indirectly, an advantage for herself or for any other person or to cause detriment to the Plaintiff.

III.   **CIRCUMSTANCES LEADING TO THE PLAINTIFF'S CLAIMS**

(a)   **The Khan Entities**

29.   The Plaintiffs are aware of the following Khan Entities:

(a)   Genghis Khan Investment, Inc. ("**GKI**"), which was incorporated in or around February 2006 in the British Virgin Islands;

(b)   深圳市旗隆投资管理有限公司 (also known as Shenzhen Khan Investment Management Co. Ltd., "**SKI**"), which was incorporated in China in or around April 2006;

(c)   重庆市旗隆投资管理有限公司 (also known as Chongqing Khan Investment Management Co. Ltd., "**CQKIM**"), which was incorporated in China in or around July 2008;

(d)   深圳前海旗隆基金管理有限公司 (also known as Shenzhen Qianhai Genghis Khan Fund Management Co., Ltd. and Shenzhen Qianhai Khan Fund Management Co., Ltd., "**SQKFM**"), which was incorporated in China on or around 1 April 2014;

(e)   Khan Funds Management America, Inc. ("**KFA**"), which was incorporated in the US under the laws of the State of New York on or about 15 October 2014;

(f)   Beijing Khan, referred to in paragraph 5(b) herein, which was incorporated on or around 7 August 2015;

(g)   Khan Funds Global Limited ("**KFG**"), which was incorporated in the Cayman Islands on or about 18 September 2015;

(h)    Khan Funds Oriental Medicine Fund SPC ("**KOM**"), which was a segregated portfolio company incorporated in the Cayman Islands on or about 18 September 2015; and

(i)    SGKFM, referred to in paragraph 21(b) herein, which was incorporated in Singapore on or about 31 March 2016.

30.    The Plaintiff understands that the 1st Defendant is the ultimate beneficial owner of KFG, KOM, KFA and SGKFM:

(a)    According to a "*structure chart*", the 1st Defendant owned 100% of KFG, which in turn owned 100% of KOM (the "**Structure Chart**").

(b)    According to the Register of Members of KFG dated 23 September 2015, and the Certificate of Incumbency of KFG dated 28 January 2016 ("**KFG's COI**") the 1st Defendant was the sole shareholder of KFG.

(c)    According to the Register of Members of KOM dated 29 December 2015, KFG was the sole shareholder of KOM.

(d)    According to a Business Profile search of SGKFM dated 1 April 2016, KFG was the sole shareholder of SGKFM.

(e)    According to a Verified Amended Complaint dated 30 August 2019 that the 1st Defendant signed and swore before a Notary Public in the State of New York (the "**New York Complaint**"), and filed in the New York County Court in Case Number 161221/2018, the 1st Defendant was the "*sole shareholder, Chief Executive Officer ("CEO") and President*" of KFA.

The documents referred to in this paragraph are annexed hereto and marked "**TAB 20**" of Exhibit "**SYT-1**". The documents referred to in (a) to (c) above were recovered in the course of the ongoing investigations, from a computer seized from the

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024
NYSCEF DOC. NO.
Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 209 of 331
RECEIVED NYSCEF: 03/12/2024

16

Plaintiff's office that was used during the 1st and/or 2nd Defendants' tenure with the Plaintiff.

31. GKI and SKI were incorporated in around 2006. According to the Khan Marketing Material (see "**TAB 16**" of Exhibit "**SYT-1**"):

    (a)    the 1st Defendant used GKI and SKI for the "*initiation and management of securities investment funds outside of Mainland China*";

    (b)    the 1st Defendant held himself out as a specialist in investments in the biomedical industry, and aggressively promoted himself as a fund manager investing in companies with "*upright, honest, trustworthy people who have a passion for life*"; and

    (c)    in around July 2008, the 1st Defendant incorporated CQKIM, which was used as a vehicle to:

        (i)    raise investment monies through issuing funds in China ("**Khan-Issued Funds**");

        (ii)    carry out investment management of Khan-Issued Funds; and

        (iii)    carry out investment management of venture capital and funds issued by third parties ("**Third Party Funds**").

32. According to the Khan Funds website, the 2nd and 3rd Defendants joined the Khan Entities in around 2009. A copy of a print-out of the Khan Funds website as of 29 September 2020 is annexed hereto and marked "**TAB 21**" of Exhibit "**SYT-1**".

33. During the material time, the 2nd and 3rd Defendants were key members of the management in and controlled various Khan Entities alongside the 1st Defendant, and were part of the 1st Defendant's inner circle:

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024
NYSCEF DOC. NO.
Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 210 of 331
RECEIVED NYSCEF: 03/12/2024

17

(a) According to the Khan Funds website, the 1st, 2nd and 3rd Defendants were part of the "*Executive Team*" of the Khan Entities (see "**TAB 21**" of Exhibit "**SYT-1**" (page 817)).

(b) According to the Khan Marketing Material, the 1st, 2nd and 3rd Defendants were "*Core Members*" of the Khan Entities (see "**TAB 16**" of Exhibit "**SYT-1**" (page 467)).

(c) According to the "*Organizational Chart*" in a set of presentation slides produced by one of the Khan Entities, the 2nd and 3rd Defendants, who were the "*Director of investment research*" and "*General Manager*" respectively, ranked at the top of the hierarchy reporting directly to the 1st Defendant (see page 848). The aforesaid slides, and a similar set of presentation slides which further identify the 2nd and 3rd Defendants as "*Head of Quantitative Trading*" and "*Head of Macro Research*" as well (see page 868), are annexed hereto and collectively marked "**TAB 22**" of Exhibit "**SYT-1**".

(d) According to the Structure Chart, the 1st, 2nd and 3rd Defendants were the directors of KFG and KOM (see "**TAB 20**" of Exhibit "**SYT-1**" (page 591)).

(e) According to KFG's COI (see "**TAB 20**" of Exhibit "**SYT-1**" (pages 593)) and the Register of Directors of KFG dated 23 September 2015 (annexed hereto and marked "**TAB 23**" of Exhibit "**SYT-1**"), the 1st, 2nd and 3rd Defendants were the directors of KFG.

**(b)** **Events leading to the Joint Venture**

34. By an Announcement No. 2013-010 titled "*Announcement of the Resolutions of the 8th Meeting of the 2nd Board of Directors*" dated 17 April 2013, Nations announced that it was considering possible avenues for investment of its "*spare monies*" by way

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024
NYSCEF DOC. NO.
Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 211 of 331
RECEIVED NYSCEF: 03/12/2024

18

of purchasing "*wealth management products*" ("**Nations Announcement 2013-010**"). A copy of Nations Announcement 2013-010 is annexed hereto and marked "**TAB 24**" of Exhibit "**SYT-1**". The 1st Defendant was aware of the Nations Announcement 2013-010, or was otherwise aware that Nations was considering possible avenues for investment of its cash reserves by way of purchasing investment products. He thus sought to cultivate Nations to become a substantial investor in Khan-Issued Funds.

35.   In around early-2014, the 1st Defendant was introduced to and met with Mr Luo Zhaoxue ("**Mr Luo**") (the "**First Meeting**"). At the time, Mr Luo was the Chief Executive Officer of Nations.

36.   During the First Meeting, the 1st Defendant and Mr Luo discussed the prospects of making investments into the biomedical industry outside of China, and particularly in the US and Europe, through the purchase of investment products offered by Khan Entities.

37.   After the First Meeting, the 1st Defendant continued to cultivate Nations to become a substantial investor in Khan-Issued Funds, and from time to time proposed various avenues for Nations to carry out investments through the purchase of Khan-Issued Funds.

38.   On or about 1 April 2014, SQKFM was incorporated. According to the Khan Marketing Material, the 1st, 2nd and 3rd Defendants held the positions of "*President and Investment Decision Committee Chairman*", "*Investment Director & Head of Quantitative Trading*" and "*General Manager and Head of Macro Research*", respectively (see "**TAB 16**" of Exhibit "**SYT-1**" (pages 467)).

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
NYSCEF DOC. NO.

INDEX NO. 152210/2024
RECEIVED NYSCEF: 03/12/2024

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 212 of 331

19

39. According to the Khan Marketing Material, the incorporation of SQKFM was to "*conduct[] private equity securities investment, equity investment, venture capital investment and other private equity fund businesses [and] to independently issue Khan-issued private equity funds*" (see "**TAB 16**" of Exhibit "**SYT-1**" (page 465)).

40. On or about 15 October 2014, KFA was incorporated in the US by the 1st Defendant. A copy of the Certificate of Incorporation of KFA is annexed hereto and marked "**TAB 25**" of Exhibit "**SYT-1**". According to the New York Complaint, the 1st Defendant was the sole shareholder, Chief Executive Officer and President of KFA (see "**TAB 20**" of Exhibit "**SYT-1**" (page 605)). The 1st, 2nd and 3rd Defendants are and were at all material times members of KFA's "*Executive Team*" (see the print-out of the Khan Funds website at "**TAB 21**" of Exhibit "**SYT-1**" (page 817)).

41. In around November 2014, Nations agreed to make a preliminary investment of RMB 200 million into a Khan-Issued Fund known as 前海旗隆量化分级基金 (also known as the Qianhai Khan Quantitative Diversified Fund, the "**Khan QD Fund**"). SQKFM was the fund management company Khan QD Fund. This was announced by Nations by Announcement No. 2014-067 titled "*Announcement of Updates on Proposal to Use Spare Monies to Purchase Wealth Management Products*" dated 28 November 2014, a copy of which is annexed hereto and marked "**TAB 26**" of Exhibit "**SYT-1**". According to the Khan Marketing Material, the 2nd Defendant managed SQKFM's quantitative funds and was "*responsible for the realisation and implementation of SQKFM's quantitative investment strategy*" (see "**TAB 16**" of Exhibit "**SYT-1**" (page 467)).

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM INDEX NO. 152210/2024
NYSCEF DOC. NO. Case 1:24-cv-03142-UA Document 1-1 Filed 04/24/24 Page 213 of 331 RECEIVED NYSCEF: 03/12/2024

20

42.     After Nations' investment into the Khan QD Fund, the 1st Defendant continued to propose that Nations either increase its investments into Khan-Issued Funds, or make other investments through the Khan Entities into potential investment targets.

43.     In around July or August 2015, Nations provisionally agreed to a proposal made by the 1st Defendant for Nations to invest further monies into a joint venture with 1st Defendant and one or more of the Khan Entities to invest in the biomedical industry, which the 1st Defendant had purportedly identified as a viable investment target. This was the Joint Venture, which was referred to in paragraph 6 herein.

44.     The Joint Venture was thereafter carried out through the formation of a limited partnership between Nations Investment (which was a wholly-owned subsidiary of Nations) and Beijing Khan, with the 1st, 2nd and 3rd Defendants acting as fund managers. This limited partnership was Shenzhen Guotai as discussed in paragraphs 5 and 6 herein.

**(c)     The Diversion**

45.     On or about 6 November 2015, the Board of Directors of Nations resolved to invest RMB 300 million in the Joint Venture through Nations Investment (see Nations Announcement 2015-075 at "**TAB 4**" of Exhibit "**SYT-1**" (pages 161 to 165)).

46.     On or about 9 November 2015, the 1st, 2nd and/or 3rd Defendants incorporated the Plaintiff, or procured that the Plaintiff be incorporated, as a wholly-owned subsidiary of Shenzhen Guotai. At all material times, the Plaintiff's capital was USD 35 million divided into 35 million equal shares (see "**TAB 1**" of Exhibit "**SYT-1**" (pages 71 to 74)).

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
NYSCEF DOC. NO.

INDEX NO. 152210/2024
RECEIVED NYSCEF: 03/12/2024

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 214 of 331

21

47. In the course of negotiating the terms of the agreement to formalise the Joint Venture, Nations proposed that a custodian bank be appointed to take custody of the monies and assets invested by Nations Investment pursuant to the Joint Venture. Nations proposed this arrangement as a safeguard against the risk of misappropriation of investment monies.

48. To facilitate the Diversion, the 1st Defendant resisted Nations' request for a custodian bank, and counter-proposed that SQKFM provide to Nations Investment a guarantee for the principal investment of RMB 300 million with a return on investment of 5% per annum which he represented would provide the same level of security.

49. Accordingly:

(a) By the Partnership Agreement: (i) Nations Investment agreed to, *inter alia*, invest RMB 300 million into Shenzhen Guotai; and (ii) Beijing Khan agreed to, *inter alia*, invest RMB 500,000 into Shenzhen Guotai and to honestly and diligently maximise returns on the investment monies through equity, debenture and other investments. The Partnership Agreement conferred upon Beijing Khan, which was controlled by the 1st, 2nd and 3rd Defendants, the exclusive power to manage the operations of Shenzhen Guotai and to make all investment decisions without interference from Nations Investment (see "**TAB 2**" of Exhibit "**SYT-1**" (pages 88 to 92)).

(b) By a Supplementary Partnership Agreement Regarding Shenzhen Guotaiqixing Industry Investment Fund Co., Ltd. (Limited Partnership) dated 25 November 2015 between Nations Investment and SQKFM, SQKFM provided a guarantee to Nations Investment for the investment of RMB 300

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM INDEX NO. 152210/2024
NYSCEF DOC. NO. Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 215 of 331 RECEIVED NYSCEF: 03/12/2024

22

million with a return on investment of 5% per annum (the "**First Supplementary Partnership Agreement**"). A copy of the First Supplementary Partnership Agreement is annexed hereto and marked "**TAB 27**" of Exhibit "**SYT-1**".

(c)    In pursuance of the Partnership Agreement, on or about 30 November 2015, Nations Investment paid the sum of RMB 300 million to Shenzhen Guotai (the "**RMB 300 Million Investment**").

(d)    On or about 23 December 2015, the 1st, 2nd and/or 3rd Defendants caused Shenzhen Guotai to transfer a substantial part of the RMB 300 Million Investment to the Plaintiff for subscription of the Plaintiff's shares. The sum of USD 34,639,399.87 was received by the Plaintiff in its USD-denominated account held with DBS in Singapore (the "**Plaintiff's DBS Account (USD)**"). A copy of the Transaction Advice showing receipt of the aforesaid sum in the Plaintiff's DBS Account (USD) is annexed hereto and marked "**TAB 28**" of Exhibit "**SYT-1**". According to an email chain between the 2nd Defendant and an employee of the Plaintiff, the amount received was less than the USD 35 million share capital of the Plaintiff as a result of deductions for fees and foreign exchange rates. A copy of the aforesaid email chain is annexed hereto and marked "**TAB 29**" of Exhibit "**SYT-1**".

(e)    On or about 9 November 2015, Mr Luo was appointed as a director of the Plaintiff. A copy of the People Profile search on Mr Luo is annexed hereto and marked "**TAB 30**" of Exhibit "**SYT-1**". Notwithstanding his directorship, Mr Luo was not involved in the operations of the Plaintiff and the 1st, 2nd and/or 3rd Defendants concealed the Diversion from him. The 1st, 2nd and/or 3rd Defendants forged Mr Luo's signature on at least one document in the course of concealing and concealing the nature of the Diversion (this is further discussed in paragraph 53(c) herein).

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM INDEX NO. 152210/2024
NYSCEF DOC. NO. Case 1:24-cv-03142-UA Document 1-1 Filed 04/24/24 Page 216 of 331 RECEIVED NYSCEF: 03/12/2024

23

50. The 1st, 2nd and 3rd Defendants used the Khan Entities, including KFA, KFG, KOM and SGKFM, as conduits for funds transfers which ultimately benefited themselves. Evidence that the Khan Entities were used as conduits for such funds transfers include:

(a) Four "*Research Consultancy Contract[s]*" between KFA and SQKFM, dated 15 November 2014, 14 January 2015, 3 June 2015 and 1 July 2015, which provided for substantial "*consultancy fee[s]*" of between USD 30,001 and USD 31,106 per month to be paid by SQKFM to KFA for a tenure of 6 months or 1 year (the "**Research Consultancy Contracts**"). These documents were manufactured to provide justification for remittances to KFA – the 1st, 2nd and 3rd Defendants were employees of both KFA and SQKFM and there was no commercial basis for such "*consultancy fee[s]*", the tenure of the various Research Consultancy Contracts overlapped with each other, and the Plaintiff has not found any evidence that any services were provided under the Research Consultancy Contracts. Copies of the Research Consultancy Contracts and invoices issued by KFA in respect of the "*Consultancy Fee[s]*" that the Plaintiff has uncovered in the course of the ongoing investigations are annexed hereto and collectively marked "**TAB 31**" of Exhibit "**SYT-1**".

(b) On 24 April 2017, a former employee of KFA, Mr Robert Polite ("**Mr Polite**") filed a Federal discrimination and whistleblower lawsuit against KFA in the District Court of the Southern District of New York. According to paragraph 12 of the Complaint filed by Mr Polite in that lawsuit, the 1st Defendant "*was pilfering company funds for his personal benefit - such as purchasing furniture and paying rent for an apartment*" (see paragraph 61 herein).

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
NYSCEF DOC. NO.

INDEX NO. 152210/2024

RECEIVED NYSCEF: 03/12/2024

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 217 of 331

24

(c)   On or about 18 December 2017, the 1st Defendant remitted USD 3 million to KFG from his personal JPMorgan Chase Bank, N.A. bank account, which was held with his ex-wife Liu Xiayu.

(d)   Between about 21 and 26 December 2017, five transfers of USD 900,000 each (*i.e.* an aggregate of USD 4.5 million) was transferred from SGKFM (which is wholly owned by KFG) to Wang Guoli, who is the 1st Defendant's mother.

(e)   On or about 26 December 2017, the sum of USD 400,000 was transferred from KFG to Wang Jing, who is the 1st Defendant's sister.

(f)   On or about 26 December 2017, the 1st Defendant remitted to KFG USD 3.5 million from his personal JPMorgan Chase Bank, N.A. bank account, which was held with his ex-wife Liu Xiayu.

Copies of the Transaction Advices evidencing the transfers referred to in paragraphs (c) to (f) above are annexed hereto and marked "**TAB 32**" of Exhibit "**SYT-1**".

51.   Turning specifically to the Diversion of funds from the Plaintiff, the 1st, 2nd and 3rd Defendants effected this through multiple withdrawals made from time to time between 29 December 2015 and 6 April 2017 from the Plaintiff's DBS Account (USD). These sums were transferred to the 2nd Defendant, or to KFA, KFG or KOM as conduits for the Diversion. As discussed in paragraphs 30 and 33 herein, KFA, KFG and KOM were entities owned by the 1st Defendant and controlled by the 1st, 2nd and 3rd Defendants. The substantial withdrawals made from and deposits made into the Plaintiff's DBS Account (USD) were as follows:

| Date of Withdrawal / Deposit | Recipient of Transfer | Sum Transferred out of / Returned to the Plaintiff (USD) | Bank Charges Incurred (USD) | Purported Reason for Transfer and Reference |
|---|---|---|---|---|
| 29 December 2015 Withdrawal | KOM | 33,600,000.00 | - | "*The Company had funded 3300 shares at the values of US$33 million in KHAN FUNDS ORIENTAL MEDICINE FUND on 29th Dec 2015 as 2% is the subscribe fee.*" ("**TAB 35**" of Exhibit "**SYT-1**" (page 1030)) |
| 6 January 2016 Withdrawal | KFA | 310,000.00 | 179.24 | Characterised as a "*loan [at] 3 years loan tenure and 3% per interest annum*" in the 2016 Management Accounts ("**TAB 35**" of Exhibit "**SYT-1**" (page 1030)) and in an Excel spreadsheet recovered in the ongoing investigations ("**TAB 36**" of Exhibit "**SYT-1**" (page 1034)) |
| 30 August 2016 Withdrawal | KFA | 250,000.00 | 203.53 | Characterised as a "*loan [at] 3 years loan tenure and 3% per interest annum*" in the 2016 Management Accounts ("**TAB 35**" of Exhibit "**SYT-1**" (page 1030)) and in an Excel spreadsheet recovered in the ongoing investigations ("**TAB 36**" of Exhibit "**SYT-1**" (page 1034)) |
| 18 November 2016 Deposit | KOM | (10,000,000.00) | - | Characterised as a "*REDEMPTION OF 1,381.3223. SHARES*" ("**TAB 34**" of Exhibit "**SYT-1**" (page 1010)) and also a "*redemption [of] 1382 shares at the value of* |

| Date of Withdrawal / Deposit | Recipient of Transfer | Sum Transferred out of / Returned to the Plaintiff (USD) | Bank Charges Incurred (USD) | Purported Reason for Transfer and Reference |
|---|---|---|---|---|
| | | | | *US$10 million so company loss US$3.82 million in investment [sic]*" ("**TAB 35**" of Exhibit "**SYT-1**" (page 1030)) |
| 18 November 2016 Withdrawal | KFG | 500,000.00 | - | Characterised as a "*loan [at] 3 years loan tenure and 3% per interest annum*" in the 2016 Management Accounts ("**TAB 35**" of Exhibit "**SYT-1**" (page 1030)) and in an Excel spreadsheet recovered in the ongoing investigations ("**TAB 36**" of Exhibit "**SYT-1**" (page 1034)) |
| 18 November 2016 Withdrawal | KFG | 500,000.00 | - | Characterised as a "*loan [at] 3 years loan tenure and 3% per interest annum*" in the 2016 Management Accounts ("**TAB 35**" of Exhibit "**SYT-1**" (page 1030)) and in an Excel spreadsheet recovered in the ongoing investigations ("**TAB 36**" of Exhibit "**SYT-1**" (page 1034)) |
| 1 December 2016 Withdrawal | KFG | 500,000.00 | - | Characterised as a "*loan [at] 3 years loan tenure and 3% per interest annum*" in the 2016 Management Accounts ("**TAB 35**" of Exhibit "**SYT-1**" (page 1030)) and in an Excel spreadsheet recovered in the ongoing investigations ("**TAB** |

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM INDEX NO. 152210/2024
NYSCEF DOC. NO. Case 1:24-cv-03142-UA Document 1-1 Filed 04/24/24 Page 220 of 331 RECEIVED NYSCEF: 03/12/2024

27

| Date of Withdrawal / Deposit | Recipient of Transfer | Sum Transferred out of / Returned to the Plaintiff (USD) | Bank Charges Incurred (USD) | Purported Reason for Transfer and Reference |
|---|---|---|---|---|
| | | | | **36**" of Exhibit "**SYT-1**" (page 1034)) |
| 1 December 2016 Withdrawal | KFG | 500,000.00 | - | Characterised as a "*loan [at] 3 years loan tenure and 3% per interest annum*" in the 2016 Management Accounts ("**TAB 35**" of Exhibit "**SYT-1**" (page 1030)) and in an Excel spreadsheet recovered in the ongoing investigations ("**TAB 36**" of Exhibit "**SYT-1**" (page 1034)) |
| 5 December 2016 Withdrawal | KFA | 550,025.00 | 195.18 | Characterised as a "*CONSULTANCY FEE*" with no further details ("**TAB 34**" of Exhibit "**SYT-1**" (page 1012)) and also a "*loan [at] 3 years loan tenure and 3% per interest annum*" in the 2016 Management Accounts ("**TAB 35**" of Exhibit "**SYT-1**" (page 1030)) and in an Excel spreadsheet recovered in the ongoing investigations ("**TAB 36**" of Exhibit "**SYT-1**" (page 1034)) |
| 27 December 2016 Withdrawal | KFA | 500,000.00 | 192.14 | Characterised as a "*loan [at] 3 years loan tenure and 3% per interest annum*" in the 2016 Management Accounts ("**TAB 35**" of Exhibit "**SYT-1**" (page 1030)) and in an Excel spreadsheet recovered in the ongoing investigations ("**TAB** |

