# EXHIBIT A – PART 2

Case 1:24-cv-03142-UA   Document 1-2   Filed 04/24/24   Page 2 of 131

# EXHIBIT 9

Case 1:24-cv-03142-UA   Document 1-2   Filed 04/24/24   Page 3 of 131

*1st Defendant; Xuefeng Dai; 2nd; 08.07.2022*

# IN THE GENERAL DIVISION OF
## THE HIGH COURT OF THE REPUBLIC OF SINGAPORE

HC/S 1027/2020

Between

**GUOTAIQIXING BIOMEDICAL
INTERNATIONAL (S) PTE. LTD.**
(UEN No. 20150039K)

…Plaintiff(s)

And

1. **DAI XUEFENG**
   (PRC Passport No. ████2878)

2. **ZHANG JUNQI**
   (PRC Passport No. ████9520)

3. **XU XINMANNI**
   (PRC Passport No. ████7254)

…Defendant(s)

## AFFIDAVIT

I, Xuefeng Dai (Passport No. ████2878), care of 6300 Riverside Drive, Parkland, Florida 33067, USA, do solemnly make oath/affirm and say as follows:

1. I am the 1st Defendant in this action.

2. Insofar as the matters hereto are within my knowledge, they are true. Insofar as they are not within my personal knowledge, I believe them to be true to

the best of my knowledge, information, and belief based on the documents and records in my possession.

3. I make this affidavit in support of my summons for, amongst other things, the following:

(a) That an extension of time be granted for me to file an application to stay HC/S 1027/2020 ("**Suit 1027**"), notwithstanding that time limited for making such an application under the Rules of Court 2014 had expired; and

(b) That the Honourable Court stays Suit 1027 in favour of parallel proceedings in the USA and/or China ("**Stay Application**").

4. In this affidavit, I will set out the following matters:

(a) First, the relevant background of the parties and events leading up to Suit 1027;

(b) Second, the procedural history of Suit 1027;

(c) Third, the reasons why I should be granted an extension of time to file the Stay Application. In short, no prejudice will be caused to the Plaintiff which cannot be compensated by costs;

(d) Fourth, I will set out the substantive grounds for why Suit 1027 should be stayed in favour of ongoing proceedings in China and/or the USA, and why Singapore is not the appropriate forum.

5. All documents which I will be referring to in this affidavit are exhibited and collectively marked **"XD-1"**. Unless otherwise defined, I adopt the abbreviations used in the pleadings filed in Suit 1027.

6. I also wish to refer to the other affidavits filed in Suit 1027 and the relevant interlocutory applications, including:

(a) My 1st affidavit dated 5 May 2022 filed in respect of HC/RA 317/2021 ("**RA 317**") and HC/RA 352/2021 ("**RA 352**") ("**ED's 1st Affidavit**"); and

(b) 1st Affidavit of Sun Yingtong dated 27 October 2020 filed in support of HC/SUM 4685/2020 ("**Sun's Affidavit**").

**BACKGROUND**

7. Suit 1027 was commenced by the Plaintiff against me (as well as the 2nd and 3rd Defendants) for the purported breach of my duties as a director of the Plaintiff by allegedly diverting funds to other entities controlled by me as well as for letting SGKFM use the Plaintiff's office premises without

Case 1:24-cv-03142-UA Document 1-2 Filed 04/24/24 Page 6 of 131

4

collecting rental. I was, at all material times, a director of the Plaintiff until I was wrongfully removed.

8. While Suit 1027 appears to be a case of a Singapore company claiming against its director for breach of duties, the crux of this case involves complex questions of both fact and law relating to performance of a contract governed by Chinese law which resulted in a breach of the national security laws of the USA and other crimes on the basis of events occurring in the United States. The Singapore entity, ie the Plaintiff, was a mere conduit through which the acts were performed. I shall elaborate further below.

9. The Plaintiff is a company incorporated in Singapore and is a wholly-owned subsidiary of Shenzhen Guotaiqixing Industry Investment Fund Management Centre LLP ("**Shenzhen Guotai**"), which is a limited partnership formed under the laws of the People's Republic of China ("**China**"). Prior to 27 May 2019, Shenzhen Guotai had two partners and they are:

(a) Shenzhen Qianhai Nations Investment Management Co., Ltd. ("**Nations Investment**"); and

(b) Beijing Khan Pharmaceutical Holdings Co., Ltd. ("**Beijing Khan**").

10. Both Nations Investment and Beijing Khan are corporations incorporated in China. For the avoidance of doubt, the parent company of Beijing Khan is Shenzhen Qianhai Khan Funds Management ("**SQKFM**") of which I was the majority shareholder, president and director of.

11. Nations Investment is a wholly owned subsidiary of Nations Technologies Inc ("**Nations**"), which is a company listed on the Shenzhen Stock Exchange. Nations Investment was, at the time of entering into the Agreements, purportedly used as a vehicle for Nations to carry out investments. As I shall detail later in this affidavit, I found out subsequently that Nations Investment was just one of a number of entities used by Nations and Messrs. Luo and Sun to surreptitiously procure controlled technology for Chinese military use, in contravention of national security laws of various jurisdictions.

12. The key persons involved in Nations and Nations Investment, whom I will refer to in this affidavit repeatedly, are:

(a) Mr Luo Zhaoxue ("**Mr Luo**"), who held the position of Independent Director of Nations from May 2009 to May 2012 and subsequently the position of President and Director of Nations from 29 January 2014 to 12 May 2018 . He was also a director of the Plaintiff from on or around 9 November 2015 to 16 October 2019.

Case 1:24-cv-03142-UA Document 1-2 Filed 04/24/24 Page 8 of 131

(b) Mr Sun Yingtong ("**Mr Sun**"), who was appointed a director of the Plaintiff on 16 October 2019 to date. Mr Sun is also the current Director, General Manager and President of Nations. He further served as Mr. Luo's right-hand man during the events giving rise to my claims in China and the USA.

13. Shenzhen Guotai is a private equity fund managed by Beijing Khan. Nations Investment, together with Beijing Khan are investors of the fund as they had made capital contributions to Shenzhen Guotai. As a private equity fund, Shenzhen Guotai is a limited partnership formed pursuant to the following agreements:

(a) Partnership Agreement dated 23 November 2015 ("**Partnership Agreement**"); and

(b) Agreement for Further Investment Regarding Shenzhen Guotaiqixing Industry Investment Fund Co., Ltd (Limited Partnership) dated 25 March 2016 between Nations Investment, Beijing Khan and Shenzhen Guotai (the "**Further Investment Agreement**")

collectively (the "**Agreements**").

14. The purpose of the Agreements was to combine the technical expertise of Beijing Khan on professional investment together with the capital of

Case 1:24-cv-03142-UA   Document 1-2   Filed 04/24/24   Page 9 of 131

Nations Investment to participate in the investment of equity in pharmaceutical and healthcare companies in the USA It is hoped that with the collaboration of Beijing Khan and Nations Investment, parties will be able to share in the returns of the mergers and acquisition investment market in the USA.  Specifically, during discussions between Mr Luo and I, we identified the biomedical industry as a main area of interest for investment and it was agreed upon to target a biomedical investment pursuant to the Agreements.

15. The Partnership Agreement provides that Beijing Khan, as the General Partner (also referred to as Executive Partner in the Partnership Agreement), has the authority to manage daily operations of the partnership as well as make investment management decisions without the participation or interference of the Limited Partners. Nations Investment is the Limited Partner referred to in the Partnership Agreement. The salient clauses are:

2.6.5   Independent Management Mechanism: The Executive Partner shall independently manage the daily operations of the Partnership, and the Limited Partners may not participate nor interfere.

2.6.6   Independent Investment Decision-Making Mechanism: The Executive Partner shall make investment decisions independently

Case 1:24-cv-03142-UA   Document 1-2   Filed 04/24/24   Page 10 of 131

for the Partnership, and the Limited Partners may not participate nor interfere.

4.2.3   Except when expressly stated within the rights and obligations of this Agreement, the Limited Partner shall not participate in or interfere in the normal operation and management of the Partnership.

6.1   The Executive Partner and Manager shall exercise the investment decision-making authority of the Partnership.

6.2   The Executive Partner and Manager shall determine if the investment conditions of the projects are in line with the overall interest of the Partnership, and ultimately decide whether to invest.

6.3   The Executive Partner and Manager shall make decisions with regards to the transfer and disposition of the Partnership's investment assets, real estates held for various reasons, and intellectual property.

6.4   The Executive Partner and Manager shall make decisions with regards to other investment related matters of the Partnership.

(a)    The Partnership Agreement, together with a certified translation, is exhibited at **Tab - 1** of **"XD-1"**.

16. Pursuant to the agreed objectives of investing in companies in the biomedical industry and in accordance with the Agreements, Beijing Khan started working on looking into potential U.S.-based targets for acquisition. Vast amount of effort and resources were poured into doing research, identifying target companies, and conducting due diligence.

   (a) As we were required to look into a large number of U.S.-based companies to assess their viability for investment, we necessarily engaged Khan Funds Management America, Inc. ("**KFA**") to provide consultancy services. Mr. Luo and Nations Investment were aware of and agreed to this arrangement.

   (b)    Pursuant to the consultancy services provided by KFA to the Plaintiff, all fees incurred by KFA on behalf of and for the benefit of the Plaintiff, in performance of the consultancy services, were to be reimbursed by the Plaintiff. Over the years, substantial costs were incurred by KFA in merger and acquisition due diligence expenses and other fees such as fees paid to lawyers, bankers and accountants.

   (c) Khan Funds Oriental Medicine Fund SPC ("**KOM**") was a fund which held shares in various biomedical companies. As with all funds, KOM

Case 1:24-cv-03142-UA   Document 1-2   Filed 04/24/24   Page 12 of 131

charged management and performance fees, which were in line with industry practices.

(d) Beijing Khan, exercising its authority as general partner of Shenzhen Guotai, and as specifically requested by Nations, designed to manage the investments through Singapore as it provided the best tax benefits. As such, we incorporated the Plaintiff in Singapore. Mr. Luo and Nations Investment specifically requested and were aware of and agreed to this investment structure.

(e) As the Plaintiff was meant to carry out the investments of Shenzhen Guotai, Mr Luo demanded to be appointed a director of the Plaintiff, and thus I agreed for Mr Luo to sit on the board of directors. The Plaintiff therefore became the vehicle and conduit through which the Agreements were carried out.

(f)  The consultancy fees, including due diligence costs, were paid through the Plaintiff. These fees were all incurred for the purpose of carrying out the investments pursuant to the Agreements.

17. However, in May 2016, while present in the United States, Mr Luo demanded that pursuant to the Agreements, the team from Beijing Khan and KFA acquire a US-based semiconductor company. I was surprised to learn of Mr Luo's demands as firstly, his demands violated the terms of the

Partnership Agreement as it was agreed that Beijing Khan would make the executive decisions relating to investments and violated the investment scope.

18. In addition, I was aware that there were several Chinese nationals who had tried to acquire an interest in semiconductor companies in the US and later export the products and technologies from the acquired US semiconductor to the military for end use in China. These Chinese nationals have been arrested by the US authorities for espionage and a transaction of this type implicated a number of U.S. laws and governmental scrutiny, particularly the attention of the Committee of Foreign Investment in the United States ("**CIFUS**") which is an interagency panel that reviews foreign investments in the US companies for national security risks.

19. For context, the US government has recently identified the government of the People's Republic of China as a significant counterintelligence and economic espionage threat. This means that CIFUS has over the years, been increasingly focused on Chinese investment in US businesses involving sensitive data or critical technology, such as semiconductors.

20. Naturally, Mr Luo's demands to focus the activities of our investments into sensitive semi-conductor companies alarmed me. I became worried and afraid of the legality of what Mr Luo wanted us to do and was increasingly worried about attracting the scrutiny of the US government and CIFUS. I

am after all a legitimate investment professional with substantial activities in the US.

21. Mr Luo further revealed to me during certain conversations held in New York City in September 2017 at the corporate headquarters at KFA and elsewhere that the controllers of Nations, namely Mr Luo himself, Mr. Sun and those associated with Nations, including Mr Chen Yaping, had been working together with Nations for many years to acquire U.S. materials and technology required for the production of semiconductor chips with potential military uses in China.

22. Mr Luo further disclosed to me that all key members within Nations were members of the Chinese Communist Party and Nations was a platform for the Chinese government to obtain US semiconductor technology and other technologies with military application, which is a breach of US law.

23. After learning about the above, in late September 2017, I reported Mr Luo, Mr. Sun and Nations to the New York Field Office of the FBI and subsequently to the U.S. Department of Justice via the U.S. Attorney's Office for the Southern District of New York. This resulted in investigations by the US authorities of the crimes committed by Nations, Mr. Luo and Mr. Sun and others occurring in the United States and elsewhere, resulting in various prosecutions, including for violating the International Emergency Economic Powers Act. The US DOJ and FBI uncovered a scheme carried

Case 1:24-cv-03142-UA   Document 1-2   Filed 04/24/24   Page 15 of 131

out in the U.S. to, among other things, illegally obtain technology and integrated circuits with military applications for export to a Chinese company without the required license.

24. Once I knew about the illegal purpose of Nations, Mr Luo, Mr. Sun and other related persons, I had to discontinue work on the Agreements. This is because:

(a)     The true ulterior motive of Nations and Messrs. Luo and Sun was to conduct espionage in the USA for the Chinese government and military, knowing full well that this was a serious and egregious breach of US national security laws.

(b)     I was unwittingly made used of and tricked into Nations and Mr Luo's unscrupulous scheme and web of deceit.

(c)     My original intention was purely to use my investment expertise for economic gains by carrying out the Agreements' purpose of investing in the biomedical industry. I had no intention or willingness at all of acquiring controlled and sensitive semiconductor technology for Chinese military use.

(d)     If I had known that the intention of Nations and Messrs. Luo and Sun all along was to make use of our partnership for illegal purposes, I

would never have agreed to work with them, as they purposefully failed to disclose and concealed these intentions in an effort to solicit my involvement in this criminal scheme.

(e) Further, by interfering with the investment decisions and the day to day running of the investments carried out pursuant to the Agreements, Nations Investment was in breach of the Partnership Agreement. The role of Nations Investment was expressly stated to be that of a limited partner who had no right or authority to interfere with Beijing Khan's investment decisions in carrying out the partnership objectives. Indeed, the attempt to use the partnership for illegal purposes was a total breach of the Agreements and rendered the performance of the Agreements impossible due to the criminal intent of the stated objective of violating U.S. laws.

(f) As the business of the Agreements was carried out through Shenzhen Guotai and ultimately through Shenzhen Guotai's wholly-owned Singapore subsidiary, the Plaintiff, any breach of the Partnership Agreement is inextricably linked to the running of the Plaintiff's business. In short, the Plaintiff must be run in accordance with the terms of the Partnership Agreement.

(g)     By using the might and strength of Nations in an attempt to force me to assist Nations in illegally acquiring semiconductor technology, Nations Investment was in breach of the Partnership Agreement.

25. By that point in time, in reliance on the representations of Mr Luo and/or Nations that the Partnership Agreement was for the purpose of lawful investment activities into the biomedical industry, vast resources had already been expanded in the U.S. to conduct due diligence and sourcing for investment opportunities and targets. For amounts spent by KFA in providing its consultancy services to the Plaintiff, the Plaintiff was, under the consultancy agreement with KFA, obliged to pay the relevant disbursements incurred, in addition to consultancy fees.

26. Faced with the reality that the original purposes of the Agreements could not be carried out due to Nations' illicit and illegal activities, I had to wind down the activities of the Plaintiff in a manner which would cause the least amount of losses to the Plaintiff and to fulfil all remaining contractual obligations of the Plaintiff. This included transfers to KFA for fees incurred in conducting due diligence.

27. On February 2018, Nations Investment commenced an action before the People's Court of the Shenzhen Qianhai Co-operation Zone ("**Shenzhen Court**") against Beijing Khan, alleging amongst others, professional

embezzlement of the monies in Shenzhen Guotai by the staff of Beijing Khan (i.e. the 3rd Defendant and I) ("**Shenzhen Proceedings**").

28. Beijing Khan did not participate in the Shenzhen Proceedings as the sole director of Beijing Khan, the 2nd Defendant, was not living in the People's Republic of China. Similarly, the 3rd Defendant and I were also not living in China. None of us had notice of the Shenzhen Proceedings because Nations Investment used its corrupt connections and falsely claimed, among other things, that it could not locate the relevant parties of Beijing Khan despite knowing that all relevant parties were residing in the United States, thus allowing Nations Investment to obviate the requirement to provide notice of the Shenzhen Proceedings. Accordingly, the Shenzhen Proceedings proceeded with the staff of Beijing Khan *in absentia*. Beijing Khan was unknowingly removed as partner of Shenzhen Guotai pursuant to a court order in the Shenzhen Proceedings dated 14 February 2019.

29. Subsequently, Nations, as the parent company and controller of Nations Investment, appointed Nations Investment as the liquidator of Shenzhen Guotai, thereby granting Nations Investment full control of Shenzhen Guotai and the Plaintiff.

30. The judgment obtained by Nations Investment in the Shenzhen Proceedings is currently pending a retrial before the Shenzhen Intermediate People's

Court in case number (2002) Guangdong 03 Civil Appeal No. 59 ("**Shenzhen Appeal**") based on the following grounds:

(a)   There is new evidence sufficient to overturn the judgment in the Shenzhen Proceedings;

(b)   The basic facts in the judgment of the Shenzhen Proceedings are not in accordance with Item (2) of Article 207 of the Chinese Civil Procedure law;

(c)   The main evidence for the determination of facts in the original judgment in the Shenzhen Proceedings has not been cross-examined in accordance with Item (4) of Article 207 of the Chinese Civil Procedure law;

(d)   A mistake exists in the application of the law in the original judgment in the Shenzhen Proceedings;

(e)   The failure of Beijing Khan to participate in the Shenzhen Proceedings is not due to reasons attributable to himself or his agent ad litem;

(f)   Nations Investment and its controller Mr Luo were at all material times aware of the investment income and expenditure, the

whereabouts of funds and the financial situation of Shenzhen Guotai and the application is misconceived; and

(g)   The investment activities of Beijing Khan, as executive partner in Shenzhen Guotai, was conducted properly in accordance with the Agreements.

(h)   A copy of the pleadings filed in the Shenzhen Appeal, together with a certified translation, is exhibited at **Tab-2** of **"XD-1"**.

## PROCEDURAL HISTORY FOR S 1027

31. After: (i) the removal of Beijing Khan as partner of Shenzhen Guotai; and (ii) Nations Investment was granted full control of Shenzhen Guotai, Suit 1027 was commenced by the Plaintiff in 2020 (under the influence and control of Nations) for the recovery of the following sums (the "**Alleged Sums**"):

(a)   USD 34,264,935.99; and

(b)   SGD 290,153.97.