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM                INDEX NO. 152210/2024
NYSCEF DOC. NO. Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 221 of 331
RECEIVED NYSCEF: 03/12/2024

28

| Date of Withdrawal / Deposit | Recipient of Transfer | Sum Transferred out of / Returned to the Plaintiff (USD) | Bank Charges Incurred (USD) | Purported Reason for Transfer and Reference |
|---|---|---|---|---|
| | | | | 36" of Exhibit "**SYT-1**" (pages 1034)) |
| 28 December 2016 Withdrawal | KFG | 6,000,000.00 | - | Characterised as a "*loan [at] 3 years loan tenure and 3% per interest annum*" in the 2016 Management Accounts ("**TAB 35**" of Exhibit "**SYT-1**" (page 1030)) and in an Excel spreadsheet recovered in the ongoing investigations ("**TAB 36**" of Exhibit "**SYT-1**" (page 1034)) |
| 4 January 2017 Withdrawal | KFA | 400,000.00 | 192.48 | Characterised as a "*CONSULTANCY FEE*" with no further details ("**TAB 34**" (page 1016) of Exhibit "**SYT-1**") |
| 22 February 2017 Withdrawal | 2nd Defendant | 353,356.89 | | Characterised as "BONUS" ("**TAB 36A**" (page 1037) of Exhibit "**SYT-1**") |
| 9 March 2017 Withdrawal | KFA | 200,000.00 | 195.75 | No stated reasons provided |
| 21 March 2017 Withdrawal | KFG | 100,000.00 | | No stated reasons provided |
| 6 April 2017 Deposit | KOM | (1,000,000.00) | - | Characterised as a "*REDEMPTION OF 324.4625 SHARES*" ("**TAB 34**" (page 1024) of Exhibit "**SYT-1**") |
| 6 April 2017 Withdrawal | KFA | 500,000.00 | 197.89 | No stated reasons provided |
| 6 April 2017 Withdrawal | KFA | 500,000.00 | 197.89 | No stated reasons provided |
| | **Sub-Totals:** | **34,263,381.89** | **1,554.10** | |
| | **Net Sum Misappropriated:** | **34,264,935.99** | | |

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM INDEX NO. 152210/2024
NYSCEF DOC. NO. Case 1:24-cv-03142-UA Document 1-1 Filed 04/24/24 Page 222 of 331 RECEIVED NYSCEF: 03/12/2024

29

52. In truth, the transfers were not "*loans*", "*consultancy fee[s]*" or "*BONUS*" as falsely recorded in the Plaintiffs' records (this is elaborated upon further at paragraphs 53(d) to 53(f) herein). By April 2017, the funds in the Plaintiff's DBS Account (USD) had been almost entirely depleted and only a balance of USD 5,793.53 remained as of 30 April 2017. After misappropriating these sums, the 1st, 2nd and 3rd Defendants absconded from China in late 2017. Thereafter, the 1st and 2nd Defendants also ceased to carry out duties or functions owed to the Plaintiff, and did not return to the Plaintiff's Office Premises (see paragraph 68 herein). Copies of the bank account statements for the Plaintiff's DBS Account (USD) for the period from 1 November 2015 to 30 April 2017 are annexed hereto and collectively marked "**TAB 33**" of Exhibit "**SYT-1**". Copies of the Transaction Advices which contain details of the transfers from the Plaintiff's DBS Account (USD), and which the Plaintiff has been able to recover, are annexed hereto and collectively marked "**TAB 34**" of Exhibit "**SYT-1**". A copy of the Plaintiff's management accounts for the financial year ended 31 December 2016 (the "**2016 Management Accounts**") is annexed hereto and marked "**TAB 35**" of Exhibit "**SYT-1**". Copies of spreadsheets that were recovered in the ongoing investigations, from a computer seized from the Plaintiff's office that was used during the 1st and/or 2nd Defendants' tenure with the Plaintiff, showing, among other things, that the withdrawal of USD 33,600,000 on 29 December 2015 was in favour of KOM, are annexed hereto and collectively marked "**TAB 36**" of Exhibit "**SYT-1**". A copy of an email chain with DBS regarding the transfers made on 22 February 2017 and 21 March 2017 is annexed hereto and marked "**TAB 36A**" of Exhibit "**SYT-1**".

53. The 1st, 2nd and 3rd Defendant took steps to conceal the nature and existence of the Diversion and gave the false impression that the monies transferred out of the Plaintiff to the 2nd Defendant was for "*BONUS*", and that the monies transferred to

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM    INDEX NO. 152210/2024
NYSCEF DOC. NO.    Case 1:24-cv-03142-UA    Document 1-1    Filed 04/24/24    Page 223 of 331    RECEIVED NYSCEF: 03/12/2024

30

KFA, KFG and KOM were being used in relation to genuine investments. In this respect, the Plaintiff has uncovered the following incriminating evidence as part of the ongoing investigations:

(a)     In or around end-2015, the 1st, 2nd and/or 3rd Defendants created or caused to be created various documents which were designed to create the false impression that the Plaintiff had serious plans to be involved in research and development, technology and innovation in "*gene chip and peptide synthesis*" in Singapore. These documents included:

   (i)     A report assessing the feasibility of having the Plaintiff carry out these tasks, and setting out a breakdown of the Plaintiff's purported costs in doing so (the "**Feasibility Report**"). The Feasibility Report did not and was never intended by the 1st, 2nd and/or 3rd Defendants to reflect their true intentions for using the USD 35 million that was injected into the Plaintiff, which was to effect the Diversion to benefit themselves.  A copy of the Feasibility Report is annexed hereto and marked "**TAB 37**" of Exhibit "**SYT-1**".

   (ii)     Unsigned memoranda of understanding, letters of intent or agreements, some with fictitious research organisations such as the "Biopolis Bio-Medical Science Institute" and the "Singapore General Hospital Pathology Laboratory".  Copies of these documents are is annexed hereto and collectively marked "**TAB 38**" of Exhibit "**SYT-1**".

(b)     The 1st, 2nd and/or 3rd Defendants falsely recorded or caused that it be falsely recorded in the Plaintiff's records that the transfer of USD 33,600,000 to KOM on or around 29 December 2015 was for the subscription of 3,300 "*shares*" in KOM (see the 2016 Management Accounts at "**TAB 35**" of Exhibit "**SYT-1**" (page 1030)). There was no genuine agreement for the Plaintiff to subscribe

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM   INDEX NO. 152210/2024
NYSCEF DOC. NO.   Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 224 of 331   RECEIVED NYSCEF: 03/12/2024

31

to KOM's shares, and no such agreement or share certificates have been uncovered in the Plaintiff's records in the course of the ongoing investigations.

(i)    There was no commercial basis for the purported subscription of shares. According to the Certificate of Incorporation of KOM dated 23 September 2015 ("**KOM's COI**"), KOM was incorporated shortly before the purported subscription on or about 18 September 2015 with a paid-up capital of USD 1. A copy of KOM's COI, which was recovered in the course of the ongoing investigations, from a computer seized from the Plaintiff's office that was used during the 1st and/or 2nd Defendants' tenure with the Plaintiff, is annexed hereto and marked "**TAB 39**" of Exhibit "**SYT-1**".

(ii)    According to an Investment Management Agreement dated 23 December 2015 signed by the 2nd Defendant on behalf of KOM and KFG ("**IMA**"), KFG was purportedly appointed as the "*Investment Manager*" of KOM. The date of the IMA was the same day on which USD 33,600,000 was transferred from the Plaintiff to KOM pursuant to the Diversion (as discussed in 51 herein). Pursuant to clause 7.2, KFG would receive a monthly "*Management Fee*" that was "*equal to 1/12 x 2.5% of the Net Asset Value of [KOM form that month].*" Further, KFG would be remunerated regardless of its performance – the IMA provided for a separate "*Performance Fee*" under clause 7.3. For instance, according to the information uncovered from the ongoing investigations, for April 2016, KFG received a Management Fee of USD 78,784.74 and a Performance Fee of just USD 636.70. There is no apparent commercial justification for the Management Fee when KOM and KFG were both ultimately owned and controlled by the 1st Defendant. A copy of the IMA is annexed hereto and marked "**TAB 40**" of Exhibit "**SYT-1**".

(c)  The 1st, 2nd and/or 3rd Defendants created or caused to be created a document titled "Authorized Person" dated 29 December 2015 which purported to confer upon the 2nd Defendant the power to sign "*subscription form related documents*" on the Plaintiff's behalf. This served to create the false impression that one or more of the transfers made pursuant to the Diversion was or were for the purpose of share subscriptions. The aforesaid document was signed by the 1st Defendant and contained a forgery of Mr Luo's signature. A copy of the aforesaid document is annexed hereto and marked "**TAB 41**" of Exhibit "**SYT-1**".

(d)  The 1st, 2nd and/or 3rd Defendants falsely recorded or caused that it be falsely recorded in the Plaintiff's records that transfers of monies out of the Plaintiff were "*loan[s]*" to KFA (for an aggregate sum of as much as USD 1,610,025) and KFG (for an aggregate sum of as much as USD 8,000,000) or "*consultancy fee[s]*" paid to KFA (for an aggregate sum of as much as USD 950,025). There were no genuine loan agreements or consultancy agreements between the Plaintiff and KFA or KFG, and no such agreements have been uncovered in the Plaintiff's records pursuant to the ongoing investigations.

(e)  With regards to the purported "*loan[s]*" to KFA and KFG, according to the 2016 Management Accounts, those loans had a "*3 years loan tenure and 3% interest per annum*" (see "**TAB 35**" of Exhibit "**SYT-1**" (page 1030)). However, notwithstanding that the tenures for the purported loans have all expired, none of those purported loans have been repaid to-date and no interest has been paid to the Plaintiff thereon. Further, it appears from representations made by KFA itself that there was no commercial basis for KFA to be taking such a substantial loan (for an aggregate sum of as much as USD 8,000,000): (i) in a letter from KFA dated 1 May 2016 that purported to authorise "*China Merchants Bank, New York Branch to search for pharmaceutical projects*",

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM INDEX NO. 152210/2024
NYSCEF DOC. NO. Case 1:24-cv-03142-UA Document 1-1 Filed 04/24/24 Page 226 of 331 RECEIVED NYSCEF: 03/12/2024

33

which was signed by the 1ˢᵗ Defendant, KFA represented that it had "*$2 billion assets under management*" (a copy of the aforesaid letter is annexed hereto and marked "**TAB 42**" of Exhibit "**SYT-1**"); and (ii) according to the Khan Funds website, in 2015, KFA had "*signed a 15-year lease agreement with One World Trade Center*" (see "**TAB 21**" of Exhibit "**SYT-1**" (page 818)).

(f)     The 1ˢᵗ, 2ⁿᵈ and/or 3ʳᵈ Defendants falsely recorded or caused that it be falsely recorded in the Plaintiff's records that the transfer of USD 353,356.89 (approximately SGD 487,632.51 at an exchange rate off USD 1 to SGD 1.38) to the 2ⁿᵈ Defendant on 22 February 2017 was a "*BONUS*" payment. According to clause 5.1 of the 2ⁿᵈ Defendant's Employment Contract dated 8 February 2017, the 2ⁿᵈ Defendant's basic monthly salary was SGD 8,500 and was to be increased to SGD 12,000 after "*completing six months of employment*". According to clause 5.4 of the 2ⁿᵈ Defendant's Employment Contract, the Plaintiff also had the "*absolute discretion [to] pay the [2ⁿᵈ Defendant] a bonus in accordance with the bonus schemes or policies from time to time prevailing in the [Plaintiff]*". According to clause 4.3 of the Plaintiff's Employee Handbook: "*Employees who have completed one year's service as at 31ˢᵗ December may be paid an annual bonus each year. The quantum shall be at the absolute discretion of the Management and be based on the employee's last drawn basic salary as at 31ˢᵗ December of that year.*" The aforementioned transfer would have been equivalent to between 40.6 months (assuming a basic salary of SGD 12,000) and 57.4 months (assuming a basic salary of SGD 8,500) of bonus paid to the 2ⁿᵈ Defendant. Considering that there were no genuine investments being made by the Plaintiff, and in any event that the 2016 Management Accounts showed that the Plaintiff had incurred an operating loss of SGD 6,574,262.96 for the financial year ending 31 December 2016 (see "**TAB 35**" of Exhibit "**SYT-1**" (pages 1027)), it was

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM INDEX NO. 152210/2024
NYSCEF DOC. NO. Case 1:24-cv-03142-UA Document 1-1 Filed 04/24/24 Page 227 of 331 RECEIVED NYSCEF: 03/12/2024

34

unjustifiable for the 2nd Defendant to have been paid a bonus, much less a bonus of 40.6 to 57.4 months, and it is evident that the characterisation of the aforesaid payment as a "*BONUS*" was false and to justify or conceal the unjustified diversion of monies to benefit the 2nd Defendant. In any event, there were no board resolutions, payslips or other documents justifying or approving a "*BONUS*" payment to the 2nd Defendant, and no such documents have been uncovered in the Plaintiff's records pursuant to the ongoing investigations.

(g) The 1st, 2nd and/or 3rd Defendants purported to commence negotiations with various purported investment targets in the biomedical industry in the US, which they alleged had to be prolonged due to complications relating to foreign exchange controls in China, changes to China's regulations on outbound investment monies, the global economic downturn and issues with corporate governance in the investment targets. No evidence of such negotiations have been uncovered in the Plaintiff's records pursuant to the ongoing investigations.

(h) In the Letter to MOM which was dated 29 January 2016, the 2nd Defendant caused the Plaintiff to falsely state that: "*Our [GTQX's] vision is to be the leading investor in biomedical science industry and intend to invest to shape the future-industries of Singapore in the demanding sectors of biomedical science. We encourage the development, expansion and revolution of successful industries to enhance economic progress and generate employment opportunities in Singapore.*" This was after the first two transfers of USD 33,600,000 and USD 310,000 to KOM and KFA, respectively, pursuant to the Diversion had been effected (see paragraphs 51 herein).

(i) On or about 18 November 2016, the 1st, 2nd and/or 3rd Defendants caused KOM to transfer the sum of USD 10 million to the Plaintiff. This was falsely recorded in the 2016 Management Accounts to be for the "*redemption*" of

1,832 shares of KOM (see "**TAB 35**" of Exhibit "**SYT-1**" (page 1030)). However, as discussed at paragraphs 53(b) and (c) herein, there was no genuine subscription or redemption of shares of KOM by the Plaintiff, and no agreements for the subscription or redemption of shares of KOM by the Plaintiff have been uncovered in the Plaintiff's records pursuant to the ongoing investigations.

(j)    In any event, even if the monies were in fact the proceeds from "*redemption*" of a fund that the Plaintiff had invested in through KOM, there was no commercial basis for such a "*redemption*" and no documents evincing any possible commercial basis have been uncovered in the Plaintiff's records pursuant to the ongoing investigations. According to the Plaintiff's 2016 Management Accounts, the "*redemption*" (less than one year after the purported subscription) resulted in a loss of "*USD 3.82 million*" to the Plaintiff, which contributed to an overall "*Loss in investment loss*" of SGD 5,211,740 and an operating loss of SGD 6,574,262.96 for the financial year ending 31 December 2016 (see "**TAB 35**" of Exhibit "**SYT-1**" (pages 1027)). Further and in any event, substantially all of the proceeds of the purported "*redemption*" were transferred on the very same day (*i.e.*18 November 2016) from the Plaintiff to KFG and KFA for the purported "*loans*" referred to in paragraph (d) herein, and pursuant to the Diversion set out in paragraph 51 herein.

(k)    The 1st, 2nd and/or 3rd Defendants systematically effected the Diversion through numerous deposits into and withdrawals from the Plaintiff's DBS Account (USD) over more than 27 months between 29 December 2015 and 6 April 2017 (the details of the deposits and withdrawals are set out in paragraph 51 herein). By April 2017, the funds in the Plaintiff's DBS Account (USD) had been almost entirely depleted and only a balance of USD 5,793.53 remained as of 30 April 2017.

(l)    On or about 12 December 2016, the 1st, 2nd and/or 3rd Defendants caused Shenzhen Guotai to resolve to distribute a "*bonus dividend*" of RMB 50 million to Nations Investment. Some part of the monies were in fact paid out of the RMB 200 Million Investment made by Nations Investment, and not genuine returns on genuine investment carried out by Beijing Khan through Shenzhen Guotai and, by extension, the Plaintiff. A copy of the Dividend Resolution of Shenzhen Guotai dated 12 December 2016 is annexed hereto and marked "**TAB 43**" of Exhibit "**SYT-1**".

(d)    <u>Further investment into Shenzhen Guotai</u>

54.    On or around 29 February 2016, the Board of Directors of Nations resolved to invest a further RMB 200 million into Shenzhen Guotai through Nations Investment. This was announced by Nations by an Announcement No. 2016-016 titled "*Announcement of the Increased Investment by the Wholly-Owned Subsidiary in Shenzhen Guotaiqixing Industry Investment Fund Management Centre*" dated 29 February 2016 ("**Nations Announcement 2016-016**"), a copy of which is annexed hereto and marked "**TAB 44**" of Exhibit "**SYT-1**".

55.    Accordingly:

(a)    By the Further Investment Agreement, Nations Investment agreed to, *inter alia*, invest a further RMB 200 million into Shenzhen Guotai on substantially similar terms as under the Partnership Agreement (see "**TAB 3**" of Exhibit "**SYT-1**" (pages 143 to 150)).

(b)    By a Supplementary Partnership Agreement Regarding Shenzhen Guotaiqixing Industry Investment Fund Co., Ltd. (Limited Partnership) dated

25 March 2016 between Nations Investment and SQKFM, SQKFM provided a guarantee to Nations Investment for the further investment of RMB 200 million with a return on investment of 5% per annum (the "**Second Supplementary Partnership Agreement**"). A copy of the Second Supplementary Partnership Agreement is annexed hereto and marked "**TAB 45**" of Exhibit "**SYT-1**".

(c)     In pursuance of the Further Investment Agreement, on or about 4 July 2016, Nations Investment paid the sum of RMB 200 million to Shenzhen Guotai (the "**RMB 200 Million Investment**").

(e)     **Events leading to the 1st, 2nd and 3rd Defendants absconding in November 2017**

56.     Beginning in late 2016, evidence of the 1st, 2nd and 3rd Defendants' misconduct began to come to light.

57.     In around December 2016, Shenzhen Huilong Certified Public Accountants (General Partnership) ("**Huilong CPA**") carried out a routine audit of Shenzhen Guotai for the period 1 January 2016 to 30 November 2016. Following the audit, Huilong CPA issued an Audit Report dated 21 December 2016, which bore the stamp of the 2nd Defendant as the legal representative of Shenzhen Guotai (the "**Audit Report**").

58.     The audit revealed that;

(a)     apart from its subscription to the Plaintiff's shares, Shenzhen Guotai had only invested RMB 120 million into derivatives trading through 中国国际期货有限公司 (also known as China International Futures Co., Ltd.);

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM INDEX NO. 152210/2024
NYSCEF DOC. NO.    Case 1:24-cv-03142-UA    Document 1-1    Filed 04/24/24    Page 231 of 331 RECEIVED NYSCEF: 03/12/2024

38

    (b)    SQKFM owed RMB 196,344,553.50 to Shenzhen Guotai; and

    (c)    Shenzhen Guotai owed RMB 82,370,561.25 to SQKFM.

59.    By an email dated 12 January 2017, Nations received a copy of the Audit Report from SQKFM. A copy of the aforesaid email and the attached Audit Report are annexed hereto and marked "**TAB 46**" of Exhibit "**SYT-1**". Thereafter, Nations sought clarification from the 1st, 2nd and/or 3rd Defendants as to:

    (a)    whether and which investments into the CROs in the US and EU that was the basis of the original proposal for investment had been made by the 1st Defendant; and

    (b)    the nature of the monies owed by SQKFM to Shenzhen Guotai and *vice versa*.

60.    Nations did not receive any satisfactory clarification to its queries. Accordingly, in around mid-2017, Nations proposed that there be a change to the structure of its investment in Shenzhen Guotai to ensure better governance of its investment. In order to stall any action by Nations, the 1st Defendant purported to agree to Nations' proposal, and represented that he would return to China in end-2017 to discuss further details of the proposal with Nations.

61.    As discussed in paragraph 50(b) herein, in his Complaint dated 24 April 2017, which was and is a publicly accessible document, Mr Polite asserted that the 1st Defendant had been using KFA's funds for his own personal use, such as paying rent and purchasing furniture, that contracts with foreign entities (*i.e.* outside of the US) were repeatedly breached by shortfalls in payments which KFA ignored, and that it appeared that KFA was being used for money laundering. Copies of the Complaint filed by Mr Polite and the Declaration of the 1st Defendant filed in response are

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM INDEX NO. 152210/2024
NYSCEF DOC. NO. Case 1:24-cv-03142-UA Document 1-1 Filed 04/24/24 Page 232 of 331 RECEIVED NYSCEF: 03/12/2024

39

annexed hereto and collectively marked "**TAB 47**" of Exhibit "**SYT-1**". I understand that the Complaint has since been dismissed as the Court declined to exercise jurisdiction over the case, without prejudice to Mr Polite's right to file in the State Court.

62. As the evidence of their misconduct began to come to light, the 1st, 2nd and/or 3rd Defendants took steps to abscond from China and to reside in a jurisdiction outside of China.

63. On or about 21 November 2016, the 1st Defendant incorporated Daibenewise Limited in the Cayman Islands ("**Daibenewise**") (see Section C.2 of the AF Memorandum (1st Defendant) at "**TAB 9**" of Exhibit "**SYT-1**" (pages 238 to 239)). At all material times, the 1st Defendant was the sole shareholder and controller of Daibenewise. In around December 2016, the 1st Defendant used Daibenewise as a vehicle to purchase the property at 249 Cleft Rd, Mill Neck, New York 11765-1003 (Nassau County) in the US. This is the property at which the 1st Defendant now resides (see Section B.1 of the AF Memorandum (1st Defendant) at "**TAB 9**" of Exhibit "**SYT-1**" (pages 231 to 233)). Evidently, the 1st Defendant used Daibenewise to purchase the property in order to conceal his ownership of the property.

64. Beginning from around early-2017, the 1st, 2nd and/or 3rd Defendants carried out or caused to be carried out investigations into visa and immigration requirements for, and regulations surrounding the setting up of family trusts in, diverse territories including the US, Korea and New Zealand:

(a) In around January 2017, the 2nd Defendant instructed an employee of the Plaintiff to carry out research on Korean citizenship requirements. A copy of

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 233 of 331

the email chain between that employee and the 2nd Defendant discussing the employee's research is annexed hereto and marked "**TAB 48**" of Exhibit "**SYT-1**".

(b)     In around February 2017, a law firm in New York, Wildes & Weinberg, P.C., was engaged by the 1st, 2nd and/or 3rd Defendants to provide advice on how to obtain a visa for residence in the US, and to make one or more applications for the same. Copies of email chains showing Wildes & Weinberg, P.C.'s involvement are annexed hereto and marked "**TAB 49**" of Exhibit "**SYT-1**".

(c)     In around May 2017, the 2nd Defendant instructed an employee of the Plaintiff to carry out research on immigration to the US. A copy of an email from that employee to the 2nd Defendant dated 29 May 2017 setting out her research is annexed hereto and marked "**TAB 50**" of Exhibit "**SYT-1**".

(d)     In around July 2017, the 1st, 2nd and/or 3rd Defendants inquired with a law firm in New York, Kleinberg, Kaplan, Wolff & Cohen, P.C. ("**KKWC**"), as to setting up a domestic hedge fund in the US in order to obtain a visa for residence in the US. A copy of KKWC's engagement letter dated 24 July 2017 addressed to the 1st Defendant is annexed hereto and marked "**TAB 51**" of Exhibit "**SYT-1**".