32. At the outset, I wish to state that Suit 1027 is an unmeritorious claim commenced by Nations with the intent of exerting pressure on me through multiple litigation proceedings. I say this because Suit 1027 was

Case 1:24-cv-03142-UA   Document 1-2   Filed 04/24/24   Page 21 of 131

commenced by the controllers of the Plaintiff who are also the controllers of Nations. As alluded to earlier, they are Mr Luo and Mr Sun. As I had set out at paragraph 12(a) above, Mr Luo was the President and Director of Nations from 29 January 2014 to 12 May 2018. He was also previously an independent director of Nations from May 2009 to May 2012.

33. Mr Sun is a director of the Plaintiff (see page 72 of Sun's Affidavit). Mr Luo was a director of the Plaintiff from the time the Plaintiff was incorporated in November 2015 to October 2019.

34. I will now draw the connection between Nations and the Plaintiff to illustrate how the Plaintiff had been used by Mr Luo, Mr Sun and Nations to commence Suit 1027 against me. First, Nations is the parent company of Nations Investment, one of the partners of Shenzhen Guotai (the parent company of the Plaintiff). As I have stated earlier, Shenzhen Guotai is a Partnership which had two partners, Beijing Khan and Nations Investment (wholly owned and controlled by Nations). Pursuant to the Agreements, Beijing Khan was vested with the authority to make executive decisions for Shenzhen Guotai in relation to its investments and operations until it was unlawfully removed as a result of the Shenzhen Proceedings in 2019.

35. The removal of Beijing Khan as a partner of Shenzhen Guotai under the Shenzhen Proceedings was on the basis of unfounded and untrue allegations of embezzlement of monies by office holders of Beijing Khan.

36. However, Beijing Khan was not given an opportunity to defend itself at the Shenzhen Proceedings because the key office holder of Beijing Khan (i.e. the 2nd Defendant) was living abroad and Nations Investment corruptly and fraudulently concealed this fact and purposefully sought to obtain a default judgment to gain control over Shenzhen Guotai without a contest of the merits of the claims. Neither was SQFM, the parent company of Beijing Khan, made aware of the Shenzhen Proceedings.  Moreover, at the material time, I was living in fear of continued malicious prosecution in China as Nations and Mr Luo and Mr. Sun had persistently threatened to inflict harmful consequences on me for choosing not to comply with Nations' demands and refusing to participate in Nations' scheme of espionage in the US. Further, I was worried for my safety as Mr Luo had consistently boasted to me about Nations' economic clout and influence in China as a means to imprison me and otherwise inflict harm upon me.

37. With the removal of Beijing Khan as the Executive Partner of Shenzhen Guotai, Nations then had access to appoint Nations Investment as the liquidator of Shenzhen Guotai. This is because under clause 15.2 of the Partnership Agreement, the role of the liquidator falls under the Executive Partner, and with Beijing Khan removed, Nations Investment then assumed the role of Executive Partner and liquidator of Shenzhen Guotai. As the controlling and executive partner of Shenzhen Guotai, Nations Investment was then able to control the Plaintiff which is a wholly-owned subsidiary of

Shenzhen Guotai and commence Suit 1027 on the Plaintiff's behalf against me in Singapore as I was a director of the Plaintiff at the material time until my removal as director by Nations Investment. The sinister connection is clear – Mr Sun was the person who signed off as the authorised corporate representative on the member's resolution of the Plaintiff removing me as director (pg 221 of the 1st Affidavit of Sun Yingtong).

38. I verily believe that Nations, under the directions of Mr Luo and Mr Sun, plotted this elaborate scheme to commence proceedings against me in Singapore as one of the ways to reinforce and perpetuate the malicious falsehoods of misconduct and embezzlement of monies by all 3 defendants. The entire scheme was conceived to retaliate against and punish me for my cooperation with U.S. law enforcement in exposing Mr Luo, Mr Sun and Nations' illegal acts of espionage.

39. As a part of Nations' sinister scheme and plot against me in multiple jurisdictions, the Plaintiff, essentially controlled by Nations, alleges in Suit 1027 that, amongst other things, I am liable to the Plaintiff for the Alleged Sums citing amongst others, the following reasons:

(a) Breaches of fiduciary duty by me to the Plaintiff, causing the Plaintiff to make transfers to several Khan related entities which are allegedly detrimental to the Plaintiff. The Plaintiff alleges that these transactions

have resulted in the Plaintiff incurring losses amounting to USD 34,264,935.99 and is seeking to recover the same from the 1st Defendant.

(b) Allegedly assisted in or procured the 2nd Defendant to dishonestly breach her fiduciary duties and allowed the allegedly detrimental transfers to be made by the Plaintiff to the Khan related entities.

(c) Allegedly conspiring with the 2nd and 3rd Defendants through lawful and/or unlawful means, thus causing the Plaintiff to incur losses amounting to USD 34,264,935.99.

(d) Causing Khan Fund Management Asia Pte. Ltd. ("**SGKFM**") to occupy the Plaintiff's office premises without making any payment to the Plaintiff, causing the Plaintiff to incur losses amounting to SGD 290,153.97.

40. When Suit 1027 was commenced, I instructed my then solicitors, Messrs Davinder Singh Chambers, to set aside service of cause papers for Suit 1027 ("**Setting Aside Application**") as the Plaintiff served the cause papers for Suit 1027 to an address in New York whereas I resided in Florida. The Singapore High Court dismissed the Setting Aside Application and ordered for costs to be paid to the Plaintiff for amongst others, the Plaintiffs' disbursements incurred in respect of the Setting Aside Application ("**Plaintiffs' Costs**").

41. Subsequently, I instructed my then solicitors (i.e. the lawyers from LVM Law Chambers LLC) to appeal against: (i) the High Court's decision on the Setting Aside Application (Registrars' Appeal 317) ("**RA 317**"); and (ii) the Court's orders on the Plaintiffs' costs (Registrars' Appeal 352) ("**RA 352**"). Subsequently, I discharged LVM Law Chambers LLC and represented myself in person at the hearings for RA 317 and RA 352.

42. However, on 11 May 2022, the Singapore High Court dismissed RA 317 and RA 352. On 17 May 2022, I was directed by Senior Assistant Registrar Ng Teng Teng Cornie to serve my Defence by 31 May 2022.

43. When RA 317 and RA 352 were dismissed, I was self-represented and had only engaged the lawyers of Harry Elias Partnership LLP ("**HEP**") in the capacity as a proxy to assist me with the filing of documents for RA 317 and RA 352 on eLitigation by physically attending at the LawNet service bureau on my behalf as I was (and still am) living overseas.

44. I engaged HEP to act for me in Suit 1027 on 26 May 2022 (US time) and HEP filed a Notice of Appointment of Solicitor on my behalf on 30 May 2022 (Singapore time). A copy of the signed Warrant to Act dated 26 May 2022 (US time), is annexed hereto and marked as **Tab - 3** of **"XD-1"**.

45. As HEP had just been instructed by me to formally take over conduct of Suit 1027, they requested for an extension of 4 weeks from Ark Law on 30 May 2022 to file my Defence.

46. On 31 May 2022, Ark Law responded to HEP by way of a letter stating that they object to an extension of time for me to file a Defence, and on 1 June 2022, Ark Law sent HEP a letter stating that they intend to enter default judgment against me. Copies of Ark Law's letters dated 31 May 2022 and 1 June 2022 are annexed hereto and marked as **Tab - 4** of **"XD-1"**.

47. On 2 June 2022, HEP filed my Defence. Subsequently, on 16 June 2022, I instructed HEP to file my Defence (Amendment No.1) ("**Def Amd 1**"). It was only at that point in time that HEP had the time and opportunity to consider the substantive merits of Suit 1027. I was at that point in time advised of the factual overlaps between Suit 1027 and the proceedings in both China and the US, as well as the connecting factors pointing towards either China or the US as the appropriate forum.

48. On 18 June 2022, Ark Law wrote to HEP by way of a letter stating that if I truly believed that there was a valid ground to stay Suit 1027, I should be proceeding expeditiously with a formal application to stay Suit 1027. A copy of Ark Law's letter dated 18 June 2022 is annexed hereto and marked as **Tab - 5** of **"XD-1".**

49. Having carefully considered the overlapping issues and facts of the Shenzhen Appeal and the US Proceedings which I will detail below, I have decided that it was in my best interests that Suit 1027 be stayed to save parties time and costs as it is not beneficial for Suit 1027 to proceed with parallel litigation proceedings in various jurisdictions. Given the various factors connecting the crux of the dispute in Suit 1027 to either China or the US, I instructed my solicitors to proceed with the Stay Application and to inform Ark Law of the same. HEP did so by way of a letter dated 23 June 2022 and a copy of HEP's letter dated 23 June 2022 is annexed hereto and marked as **Tab - 6** of **"XD-1".**

## EXTENSION OF TIME SHOULD BE GRANTED AS THERE IS NO PREJUDICE TO THE PLAINTIFF WHICH CANNOT BE COMPENSATED BY COSTS

50. I believe that an extension of time should be granted for me to file the Stay Application as no prejudice will be caused to the Plaintiff. Even if there is any prejudice, they can easily be compensable by costs.

(a)    Save that the Plaintiff may have spent time reviewing my Defence and Def Amd 1, the Plaintiff has suffered no prejudice due to my filing of a Stay Application out of time. In the event that the Stay Application does not succeed, the Plaintiff would have to in any event review my Defence and Def Amd 1.

(b)    In fact, given the merits of the Stay Application which I shall elaborate in the next section, granting an extension of time for us to file the Stay Application would save all parties time and costs. This is because, as I shall detail below, the crux of the entire dispute is already included in proceedings currently pending before the courts in the USA and China.

(c)    Further, I wish to highlight that in Ark Law's letter dated 18 June 2022, the Plaintiff has requested that the filing of the Reply in abeyance be held pending the disposal of the merits of the Stay Application. In the interest of saving costs for the Plaintiff, I consented to the Plaintiff's request to hold the filing of their Reply for Suit 1027 in abeyance. This is notwithstanding the fact that the Plaintiff had objected to my request for an extension of time to file the Stay Application. See paragraph 5 of HEP's letter dated 23 June 2022 (Tab 6).

51.    On the other hand, if I were not allowed to file the Stay Application, I would not have the opportunity to raise the implications of the pending proceedings in the US and China before the Honourable Court. This will ultimately result in me having to defend multiple proceedings which involve what is essentially similar set of facts and disputes, incurring multiple set of costs and fees which would be highly prejudicial to me, and forces me to litigate in a forum in Singapore where none of the relevant events have occurred

and where none of the relevant parties reside. In other words, this is a dispute between China-based entities based on events occurring in the United States, and either forum is more appropriate in adjudicating this case and will fully dispose of the instant matter for the reasons set forth herein.

52. I also wish to point out that I have sought to save costs and reduce the issues in dispute by seeking the Plaintiff's consent to an extension of time to file the Stay Application, in the hopes that all parties as well as the Court can focus on the merits of the Stay Application instead of wasting time and costs on the procedural dispute over extension of time:

(a) On 18 June 2022, after filing Def Amd 1, Ark Law wrote to HEP requesting for amongst others, my proposal on the timelines for a Stay Application. See Ark Law's letter dated 18 June 2022 (Tab 5).

(b) On 23 June 2022, HEP responded to Ark Law informing them that they have been instructed by me to file the Stay Application. Further, to narrow the issues in dispute regarding the Stay Application, HEP enquired whether Ark Law consents to an extension of time for me to file the Stay Application. See HEP's letter dated 23 June 2022 at Tab 6.

(c) Ark Law responded on 23 June 2022 informing HEP that the Plaintiff objects to an extension of time for me to file my Stay Application. A

copy of Ark Law's letter to HEP dated 23 June 2022 is annexed hereto and marked as **Tab - 7** of **"XD-1"**.

53. As I have explained through the procedural history above, I was unable to file the Stay Application within the time limited for filing a Defence as I had only appointed HEP as my solicitors a mere 3 working days before the deadline of 31 May 202 for filing my Defence:

(a)  On 17 May 2022, I was directed by the Court to file and serve my Defence by 31 May 2022 or the Plaintiff was entitled to enter default judgment against me in Suit 1027. HEP was formally engaged by me on 27 May 2022, which was a Friday.

(b)  On 30 May 2022, HEP wrote to Ark Law seeking an extension of time from the Plaintiff to file my Defence, and to take my instructions regarding the conduct of Suit 1027. However, as I have highlighted above, the Plaintiff disagreed to any extension of time for me to file my Defence and on 31 May 2022, Ark Law informed HEP that they intended to enter default judgment against me.

(c)  By then, I already knew of the default judgment which Nations had obtained against Beijing Khan in the Shenzhen Proceedings and had experienced how difficult it was to set aside a default judgment, albeit in China. Faced with the threat of default judgment in Singapore, I

was afraid that it would be extremely difficult to set aside and places me at a disadvantage in the court proceedings even prior to the merits of the case being heard.

(d) Thus, I verily believed that it was in my best interest to comply with the timelines directed by the Singapore High Court in respect of Suit 1027 and to participate in the court proceedings by filing the Defence first and seek the relevant reliefs at the appropriate juncture should the need arises.

(e) With the threat of default judgment looming against me, I instructed HEP to file my Defence.

(f) At the time the Defence was filed, it was only 3 days after HEP had filed the Notice of Appointment of solicitor in Suit 1027 and I have not had the opportunity to discuss with HEP on the implications of having pending proceedings in the US and China on Suit 1027.

54. Notwithstanding the above, once I have had the opportunity to discuss the substance of Suit 1027 as well as the China and US proceedings with my solicitors, Def Amd 1 was filed and it was expressly set out therein at paragraph 6A that Suit 1027 should be stayed pending the Shenzhen Appeal. To be clear, I only learned of the Shenzhen Proceedings after becoming aware of this lawsuit, and if I had learned earlier that Nations had obtained

a default judgment against Beijing Khan prior to commencing Suit 1027, I would have made earlier arrangements to timely commence the Shenzhen Appeal.

55. Notwithstanding that my Defence had been filed, I am advised by my solicitors that a summons for extension to file the Stay Application, if granted by the Court, would allow me to file the Stay Application.

56. I will now explain why it is imperative that an extension be granted for me to file my Stay Application as I verily believe that the merits of Suit 1027 are inextricably linked to the proceedings in China and the USA. This in turn, will show why Suit 1027 should be stayed. I will explain below on the overlaps between the parties, issues and substance of the dispute between the proceedings in China and the US.

## OVERLAPS BETWEEN THE SHENZHEN APPEAL AND SUIT 1027

(i) *Parties and Pending case before the Shenzhen Intermediate People's Court*

57. The parties before the Shenzhen Intermediate People's Court for the Shenzhen Appeal are all based in China as follows:

(a) Beijing Khan as the appellant;

(b) Nations Investment and Shenzhen Guotai as the Respondents.

58. While it should be noted that I am not a director of Beijing Khan, I am the main shareholder, president and director of the parent company of Beijing Khan, SQKFM, at the material time of the performance of the Agreements.

59. The key witnesses for the Shenzhen Appeal are:

(a) For the appellant – myself and the 2nd Defendant, who is the director of Beijing Khan; and

(b) For Nations Investment and Shenzhen Guotai – Mr Luo and Mr Sun, both of whom are based in China.

60. As it can be seen, the witnesses for the Shenzhen Appeal and Suit 1027 overlap.

61. Further, as with the cases of cross border transactions, entities have been incorporated in different jurisdictions to facilitate the ease of business transactions. The Plaintiff is no exception as the Plaintiff was incorporated by Shenzhen Guotai to manage its investments through Singapore as it provided the best tax benefits and as communicated and requested by Nations, avoided the scrutiny of the foreign exchange department in China monitoring cross-border transactions with foreign entities. Further, the

Case 1:24-cv-03142-UA Document 1-2 Filed 04/24/24 Page 34 of 131

32

Plaintiff's purpose included facilitating payment of expenses to Khan related entities and/or entities tasked to carry out due diligence on Shenzhen Guotai and/or the Plaintiff's behalf.

62. However, the main people who are directing and controlling the actions of the Plaintiff, Shenzhen Guotai and Nations Investment are the same, namely Mr Luo and Mr Sun, after the unlawful removal of Beijing Khan in 2019.

*(ii) Issues*

63. The Shenzhen Appeal would dispose of the following issues:

(a) Whether Beijing Khan had been unlawfully removed by Nations as a partner of Shenzhen Guotai; and

(b) Whether there had been an unlawful transfer of monies from Shenzhen Guotai and by extension the Plaintiff.

64. I wish to highlight that if the Shenzhen Appeal decides in favour of Beijing Khan, Beijing Khan would be reinstated as the partner of Shenzhen Guotai and by extension, the Plaintiff.

65. Thus, the issue of whether the Plaintiff is entitled or should have commenced Suit 1027 will be impugned as I will be one of the controllers of the Plaintiff.

66. The main complaint of the Plaintiff is that my conduct was unlawful and that I have illegally embezzled monies from the Plaintiff. However, the Plaintiff's allegations fall squarely under the issues of the Shenzhen Appeal and will be fully disposed of pending the adjudication of the Shenzhen Appeal.

67. First, I wish to highlight that the monies in the Plaintiff were intended to be used for the acquisition of equity of companies in the US and the Plaintiff was incorporated with the purpose of facilitating investments of Shenzhen Guotai which includes amongst others, making payments to entities which are conducting due diligence on Shenzhen Guotai's behalf.

68. Therefore, if it is decided by the Shenzhen Intermediate People's Court that my actions were lawful and in accordance with the terms of the Agreements, there is no wrongdoing on my part to have moved the monies from the Plaintiff to the Khan entities as such transfers are within my authority as director of the Plaintiff and as an office holder of Shenzhen Guotai.

69. Second, if the Shenzhen Court accepts that the Alleged Sums are monies which have been transferred to the Plaintiff by Shenzhen Guotai with the

intention of fulfilling the purposes of the Agreements, and that all transfer of monies was done so under the approval and knowledge of Nations Investment and Mr Sun, the Plaintiff's claims in Suit 1027 will not be sustainable because the Plaintiff was incorporated with the purpose of facilitating the investments of Shenzhen Guotai and does not own the Alleged Sums alleged to have been unlawfully diverted from the Plaintiff.

70. Therefore, if the Shenzhen Intermediate People's Court determine that the officers of Beijing Khan had not acted unlawfully and outside the scope of their authority pursuant to the Agreements, the allegations of me and the 2nd and 3rd Defendants acting in detriment of the Plaintiff will not be sustainable.

*(iii) Applicable Law to the Dispute*

71. The crux of the dispute in this case is whether the impugned transactions pleaded at paragraph 49 of the Statement of Claim, which monies were from Shenzhen Guotai and therefore to be used and invested in accordance with the Agreements, were transferred out of the Plaintiff's accounts in a manner which were unlawful or in breach of the Agreements.