(e)     In around September 2017, the 2nd Defendant instructed an employee of the Plaintiff to carry out research on how to set up an irrevocable family trust in the US, and to source for lawyers who would be able to carry out such work. A copy of an email chain with emails discussing this research dated September and October 2017 is annexed hereto and marked "**TAB 52**" of Exhibit "**SYT-1**".

(f)     Notes on obtaining permanent residence in New Zealand were also found in an undated document recovered in the course of the ongoing investigations, from a computer seized from the Plaintiff's office that was used by the 2nd

Defendant. A copy of the aforesaid document is annexed hereto and marked "**TAB 53**" of Exhibit "**SYT-1**".

The documents referred to above were recovered in the course of the ongoing investigations, from computers seized from the Plaintiff's office that were used during the 1st and/or 2nd Defendants' tenure with the Plaintiff.

65.   In around July 2017, the 1st Defendant was issued with an EB-1 visa permitting him to reside in the US (see Section A.3 of the AF Memorandum (1st Defendant) at "**TAB 9**" of Exhibit "**SYT-1**" (pages 231)).

66.   From around 3 to 16 November 2017, Nations wrote to the 2nd Defendant to request an update on the payment of investment returns for the year ending 2017. The 2nd Defendant falsely represented to Nations that Shenzhen Guotai was calculating the amount of investment returns to be paid. Copies of the Wechat conversation between a Nations representative and the 2nd Defendant are annexed hereto and marked "**TAB 54**" of Exhibit "**SYT-1**".

67.   On around 11 November 2017, the 1st Defendant announced that he would be shutting down a Wechat group which he used to communicate with investors and potential investors. Subsequently, the 1st Defendant became *in communicado* and could not be reached by Wechat or otherwise.  After around 16 November 2017, the 2nd and 3rd Defendants also became *in communicado* and could not be reached by Wechat or otherwise. In around end-November 2017, Nations discovered that the Khan Entities including SQKFM and Shenzhen Guotai had vacated their offices in Shenzhen in early-November 2017 (see the report made to the Shenzhen Municipal Public Security Bureau by Nations Investment dated 29 November 2017, a copy of

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
NYSCEF DOC. NO.

INDEX NO. 152210/2024

RECEIVED NYSCEF: 03/12/2024

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 235 of 331

42

which is annexed hereto and marked "**TAB 55**" of Exhibit "**SYT-1**", and the 14 February 2019 Judgment at "**TAB 5**" of Exhibit "**SYT-1**" (pages 173 to 178)).

68.  The 1st and 2nd Defendants thereafter also ceased to carry out duties or functions owed to the Plaintiff, and did not return to the Plaintiff's Office Premises after around November 2017.

## IV.  SGKFM'S OCCUPATION OF THE PLAINTIFF'S PREMISES

69.  At all material times:

(a)  the 1st, 2nd and 3rd Defendants were and are directors of SGKFM;

(b)  SGKFM's registered address was the Plaintiff's Office Premises; and

(c)  the 1st and 2nd Defendants transacted business for SGKFM from the Plaintiff's Office Premises.

(See the People Profile search carried out on the 1st Defendant at "**TAB 11**" of Exhibit "**SYT-1**" (pages 414 to 415), the Business Profile search carried out on SGKFM at "**TAB 20**" of Exhibit "**SYT-1**" (pages 595 to 598), and the People Profile searches on the 2nd and 3rd Defendants, copies of which are annexed hereto and collectively marked "**TAB 56**" of Exhibit "**SYT-1**".)

70.  The 1st and 2nd Defendants did not require, and the 1st, 2nd and 3rd Defendants did not procure, that SGKFM pay the Plaintiff or any other person for the use of the Plaintiff's Office Premises. At all material times, the rental and service charges for the Plaintiff's Office Premises were entirely paid by the Plaintiff.

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM    INDEX NO. 152210/2024
NYSCEF DOC. NO.    Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 236 of 331    RECEIVED NYSCEF: 03/12/2024

43

71.   The aggregate amount of rental and service charges paid by the Plaintiff to the landlord Shing Kwan Realty Pte Ltd ("**SKR**") for the period from 31 March 2016 (*i.e.* the date of SGKFM's incorporation) to 30 November 2017 was **SGD 290,153.97**. The breakdown of this amount is as follows:

| Year | Month | Amount paid by the Plaintiff (SGD) | Evidence |
|---|---|---|---|
| **2016** | March (only 30th and 31st) | 932.97 (pro-rated) | - Plaintiff's bank statement for its SGD-denominated account held with DBS (the "**Plaintiff's DBS Account (SGD)**") for the period 1 March 2016 to 31 March 2016 |
| | April | 14,461.05 | - Bank statement for the Plaintiff's DBS Account (SGD) for the period 1 April 2016 to 30 April 2016 |
| | May | 14,461.05 | - Bank statement for the Plaintiff's DBS Account (SGD) for the period 1 May 2016 to 31 May 2016 |
| | June | 14,461.05 | - Bank statement for the Plaintiff's DBS Account (SGD) for the period 1 June 2016 to 30 June 2016 |
| | July | 14,461.05 | - Bank statement for the Plaintiff's DBS Account (SGD) for the period 1 July 2016 to 31 July 2016 |
| | August | 14,461.05 | - SKR Invoice dated 1 August 2016<br>- Bank statement for the Plaintiff's DBS Account (SGD) for the period 1 August 2016 to 31 August 2016 |
| | September | 14,461.05 | - SKR Invoice dated 1 September 2016<br>- Bank statement for the Plaintiff's DBS Account (SGD) for the period 1 September 2016 to 30 September 2016 |
| | October | 14,461.05 | - SKR Invoice dated 1 October 2016<br>- Bank statement for the Plaintiff's DBS Account (SGD) for the period 1 October 2016 to 31 October 2016 |
| | November | 14,461.05 | - SKR Invoice dated 1 November 2016 |

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM  INDEX NO. 152210/2024
NYSCEF DOC. NO.  Case 1:24-cv-03142-UA  Document 1-1  Filed 04/24/24  Page 237 of 331  RECEIVED NYSCEF: 03/12/2024

44

| Year | Month | Amount paid by the Plaintiff (SGD) | Evidence |
|---|---|---|---|
|  |  |  | - Bank statement for the Plaintiff's DBS Account (SGD) for the period 1 November 2016 to 30 November 2016 (no payment was made, but two payments were made for rent in December 2016) |
|  | December | 14,461.05 | - SKR Invoice dated 1 December 2016<br>- Bank statement for the Plaintiff's DBS Account (SGD) for the period 1 December 2016 to 31 December 2016 (two payments were made for rent in December 2016) |
| **2017** | January | 14,461.05 | - SKR Invoice dated 1 January 2017<br>- Bank statement for the Plaintiff's DBS Account (SGD) for the period 1 January 2017 to 31 January 2017 |
|  | February | 14,461.05 | - SKR Invoice dated 1 February 2017<br>- Bank statement for the Plaintiff's DBS Account (SGD) for the period 1 February 2017 to 28 February 2017 |
|  | March | 14,461.05 | - SKR Invoice dated 1 March 2017<br>- Bank statement for the Plaintiff's DBS Account (SGD) for the period 1 March 2017 to 31 March 2017 |
|  | April | 14,461.05 | - SKR Invoice dated 1 April 2017<br>- Bank statement for the Plaintiff's DBS Account (SGD) for the period 1 April 2017 to 30 April 2017 |
|  | May | 14,461.05 | - SKR Invoice dated 1 May 2016<br>- Bank statement for the Plaintiff's DBS Account (SGD) for the period 1 May 2017 to 31 May 2017 |
|  | June | 14,461.05 | - SKR Invoice dated 1 June 2017<br>- Bank statement for the Plaintiff's DBS Account (SGD) for the period 1 June 2017 to 30 June 2017 |
|  | July | 14,461.05 | - SKR Invoice dated 1 July 2017<br>- Bank statement for the Plaintiff's DBS Account (SGD) for the period 1 July 2017 to 31 July 2017 |

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM INDEX NO. 152210/2024
NYSCEF DOC. NO. Case 1:24-cv-03142-UA Document 1-1 Filed 04/24/24 Page 238 of 331 RECEIVED NYSCEF: 03/12/2024

45

| Year | Month | Amount paid by the Plaintiff (SGD) | Evidence |
|------|-------|-----------------------------------|----------|
| | August | 14,461.05 | - SKR Invoice dated 1 August 2017<br>- Bank statement for the Plaintiff's DBS Account (SGD) for the period 1 August 2017 to 31 August 2017 |
| | September | 14,461.05 | - SKR Invoice dated 1 September 2017<br>- Bank statement for the Plaintiff's DBS Account (SGD) for the period 1 September 2017 to 30 September 2017 |
| | October | 14,461.05 | - SKR Invoice dated 1 October 2017<br>- Bank statement for the Plaintiff's DBS Account (SGD) for the period 1 October 2017 to 31 October 2017 (excess payment of SGD 0.95 made, not included in Plaintiff's claim) |
| | November | 14,461.05 | - SKR Invoice dated 1 November 2017<br>- Bank statement for the Plaintiff's DBS Account (SGD) for the period 1 November 2017 to 30 November 2017 |

Copies of the SKR Invoices and bank statements for the Plaintiff's DBS Account (SGD) referred to in the table above are annexed hereto and collectively marked "**TAB 57**" of Exhibit "**SYT-1**". A copy of the Tenancy Agreement for the Plaintiff's Office Premises dated 20 January 2016 is annexed hereto and marked "**TAB 58**" of Exhibit "**SYT-1**".

## V.   THE PLAINTIFF'S CLAIMS AGAINST THE 1ST DEFENDANT: BREACHES OF DUTIES

72.   By reason of the matters set out in paragraphs 29 to 68 herein (*i.e.* the Diversion), the Plaintiff is advised and verily believes that the 1st Defendant was in breach of his fiduciary duties (including statutory duties under section 157 of the Companies Act)

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM INDEX NO. 152210/2024
NYSCEF DOC. NO. Case 1:24-cv-03142-UA Document 1-1 Filed 04/24/24 Page 239 of 331 RECEIVED NYSCEF: 03/12/2024

46

to the Plaintiff. As a result, the Plaintiff has suffered loss and damage for which the 1st Defendant is liable.

(a)   The net amount of loss suffered by the Plaintiff in this respect is USD 34,264,935.99 (see paragraph 51 herein).

73.   By reason of the matters set out in paragraphs 69 to 71 herein (*i.e.* SGKFM's occupation of the Plaintiff's premises), the Plaintiff is advised and verily believes that the 1st Defendant was in breach of his fiduciary duties (including statutory duties under section 157 of the Companies Act) to the Plaintiff. As a result, the Plaintiff has suffered loss and damage for which the 1st Defendant is liable.

(a)   In this respect, the Plaintiff paid the rental and service charges for the period from 31 March 2016 to 30 November 2017 that SGKFM should have paid for the use of the Plaintiff's Office Premises, amounting to SGD 290,153.97 (see paragraph 71 herein).

## VI.   THE PLAINTIFF'S CLAIMS AGAINST THE 2ND DEFENDANT: BREACHES OF DUTIES

74.   By reason of the matters set out in paragraphs 29 to 68 herein (*i.e.* the Diversion), the Plaintiff is advised and verily believes that the 2nd Defendant was in breach of her contractual duties and/or fiduciary duties (including statutory duties under section 157(2) of the Companies Act) to the Plaintiff. As a result, the Plaintiff has suffered loss and damage for which the 2nd Defendant is liable.

(a)    The net amount of loss suffered by the Plaintiff in this respect is USD 34,264,935.99 (see paragraph 51 herein).

75.    By reason of the matters set out in paragraphs 69 to 71 herein (*i.e.* SGKFM's occupation of the Plaintiff's premises), the 2nd Defendant was in breach of her contractual duties and/or fiduciary duties (including statutory duties under section 157(2) of the Companies Act) to the Plaintiff. As a result, the Plaintiff has suffered loss and damage for which the 2nd Defendant is liable.

(a)    In this respect, the Plaintiff paid the rental and service charges for the period from 31 March 2016 to 30 November 2017 that SGKFM should have paid for the use of the Plaintiff's Office Premises, amounting to SGD 290,153.97 (see paragraph 71 herein).

## VII.    THE PLAINTIFF'S CLAIMS AGAINST THE 2ND AND 3RD DEFENDANTS: DISHONEST ASSISTANCE

76.    By reason of the matters set out in paragraphs 29 to 71 herein (*i.e.* the Diversion and SGKFM's occupation of the Plaintiff's premises), the Plaintiff is advised and verily believes that the 2nd and 3rd Defendants dishonestly assisted the 1st Defendant's breaches of his fiduciary duties owed to the Plaintiff. The breaches of the 1st Defendant's fiduciary duties are set out in paragraphs 72 and 73 herein.

77.    The 2nd and 3rd Defendants had assisted in or procured the aforesaid breaches of the 1st Defendant in that:

(a) As persons holding executive positions in or otherwise controlling Beijing Khan, Shenzhen Guotai, KOM, KFG and KFA, the 2nd and 3rd Defendants assisted in, procured and/or omitted to prevent the transfers made pursuant to the Diversion, which did not benefit but were detrimental to the Plaintiff (see paragraphs 11 to 20, 29 to 34, 49 to 50 and 54 herein).

(b) The 2nd and 3rd Defendants took steps to conceal the nature and existence of the Diversion and gave the false impression that the monies transferred out of the Plaintiff to KFA, KFG and KOM were being used in relation to genuine investments (see paragraph 53 herein).

(c) As persons holding executive positions or controlling the Plaintiff and SGKFM, the 2nd and 3rd Defendants assisted in having and/or procured that SGKFM occupy the Plaintiff's Office Premises without payment to the Plaintiff or any other person (see paragraphs 69 to 71 herein).

78. The 2nd and 3rd Defendants' assistance in or procurement of the aforesaid breaches of the 1st Defendant were dishonest in that:

(a) Paragraphs 77(a), 77(b) and 77(c) herein are repeated.

(b) The 2nd and 3rd Defendants took steps to abscond from China and to reside in a jurisdiction outside China as evidence of their misconduct began to come to light (see paragraphs 62 to 67 herein).

(c) The 2nd and 3rd Defendants became *in communicado* since November 2017 and absconded from China in late 2017 (see paragraphs 65 to 68 herein).

(d) The 2nd Defendant thereafter also ceased to carry out duties or functions owed to the Plaintiff, and did not return to the Plaintiff's Office Premises after around November 2017 (see paragraph 68 herein).

79.   As a result, the Plaintiff has suffered loss and damage

(a)   The net amount of loss suffered by the Plaintiff in respect of the Diversion was USD 34,264,935.99 (see paragraph 51 herein).

(b)   Further, the Plaintiff paid the rental and service charges paid by the Plaintiff for the period from 31 March 2016 to 30 November 2017 that SGKFM should have paid for the use of the Plaintiff's Office Premises, amounting to SGD 290,153.97 (see paragraph 71 herein).

## VIII.   THE PLAINTIFF'S CLAIMS AGAINST THE 1ST AND 3RD DEFENDANTS: DISHONEST ASSISTANCE

80.   By reason of the matters set out in paragraphs 29 to 71 herein (*i.e.* the Diversion), the Plaintiff is advised and verily believes that the 1st and 3rd Defendants dishonestly assisted the 2nd Defendant's breaches of her fiduciary duties owed to the Plaintiff. The breaches of the 2nd Defendant's fiduciary duties are referred to in paragraphs 74 and 75 herein.

81.   The 1st and 3rd Defendants had assisted in or procured the aforesaid breaches of the 2nd Defendant in that:

(a)   As persons holding executive positions in or otherwise controlling the Plaintiff, Beijing Khan, Shenzhen Guotai, KOM, KFG and KFA, the 1st and 3rd Defendants assisted in, procured and/or omitted to prevent the transfers made pursuant to the Diversion, which did not benefit but were detrimental to the Plaintiff (see paragraphs 11 to 20, 29 to 34, 49 to 50 and 54 herein).

(b)    The 1st and 3rd Defendants took steps to conceal the nature and existence of the Diversion and gave the false impression that the monies transferred out of the Plaintiff to KFA, KFG and KOM were being used in relation to genuine investments (see paragraph 53 herein).

(c)    As person holding executive positions or controlling the Plaintiff and SGKFM, the 1st and 3rd Defendants assisted in having and/or procured that SGKFM occupy the Plaintiff's Office Premises without payment to the Plaintiff or any other person (see paragraphs 69 to 71 herein).

82.    The 1st and 3rd Defendants' assistance in or procurement of the aforesaid breaches of the 2nd Defendant were dishonest in that:

(a)    Paragraphs 81(a), 81(b) and 81(c) herein are repeated.

(b)    The 1st and 3rd Defendants took steps to abscond from China and to reside in a jurisdiction outside China as evidence of their misconduct began to come to light (see paragraphs 62 to 67 herein).

(c)    The 1st and 3rd Defendants became *in communicado* since November 2017 and absconded from China in late 2017 (see paragraphs 65 to 68 herein).

(d)    The 1st Defendant thereafter also ceased to carry out duties or functions owed to the Plaintiff, and did not return to the Plaintiff's Office Premises after around November 2017 (see paragraph 68 herein).

83.    As a result, the Plaintiff has suffered loss and damage.

(a)    The net amount of loss suffered by the Plaintiff in this respect is USD 34,264,935.99 (see paragraph 51 herein).

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM    INDEX NO. 152210/2024
NYSCEF DOC. NO.    Case 1:24-cv-03142-UA    Document 1-1    Filed 04/24/24    Page 244 of 331    RECEIVED NYSCEF: 03/12/2024

51

(b)    In this respect, the Plaintiff paid the rental and service charges for the period from 31 March 2016 to 30 November 2017 that SGKFM should have paid for the use of the Plaintiff's Office Premises, amounting to SGD 290,153.97 (see paragraph 71 herein).

## IX.   THE PLAINTIFF'S CLAIMS AGAINST THE 1ST, 2ND AND 3RD DEFENDANTS: CONSPIRACY BY LAWFUL AND UNLAWFUL MEANS

**(a)   <u>Lawful Means Conspiracy</u>**

84.   The 1st, 2nd and 3rd Defendants wrongfully and with the predominant purpose of injuring the Plaintiff conspired and combined together to injure the Plaintiff by lawful means by:

(a)   effecting the Diversion referred to in paragraph 51 herein; and/or

(b)   assisting in having and/or procuring that SGKFM occupy the Plaintiff's Office Premises without payment to the Plaintiff or any other person (see paragraphs 69 to 71 herein).

85.   The 1st, 2nd and 3rd Defendants intended to cause damage to the Plaintiff in that they intended that:

(a)   the monies that were transferred from Shenzhen Guotai to the Plaintiff for the subscription of the Plaintiff's shares referred to in paragraph 49(d) herein would not be used for the benefit of the Plaintiff but were to be diverted from the Plaintiff to the 2nd Defendant or the various Khan Entities for their own

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM    INDEX NO. 152210/2024
NYSCEF DOC. NO.    Case 1:24-cv-03142-UA    Document 1-1    Filed 04/24/24    Page 245 of 331    RECEIVED NYSCEF: 03/12/2024

52

    benefit pursuant to the Diversion (see paragraphs 11 to 20, 29 to 34, 49 to 50 and 54 herein); and

(b)    the Plaintiff's Office Premises would not be used for the benefit of the Plaintiff but was to be used for the benefit of SGKFM and, by extension, the 1st, 2nd and/or 3rd Defendants' own benefit (see paragraphs 13, 18 and 33 herein).

86.    The common intention of the 1st, 2nd and 3rd Defendants may be seen from the matters referred to in paragraphs 29 to 71 herein. In particular:

(a)    As persons holding executive positions in or otherwise controlling the Plaintiff, Beijing Khan, Shenzhen Guotai, KOM, KFG and KFA, the 1st, 2nd and 3rd Defendants knew or ought to have known of the transfers made pursuant to the Diversion and that the Diversion did not benefit but was detrimental to the Plaintiff (see paragraphs 11 to 20, 29 to 34, 49 to 50 and 54 herein).

(b)    The 1st, 2nd and 3rd Defendants took steps to conceal the nature and existence of the Diversion and gave the false impression that the monies transferred out of the Plaintiff to KFA, KFG and KOM were being used in relation to genuine investments for the Plaintiff's benefit (see paragraph 53 herein).

(c)    The 1st, 2nd and 3rd Defendants took steps to abscond from China and to reside in a jurisdiction outside China as evidence of their misconduct began to come to light (see paragraphs 62 to 67 herein).

(d)    The 1st, 2nd and 3rd Defendants became *in communicado* since November 2017 and absconded from China in late 2017 (see paragraphs 65 to 68 herein).

(e)    The 1st, 2nd and 3rd Defendants thereafter also ceased to carry out duties or functions owed to the Plaintiff, and did not return to the Plaintiff's Office Premises after around November 2017 (see paragraph 68 herein).

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM   INDEX NO. 152210/2024
NYSCEF DOC. NO.   Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 246 of 331   RECEIVED NYSCEF: 03/12/2024

53

(f)   As persons holding executive positions in or otherwise controlling the Plaintiff and SGKFM, the 1st, 2nd and 3rd Defendants knew or ought to have known that SGKFM was occupying the Plaintiff's Office Premises without payment to the Plaintiff or any other person (see paragraphs 69 to 71 herein).

**(b)   Unlawful Means Conspiracy**

87.   Further or in the alternative to the Plaintiff's claim in lawful means conspiracy, the 1st, 2nd and 3rd Defendants wrongfully and with intent to injure the Plaintiff by unlawful means conspired and combined together to injure the Plaintiff by:

(a)   effecting the Diversion referred to in paragraph 51 herein; and/or

(b)   assisting in having and/or procuring that SGKFM occupy the Plaintiff's Office Premises without payment to the Plaintiff or any other person (see paragraphs 69 to 71 herein).

88.   Paragraphs 85 and 86 herein are repeated.

89.   The unlawful means referred to in paragraph 87 are:

(a)   the 1st Defendant's breaches of fiduciary duties (including statutory duties under section 157 of the Companies Act) to the Plaintiff, which are referred to in paragraphs 72 and 73 herein;

(b)   the 2nd and 3rd Defendants' dishonest assistance of the 1st Defendant's breaches, which is referred to in paragraphs 76 and 79 herein.

(c)   the 2nd Defendant's breaches of fiduciary duties (including statutory duties under section 157(2) of the Companies Act) to the Plaintiff, which are referred to in paragraphs 74 and 75 herein; and/or

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM    INDEX NO. 152210/2024
NYSCEF DOC. NO.    Case 1:24-cv-03142-UA    Document 1-1    Filed 04/24/24    Page 247 of 331    RECEIVED NYSCEF: 03/12/2024

54

(d)    the 1st and 3rd Defendants' dishonest assistance of the 2nd Defendant's breaches, which is referred to in paragraphs 80 and 83 herein.

**(c)    Loss and Damage from the Lawful Means Conspiracy and/or Unlawful Means Conspiracy**

90.    By reason of the matters set out in paragraphs 84 to 89 herein, the Plaintiff has suffered loss and damage.

(a)    The net amount of loss suffered by the Plaintiff in this respect is USD 34,264,935.99 (see paragraph 51 herein).

(b)    In this respect, the Plaintiff paid the rental and service charges for the period from 31 March 2016 to 30 November 2017 that SGKFM should have paid for the use of the Plaintiff's Office Premises, amounting to SGD 290,153.97 (see paragraph 71 herein).