72. Thus, the law governing the dispute should be Chinese Law as the Agreements are governed by Chinese Law.

Case 1:24-cv-03142-UA Document 1-2 Filed 04/24/24 Page 37 of 131

35

(a) The Partnership Agreement makes express reference to various legislation of China, including the Partnership Enterprise law of China.

(b) Additionally, clause 19.2 of the Partnership Agreement states that a dispute shall be submitted to an arbitral institute at the place of the partnership (i.e. Shenzhen Guotai), which is clearly China.

(c) The preamble of the Further Investment Agreement states that the agreement is in accordance with Chinese law:

"*In accordance with the Contract Law of the People's Republic of China, Company Law of the People's Republic of China, Partnership Enterprise Law of the People's Republic of China and related laws, regulations and government policies, after amicable negotiations between each of the Parties, they hereby agree upon the terms to the additional investment contributions from Party B to Party C as follows*"

73. Further, I wish to highlight that the Plaintiff is being controlled by parties based in China (i.e. Mr Luo, Nations and Mr Sun).

74. Notwithstanding that the duties are owed by me as director of the Singapore-incorporated Plaintiff, as I have set out throughout the course of this affidavit, the crux of the dispute is whether the affairs of the Plaintiff were conducted in accordance with the Agreements. The relevant clauses and

context of the Agreements clearly show that they were meant to be governed by the laws of China.

### (iv) *Claim and Defence pleaded*

75. Having reviewed the Plaintiff's Statement of Claim, I believe that a significant portion of the Plaintiff's claim overlaps with the Shenzhen Appeal. I say this because the parties involved, namely Mr Sun, Mr Luo and Nations, agreements which relate to the Agreements and issues of embezzlement/ unlawful diversion of monies, are all issues pending before the Shenzhen Intermediate People's Court as part of the Shenzhen Appeal.

76. I will elaborate below.

77. At paragraphs 4 to 6 of the Statement of Claim filed in Suit 1027, the Plaintiff had set out in the detail the parties who have a controlling stake of the Plaintiff, i.e. Nations.

78. Paragraphs 27 to 41 of the Statement of Claim lists the background of the existence of the Agreements and the links between Nations and the Plaintiff showing that Suit 1027 is linked to the issues of the Shenzhen Appeal.

79. Most pertinently the key complaint of the Plaintiff in Suit 1027 is in relation the alleged diversion of funds from the Plaintiff to various Khan entities.

However, the monies involved in this diversion are in fact, the property of Shenzhen Guotai. They were deposited in the Plaintiff to facilitate amongst others, the investments, and payments which the controlling members of Shenzhen Guotai had directed the Plaintiff to do so.

80. At paragraph 3 of the Statement of Claim, it is telling that the Plaintiff is only a conduit of Shenzhen Guotai as there is no other purpose of the Plaintiff described in the Statement of Claim except as a wholly owned subsidiary of Shenzhen Guotai.

81. Any wrongdoing or harm complained of by the Plaintiff essentially means harm inflicted on Shenzhen Guotai and in this regard, Nations Investment had commenced the Shenzhen Proceedings against the officers of Beijing Khan for allegedly embezzling monies paid to Shenzhen Guotai under the Agreements. Further with the Shenzhen Appeal pending, it is even more likely that the issues in Suit 1027 will be brought to the fore in the Shenzhen Appeal.

82. In Def Amd 1, paragraphs 6A and 6B highlight the overlap of issues between the Shenzhen Appeal and Suit 1027.

83. At paragraphs 22, 22A and 23 to 25 of Def Amd 1, my Defence is focused on the reasons for the transfer of monies to the various Khan entities and I have explained that these transfers were:

(a) pursuant to the purchase of shares in KOM;

(b) pursuant to expenses (i.e. consultancy services, merger and due diligence expenses) incurred by Khan entities on the Plaintiff's behalf;

(c) In anticipation of the termination of the Agreements to prevent the commission of an illegal act and/or purpose; and

(d) Genuine bonus payments to the 2nd Defendant.

84. Crucially, these transfers were done on the Plaintiff's behalf to amongst others, fulfil Shenzhen Guotai's contractual obligations of the Agreements (i.e. conduct due diligence and identify suitable targets to acquire in the US) and under the approval and knowledge of Nations Investment and Mr Luo.

85. I verily believe that the pleadings in Suit 1027 are issues which are covered by the Shenzhen Appeal and it will be impossible to consider the issues in dispute in Suit 1027 without referring to the Shenzhen Appeal.

**PENDING US PROCEEDINGS**

86. Further, there are related proceedings on the same issues concerning the same parties pending before the Courts of the United States of America.

87. I, together with Khan Funds Management America, Inc (an entity which I am the sole shareholder of), have commenced proceedings under the Racketeer Influenced and Corrupt Organizations Act ("**RICO**") against amongst others, Nations, Mr Luo and Mr Sun (all of whom are formerly or currently the Plaintiff's controllers) before the Supreme Court of the State of New York ("**US Proceedings**"). A copy of the RICO complaint filed before Supreme Court of the State of New York is annexed hereto and marked as **Tab - 8** of **"XD-1"**.

88. The US Proceedings was subsequently removed from the Supreme Court of the State of New York to the United States District Court for the Southern District of New York. Pursuant to an order granted by Judge Edgardo Ramos, a pre-motion conference in respect of the US Proceedings is scheduled on 20 July 2022 at 10am. Nations has entered an appearance in respect of the US proceedings and Luo and Sun have retained counsel to represent them in the US Proceedings. Prior to this pre-motion conference, my U.S. solicitors will notify the Court of our intention amend the complaint to add additional facts and claims where applicable.

*(i)  Parties*

89. I am one of the plaintiffs for the US Proceedings.

90. The defendants for the US Proceedings involve Mr Luo, Mr Sun and Nations.

91. Again, there is an overlap between the parties for Suit 1027 and the US Proceedings.

   (ii) *Issues*

92. A core issue of the US Proceedings is that Nations and related parties, who are the controllers of the Plaintiff, have retaliated against me by engaging in illegal acts against me for cooperating with authorities in the US, including reporting Mr Luo, Mr Sun and Nations for acquiring protected technologies from companies headquartered in the US for end use in China, and specifically, the Chinese military. The US Proceedings will therefore decide whether Nations, Mr Luo, Mr Sun and related parties have engaged in illegal espionage activities in the US.

93. As I have highlighted earlier, the Agreements were actually to be used by Nations and Mr Luo and Mr. Sun to illegally acquire semiconductor companies and related technologies and materials in the US, which is an offence in the US and a direct contravention of the goals of the Agreements (i.e. to acquire biomedical companies).

94. Nations and Mr Luo and Mr. Sun have over the years, increased their demands and threats for me and Beijing Khan and KFA to purchase semiconductor companies and conduct economic espionage in the US. As alleged, the relevant events occurred in the U.S. and China; none of the relevant events at issue in the US Proceedings occurred in Singapore.  In 2017, I reported Luo, Sun and Nations to the FBI based on their unlawful conduct in the U.S. and China.

95. In this regard, the issue regarding the alleged unlawful transfer of monies from the Plaintiff in Suit 1027 is directly linked to the illegal activities that Nations, through Mr Luo and Mr. Sun, had asked me and KFA to carry out in the US:

(a) First, the monies transferred from the Plaintiff was for amongst others, costs incurred by Khan entities under the Agreements and expenses as listed in paragraph 81 above. The obligation of Beijing Khan and thus KFA under the Agreements was to identify CRO and other biomedical companies as acquisition targets.

(b) The unilateral change of focus of companies for acquisition by Shenzhen Guotai to semiconductor companies is illegal in the US. Nations and Mr Luo and Mr. Sun refuses to admit and/or address this fact and continues to falsely accuse Beijing Khan/me of not fulfilling the obligations required of the executive partner under the Partnership Agreement.

(c) The blatant breach of the terms of the Agreements by Luo and Sun by interfering with the investment decisions of Shenzhen Guotai and coercing me to conduct economic espionage in the US has caused several Khan entities to incur significant expenses on behalf of Shenzhen Guotai (i.e. legal fees, travelling and due diligence on companies which were initially targets of Shenzhen Guotai).

(d) As the illicit activities of Mr Luo and Mr Sun were reported to law enforcement agencies in the US, I was concerned that monies in Shenzhen Guotai may be viewed by the US authorities as proceeds of an illegal enterprise and if so, the monies in Shenzhen Guotai and the Plaintiff might be part of a freezing order by the US authorities and prohibited from being utilized for payments to entities who had already incurred expenses on Shenzhen Guotai and the Plaintiff's behalf and to protect against any contingency from the fallout of the breach of the Agreements.

(e) Further, as Mr Luo was a signatory on the Plaintiff's bank account, I anticipated that Mr Luo might, as a form of retaliation against me for cooperating with the US authorities and in furtherance of the stated criminal scheme, attempt to remove the monies in the Plaintiff's bank account and use these monies for illegal purposes, leaving the Plaintiff as an empty shell with unpaid debts owed to the Khan entities and leaving the Plaintiff, me and others as a link in this chain of criminal wrongdoing. Given Mr Luo's pattern of persistently harassing me and continuously

threatening to inflict harm upon me, I felt it was important that I safeguarded the funds in the Plaintiff's bank account and prepare for such situations by transferring the monies from the Plaintiff to the various Khan entities.

(f)  Additionally, I was concerned that target companies previously identified by Shenzhen Guotai could initiate proceedings against the Khan entities for not following through with the acquisition as previously represented.

(g)  A further consideration which weighed heavily on my mind was the fact that Luo had admitted to me that he together, Nations and Sun, were all members of a criminal enterprise laundering money in various jurisdictions to fund the objectives of Nations to procure restricted commodities and technologies in the US. Therefore, I was deeply troubled and concerned that monies originating from Nations, and by extension, Nations Investment which have been deposited in Shenzhen Guotai and the Plaintiff will be viewed as illegal proceeds and unnecessarily implicate me, Shenzhen Guotai and the Plaintiff. Accordingly, I had to take all reasonable steps to safeguard the funds belonging to Shenzhen Guotai and the Plaintiff.

96. Thus, the disposal of the US Proceedings would determine whether:

(a) Mr Luo, Mr. Sun and Nations had conspired to induce the team from Beijing Khan and KFA to breach the Agreements by illicitly acquiring and exporting protected commodities and technologies from the US to China for unauthorised use. If it is indeed determined by the US Courts that Mr Luo, Nations and Mr Sun had compelled me to engage in illegal activities in the US, it will necessarily mean that Nations had breached the Agreements. A finding on the facts by the US courts will also be highly relevant in deciding whether the impugned transactions (i.e. transfers of monies from the Plaintiff) were justified, thereby exonerating me of any breaches of directors' duties to the Plaintiff.

(b) Whether Mr Luo, Mr. Sun and Nations have promulgated malicious falsehoods in respect of my embezzlement of monies from Shenzhen Guotai in China.

(c)  Whether the alleged breach of the Agreements was induced by Nations, Mr Luo and Mr Sun as the ultimate objective of the Agreements were for an illegal and illicit purpose to be performed in the US and any alleged breach of the Agreements were due to my and the team from Beijing Khan and KFA's refusal to engage in illegal activities in the US.

(d) Whether Suit 1027 is a fraudulent proceeding instituted by Mr Luo and Nations to retaliate against me. If the US Court determines that as a result of my cooperation with the US authorities in reporting the illicit and

illegal activities of Nations, Mr Luo and Mr. Sun, and finds that they have exhibited a continuous pattern of harassing me and the defendants in Suit 1027 through litigation proceedings in various jurisdictions, including the Singapore High Court, it is likely to have a huge impact on the credibility of the Plaintiff's claims and allegations made in Suit 1027. Nations' sinister motivation in commencing Suit 1027 will be laid bare by a finding of fact in the US Proceedings – they have commenced actions in multiple jurisdictions in retaliation and in circumvention of the US laws which protect, amongst others, informants and witnesses from unlawful retaliation.

97. Therefore, with the US Proceedings taking place concurrently, I verily believe that Suit 1027 should not be proceeded with until the disposal of the merits of the US Proceedings, as the allegations of unlawful diversion of monies from the Plaintiff by me, conspiracy to injure the Plaintiff and dishonest assistance by me to unlawfully divert monies from the Plaintiff will not be sustained before the Singapore High Court if the US Court were to determine that Mr Luo, Mr Sun and Nations had caused Nations Investment to enter into the Agreements for illegal purposes and unlawfully retaliated against me for my cooperation with law enforcement.

*(iii)Applicable Law and Defence Pleaded*

98. As the performance of the Agreements is for the acquisition of companies based in the US and the relevant acts complained of occurred in the U.S. giving rise to my claims, the applicable law should be federal law under RICO and the relevant state of the US.

99. In this regard, if the US Court finds that Nations had intended for the Agreements to be performed in a manner which would have been illegal in the US, I verily believe that the Singapore High Court should not assist the Plaintiff with the recovery of the monies under an illegal contract.

100. At paragraph 26A and 26B of Def Amd 1, my solicitors have pleaded that "… *the recovery of funds received by the Plaintiff for the performance of illegal purposes should not be permitted by the Singapore Courts*."

101. I verily believe that Suit 1027 should not proceed whilst the US Proceedings are pending as this will materially affect the merits of Suit 1027 and whether the Plaintiff's claims are unmeritorious.

## REASONS FOR THE STAY APPLICATION

102. Given the overlapping parties and issues of the Shenzhen Appeal and the US proceedings, the merits of Suit 1027 should be stayed pending the disposal of both proceedings before the US and China.

Case 1:24-cv-03142-UA   Document 1-2   Filed 04/24/24   Page 49 of 131

47

103. Further, in light of the multiple connecting factors set out above, Singapore

is not the appropriate forum to determine the disputes.

## CONCLUSION

104. In conclusion, I humbly pray for an order in terms of the prayers of this

application.

Sworn/Affirmed by the abovenamed    )
DAI XUEFENG    )
On this    ⌐    day of July 2022    )
In the State of Florida    )
United States of America    )

BEFORE ME,

**A NOTARY PUBLIC**

Notary Public State of Florida
LaQueesha V Davis
My Commission
HH 246161
Exp. 3/28/2026

THIS IS THE EXHIBIT

MARKED AS

"XD-1"

REFERRED TO

IN THE AFFIDAVIT OF

**XUEFENG DAI SWORN/AFFIRMED**

THIS ⌐ DAY OF JULY 2022

BEFORE ME

A NOTARY PUBLIC

Notary Public State of Florida
LaQueesha V Davis
My Commission
HH 246161
Exp. 3/28/2026

# **TAB 1**

Case 1:24-cv-03142-UA   Document 1-2   Filed 04/24/24   Page 52 of 131

Date :        14 September 2020
Our ref.:     14744

# Certification of Translation Accuracy

To whom it may concern:

LINGUA TECHNOLOGIES INTERNATIONAL PTE LTD, an ISO 17100:2015 certified professional translation company, do hereby certify that the translation of the attached document(s) was executed by a professional translator competent to translate and review from Chinese into English in accordance with the requirements set out in the ISO 17100 standard (International Standard for Translation Services), and is to the best of our professional knowledge and belief, a true and faithful rendering of the original document(s) in Chinese.



_____
Loh Wai Wah
Corporate Development Manager
for and on behalf of LINGUA TECHNOLOGIES INTERNATIONAL PTE LTD

Case 1:24-cv-03142-UA   Document 1-2   Filed 04/24/24   Page 53 of 131

51

Shenzhen Guotaiqixing Industry Investment Fund Management Centre

(Limited Partnership)

# Partnership Agreement



Signatories to the Agreement:

General Partner:

    Name:    Beijing Genghis Khan Pharmaceutical Holdings Co., Ltd

    Address:  0801-1, 8th Floor, Block 17, 17-A, 17-B, 17-C, 17-D, 17 Financial Street, Xicheng District, Beijing

    Legal Representative:  Huang Chao

Limited Partner (1):

    Name:    Shenzhen Qianhai Nations Investment Management Co., Ltd

    Address:  Room 201, Building A, No. 1, Qianwan 1st Road, Qianhai Shenzhen-Hong Kong Cooperation Zone, Shenzhen (with Shenzhen Qianhai Commerce Secretariat Co., Ltd.)

    Legal Representative:  Luo Zhaoxue



## 1.    Definitions

In this document, unless otherwise stated, the following terms shall have the respective definitions:

**This Agreement**: Refers to the Shenzhen Guotaiqixing Industry Investment Fund Centre (Limited Partnership) Partnership Agreement and its amendments or revised versions that have been approved through due process.

**Partnership or Limited Partnership**: Refers to the Limited Partnership established in This Agreement in accordance with the Partnership Enterprise Law.

**Cash Management**: Refers to all the cash assets of the Limited Partnership except for cash used for project investment purposes, including but not limited to investment monies, undistributed cash, and cash provisioned for expenses.

**Establishment Date**: With regards to this Agreement, the date of issuance of the Partnership's business license.

**Working Days**: Refers to days other than the statutory holidays and rest days in China.

**Related Party**: Refers to any person who has control, joint control, or significant influence over the entity, or who is controlled, jointly controlled, or significantly influenced by a person who is a related party. "Control" refers to having the right to determine the financial and operating policies of an enterprise, and being able to benefit from the business activities of the enterprise (for individuals, this refers to a relationship in which one party is accustomed to act in accordance with the instructions of another). "Joint control" refers to the shared control of an economic activity in accordance with the contract, which only exists when the important financial and operating decisions related to the economic activity require the unanimous consent of the investors who share control. "Significant influence" refers to the power to participate in the decision-making of an enterprise's financial and operating policies, but not the control or joint control of the formulation of these policies with other parties.



**Management Fee**: Refers to the payment for providing investment management services to the Partnership as a Manager, which is the remuneration that the Partnership pays to the Manager in accordance with the investment management agreement.

**Manager**: The investment manager hired by the General Partner, in accordance with this Agreement.

**Partnership Enterprise Law**: Refers to the *Partnership Enterprise Law of the People's Republic of China*, amended and adopted at the 23rd session of the Standing Committee of the 10th National People's Congress of the People's Republic of China on August 27, 2006. The amended *Partnership Enterprise Law of the People's Republic of China* was promulgated and came into force as of 1 June 2007.

**Partnership Rights**: Refers to all the rights and interest of the partners in this Partnership in accordance with this Agreement. With regards to the Limited Partner, this includes but is not limited to the subscribed capital contribution, the paid capital contribution, the financial contribution received based on the paid-in capital contribution, including the right to obtain distribution in accordance with this Agreement. With regards to the General Partner, this includes but is not limited to the subscribed capital contribution, the paid-in capital contribution, the financial contribution received based on the paid-in capital contribution, including the right to obtain distribution, and the administrative and management rights to the Partnership in accordance with this Agreement.