**X.    RELIEFS SOUGHT IN THE STATEMENT OF CLAIM**

91.    In the premises, the Plaintiff has made the following claims for relief in the Statement of Claim:

(1)    As against the 1st Defendant, for the breaches of the 1st Defendant's fiduciary duties (including statutory duties under section 157 of the Companies Act):

(a)    pursuant to paragraph 72 herein, the amount of **USD 34,264,935.99**;

(b)    pursuant to paragraph 73 herein, the amount of **SGD 290,153.97**; and

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM INDEX NO. 152210/2024
NYSCEF DOC. NO. Case 1:24-cv-03142-UA Document 1-1 Filed 04/24/24 Page 248 of 331 RECEIVED NYSCEF: 03/12/2024

55

(c)    further or in the alternative to Reliefs 1(a) and 1(b) above, equitable compensation / damages to be assessed for breaches of the 1st Defendant's fiduciary duties (including statutory duties under section 157 of the Companies Act) owed to the Plaintiff.

(2)    As against the 2nd Defendant, for the breaches of the 2nd Defendant's contractual duties and/or Defendant's fiduciary duties (including statutory duties under section 157(2) of the Companies Act):

(a)    pursuant to paragraph 74 herein, the amount of **USD 34,264,935.99**;

(b)    pursuant to paragraph 75 herein, the amount of **SGD 290,153.97**; and

(c)    further or in the alternative to Reliefs 2(a) and 2(b) above, equitable compensation / damages to be assessed for breaches of the 2nd Defendant's contractual duties and/or fiduciary duties (including statutory duties under section 157(2) of the Companies Act) owed to the Plaintiff.

(3)    As against the 2nd and 3rd Defendants, for the 2nd and 3rd Defendants' dishonest assistance of the 1st Defendant's breaches of fiduciary duties (including statutory duties under section 157 of the Companies Act):

(a)    pursuant to paragraphs 76 to 79 herein, the sums of **USD 34,264,935.99** and **SGD 290,153.97** for the 2nd and 3rd Defendants' dishonest assistance of the 1st Defendant's breaches; and

(b)    further or in the alternative to Relief 3(a) above, equitable compensation / damages to be assessed for the 2nd and 3rd Defendants' dishonest assistance of the 1st Defendant's breaches.

(4)   As against the 1st and 3rd Defendants, for the 1st and 3rd Defendants' dishonest assistance of the 2nd Defendant's breaches of fiduciary duties (including statutory duties under section 157(2) of the Companies Act):

   (a)   pursuant to paragraphs 80 to 83 herein, the sums of **USD 34,264,935.99** and **SGD 290,153.97** for the 1st and 3rd Defendants' dishonest assistance of the 2nd Defendant's breaches; and

   (b)   further or in the alternative to Relief 4(a) above, equitable compensation / damages to be assessed for the 1st and 3rd Defendants' dishonest assistance of the 2nd Defendant's breaches.

(5)   As against the 1st, 2nd and 3rd Defendants:

   (a)   pursuant to paragraphs 84 to 86 and 90 herein, in the tort of conspiracy by lawful means, the sums of **USD 34,264,935.99** and **SGD 290,153.97**;

   (b)   in the alternative to Relief 5(a) above, damages to be assessed for conspiracy by lawful means to injure the Plaintiff; and

   (c)   further or in the alternative to Reliefs 5(a) and 5(b) above:

      (i)   pursuant to paragraphs 87 to 90 herein, in the tort of conspiracy by unlawful means the sums of **USD 34,264,935.99** and **SGD 290,153.97**; and

      (ii)   in the alternative to Relief 5(c)(i) above, damages to be assessed for conspiracy by unlawful means to injure the Plaintiff.

(6)   Further to Reliefs 1 to 5 above, as against the 1st, 2nd and 3rd Defendants:

   (a)   interest;

   (b)   costs; and

   (c)   such further or other relief as this Honourable Court deems fit.

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
NYSCEF DOC. NO.
INDEX NO. 152210/2024
RECEIVED NYSCEF: 03/12/2024
Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 250 of 331

57

B.     **THERE IS A GOOD ARGUABLE CASE THAT THE PLAINTIFF'S CLAIMS FALL WITHIN ONE OF THE LIMBS UNDER ORDER 11 RULE 1**

92.    This application is made pursuant to Order 11 Rules 1(d)(i), (iii) and (iv), (f), (o), (p) and (s) of the Rules of Court. In this respect, I am advised and verily believe that there is a good, arguable case that the Plaintiff's claims satisfy the aforementioned limbs of Order 11 Rule 1.

93.    In respect of the claims for breaches of duties against the 1st and 2nd Defendants set out in paragraphs 72 to 75, the Plaintiff relies on:

(a)    Order 11 Rule 1(o), as the claims are for relief against the 1st and 2nd Defendants as fiduciaries of the Plaintiff, a Singapore company, and their liability arises out of acts that were carried out in Singapore, including without limitation effecting the Diversion from the Plaintiff's DBS Account (USD) that was a bank account situated in Singapore;

(b)    Order 11 Rule 1(s), as the claims against them also concern the construction, effect or enforcement of section 157 of the Companies Act, since the 1st and 2nd Defendants were respectively a director and an officer of the Plaintiff, a Singapore company (see paragraphs 22 and 26 herein);

(c)    Order 11 Rules 1(d)(i), (iii) and (iv), as the 2nd Defendant's Employment Contract with the Plaintiff referred to in paragraph 15(b) herein was made in Singapore and pursuant to the 2nd Defendant's employment in Singapore. The 2nd Defendant's Employment contract contains Clause 14.6 which states: "*This Agreement and the relationship between the Parties shall be governed by, and interpreted in accordance with, the laws of Singapore. In respect of any legal*

*action or proceedings arising out of or in connection with this Agreement, the Parties irrevocably submit to the exclusive jurisdiction of the courts of Singapore.*" (see "**TAB 14**" of Exhibit "**SYT-1**" (pages 444)).

(d)   Order 11 Rule 1(p), as the substance of the Plaintiff's causes of actions arose in Singapore. In this regard, the claims are founded on acts that were carried out in Singapore (see paragraph 93(a) above), and the relationships between the Plaintiff and the 1st and/or 2nd Defendants arose in Singapore, are governed by Singapore law and/or subject to the jurisdiction of the courts of Singapore (see sub-paragraphs 93(b) and (c) herein).

94.   In respect of the claims for dishonest assistance against the 2nd and 3rd Defendants set out in paragraphs 77 to 79 herein, and against the 1st and 3rd Defendants set out in paragraphs 80 to 83 herein, the Plaintiff relies on:

(a)   Order 11 Rule 1(o), as the Plaintiff's dishonest assistance claims, including the reliefs sought for those claims, are restitutionary ones and, in any event, seek relief against the respective defendants as trustees; and

(b)   Order 11 Rule 1(p), as the substance of the Plaintiff's causes of action arose in Singapore.  In this regard, the claims are founded on acts that were carried out in Singapore (see paragraph 94(a) herein), and the relationships between the Plaintiff and the 1st and/or 2nd Defendants arose in Singapore, are governed by Singapore law and/or subject to the jurisdiction of the courts of Singapore (see paragraphs 94(b) and (c) herein).

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM    INDEX NO. 152210/2024
NYSCEF DOC. NO.    Case 1:24-cv-03142-UA    Document 1-1    Filed 04/24/24    Page 252 of 331    RECEIVED NYSCEF: 03/12/2024

59

95.    In respect of the claims for the torts of lawful means conspiracy and unlawful means conspiracy set out in paragraphs 84 to 90 herein, the Plaintiff relies on Order 11 Rule 1(f), as the claims are founded on acts that were carried out in Singapore, including without limitation effecting the Diversion from the Plaintiff's DBS Account (USD) that was a bank account situated in Singapore, and involved breaches of duties owed by a director and an officer of the Plaintiff, a Singapore company. Further, the claims are for damage in respect of, or suffered, in Singapore by a Singapore company.

C.    **SINGAPORE IS THE PROPER FORUM**

96.    I have been advised and verily believe that Singapore is the clearly more appropriate forum for hearing the Plaintiff's claims:

(a)    In respect of the claims for breaches of duties against the 1st and 2nd Defendants set out in paragraphs 72 to 75, these fiduciary duties (including statutory duties) were owed to the Plaintiff, which is a Singapore company. These duties owed by the 1st and 2nd Defendants arise out of the common law and section 157 of the Companies Act. They are governed by Singapore law since the law of the place of incorporation (*i.e.* Singapore law) determines the nature and extent of the duties owed by the directors and officers of the corporation. Further, the governing law of the 2nd Defendant's employment contract is governed by Singapore law and provides for the exclusive jurisdiction of the Singapore Courts.

(b)    In respect of the claims for dishonest assistance against the 2nd and 3rd Defendants set out in paragraphs 77 to 79 herein, and against the 1st and 3rd Defendants set out in paragraphs 80 to 83 herein, and the claims for the torts

of lawful means conspiracy and unlawful means conspiracy set out in paragraphs 84 to 90 herein, the governing law is also Singapore law as the substance of the dishonest assistance and the torts is in Singapore – the claims are founded on acts that were carried out in Singapore, including without limitation effecting the Diversion from the Plaintiff's DBS Account (USD) that was a bank account situated in Singapore, and involved breaches of duties owed by a director and an officer of the Plaintiff, a Singapore company. Further, the claims are for damage in respect of, or suffered, in Singapore. In any event, in respect of the aforesaid claims for dishonest assistance, the underlying fiduciary duties which were breached are governed by Singapore law (see paragraph 96(a) herein).

(c)     Obviously, the Singapore Courts are best placed to apply Singapore law.

(d)     In respect of the Plaintiff's claims in general, issues concerning the Plaintiff's corporate governance and internal management arise are issues that should be determined in the place of incorporation (*i.e.* Singapore), according to the law of the place of incorporation (*i.e.* Singapore law). Further, the damage suffered by the Plaintiff occurred in Singapore as the Diversion was effected through transfers from the Plaintiff's DBS Account (USD) that was a bank account situated in Singapore, and in respect of SGKFM's use of the Plaintiff's Office Premises that are located in Singapore.

97.     Further, the Plaintiff's only office was located in Singapore, and documents and devices recovered from the office as part of the ongoing investigations are situated in Singapore.

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
NYSCEF DOC. NO.

INDEX NO. 152210/2024
RECEIVED NYSCEF: 03/12/2024

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 254 of 331

61

**D.**     **THE PLAINTIFF'S CLAIMS HAVE A SUFFICIENT DEGREE OF MERIT**

98.    For the reasons set out in this Affidavit and in the Statement of Claim (a copy of which is annexed hereto and marked "**TAB 59**" of Exhibit "**SYT-1**"), I verily believe that the Plaintiff's claims have a sufficient degree of merit in that they involve a serious issue to be tried.

**E.**     **WHERE THE DEFENDANTS MAY BE FOUND**

99.    As discussed in paragraph 11 herein, the 1st Defendant presently resides at 249 Cleft Rd., Mill Neck, NY 11765 in the US and is likely to be found there. The Plaintiff therefore applies for leave to serve the Writ and Statement of Claim on the 1st Defendant at the aforementioned address or elsewhere as he may be found in the US.

100.   As discussed in paragraph 14 herein, the 2nd Defendant presently resides at 2618 Sea Island Drive, Fort Lauderdale, FL 33301-1589 in the US and is likely to be found there. The Plaintiff therefore applies for leave to serve the Writ and Statement of Claim on the 2nd Defendant at the aforementioned address or elsewhere as she may be found in the US.

101.   As discussed in paragraph 16 herein, the 3rd Defendant presently resides at 249 Cleft Rd., Mill Neck, NY 11765 in the US and is likely to be found there. The Plaintiff therefore applies for leave to serve the Writ and Statement of Claim on the 3rd Defendant at the aforementioned address or elsewhere as she may be found in the US.

62

### F. OTHER MATTERS

102. 21 days will likely be sufficient for the 1st, 2nd and 3rd Defendants to enter an appearance in the Registry of the Supreme Court.

103. It is not necessary to extend the validity of the Writ filed herein.

104. In the circumstances, I pray for an order in terms of the Plaintiff's application herein.

Affirmed by the abovenamed     )
**SUN YINGTONG**     )
on this 26th day of October 2020     )
in Guangzhou, People's Republic of China     )

Before Me,



Ho Jia Yin
Attaché
(Admin & Consular)

2020 -10- 2 6

# EXHIBIT 5

# IN THE GENERAL DIVISION OF
## THE HIGH COURT OF THE REPUBLIC OF SINGAPORE

HC/S 1027/2020
HC/SUM 3901/2021

Between

GUOTAIQIXING BIOMEDICAL INTERNATIONAL
(S) PTE. LTD.

...Plaintiff

And

1. DAI XUEFENG

2. ZHANG JUNQI

3. XU XINMANNI

...Defendants

## 15 November 2021

Coram:  Alison See, Assistant Registrar

*Calvin Liang (instructed) ("PC") and Eugene Low (instructing (Ark Law
Corporation) for the plaintiff/respondent in the application);*

*Lok Vi Ming SC ("D1C"), Ooi Huey Hien, Derric Yeoh, Kenneth Loh (LVM Law
Chambers LLC) for the 1st defendant/applicant in the application.*

*[Hearing conducted via Video Conferencing Zoom]*

[Start: 9.05 am]

Ct    :    *The Court would like to remind you that today's hearing is subject to the
directions previously conveyed to parties in the registry notice. The
Court directs that there is to be no photography or recording in any form
and, in any event, no dissemination of any photographs or recording of
these proceedings as might have been made whether intentionally or
otherwise. Any such photographs or recording should be surrendered to
the Court immediately upon discovery. Only those counsel or persons
notified to the Court should be present at each location. Everyone should*

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 258 of 331

HC/S 1027/2020
HC/SUM 3901/2021                          2                    15 November 2021

> *treat these proceedings as they would a physical hearing in Chambers,*
> *save they need not rise and bow or stand when addressing the Court.*

I have read each parties' affidavits and submissions and it would suffice to highlight your main arguments this morning.

D1C   :   Burden of proof falls on the Plaintiff – see *Humpuss Sea Transport* at Tab 15 of the first Defendant's Bundle of Authorities ("DBOA") [102] – falls on the Plaintiff to show that method of service complies with O 11. Plaintiff has clarified that service is taken out under O 62 not O 11. Whatever method of service is employed, the requirement is still on them to show that the method of service employed complies with the requirements under our Rules of Court ("ROC"). That is clear from *Humpuss*. Refer also to [109] – goes through [109]-[110]. [110b and 110c] relevant in our case. These are well known principles and uncontroversial in nature. See also [100] – burden is reiterated. Reason is because jurisdiction conferred by O 11 is condition precedent to the exercise of jurisdiction under s 16 of the Supreme Court of Judicature Act. Important duty to be discharged by the Plaintiff so there cannot be any shortcuts or assumptions. To found jurisdiction, service must be properly carried out. There are also requirements of comity which run through O 11 and the decision in *Humpuss* and hence service must not contravene laws of the foreign country.

Requirements of substituted service not satisfied here. Not in dispute that under O 62 r 5, order for substituted service can be made but only if it appears to the court that personal service is impracticable. Burden of showing this must lie on the Plaintiff. It is an exception, a limited exception to the rule that originating process must be personally served so that the Defendant knows that an action has been commenced against him. This is also all the more important in respect of a foreign Defendant as service is the condition precedent for jurisdiction to be founded over

1  him. Hence, requirements must be even more stringently scrutinised
2  where service on foreign Defendant is concerned.
3
4  Para 23 of the Supreme Court Practice Directions explains reasonable
5  attempts to be taken to ensure that person is resident or can be located at
6  the property. The Plaintiff has not shown that personal service is
7  impracticable. Service was attempted at two addresses, mostly focused
8  on 249 Cleft Road address *ie* the "New York Premises" – 4 attempts; and
9  one attempt at World Trade Center Address *ie* address of Khan Funds
10 America. No other service attempts. Sufficiency and reliability of service
11 at New York Premises questionable. Basis on which they served there is
12 the report by Applied Facts which relies on third party database
13 aggregator *ie* TLO. We do not know who TLO is and how they carry out
14 the search. We have not seen the TLO search so we do not know the steps
15 taken to verify the accuracy of their searches. We do know however that
16 at the time of the substituted service application, according to the search,
17 the first Defendant ("D1") apparently resided at the address from 2017 to
18 July 2020. By the time that the application was made in February 2021,
19 we know that the search results were outdated by almost 7 months. For
20 search results to be relied on, they should be current and it is stated in the
21 White Book that the "use by" date should not be more than two weeks.
22 There was no full and frank disclosure.
23
24 Affidavits have been exchanged on whether D1 was still staying at the
25 New York Premises. I note that at this stage, the court will not be making
26 findings of fact based on affidavit evidence but I would like to highlight
27 a number of points. Mr Zhang was able to make a couple of assertions on
28 his own – that he assisted in the removal of personal belongings out of
29 the property in March 2020. He also said on affidavit that he has personal
30 knowledge that D1 is no longer staying there.
31

Plaintiff has tried to shore up their evidence. They have adduced a supplemental investigative report to try to bolster their argument that D1 continues to reside at the New York address. When the court considers whether an application ought to stand or be set aside, the court looks at the evidence as at the time of the presentation of the application. In any event, the information in investigative report is equivocal. It shows property may be maintained but does not show conclusively that he lives there. Videos and photos were taken to show activity *eg* gates decorated, entryway maintained. If these efforts were taken after a challenge was mounted, why couldn't they have been done before? *Eg*, why didn't the Plaintiff stake out the property or check with neighbours. If they had done so, they would come to know that D1 no longer resided at that address.

Ct    :    Wouldn't this place too high a burden on an applicant in a substituted service application? You seem to be suggesting that in a substituted service application one would have to stake out at the address in order to confirm that the person to be served is residing there and cannot rely on searches done on the property *etc*. Isn't this impractical especially given that a substituted service application would be taken out after failed personal service attempts *eg* failing to find the individual at the relevant address.

D1C   :    Not unreasonable in this case to say that the Plaintiff ought to have done something more. The Plaintiff company need not do the "stake out". They can hire people to do so. Here, they should have done more because their searches were outdated. Our point is that if they had done a surveillance, there would have been no signs of D1 moving in and out of the premises.

Also refer to *Low Choon Kung* – Tab 21 p 332 of DBOA – para 10. Court in this case appears to place a relatively high burden on the Plaintiff Husband to locate the Wife.

Here, the Plaintiff is a company that has commenced a suit against an individual. Difference in resources available to each, do not see issue with requiring Plaintiff to take reasonable steps to ascertain that he was living there, *eg* talking to neighbours *etc*. They did that at the World Trade Center address by speaking to the guard, but no evidence of such attempts at New York Premises. They could also have conducted searches with government agencies.

Not saying that in every case, all of this must be carried out. But here service is condition precedent to court having jurisdiction over the Defendant.

Moving to our argument on methods of service being contrary to New York law. Our position is that the affix-and-post method carried out do not permit service at a Defendant's last known address. Refer to s 308(4) of the CPLR at Defendant's Bundle of Documents ("DBOD") Vol 1 p 310.

Ct    :    There is no need to spend too much time going through the wording of s 308(4) CPLR because the Plaintiff is not disputing that affixing under s 308(4) must be done at current rather than last known address. Their argument is that s 308 is not even applicable in the first place.

D1C    :    Yes their argument is that s 308 applies only to local processes and not service of foreign process. Our argument is that it applies. We also say it is too late for the Plaintiff to say that it does not apply. Plaintiff cannot blow hot and cold. Plaintiff had relied on s 308. Affidavit of process server stated that affixing at New York address would satisfy laws of New York. Clearly referring to s 308 CPLR. Tab 14 DBOD Vol 1. They say the method of service is specifically permitted. Therefore, the Plaintiff is now running a self-serving argument.

Case in *Humpuss* is clear. Method of service employed must not contravene law of foreign jurisdiction within which service is carried out. Court says there are two ways in which this may not be carried out – failure to serve by way of a mandatory method, or where service was carried out by way of a method that is expressly outlawed.

Law of New York would not permit service of process at last known address under s 308(4) CPLR. We say CPLR does apply to foreign process but it really does not matter because so long as method of service is contravened, one cannot allow it. If Your Honour is troubled by this point, then a New York court can determine if s 308(4) applies to service of foreign process also. But I do not think that we have to go there. But if we were to go there, there is the procedure under O 101 r 3 of the ROC, where a reference can be made to the New York courts to make a determination. This order arose from the *Westacre* case where I had represented one of the parties. Memorandum of Understanding has been entered with Supreme Court of New York in 2015. Valid for 5 years and lapsed in December 2020 and I am not aware of the status. But there can be a reference made using the procedure under O 101 if Your Honour is minded.

Finally, I come to the point that the Plaintiff failed to make full and frank disclosure in obtaining ORC 861. This is a matter determined by the information disclosed at the time of application not at the time of challenge. Fact is material if it comprises matters which the court would likely take into consideration in making informed decision on the application. Here, there was failure to disclose that affixing cannot be done at the last known place of address. Instead, it was stated that service at last known address is specifically permitted. Refer to the affidavit of the process server Charlie Spano. Here, it was not that there was a typo for example. It was the very basis for their application.

Material facts that would be made known to applicant by undertaking inquiries must also be disclosed. Mr Spano has not affirmed an affidavit saying he did not know at the time that the wording would be a critical point. Question is also not whether he considered it to be reasonable but whether this is something which the court ought to have been informed of.

Refer also to case of *Transniko*, and case of *Tecnomar* cited in our BOA.

If Your Honour is with us on the point, breach is not curable per the holding in *Humpuss*.

Those are my submissions.

[Stand Down: 9.55am]

[Resume: 10.05am]

PC     :     Begin with threshold issue. Even if we assume correctness of D1's proxies' evidence that D1 left New York Premises in March 2020, that still does not address the issue of email service. There is no prohibition of substituted service by email. There is nothing in the expert report of Mr Delehanty on email service.

Refer to *Petroval* at tab 15 of our BOA – Justice Tay granted application for substituted service on Defendant's BVI solicitors. Defendants were Swiss residents. To get around delay arising from the need to serve in Switzerland under the Hague Convention, Plaintiff in that case served on Defendant's BVI solicitors. The principles in *Petroval* apply in this case because by the evidence of D1's proxies, D1 was no longer resident of New York since March 2020. Hence email substituted service only needs to comply with Singapore law and not New York law.

At para 69 of Mr Zhang's second affidavit, Mr Zhang says that the email address is not his email address. This is an afterthought. He makes no mention of this in his first affidavit. See para 5 Tab 2 of DBOD vol 1. He does not speak of email service. His evidence that that is not D1's email address also cannot be believed. Refer to DBOD vol 2 p 909 – email sent by D1 using the email address. Refer also to p 19 PBOD – complaint by D1 filed in New York courts. Court filing from Sept 2019. He discharged his lawyers and acted as Litigant-in-Person. He makes allegations of espionage and says that was the reason he fled to New York. He claims that he was asked to assault Warren Buffett, para 418. Further allegations.

Ct   :   What is the relevance of this?

PC   :   P 104 – he says his emails were hacked. Para 370 – shows that he is accessing the email. He refers to it as his own email system. Point is that he refers to email as his own email, signs off on emails. As to whether it is currently active, refer to our submissions at para 48. Email address was listed on Khan Funds website and continued to be listed even where there were developments in this case. He removes the address of the World Trade Center office, but the email remains. References to himself on the website are subsequently deleted. But email address remains unchanged on the website. Pattern of evasion.

For completeness, his complaints were dismissed by the New York courts. Refer to p –

Ct   :   What is the relevance of the findings of the New York court on his complaint?