**Partner(s)**: Unless otherwise stated, refers to the General Partner and Limited Partner.

**Quarter**: Refers to a quarter in a calendar year.

**General Partner**: Refers to Beijing Genghis Khan Pharmaceutical Holdings Co., Ltd

**Executive Partner**: Refers to Beijing Genghis Khan Pharmaceutical Holdings Co., Ltd

**Limited Partner**: Upon acceptance and ratification of the capital contribution to the Partnership by the General Partner in accordance with this Agreement, refers to the partner who bears limited liability for the debt of the Partnership enterprise with the amount of the capital contribution, as well as partners who join by accepting the Partnership interests of the original Limited Partners of this Partnership according to this Agreement.



**Person(s)**: Refers to natural persons, Partnerships, companies and other legal or economic entities.

**Subscribed Capital Contribution**: Refers to the contribution amount a Partner undertakes to pay to the Limited Partnership.

**Total Subscribed Capital**: Refers to the total amount of capital all Partners undertake to pay.

**Paid-in Capital Contribution**: Refers to the amount of capital contributions actually paid by the Partner to the Partnership, in accordance with the Agreement.

**Total Paid-in Capital**: Refers to the total amount of capital contributions actually paid by all Partners to the Partnership, in accordance with the Agreement.

**Investment Period**: Refers to the period commencing on the Establishment Date and expiring **20** years from the date. Upon expiry of the business period, said period can be extended in accordance with the management requirements of the Limited Partnership, with agreement from all Partners.

**Portfolio Company:** Refers to a company in which the Limited Partnership has invested directly or indirectly and holds its equity or other rights or interests.

**Escrow Agreement**: Refers to the agreement entered into by the Partnership, the Manager and the custodian institution determined in accordance with this Agreement, regarding the custody of the Partnership's enterprise funds (including the capital contributions paid by the partners to the Limited Partnership).

**Project Investment:** Refers to investments such as equity share investments made by the Limited Partnership.

**Partnership Expenses**: Refers to the expenses borne by the Partnership itself under this Agreement.

**Financial Terms**: Unless otherwise stated, the monetary currency is to be Renminbi (RMB).

In this Agreement, figures with the terms "above", "within" and "below" are inclusive of the figure mentioned; figures with the terms "not including", "excluding" and "higher than" are not inclusive of the figure mentioned.



Case 1:24-cv-03142-UA   Document 1-2   Filed 04/24/24   Page 58 of 131

**2.      Partnership Establishment**

With the exception of the parties listed in this Agreement, newly joined partners and parties who have received a share of capital contribution are all parties to this Agreement and are bound by the terms of this Agreement, unless all partners have signed a separate partnership agreement.

2.1    Type of Partnership

All partners agree unanimously that the Partnership is a **Limited Partnership**, in accordance with the definition under the *Partnership Enterprise Law of the People's Republic of China*, comprising of a General Partner and Limited Partner. The General Partner has unlimited liability of the debt of the Partnership while the Limited Partner has limited liability of the Partnership debt, up to the amount of their investment.

2.2    Basic Details of the Partnership

2.2.1   Partnership Name: Shenzhen Guotaiqixing Industry Investment Fund Management Centre (Limited Partnership) (Working title; final name shall be in accordance with the business registration with the Department of Industry and Commerce).

2.2.2   Place of Business: Room 201, Block A, Qianhai Shenzhen-Hong Kong Cooperation Zone Management Bureau Office Building, 1 Liyumen Street, Qianwan 1st Road, Qianhai Shenzhen-Hong Kong Cooperation Zone, Shenzhen (with Shenzhen Qianhai Commerce Secretariat Co., Ltd.)

2.2.3   Business Scope: Investment management (excluding restricted projects), equity investment funds, equity investment fund management, investment and establishment in projects (specific projects to be reported separately), investment consulting (excluding restricted projects), investment consultant (excluding restricted projects).

2.2.4   Partnership period: The business period of the Partnership is **20** years. Upon expiry of the business period, the decision to extend as well as the duration of extension shall be determined through unanimous agreement from all Partners.



2.3     Partners

This Partnership shall comprise of not more than 50 Partners, with 1 General Partner, and no more than 49 Limited Partners.

2.3.1   General Partner

Name: Beijing Genghis Khan Pharmaceutical Holdings Co., Ltd

Address: 0801-1, 8th Floor, Block 17, 17-A, 17-B, 17-C, 17-D, 17 Financial Street, Xicheng District, Beijing

Document Name: Business License

Document Number: 11010102019662188

2.3.2   Limited Partner (1)

Name: Shenzhen Qianhai Nations Investment Management Co., Ltd

Address: Room 201, Building A, No. 1, Qianwan 1st Road, Qianhai Shenzhen-Hong Kong Cooperation Zone, Shenzhen (with Shenzhen Qianhai Commerce Secretariat Co., Ltd.)

Document Name: Business License

Document Number: 914403003498822023

2.4     Partnership Purpose

Share in the returns of the rapidly developing mergers and acquisitions (M&A) investment market by combining capital advantage and the advantages of professional investment and management.



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM    INDEX NO. 152210/2024
NYSCEF DOC. NO. 12    Case 1:24-cv-03142-UA    Document 1-2    Filed 04/24/24    Page 60 of 131    RECEIVED NYSCEF: 03/12/2024

58

2.5    Investment Purpose

The purpose of the Partnership is to invest in equity/debt and/or other investments that conform with legal regulations and this Agreement.

2.6    Basic Management Structure

2.6.1    Within the duration of the Partnership, the type of partnership cannot be changed; meetings of the Partnership will not have the right to resolve against this.

2.6.2    The General Partner and Limited Partner of this Partnership cannot be exchanged.

2.6.3    Cash Management Mechanism: With the exception of investments in projects to meet the investment target, all cash assets of the Limited Partnership (including but not limited to cash to be invested, cash to be distributed and cash reserved for expenses) shall only be managed in the form of cash, and cannot be used for other investments in fixed assets.

2.6.4    Investment Exit Mechanism: The Executive Partner and Manager shall strive to maximise the interests of the Partnership based on the principle of good faith, to arrange for the Partnership to withdraw from previously invested projects, as permitted by the law, before the expiration of the Partnership's business period. The investment exit strategies mainly involve investment project liquidation, equity transfer and equity repurchase. If the pre-determined exit strategies cannot be realised, the Executive Partner and Manager shall adopt other suitable exit strategy methods.

2.6.5    Independent Management Mechanism: The Executive Partner shall independently manage the daily operations of the Partnership, and the Limited Partners may not participate nor interfere.

2.6.6    Independent Investment Decision-Making Mechanism: The Executive Partner shall make investment decisions independently for the Partnership, and the Limited Partners may not participate nor interfere.



### 3. Investment

3.1    Total Investment

This Partnership aims to raise RMB **2** billion in total capital, of which:

the General Partner, Beijing Genghis Khan Pharmaceutical Holdings Co., Ltd undertakes to contribute RMB **500,000**;

and the Limited Partner (1), **Shenzhen Qianhai Nations Investment Management Co., Ltd** undertakes to contribute RMB **300 million**.

The remaining capital contribution shall be raised in instalments within **3** years through the operation and project investments of the Partnership.

3.2    Type of Investment

The capital contributions of all partners of this Partnership is in the form of currency, with the currency being Renminbi (RMB).

3.3    Subscription Agreement

The minimum subscribed capital of the Limited Partner is RMB 10 million, and may be increased in increments of RMB 1 million, but the General Partner may adjust the amount based on their independent judgement.

3.4    Payment Schedule

Upon signing this Agreement, the Partners shall pay the subscribed capital in a timely manner, within 7 working days after the Executive Partner sends the payment notice, in accordance with the time and payment amount specified in the payment notice.

Partners who fail to pay their contributions on time are given a 30-day grace period, with a late payment fee of 1/1000th of the amount overdue calculated daily for overdue charges. Those who have paid their contributions within the grace period are not liable for breach of contract.



The capital contribution of a new Partner should be paid in accordance with the terms agreed upon with the new Partner and at the request of the Executive Partner, after the General Partner had made the decision to approve the new Partner.

**4.    Limited Partner**

Refers to the Partner, whose capital contribution to the Partnership is accepted by the General Partner, and who signs this Agreement, with limited liability for the debt of the Partnership, based on the amount of capital contribution subscribed, through the transfer of the original Partner equity in accordance with this Agreement.

4.1    Rights of Limited Partners

4.1.1    To participate or appoint a representative to participate in a Partner Meeting and exercise their voting rights in accordance with the actual contributions.

4.1.2    To personally, or appoint a representative, review the meeting minutes and audit financial summaries.

4.1.3    To understand and supervise the operational status of the Limited Partnership, and make reasonable opinions.

4.1.4    To have rights to income distribution.

4.1.5    To transfer capital, but within the restrictions of this Agreement.

4.2    Obligations of Limited Partners

4.2.1    Limited Partners shall bear limited liability for the debts of the Partnership, up to the amount of their subscribed capital contributions.

4.2.2    To make full payment of the capital on time in accordance with the conditions and methods stated in this Agreement. If the Limited Partner is unable to make payment to the Partnership on time, the Limited Partner shall be liable for breach of contract in accordance with the relevant provisions of this Agreement, including but not limited to adjusting the proportion of capital contributions among the Partners accordingly.



4.2.3   Except when expressly stated within the rights and obligations of this Agreement, the Limited Partner shall not participate in or interfere in the normal operation and management of the Partnership.

4.2.4   Except as required by law, regulations and rules, the Limited Partner shall only use all information provided by the General Partner to Limited Partners for partnership-related matters, and shall not disclose such information to third parties or use it for business activities not related to the Partnership. The General Partner has the right to hold Limited Partners responsible for breaching confidentiality obligations in their own name or in the name of the Partnership.

4.2.5   The Limited Partner shall not be involved in the management of the Partnership.

4.3   Liability of the Limited Partner for Breach of Contract

4.3.1   If a Limited Partner conducts a transaction with another person in the name of the Partnership without authorisation and causes losses to the Partnership or other partners, the Limited Partner shall be liable for compensation.

4.3.2   The Limited Partner shall not represent the Partnership if not executing business pertaining to the Partnership. If a Limited Partner violates the terms of this Agreement and participates in business management, he shall bear unlimited joint and several liability for the Partnership debt with the General Partner on the participation matters.

4.3.3   The following acts of a Limited Partner shall not be regarded as executing Partnership matters:

1)   Participating in the decision of the joining and termination of the General Partner.

2)   Making reasonable suggestions for the management of the Partnership.

3)   Reviewing Partnership financial information, such as accounting books, in matters involving their own self-interest.

4)   Claiming their rights or filing lawsuits against the responsible Partner when the interests of the Partnership have been violated.



    5)    Urging the Executive Partner to exercise his rights when said Partner has neglected to exercise his rights.

    6)    Provide guarantee to the Partnership, in accordance with the law.

## 5. Executive Partner

5.1    The Executive Partner shall execute Partnership affairs on behalf of the Partnership, in accordance with this Agreement.

The Partnership authorises Managers to execute investment management, and shall pay management fees in accordance with this Agreement.

5.2    Requirements of the Executive Partner

    5.2.1    The Partner shall be the General Partner of this Partnership

    5.2.2    To be fully aware of investment risks and be willing to assume the rights and obligations of the Partnership for the duration of its existence.

    5.2.3    Possess corresponding industry investment experience and good management capabilities.

    5.2.4    Not be prohibited by law to be an Executive Partner.

5.3    Authority and Responsibilities of the Executive Partner

    5.3.1    Executing investments and other businesses of the Partnership (including project investment and cash management).

    5.3.2    Administering, maintaining and disposing of Partnership assets, including but not limited to investment assets, non-investment assets, intellectual property rights, etc.

    5.3.3    Performing all actions necessary to maintain the legal existence of the Partnership and carrying out business activities in the name of the Partnership.



Case 1.24-cv-03142-UA   Document 1-2   Filed 04/24/24   Page 65 of 131

5.3.4    In accordance with the Agreement, opening and maintaining bank accounts in the name of the Partnership; issuing payment orders and other instruction from these accounts to the bank; receiving capital contributions from the Limited Partnership, investment income, cash generated from the disposal of project investments, and any amounts received by the Limited Partnership that is to be deposited into these accounts.

5.3.5    Employing, terminating and substituting professionals, intermediaries and consultancies (including independent audit institutions) in the provision of service to the Partnership, but the General Partner shall disclose relevant matters in accordance with this Agreement.

5.3.6    All Partners unanimously agree that the Executive Partner has the right, within reasonable judgement, to appoint a person who is not part of the Limited Partnership as a Manager, and enter into investment management agreements, but said Manager shall meet the conditions stipulated by the law and this Agreement.

5.3.7    Selecting a banking institution and entering into an account opening agreement (including account opening agreements entered into, on behalf of the Partnership, before the Partnership was established).

5.3.8    In the case where a Limited Partner transfer his Partnership interest, reviewing the transferee's qualifications and approving the transfer in accordance with the provisions of this Agreement.

5.3.9    Initiating or responding to litigation for arbitration purposes in the interest of the Partnership; entering into actions such as negotiations or reconciliations in disputes with third parties; taking all possible actions to protect the financial safety of the Partnership, and minimise risks to the Limited Partner, General Partner and property of the Partnership, arising from the activities of the Partnership.



5.3.10   Managing matters regarding taxes of the Partnership in accordance with state taxation regulations.

5.3.11   Providing guarantee, assurance and compensation to investments that are in-progress, holding and clearance, which the General Partner deems necessary or appropriate.

5.3.12   Monitoring the performance of investment portfolio companies, and executing all rights of the Partnership related to the portfolio companies.

5.3.13   Compensating in accordance with this Agreement, but the General Partner shall disclose related matters in accordance with the regulations stipulated in this Agreement.

5.3.14   Distributing to Partners in accordance with the terms of this Agreement.

5.3.15   Taking the necessary actions to realise the Partnership objectives, and maintain and contest the rights of the Partnership.

5.3.16   Negotiating with other General Partners to determine the acceptance or rejection of all or part of the subscribed capital and become a limited, refunded Partnership, and to be liable for compensation according to law for any losses caused to the Partnership enterprise or other partners.

5.3.17   If an Executive Partner is found to have broken the law or the terms of this Agreement, and has brought losses to the investment projects of the Partnership, he shall bear the related responsibility and be liable to compensation.

5.3.18   The Executive Partner shall bear full liability for the Partnership if the Partnership suffers losses due to non-executive partnership affairs.

5.4   The Executive Partner shall be replaced if one of the following situations occurs:



5.4.1   Removed for not performing duties.

5.4.2   Held criminally liable.

5.4.3   Death or loss of ability.

5.4.4   Business license revoked, ordered to be closed, revoked or declared bankrupt according to law.

5.4.5   Unable to make payments on time due to debts.

5.4.6   Cause serious losses to the Partnership.

5.5    The resolution to remove the Executive Partner shall be effective only after the unanimous consent of the other partners, and the resolution of removal shall be notified in writing to the person being removed. The removal shall become effective on the day the removed person receives notice of the removal, with the removed person withdrawn from the Partnership. If the removed person has objections to the resolution of removing, he may, within thirty (30) days from the date of receiving the removal notice, proceed with the dispute resolution process stipulated in this Agreement. After the Executive Partner is removed, the General Partner shall nominate other persons, who shall be elected in a Partner Meeting.

5.6    The Executive Partner can independently decide to replace its appointed representative, but the Partnership shall be informed of the replacement by writing, with the necessary corporate registrations completed to facilitate replacement. The Partnership shall inform the Limited Partners of the change of the representative of the Executive Partner in a timely manner.

## 6.   **Authority to Make Investment Decisions**

6.1    The Executive Partner and Manager shall exercise the investment decision-making authority of the Partnership.

6.2    The Executive Partner and Manager shall determine if the investment conditions of the projects are in line with the overall interest of the Partnership, and ultimately decide whether to invest.

6.3    The Executive Partner and Manager shall make decisions with regards to the transfer and disposition of the Partnership's investment assets, real estates held for various reasons, and intellectual property.



Case 1:24-cv-03142-UA   Document 1-2   Filed 04/24/24   Page 68 of 131

6.4     The Executive Partner and Manager shall make decisions with regards to other investment related matters of the Partnership.

## 7.      Expenses of the Partnership

Partnership expenses are borne by the Partnership. The total expenditure incurred by the Partnership includes but is not limited to the expenses relating to the establishment, operation, termination, disbandment and liquidation, and the following fees, cost and overheads.

1)  Partnership Start-up Expenses

    Start-up expenses include the establishment of the Partnership with the General Partner, all reasonable expenses incurred, including opening expenditure, legal, accounting consultancy fees, but does not include expenditures incurred by the Limited Partners. Start-up expenses shall be borne by the Partnership. Expenses paid by the Manager, General Partner or any persons prior to the establishment of the Partnership shall be immediately reimbursed by the Partnership after establishment.

2)  Government taxes, fees and other expenditures on the Partnership's earning or transactions, or on the Partnership's earnings or assets.

3)  Management fees

4)  Fees incurred during the annual audit of the Partnership

5)  Bank account fees

6)  Expenses paid to third party for investment purposes

7)  Litigation and mediation costs

8)  Partnership daily operational overheads, based on market rates.



## 8.     Management Fees

8.1     As consideration for the management of the Partnership and other services provided by the Manager, the parties agree that the Partnership shall pay the Manager a management fee with the funds in the custody account of the custodian institution during its existence as follows:

The management fee is based on the total amount of capital contributed by the Partners and is drawn at an annual rate of **2.0%**.

The management fee is to be paid annually, and is charged starting on the day all partners fulfil their investment commitments, with a total of 365 days making up the year. The first management fee is to be paid within 10 days of all partners fulfilling their investment contributions, following which payments to the Manager shall be made on the 10th day after every 365 days.

8.2     The following expenses shall be borne by the General Partner or Manager, including the management fee charged:

1)     Start-up expenses by the General Partner or Manager

2)     Third party charges incurred by the General Partner or Manager during start-up

3)     Personnel expenses of the management team, including payroll, bonuses and benefits, etc.

4)     Office rental, property management fees, water and electricity, communications and office equipment costs for the General Partner and Manager.

5)     Daily operational costs for the General Partner and Manager.

6)     Costs associated with routine investigation for the purpose of investment projects, including but not limited to financial, legal and industrial investigations.



7)    Partnership meeting expenses (Excluding travel expenses, accommodations and communication fees for all Limited Partners for the purposes of joining the meeting).

## 9.    Partnership Administration

9.1    The custodial and Executive Partner of this Partnership shall be **Beijing Genghis Khan Pharmaceutical Holdings Co., Ltd**, with **Huang Chao** as the Executive Representative. Other managers are to be independently appointed by Beijing Genghis Khan Pharmaceutical Holdings Co., Ltd, and no Limited Partners shall interfere.