PC   :   Shows that his evidence is not credible. In the present application, he does not put in his own evidence. He is by all accounts a fugitive. My

learned friend says we should stake out the premises which is an implicit concession that he is on the run. Apparently according to my learned friend, we should have tried to speak to him like the wife in the *Lim* case, we should have checked with neighbours, we should have checked with government agencies *eg* his driving registration *etc*. These are all things which we did.

DBOD vol 1 p 246 and 248 – his own neighbours thought he was living there. He went incommunicado and deleted all his chats – this is asserted in DBOD vol 1 p 170. My learned friend also says that we did not conduct search on driver's licence. We did – see DBOD vol 2 p 799. Search did not turn up any result.

DBOD Vol 1 Tab 6 - Mr Zhang says at para 42 of his affidavit that D1 informed Department of Motor Vehicles ("DMV") of his change in residence on 13 October 2020 and that he went to surrender his licence plate. He says there was receipt for the surrendering dated 22 October 2020. But see the receipt at p 267, his address is still stated as the New York address. Also, surrendering of plates tells us nothing about whether he changed his residency. It also does not verify what he said about D1 informing DMV of his change of address.

DBOD vol 1 p 235 – Mr Zhang says D1 did not check mail since March 2020 – evidence in support is a letter from village clerk. See phrasing at para 7b. Mr Delehanty explains what certificate of occupancy is even though it was not part of his instructions. Nothing said on whether D1 renews the certificate. P 246 – nothing here suggesting that the letter was addressed to his lawyer. It was addressed to D1. Shows that as late as 3 February 2021, D1 was still able to collect his mail. According to D1's own expert at para 109 of Defendant's submissions – the test of whether the premises is Defendant's dwelling place or usual place of abode

Case 1:24-cv-03142-UA    Document 1-1    Filed 04/24/24    Page 266 of 331

1    depends on whether the Defendant stays sporadically at those premises,
2    receives mails or phone calls from those premises *etc*.

3

4    Refer to p 248 DBOD vol 1 – shows that his neighbour still thinks he is
5    living there. Because letter says he received a complaint from neighbour
6    "regarding Eric Dai" and his grass not being cut.

7

8    On phone calls, refer to p 261 - only call logs adduced show outgoing
9    calls. There are 10 pages, only first 3 have been exhibited. So it is not a
10   complete document.

11

12   Their own evidence shows that the address is his usual abode. What more
13   were we expected to do?

14

15   The suggestions made by my learned friend that we should call him,
16   check with neighbours, check with government agencies *etc*, I have
17   explained why that has either already been done, or could not be done
18   because he is a fugitive.

19

20   In any case, we say Mr Zhang's testimony cannot be accepted. Refer to
21   PSBOA *M2B* case – Judge has duty to reject assertions made on affidavit
22   that are equivocal, lacking in precision, inconsistent with documents, or
23   inherently improbable in itself. Courts have warned against uncritical
24   acceptance of affidavit evidence.

25

26   PC says that we should avoid finding of fact in this application. This is
27   not correct. Faced with inconsistencies, duty of court is to reject them.
28   D1's objections hinge on the court accepting the credibility of D1's
29   proxies' evidence that he had moved out since 2020. Refer to Mr Zhang's
30   first affidavit – para 1. Para 11 – no basis stated, inadmissible under O
31   41 r 5. Para 12 – these are hearsay, without basis stated. Goes through
32   para 12. There is no way that D1 can attest to these matters unless he is

1    joined at the hip to D1. He also does not assert that he is joined at the hip
2    to D1. He does not say so because that would make him a possible target
3    for substituted service.

5    Refer to our affidavits in response. Para 119 of our submissions provides
6    a summary – p 55. He has conceded that he engaged Molina
7    Landscaping. The statement in Mr Zhang's first affidavit that D1 is not
8    maintaining the property is therefore misleading. Para 119(c) – telephone
9    lines inconsistency. This is all Mr Zhang says. Somehow, Mr Delahanty
10   knows more than Mr Zhang – p 281(g) where first line contains factual
11   information not stated in factual affidavits. See also 15(d).

13   Ct    :    Wasn't Mr Delehanty just stating his instructions in those paragraphs?

15   PC    :    He was also given the documents. If those were his instructions, they are
16   inaccurate.

18   Refer also to p 291 – p 61(b). There has been no mention of "New Year"
19   decorations. Other troubling aspects of his evidence covered in para 120-
20   126.

22   Also note that my learned friend has watered down his submission from
23   those in his written submissions which were more assertive. He now says
24   we need not determine if s 308 is or is not applicable. The position in the
25   written submissions is that s 308 is applicable. Refer para 32 p 286 – Mr
26   Delehanty says it "may" render judgment a nullity only. Para 33 of his
27   report is on all fours with what our expert is saying all along *ie* that s 308
28   does not relate to service of foreign process and only service of New York
29   process. Key concession.

31   So Mr Zhang's evidence and Mr Delehanty's evidence is undermined.
32   What do we have left? The affidavit of Ms Zheng which contains

1  incredulous statements. Shocked that this affidavit can be found in
2  Singapore proceedings. She says she does not keep in close contact so
3  that substituted service cannot be carried out through her. New York state
4  ID number given on p 271 even though she states her address in para 1
5  as being in Florida. No basis stated for her assertion that he no longer
6  lives at New York premises. Para 7 does not make sense. Para 8 also
7  unbelievable. Double hearsay in para 8. Para 9 – why did she put up the
8  decorations when she was told that he had moved out? Also no
9  documents in support *eg* photo of the decoration, call logs. Is the putting
10 up of the decoration the gesture of gratitude or the making of this affidavit
11 the gesture of gratitude? She also asserted that the decorations were put
12 up in December 2020. Photo that we took showing the decorations was
13 taken in February 2021. Not believable that they were left there for 3
14 months without being affected by the weather. This is the final throw of
15 the dice. New York court stated that D1's evidence is fantastical. Same
16 here.

17

18 This is an unusual case. Not bona fides. No challenge on *forum non*
19 *conveniens*. No challenge that there is good arguable case.

20

21 *IM Skaugen* para 17 – setting aside of service out would serve little
22 purpose but result in more time and costs. D1's decision to avoid
23 submitting an affidavit to avoid stating his address is to evade service and
24 waste more time and costs.

25

26 On substituted service application, on impracticability, general guideline
27 under White Book is that we have to show failed attempts at residential
28 address. Highlight that the phrasing in para 19 of D1's written
29 submissions differs from White Book wording. We have complied with
30 requirements – refer 15 to 23 of our submissions. He was incommunicado
31 so we could not make phone call. A lot of emphasis has been placed on
32 TLO search but TLO search is credible and but one of four data points.

TLO search at p 798. Date of search was 14 July 2020. Why did we not serve at other addresses shown on the search result? Because the dates predated the date of search and thus were not live. Litigation search on Cleft Road also done – these were for tax assessment until 2020. We know from Mr Delehanty's affidavit that he continues to pay tax. He renews tax, signing the document as the owner. P 878 – representation that property is "owner occupied". No evidence that this was changed subsequently. Property owned by Daibenewise which D1 is owner of. Therefore, TLO search was corroborated by these three other sources. For completeness, regarding the end date "14 July 2020" – this is explained at DBOD p 64.

Defendant's submissions para 29(c) – he says he has not listed New York address as his personal address without time limitation. But this is contrary to the documents I have shown. I have dealt with the other sub paras. So there are no other steps which we could have taken.

On credibility of TLO search, these points were not taken on affidavit. But in any event, TLO search was corroborated by other sources. But for Your Honour's knowledge, TLO is used by law enforcement and financial institutions. 2 week "use by" date also stated in White Book not in Practice Directions / Rules of Court. The outcome of the searches remains the same today.

On reasonable attempts at World Trade Center address – complaint is that we only attempted once. Clearly, this is irrelevant because what the guard informed us shows that a second attempt would have been futile. There must be common sense applied to the stipulations.

What is undisputed is that the premises remain owned and maintained by D1 – there is a telephone line, landscaping, he continues to pay taxes *etc*. We have not heard of intention to sell. The address is his last known and

1    also, based on the evidence, his current residence. As late as February
2    2021, he was able to check his mail. There were also decorations in
3    February 2021. Hence, it is safe to say that the address is not only his last
4    known address but also his current address.

5

6    On requirement that there is reasonable probability that method of service
7    would give notice to the defendant of the documents – DBOD Vol 2 Tab
8    27 – White Book [62/5/5] – passage cites *OCBC* case. We have thus
9    shown Your Honour the due diligence conducted. For purposes of
10   substituted service application, we need not prove actual notice. But it is
11   clear from subsequent events that there is actual notice which makes
12   good the requirement that the method of service is likely to bring the
13   documents to the notice of the Defendant. Refer to PBOA – Tab 20 –
14   *Terrestrial* case at paras 30, 31. Inference of actual notice by virtue of
15   subsequent actions of Defendant. In this case, clear from subsequent
16   events that there is actual notice. See para 71 of Defendant's submissions.
17   Worded carefully. Plaintiff's submissions para 55 – request for
18   inspection shortly after service at Cleft Road address. Also another
19   request for inspection shortly after email service. In this request, they
20   specifically asked for affidavits of service and memorandum of service.

21

22   On material non-disclosure – the allegation is that we did not disclose the
23   fact that D1 was no longer living at the address. As I have shown, this is
24   not a fact but a bare assertion. The premise of the material non-disclosure
25   submission and their entire application is the bare assertion that he had
26   moved out since March 2020.

27

28   Legal burden falls on us, but evidential burden falls on D1 because it is
29   a fact that is specifically within his knowledge. Refer s 108 Evidence Act.
30   See Illustration A. This is exactly the case here. Burden of charging
31   accused person is on prosecution but burden to prove that he had his
32   ticket is on the Defendant. Here, D1 has merely put up 2 proxy affidavits.

Mr Zhang says D1 moved out for COVID reasons, but does not explain why he does not want to come back to New York forever. Is it because if he comes back, it would be deemed his usual abode pursuant to s 308(4) CPLR? There is also complete silence on where he has moved to. Portions of his affidavit also contains inadmissible hearsay as mentioned earlier. Also silent on ongoing contacts with D1. They are engaging in cat and mouse games. The suit raises serious issues. He should not be allowed to continue with these cat and mouse games.

Final point is on New York law point. Already pointed Your Honour to fatal statement in Mr Delehanty's expert report. Their point is that we held ourselves to the s 308(4) standard but we conducted service at last known address not actual address. There is misreading of Mr Spano's affidavit – there is no reference to affix and mail, and he is not a lawyer purporting to give evidence on New York law. This was an application for substituted service.

My learned friend also says we made late clarification on the method of service. Not true – see our summons for service out at p 727 where we applied for personal service. When that was impracticable, we then applied for substituted service – see summons at p 984. Mr Spano's affidavit was drafted in a manner to comply with Practice Directions on affidavits for substituted service.

According to *Humpuss*, service only needs to be not contrary to foreign law on service of foreign process. Defendant has avoided stating this distinction in their submissions. As Judge Smith has stated, there is no prescribed method of service of foreign process under New York law.

On Spano's affidavit – it is clear when he said "last residence", it was also a reference to his present residence – see para 6d. Defendant has

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 272 of 331

1  defined last known and actual residence mutually exclusively but here, it
2  is clear that when he said last known, he meant present address and the
3  two terms were not mutually exclusive.

5  Refer to *Humpuss* Tab 10 PBOA – goes through case. The methods of
6  service under O 11 r 3 and r 4 are alternatives. Para 72 – same concession
7  is made by Delahanty here. See also parochial references "village head"
8  and "head of Chinese people" in the relevant foreign legislation there.
9  Same references found in s 308(4) CPLR. See references to "summons"
10 – we served writ and Statement of Claim. "Summons" is specific to New
11 York court process as I showed Your Honour earlier. See also p 496 on
12 "issuance of summons" – p 501-502,503 which set out forms of
13 summons. P 505 – initiating papers in New York are termed "summons".
14 So this is clearly parochial reference to domestic New York litigation.
15 Also reference to "clerk of court" in s 308(4). There is also a filing
16 requirement. When this was pointed out to Mr Delehanty, he says that
17 "court" can refer to foreign court because the act is passive – see  DBOD
18 vol 1 p 288. This is an understatement – para 3 – the filing triggers
19 timelines for entry of appearance. Failure to file nullifies default
20 judgment.

22 O 101 r 3 referred to for the first time today by D1C. This is just a
23 delaying tactic. Submission was also made tentatively on whether
24 Memorandum of Understanding still subsists. Based on what I have
25 shown, there is also really no dispute to be had. No need to trouble New
26 York courts. This is delay tactic because we wrote and asked whether we
27 could have hot tub – see our letter at p 398. Their reply at p 403. At the
28 time, they did not think that hot tub was necessary.

30 Hence, there is no non-disclosure, no breach of New York law. Those are
31 my submissions.

| | | |
|---|---|---|
| 1 | | [Stand Down: 11.53am] |
| 2 | | [Resume: 12pm] |
| 3 | | |
| 4 | D1C : | Three main points in reply. First, the Plaintiff, after all of the |
| 5 | | explanations, has not signalled to us what mode of service they say they |
| 6 | | undertook on the New York premises. Second, on the TLO search. Third, |
| 7 | | we still do not have evidence that they say show that the Defendant still |
| 8 | | lives at premises after March 2020. PC pointed to evidence showing that |
| 9 | | D1 indirectly owns property, but that is as far as he can go. |
| 10 | | |
| 11 | | First point on service – my learned friend prefaced by saying that D1 is |
| 12 | | evading service and absconded to the US. Those are loaded submissions |
| 13 | | which the court cannot make conclusions on especially at this stage. We |
| 14 | | object to the suggestion on absconding. He says he moved to US for |
| 15 | | professional reasons. Not right at this stage to put colour on these |
| 16 | | professional decisions. |
| 17 | | |
| 18 | | Mode of service is important – refer to *Humpuss*. Para 58. Para 59 and |
| 19 | | 62(a) of *Humpuss* lists available methods of service. Methods stated at |
| 20 | | para 59(b) and 59 (c), and 62(b) may be relevant but we still don't know |
| 21 | | which one is being relied on by the Plaintiff. |
| 22 | | |
| 23 | Ct : | Didn't the Plaintiff clarify in their submissions that the service that they |
| 24 | | carried out was pursuant to O 62 r 5? So it would be the method stated |
| 25 | | under para 59(b) of the *Humpuss* decision? |
| 26 | | |
| 27 | PC : | Yes that is clear from our submissions at para 10 and 11 and also the |
| 28 | | header of our summons. |
| 29 | | |
| 30 | D1C : | That is a helpful clarification and would engage our submissions this |
| 31 | | morning. |
| 32 | | |

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 274 of 331

HC/S 1027/2020
HC/SUM 3901/2021                          18                          15 November 2021

1   On TLO search, DBOD vol 1 p 798 – report was dated September 2020,

2   but the TLO search was allegedly done on 14 July 2020. This is a huge

3   gap. My learned friend has not explained this save to say that "use by"

4   date of two weeks is stated in White Book but not set in stone – see my

5   BOA tab 45 p 709 para 62/5/5. Updated search would have been an easy

6   thing to do but was not done. If they did it after the order was obtained,

7   they could have done so before the order was obtained but it was not

8   done. Onus is on the Plaintiff to show that personal service was

9   impracticable. I do not see how inconvenient it would be for the Plaintiff

10   to maintain a surveillance. So there was no response from my learned

11   friend really.

12

13   On enquiries with government agencies, my learned friend said that a

14   search was done on vehicle registration. P 799 – not stated what research

15   was carried out, and what allowed the conclusion to be made. DBOD vol

16   1 p 248 – letter from building manager to solicitor for D1 – "regarding

17   Eric Dai" – difficult to draw any conclusions from this email, concerned

18   only the state of the grass. This was dated June 2020 and is thus consistent

19   with the fact that he had moved out and vegetation was unkempt.

20

21   Owning property and living at property also two different things.

22

23   On the February 2021 letter which my learned friend brought you to, the

24   mail could have been forwarded to D1. The fact that mail is collected and

25   forwarded does not mean person is staying there.

26

27   Ct   :   But in this case Mr Zhang has expressly stated in his affidavit that D1

28   has not checked the mail since he moved out in March 2020. Isn't this

29   inconsistent with the fact that he has managed to produce this February

30   2021 letter?

31

HC/S 1027/2020
HC/SUM 3901/2021        19        15 November 2021

| | | |
|---|---|---|
| D1C | : | Handwritten note "give copies and follow up with Dai" at the top of letter suggest that someone collected the mail. Not unusual for a party to make arrangements for mail to be forwarded. |
| | | On outgoing calls p 259 – latest call is 24 February 2020. P 260 – this shows p 1 which would be the latest call. So the latest call would be 24 February 2020. |
| | | On p 267 – surrender of licence plates on 13 October 2020. On the New York address being reflected in the receipt, the address stated is the address according to the records which may not be updated and accurately reflect where he was residing. |
| Ct | : | But Mr Zhang says that he informed DMV of his change of address on 13 October 2020 and that the receipt was issued for his surrendering of license plates on 22 October 2020. If Mr Zhang had updated the DMV of his change of address, why did the receipt for surrendering the plates still reflect the address of D1 as the New York address? |
| D1C | : | System may take a little bit of time to update. But what we do have is a receipt showing that plates were surrendered by D1. |
| | | On festive decorations – p 269 affidavit of Ms Zheng. PC says it's a farcical account. Acts of gratitude sometimes defy logic and what might seem to be incongruous may not be so. Decorations at p 114 – it's just two ribbons. Uncollected parcels can also be seen in the photo. |
| | | All of these show that by March 2020, D1 had left the premises. |
| | | At the end of the day, what I suggested, doing surveillance, checking with the neighbours *etc* are simple things which could have been done but were not done. |

On Spano's affidavit – my learned friend says the para 7 statements must be read with para 6 and that there is no contradiction *ie* that the address can both be last known place of residence and current residence. Your Honour should look at totality of evidence. See para 8 – refers to para 7(a) and 7(b) modes of service being in compliance with New York law. Para 7(a) and 7(b) refer to "last known address". Plaintiff can't have it both ways. My learned friend says Spano is just a process server but those are his conclusions. Both sides are agreed that under s 308(4), service at actual residence is required. Service at last known address is not sufficient.

My learned friend paints picture of D1 as someone trying to delay proceedings. Pointed Your Honour to a letter suggesting hot tub where Davinder Singh Chambers said that hot tub was not necessary. If delaying was really the intent of D1, he would have agreed to a hot tub since that would have resulted in a longer process.

On my suggestion on O 101, I am not raising this to delay further proceedings and my suggestion certainly does not come from an admission that s 308 is not applicable. What I am simply saying is that if Your Honour would like this to be determined by a New York court, this is open. Making suggestion only to assist Your Honour.

If Your Honour is with us, whether or not New York law is contravened is not for either party to decide but is certainly a point to be made at the time of application for substituted service order. If Your Honour is with us, substituted service order should be set aside and the service carried out would be invalid.

Those are my reply submissions.

| | | |
|---|---|---|
| PC | : | Just 2 quick points. |

First, there has been silence on my submissions concerning service by email.

Second, as to what is material. Materiality and duty of full and frank disclosure were discussed in *Vasiliy Golovin* case at DBOA Tab 35 – [87] – duty of full and frank disclosure only extends to plausible and not all conceivable or theoretical defences. Refer to [88]. It is therefore not for the Plaintiff to conceive of all possible defences and pre-empt them in applying for service out. Can we be blamed for not thinking that a grateful friend would come up with story on their decorations? Can we be blamed for –

| | | |
|---|---|---|
| Ct | : | You have already raised these points earlier. What is the point you wish to make under your second point? |

| | | |
|---|---|---|
| PC | : | Main point is that we are now being chastised for not conducting searches which would result in the same result. |

On delay, not wanting cross examination is just because they didn't want Mr Delehanty to be cross examined after his fatal admission. All of our other suggestions to save time *eg* going straight to High Court Judge were not acceded to also.

| | | |
|---|---|---|
| D1C | : | On emails, my learned friend said essentially that inspection requests were made by Davinder Singh Chambers but that cause papers were not asked for. This has been addressed in our submissions. |

Refer also to para 95 of *Humpuss*. Court said that actual notice alone is not sufficient to cure defective service. If not, all irregularities would *ipso facto* be cured because the fact that a setting aside application is brought

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 278 of 331

1  would show that proceedings have been brought to the notice of the
2  Defendant. My learned friend also brought Your Honour to cause papers
3  in New York proceedings. They simply lifted from the papers in other
4  proceedings and I am not sure how relevant they are. On materiality, and
5  blameworthiness of parties, in respect of category c cases in *Humpuss*,
6  Justice Chong said that to determine if it is curable, one looks at which
7  of the parties is more blameworthy, whether the Plaintiff has made a good
8  faith effort *etc*. In any event, we say this is not a category C case but
9  category B case, and if Your Honour is with me, that would not be
10  curable.

12  Ct      :    Will stand down to deliberate.

14  [Stand Down: 12.55pm]
15  [Resume: 1.15pm]

17  Ct      :    *Decision in Annex is read*.

19  PC      :    On stay pending appeal, this should be separately applied for by D1.

21  On costs, Appendix G range for complex lengthy application of more
22  than three hours is $9,000 to $22,000. We have spent more than 3 hours.
23  Hearing was fact and law intensive. Voluminous affidavits and cross
24  border element to this dispute which increased the workload. In light of
25  this, seeking $22,000 in legal costs, plus reasonable disbursements to be
26  agreed or taxed, and those disbursements should include disbursements
27  for forensic investigative report and expert report.

29  D1C     :    Under Appendix G, there is a specific item for setting aside service
30  applications and this is exactly that application. The range is $3,000 to
31  $14,000 – see item 15 under Part B. This should be the range applied
32  here.

Case 1:24-cv-03142-UA    Document 1-1    Filed 04/24/24    Page 279 of 331

Setting aside applications are not usually considered particularly complex. My learned friend referred to forensic investigation. This is common in setting aside applications. It would involve forensic investigation into place of abode and place of business, this is nothing extraordinary.

I also understand that a prior costs order was already made in relation to the first TLO memo. Understand that costs were in the cause so that would be reserved to the trial Judge.

PC  :  Yes. I should clarify that when I referred to disbursements for the forensics report and Judge Smith's expert report, I was referring to those incurred for this application, not the initial TLO memorandum which was prepared for the purposes of obtaining leave to serve at the earlier stage.

Ct  :  For disbursements, parties to attempt to agree on quantum and if there is no agreement, each party can write in to state their respective positions and I will then determine the amount.

D1C  :  Noted. In relation to legal costs, applying range under item 15, submit that costs of $9,000 would be appropriate.

PC  :  I am just wondering whether item 5 is for matters fixed on the ordinary list as this is a special date hearing.

Ct  :  Appendix G para 4 explains the relationship between Part A and Part B.