9.2    Partner Meeting

Partner meetings can be classified as regular meetings and extraordinary meetings. Regular meetings are held once a year while extraordinary meetings can be convened by Executive Partners or more than 30% of Limited Partners. Partner meetings are to be convened and chaired by the Executive Partner. To convene a partner meeting, the Executive Partner shall inform all Partners 7 days before the meeting date, and shall send the meeting agenda and voting matters to all partners.

9.3    Partners shall vote on matters pertaining to the Partnership in accordance with the relevant provisions of the partner meeting. In the partner meeting, all Partners shall exercise their voting rights in accordance with the proportion of their respective capital contributions at the time of voting. Decisions made through voting during the Partner meeting must be passed with more than half the votes casts, unless otherwise stated according to the law, or in this Agreement.

9.4    Partners may exercise their rights by signing off on the Partners' decision (resolution) in writing, or in the form of an off-site meeting or on-site meeting. The partner meeting is a way for partners to exercise their rights under the Partnership Enterprise Law and Partnership Agreement, and is neither legally required nor a permanent fixture.



**10.     Income Distribution and Loss Sharing**

10.1     Sources of Income

The Partnership sources of income come from investment project liquidation, equity transfer, equity repurchase and equity fund management.

10.2     Principles and Methods of Income Distribution and Loss Sharing

10.2.1   During the business period of the Partnership, the income can be distributed only under the premise of a realistic net profit. If there is no net profit, the income cannot be distributed.

10.2.2   Under the premise of realistic net profit, the profit distribution right of the Limited Partners has priority over the General Partners, and the Limited Partners shall distribute the income according to the proportion of paid-in capital.

10.2.3   Before the Limited Partner's annual investment yield reaches **20%**, the General Partner shall not participate in the Partnership's profit distribution. After the Limited Partner's annual investment return rate exceeds 20%, the Limited Partner and General Partner's income distribution ratio shall be **80%: 20%**

10.3     Loss Sharing

The losses of the Partnership within the total subscribed capital contribution shall first be borne by the General Partner's subscribed capital contribution. If the loss exceeds the General Partner's subscribed capital contribution, the Limited Partner shall bear the loss through their subscribed capital contribution

10.4     Non-Cash Distribution

There will be no non-cash distribution for the duration of the business period of the Limited Partnership.



10.5    Upon expiry of the determined business period, if there remains unrealised assets, the partners shall discuss extending the business period appropriately, so that the Executive Partner can liquidate the assets of the Partnership, to distribute it according to the principles agreed upon.

10.6    Income Tax

All partners shall pay income tax in accordance with state taxation laws.

In accordance with the Partnership Enterprise Law, the Limited Partnership is not the subject of income tax. Partners are to pay income tax according to their individual profits from the Partnership, in accordance with state taxation laws, with the exception of payment held by the Limited Partnership by relevant authorities.

## 11.    Procedure for New Partners

The entry of a new Partner shall be agreed upon by the General Partner and the investor who intends to join, and the newly joined Limited Partner shall comply with the provisions of the laws and regulations on qualified investors, with an amount of capital contribution not less than the requirements of this Agreement.

Under the premise of not affecting the interests of the original Limited Partners, the General Partner may solely decide to accept the entry of the new Partner.

If the General Partner decides to accept the investment of the new Partner, they shall enter into a partnership agreement. During the confirmation of the partnership agreement, the General Partner shall truthfully inform the new Partner about the financial status of the Partnership and management outcome. The new Partner shall have the same rights as the original Limited Partner, as well as the same liability.

The new Limited Partner shall be liable for Partnership debts prior to the joining of the Partnership by the subscribed capital contribution.



The new Limited Partner shall make payment of the capital according to the conditions and stipulations stated in this Agreement, or shall be liable for breach of contract in accordance with the relevant provisions of this Agreement.

If the General Partners decide to amend the Partnership Agreement, the Partnership shall arrange for accounts adjustments, registration of the relevant changes with the Department of Industry and Commerce, as well as the registration of the changes in the share of assets held, in accordance with the decision of the General Partners.

## 12. Withdrawal, Removal, Inheritance and Transfer of Rights

12.1    A Partner may withdraw in the event of one of the following situations:

1)    The reason for withdrawal stated in this Agreement appears

2)    Unanimous agreement from all Partners

3)    Reasons which render a Partner unable to remain in partnership

4)    Other Partners have seriously violated their obligations under this Agreement.

12.2    Procedure for Withdrawal

The Limited Partner shall inform the other Partner of his decision to withdraw 30 days prior to withdrawal. Except for statutory or reasons agreed upon in this Agreement, Limited Partners may not withdraw within a year of their investment.

Unless force majeure occurs or the dissolution and liquidation procedures are started, the General Partner may not withdraw from the Partnership.

13.3    Automatic Withdrawal

A Partner is automatically withdrawn in the following situations:

1)    The Executive Partner is replaced in accordance with the terms of this Agreement

2)    The General Partner becomes unable to repay debts



3) The Legal Person or other organisation acting as the Partner has their business license revoked, is ordered to shut down, or is declared bankrupt according to law.

4) A Partner loses qualifications which is a prerequisite in accordance with statutory requirements or in accordance with this Agreement.

5) All the property of a Partner is seized by a People's Court.

### 13.4    Delisting

If a Partner has any of the following situations, the other Partners can resolve to remove said Partner upon their unanimous agreement:

1) Does not perform their obligations as stipulated in his Agreement

2) Intentionally or unintentionally causes major loss to the Partnership

3) Conducts themselves inappropriately during the execution of Partnership operations

4) Occurrence of the reasons as stipulated in this Agreement

In the event of the abovementioned situations, the Partner shall be liable to compensate losses caused to other Partners.

The resolution to remove a partner shall be made in writing to the removed person. The removal shall become effective on the day the removed person receives the removal notice, with the removed person withdrawn from the Partnership. If the removed person has objections to the removal resolution, he may, within 30 days from the date of receiving the removal notice, proceed with the dispute resolution process stipulated in this Agreement.

### 13.5    Liability of Withdrawn or Removed Partners

After the Limited Partner withdraws from the Partnership or is removed, the Partner shall be liable for the debts of the Partnership that occurred for the reasons before the withdrawal of the Partnership, based on the property recovered from the Partnership when the Partner withdrew.



13.6    Disposal of Property of Withdrawn or Removed Partners

When a Partner withdraws or is removed, the Executive Partner shall appoint an accounting agency to perform an audit of the net assets of the Partnership at the point of withdrawal or removal, and return the aforementioned Partner's investment based on the investment ratio in the Partnership according to the audited net assets of the Partnership.

The auditing costs shall be borne by the withdrawing or removed Partner, and is to be paid out from the returned investment contributions at the point of withdrawal or removal.

The Partnership has the right to deduct all debts owed by the withdrawn or removed Partner to the Partnership and compensation due to the Partnership, prior to the return of investment contributions.

13.7    Transfer of Rights

The transfer of the rights of the Partner to the other Partners, shall be made known to all Partners within 30 days. If other Partners agree to the transfer, the transferee shall negotiate with the transferrer as equals. If the negotiation fails, they will be transferred separately according to the proportion of capital contribution and go through the industrial and commercial registration procedures.

Partners transferring capital contributions to parties outside of this Partnership, must obtain approval from more than half of the Partners. Under the same conditions, the other Partners have the priority to purchase the approved amount of capital for transfer. If multiple Partners exercise their priority, refer to the Agreement in the preceding paragraph.

## 13.    Accounting and Reporting

13.1    Book-keeping

The Executive Partner, within the statutory period, shall maintain the accounting books representing the investment portfolio of the Partnership, in accordance with the law, as the basis to report to the Limited Partners, and the financial statements submitted by the reporting department.



13.2    Fiscal year

The fiscal year shall correspond with the calendar year, with the first accounting period starting from the date of establishment of the Limited Partnership until 31 December 2016.

13.3    Audit and Financial Report

The General Partner shall appoint an accounting agency to perform an independent audit of the Partnership.

At the end of each fiscal year, the financial reports of the Partnership shall be audited by an independent audit agency.

After every half year period of a natural calendar year, the General Partner shall deliver the unaudited financial report within two months, in writing, fax, email or using other methods, to all Limited Partners. Within four months after the fiscal year, the General Partner shall deliver the following financial reports in writing, fax, email or other methods, to all Limited Partners:

    1)    Assets and Liabilities

    2)    Income Statement

    3)    Cash Flow Statement

13.4    Annual Report

Starting from the first full year of establishment of the Partnership, the General Partner shall deliver in writing, fax, email or other methods, to all Limited Partners the annual report before 30 April of every year. The report shall include the business report from the preceding year, and audited financial report from the preceding year.



### 13.5    Access to Financial Records

Provided that written notice is issued five working days in advance, within a reasonable duration during the reasonable working hours, the Limited Partner shall have the right to personally or appoint a representative to inspect all Partnership financial records, in the interest of official business relating to the Partnership. When exercising this right, the Limited Partner shall follow the updated and revised confidentiality procedures and regulations of the Partnership. Furthermore, if the General Partner determines that it is necessary to protect the interests of the Partnership, the General Partner shall have the right to request the Limited Partner return or destroy the information obtained from the Partnership. All expenses incurred by the aforementioned actions shall be borne by the respective Partner.

### 14.    Information Disclosure

The Executive Partner shall disclose to all Partners in a timely manner, all executive administration related matters, and the business and financial situation of the Partnership.

All disclosure documents shall be submitted in writing (not limited to hard copy documents, electronic mail and website notifications).

The method of information disclosure shall include but is not limited to summary reports, periodic reports and interim reports.

### 15.    Partnership Dissolution and Liquidation

15.1    The Partnership shall be terminated and liquidated if any of the following situations occurs:

1)    The General Partner proposes a motion for the same that is passed by all Partners.

2)    Expiration of the Partnership business period.



3) A breach of Agreement by one or multiple Limited Partners, with the General Partner determining that the Partnership is unable to continue operations.

4) Revocation of business license of the Partnership.

5) Other reasons for dissolution as stipulated in the Partnership Enterprise Law or in this Agreement.

15.2    Liquidator

The Executive Partner shall execute the role of Liquidator.

All unrealised investments of the Partnership shall be managed by the liquidator. During the liquidation period, the Limited Partners shall pay the Manager reasonable liquidation costs, but shall not pay any management fees or other expenses to the Manager.

The main responsibilities of the liquidator are: liquidation of Partnership properties, compiling a balance sheet and a list of properties, managing and liquidating all unrealised matters related to the company, paying all taxes, paying all debts and claims, managing all reputational property of the Partnership after all debts have been paid, as well as representing the Partnership in litigation and arbitration activities.

15.3    Order of Liquidation

15.3.1 Upon the expiration or termination and liquidation of the Limited Partnership, after all expenses and fees have been accounted for, the partnership property shall be paid and allocated in the following order:

1) Payment for all liquidation expenses;

2) Payment for all staff wages, social insurance and statutory compensation;

3) Payment for all taxes owed;



        4)     Liquidation of Limited Partnership debt;

15.3.2  Distribution among all Partners in accordance with the distribution principles and procedures of this Agreement

15.3.4  If the partnership property is insufficient to pay off the partnership debts, the General Manager shall assume unlimited joint liability for payment to creditors.

15.3.5  Upon completion of liquidation, the liquidator shall prepare a liquidation report that is signed or sealed by all Partners, and submit the liquidation report within 15 days to the business registration authority to apply to deregister the Partnership.

## 16.    Liability for Breach of Contract

Any Partner in breach of the Partnership Agreement shall bear the corresponding liability for breach of contract in accordance with the law or in accordance with the provision of this Agreement.

If a Party breaches the contract and the Partnership Agreement cannot be fulfilled in whole or in part, the breaching party shall be liable for breach of contract. In the case of breach of contract by multiple parties, according to the actual situation, each party shall be responsible for its own liability.

## 17.    Confidentiality

The Parties to this Agreement shall bear the highest level of responsibility for the confidentiality of the trade secrets of other parties made known through the negotiation, signing and execution of the Agreement. The Limited Partners shall also bear the highest level of responsibility for the confidentiality of the business information of the Partnership that they, as well as the members they have appointed, have learned through financial reports and partner meetings, and from investment and advisory committees. Despite the above provisions, each Partner has the right to disclose the information for which he has the responsibility of confidentiality as follows:



1)   Disclosure to Related Parties who are their shareholders;

2)   Good faith disclosure to professional consultants and accountants;

3)   If laws, courts, rules of any relevant stock exchange, or any other regulatory authority with jurisdiction specifically require disclosure, the Partner shall notify the General Partner immediately after learning of the disclosure requirements. Each Partner with an obligation to disclose information shall make all reasonable efforts and always seek to avoid meeting such disclosure requirements or to minimise the scope of disclosure in accordance with relevant laws, regulations or policies.

## 18.   Force Majeure

"Force Majeure" refers to events that happen after the signing of the Agreement which cannot be predicted at the point of signing this Agreement, and whose occurrence and consequences cannot be prevented or overcome, prevents any Party or all Parties from fulfilling their obligations in part or in full. The above include earthquakes, typhoons, floods, fires, wars, international or domestic transport interruptions, government or public agency acts (including major legal changes or political changes), pandemics, riots, strikes and other events considered to be force majeure in general international business practice.

In the event of force majeure, which affects a Party in their fulfilling of obligations as stipulated in this Agreement, ceasing such obligations in the duration of the delay caused by the force majeure shall not be considered a breach of contract. The Party declaring force majeure shall inform the other Party as soon as possible, and within fifteen (15) days of force majeure occurring, provide complete proof of the force majeure and the duration.

In the event of force majeure, all Partners shall negotiate with each other to find a fair solution for all, and to make reasonable effort to minimise the impact of the force majeure.



## 19.    Dispute Resolution

19.1    Negotiation

Any disputes arising from the obligations stipulated in this Agreement or that are related to this Agreement shall be settled through friendly negotiation between both parties.

19.2    Arbitration

If all parties in the Agreement are unable to reach a settlement within thirty (30) days, any party has the right to submit the dispute to the board of arbitration with jurisdiction over the Partnership for arbitration. The written decision of the arbitration shall be final and legally binding.

## 20.    Supplementary Provisions

20.1    Amendments

Except as stipulated elsewhere in this Agreement that the General Partner may unilaterally modify the terms, other amendments or supplements to this Partnership Agreement, as well as the formulation and implementations of conditions, requires the Partners to negotiate and come to an agreement.

Matters pertaining to changes to the registration of the Partnership and changes to other important terms shall require amendments to the Partnership Agreement. Amendments to the Agreement shall be made in accordance with the Partnership Enterprise Law and the regulations stipulated in this Agreement. With regards to amendments to the Agreement, a proposal to make changes to the terms to be revised or a resolution to make additions may be passed. Additionally, a new Partnership Agreement may be signed to replace this Partnership Agreement.

If any terms in this Agreement, or terms referring to persons or situations are found to be invalid, the effectiveness of the remaining terms or terms referring to other persons or situations are not affected.



20.2    Cancellation and Termination

Unless all parties to the Agreement agree to terminate this Partnership Agreement, no Party to the Agreement shall terminate this Partnership Agreement.

Upon expiry of the Partnership's business period, or if the Partnership is terminated for other reasons, this Agreement shall also cease.

20.3    Versions

This Agreement is made in <u>SIX</u> copies, with each copy having the same legal effect.

The annexe, and relevant supplementary agreements form an integral part of this Partnership Agreement and have the same legal effect.

20.4    Entry into Force

This Agreement shall come into force when the parties sign or seal this Agreement.

20.5    Other Matters

Matters not covered in the Partnership Agreement shall be negotiated by the parties in compliance with relevant national laws and regulations.

In the course of implementing this Agreement, if the national or local authority promulgates or revises the relevant laws and regulations, this Agreement will be revised in accordance with the new laws and regulations.  If conflicts, disputes or differences arise, they shall be handled in accordance with the principle of fairness.

(This is the last page of the document. Remaining pages contain only signatures and annexes.)



**Partnership Signature Page:**

This Agreement is signed by the following Partners on 23 November 2015.

**General Partner:**

    Name: Beijing Genghis Khan Pharmaceutical Holdings Co., Ltd

    Address: 0801-1, 8th Floor, Block 17, 17-A, 17-B, 17-C, 17-D, 17 Financial Street, Xicheng District, Beijing

    Legal Representative (or Authorised Nominee):

**Limited Partner (1):**

    Name: Shenzhen Qianhai Nations Investment Management Co., Ltd

    Address: Room 201, Building A, No. 1, Qianwan 1st Road, Qianhai Shenzhen-Hong Kong Cooperation Zone, Shenzhen (with Shenzhen Qianhai Commerce Secretariat Co.,Ltd.)