PC  :  The facts as I mentioned show that this summons was a complex one. Therefore by virtue of para 4(b)(ii), reference may be made to the Part A costs range.

| | | |
|---|---|---|
| D1C | : | According to para 4, the applicable range depends on whether the court considers the application to be simple or complex. The present application is for setting aside of service, the law in respect of which is not complex. Parties had only focused on *Humpuss*. There was some investigation into the facts but this is consistent with any application of this nature. |
| | | |
| Ct | : | Questions of foreign law were raised in this case and there were also factual disputes that required consideration of investigative reports, the reliance on which by the Plaintiff was not unreasonable. There were also voluminous bundles of documents and quite a number of authorities tendered. I therefore think that costs should be fixed at the higher end of the Appendix G scale for setting aside service applications (item 15 under Part IIB). I do not think that the circumstances warrant going outside of that scale and applying instead the upper limit of $22,000 (under Part IIA) given that no novel or complex points of law were raised. **I therefore award costs of $12,000 to the Plaintiff with disbursements to be agreed if not taxed.** |
| | | |
| | | Which leaves us with Prayer 4 of the summons concerning the stay. Are you still seeking that Mr Lok? |
| | | |
| D1C | : | This would be a consequential order that we would have to take instructions on. There would be timelines for appeal that apply automatically. Rather than us filing another application for stay and incurring further costs, and parties having to return on another day for that application, it would be preferable for prayer 4 to be dealt with today. Ask for prayer 4 to be granted by Your Honour today. |
| | | |
| Ct | : | Minded to deal with this today to save time and costs since it was included in the application and covered in D1C's submissions. What is the reason for your objection to prayer 4 Mr Liang? Is it the phrasing? |

Case 1:24-cv-03142-UA Document 1-1 Filed 04/24/24 Page 281 of 331

HC/S 1027/2020
HC/SUM 3901/2021                          25                          15 November 2021

PC      :      The law is clear that we cannot press the Defendant to file his defence if
               an appeal is pending. But it does not mean that he should get a stay. One
               does not follow from the other. Also, no appeal has been filed and my
               learned friend indicated that he would have to take instructions so it
               would be premature.

Ct      :      Will **grant prayer 4** so that any appeal would not be rendered moot. **The
               rest of the prayers in the summons are dismissed.**

[End: 1.45pm]

Certified Transcript

Assistant Registrar
Supreme Court Singapore

*Sgd*:      Alison See
            Assistant Registrar
            Supreme Court

AS/TSK [23-11-2021]

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 282 of 331

## Annex

1. Summons 3901 of 2021 is the first Defendant's application to set aside an order dated 14 February 2021 granting the Plaintiff leave to serve the Writ and Statement of Claim ("**the Documents**") on the first Defendant by way of substituted service in New York, by:

    a. Posting the Documents on the front door of 249 Cleft Road Mill Neck Nassau County New York 11765-1003 ("**New York Address**");

    b. Sending the Documents by first class mail to the New York Address; and

    c. Emailing the Documents to "office@khanfunds.com" being the email account used by Khan Funds Management America.

    Leave to serve out of jurisdiction had been granted in a separate prior order, which the first Defendant is not challenging in the present application.

2. Having considered the affidavits and submissions made in respect of the summons, the first Defendant's setting aside application should, in my judgment, be dismissed.

3. The first Defendant's principal submission is that it was not impracticable for the Plaintiff to serve the documents by way of personal service and that the Plaintiff had not provided full and frank disclosure to the court in its application for substituted service. In the alternative, the first Defendant submits that the service of the Documents was invalid because the methods of service adopted contravened New York law, and accordingly constituted a violation of O 11 r 3(2) of our Rules of Court.

<u>Whether the requirements for a substituted service order had been satisfied</u>

4. First, I find that the Plaintiff had complied with the requirements for substituted service because reasonable attempts at personal service had been carried out by the Plaintiff prior to applying for substituted service, and there was no breach by the Plaintiff of its duty to make full and frank disclosure.

5. The first Defendant takes issue with the fact that the personal service attempts were made by the Plaintiff at the New York Address. He claims that he had moved out of that address since March 2020, prior to the personal service attempts made by the Plaintiff and submits that the Plaintiff had failed to make proper inquiries concerning his whereabouts. Counsel

for the first Defendant submits that the Plaintiff had merely relied on the findings of an investigative report prepared by a US investigative firm, which in turn contained the results of a search that was conducted a few months before the application for substituted service on "TLO, a third-party database aggregator from Transunion", and that further steps such as checking with neighbours and conducting a surveillance at the property could have been done but were not done. Counsel for the first Defendant also submits that the Plaintiff had failed to disclose that the first Defendant was no longer residing at the New York Address as at the time of the substituted service application, which he says would have made known to the Plaintiff through the TLO search which stated that the first Defendant resided at the address from January 2017 to 14 July 2020.

6.   I find that the personal service attempts at the New York Address were reasonable as they were carried out following the taking of reasonable steps by the Plaintiff to obtain credible information on the first Defendant's residential address and whereabouts, including by hiring an investigative firm to carry out searches and obtain other relevant information. The attempts made by the Plaintiff to determine the whereabouts of the first Defendant were, on the facts of this case, sufficient. There was also no other source of information known to the Plaintiff or which the Plaintiff could reasonably have obtained which contradicted the investigative firm's finding that the first Defendant was residing at the New York Address. I also accept that the phrase "(01/2017 to 07/14/2020)" stated next to the New York Address in the investigative firm's first report was not an indication of the date that the first Defendant ceased to live at the address, but simply showed the date of the TLO search. That the TLO search was carried out a few months prior to the Plaintiff's substituted service application is also immaterial in my judgment because subsequent searches recently carried out on public databases in August 2021 and September 2021 continue to reflect the New York Address as one of the first Defendant's addresses. As I will explain further later on, I also find that the evidence adduced for the first Defendant in this application does not show that he had not been residing at the New York Address at the time personal service attempts were made, or when substituted service was effected.

7.   Thus, on the facts of the present case, I find that the unsuccessful personal service attempts by the Plaintiff's authorised process servers were sufficient to satisfy the prerequisite for a substituted service order, which is that it must appear to the court that personal service is

impracticable. There was also no breach by the Plaintiff of its duty to provide full and frank disclosure to the court.

**Whether the service of the Documents in the manner prescribed under the substituted service order contravened New York law**

8.   As for the question of whether the service of the Documents in the manner prescribed under the substituted service order contravened New York law and therefore constituted a breach of O 11 r 3(2), I find that it did not.

9.   In *Humpuss Sea Transports Pte Ltd (in compulsory liquidation) v PT Humpuss Intermoda Transportasi TBK and anor* [2015] 4 SLR 625 ("***Humpuss***"), the court held that O 11 r 4 of the Rules of Court did not list the possible methods of service out of jurisdiction exhaustively. Instead, it was held that our rules allow different alternative modes of service under O 11 r 3 and O 11 r 4. One of the possible modes of service is that under O 11 r 4(2)(c), that is, service by a method recognised by the law of the foreign jurisdiction for the service of *domestic process* in that country provided that did not contravene foreign law (see para 62b of *Humpuss*). Another possible mode is by way of substituted service with leave of court provided it does not contravene the law of the foreign jurisdiction pursuant to O 11 r 3(1) read with O 11 r 3(2) (see para 59b of *Humpuss*) Here, the Plaintiff is relying on the latter method of service and not the former. In this regard, it is New York law on the service of *foreign process* within New York that is relevant in this application, rather than New York law concerning the service of *domestic process* within New York.

10.  The court in *Humpuss* also explained, at [86], that there are two types of cases prohibited by O 11 r 3(2). First, cases where the foreign jurisdiction has provided for a mandatory method of service of foreign process but the plaintiff did not adopt this method and employed another instead. Second, cases where the method of service employed by the Plaintiff was specifically outlawed by the foreign jurisdiction (at [84]). The court cited Japan, where service of foreign process must be effected by the Japanese courts, as an example of a case where the foreign jurisdiction provides for a mandatory method of service of foreign process, and Switzerland, where service of foreign process by way of a private agent is illegal, as an example of a case where there are methods of service of

foreign process outlawed by the foreign country. I find that the present case does not fall within either of these two types of cases because New York law neither prescribes a mandatory method of service of foreign process nor prohibits any method of service of foreign process.

11. I accept, in this regard, the opinion of the Plaintiff's expert Mr Smith who opines that s 308 of the New York Civil Practice Laws and Rules ("CPLR"), which the first Defendant's expert Mr Delehanty cites for his submission that service in the manner effected had contravened New York law, is of limited relevance. This is because s 308 of the CPLR contains language that is unique to New York proceedings, and that makes it clear that the methods of service prescribed thereunder apply to service of documents pertaining to New York court proceedings and do not concern service of foreign originating process in New York.

12. The provision in the CPLR that is of greater relevance to service of foreign process is s 328 of the CPLR which is permissive in nature. I accept Mr Smith's evidence that section 328 of the CPLR does not set out any mandatory methods of service of foreign process within New York and essentially states that while a party may seek an order from the New York courts to effect service of a document pertaining to foreign proceedings on a person who may be found in New York, "service in connection with a proceeding in a tribunal outside the state may be made within the state without an order of court".

13. For these reasons, I reject counsel for the first Defendant's submission that there was a material non-disclosure or misleading of the court by the Plaintiff in its substituted service application of the fact that affixing pursuant to s 308(4) of the CPLR could not be carried out at the last known address of the person to be served but must be carried out at the person's current address. There was no reference in Mr Spano's affidavit to s 308(4) of the CPLR specifically, or the requirements under that provision. In any event, I do not think that the references to "last known" address and "current address" in that affidavit were intended by Mr Spano to mean different things, nor should they be interpreted as such.

14. In addition, even if I accept Mr Delehanty's opinion that service must be effected through one of the modes of service prescribed under s 308 of the CPLR, I disagree that service has

Case 1:24-cv-03142-UA Document 1-1 Filed 04/24/24 Page 286 of 331

not been effected in accordance with the requirements of s 308(4). Section 308(4) prescribes the method of service known as the "affix-and-mail" service which allows, where personal service is not possible, service by affixing the papers to the door of either the "actual place of business, dwelling place or usual place of abode" of the person to be served, to be followed by mailing the papers to either the person's last known address or actual place of business.

15. The first Defendant's main argument is that service had not been effected in accordance with s 308(4) because the Documents were affixed at the last known address of the first Defendant, rather than the first Defendant's "actual place of business, dwelling place or usual place of abode". To this end, in support of the present application, the first Defendant submitted an affidavit made by his cousin-in-law which essentially states that the first Defendant had moved out of the New York Premises by March 2020, prior to the date on which the Plaintiff had affixed and mailed the Documents in February 2021. No reason was provided as to why the first Defendant had not himself affirmed an affidavit and why his cousin-in-law ("**Mr Zhang**") was doing so on his behalf. The Plaintiff posits that the first Defendant has done so in order to avoid the requirement to state his current address on oath. While I accept that the affidavit filed by Mr Zhang is admissible because hearsay evidence can be admitted in interlocutory proceedings, I place little weight on his evidence for the following reasons.

16. First while Mr Zhang stated that the first Defendant had moved out of the New York Address and has not returned since, aside from his evidence that he personally helped the first Defendant to move out of the premises in March 2020, the majority of his other evidence appears to be based on matters which the first Defendant allegedly told him and which he is not in a position to verify as he does not claim, for example, that he is currently living with the first Defendant or is always with him. This includes, for instance, his statements that the first Defendant has not returned to the premises since March 2020, has not checked the mail at the premises, and has maintained landscaping services and a landline for certain reasons unrelated to residence at the address.

17. Second, Mr Zhang's evidence has not been consistent. For instance, Mr Zhang stated in his first affidavit that the first Defendant has not since the end of March 2020 "made any effort

to maintain the New York Premises in a habitable condition …[and] has not undertaken any maintenance, servicing or renovation work on the premises since then;". However, after the Plaintiff adduced evidence suggesting that snow and leaves continue to be cleared from the property, he stated in his second affidavit that although the first Defendant no longer lived at the address, he had engaged the services of a landscaping company to remove the snow and leaves in order to comply with city land codes. Likewise, although Mr Zhang originally stated that "the 1st Defendant terminated the telephone services at the New York Premises when he and his family moved out of the New York Premises at the end of March 2020", when the Plaintiff adduced evidence that a live telephone line remains registered at the New York Premises, Mr Zhang stated in his second affidavit that the reference to telephone services in his earlier affidavit had been in relation to the use of telephone services for communication purposes and that he has been informed by the first Defendant that a landline has been maintained simply for the alarm system at the premises to work.

18. Third, there is other evidence that, taken together collectively, casts serious doubt on the veracity of Mr Zhang's evidence that the first Defendant had moved out of the New York premises since March 2020 and has not returned since. To name a few amongst others:

   a. First, a request for inspection of documents filed in the suit was made on behalf of the first Defendant by his former solicitors Davinder Singh Chambers on 24 March 2021, shortly after the Documents were affixed and mailed to the New York Address in February 2021 (and before they were sent by email in July 2021). The reason stated for the request was to "find out the grounds on which the Plaintiff sought and obtained leave to serve the Writ and the Statement of Claim out of the jurisdiction on the 1st Defendant *and the grounds on which the Plaintiff sought and obtained leave to serve by substituted service*." In the absence of any explanation provided by the first Defendant as to how he came to become aware of the proceedings and the existence of the substituted service order, the timing of the request for inspection strongly suggests that the first Defendant had actual notice of the proceedings and the existence of the substituted service order by way of the "affix and mail" method of service effected by the Plaintiff. I accept that actual notice by the person on whom documents are sought to be served cannot cure invalid service, where the reason for invalidity is because of a violation of foreign

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 288 of 331

law. However, in the circumstances of this case, the fact that the first Defendant had actual notice of the proceedings soon after substituted service was effected by the "affix-and-mail" method strongly suggests that Mr Zhang's evidence that the first Defendant had moved out from and never returned to the New York Address and has not checked the mail received at the premises since March 2020 (*ie*, evidence submitted on behalf of the first Defendant to show that there is no permanence and stability in the first Defendant's residence at the New York Address), is not credible.

b.   Second, although it is claimed that the first Defendant had moved out from March 2020 and the property has remained vacant since then, festive decorations had been put up sometime between November 2020 and February 2021. On this, I do not accept the evidence given by the 1st Defendant's friend, Ms Zheng, that she and her husband had put up the decorations in gratitude to the first Defendant. This is because of the inherently unbelievable nature of the statements made in her affidavit where she essentially said that although she did not keep in close contact with the first Defendant and did not even have his mobile number, she had gone to the New York Address to hand the first Defendant festive decorations; and when she discovered on arrival that he had moved out of the premises after making a phone call to the first Defendant's sister as no one answered the door, she nevertheless put up the decorations as a gesture of gratitude to the first Defendant.

c.   Third, recent searches carried out on public databases continue to list the New York Address as an address of the first Defendant. Recent property searches also show that the property continues to be owned by Daibenewise Limited, a company which the first Defendant is the sole shareholder and director of.

19.  In conclusion, I find that the substituted service order was obtained by the Plaintiff after reasonable attempts at personal service were carried out, that the method of substituted service was not contrary to New York law because New York law neither prescribes a mandatory method of service of foreign process nor prohibits any method of service of foreign process, and that even if compliance with s 308(4) of the CPLR is required, the requirements prescribed under New York law for that method of service have not been contravened. I therefore dismiss the first Defendant's application. I will now hear parties

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 289 of 331

HC/S 1027/2020
HC/SUM 3901/2021
33
15 November 2021

on the prayer in the summons concerning a stay pending a final resolution of this application, as well as on costs.

_____

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 290 of 331

# EXHIBIT 6

# IN THE GENERAL DIVISION OF

## THE HIGH COURT OF THE REPUBLIC OF SINGAPORE

**1031**

1    HC/S 1027 of 2020

2    (HC/RA 317 of 2021 and HC/RA 352 of 2021)

4                Between

6    **GUOTAIQIXING BIOMEDICAL INTERNATIONAL (S)**

7    **PTE. LTD.**

8                                                   … Plaintiff(s)

9                And

11        1) **DAI XUEFENG**

12        2) **ZHANG JUNQI**

13        3) **XU XINMANNI**

14                                                   … Defendant(s)

16    Coram  :   Justice Valerie Thean                    <u>In Chamber (Zoom)</u>

18    *Eugene Low (Ark Law Corporation); Instructed Counsel – Lead Counsel: Aurill*

19    *Kam (Legal Clinic LLC) and Calvin Liang (Calvin Liang LLC)* ("PC") for the

20    Plaintiff (Respondent in RA 317/2021 and Appellant in RA 352/2021);

21    *Dai Xuefeng (ID verified)* 1st Defendant ("D1") (Appellant in RA 317/2021 and

22    Respondent in RA 352/2021); and

23    *Seah Wei Chun (Mandarin Interpreter)*

25                        <u>**NOTES OF ARGUMENT**</u>

26    <u>**11 May 2022**</u>

28    PC:    RA 317 and 352. On Monday, D1 filed various documents. We have

29             yesterday filed and served on D1 the Counsel Note and affidavit of Mr Low.

30             We are objecting to the new affidavit.

32    Ct:    Affidavit is affirmed in English while D1 is using court interpreter today?

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024
NYSCEF DOC. NO. Case 1:24-cv-03142-UA    Document 1-1    Filed 04/24/24    Page 292 of 331
RECEIVED NYSCEF: 03/12/2024

HC/S 1027 of 2020
(HC/RA 317 of 2021 and HC/RA 352 of 2021)          2

**1032**

Notes of Argument

| | | |
|---|---|---|
| 1 | D1: | Since January, plaintiff has been giving me many troubles, causing me to be |
| 2 | | unable to appoint counsel. After I managed to appoint counsel, problems |
| 3 | | ensured. Have written many letters. Put in affidavit so late because the court |
| 4 | | had approved my filing it. Affidavit was in English because prepared by my |
| 5 | | lawyers in America. Original content provided by me in Mandarin and |
| 6 | | translated by counsel. |
| 7 | | |
| 8 | Ct: | Approval was for filing only. Leave had not been given for the affidavit. |
| 9 | | You must give reasons for late adduction of evidence. |
| 10 | | |
| 11 | D1: | Hope the court can see from litigant's point of view. Fact is that new |
| 12 | | evidence was uncovered. Relates to the plaintiff fraudulently representing to |
| 13 | | the court to get the order for substituted service. Having obtained the service |
| 14 | | of documents through illegal means, I have managed to get hold of process |
| 15 | | server. Second point was that former counsel did not accurately represent |
| 16 | | my wishes to the court. He had neglected his duty. I had provided |
| 17 | | documents to counsel to ask him to provide to the court but he did not do so. |
| 18 | | PC also submitted a few hours ago a few documents. I am objecting to their |
| 19 | | objection to me filing my affidavit so late. But if court allows my document, |
| 20 | | I am not objecting to their response. |
| 21 | | |
| 22 | PC: | 2 points (1) Mr Dai said because of plaintiff, he was not able to appoint new |
| 23 | | lawyers. This is not at all correct. No evidence as to this at all. (2) Mr Dai's |
| 24 | | affidavit was affirmed in English with no Mandarin translation. And clear |
| 25 | | from Mr Dai's letters that he is absolutely fluent in English. |
| 26 | | |
| 27 | | Coming to my objections to the admission of Mr Dai's new affidavit. Refer |
| 28 | | to Counsel Note (New Evidence) and 3rd affidavit of Eugene Low. |
| 29 | | |
| 30 | Ct: | He makes the allegation that plaintiff knew all along he resided in Florida. |
| 31 | | Is this dealt with in Mr Low's affidavit. |

| | | |
|---|---|---|
| 1 | PC: | Mr Low's affidavit only deals with Nations Tech. As for his allegation, at |
| 2 | | paragraph 4c of his affidavit. Crux of the allegation is based on plaintiff's |
| 3 | | own evidence according to Mr Dai. |
| 4 | | |
| 5 | Ct: | Should I put the question another way, which is that he makes an allegation |
| 6 | | that the plaintiff misled the court in the substituted service application. This |
| 7 | | is a new allegation. If I allow D1's affidavit, would plaintiff prefer to |
| 8 | | respond more fully. |
| 9 | | |
| 10 | PC: | No we would not need to. This is not a new point. This is in substance the |
| 11 | | non-disclosure point. Evidence is affidavit of Mr Soon at 1Plaintiff's |
| 12 | | Bundle of Documents ("PBOD") 53 – plaintiff have affirmed to say not |
| 13 | | aware of any other address at the material time. |
| 14 | | |
| 15 | Ct: | In that case, are we able to continue the hearing today based on Mr Dai's |
| 16 | | affidavit and Mr Low's affidavit. |
| 17 | | |
| 18 | PC: | Yes we are able to. |
| 19 | | |
| 20 | Ct: | In that case we will continue with the hearing today. I allow Mr Dai's and |
| 21 | | Mr Low's affidavits. Mr Dai would you like to start with your RA? |
| 22 | | |
| 23 | D1: | Would like court to note this is 10.30pm in Florida. |
| 24 | | |
| 25 | | Have filed a 14-page document. Refer to my affidavit. (1) Plaintiff just |
| 26 | | needs to correctly serve the documents and we can proceed from there. No |
| 27 | | need to lie to the court. Plaintiff has lied to the court. (2) Facts will show |
| 28 | | that I was no longer residing in New York since March 2020. I was already |
| 29 | | residing in Florida. Evidence includes correspondence with doctors, driving |
| 30 | | licence (Florida Driving Licence was issued on 4 October 2020). (3) Have |
| 31 | | engaged counsel in US to conduct investigation. Evidence submitted by Mr |
| 32 | | Emory   Hardy   in   relation   to   misrepresentation   to   the   court. |

| | | |
|---|---|---|
| 1 | | Misrepresentation of the process server. (4) Previous counsel argued in |
| 2 | | court the point about substituted service – this was incorrect because order |
| 3 | | was not properly obtained in first place. Plaintiff did not adhere to New |
| 4 | | York law and so the execution of the order is not correct. |
| 5 | | |
| 6 | Ct: | Clarify whether D1 is asking the court to adopt the previous solicitors' |
| 7 | | submissions, or whether he is asking the court to ignore the submissions? |
| 8 | | |
| 9 | D1: | If there is a conflict, my version is to prevail. |
| 10 | | |
| 11 | Ct: | Are you relying on the previous solicitors' submissions at all. |
| 12 | | |
| 13 | D1: | Will not rely on them if the plaintiff does not rely on them. |
| 14 | | |
| 15 | Ct: | You are the applicant. Plaintiff needs to know what to reply to. |
| 16 | | |
| 17 | D1: | I will not rely on their submissions. I do not know the details of it. It is all |
| 18 | | rubbish. |
| 19 | | |
| 20 | Ct: | Alright. Anything else? |
| 21 | | |
| 22 | D1: | I have engaged an expert on service of documents. Mr Michael Levey has |
| 23 | | given affidavit. Actions taken by the two process servers were irregular. (2) |
| 24 | | Sun's evidence indicated plaintiff knew I was in Florida in October. Sun's |
| 25 | | affidavit. Why didn't they serve on all known addresses. Why didn't they |
| 26 | | serve on me in Florida. (3) Writ commenced on 27 October 2020. Proof of |
| 27 | | address was dated July and September 2020. In normal circumstances, you |
| 28 | | only proceed with process server after the filing of the writ. (4) Had |
| 29 | | engaged counsel in US to investigate the process servers. One of the process |
| 30 | | servers, Apple, was unable to locate me in New York and suggested that I |
| 31 | | had Florida driving licence. Indeed they served the documents on me in |

HC/S 1027 of 2020
(HC/RA 317 of 2021 and HC/RA 352 of 2021)    5

**1035**

Notes of Argument

| | |
|---|---|
| 1 | Florida in April 2022. But that was not the plaintiff's documents, its trial |
| 2 | documents by investigative counsel. |
| 3 | |
| 4 | Mr Emory's affidavit has evidence of the illegal acts. |
| 5 | |
| 6 | Last point is that I am a cooperating agent with the FBI. Can see letter from |
| 7 | FBI to National Security Department. Plaintiff is just trying to take me |
| 8 | down. Plaintiff is carrying out all these acts because plaintiff wants to obtain |
| 9 | more information through this litigation. So for example, now they know I |
| 10 | am a cooperating witness, a whistle blower. This threatens my safety. |
| 11 | |
| 12 | Plaintiff had obtained order in February 2021. Chose specially 8 July 2021 |
| 13 | just so that they can prop up share price. They are a listed company in China |
| 14 | and in announcement to public they announced they obtained successful |
| 15 | service of documents. This is a lie. |
| 16 | |
| 17 | **PC:** Overview - Mr Dai said he will not rely on LVM's submissions. One of the |
| 18 | arguments made by LVM is that O11 is not a valid service under O62r5. |
| 19 | Service not under r3(3) or 4(2)(c). |
| 20 | |
| 21 | **Ct:** However, Mr Dai made the point about how service was not regular under |
| 22 | New York law. PC will have to reply in context of O62r5. |
| 23 | |
| 24 | **PC:** 3 broad points. (1) Validity of the service is a matter for Singapore law. |
| 25 | New York law is only relevant if such subservice is contrary to New York |
| 26 | law. Test is in *Humpuss*. Incompatibility is to be tested by reference to any |
| 27 | mandatory or specified law for the service of foreign process. There is none |
| 28 | in this case. CPLR 308(4) not relevant. |
| 29 | |
| 30 | (2) To extent that D1's expert that CPLR 308(4) applies, we contend his |
| 31 | evidence should be rejected because of failure to address correct question, |
| 32 | and its lack of credibility. (3) Even if assuming it applies, the service |

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM

NYSCEF DOC. NO.