    Legal Representative (or Authorised Nominee):

*<Seal affixed>*
Shenzhen Qianhai
Nations
Investment
Management Co.,
Ltd
[illegible]



Annexe 1: Table of Basic Information of Partners

| Number | Name or Title | Identification or Business License Number | Address | Subscribed capital contribution (RMB) | Paid-in Capital Contribution (RMB) | Investment Ratio | Type of Investment | Liability |
|---|---|---|---|---|---|---|---|---|
| 1 | Beijing Genghis Khan Pharmaceutical Holdings Co., Ltd | 62188 | 0801-1, 8th Floor, Block 17, 17-A, 17-B, 17-C, 17-D, 17 Financial Street, Xicheng District, Beijing | 500,000 | | | | Unlimited Liability |
| 2 | Shenzhen Qianhai Nations Investment Management Co., Ltd | 22023 | Room 201, Building A, No. 1, Qianwan 1st Road, Qianhai Shenzhen-Hong Kong Cooperation Zone, Shenzhen (with Shenzhen Qianhai Commerce Secretariat Co.,Ltd.) | 300 million | | | | Limited Liability |



# 深圳国泰旗兴产业投资基金管理中心

# （有限合伙）

# 合伙协议书



签署协议方：

普通合伙人：

　　名称：北京旗隆医药控股有限公司

　　住所（址）：北京市西城区金融大街 17 号，甲 17 号，乙 17 号，丙 17 号 17 号楼 8 层 0801-1

　　法定代表人：黄超

有限合伙人(之一)：

　　名称：深圳前海国民投资管理有限公司

　　住所（址）：深圳市前海深港合作区前海湾一路 1 号 A 栋 201 室（入 驻深圳市前海商务秘书有限公司）

　　法定代表人：罗昭学



第 1 页

## 一、释义

在本协议中，除非上下文另有说明，下列词语分别具有本条所指含义：

**本协议**：指《深圳国泰旗兴产业投资基金管理中心（有限合伙）合伙协议》及其经适当程序通过的修正案或修改后的版本。

**合伙企业或有限合伙**：指本协议各方根据《合伙企业法》及本协议共同设立的有限合伙企业。

**现金管理**：指除用于满足项目投资之外，有限合伙的全部现金资产，包括但不限于待投资、待分配及费用备付的现金。

**成立日**：对于本有限合伙而言，指合伙企业营业执照颁发之日。

**工作日**：指中国法定节假日、休息日之外的日期。

**关联人**：指对于任何人而言，指该人控制、共同控制或施加重大影响的，或与该人同受其他人控制、共同控制或重大影响的人。此处的"控制"是指有权决定一个企业的财务和经营政策，并能据以从该企业的经营活动中获取利益（对于个人而言，指通过惯常认为有支配力的关系支配个人活动的权力）；"共同控制"是指按照合同约定对某项经济活动所共有的控制，仅在与该项经济活动相关的重要财务和经营决策需要分享控制权的投资方一致同意时存在；"重大影响"是指对一个企业的财务和经营政策有参与决策的权力，但并不能够控制或者与其他方一起共同控制这些政策的制定。

**管理费:**指作为管理人向合伙企业提供投资管理服务的对价,而由合伙企业根据投资管理协议向管理人支付的报酬。

**管理人:**指由普通合伙人根据本协议聘任的投资管理人。

**《合伙企业法》:**指《中华人民共和国合伙企业法》,由中华人民共和国第十届全国人民代表大会常务委员会第二十三次会议于 2006 年 8 月 27 日修订通过,自 2007 年 6 月 1 日起施行。

**合伙权:**指合伙人按照本协议的约定在合伙企业中享有的所有权利和利益;对有限合伙人而言,包括但不限于其认缴出资额、实缴出资额、其基于实缴出资额而在合伙企业中享有的财产份额,包括按照本协议的约定取得分配的权利;对于普通合伙人而言,包括但不限于其认缴出资额、实缴出资额、其基于实缴出资额而在合伙企业中享有的财产份额,包括按照本协议的约定取得分配的权利,以及其对合伙事务的执行及管理权。

**合伙人:**除非另有说明,指普通合伙人和有限合伙人。

**季度:**指一个日历季度。

**普通合伙人:**指北京旗隆医药控股有限公司。

**执行事务合伙人:**指北京旗隆医药控股有限公司。

**有限合伙人:**指认缴本合伙企业出资被普通合伙人接受、并且签署本协议的、以其认缴出资额对合伙企业债务承担有限责任的合伙人,以及按照本协议约定通过受让本合伙企业原有限合伙人合伙权益而入伙的合伙人。

**人、人士:**指任何自然人、合伙企业、公司等法律或经济实体。

**认缴出资额:**指任何一个合伙人向有限合伙认缴的出资金额。

**认缴出资总额:**指全体合伙人认缴出资额的总和。

**实缴出资额:**指任何一个合伙人根据本协议约定实际向合伙企业缴付的现金金额。

**实缴出资总额:**指全体合伙人根据本协议约定实际向合伙企业缴付的现金总金额。

**投资期:**指自本有限合伙成立日起 <u>20</u> 年，经营期限届满后，根据有限合伙企业的经营需要，经全体合伙人同意可延长经营期限。

**投资组合公司:**指有限合伙以直接或间接方式对其进行了投资并持有其股权或对其拥有其他权利或利益的公司。

**托管协议:**指合伙企业、管理人及根据本协议确定的托管机构就合伙企业资金（包括合伙人向有限合伙所缴付的出资）托管事宜订立的协议。

**项目投资:**指有限合伙进行的股权等权益性投资。

**合伙企业支出:**指根据本协议由合伙企业自身承担的开支。

**元:**若非特别指出币种，指人民币元。

本合伙协议所称"以上"、"以内"、"以下"，都含本数；"不满"、"以外"、"高于"不含本数。



**二、合伙企业的创立**

除本协议所列当事人外，新入伙的合伙人和受让出资份额的当事人，均为本合伙协议的当事人，并受本合伙协议约束，但全体合伙人另行签订合伙协议的除外。

2.1 合伙企业的类型

合伙人一致同意创立的合伙企业为《中华人民共和国合伙企业法》规定的<u>有限合伙企业</u>，即合伙企业由普通合伙人和有限合伙人组成，普通合伙人对合伙企业债务承担无限连带责任，有限合伙人以其认缴的出资额为限对合伙企业债务承担责任。

2.2 合伙企业的基本情况

2.2.1 合伙企业名称：深圳国泰旗兴产业投资基金管理中心（有限合伙）（暂定名，最终以工商部门登记为准）

2.2.2 经营场所：深圳市前海深港合作区前湾一路鲤鱼门街 1 号前海深港合作区管理局综合办公楼 A 栋 201 室（入驻深圳市前海商务秘书有限公司）

2.2.3 经营范围：投资管理（不含限制项目）；股权投资基金；股权投资基金管理；投资兴办实业（具体项目另行申报）；投资咨询（不含限制项目）；投资顾问（不含限制项目）。

2.2.4 合伙期限：合伙企业的经营期限为 <u>20</u> 年。经营期限届满后，经



全体合伙人一致同意，确定是否延期及延期期限。

### 2.3　合伙人

本合伙企业合伙人不应多于 50 个，其中普通合伙人 1 人，有限合伙人不应多于 49 个。

### 2.3.1 普通合伙人

名称：北京旗隆医药控股有限公司

住所（址）：北京市西城区金融大街 17 号，甲 17 号，乙 17 号，丙 17 号 17 号楼 8 层 0801-1

证件名称：营业执照

证件号码：11010102019662188

### 2.3.2 有限合伙人（之一）

名称：深圳前海国民投资管理有限公司

住所（址）：深圳市前海深港合作区前海湾一路 1 号 A 栋 201 室（入驻深圳市前海商务秘书有限公司）

证件名称：营业执照

证件号码：914403003498822023

### 2.4　合伙目的

通过资金优势与专业投资及管理优势的结合，分享快速发展的并购投资市场的回报。



2.5  投资目标

合伙企业的投资目标为对企业进行股权/债权投资和/或符合法律规定及本协议约定的其它投资。

2.6  基本管理机制

2.6.1 合伙企业存继期间,合伙企业类型不得转换,合伙人会议无权对此进行表决。

2.6.2 本合伙企业之普通合伙人与有限合伙人不得转换。

2.6.3 现金管理机制：除用于满足投资目标项目投资之外,有限合伙的全部现金资产，包括但不限于待投资、待分配及费用备付的现金,只能以现金管理方式进行管理，不能用于其他固定资产投资。

2.6.4 投资退出机制：执行事务合伙人、管理人应努力在合伙企业的经营期限届满前，基于诚实信用原则为合伙企业利益最大化的原则，在法律法规允许的前提下，安排合伙企业从已投资项目中的退出。项目的退出方式主要为投资项目清算、股权转让以及股权回购。如预先设定的退出机制无法实现，执行事务合伙人、管理人应采用其他适当的退出方式。

2.6.5 独立管理机制：执行事务合伙人独立管理合伙企业的日常运营，有限合伙人不得参与及干预。

2.6.6 投资业务独立决策机制：执行事务合伙人对合伙企业的投资业务独立决策，有限合伙人不得参与及干预。



### 三、出资

#### 3.1 出资总金额

本合伙企业拟募集资金总额为 <u>20</u> 亿元，其中：

普通合伙人北京旗隆医药控股有限公司认缴出资 <u>50</u> 万元；

有限合伙人（之一）<u>深圳前海国民投资管理有限公司</u>认缴出资 <u>30,000</u> 万元。

剩余出资，由合伙企业根本合伙企业运营及项目投资需要在 <u>3</u> 年内分期募集。

#### 3.2 出资方式

本合伙企业全体合伙人的出资方式均为货币出资，币种为人民币。

#### 3.3 认缴出资约定

有限合伙人最低认缴出资额为人民币 1000 万元，并按 100 万元整数倍递增，但普通合伙人可依独立判断予以变更。

#### 3.4 缴付期限

合伙人应于签署本协议后，并经执行事务合伙人发送缴款通知后 <u>7</u> 个工作日内按照缴款通知规定的时间和缴纳金额及时缴纳认缴的出资。

对于未能按约缴纳出资的合伙人给予 30 日的宽限期，同时对逾期缴纳的出资每日计收逾期缴纳出资金额千分之一的滞纳金，宽限期出资到位的不需承担违约责任。



新入伙合伙人的出资应在普通合伙人作出同意其入伙的决定后按照入伙协议的约定以及执行事务合伙人的要求缴纳。

**四、有限合伙人**

指认缴本合伙企业出资被普通合伙人接受、并且签署本协议的、以其认缴出资额对合伙企业债务承担有限责任的合伙人，以及按照本协议约定通过受让本合伙企业原有限合伙人合伙权益而入伙的合伙人。

4.1 有限合伙人的权利

4.1.1 参加或委托代表参加合伙人会议并依实缴出资额行使表决权。

4.1.2 有权自行或委托代理人人查阅会议记录，审计财务会计报表等资料。

4.1.3 有权了解和监督有限合伙企业的经营状况并提出合理意见。

4.1.4 收益分配权。

4.1.5 出资转让权，但应受到本协议约定之限制。

4.2 有限合伙人的义务

4.2.1 有限合伙人对合伙企业的债务以其认缴出资额为限承担有限责任。

4.2.2 按照本协议约定的条件和方式如期足额缴付出资。如有限合伙人对合伙企业的出资不能按期缴纳到位，按照本协议的相关约定承担违约责任，包括但不限于相应调整各合伙人之间的出资比例。



4.2.3 除本协议明确规定的权利和义务外,有限合伙人不得参与也不得干预合伙企业的正常经营管理。

4.2.4 除法律、法规、规章规定所必须,有限合伙人仅将普通合伙人向有限合伙人所提供的一切信息资料用于合伙企业相关的事务,不得向第三方公开或用于与合伙企业无关的商业活动。普通合伙人有权以自己的名义或以合伙企业的名义对违反保密义务的有限合伙人追究法律上的责任。

4.2.5 有限合伙人不参与合伙企业的经营管理。

4.3 有限合伙人的违约责任

4.3.1 有限合伙人未经授权以合伙企业名义与他人进行交易,给合伙企业或者其他合伙人造成损失的,该有限合伙人应当承担赔偿责任。

4.3.2 有限合伙人不执行合伙事务,不得对外代表合伙企业。有限合伙人如违反本协议约定参与经营管理的,应与普通合伙人就参与事项一起对合伙债务承担无限连带责任。

4.3.3 有限合伙人的下列行为,不应视为执行合伙事务:

（1）参与决定普通合伙人入伙退伙。

（2）对企业的经营管理提出合理建议。

（3）对涉及自身利益的情况,查阅合伙企业财务会计账簿等财务资料。

（4）在合伙企业中的利益受到侵害时,向有责任的合伙人主张权利



或者提起诉讼。

（5）执行事务合伙人怠于行使权利时，督促其行使权利。

（6）依法为本企业提供担保。

## 五、执行事务合伙人

5.1 执行事务合伙人依据本协议对外代表合伙企业执行合伙事务。

合伙企业委托管理人进行投资管理的，应按照本协议的约定向管理人支付管理费。

5.2 执行事务合伙人应具备的条件

5.2.1 应为本合伙企业的普通合伙人。

5.2.2 对投资风险有充分认知，愿意承担本合伙企业存续期间的权利与义务。

5.2.3 具有相应的行业投资经验和良好的管理能力。

5.2.4 不存在法律禁止担任执行合伙人的情形。

5.3   执行事务合伙人的权限和职责

5.3.1 执行合伙企业的投资业务及其他业务（包括进行项目投资和现金管理）。

5.3.2 管理、维持和处分合伙企业的资产，包括但不限于投资性资产、非投资性资产、知识产权等。

5.3.3 采取为维持合伙企业合法存续、以合伙企业名义开展经营活动



所必需的一切行动。

5.3.4 根据协议的要求，以合伙企业的名义开立并维持银行账户，向银行发出关于该等账户的付款指令和其他指令，收取有限合伙人提供的出资、投资收入、处置项目投资产生的金额和有限合伙收取的任何其他款项并存入该等账户。

5.3.5 聘用、解聘及替换专业人士、中介及顾问机构（包括独立审计机构）对合伙企业提供服务，但是普通合伙人应该就相关事项依照本协议进行披露。

5.3.6 全体合伙人一致同意执行事务合伙人有权根据其合理判断，另行指定本有限合伙人以外的人为管理人，并订立投资管理协议，但该管理人应符合法律和本协议约定的条件。

5.3.7 选择银行机构并与其订立账户协议（包括在合伙企业成立前代表合伙企业与银行机构订立账户协议）。

5.3.8 在有限合伙人转让其合伙权益的情况下，按本协议的规定对受让方资格进行合理审查并批准合格的转让。

5.3.9 为合伙企业的利益决定提起诉讼或应诉，进行仲裁；与争议对方进行妥协、和解等，以解决有限合伙与第三方的争议；采取所有可能的行动以保障有限合伙的财产安全，减少因合伙企业的业务活动而对有限合伙、普通合伙人及其财产可能带来的风险。



5.3.10 根据国家税务管理规定处理合伙企业的涉税事项。

5.3.11 为进行、持有或处置项目投资提供普通合伙人认为必要或适当的担保、保证和赔偿。

5.3.12 监督投资组合公司的业绩，并行使合伙企业的有关投资组合公司的所有权利。

5.3.13 根据本协议的规定进行补偿，但是普通合伙人应该就相关事项依照本协议的规定进行披露。

5.3.14 根据本协议的条款向合伙人进行分配。

5.3.15 采取为实现合伙目的、维护或争取有限合伙合法权益所必需的其他行动。

5.3.16 与其他普通合伙人协商确定接受或拒绝全部或部分认缴出资额并成为有限、退还合伙企业，给合伙企业或者其他合伙人造成损失的，依法承担赔偿责任。

5.3.17 执行事务合伙人如被证明违法或违反本合伙协议约定，给合伙企业的投资项目造成损失的，执行事务合伙人应负相关责任，并赔偿该项目损失。

5.3.18 执行事务合伙人因为非执行合伙事务的个人行为导致合伙企业遭受损失的，应当对合伙企业承担全部的赔偿责任。

5.4　执行事务合伙人有下列情形之一的，予以更换：



5.4.1 因未履行出资义务而被除名。

5.4.2 被追究刑事责任的。

5.4.3 死亡或丧失行为能力。

5.4.4 依法被吊销营业执照、责令关闭、撤销或者被宣告破产。

5.4.5 因负债未能清偿到期债务。

5.4.6 给合伙企业造成严重损失的。

5.5　执行事务合伙人的除名决议应经其他合伙人一致同意方为有效，除名决议应当书面通知被除名人。被除名人接到除名通知之日，除名生效，被除名人退伙。被除名人对除名决议有异议的，可以自接到除名通知之日起三十日内，根据本协议约定的争议解决方式处理。执行事务合伙人被除名后，应当由普通合伙人另行提名人员，再由合伙人会议选举产生。

5.6 执行事务合伙人可独立决定更换其委派的代表,但更换时应书面通知合伙企业，并办理相应的企业变更登记手续。合伙企业应将执行事务合伙人代表的变更情况及时通知有限合伙人。

## 六、投资决策权

6.1 由执行事务合伙人、管理人行使合伙企业投资决策职权；

6.2 由执行事务合伙人、管理人就项目投资的投资条件是否符合合伙企业的整体利益以及最终是否进行投资作出决定；

6.3 由执行事务合伙人、管理人就转让和处分合伙企业的投资性资



第 14 页

Case 1:24-cv-03142-UA Document 1-2 Filed 04/24/24 Page 100 of 131

产、因各种原因而持有的不动产、知识产权作出决定；

6.4 由执行事务合伙人、管理人决定其他与有限合伙投资相关的事项。

## 七、合伙企业的支出

合伙企业支出由合伙企业承担，合伙企业发生的总计支出包括但不限于与设立、运营、终止、解散、清算等相关的下列费用、成本和开支：

（1）合伙企业的开办支出。

开办支出指普通合伙人及合伙企业之组建、设立相关的合理支出，包括筹建支出，法律、会计等专业顾问咨询费用等，但不包括有限合伙人发生的支出。开办费由合伙企业承担。管理人、普通合伙人或其任何关联人在成立日前垫付的开办支出，由合伙企业在成立日后立即向其全额支付。

（2）政府部门对合伙企业的收益或资产，或对合伙企业的交易或运作收取的税、费及其它支出。

（3）管理费。

（4）合伙企业年度审计所发生的费用。

（5）银行账户费用。

（6）为取得项目所支付给第三方的相关费用。

（7）诉讼费和仲裁费。

（8）根据市场惯例或交易惯例应由有限合伙承担的日常运营费用。



## 八、管理费

8.1 作为管理人对合伙企业提供管理及其他服务的对价，各方同意合伙企业在其存续期间应按下列规定以其在托管机构处的保管账户中的资金向管理人支付管理费：

管理费以合伙企业实收的合伙人出资总额为基数，每年按 **2.0%** 的费率提取。

管理费按年支付，收费期间以合伙人完成出资义务之日为起点满 365 天为一年期计算，第一笔管理费于合伙人完成出资义务之日 10 日内支付；其后于每满 365 天后 10 日内向管理人支付。

8.2 下列支出由普通合伙人或管理人自行承担，包括以其自身收取的管理费承担：

（1）普通合伙人或管理人的开办支出。

（2）第三方为此次募集向普通合伙人或管理人收取的费用。

（3）管理团队的人事开支，包括工资、奖金和福利等费用。

（4）普通合伙人及管理人的办公场所租金、物业管理费、水电费、通讯费、办公设施费用。

（5）普通合伙人及管理人的其他日常运营经费。

（6）为对投资项目进行调查所进行的一般性的包括但不限于财务、法律、行业等尽职调查所发生的费用。



（7）合伙人会议费用（各有限合伙人为参加会议所支出的差旅费、住宿费、通讯费等费用除外）。

## 九、合伙事务执行

9.1 本合伙企业的管理人和执行事务合伙人为<u>北京旗隆医药控股有限公司</u>。执行事务代表为<u>黄超</u>，其他管理人员由北京旗隆医药控股有限公司独立委派，任何有限合伙人不得干预。

9.2 合伙人会议

合伙人会议分为定期会议和临时会议。定期会议每年一次，执行事务合伙人或30%以上的有限合伙人有权提议召开临时会议，合伙人会议由执行合伙人负责召集和主持。召开合伙人会议，执行合伙人应当提前 7 日通知全体合伙人，并将会议议题及表决事项通知全体合伙人。

9.3 合伙人按照合伙人会议的有关规定对合伙企业有关事项作出决议,合伙人会议由全体合伙人按照表决时各自实缴出资比例行使表决权,合伙人会议作出决议必须经持有过半数表决权的合伙人通过,但法律另有规定或本协议另有约定的除外。

9.4 合伙人可采取书面签署合伙人决定（决议）、非现场会议方式、现场会议等方式行使权利。本协议如无特殊说明，现场会议方式专指合伙人会议。合伙人会议是合伙人行使《合伙企业法》、《合伙协议》规定之权利的一种方式，并非法定、常设机关。