INDEX NO. 152210/2024

RECEIVED NYSCEF: 03/12/2024

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 296 of 331

HC/S 1027 of 2020
(HC/RA 317 of 2021 and HC/RA 352 of 2021)

6

**1036**

Notes of Argument

1   complied with those requirements. And on those requirements D1 received
2   service of the papers.

3

4   O62r5(3) – subservice. Subrule (4) – electronic mail is permitted.

5

6   O11, r3(2) is prohibitive – service cannot be contrary of New York. Rule
7   3(3) is not applicable here. Rule 4 is also not relevant.

8

9   See *Humpuss* Tab 11 [103], [104]. Applying *Humpuss*, Plaintiff's Written
10  Submission ("PWS") paragraph 78 – my expert says no mandatory
11  restrictions, see paragraphs 88 and 90 of PWS – Mr Delahanty does not say
12  there is any mandatory restriction. Paragraph 90 – Mr Delahanty says that
13  domestic laws of New York does not govern foreign process.

14

15  So only issue is Singapore law.

16

17  (2) To reject Mr Delahanty's contentions on CPLR.

18

19  Ct:   That is a fallback position am I right. That on Mr Delahanty's evidence,
20        there is no O11 prohibition, and so the only relevant issue is O62.

21

22  PC:   Yes. Email – even Mr Delahanty does not assert email service is contrary to
23        New York law. See Defendant's Written Submission ("DWS") 63 refers to
24        Mr Delahanty's report but if turn to 1PBOD 285 there is no allegation that
25        email service is contrary to New York law. 276-277 paragraph 11 – the
26        issues that he addresses only refers to affix and mail process, not email
27        process. In 295-296, he refers in conclusion only to the affixing of process.
28        He does not say email service is bad.  So in this case O62r5(4) applies –
29        email service was valid and also effective.

30

31        [Mr Liang]

32

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
NYSCEF DOC. NO.
INDEX NO. 152210/2024
RECEIVED NYSCEF: 03/12/2024

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 297 of 331

HC/S 1027 of 2020
(HC/RA 317 of 2021 and HC/RA 352 of 2021)                7

1037
Notes of Argument

1   Mr Dai's evidence now is that he was residing in Florida all this time. In
2   such a case New York law is irrelevant. The email service is all the more
3   valid.
4

5   Counsel Note paragraph 4 – D1 says core is that solicitors lied to court.
6   There is no default judgment against him. PBOD 53 2nd affidavit of Sun
7   categorically states that plaintiff did not know. This was in the affidavit for
8   service out of jurisdiction 2PBOD 89. Mr Dai's point was to blanket serve
9   on all New York addresses. But today he is saying he lived in Florida all
10  along. There were no Florida addresses. For Cleft Road, that was current as
11  at date search was run.
12

13  Ct:   But in Mr Dai's latest affidavit, he points to Sun's affidavit.
14

15  PC:   He uses Applied Facts Memo – generated in response to present application,
16        filed in our reply affidavit 1PBOD 79. Does not relate to facts that plaintiff
17        knew at the material time of the subservice application. Ex post. This was
18        run on 24 August 2021. Mr Dai filed application to set aside on 19 August
19        2021. Cleft Road still remained as his most recent address in 2021.
20

21        I will come to 2022.
22

23  Ct:   2022 is not relevant though. Your case is (1) that the service was valid and
24        effective at time of service; and then (2) there was no material disclosure
25        behind the obtaining of that subservice order which has been validly carried
26        out? 2022 is not in issue.
27

28  PC:   Yes and what the 24 August 2021 search shows is that even if we ran the
29        same search at time of service of the writ, the Cleft Road address would
30        have been the current address. His supporting affidavit to set aside, his own
31        evidence was the last date. So it would not have made sense to serve in
32        Florida because Cleft Road was the most recent address.

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM

NYSCEF DOC. NO. Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 298 of 331

INDEX NO. 152210/2024

RECEIVED NYSCEF: 03/12/2024

HC/S 1027 of 2020
(HC/RA 317 of 2021 and HC/RA 352 of 2021)                8

1038

Notes of Argument

1  Plaintiff's Bundle of Authority ("PBOA") Tab 28. US judgment page 3.
2  Issue of him being a whistle blower is not new. Dismissed in page 6 of
3  judgment.
4
5  This morning Mr Dai raised Exhibits. See Annex A. Mr Levey is referring
6  to New York standards. Mr Delahanty never made reference to these
7  standards.
8
9  Exhibit E – Mr Hardy. Relates to wrong time window.
10
11  Final point to note. Letter dated 25 February to court – "I have been open
12  with court since 11 January 2022" when terminated LVMC. Building on
13  that this morning by saying lawyers did not follow his instructions. He is
14  now saying all erroneous and relying on his affidavit of today. But the
15  affidavit of today derails all his arguments.
16
17  RA 352: Refer to WS. $20,184.22 for investigators. Judge Smith
18  $100,038.71. AR discounted both – awarded $15,000 for the investigators.
19  For Smith $20,000. (1) At first instance DC said nothing extraordinary.
20  Now defendant is saying disallow in entirety. (2) $21,000 to the AR.
21  Defendant has disclosed Mr Delahanty's invoices $1,150 per hour and
22  $10,000 retainer. Smith by comparison charge out was $1,500.
23
24  [12.30pm]
25
26  D1:    Could I have a break.
27
28  Ct:    Stand down to 2.30pm.
29
30  [2.30pm]
31

HC/S 1027 of 2020
(HC/RA 317 of 2021 and HC/RA 352 of 2021)          9

**1039**

Notes of Argument

| | | |
|---|---|---|
| 1 | PC: | Delahanty spent 23.6 hours in reply to Judge Smith. Total bill came to |
| 2 | | $61,290. In Singapore dollars, it is $98,000. Identical to Judge Smith's bill. |
| 3 | | Defendant has also disclosed Sidley Austin's bill and that was US$297,000. |
| 5 | Ct: | Question: was issue as to New York law first raised by D1? |
| 7 | PC: | First raised by D1 in their setting aside application. So we replied to them. 2 |
| 8 | | reports on each side. |
| 10 | | D1 contended fees disproportionate. We now know D1 spent US$690,000 |
| 11 | | in US lawyers and expert just for the hearing before the AR. |
| 13 | Ct: | Did AR have this information? |
| 15 | PC: | When AR applied the discount, she did not have this information. She relied |
| 16 | | on the defendant's characterisation of it. There was no comparative figures |
| 17 | | from D1. Now there are. These breakdowns are from his latest affidavit. |
| 18 | | Sidley – US$290,000, DSC - US$290,000 LVM - US$200,000. Mr |
| 19 | | Delahanty's bill was in a letter to the court, was not before the AR. |
| 21 | D1: | Reply. Refer my affidavit page 109 order of court – not too sure about the |
| 22 | | specific rules or orders used by counsel, just adopt this order to make my |
| 23 | | argument. On relevance of New York law, I agree that it is Singapore law |
| 24 | | that should be followed. As to which foreign law is applicable, must be New |
| 25 | | York law. But I have been in living in Florida since March 2020 and it is |
| 26 | | ridiculous to be discussing New York law. They have used New York law |
| 27 | | but in this case they have contravened New York law. Should not allow |
| 28 | | them to carry out illegal action. As for paragraphs quoted by PC, Mr |
| 29 | | Delahanty was not engaged by me, engaged by counsel. They just handed |
| 30 | | me a huge bill. |

1   Plaintiff had obtained order by fraudulent means. They have conducted an
2   illegal surveillance against me.

3

4   Reply to Mr Liang's point. Chinese have an idiom, creating buildings on
5   sand – once the sand is off, the building falls. Mr Liang disapproved what
6   Ms Kam argued, in that I was living in Florida. He had mentioned he knew I
7   was in Florida. This was all built upon the order of 14 February 2021 – this
8   order was obtained through deceptive means.

9

10   Focus of my argument was whether or not in the first place they had the
11   eligibility to obtain the subservice order, whether obtained through legal
12   means.

13

14   Had instructed my previous counsel to investigate circumstances as to how
15   they obtained substituted order and pursued this in New York. Previous
16   solicitors said they were afraid they would be killed in the investigation.
17   Later I will pose question to Ark Law as to whether they have done
18   anything illegal.

19

20   Service through email: It is ridiculous that they served me by my office
21   email.

22

23   Ct:   You are not saying the email service not effective, am I right – you have not
24         disputed this in any of your affidavits.

25

26   D1:   I did not receive it.

27

28   Ct:   Where did you say you did not receive it. This was also not raised by both
29         of your previous solicitors.

30

31   D1:   This is not my personal email. I am not adopting any of my previous
32         solicitors' submissions. Only my latest affidavit. Page 9 see (h) 6th line –

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM INDEX NO. 152210/2024

NYSCEF DOC. NO. Case 1:24-cv-03142-UA Document 1-1 Filed 04/24/24 Page 301 of 331 RECEIVED NYSCEF: 03/12/2024

HC/S 1027 of 2020
(HC/RA 317 of 2021 and HC/RA 352 of 2021)        11

1041

Notes of Argument

1  general email address of one of my companies using an address that I do not
2  personally monitor.

3

4  Ct:    There is no allegation at (h) of your affidavit that the service was not
5         effective in that you did not receive it.

6

7  D1:    Indeed I did not see this email. I only got wind of this after the Nations
8         Tech's public announcement that they had effected service. I found out
9         because someone told me there was mail from Singapore related to me.
10        Because I was cooperating with FBI and they were harping on this
11        Singapore matter and so the mail caught my attention. In January 2018,
12        controller of Nations went to my office in SGX and took away items,
13        damaging the office.

14

15        RA 352: How much one party has spent you must get a third party to look at
16        them. Cannot use my bills to compare. I totally object to their appeal.
17        Should have gotten a third party to validate the claims.

18

19 Ct:    Their point is that the bills that you paid could be an indication of
20        reasonableness as to their bills, which are not disputed. Do you have a
21        response to that.

22

23 D1:    I agree to their view but would just like to let them know I have incurred a
24        lot more money. Bill in US is $1.5 million. Could I have the amounts again.

25

26 PC:    Mr Dai referred to time stamps. That would suggest there is a recording
27        taking place. Could Mr Dai confirm he is not flouting the rules as to
28        recording.

29

30 Ct:    Mr Dai please clarify.

31

32 D1:    I only took written note of the times.

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM    INDEX NO. 152210/2024
NYSCEF DOC. NO. Case 1:24-cv-03142-UA    Document 1-1    Filed 04/24/24    Page 302 of 331    RECEIVED NYSCEF: 03/12/2024

HC/S 1027 of 2020
(HC/RA 317 of 2021 and HC/RA 352 of 2021)          12

**1042**

Notes of Argument

| | | |
|---|---|---|
| 1 | PC: | Grateful for the confirmation. Judge Smith: $100,038.71. Applied Facts |
| 2 | | (investigators): $20,184.22. |
| 3 | | |
| 4 | D1: | Who engaged Applied Facts. |
| 5 | | |
| 6 | PC: | Plaintiff had engaged Applied Facts. |
| 7 | | |
| 8 | Ct: | Any response to the issue of the email address raised by Mr Dai for the first |
| 9 | | time. |
| 10 | | |
| 11 | PC: | (1) Was he notified (2) Whether it was his email account. Prior to today no |
| 12 | | denial of notice of email. Even paragraph 4(h) does not deny that he |
| 13 | | received notice. Just a bald statement that does not monitor. This is |
| 14 | | contradicted by the evidence.  See PWS paragraph 7 – in the New York |
| 15 | | Complaint 2PBOD 396. See (iii) He identifies the account as his. 383 |
| 16 | | paragraph 370. This puts paid to latest assertion that he does not monitor the |
| 17 | | account. 403 paragraph 414. 423 paragraph 449. PWS paragraph 7(b) – he |
| 18 | | self identifies as President using this email address. 7(c) – section on |
| 19 | | website saying contact us. Throughout life of action it was the defendants |
| 20 | | listed on the site. Updated regularly per (i). |
| 21 | | |
| 22 | | See PWS 28. D1 is clearly making up the facts as he goes along. |
| 23 | | |
| 24 | D1: | Is Alibaba relevant? |
| 25 | | |
| 26 | Ct: | I do not consider it relevant, but do you have anything further to say before I |
| 27 | | give my orders. You may say anything you think relevant. |
| 28 | | |
| 29 | D1: | In relation to email, no evidence that I was in control of that address since |
| 30 | | 2020. I do admit I was in control in 2020. With appointment of CEO and |
| 31 | | CFO, why would I be controlling this email. I had moved to Florida in |

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM INDEX NO. 152210/2024
NYSCEF DOC. NO. Case 1:24-cv-03142-UA Document 1-1 Filed 04/24/24 Page 303 of 331 RECEIVED NYSCEF: 03/12/2024

HC/S 1027 of 2020
(HC/RA 317 of 2021 and HC/RA 352 of 2021)          13

**1043**

Notes of Argument

1    March 2020 so why would I still control the email in New York when I
2    have a CEO in New York.
3
4    In conclusion, I would like to say proceedings started by plaintiff is illegal,
5    they had used deceptive means. At my end, I have obtained investigations.
6    If this is not enough, we can subpoena the process servers. Why are we not
7    getting them into this case.
8
9    I find it very unfair if court were to order this service is effective. Not in
10   New York, not living in New York. If plaintiff can get subservice, this is
11   unfair. Anyone can use this kind of practice.
12
13   Last point is that I don't know what motive Ark Law has, motive may be to
14   make money. If I lose appeal, I will definitely appeal against the decision.
15   This subservice order was illegal. It is very unfair to me. Actual crux of case
16   is something else. At most Ark Law will get judgment and try to enforce but
17   I can tell you seriously they will not get any money. Although I am a
18   foreigner, I hope to be treated fairly by the Singapore court system.
19
20   As to the address as to why it was effective only until 17 October, what Mr
21   Liang represented just now was untrue. As for 249 addresses, that search
22   can only list out all addresses related to me, that is the only point made by
23   the address search. Still no reply as to why they did not make a refresh
24   search for last known address, even after the writ was served.
25
26   I am currently carrying out criminal investigation against Ark Law. If new
27   evidence we will present the new evidence and defend ourselves from there
28   on. Simple issue on service. Can just serve documents on me in Florida.
29
30   Ct:   Let me start by noting D1's remarks about the Singapore judicial system.
31         Let me assure D1 that the Singapore judicial system treats all litigants fairly.

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM   INDEX NO. 152210/2024
NYSCEF DOC. NO.   Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 304 of 331   RECEIVED NYSCEF: 03/12/2024

HC/S 1027 of 2020
(HC/RA 317 of 2021 and HC/RA 352 of 2021)          14

**1044**

Notes of Argument

1    We deal with cases in accordance with our laws, which provide rules for
2    substituted service on litigants.

3

4    **RA 317 -** Many arguments were raised. I deal with the two primary issues.
5    First, I deal with the antecedent question as to whether the AR's order for
6    subservice was obtained on a material non-disclosure or deception because
7    the plaintiff knew all along that D1 lived in Florida. The exhibits in his
8    recent affidavit are not relevant to the specific issue as to the plaintiff's
9    knowledge at the time of the application for subservice. The evidence does
10    not show that the plaintiff knew he lived in Florida as asserted this morning,
11    nor was fraudulent means shown.

12

13    Coming then to the validity of the service effected. New York law does not
14    carry any particular prohibition relevant to service of Singapore process.
15    Our Rules allow substituted service under O62r5. Email service is
16    permissible under O62r5(4) and was effective in this case. The other orders
17    were also valid under O62r5(3).

18

19    **This appeal is therefore dismissed.**

20

21    **RA 352 -** There were two disbursements in issue. Will not change the order
22    on the disbursement concerning Applied Facts as the AR had discretion to
23    tax down and the reduction amount was a small amount. **For the**
24    **disbursement for Judge Smith, in light of the new facts indicating**
25    **reasonableness of the disbursements, appeal is allowed and this**
26    **disbursement should be paid at $100,038.71. This appeal is allowed in**
27    **part.**

28

29    May I hear parties on costs. Are there any other directions required?

30

31   PC:   (1) 3 rounds of getting up prior to today. January, March and then today. (2)
32        In between January and today, 13 sets of correspondence written by D1 to

HC/S 1027 of 2020
(HC/RA 317 of 2021 and HC/RA 352 of 2021)    15    Notes of Argument

**1045**

the court. Annex B. Item 21 – 56 pages. Item 36 – 233 pages. We dealt with all this on urgent basis. (3) Item 48 is new affidavit with new arguments which we dealt with today on urgent basis. (4) LVM had contended *Humpuss* was wrongly decided and we had done the work to contest that.

As to quantum Appendix G – $9–22,000 for special date half date. $5–35,000 per appeal.

$65,000 for RA 317 and $10,000 for RA 352. Ask global order of $75,000 exclusive of disbursements. Ask $65,000 taking into account the costs thrown away, getting up on different points, substantive correspondence.

Disbursements total for both is about $5,500.

No other ancillary issues.

D1:    I object to the amounts. I will see you in the New York court.

I hope Court will consider to not dismiss RA 317 although you have already done so. If making further orders, nothing to say.

Perhaps court can order them to go to jail, and review the earlier order.

Ct:    I have made the orders on due consideration, and have explained them to you.

As for costs, **costs to the plaintiff. Inclusive of wasted costs of previous adjournments, correspondences and also disbursements, fixed at $60,000 all in.**

Sgd by: Valerie Thean
Judge

Certified True Copy

Manager, Judge's Chambers
Supreme Court Singapore

# EXHIBIT 7

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 307 of 331

## IN THE GENERAL DIVISION OF
## THE HIGH COURT OF THE REPUBLIC OF SINGAPORE

HC/S 1027/2020

Between

**GUOTAIQIXING BIOMEDICAL
INTERNATIONAL (S) PTE. LTD.**
(UEN No. 20150039K)

…Plaintiff(s)

And

1. **DAI XUEFENG**
   (PRC Passport No. █████2878)

2. **ZHANG JUNQI**
   (PRC Passport No. █████9520)

3. **XU XINMANNI**
   (PRC Passport No. █████7254)

…Defendant(s)

## DEFENCE OF THE 1ST DEFENDANT

1.     This Defence is filed without prejudice to the 1st Defendant's right to seek further and better particulars of the Statement of Claim dated 27 October 2020 ("**SOC**") and/or administer interrogatories and/or strike out the SOC or any part thereof. The 1st Defendant expressly reserves his right to amend this Defence thereafter.

2.     Unless otherwise defined herein, the 1st Defendant adopts the abbreviations used in the SOC.

3.     Paragraphs 2 and 3 of the SOC are admitted.

4.      Save that there was a Partnership Agreement and a Further Investment Agreement as set out at paragraphs 4(a) and 4(b), paragraph 4 is not admitted.

5.      Paragraph 5 of the SOC is admitted.

6.      Save that there was a judgment from the People's Court of the Shenzhen Qianhai Co-operation Zone in 2019, paragraph 6 is denied. The 1st Defendant further avers that there was no misconduct on the part of Beijing Khan. Further, the Shenzhen judgment was a default judgment and neither the 1st Defendant nor Beijing Khan were aware of the action until disclosed in the SOC. An action is currently pending before the Chinese courts to overturn the 2019 default judgment.

7.      Save that the 1st Defendant is no longer a director of the Plaintiff, paragraphs 7 and 8 of the SOC are not admitted.

8.      Paragraphs 9 and 10 are admitted.

9.      Paragraph 11 is not admitted, and the Plaintiff is put to strict proof thereof. The 1st Defendant specifically denies being the founder of Beijing Khan.

10.     The 1st Defendant does not plead to paragraphs 12 to 15 as they do not relate to the 1st Defendant.

11.     Save that the 1st Defendant was in the business of fund management, paragraph 16 is not admitted.

12.     Paragraphs 17 to 19 are not admitted and the Plaintiff is put to strict proof thereof.

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM    INDEX NO. 152210/2024
NYSCEF DOC. NO. 10    Case 1:24-cv-03142-UA    Document 1-1    Filed 04/24/24    Page 309 of 331    RECEIVED NYSCEF: 03/12/2024

3

13.    Save that the 1st Defendant owes statutory duties under section 157 of the Companies Act, paragraph 20 is not admitted.

14.    The 1st Defendant does not plead to paragraphs 21 to 26 as they are not relevant to the 1st Defendant.

15.    Paragraphs 27 to 30 of the SOC are not admitted. The 1st Defendant avers that the Khan Marketing Material, including all its contents, was prepared and produced by Nations, without any input from the 1st Defendant.

16.    Save that there was an announcement by Nations dated 17 April 2013, paragraph 31 is not admitted.

17.    Save that the 1st Defendant was introduced to Mr Luo in around early 2014, paragraph 32 of the SOC is not admitted.

18.    Paragraphs 33 to 35 of the SOC are denied. The 1st Defendant avers that there was no discussion on the making of any investments into the biomedical industry during the First Meeting. The 1st Defendant further denies cultivating Nations. The First Meeting was neither arranged nor requested for by the 1st Defendant.

19.    Paragraph 36 is not admitted, and the Plaintiff is put to strict proof thereof. The 1st Defendant repeats paragraph 15 of the Defence herein. The Khan Marketing Material, including all its contents, was prepared and produced by Nations without any input from the 1st Defendant.

20.    Paragraphs 37 to 41 are not admitted and the Plaintiff is put to strict proof thereof.

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 310 of 331

4

21.    Paragraphs 42 to 47 of the SOC are not admitted and the Plaintiff is put to strict proof thereof. The 1st Defendant avers as follows:

    a.    With regards to paragraphs 45 and 46 of the SOC, the 1st Defendant did not refuse to use a custodian bank and neither did he propose the guarantee arrangement pleaded at paragraph 46 of the SOC. It was Nations who requested that SQKFM provide the guarantee.

    b.    With regards to paragraph 47(e) of the SOC, Mr Luo was a director of the Plaintiff, was involved in its operations and acted as the authorised person for the Plaintiff's bank account.

22.    Paragraphs 48 and 49 are denied. The 1st Defendant avers that all transfers and transactions were made with genuine commercial basis. Pending discovery, these are the best particulars available to the 1st Defendant and the 1st Defendant reserves the right to amend its Defence to include further particulars.