## 十、利润分配和亏损分担

### 10.1 收益来源

合伙企业的收益来源于投资项目清算、股权转让、股权回购、股权基金管理等。

### 10.2 收益分配与亏损分担的原则与方式

10.2.1 合伙企业在经营期间，在实现净利润的前提下，方可进行收益分配，没有实现净利润的，不得进行收益分配。

10.2.2 在合伙企业实现净利润的前提下，有限合伙人的利润分配权优先于普通合伙人，有限合伙人按照实缴出资比例进行收益分配。

10.2.3 在有限合伙人年度投资收益率达到 <u>20%</u> 之前，普通合伙人不参与合伙企业的利润分配。在有限合伙人年度投资收益率超过 20% 之后，有限合伙人和普通合伙人的收益分配比例为 <u>80%：20%</u>。

### 10.3 亏损分担

合伙企业在认缴出资总额之内的亏损先以普通合伙人的认缴出资承担，如亏损超出普通合伙人认缴出资的，再由有限合伙人以认缴出资额承担亏损。

超出合伙企业认缴出资总额的亏损由普通合伙人承担无限连带责任。

### 10.4 非现金分配

在有限合伙存续期内，不以非现金方式进行分配。



10.5 设定的经营期限届满时仍有未变现资产，合伙人应协商适度延长经营期限以便于执行事务合伙人将有限合伙的资产变现并按照约定的原则进行分配。

10.6 所得税

有限合伙依照国家有关税收规定纳税。

根据《合伙企业法》之规定，有限合伙企业并非所得税纳税主体，合伙人自有限合伙企业所取得的收益，由各合伙人根据法律法规自行缴纳所得税，但主管机关要求有限合伙企业代扣代缴的除外。

**十一、新合伙人入伙的程序**

新合伙人入伙应由普通合伙人与拟入伙的投资人协商一致，新入伙的有限合伙人应当符合法律法规关于合格投资者的规定，同时出资额不得低于本协议的要求。

在不损害原有限合伙人的利益前提下，普通合伙人独立决定是否接纳拟入伙的投资人入伙。

如普通合伙人决定接纳拟入伙的投资人入伙，应与其签订入伙协议，订立入伙协议时，普通合伙人应当向新合伙人如实告知合伙企业的财务状况和经营成果。入伙的新合伙人与原有限合伙人享有同等权利，承担同等责任。

新入伙的有限合伙人对入伙前合伙企业的债务以其认缴的出资额为



限承担责任。

新合伙人应按照入伙协议的约定及时缴纳出资,否则应承担相应的违约责任。

普通合伙人据此作出修改合伙协议的决定,合伙企业应根据普通合伙人的决定办理帐务调整、工商变更登记及财产份额托管变更登记事项。

## 十二、退伙、除名、继承及权益转让

12.1 有下列情形之一的,合伙人可以退伙:

(1)本协议约定的退伙事由出现。

(2)经全体合伙人一致同意。

(3)发生合伙人难以继续参加合伙的事由。

(4)其他合伙人严重违反本协议约定的义务。

12.2 退伙的程序

有限合伙人退伙应当提前 30 日通知其他合伙人,但除法定或本协议约定的原因外,有限合伙人在出资一年内不得退伙。

除非发生不可抗力或进入解散、清算程序,普通合伙人不得退伙。

13.3 当然退伙

出现下列事项时,合伙人当然退伙:

(1)执行事务合伙人按照本合伙协议的约定而被更换。

(2)普通合伙人个人丧失偿债能力。



INDEX NO. 152210/2024
NYSCEF DOC. NO. 12
Case 1:24-cv-03142-UA Document 1-2 Filed 04/24/24 Page 106 of 131
RECEIVED NYSCEF: 03/12/2024
104
FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM

（3）作为合伙人的法人或者其他组织依法被吊销营业执照、责令关闭、撤销或者被宣告破产。

（4）法律规定或者合伙协议约定合伙人必须具有相关资格而丧失该资格。

（5）合伙人在合伙企业中的全部财产份额被人民法院强制执行。

13.4　除名

合伙人有下列情形之一的，经其他合伙人一致同意，可以决议将其出除名：

（1）未按照本协议履行出资义务。

（2）因故意或重大过失给合伙企业造成重大损失。

（3）执行合伙事务时有不正当行为。

（4）发生本协议约定的事由。

合伙人存在上述情形的，还应当赔偿由此给其他合伙人造成的损失。

对合伙人的除名决议应当书面通知被除名人。被除名人接到除名通知后，除名生效，被除名人退伙。被除名人对除名决议有异议的。可以自接到除名通知之日起 30 日内根据本协议有关争议解决的规定解决。

13.5　退伙人或者被除名人的责任

有限合伙人退伙或者被除名后，对基于退伙前的原因发生的本合伙企业债务，以其退伙时从本合伙企业中取回的财产承担责任。



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024
NYSCEF DOC. NO. 12
Case 1:24-cv-03142-UA   Document 1-2   Filed 04/24/24   Page 107 of 131
RECEIVED NYSCEF: 03/12/2024
105

### 13.6 合伙人退伙或被除名的财产处理方式

合伙人退伙或被除名的,由执行事务合伙人选聘会计师事务所对该名合伙人退伙或被除名时合伙企业的净资产进行审计,并根据审计后的合伙企业的净资产按照该名合伙人在合伙企业的出资比例对其予以退还。

评估费用由退伙或被除名的合伙人承担,合伙人退伙时其在合伙企业中的出资份额以货币方式退还。

合伙人退伙或被除名时,对其合伙企业负有赔偿责任的,合伙企业有权在向其退还财产之前扣除相应的应赔偿的款项。

### 13.7 权益转让

合伙人向本合伙企业的其他合伙人转让出资份额,应当在 30 日内通知其他全部合伙人,其他合伙人同时愿意购买的,应与受让方平等协商,协商不成的,按照出资比例分别受让,并办理工商登记手续。

合伙人向本合伙企业以外的人转让出资份额,应当取得其他合伙人过半数通过。经合伙人同意转让的出资份额,在同等条件下,其他合伙人有优先购买权,多名合伙人行使优先购买权的,参照前款约定处理。

## 十三、会计及报告

### 13.1 记账

执行事务合伙人应当在法定期间内维持符合有关法律规定的、反映合伙企业投资项目的会计账簿,作为向有限合伙人、备案主管部门提交财务



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024
NYSCEF DOC. NO. 12
RECEIVED NYSCEF: 03/12/2024
Case 1:24-cv-03142-UA   Document 1-2   Filed 04/24/24   Page 108 of 131
106

报表的基础依据。

### 13.2 会计年度

合伙企业的会计年度与日历年度相同,首个会计年度自有限合伙设立之日起到 2016 年 12 月 31 日。

### 13.3 审计及财务报告

普通合伙人应当挑选一家会计师事务所担任合伙企业的独立审计机构。

合伙企业应于每一会计年度结束之后,由独立审计机构对有限合伙的财务报表进行审计。

普通合伙人应在自然年度每半年结束后两个月之内以信件、传真、电子邮件或其他方式向有限合伙人提交未经审计的财务报表,并应在会计年度结束后四个月之内以信件、传真、电子邮件或其他方式向有限合伙人提交经审计的下列财务报表:

　　(1)　资产负债表;

　　(2)　损益表;

　　(3)　现金流量表;

### 13.4 年度报告

自合伙企业设立的第一个完整年度结束时起,普通合伙人应以信件、传真、电子邮件或其他方式向有限合伙人于每年 4 月 30 日前提交年度报



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
NYSCEF DOC. NO. 12
Case 1:24-cv-03142-UA   Document 1-2   Filed 04/24/24   Page 109 of 131

告。内容为上一年度业务报告及上一年度经审计的财务报告。

### 13.5　查阅财务帐簿

　　　有限合伙人在提前五个工作日书面通知的前提下，有权在正常工作时间内的合理时限内亲自或委托代理人为了与其持有的合伙权益相关的正当事项查阅合伙企业的会计账簿。有限合伙人在行使本条项下权利时应遵守合伙企业不时制定或更新的保密程序和规定，且如经普通合伙人判断为保护合伙企业利益之必要，普通合伙人有权要求有限合伙人返还或销毁其从合伙企业取得的资料。所有因上述事宜而可能发生的费用，由该有限合伙人自行承担。

### 十四、信息披露

　　　执行事务合伙人应当及时向全体合伙人披露其受托管理事务执行情况以及合伙企业的经营和财务状况。

　　　所有信息披露文件应以书面（不限于纸质文件、电子邮件和网站公告）方式提交。

　　　信息披露的方式包括但不限于简报、定期报告、临时报告。

### 十五、合伙企业的解散与清算

### 15.1　当下列任何情形之一发生时，有限合伙应被终止并清算：

　　　（1）普通合伙人提议并经全部合伙人表决通过。

　　　（2）合伙企业经营期限届满。



（3）有限合伙人一方或数方严重违约，普通合伙人判断有限合伙无法继续经营。

（4）合伙企业被吊销营业执照。

（5）出现《合伙企业法》及本协议规定的其他解散原因。

15.2 清算人

清算人由执行事务合伙人担任。

所有有限合伙未变现的资产由清算人负责管理。清算期内有限合伙应当向管理人支付公平价格的清算费用，但除此以外不再向管理人支付任何管理费或其他费用。

清算人的主要职责为：清理合伙企业财产，分别编制资产负债表和财产清单；处理与清算有关的合伙企业未了结的事务；清缴所欠税款；清理债权、债务；处理合伙企业清偿债务后的声誉财产；代表合伙企业诉讼、仲裁活动。

15.3 清算清偿顺序

15.3.1 有限合伙到期或终止清算时，合伙财产在支付清算费用后，按下列顺序进行清偿及分配：

（1）支付清算费用；

（2）支付职工工资、社会保险费用和法定补偿金；

（3）缴纳所欠税款；



（4）清偿有限合伙债务；

15.3.2 根据本协议的分配原则和程序在所有合伙人之间进行分配。

15.3.4 有限合伙财产不足以清偿合伙债务的，由普通合伙人向债权人承担无限连带清偿责任。

15.3.5 清算结束后，清算人应当编制清算报告，经全体合伙人签名或盖章后，在 15 日内向企业登记机关报送清算报告，申请办理合伙企业注销登记。

## 十六、违约责任

合伙人违反合伙协议的,应当依法或依照本合伙协议的约定承担相应的违约责任。

由于一方违约,造成本合伙协议不能履行或不能完全履行时,由违约方承担违约责任。如属多方违约,根据实际情况,由各方分别承担各自应负的违约责任。

## 十八、保密

本协议各方均应对因协商、签署及执行本协议而了解的其他各方的商业秘密承担最高级别的保密责任。有限合伙人并应对其通过财务报告及合伙人会议、及其提名的成员在投资、咨询委员会中所了解到的合伙企业经营信息承担最高级别的保密责任。 尽管有上述规定，各合伙人有权将其负有保密责任的信息作如下披露：

（1）向作为其股东的关联人披露；

（2）向其善意的专业顾问和审计师披露；

（3）如果法律、法院、任何相关证券交易所的规章或任何有管辖权的其他监管机构特别要求披露，在获悉披露要求后，该合伙人应立即通知普通合伙人。有信息披露义务的各合伙人应当尽所有合理努力，根据相关法律法规或政策，始终寻求避免满足该等披露要求或尽量缩小披露的范围。

## 十八、不可抗力

"不可抗力"指在本协议签署后发生的、本协议签署时不能预见的、其发生与后果无法避免或克服的、妨碍任何一方全部或部分履约的所有事件。上述事件包括地震、台风、水灾、火灾、战争、国际或国内运输中断、政府或公共机构的行为（包括重大法律变更或政策调整）、流行病、民乱、罢工，以及一般国际商业惯例认作不可抗力的其他事件。一方单纯缺少资金不能视为不可抗力事件。

如果发生不可抗力事件，影响一方履行其在本合同项下的义务，则在不可抗力造成的延误期内中止履行，而不视为违约。宣称发生不可抗力的一方应迅速书面通知另一方，并在其后的十五天内提供证明不可抗力发生及其持续的充分证据。

如果发生不可抗力事件，各合伙人应立即互相协商，以找到公平的解

决办法，并且应尽一切合理努力将不可抗力的后果减小到最低限度。

## 十九、争议解决办法

19.1　协商

因履行本合伙协议引起的或与本合伙协议有关的任何争议，各方应通过友好协商解决。

19.2　仲裁

如果协议各方在三十（30）天内无法达成一致，任何一方有权将争议提交合伙企业所在地仲裁委员会仲裁，仲裁的书面裁决具有终局性，对各方都具有约束力。

## 二十、附则

20.1　修改

除本合伙协议另有约定可以由普通合伙人单方修改的条款外，其他修改或者补充本合伙协议、制定实施细则均需全体合伙人协商一致。

合伙协议中涉及登记事项的变更及其它重要条款变动应当修改合伙协议，合伙协议的修改程序，应当符合《合伙企业法》及本合伙协议的规定。修改合伙协议，可以只对所修改条款作出修正案或作出补充决议，亦可签署新的合伙协议替换本合伙协议。

如本协议的任何条款或该条款对任何人或情形适用时被认定无效，其余条款或该条款对其他人或情形适用时的有效性并不受影响。



Case 1:24-cv-03142-UA   Document 1-2   Filed 04/24/24   Page 114 of 131

20.2　解除和终止

　　除非协议各方一致同意解除本合伙协议，否则协议各方均不得解除本合伙协议。

　　合伙企业经营期限届满或因其他原因终止的，本协议亦同时终止。

20.3　文本

　　本合伙协议一式 六份，各份具有同等法律效力。

　　本合伙协议附件、相关补充协议作为本合伙协议不可分割的组成部分，具同等法律效力。

20.4　生效

　　本合伙协议经当事人签字或盖章之后生效。

20.5　其他事宜

　　本合伙协议未尽事宜，在遵从国家有关法律、法规规定下由当事人协商。

　　本协议履行过程中，如果国家或者地方颁布或者修改有关法律法规，本协议按照新的法律法规进行修订，如果出现冲突、争议或者分歧，应当按照公平原则处理。

　　　　（本页以下无正文，之后为本协议签章处和附件）



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
NYSCEF DOC. NO. 12

INDEX NO. 152210/2024
RECEIVED NYSCEF: 03/12/2024

113

Case 1:24-cv-03142-UA   Document 1-2   Filed 04/24/24   Page 115 of 131

**合伙人签署页：**

本协议由以下合伙人于 2015 年 11 月 23 日签署：

**普通合伙人：**

名称：北京旗隆医药控股有限公司

住所（址）：北京市西城区金融大街 17 号，甲 17 号，乙 17 号，丙 17 号 17 号楼 8 层 0801-1

法定代表人（或授权人）：

**有限合伙人(之一)：**

名称：深圳前海国民投资管理有限公司

住所（址）：深圳市前海深港合作区前海湾一路 1 号 A 栋 201 室（入驻深圳市前海商务秘书有限公司）

法定代表人（或授权人）：



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024
NYSCEF DOC. NO. 12
Case 1:24-cv-03142-UA Document 1-2 Filed 04/24/24 Page 116 of 131
RECEIVED NYSCEF: 03/12/2024

114

140

附件一、合伙人基本信息表：

| 序号 | 姓名或名称 | 身份证号码或统一营业执照号码 | 住 所 | 认缴出资额（万元） | 实缴出资额（万元） | 出资比例 | 出资方式 | 责任承担方式 |
|---|---|---|---|---|---|---|---|---|
| 1 | 北京旗隆医药控股有限公司 | 2188 | 北京市西城区金融大街17号、甲17号、乙17号、丙17号17号楼8层0801-1 | 50 | | | | 无限责任 |
| 2 | 深圳前海国民投资管理有限公司 | 2023 | 深圳市前海深港合作区前海湾一路1号A栋201室（入驻深圳市前海商务秘书有限公司） | 30,000 | | | | 有限责任 |
| | | | | | | | | |

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM

NYSCEF DOC. NO. 12

INDEX NO. 152210/2024

RECEIVED NYSCEF: 03/12/2024

115

Case 1:24-cv-03142-UA   Document 1-2   Filed 04/24/24   Page 117 of 131

# TAB 2

# Translation

Globibo hereby declares that the enclosed translation is true and accurate to the best of the translator's knowledge and abilities.

This file contains the copy of the original source file followed by its respective translation. The translation has been prepared by Globibo's professional translator based on the ISO 17100 and/or EN15038, ASTMF2575, CAN131.10 standards. To verify the authenticity, content and number of pages of this file, please contact us with the below-stated reference number. Please find the contact details closest to your location on www.globibo.com.