23.    Paragraphs 50 and 51 are denied. The 1st Defendant avers that the transfers were for the reasons as recorded. The 1st Defendant repeats paragraph 22 herein. All transfers and transactions were made with genuine commercial basis.

24.    Save that there was a Further Investment Agreement, paragraphs 52 and 53 are not admitted. Paragraphs 54 to 60 of the SOC are not admitted and the Plaintiff is put to strict proof thereof.

25. Paragraph 61 of the SOC is admitted. The 1st Defendant further avers that he had already been residing and working in the USA since 2015 prior to obtaining permanent residence in 2017. He moved to the USA for legitimate work reasons.

26. Save that the Khan Entities had vacated their Shenzhen offices, paragraphs 62 to 66 are not admitted, and the Plaintiff is put to strict proof thereof. The 1st Defendant avers as follows:

   a. The 1st Defendant ceased involvement in the joint venture and its related entities sometime in late 2017 once he finally determined that Nations, through Nations Investment, related entities and Mr Luo, had entered into the Partnership Agreement for the main purpose of conducting espionage activity for the Chinese military and obtaining restricted technologies.

   b. In conversations with Mr Luo sometime in September 2017, Mr Luo disclosed to the 1st Defendant that one Chen Yaping and his team had been working with Mr Luo and Nations for many years to acquire materials and technology required for production of chips with potential military uses.

   c. Mr Luo disclosed in these conversations that all key persons within Nations were members of the Chinese Communist Party and Nations was a platform for the Chinese government to obtain US semiconductor technology, in breach of US laws.

   d. After learning about the above, in late September 2017, the 1st Defendant reported Mr Luo to the US Department of Justice and the FBI. This

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 312 of 331

6

resulted in investigations by the US authorities, resulting in various prosecutions, including for violating the International Emergency Economic Powers Act. The US DOJ and FBI uncovered a scheme to, among other things, illegally obtain technology and integrated circuits with military applications for export to a Chinese company without the required license.

e.    The 1st Defendant thereafter discontinued work on the Partnership Agreement or with the Plaintiff once he had actual knowledge about the true ulterior motive of Nations in funding the investments.

f.    Further, in reliance on representations of Mr Luo and/or Nations that the Partnership Agreement was for the purpose of lawful investment activities into the biomedical industry, the 1st Defendant had incurred substantial costs and effort in conducting due diligence and sourcing for investment opportunities and targets. Had the 1st Defendant known of the ulterior motive to illegally obtain material for military use, which ulterior motive was hidden from him, the 1st Defendant would not have incurred or caused to be incurred these costs. The 1st Defendant has now ceased all activity and is obtaining legal advice to recover these costs from the appropriate party.

27.    Paragraphs 67 to 69 of the SOC are not admitted and the Plaintiff is put to strict proof thereof. Further, the Plaintiff's Office Premises was at all material times used for the Plaintiff's business.

28. Paragraphs 70 and 71 of the SOC are not admitted and the Plaintiff is put to strict proof thereof.

29. The 1st Defendant does not plead to paragraphs 72 to 77 of the SOC as they relate to the 2nd and 3rd Defendants.

30. Paragraphs 78 to 81 of the SOC are not admitted and the Plaintiff is put to strict proof thereof.

31. Paragraphs 82 to 84, so far as they relate to the 1st Defendant, are denied. The 1st Defendant avers that all acts of the 1st Defendant were with genuine commercial purposes and not for the predominant purpose of injuring the Plaintiff. The 1st Defendant further denies any common intention with the 2nd and 3rd Defendant to injure the Plaintiff. The 1st Defendant avers that there were no discussions with the 2nd or 3rd Defendant on the various transfers of monies pleaded at paragraph 49 of the SOC. The Plaintiff is put to strict proof thereof.

32. Paragraphs 85 to 88 of the SOC are denied. The 1st Defendant repeats paragraph 32 of the Defence herein.

33. By reason of the above and in the premises, the Plaintiff is not entitled to any of the reliefs prayed for in the SOC.

34. Save as hereinbefore expressly admitted, the 1st Defendant denies each and every allegation in the SOC as if the same had been set out seriatim and specifically traversed.

Case 1:24-cv-03142-UA    Document 1-1    Filed 04/24/24    Page 314 of 331

8

Dated this 2nd day of June 2022

_____

**SOLICITORS FOR THE 1ST DEFENDANT**
**HARRY ELIAS PARTNERSHIP LLP**

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 315 of 331

# EXHIBIT 8

## IN THE GENERAL DIVISION OF
## THE HIGH COURT OF THE REPUBLIC OF SINGAPORE

HC/S 1027/2020

Between

**GUOTAIQIXING BIOMEDICAL
INTERNATIONAL (S) PTE. LTD.**
(UEN No. 20150039K)

...Plaintiff(s)

And

1. **DAI XUEFENG**
   (PRC Passport No. ▇▇▇2878)

2. **ZHANG JUNQI**
   (PRC Passport No. ▇▇▇9520)

3. **XU XINMANNI**
   (PRC Passport No. ▇▇▇7254)

...Defendant(s)

---

Amended as deleted/underlined in
black, pursuant to Order 20 Rule 3
of the Rules of Court 2014

*[signature]*

**Harry Elias Partnership LLP**
Solicitors for the 1st Defendant

---

## DEFENCE OF THE 1ST DEFENDANT (AMENDMENT NO.1)

1.    This Defence is filed without prejudice to the 1st Defendant's right to seek further and better particulars of the Statement of Claim dated 27 October 2020 ("**SOC**") and/or administer interrogatories and/or strike out the SOC or any part thereof. The 1st Defendant expressly reserves his right to amend this Defence thereafter.

2.    Unless otherwise defined herein, the 1st Defendant adopts the abbreviations used in the SOC.

3.    Paragraphs 2 and 3 of the SOC are admitted.

4.    Save that there was a Partnership Agreement and a Further Investment Agreement as set out at paragraphs 4(a) and 4(b), paragraph 4 is not admitted.

5.    Paragraph 5 of the SOC is admitted.

6.    Save that there was a judgment from the People's Court of the Shenzhen Qianhai Co-operation Zone in 2019, paragraph 6 is denied. The 1st Defendant further avers that there was no misconduct on the part of Beijing Khan and that Beijing Khan was wrongly removed as a partner of Shenzhen Guotai. Further, the Shenzhen judgment was a default judgment and neither the 1st Defendant nor Beijing Khan were aware of the action until disclosed in the SOC. An ~~action~~ appeal is currently pending before the ~~Chinese courts~~ Shenzhen Intermediate People's Court in case number (2002) Guangdong 03 Civil Appeal No. 59 ("**Shenzhen Appeal**") to, amongst others, overturn the 2019 default judgment and retrial the case on its merits, including on the following grounds.

<u>PARTICULARS</u>

(a)    Nations Investment and its controller Mr Luo were at all material times aware of the investment income and expenditure, the whereabouts of funds and the financial situation of the partnership, Shenzhen Guotai.

(b)    The investment activities of Beijing Khan, as the executive partner in Shenzhen Guotai, was conducted properly in accordance with the Partnership Agreement and Further Investment Agreement.

6A In the circumstances, HC/S 1027/2022 ("**Suit 1027**") should be stayed pending the resolution of the  Shenzhen Appeal The Plaintiff should not be allowed to proceed with Suit 1027 as the identity of the controller and who can exercise the powers of Shenzhen Guotai, and therefore the Plaintiff, is still the subject of appeal. There are also questions of facts in the Shenzhen Appeal which are relevant and overlap with those in Suit 1027.

<u>PARTICULARS</u>

(a) The 1st Defendant repeats paragraph 6 above. The default judgment was obtained in breach of Chinese procedural rules and in breach of rules of natural justice as Beijing Khan was not served or given notice of the proceedings.

(b) The 1st Defendant further avers that the default judgment was obtained by unlawful means. Beijing Khan will seek to establish that in the pending proceedings before the Shenzhen Intermediate People's Court.

(c) The wrongful removal of Beijing Khan as a partner of Shenzhen Guotai allowed its controllers, Nations Investment and by extension Nations, to obtain sole control and engineered the appointment of Nations Investment as the liquidator of Shenzhen Guotai, thereby giving Nations Investment and Nations full control over the Plaintiff. This led to the wrongful removal of the 1st Defendant as director of the Plaintiff and the appointment of new directors leading to the commencement of Suit 1027.

Case 1:24-cv-03142-UA    Document 1-1    Filed 04/24/24    Page 319 of 331

(d)  In the event that the appeal is successful, the identity of the partners of Shenzhen Guotai, and consequently the appointment of Nations Investment as liquidator, will be impugned.

(e)  Further to that, the decision to remove the 1st Defendant as director of the Plaintiff and the appointment of new directors by Nations Investment in exercise of its powers as liquidator of Shenzhen Guotai, will similarly be impugned.

(f)  Additionally, the question of whether the investment activities of Beijing Khan Funds, in their capacity as partner of Shenzhen Guotai, were proper and in accordance with the Partnership Agreement, which question is the subject of the Shenzhen Appeal, is directly relevant to and significantly overlaps with the factual disputes in Suit 1027 as the 1st Defendant's conduct in question in Suit 1027 relate to investment activities of Shenzhen Guotai carried out through the Plaintiff.

In the premises, pending disposal of the Shenzhen Appeal and the resolution of the issues pleaded in this paragraph, Suit 1027 should be stayed.

6B    Further and/or in the alternative, the appointment of Nations Investment as liquidator of Shenzhen Guotai is improper and illegal and the decisions undertaken by Nations Investment as the liquidator of Shenzhen Guotai should not be given effect by the Singapore Courts. Particulars of illegality are pleaded at paragraphs 26A to 26B below.

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 320 of 331

5

7.      Save that the 1st Defendant is no longer a director of the Plaintiff, paragraphs 7 and 8 of the SOC are not admitted. <u>Paragraphs 6 to 6B above are repeated.</u>

8.      Paragraphs 9 and 10 are admitted.

9.      Paragraph 11 is not admitted, and the Plaintiff is put to strict proof thereof. The 1st Defendant specifically denies being the founder of Beijing Khan.

10.     The 1st Defendant does not plead to paragraphs 12 to 15 as they do not relate to the 1st Defendant.

11.     Save that the 1st Defendant was in the business of fund management, paragraph 16 is not admitted.

12.     Paragraphs 17 to 19 are not admitted and the Plaintiff is put to strict proof thereof.

13.     Save that the 1st Defendant owes statutory duties under section 157 of the Companies Act, paragraph 20 is not admitted.

14.     The 1st Defendant does not plead to paragraphs 21 to 26 as they are not relevant to the 1st Defendant.

15.     Paragraphs 27 to 30 of the SOC are not admitted. The 1st Defendant avers that the Khan Marketing Material, including all its contents, was prepared and produced by Nations, without any input from the 1st Defendant.

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 321 of 331

16.     Save that there was an announcement by Nations dated 17 April 2013, paragraph 31 is not admitted.

17.     Save that the 1st Defendant was introduced to Mr Luo in around early 2014, paragraph 32 of the SOC is not admitted.

18.     Paragraphs 33 to 35 of the SOC are denied. The 1st Defendant avers that there was no discussion on the making of any investments into the biomedical industry during the First Meeting. The 1st Defendant further denies cultivating Nations. The First Meeting was neither arranged nor requested for by the 1st Defendant. <u>As the 1st Defendant pleads at paragraph 26 below, Nations, through Mr Luo, was the party directing the investments of Shenzhen Guotai and/or the Plaintiff to fulfil an agenda which the 1st Defendant subsequently found out was illegal.</u>

19.     Paragraph 36 is not admitted, and the Plaintiff is put to strict proof thereof. The 1st Defendant repeats paragraph 15 of the Defence herein. The Khan Marketing Material, including all its contents, was prepared and produced by Nations without any input from the 1st Defendant.

20.     Paragraphs 37 to 41 are not admitted and the Plaintiff is put to strict proof thereof.

21.     Paragraphs 42 to 47 of the SOC are not admitted and the Plaintiff is put to strict proof thereof. The 1st Defendant avers as follows:

        a.      With regards to paragraphs 45 and 46 of the SOC, the 1st Defendant did not refuse to use a custodian bank and neither did he propose the guarantee

arrangement pleaded at paragraph 46 of the SOC. It was Nations who requested that SQKFM provide the guarantee.

b.      With regards to paragraph 47(e) of the SOC, Mr Luo was a director of the Plaintiff, was involved in its operations and acted as the authorised person for the Plaintiff's bank account.

22.     Paragraphs 48 and 49 are denied. The 1st Defendant avers that all transfers and transactions were made with genuine commercial basis. Where the Plaintiff alleges that the transfers were made for reasons other than what was recorded, the Plaintiff is put to strict proof. Pending discovery, these are the best particulars available to the 1st Defendant and the 1st Defendant reserves the right to amend its Defence to include further particulars.

## PARTICULARS

a.      The USD 33,600,000.00 transferred from the Plaintiff to KOM on 29 December 2015 was for the purchase of 3300 shares in KOM which was directed by and duly approved and authorised by Mr Luo, a director and authorised signatory of the Plaintiff.

b.      With regards to the transactions on 5 December 2016 and 4 January 2017, these were fees for legitimate consultancy services provided by KFA to the Plaintiff.

c.  <u>Pursuant to the consultancy services provided by KFA to the Plaintiff, all fees incurred by KFA on behalf of and for the benefit of the Plaintiff, in performance of the consultancy services, were to be reimbursed by the Plaintiff. These were merger and acquisition due diligence expenses and other fees incurred by KFA, including without limitation fees paid to lawyers, bankers and accountants.</u>

d.  <u>The transfers from the Plaintiff to KFA pleaded at paragraph 49 of the SOC, which are characterised as loan agreements (i.e. transfers on 6 January 2016, 30 August 2016 and 27 December 2016), as well as the transfers for which there were no stated reasons (i.e. transfers on 9 March 2017 and 6 April 2017), were reimbursements for fees and expenses incurred by KFA pursuant to the consultancy services provided.</u>

e.  <u>However, at the direction of Nations and Mr Luo, the reimbursement of these due diligence expenses and fees incurred by KFA were structured as a loan pending the identification of a target company and completion of a merger and acquisition.</u>

f.  <u>In respect of the USD 10,000,000 deposited from KOM to the Plaintiff on 18 November 2016, the 1st Defendant avers that this was for the benefit and in the best interests of the Plaintiff in order to prevent the commission of an illegal act and purpose. Particulars of the said illegality are pleaded at paragraphs 26A and 26B below. The Plaintiff redeemed a further tranche of shares on 6 April 2017 for USD 1,000,000.</u>

22A   In respect of the transfer of USD 353,356.89 from the Plaintiff to the 2nd Defendant on 22 February 2017, the 1st Defendant avers that the bonus payment was a genuine bonus paid to reward the 2nd Defendant for her contributions to the Plaintiff. In any event, the 2nd Defendant returned the sum of SGD 500,000 to the Plaintiff (equivalent to USD 353,356.89) on 10 March 2017 and no loss was caused to the Plaintiff.

23.   Paragraphs 50 and 51 are denied. The 1st Defendant avers that the transfers were for the reasons as recorded and/or pleaded in this Defence. The 1st Defendant repeats paragraph 22 and 22A herein. All transfers and transactions were made with genuine commercial basis.

23A   In respect of paragraph 51(1) of the SOC, the 1st Defendant further avers that all documents created were at the direction and with the approval and knowledge of Nations and Mr Luo.

23B   In respect of paragraph 51(2) of the SOC, the 1st Defendant repeats paragraph (22)(a) above and avers that Mr Luo specifically requested for the money to be used to subscribe to shares in an asset management fund. Further Mr Luo had consented to the transfer of monies from the Plaintiff to KOM. In any event, the 1st Defendant avers that the management and performance fees charged by KOM were in line with industry practices.

23C   In respect of paragraph 51(4) of the SOC, the 1st Defendant repeats paragraphs 22.b to 22.e above.

24.     Save that there was a Further Investment Agreement, paragraphs 52 and 53 are not admitted. Paragraphs 54 to 60 of the SOC are not admitted and the Plaintiff is put to strict proof thereof.

25.     Paragraph 61 of the SOC is admitted. The 1st Defendant further avers that he had already been residing and working in the USA since 2015 prior to obtaining permanent residence in 2017. He moved to the USA for legitimate work reasons.

26.     Save that the Khan Entities had vacated their Shenzhen offices, paragraphs 62 to 66 are not admitted, and the Plaintiff is put to strict proof thereof. The 1st Defendant avers as follows:

a.      The 1st Defendant ceased involvement in the joint venture and its related entities sometime in late 2017 once he finally determined that Nations, through Nations Investment, related entities and Mr Luo, had entered into the Partnership Agreement for the main purpose of conducting espionage activity for the Chinese military and obtaining restricted technologies.

b.      In conversations with Mr Luo sometime in September 2017, Mr Luo disclosed to the 1st Defendant that one Chen Yaping and his team had been working with Mr Luo and Nations for many years to acquire materials and technology required for production of chips with potential military uses.

c.      Mr Luo disclosed in these conversations that all key persons within Nations were members of the Chinese Communist Party and Nations was

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 326 of 331

a platform for the Chinese government to obtain US semiconductor technology, in breach of US laws.

d.    After learning about the above, in late September 2017, the 1st Defendant reported Mr Luo to the US Department of Justice and the FBI. This resulted in investigations by the US authorities, resulting in various prosecutions, including for violating the International Emergency Economic Powers Act. The US DOJ and FBI uncovered a scheme to, among other things, illegally obtain technology and integrated circuits with military applications for export to a Chinese company without the required license.

e.    The 1st Defendant thereafter discontinued work on the Partnership Agreement or with the Plaintiff once he had actual knowledge about the true ulterior motive of Nations in funding the investments.

f.    Further, in reliance on representations of Mr Luo and/or Nations that the Partnership Agreement was for the purpose of lawful investment activities into the biomedical industry, the 1st Defendant had incurred substantial costs and effort in conducting due diligence and sourcing for investment opportunities and targets. Had the 1st Defendant known of the ulterior motive to illegally obtain material for military use, which ulterior motive was hidden from him, the 1st Defendant would not have incurred or caused to be incurred these costs. The 1st Defendant has now ceased all activity

Case 1:24-cv-03142-UA Document 1-1 Filed 04/24/24 Page 327 of 331

and is obtaining legal advice to recover these costs from the appropriate party.

26A    In the circumstances set out at paragraph 26 above, the Partnership Agreement and Further Investment Agreement were entered into by Nations Investment with the intention to further a purpose which would be illegal at the place of performance, the USA. Further, the 1st Defendant has commenced proceedings before the New York County Supreme Court in the USA against, *inter alia*, Nations and Mr Luo, for fraud and violation of the provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO) as a consequence of Nations' continuing espionage activities and other conduct. Consequently, recovery of funds received by the Plaintiff for the performance of the illegal purposes should not be permitted by the Singapore courts.

26B    Further and/or in the alternative, to permit recovery of the said sums would be contrary to public policy.

27.    Paragraphs 67 to 69 of the SOC are not admitted and the Plaintiff is put to strict proof thereof. Further, the Plaintiff's Office Premises was at all material times used for the Plaintiff's business.

28.    Paragraphs 70 and 71 of the SOC are not admitted and the Plaintiff is put to strict proof thereof.

29.    The 1st Defendant does not plead to paragraphs 72 to 77 of the SOC as they relate to the 2nd and 3rd Defendants.

30.     Paragraphs 78 to 81 of the SOC are not admitted and the Plaintiff is put to strict proof thereof.

31.     Paragraphs 82 to 84, so far as they relate to the 1st Defendant, are denied. The 1st Defendant avers that all acts of the 1st Defendant were with genuine commercial purposes and not for the predominant purpose of injuring the Plaintiff. The 1st Defendant further denies any common intention with the 2nd and 3rd Defendant to injure the Plaintiff. The 1st Defendant avers that there were no discussions with the 2nd or 3rd Defendant on the various transfers of monies pleaded at paragraph 49 of the SOC. The Plaintiff is put to strict proof thereof.

32.     Paragraphs 85 to 88 of the SOC are denied. The 1st Defendant repeats paragraph 32 of the Defence herein.

33.     By reason of the above and in the premises, the Plaintiff is not entitled to any of the reliefs prayed for in the SOC.

34.     Save as hereinbefore expressly admitted, the 1st Defendant denies each and every allegation in the SOC as if the same had been set out seriatim and specifically traversed.

Dated this 2nd day of June 2022

SGD

_____

SOLICITORS FOR THE 1ST DEFENDANT

HARRY ELIAS PARTNERSHIP LLP

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 329 of 331

14

Re-Dated this 16th day of June 2022

_____

**SOLICITORS FOR THE 1ST DEFENDANT
HARRY ELIAS PARTNERSHIP LLP**

Case 1:24-cv-03142-UA    Document 1-1    Filed 04/24/24    Page 330 of 331

Dated:    New York, New York        Respectfully submitted,
          March 12, 2024
                                     NORTON ROSE FULBRIGHT US LLP

                                     By: */s/ Victoria V. Corder*

                                     Victoria V. Corder
                                     Benjamin D. Bloodstein
                                     1301 Avenue of the Americas
                                     New York, New York 10019
                                     Tel:    (212) 318-3000
                                     Fax:    (212) 318-3400
                                     benjamin.bloodstein@nortonrosefulbright.com

                                     Brian A. Sun (*pro hac vice forthcoming*)
                                     Christopher Pelham (*pro hac vice forthcoming*)
                                     555 South Flower Street
                                     Forty-First Floor
                                     Los Angeles California 90071
                                     Tel:    (213) 892-9200
                                     brian.sun@nortonrosefulbright.com
                                     christopher.pelham@nortonrosefulbright.com

                                     *Attorneys for Plaintiff Guotaiqixing Biomedical*
                                     *International (S) Pte. Ltd*

TO:

Xuefeng Dai
6300 Riverside Drive
Parkland, FL 33067

Khan Funds Management America, Inc.
Attn:  Xuefeng Dai
1 World Trade Ctr.
FL 85
New York, NY 10007

Akiva Shapiro
GIBSON, DUNN & CRUTCHER LLP
*Attorney for Defendant Xuefeng Dai*
200 Park Avenue
New York, NY 10166-0193
Tel: 212.351.4000
ashapiro@gibsondunn.com

Case 1:24-cv-03142-UA   Document 1-1   Filed 04/24/24   Page 331 of 331

Dated:   New York, New York
         March 26, 2024

Respectfully submitted,

NORTON ROSE FULBRIGHT US LLP

By: /s/ *Victoria V. Corder*

Victoria V. Corder
Benjamin D. Bloodstein
1301 Avenue of the Americas
New York, New York 10019
Tel:    (212) 318-3000
Fax:    (212) 318-3400
victoria.corder@nortonrosefulbright.com
benjamin.bloodstein@nortonrosefulbright.com

Brian A. Sun (*pro hac vice forthcoming*)
Christopher Pelham (*pro hac vice forthcoming*)
555 South Flower Street
Forty-First Floor
Los Angeles California 90071
Tel:    (213) 892-9200
brian.sun@nortonrosefulbright.com
christopher.pelham@nortonrosefulbright.com

*Attorneys for Plaintiff Guotaiqixing Biomedical
International (S) Pte. Ltd.*

TO:

Xuefeng Dai
6300 Riverside Drive
Parkland, FL 33067

Khan Funds Management America, Inc.
Attn:  Xuefeng Dai
1 World Trade Ctr., FL 85
New York, NY 10007

Akiva Shapiro
GIBSON, DUNN & CRUTCHER LLP
*Attorney for Defendant Xuefeng Dai*
200 Park Avenue
New York, NY 10166-0193
Tel: 212.351.4000
ashapiro@gibsondunn.com

2