Reference Number: ID 3344388/26

# 民事再审申请书

申请人（原审被告）：北京旗隆医药控股有限公司，住所地北京市西城区金融大街 9 号楼等 2 幢甲 9 号楼 10 层 1001-14。

法定代表人：张俊琪，执行董事、经理。

被申请人（原审原告）：深圳前海国民投资管理有限公司，住所地广东省深圳市前海深港合作区前湾一路 1 号 A 栋 201 室。

法定代表人：孙迎彤。

原审第三人：深圳国泰旗兴产业投资基金管理中心（有限合伙），住所地广东省深圳市前海深港合作区前湾一路 1 号 A 栋 201 室。

执行事务合伙人：北京旗隆医药控股有限公司

**再审申请事由：**

（2018）粤 0391 民初 255 号民事判决书判决错误：

1、有新的证据，足以推翻原判决，符合民诉法第二百零七条第（一）项；

2、判决认定的基本事实缺乏证据证明，符合民诉法第二百零七条第（二）项；

3、原判决、裁定认定事实的主要证据未经质证，符合民

1

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024
NYSCEF DOC. NO. 12
RECEIVED NYSCEF: 03/12/2024

Case 1:24-cv-03142-UA Document 1-3 Filed 04/24/24 Page 120 of 131

118

诉法第二百零七条第（四）项；

4、判决适用法律确有错误，符合民诉法第二百零七条第（六）项；

5、申请人（原审被告）因不能归责于本人或者其诉讼代理人的事由未参加诉讼，符合民诉法第二百零七条第（八）项；

为此，申请人特提起再审申请。

**再审请求：**

1、请求贵院依法撤销（2018）粤 0391 民初 255 号民事判决书；

2、请求贵院依法再审提审本案；

3、一审诉讼等费用由被申请人承担。

**事实和理由：**

**一、案件事实及争议由来**

2014 年 4 月 1 日，深圳前海旗隆基金管理有限公司（下称"前海旗隆公司"）在深圳前海登记设立，公司业务范围包括受托管理股权投资基金、受托资产管理、投资管理、股权投资等，2014 年 8 月至 2015 年 9 月，国民技术股份有限公司（下称"国民技术公司"）及时任国民技术公司董事长罗昭学陆续认购前海旗隆公司上亿元基金，盈利上千万元。

2

2015 年 8 月 7 日，前海旗隆公司全资设立北京旗隆医药控股有限公司（下称"北京旗隆公司"），并组建美国并购团队准备开始进行海外医药并购，时任国民技术公司董事长罗昭学（2018 年 5 月 28 日变更为孙迎彤）表示要参与投资，并承诺投资总金额为 20 亿元人民币。随后，2015 年 11 月 23 日，国民技术公司之全资子公司深圳前海国民投资管理有限公司（下称"国民投资公司"）与北京旗隆公司签订《深圳国泰旗兴产业投资基金管理中心（有限合伙）合伙协议书》，共同设立深圳国泰旗兴产业投资基金管理中心（有限合伙）（以下简称"国泰旗兴公司"），合伙期限为 20 年。国民投资公司作为有限合伙人、北京旗隆公司作为普通合伙人，2015 年 11 月 27 日签订《补充协议》，约定保证国民投资公司每年 5%的固定收益等内容。

上述协议签订后，双方各自履行投资款支付义务，国泰旗兴公司组建并购团队，按照协议约定开展投资活动。

**而本案争议则是因合伙期间国民投资公司不当干扰合伙事务执行，单方面要求停止原定的医药并购业务、转而跨行业开展芯片行业并购（即并购美光科技有限公司，下称"美光科技公司"）引发**。又因一方面，医药行业与芯片行业属于不同行业，并购团队是专门为医药并购组建的；另一方面，美光科技公司是美国芯片行业巨头，罗昭学承诺投资的 20 亿人民币根本不够进行并购，北京旗隆公司作为执行事务合伙

人对此明确予以拒绝，双方随即发生矛盾纠纷，并演变为刑事控告、民事诉讼（包括本案原审纠纷）等争议。

**二、案件关键事实**

**1、北京旗隆公司已经履行了合伙人出资义务，国民投资公司作为一审原告、参与案件的唯一当事人对此虚假陈述、恶意隐瞒，导致原审法院错误认定事实。**

国泰旗兴公司设立后，国民投资公司作为有限合伙人，于 2015 年 11 月 30 日实缴 3 亿元；**北京旗隆公司作为普通合伙人于 2016 年 12 月 16 日实缴 50 万元，该事实合伙企业及各合伙人均清楚知悉**，但国民投资公司在起诉状中称"第三人成立至今，被告未依照约定出资"，实属虚假陈述、误导法庭，违反了《中华人民共和国民事诉讼法》第十三条："民事诉讼应当遵循诚信原则。"。

本案原审对被告北京旗隆公司、第三人国泰旗兴公司均缺席审理，原告国民投资公司是唯一实际参与诉讼的案件当事人，其负有诚信诉讼的法定义务，但国民投资公司却作出虚假陈述，对合伙人投资这一关键事实作出与事实完全不符的陈述，误导法庭，足以看出国民投资公司本案诉讼中缺乏诚信，其各项诉讼主张也缺乏客观性。

**2、国民投资公司及其控制人罗昭学对于合伙企业的投资收支、资金去向及财务情况均清楚知悉，北京旗隆公司作**

Case 1:24-cv-03142-UA   Document 1-9   Filed 04/24/24   Page 123 of 131

为执行事务合伙人正当开展投资活动，并无不正当行为。

（1）关于**国泰旗兴公司生物医学国际（新加坡）有限公司 22661.1 万元投资**。

2015 年 12 月 8 日，经国民投资公司与北京旗隆公司共同决议，拟向国泰旗兴公司生物医学国际（新加坡）有限公司（下称"新加坡公司"）投资 3500 万美元（按当时汇率计，人民币约 2.2 亿元），并于 2015 年 12 月 22 日向新加坡公司转账 226611000 元人民币；代雪峰、**罗昭学均任新加坡公司董事，罗昭学还亲自到新加坡星展银行开立银行账户，并由银行工作人员鉴证签章下完成投资款支付**。

（2）**第三方顾问费用约 100 万美元**。

2016 年 1 月至 9 月期间，并购团队陆续与招商银行纽约分行、美国德勤会计师事务所、美国贝克麦肯锡律师事务所签订顾问协议，并支付顾问费约 100 万美元。

（3）2016 年 12 月 12 日，国泰旗兴公司应国民技术公司及罗昭学要求，**向国民投资公司分红 5000 万元人民币**。

（4）**第三方对合伙企业国泰旗兴公司的财务情况开展会计审计，国民投资公司一方对此也清楚知悉且未提出异议**。2017 年 3 月 3 日，应国民技术公司要求，国泰旗兴公司进行验资，由瑞华会计师事务所出具验资报告，报告中明确注明国泰旗兴公司全部的钱款去向，国民技术公司及罗昭学收到报告后均没有提出任何异议。

3、因国民投资公司及罗昭学干扰北京旗隆公司执行合伙事务，双方就此发生分歧导致合作投资暂停后，随后罗昭学以人身威胁、诬告等方式，索取 3 亿元资金，出于对家人、员工及自身安全考虑，2017 年 10 月至 11 月，前海旗隆公司及其投资人将存续的十几只基金及十几亿资金清盘处理，并退租了经营场所，并非原审判决认定的"人员去向不明，失去联系，致使合伙企业、原告、债权人的利益处于高度不确定的危险状态"。

（1）国民投资公司罗昭学与前海旗隆投资人代雪峰认识多年，对前海旗隆公司、北京旗隆公司的联系人以及在境内外的办公、营业场所清楚知悉，客观上不存在"失去联系"的情形。2017 年 9 月，罗昭学再次到美国办公室与代雪峰会谈，罗昭学自称是间谍，并重申国民技术对医药并购不感兴趣，并以境内家人安全相威胁，要求代雪峰个人将 3 亿元人民币汇至其私人控制的完美迅达（reach perfect)公司在纽约招行 1012010031 的账户，以便达到私吞的目的；

（2）为保护家人、员工及自身安全，2017 年 10 月至 11 月，前海旗隆公司与客户联系清盘事宜，将存续的十几只基金及十几亿资金清盘。为保证客户及员工权益不受任何损失，公司主动向客户补偿了部分资金，同时，也对离职员工进行了经济补偿，并退租了经营场所。

（3）如前所述，国民投资公司**罗昭学违背合作协议参与**

Case 1:24-cv-03142-UA    Document 1-2    Filed 04/24/24    Page 125 of 131

合伙事务，其本人亲自到新加坡星展银行开立银行账户、完成 **3500 万美元投资款的支付，并担任新加坡公司董事**，合伙企业已经取得的**该股权投资权益由罗昭学作为董事直接参与和管理，合伙企业及国民投资的利益并不存在"高度不确定的危险状态"。**

此后，因国民投资公司罗昭学违背投资协议要求停止医药并购、转而进行芯片行业并购，双方就并购方向产生严重分歧，**2016 年底合伙企业投资并购业务被迫暂停，此时合伙企业投资并购业务已因国民投资公司罗昭学不当干预合伙事务而暂停，合伙企业的利益也不存在"高度不确定的危险状态"，**另外客观上该争议纠纷因为美国政府已于 2017 年 10 月 30 日正式立案，代雪峰及旗隆有关人员不得不配合调查，因此合伙企业投资并购业务的被迫暂停也是无奈之举。显然以上这些事实一审对此认定有误。

三、申请人认为：

1、本案有新的证据，足以推翻原判决，且原判基本事实缺乏证据证明，原告提交的主要证据因被告未到庭、原告虚假陈述等，不满足证据质证认证的条件，依照民事诉讼法第二百零七条第（一）项、第（二）项、第（四）项的规定，本案应当对原审进行再审监督，依法予以纠正。

2、国泰旗兴公司是一名普通合伙人、一名有限合伙人组

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
NYSCEF DOC. NO. 12
INDEX NO. 152210/2024
RECEIVED NYSCEF: 03/12/2024

Case 1:24-cv-03142-UA Document 1-9 Filed 04/24/24 Page 126 of 131

124

成的合伙企业，不适用《中华人民共和国合伙企业法》第四十九条"经其他合伙人一致同意，可以决议将其除名"的规定，原审依据该条款判决属于适用法律错误。

在没有司法解释规定的情况下，法律条款的字面含义应当作为理解适用的前提和优先选择，否则法律的解释将陷入类推和扩大解释的范围，导致法律适用错误。

《中华人民共和国合伙企业法》第四十九条："合伙人有下列情形之一的，**经其他合伙人一致同意**，可以决议将其除名：（一）未履行出资义务；（二）因故意或者重大过失给合伙企业造成损失；（三）执行合伙事务时有不正当行为；"，该条款明确决议除名的必要条件是**"经其他合伙人一致同意"**，该文义必然是两个以上合伙人一致同意，如果只是一个合伙人则不可能满足"一致同意"的条件。

3、北京旗隆公司及其投资人因对方的人身威胁、诬告陷害，导致滞留境外，未能参加原审诉讼；国民投资公司一方作为唯一到场的诉讼参与人，虚假陈述、误导法庭，其提交的证据存在虚假、未经庭审质证，导致原审判决错误，应当依法再审纠正。

双方发生涉案投资争议后，2017 年 11 月 28 日国民技术公司向深圳市公安局报案称北京旗隆公司管理团队涉嫌职务侵占；2017 年 12 月 21 日国民技术公司公告称前海旗隆公司联系不上（事实上国民技术公司董事长罗昭学对公司境内

Case 1:24-cv-03142-UA   Document 12   Filed 04/24/24   Page 127 of 131

外办公室均清楚知悉，不存在联系不上的情况），使得北京旗隆公司及其主要工作团队滞留海外，这是因原审原告的涉嫌诬告、陷害行为导致，现刑事案件尚未查清的情况下，国民技术公司通过其控制下的国民投资公司又起诉移除北京旗隆公司的普通合伙人身份，显然原审原告的起诉不具有正当性。

另外，根据《最高人民法院关于在审理经济纠纷案件中涉及经济犯罪嫌疑若干问题的规定》"第十一条  人民法院作为经济纠纷受理的案件，经审理认为不属经济纠纷案件而有经济犯罪嫌疑的，应当裁定驳回起诉，将有关材料移送公安机关或检察机关。"，既然国民技术公司及其控制下的国民投资公司认为北京旗隆公司管理团队存在职务侵占、损害合伙企业及合伙人利益，应属于刑事案件，而不应当在刑事案件尚未定论的情况下提起本案诉讼，法院也不应当在刑事案件尚未有结论前作出民事审理和判决。

涉案合伙企业的资产、投资收益中包含了北京旗隆公司的投资资金所对应的权利与利益，国民技术公司及其控制下的国民投资公司一方先以诬告陷害、后借机提起民事诉讼，其侵占北京旗隆公司该投资收益的意图十分明显，不应得到法律的支持。

综合上述情况，本案有新的证据足以推翻原判决，且原

9

判基本事实缺乏证据证明，原告提交的主要证据因被告未到庭、原告虚假陈述等，不满足证据质证认证的条件；另外，原审判决认定"人员去向不明，失去联系，致使合伙企业、原告、债权人的利益处于高度不确定的危险状态"等基本事实缺乏证据支持，判决明显适用法律错误，最终导致本案原审判决错误。根据《民事诉讼法》第二百零七条规定，特向贵院提起再审申请。

　　此致

深圳市中级人民法院

　　　　　　　　　　申请人：北京旗隆医药控股有限公司

　　　　　　　　　　法定代表人：张俊视

　　　　　　　　　　　　2022 年 0 月 20 日

## 证据目录

| 序号 | 证据名称 | 证明事实 | 证据来源 | 页数 |
|---|---|---|---|---|
| 第一组：证实2014年4月1日，深圳前海旗隆基金管理有限公司在深圳前海登记设立，公司业务范围包括受托管理股权投资基金、受托资产管理、投资管理、股权投资等；2015年8月7日，前海旗隆公司全资设立北京旗隆医药控股有限公司。 | | | | |
| 1 | 深圳前海旗隆基金管理有限公司企业信用信息 | 2014年4月1日，深圳前海旗隆基金管理有限公司登记设立，公司业务范围包括受托管理股权投资基金、受托资产管理、投资管理、股权投资等 | 网络公开信息 | |
| 2 | 云南国际信托有限公司旗隆达尔文科技对冲一期证券投资集合资金信托计划文件（云信信2014-621002号） | 2014年起，国民技术股份有限公司时任董事长罗昭学开始陆续认购前海旗隆公司担任投资顾问的信托基金，通过前海旗隆公司进行基金投资。 | 当事人提供 | |
| 3 | 北京旗隆医药控股有限公司企业信用信息 | 2015年8月7日，前海旗隆公司全资设立北京旗隆医药控股有限公司，公司经营范围包括投资管理、资产管理、项目投资、投资咨询等 | 网络公开信息 | |
| 第二组：证实2015年11月23日，国民技术公司之全资子公司深圳前海国民投资管理有限公司与北京旗隆公司签订《深圳国泰旗兴产业投资基金管理中心（有限合伙）合伙协议书》，共同设立深圳国泰旗兴产业投资基金管理中心（有限合伙），合伙期限为20年。国民投资公司作为有限合伙人、北京旗隆公司作为普通合伙人，北京旗隆公司作为普通合伙人如约履行出资义务。 | | | | |
| 4 | 深圳国泰旗兴产业投资基金管理中心（有限合伙）合伙协议书 | 2015年11月23日，国民技术公司之全资子公司深圳前海国民投资管理有限公司与北京旗隆公司签订《深圳国泰旗兴产业投资基金管理中心（有限合伙）合伙协议书》，共同设立深圳国泰旗兴产业投资基金管理中心（有限合伙），合伙期限为20年。国民投资公司作为有限合伙人。北京旗隆公司作为普通合伙人。 | 当事人提供 | |
| 5 | 深圳国泰旗兴产业投资基金管理中心（有限合伙）章程 | | 当事人提供 | |
| 6 | 建设银行回单 | 2016年12月16日，北京旗隆医药控股有限公司通过建设银行电汇方式向合伙企业履行出资义务，如实履行了合伙协议约定的出资义务。 | 当事人提供 | |
| 第三组：国泰旗兴公司组建并购团队，按照协议约定开展投资活动。2015年12月8日，经国民投资公司与北京旗隆共同决议，拟向国泰旗兴生物医学国际（新加坡）有限公司投资3500万美元；合伙企业委托第三方审计机构就2016-1-1至11-30期间的财务情况进行审计并出具审计报告，公司财务状况正常。 | | | | |
| 7 | 企业境外投资证书 | 2015年10月23日，合伙企业依法取得《企业境外投资证书》，投资境外企业国泰旗兴生物医学国际（新加坡）有限公司，经营范围为生物医药领域技术及药品研发。 | 当事人提供 | |
| 8 | 出资决议书 | 2015年12月8日，经合伙人一致同意作出决议，同意出资3500万美元直接投资境外公司国泰旗兴生物医学国际（新加坡）有限公司。 | 当事人提供 | |
| 9 | 合伙人决议 | | 当事人提供 | |
| 10 | 审计报告（2016-12-21） | 2016年12月21日，第三方审计机构深圳瑞隆会计师事务所（普通合伙）出具《审计报告》，就2016-1-1至11-30期间的财务情况进行审计，公司财务状况正常 | 当事人提供 | |
| 第四组：国民投资公司及罗昭学违背约定的医药并购投资方向，转而提出进行芯片行业并购，无视投资约定和公司项目团队现状；2017年9月，罗昭学两次到美国办公室与代雪峰会谈，罗昭学自称是同谋，并重申中国技术对医药并购不感兴趣，并以境内家人安全相威胁；且公开信息显示其涉嫌开展同谋等违法犯罪活动，前海旗隆及其投资人处于安全考虑始终沉默。 | | | | |
| 11 | 国民技术股份有限公司关于全资子公司签订框架协议的公告 | 2017年6月16日，国民技术股份有限公司发布公告，就全资子公司国民投资与陈亚平技术团队就第二/三代集成电路外延片技术产业化签订《框架协议》等事项进行披露。 | 网络公开信息 | |
| 12 | 世贸大厦访客信息记录 | 2017年9月12日，罗昭学到合伙企业美国办公室与代雪峰会谈 | 当事人提供 | |
| 13 | 美国加利福利亚地区法院逮捕令 | | 当事人提供 | |
| 14 | 中国证监会官网公示信息 | 2021年9月10日，中国证监会就现场检查发现的国民技术全资子公司国民投资公司存在虚构应收账款收回问题、影响的披露数据准确性，罗昭学于2014年1月至2018年5月担任公司董事长，被依法采取出具警示函措施。 | 网络公开信息 | |

COPY

# 广东省深圳市中级人民法院

## 受理案件通知书

（2022）粤 03 民申 59 号

北京旗隆医药控股有限公司：

　　你（单位）诉深圳前海国民投资管理有限公司合伙企业纠纷一案，本院于 2022-01-26 立案，案号为（2022）粤 03 民申 59 号。现将受理案件的有关事项通知如下：

　　一、在诉讼过程中，当事人必须依法行使诉讼权利，有权行使《中华人民共和国民事诉讼法》第四十九条、第五十条、第五十一条等规定的诉讼权利，同时也必须遵守诉讼秩序，履行诉讼义务。

　　二、自然人应当提交身份证或者通行证、护照复印件；法人或者其他组织应当提交营业执照或者事业单位法人代码证复印件、法定代表人或者主要负责人身份证明书。

　　三、当事人、法定代理人可以委托一至二人作为诉讼代理人。

　　委托他人代为诉讼，必须向人民法院提交由委托人签名或者盖章的授权委托书。授权委托书必须记明委托事项和权限。诉讼代理人代为承认、放弃、变更诉讼请求，进行和解，提起反诉或者上诉，必须有委托人的特别授权。

　　侨居在国外的中华人民共和国公民从国外寄交或者托交的授权委托书，必须经中华人民共和国驻该国的使领馆证明；没有使领馆的，由与中华人民共和国有外交关系的第三国驻该国的使领馆证明，再转由中华人民共和国驻该第三国使领馆证明，或者由当地的爱国华侨团体证明。

　　四、根据《最高人民法院关于人民法院在互联网公布裁判文书的规定》，本院作出的生效裁判文书将在中国裁判文书网上公布。如果你认为案件涉及个

扫描全能王 创建

COPY

人隐私或商业秘密，申请对裁判文书中的有关内容进行技术处理或者申请不予公布的，至迟应在裁判文书送达之日起三日内以书面形式提出并说明具体理由。经本院审查认为理由正当的，可以在公布裁判文书时隐去相关内容或不予公布。

　　五、应在收到本通知书次日起七日内，预交案件受理费 0 元（缴款方式详见《深圳市非税收入缴款通知书》）。如预交案件受理费确有困难的，可以在预交期内向本院书面申请缓交、减交或者免交，是否准许，由本院审查决定。如逾期未预交，又未提出缓交、减交或者免交申请的，本院依法按撤回起诉处理。



二〇二二年二月二十六日
（院印）

扫描全能王 创建