# EXHIBIT A – PART 4

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 2 of 377

# EXHIBIT 10

# IN THE HIGH COURT OF THE REPUBLIC OF SINGAPORE

HC/S 1027/2020
HC/SUM 2515/2022

Between

GUOTAIQIXING BIOMEDICAL
INTERNATIONAL (S) PTE. LTD.

...Plaintiff(s)

And

1. DAI XUEFENG

2. ZHANG JUNQI

3. XU XINMANNI

...Defendant(s)

**16 September 2022**

**Stay application**

Coram: See Ying Xiu Alison, Assistant Registrar

William Khoo ("Khoo") and Alekhya Kanteti (Harry Elias Partnership LLP) for the Applicant (first Defendant in suit)

Calvin Liang (instructed) and Eugene Low (instructing) ("Low") (Ark Law Corporation) for the Respondent (Plaintiff in suit)

[*Hearing conducted via Video Conferencing Zoom*]

Ct : The Court would like to remind everyone that today's hearing is subject to the directions previously conveyed to parties in the registry notice. The Court directs that there is to be no photography or recording in any form and, in any event, no dissemination of any photographs or recording of these proceedings as might have been made whether intentionally or otherwise. Any such photographs or recording should be surrendered to the Court immediately upon discovery. Only those counsel or persons notified to the Court should be present at each location. Everyone should

| | | | |
|---|---|---|---|
| 1 | | | treat these proceedings as they would a physical hearing in Chambers, |
| 2 | | | save they need not rise and bow or stand when addressing the Court. |
| 3 | | | |
| 4 | Ct | : | *Decision in Annex is read.* |
| 5 | | | |
| 6 | | | Costs submissions. |
| 7 | | | |
| 8 | Low | : | Appendix G Supreme Court Practice Directions. Contested half day |
| 9 | | | range is $9,000 to $22,000. Item 12 which relates to *forum non* |
| 10 | | | *conveniens* applications, range is $6,000 to $21,000. |
| 11 | | | |
| 12 | | | Ask for $22,000 in costs excluding disbursements in light of complexity |
| 13 | | | of the application, 1st Defendant's actions in delaying and derailing |
| 14 | | | proceedings. |
| 15 | | | |
| 16 | | | This summons involved two applications. Stay on *forum non conveniens* |
| 17 | | | (and also case management stay brought belatedly in reply submissions), |
| 18 | | | as well as extension of time application which was very hotly contested. |
| 19 | | | |
| 20 | | | NY complaint was not well drafted, 60 pages, we spent a lot of time |
| 21 | | | determining why they say there was overlap. Also same for SZ |
| 22 | | | proceedings. We had to obtain translations and had to review them on |
| 23 | | | short notice. |
| 24 | | | |
| 25 | | | Expert report filed on Chinese law. |
| 26 | | | |
| 27 | | | Affidavit was 1,800 pages. There is some overlap with documents in |
| 28 | | | SUM 3901. We did not include those pages in the count of 1,800. |
| 29 | | | |
| 30 | | | Many authorities adduced – Singapore authorities. 14 authorities from |
| 31 | | | the US – had to review because they were referred to in the US expert |
| 32 | | | report filed by 1st Defendant. |

Nature of basis of their application was unclear. We had to prepare submissions on basis of complete stay and temporary case management stay. Substantial work had to be done.

Mr Liang had gone though many documents from the first jurisdictional challenge to show abuse of process. We reannexed documents in Sun's affidavit in order to show procedural history. Abuse can be seen only when viewed in context and chronology. Timeline of appointing and discharge of solicitors. Time bills of previous solicitors. Examination of timing of filing of the foreign proceedings. All this to make our argument that it was conscious decision of the 1st Defendant not to raise *forum non conveniens* earlier.

My learned friend also objected to same coram who heard SUM 3901 hearing the present stay application.

Costs should be more than the amount awarded in SUM 3907 which was $12,000 and $60,000 on appeal. Para 5 of Appendix G says that there is no presumption of higher amount of costs being awarded where a Judge hears at first instance instead of AR. Your Honour can have regard to the $60,000 awarded on appeal in the Registrar's Appeal. Costs should be somewhere in between those numbers.

This application was bound to fail from the start – SZ proceedings had been dismissed. Application also evolved – from one pending determination of SZ appeal, to one for stay in favour of US and SZ proceedings, and then one on temporary case management stay. Defendant is making it up as he goes along. He is happy to derail, delay, dissipate.

On disbursements, seeking $26,000 in disbursements. *Shares screen to show breakdown*. Court filing and oath fees amount to about $4,700. Printing and binding $780. Translations $4,500. Zhang's expert report $16,000. Total $26,000 in disbursements.

Khoo : On disbursements, no objections to oath fees. For filing fee incurred for 3rd affidavit of Sun of $3,385, this was high because of lengthy affidavit. A number of documents in the previous summons were repeated.

Printing and binding no objection. No objections to the rest of the disbursement items.

On costs of $22,000 submitted by my learned friend, Appendix G at para 4 does set out relationship between costs under general range and specific range of $6,0000 to $21,000. This is not a case justifying high costs. Legal principles on *forum non conveniens* were not in dispute. Legally not complex. There were documents already filed in course of SUM 3901. Not fair for costs to be awarded again for those costs.

Therefore, submit that costs of $15,000 (excluding disbursements) would be sufficient.

Low : On Sun's affidavit, all should be looked at chronologically and in context. This is why we exhibited the documents again. Even if we remove the repeated documents, filing fee would not go down substantially. Not legally complex but 1st Defendant made matter factually complex.

Ct : **I award costs of $18,000 and disbursements of $26,000 to the Plaintiff.** While the legal principles were generally not in dispute between the parties and not complex, I agree with the plaintiff that there was some factual complexity in the application, which involved multiple

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 7 of 377

1    issues, including extension of time, case management stay, stay on
2    *foreign non conveniens*, examination of nature of the foreign
3    proceedings, procedural history of the matter, and so on. Therefore, I am
4    awarding costs at the higher end of the Appendix G scale. However, I
5    decline to award costs at the upper most end as the level of complexity
6    and duration were not at the far upper end. As for disbursements, this was
7    not significantly disputed. In relation to the filing fee incurred for Sun's
8    affidavit of over $3,000, I do not think that the fee was unreasonably
9    incurred and, in any event, that a removal of any unnecessary pages
10   would significantly move the scale. I therefore award the disbursements
11   as sought by the Plaintiff.

Certified Transcript



Assistant Registrar
Supreme Court Singapore

*Sgd*:     See Ying Xiu Alison
           Assistant Registrar
           Supreme Court

AS/rw[26102022]

## Annex

### HC/S 1027/2020

### *Guotaiqixing Biomedical International (S) Pte. Ltd. V Dai Xuefeng & 2 Ors*
### **Decision for HC/SUM 2515/2022**

1. I dismiss SUM 2515, which is the first Defendant's application for an extension of time to file an application to stay the suit on the ground that Singapore is *forum non conveniens*, and if such extension is granted, for the suit to be stayed in favour of proceedings in Shenzhen and New York.

### *Extension of time application*

2. The first Defendant should not, in my view, be granted an extension of time to file the present stay application. It was not disputed that the first Defendant's application was filed out of time, in non-compliance of the timeline under O 12 r 7(2) of the Rules of Court 2014. A litigant should not, ordinarily, be deprived of his opportunity to have the matter determined on the merits by virtue of a procedural default. It is not disputed, however, that an extension of time should be refused in cases where the conduct of the party in default amounts to an abuse of process. In the present case, I find that the first Defendant's conduct amounts to an abuse of process and an extension of time ought not to be granted.

3. The first Defendant previously brought a jurisdictional challenge in this suit more than a year ago, in SUM 3901, on the limited basis that service of the originating process had allegedly not been validity effected on him in the US. It is clear from the procedural history and affidavits filed in the suit to date that the first Defendant had every opportunity to include an application for stay on the grounds that Singapore is *forum non conveniens* in SUM 3901 (whether as filed, or through an amendment), but had consciously, and under legal advice, chosen not to. The first Defendant was alive to the issue of *forum non conveniens* from an early stage of the proceedings. This is acknowledged by the first Defendant himself in his responsive affidavit for the present application, where he stated that he had briefly discussed the issue of *forum non conveniens* with his former solicitors. This is also borne out by, amongst others, billings issued by his former solicitors, as exhibited by the first

Defendant himself in his affidavit, which show that research on *forum non conveniens* and case management stays were conducted well before SUM 3901 had been heard, and well in advance of the timeline under the Rules of Court to file a stay on such grounds. Further, in the Plaintiff's submissions for SUM 3901, the Plaintiff emphasised to the court that the jurisdictional objection under SUM 3901 was based on an allegation of invalid service, and no objection on the ground of *forum non conveniens* was being made by the first Defendant. Counsel for the first Defendant did not disagree or expressly reserve the right to bring a challenge on the ground of *forum non conveniens* in the event SUM 3901 was dismissed. In the Registrar's Appeal against the dismissal of SUM 3901, the first Defendant had also already highlighted the existence of the Shenzhen and New York proceedings to the court and asserted that the Singapore action was allegedly commenced by the Plaintiff in retaliation to the first Defendant having reported alleged illegal activities of Nations Technologies and others to the FBI in the US.

4.    The first Defendant's explanation for bringing a stay application only after his Defence had been filed was essentially that he had engaged new solicitors only a few days prior to the deadline for the Defence, and his new solicitors were not able to thoroughly review the merits of the suit, including to consider the merits of a stay application, prior to the deadline for the Defence. However, no matter the precise date on which his new solicitors were formally engaged, based on the procedural history of the matter which counsel for the Plaintiff outlined in his submissions, it is clear that the first Defendant had every opportunity to bring his *forum non conveniens* claim under SUM 3901, or in any event, within the time limited for serving the Defence, but he chose not to. I agree with the Plaintiff that the circumstances show that *forum non conveniens* was not raised by the first Defendant at an earlier stage either because it was not considered to be a viable option or because the first Defendant had always intended to "keep it in the bag" to deploy the objection later and delay the proceedings.

HC/S 1027/2020
GUOTAIQIXING BIOMEDICAL INTERNATIONAL (S) PTE. LTD.
v DAI XUEFENG & 2 Ors
DECISION for SUM 2515/2022                    3                    16 September 2022

5.    Against that context, it is also noteworthy that the existence of parallel proceedings in Shenzhen and New York, a factor on which the first Defendant now seeks to rely to obtain a stay based on principles of *lis alibi pendens* and *forum non conveniens*, arose from the first Defendant's own actions in commencing the proceedings in Shenzhen and New York in 2022, well after the Singapore suit had been commenced and in fact, after SUM 3901 had been dismissed at first instance. The timing at which the foreign proceedings were commenced (ie, after SUM 3901 was dismissed at first instance), and the timing at which the present stay application was made (ie, after the Registrar's Appeal had been dismissed and the Defendant had commenced foreign proceedings) displays an intention to abuse the process of the court.

*Stay application*

6.    Even if an extension of time is granted to the first Defendant to bring the stay application, in my judgment, the stay application ought to be dismissed on the merits.

7.    In relation to whether Singapore is the natural forum for the dispute in Suit 1027, I am of the view that it is.

8.    The Plaintiff's claim against the first Defendant in the suit is for breach of fiduciary duties arising from an alleged misappropriation of the Plaintiff's funds by the first Defendant, who was a former director of the Plaintiff. In response to the Plaintiff's claim that he had diverted the Plaintiff's funds for his own benefit, the first Defendant pleads in his Defence that all transfers and transactions were made with genuine commercial basis. He further pleads that the specific sums referred to in the Plaintiff's Statement of Claim were used to, amongst others, acquire shares, pay for legitimate consultancy services, reimburse fees and expenses incurred by Khan Fund Management America, and so on.

9.    The Plaintiff is a company incorporated in Singapore. Issues relating to the duties owed by an officer to a company fall to be determined by the law of the company's place of incorporation (*Oro Negro Drilling Pte Ltd and others* [2020] 1 SLR 226 at [88]).  The law applicable to the dispute is therefore Singapore law. I also agree with the Plaintiff that there are other factors that make Singapore the natural forum for the dispute, including the fact that the alleged diversion of funds was from the Plaintiff's bank account in Singapore with DBS Bank, a Singapore Bank, and the fact that the Plaintiff's office, where devices and documents are recoverable, is in Singapore.

10.   In addition, there is an absence of an available, clearly more appropriate forum for the dispute. Counsel for the first Defendant appeared to accept that Singapore is the appropriate forum for the determination of the Plaintiff's claim for breach of fiduciary duties. His submission was, however, that the suit ought to be looked at in its wider context. When looked at in such a manner, the Singapore proceedings engage issues that overlap with those in foreign proceedings, and a stay ought to be granted as those issues are better determined by the Shenzhen and New York courts. I disagree that a stay ought to be granted on that basis. The Shenzhen and New York proceedings involve different parties and different issues that do not materially overlap with those under the Singapore proceedings.

11.   The Shenzhen proceedings pertain to an application filed by Beijing Khan against Nations Investment to set aside a default judgment that removed Beijing Khan as a partner of Shenzhen Guotai. The Plaintiff and the first Defendant in the Singapore suit are not parties to those proceedings. In addition, the Shenzhen proceedings concern whether the default judgment had been properly obtained, whether Beijing Khan was properly removed as a partner, and whether there was a breach of the Partnership Agreement. Even if the Shenzhen courts find in favour of Beijing Khan, it is unclear how that would materially affect the claim against the first Defendant in the Singapore suit, for breach of fiduciary duties for misappropriation of funds. In any event, and more

HC/S 1027/2020
GUOTAIQIXING BIOMEDICAL INTERNATIONAL (S) PTE. LTD.
v DAI XUEFENG & 2 Ors
DECISION for SUM 2515/2022                   5                   16 September 2022

importantly, the Shenzhen proceedings are no longer pending given that Beijing Khan's application has been dismissed by the Shenzhen courts and there is no right of appeal. To reopen the matter, an application has to be made to the procuratorate who has to agree to lodge a protest against the court's decision. There are no pending applications to date.

12.    As for the US proceedings, the proceedings center around the Defendant's allegation that entities related to the Plaintiff engaged in an illegal enterprise to carry out acts of espionage and that the Partnership Agreement was entered for an illegal purpose. The Plaintiff in the Singapore suit is not a Defendant in those proceedings. Again, it is unclear how the issues in the US proceedings materially overlap with and affect the Singapore proceedings, which concern whether there has been a breach of fiduciary duties arising from unlawful diversion of funds by the first Defendant for his personal benefit, rather than a claim in breach of contract such as breach of the Partnership Agreement. The first Defendant did not plead that any movement of funds out of the Plaintiff was justifiable or did not amount to a breach of fiduciary duties because of the alleged illegal enterprise. As mentioned earlier, he claims that various withdrawals were legitimate payments of fees, expenses and services incurred. In addition, the Plaintiff claims that the diversion of funds occurred from 2015 to 2017. The first Defendant's allegation, however, appears to be that he became aware of the espionage plot in September 2017 (see para 26 of the Defence). Further, although the first Defendant stated in his Defence that a deposit of US$10m to the Plaintiff was to assist the Plaintiff in the prevention of the commission of an illegal purpose, whether this was indeed the case is not material to a determination of the Plaintiff's claim. The illegal enterprise issue before the US courts therefore does not materially overlap with and affect the issues in the Singapore proceedings.

13.    Next, I agree with the Plaintiff that principles on *lis alibi pendens* are not applicable in the present instance. This is not a case where the plaintiff has sued the same defendant in Singapore and abroad, nor a case where the plaintiff has

sued the defendant in Singapore and the defendant has in turn sued the plaintiff abroad (*Virsagi Management (S) Pte Ltd v Welltech Construction Pte Ltd* [2013] 4 SLR 1097 at [27]). In the present case, the Plaintiff in Singapore is not a Defendant in the US and Shenzhen proceedings. In addition, even in the *forum non conveniens* analysis, the existence of parallel or related proceedings in this case is not a weighty factor in favour of granting a stay for the reasons earlier mentioned, namely (1) the degree of overlap in issues and parties, and risk of conflicting judgments is not significant; and (2) the timing of the commencement of the Shenzhen and US proceedings suggest that they were commenced for strategic reasons, to bolster the first Defendant's case in Singapore of a clearly more appropriate forum elsewhere (see *Virsagi Management (S) Pte Ltd v Welltech Construction Pte Ltd* [2013] 4 SLR 1097 at [39]).

14.   Finally, I address the issue of whether a case management stay ought to be granted. Counsel for the first Defendant clarified belatedly, in his reply oral submissions that he was in fact seeking a temporary case management stay in the present application. This appears to be different from the original premise of the stay application, which was expressly asserted as an application made on the grounds of *forum non conveniens*, *ie*, that Singapore is not the appropriate forum for the dispute in the suit. In any event, I decline to grant a case management stay for similar reasons as stated earlier, namely, because the parties and issues in the foreign proceedings do not overlap substantially with the Singapore proceedings and there is thus a limited risk of inconsistent findings. This is also not a case where the Singapore proceedings were commenced as a continuation of or in the backdrop of foreign proceedings. Instead, the Singapore proceedings were commenced prior to the foreign proceedings.

15.   For these reasons, I dismiss the defendant's application.

———

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 14 of 377

# EXHIBIT 11

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 15 of 377

**IN THE GENERAL DIVISION OF THE HIGH COURT OF THE REPUBLIC OF SINGAPORE**

Case No.: HC/S 1027/2020

Sub Case No.: HC/SUM 4136/2022

Filed: 15-November-2022 08:09 PM

Hearing Date/Time: For determination by Judge / Registrar. Solicitor(s)/ parties need not attend unless specifically directed to do so.



|  |  |
|---|---|
| | Between |
| | GUOTAIQIXING BIOMEDICAL INTERNATIONAL (S) PTE. LTD. (Singapore UEN No. 20150039K) |
| | ...Plaintiff(s) |
| | And |
| 1. | DAI XUEFENG (China Passport No. ▮▮2878) |
| 2. | ZHANG JUNQI (China Passport No. ▮▮9520) |
| 3. | XU XINMANNI (China Passport No. ▮▮7254) |
| | ...Defendant(s) |

**SUMMONS FOR INJUNCTION**

To: Solicitor(s) for the 1st Defendant(s)
Harry Elias Partnership LLP
SGX CENTRE 2 #17-01 4 SHENTON WAY SINGAPORE 068807
Tel No.: 65350550
Fax No.: 64380550
Email: info@harryelias.com
File Ref No.: DS121009
Solicitor in charge: 1. PHILIP FONG YENG FATT,
2. Quek Yu Chung, Eugene,
3. WILLIAM KHOO WEI MING

Let all parties concerned attend before the Court on the date and time to be assigned for a hearing of an application by the Plaintiff for the following order(s):

1. An order that the time for the service of this Summons be abridged, if necessary.

2. Pending the final determination of this Summons on a full *inter partes* basis, and any appeal therefrom, interim or temporary measures be ordered on the terms sought in prayers 3 to 5 below.

3. A proprietary injunction prohibiting the 1st Defendant from dealing with, disposing of, or diminishing the monies set out below, which were transferred out from the Plaintiff's USD-denominated account held with DBS Bank Ltd in Singapore bearing number ▮▮▮▮▮▮7-01-3 (the "**Plaintiff's DBS Account (USD)**") between 29 December 2015 and 6 April 2017 to and received by the entities and person set out below in their respective bank accounts and any traceable product therefrom, which the 1st Defendant holds on trust for

the Plaintiff:

(a) Khan Funds Oriental Medicine Fund SPC (Cayman Islands Registration No. 304036) – the net sum of USD 22,600,000.00 received in its bank account held with DBS Bank Ltd. bearing number ████4-01-5;

(b) Khan Funds Management America, Inc. (New York DOS ID 4650514) – the sum of USD 3,210,025 received in its bank account held with JPMorgan Chase Bank N.A. bearing number ████8765;

(c) Khan Funds Global Limited (Cayman Islands Registration No. 304037) – the sum of USD 8,100,000 received in its bank account held with DBS Bank Ltd. bearing number ████5-010; and

(d) The 2nd Defendant – the sum of USD 353,356.89 received in her bank account held with DBS Bank Ltd. bearing number ████2966.

In the alternative, payment of the sum of USD 34,263,381.89 into Court.

4. An order in terms of the order annexed as Annex A hereto for an Injunction Prohibiting Disposal of Assets Worldwide.

5. An order for the 1st Defendant to disclose to the Plaintiff the full details of all monies, proceeds and funds that are the subject matter of the Plaintiff's claims and that had been transferred out from the Plaintiff's DBS Account (USD) between 29 December 2015 and 6 April 2017 whether directly or indirectly, including but not limited to what has become of such monies, proceeds and funds, their present location(s), and the assets (if any) representing such monies, proceeds and funds or into which such monies, proceeds and funds have flowed, whether such monies, proceeds, funds and assets are in or outside Singapore, whether legally or beneficially owned by him, whether in his own name or not, and whether solely or jointly owned.

6. That the costs of this application be provided for.

7. Such other or further relief as this Honourable Court deems fit.

8. An order that there be liberty to apply.

The grounds of the application are:

1. Set out in the 5th Affidavit of Sun Yingtong, a draft of which is annexed to the 7th Affidavit of Eugene Jedidiah Low Yeow Chin filed herein.

1. Annex A

20221115 - Annex to Summons for Injunction.pdf


20221115 - Annex to Summons for Injunction.pdf

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 17 of 377

Issued by :

Solicitor(s) for the Plaintiff(s)

Ark Law Corporation
1 PICKERING STREET
LEVEL 8, GREAT EASTERN CENTRE
SINGAPORE 048659
Tel No.: 65928632
Email: info@arklaw.com.sg
File Ref No.: EJL.20200077
Solicitor in charge: EUGENE JEDIDIAH LOW YEOW CHIN

HC/S1027/2020-HC/SUM4136/2022-HC/S1027/2020-HC/SUM4136/2022-HC/S1027/2020-HC/SUM

TAN BOON HENG
REGISTRAR
SUPREME COURT
SINGAPORE

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 18 of 377

**IN THE GENERAL DIVISION OF THE
HIGH COURT OF THE REPUBLIC OF SINGAPORE**

HC/S 1027/2020
HC/SUM      /2022

Between

**GUOTAIQIXING BIOMEDICAL INTERNATIONAL (S) PTE. LTD.**
(UEN No. 20150039K)

... Plaintiff(s)

And

**(1)   DAI XUEFENG**
(PRC Passport No. ███2878)

**(2)   ZHANG JUNQI**
(PRC Passport No. ███9520)

**(3)   XU XINMANNI**
(PRC Passport No. ███7254)

... Defendant(s)

# INJUNCTION PROHIBITING
# DISPOSAL OF ASSETS WORLDWIDE

**BEFORE THE HONOURABLE**
**JUSTICE [ ]**                                                                    **IN CHAMBERS**

**IMPORTANT:- NOTICE TO THE 1ST DEFENDANT**

**(a)**   **This order prohibits you from dealing with your assets up to the amount stated. The order is subject to the exceptions stated at the end of the order. You should read all the terms of the order very carefully. You are advised to consult a solicitor as soon as possible. You have a right to ask the Court to vary or discharge this order.**

**(b)**   **If you disobey this order you will be guilty of contempt of Court and may be sent to prison or fined.**

**THE ORDER**

An application was made today [ ] by counsel for the Plaintiff, Ark Law Corporation, to Justice [ ] by way of HC/SUM [ ]/2022. Justice [ ] heard the application and read the 5th Affidavit of Sun Yingtong filed in support of this application on [ ] ("**SYT's 5th Affidavit**") and the exhibits therein, as well as the portions of the affidavits previously filed by the

Plaintiff and the 1st Defendant in other interlocutory applications in this Suit as referred to in SYT's 5th Affidavit, being:

<u>Affidavits filed for the Plaintiff</u>

(a)    1st Affidavit of Sun Yingtong filed on 27 October 2020 in HC/SUM 4685/2020;

(b)    2nd Affidavit of Sun Yingtong filed on 16 September 2021 in HC/SUM 3901/2021 ("**SUM 3901**");

(c)    3rd Affidavit of Sun Yingtong filed on 29 July 2022 in HC/SUM 2515/2022 ("**SUM 2515**"),

<u>Affidavits filed for the 1st Defendant</u>

(d)    1st Affidavit of Fu Zhang filed on 19 August 2021 in SUM 3901;

(e)    2nd Affidavit of Fu Zhang filed on 7 October 2021 in SUM 3901;

(f)    1st Affidavit of Zheng Yefeng filed on 7 October 2021 in SUM 3901;

(g)    1st Affidavit of Xuefeng Dai filed on 9 May 2022 in HC/RA 317/2021 and HC/RA 352/2021;

(h)    2nd Affidavit of Xuefeng Dai filed on 8 July 2022 in SUM 2515;

(i)    3rd Affidavit of Xuefeng Dai filed on 18 August 2022 in SUM 2515; and

(j)    1st Affidavit of Hui Chi Wai filed on 18 August 2022 in SUM 2515.

As a result of the application IT IS ORDERED by Justice [ ] that:

<u>Disposal of assets</u>

1.    (a)    The 1st Defendant must not:

(i)    remove from Singapore any of his assets which are in Singapore whether in his own name or not and whether solely or jointly owned up to the value of USD 34,650,158.34; and

(ii)    in any way dispose of or deal with or diminish the value of any of his assets whether they are in or outside Singapore whether in his own name or not and whether solely or jointly owned up to the same value. For this purpose, the list of entities attached at Schedule 3 to this Order are to be treated non-exhaustively as the 1st Defendant's nominees and the assets owned by those entities whether legally or

beneficially owned by them, whether in their own name or not and whether solely or jointly owned are to be covered by this Order.

(b)   This prohibition includes but are not limited to the assets listed in Schedule 2 to this Order.

(c)   If the total unencumbered value of the 1st Defendant's assets in Singapore exceeds USD 34,650,158.34, the 1st Defendant may remove any of those assets from Singapore or may dispose of or deal with them so long as the total unencumbered value of his assets still in Singapore remains not less than USD 34,650,158.34. If the total unencumbered value of the 1st Defendant's assets in Singapore does not exceed USD 34,650,158.34, the 1st Defendant must not remove any of those assets from Singapore and must not dispose of or deal with any of them, but if he has other assets outside Singapore, the 1st Defendant may dispose of or deal with those assets so long as the total unencumbered value of all his assets whether in or outside Singapore remains not less than USD 34,650,158.34.

Disclosure of Information

2.   The 1st Defendant must inform the Plaintiff in writing at once of all his assets whether in or outside Singapore and whether in his own name or not and whether solely or jointly owned, giving the value, location and details of all such assets. For this purpose, the list of entities attached at Schedule 3 to this Order are to be treated non-exhaustively as the 1st Defendant's nominees and covered by this Order. The information must be confirmed in an affidavit which must be served on the Plaintiff's solicitors within [ ] days after this order has been served on the 1st Defendant.

**EXCEPTIONS TO THIS ORDER**

3.   This order does not prohibit the 1st Defendant from spending [$ ] a week towards his ordinary living expenses and also [$ ] a week [or a reasonable sum] on legal advice and representation. But before spending any money, the 1st Defendant must tell the Plaintiff's solicitors where the money is to come from.

4.   This order does not prohibit the 1st Defendant from dealing with or disposing of any of his assets in the ordinary and proper course of business. The 1st

Defendant shall account to the Plaintiff [state interval] for the amount of money spent in this regard.

5.   The 1st Defendant may agree with the Plaintiff's solicitors that the above spending limits should be increased or that this order should be varied in any other respect but any such agreement must be in writing.

## EFFECT OF THIS ORDER

6.   A defendant who is an individual who is ordered not to do something must not do it himself or in any other way. He must not do it through others acting on his behalf or on his instructions or with his encouragement.

7.   A defendant which is a corporation and which is ordered not to do something must not do it itself or by its directors, officers, employees or agents or in any other way.

## THIRD PARTIES

### Effect of this order

8.   It is a contempt of Court for any person notified of this order knowingly to assist in or permit a breach of the order. Any person doing so may be sent to prison or fined.

### Effect of this order outside Singapore

9.   The terms of this order do not affect or concern anyone outside the jurisdiction of this Court until it is declared enforceable or is enforced by a Court in the relevant country and then they are to affect him only to the extent they have been declared enforceable or have been enforced UNLESS such person is:

(a)   a person to whom this order is addressed or an officer or an agent appointed by power of attorney of such a person; or

(b)   a person who is subject to the jurisdiction of this Court; and

(i)   has been given written notice of this order at his residence or place of business within the jurisdiction of this Court; and

5

(ii)  is able to prevent acts or omissions outside the jurisdiction of this Court which constitute or assist in a breach of the terms of this order.

### Assets located outside Singapore

10.  Nothing in this order shall, in respect of assets located outside Singapore, prevent any third party from complying with:

(a)  what it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between itself and the 1st Defendant; and

(b)  any orders of the Courts of that country or state, provided that reasonable notice of any application for such an order is given to the Plaintiff's solicitors.

### Set-off by banks

11.  This injunction does not prevent any bank from exercising any right of set-off it may have in respect of any facility which it gave to the 1st Defendant before it was notified of the order.

### Withdrawals by the 1st Defendant

12.  No bank need enquire as to the application or proposed application of any money withdrawn by the 1st Defendant if the withdrawal appears to be permitted by this order.

## UNDERTAKINGS

13.  The Plaintiff gives to the Court the undertakings set out in Schedule 1 to this order.

## DURATION OF THIS ORDER

14.  This order will remain in force until the trial or further order.

6

**VARIATION OR DISCHARGE OF THIS ORDER**

15.   The 1st Defendant (or anyone notified of this order) may apply to the Court at any time to vary or discharge this order (or so much of it as affects that person), but anyone wishing to do so must inform the Plaintiff's solicitors.

**NAME AND ADDRESS OF PLAINTIFF'S SOLICITORS**

16.   The Plaintiff's solicitors are:

> **Eugene Jedidiah Low Yeow Chin**
> **Ark Law Corporation**
> 1 Pickering Street
> Level 8, Great Eastern Centre
> Singapore 048659
> Tel: +65 6592 8634
> Email: info@arklaw.com.sg
> Ref: EJL.20200077

**Registrar**

Case 1:24-cv-03142-UA Document 1-4 Filed 04/24/24 Page 24 of 377

## SCHEDULE 1

*Undertakings given to the Court by the Plaintiff*

1. If the Court later finds that this order has caused loss to the 1st Defendant, and decides that the 1st Defendant should be compensated for that loss, the Plaintiff shall comply with any order the Court may make.

2. The Plaintiff, in respect of any order the Court may make pursuant to para (1) above, will:

   (a) on or before [date] provide to the 1st Defendant security in the sum of [$ ] by causing [payment to be made into Court / a bond to be issued by an insurance company with a place of business within Singapore / a written guarantee to be issued from a bank with a place of business within Singapore / payment to the Plaintiff's solicitor to be held by the solicitor as an officer of the Court pending further order]*; and
   (*Delete where appropriate)

   (b) cause evidence of the provision of security to be extended to the 1st Defendant immediately after the security has been put up.]

3. As soon as practicable the Plaintiff shall [issue and] serve on the 1st Defendant [a] [the] writ of summons [in the form of the draft writ produced to the Court] [claiming appropriate relief] together with this order.

4. The Plaintiff shall cause an affidavit to be sworn and filed [substantially in the terms of the draft affidavit produced to the Court] [confirming the substance of what was said to the Court by the Plaintiff's solicitors].

2

5.   ~~As soon as practicable the Plaintiff shall serve on the 1st Defendant a copy of the affidavits and exhibits containing the evidence relied on by the Plaintiff.~~

6.   Anyone notified of this order will be given a copy of it by the Plaintiff's solicitors.

7.   The Plaintiff shall pay the reasonable costs of anyone other than the 1st Defendant which have been incurred as a result of this order including the costs of ascertaining whether that person holds any of the 1st Defendant's assets and if the Court later finds that this order has caused such person loss, and decides that such person should be compensated for that loss, the Plaintiff will comply with any order the Court may make.

8.   If this order ceases to have effect, the Plaintiff will immediately take all reasonable steps to inform in writing anyone to whom he has given notice of this order, or who he has reasonable grounds for supposing may act upon this order, that it has ceased to have effect.

9.   [The Plaintiff shall not without the leave of the Court begin proceedings against the 1st Defendant in any other jurisdiction or use information obtained as a result of an order of the Court in this jurisdiction for the purpose of civil or criminal proceedings in any other jurisdiction.

10.   The Plaintiff shall not without the leave of the Court seek to enforce this order in any country outside Singapore [or seek an order of a similar nature including orders conferring a charge or other security against the 1st Defendant or the 1st Defendant's assets].]

## SCHEDULE 2

1.    All accounts in which the 1st Defendant has a legal or beneficial interest including

monies in the following bank accounts:

| Entity Holding the Account | Bank | Currency | Account No. |
|---|---|---|---|
| KFG | DBS Bank | USD | ███████5-010 |
| KFG | DBS Bank | SGD | █████614-4 |
| KOM | DBS Bank | USD | ██████4-01-5 |
| KOM | DBS Bank | USD | ██████5-02-2 |
| KOM | DBS Bank | USD | ███████-6-022 |
| KOM | DBS Bank | SGD | █████587-3 |
| KOM | UOB Kay Hian | HKD/USD | ████6-001 |
| SGKFM | DBS Bank | SGD | █████128-0 |
| SGKFM | DBS Bank | SGD | ██████-601-4 |
| SQKFM | China Construction Bank | USD | █████████████5451 |
| SQKFM | China Construction Bank | USD | █████████████8237 |
| SQKFM | China Merchants Bank | RMB | █████████0588 |
| SQKFM | China Merchants Bank | RMB | █████████0802 |
| SQKFM | DBS Bank | USD | ██████3-01-9 |
| SQKFM | DBS Bank | SGD | █████147-4 |
| KOM | KGI Asia Ltd | USD | ███████5022 |
| KOM | KGI Asia Ltd | HKD/USD | ██████044-2 |
| KOM | KGI Asia Ltd | USD | ███044F |
| KFA | JPMorgan Chase Bank | USD | ████8765 |
| KFA | JPMorgan Chase Bank | USD | ████6-3752 |
| KFA | JPMorgan Chase Bank | USD | ████2301 |

2.    The shares held directly or indirectly by the 1st Defendant in the following entities:

(a)    Khan Funds Management Asia Pte. Ltd. (Singapore)

(b)    深圳市旗隆投资管理有限公司 (also known as Shenzhen Khan Investment
Management Co. Ltd.) (China)

(c)    重庆市旗隆投资管理有限公司 (also known as Chongqing Khan
Investment Management Co. Ltd.) (China)

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 27 of 377

2

(d)  深圳前海旗隆基金管理有限公司  (also  known  as  Shenzhen  Qianhai Genghis Khan Fund Management Co., Ltd. and Shenzhen Qianhai Khan Fund Management Co., Ltd.) (China)

(e)  北京旗隆医药控股有限公司 (also known as Beijing Khan Pharmaceutical Holdings Co., Ltd.) (China)

(f)  Khan Funds Management America, Inc. (United States of America)

(g)  Chinese Fund Management of America Association, Inc. (United States of America)

(h)  SP Avatar Management LLC (United States of America)

(i)  U Place LLC (United States of America)

(j)  Springfield Beacon Holding LLC (United States of America)

(k)  Sandalfoot Boca Holdings LLC (United States of America)

(l)  Seven Isles Drive LLC (United States of America)

(m)  Riverside Oasis Holdings LLC (United States of America)

(n)  Mars Springs Farm & Ranch LLC (United States of America)

(o)  Khan Funds Global Limited (Cayman Islands)

(p)  Khan Funds Oriental Medicine Fund (Cayman Islands)

(q)  Daibenewise Limited (Cayman Islands)

(r)  Genghis Khan Investment, Inc. (British Virgin Islands)


3.  The assets, including any real properties and bank accounts, held in the names of the entities listed above or in Schedule 3, including but not limited to the following assets:


(a)  249 Cleft Rd, Mill Neck, NY 11765

(b)  4 / 6 University Place, Great Neck, NY 11020

(c)  11886 Anchorage Way, Boca Raton, FL 33428

(d)  10580 Sandalfoot Blvd, Boca Raton, FL

(e)  19944 Flotilla Pl, Boca Raton, FL

Case 1:24-cv-03142-UA Document 1-4 Filed 04/24/24 Page 28 of 377

3

(f)    11914 Anchorage Way, Boca Raton, FL

(g)    The property at Lot 46, of Sea Island Unit Three, according to the Plat thereof as recorded in Plat Book 27, Page 19, of the Public Records of Broward County, Florida

(h)    191 NE 23 Avenue, Fort Lauderdale, FL 33301

(i)    6300 Riverside Drive, Parkland, FL 33067, United States of America

(j)    The 6.681-acre property described as a portion of Parcel A of Tall-Pines, according to the Plat thereof as recorded in Plat Book 152, Book 30 of the Public Records of Broward County, Florida

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 29 of 377

**SCHEDULE 3**

The 1st Defendant's nominees:

(a)   Khan Funds Management Asia Pte. Ltd. (Singapore)

(b)   深圳市旗隆投资管理有限公司 (also known as Shenzhen Khan Investment Management Co. Ltd.) (China)

(c)   重庆市旗隆投资管理有限公司 (also known as Chongqing Khan Investment Management Co. Ltd.) (China)

(d)   深圳前海旗隆基金管理有限公司 (also known as Shenzhen Qianhai Genghis Khan Fund Management Co., Ltd. and Shenzhen Qianhai Khan Fund Management Co., Ltd.) (China)

(e)   北京旗隆医药控股有限公司 (also known as Beijing Khan Pharmaceutical Holdings Co., Ltd.) (China)

(f)   Khan Funds Management America, Inc. (United States of America)

(g)   Chinese Fund Management of America Association, Inc. (United States of America)

(h)   SP Avatar Management LLC (United States of America)

(i)   U Place LLC (United States of America)

(j)   Springfield Beacon Holding LLC (United States of America)

(k)   Sandalfoot Boca Holdings LLC (United States of America)

(l)   Seven Isles Drive LLC (United States of America)

(m)   Riverside Oasis Holdings LLC (United States of America)

(n)   Mars Springs Farm & Ranch LLC (United States of America)

(o)   Khan Funds Global Limited (Cayman Islands)

(p)   Khan Funds Oriental Medicine Fund (Cayman Islands)

(q)   Daibenewise Limited (Cayman Islands)

(r)   Genghis Khan Investment, Inc. (British Virgin Islands)

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 30 of 377

# EXHIBIT 12

*Plaintiff: Eugene Jedidiah Low Yeow Chin: 9th: 5.12.2022*

## IN THE GENERAL DIVISION OF THE
## HIGH COURT OF THE REPUBLIC OF SINGAPORE

HC/S 1027/2020
HC/SUM 4136/2022

Between

**GUOTAIQIXING BIOMEDICAL INTERNATIONAL (S) PTE. LTD.**
(UEN No. 20150039K)

... Plaintiff(s)

And

**(1) DAI XUEFENG**
(PRC Passport No. ███2878)

**(2) ZHANG JUNQI**
(PRC Passport No. ███9520)

**(3) XU XINMANNI**
(PRC Passport No. ███7254)

... Defendant(s)

## <u>AFFIDAVIT</u>

I, **EUGENE JEDIDIAH LOW YEOW CHIN (NRIC No. ███556C)** of Ark Law Corporation, care of 1 Pickering Street, Level 8, Great Eastern Centre, Singapore 048659, do solemnly and sincerely swear and say as follows:

1.  I am the Managing Director of Ark Law Corporation, solicitors for the Plaintiff herein. I am the solicitor having principal conduct of this matter on behalf of the Plaintiff and am duly authorised to make this Affidavit on its behalf.

2.  The facts and matters deposed to herein that are within my personal knowledge are true. The matters deposed to herein that are not within my personal knowledge are true to the best of my knowledge, information and belief.

2

3.   A draft of the 7th Affidavit of Mr Sun Yingtong in support of HC/SUM 4136/2022 has been prepared. Mr Sun has confirmed the contents of his draft Affidavit, and has accordingly signed the draft Affidavit.

4.   As discussed in paragraph 9 of the draft Affidavit, Mr Sun is based in Shenzhen city in China and will need to travel to Guangzhou city in order to affirm his Affidavit before the Consulate-General of the Republic of Singapore. Mr Sun's draft Affidavit also refers to paragraphs 6 to 9 of the 6th Affidavit of Mr Sun Yingtong annexed to the 8th Affidavit of Eugene Jedidiah Low Yeow Chin filed on 28 November 2022 which sets out the reasons for this. I reproduce the aforesaid paragraphs 6 to 9 herein for the Honourable Court's reference:

> "6.   *I understand that the 1st Defendant has in various letters and during a Pre-Trial Conference ("**PTC**") on 23 November 2022 (which are further discussed in paragraphs 13 to 23 herein) suggested that the reliefs sought by the Plaintiff should not be granted because my 5th Affidavit (the 5th Affidavit of Sun Yingtong ("**SYT's 5th Affidavit**")) was filed under cover of the 7th Affidavit of Eugene Jedidiah Low Yeow Chin ("**EJLYC's 7th Affidavit**")), which is a solicitor's affidavit.*

> 7.   *I am advised and believe that the 1st Defendant's position is without merit. In any event, as was explained in EJLYC's 7th Affidavit at [3], I am based in Shenzhen city and have not been able to travel to Guangzhou to have my 5th Affidavit affirmed personally before the Consulate-General of the Republic of Singapore due to, among other things, the COVID-19 situation in Guangzhou. This is the case for this Affidavit as well.*

> 8.   *To explain further, as widely reported in international media, there was a significant increase in the number of COVID-19 cases in Guangzhou since late-October 2022, which led to the imposition of enhanced*

3

*COVID-19 restrictions including lockdowns in various parts of Guangzhou in accordance with the PRC government's zero-COVID policy. On around 20 and 21 November 2022, those restrictions were intensified and large parts of Guangzhou were placed in lockdown, with majority of the public transport shut down and residents prohibited from leaving their homes except for essential workers or for essential purposes such as taking of COVID-19 tests. As of the date of this Affidavit, these restrictions continue to be in force.*

9.  *Notwithstanding that I have been unable to sign my Affidavits before the Consulate-General at this time, I have confirmed the contents of, and signed, both Affidavits. I will have both Affidavits signed before the Consulate-General as soon as possible once the COVID-19 situation in Guangzhou improves."*

A copy of the draft Affidavit signed by Mr Sun is annexed hereto and marked "**EJLYC-12**".

5.  I undertake to file the affirmed Affidavit as soon as it is available.

**SWORN** by the abovenamed )
**EUGENE JEDIDIAH LOW YEOW CHIN** on )
this 5th day of December 2022 in Singapore via a live )
video link in accordance with Order 15, Rule 22 of )
the Rules of Court 2021 and the Supreme Court )
Practice Directions, paragraph 81 )

Before me

**A COMMISSIONER FOR OATHS**



This Affidavit is filed on behalf of the Plaintiff.

This is the exhibit marked "**EJLYC-12**"

referred to in the

**AFFIDAVIT**

OF

**EUGENE JEDIDIAH LOW YEOW CHIN**

Sworn before me

this 5th day of December 2022

Before Me

**A COMMISSIONER FOR OATHS**

COMMISSIONER FOR OATHS
Patricia Lee
Yuen Sum
CD2022/0356
1 Apr 2022 – 31 Mar 2023
SINGAPORE

7th: Sun Yingtong: Plaintiff:      .12.2022

### IN THE GENERAL DIVISION OF THE
### HIGH COURT OF THE REPUBLIC OF SINGAPORE

HC/S 1027/2020
HC/SUM 4136/2022

Between

**GUOTAIQIXING BIOMEDICAL INTERNATIONAL (S) PTE. LTD.**
(UEN No. 20150039K)

... Plaintiff(s)

And

(1) **DAI XUEFENG**
(PRC Passport No. ████2878)

(2) **ZHANG JUNQI**
(PRC Passport No. ████9520)

(3) **XU XINMANNI**
(PRC Passport No. ████7254)

... Defendant(s)

## <u>AFFIDAVIT</u>

I, Sun Yingtong (PRC Passport No. ████7101), care of Guotaiqixing Biomedical International (S) Pte. Ltd. of 60 Paya Lebar Road #11-01, Paya Lebar Square, Singapore 409051, do solemnly and sincerely affirm and say as follows:

1.    I am a Director of the Plaintiff and I am duly authorised to file this Affidavit on behalf of the Plaintiff in support of its application herein.

2.    Unless otherwise stated, the matters deposed to herein are within my knowledge and are true. Insofar as the matters deposed to herein are not within my knowledge, they are derived from the Plaintiff's documents and are true to the best of my information and belief.

3.   I make this Affidavit to update the Honourable Court about further information and documents that the Plaintiff has uncovered in recent days in relation to the 1st Defendant's dissipation of assets.

4.   On 1 December 2022, the Plaintiff and its solicitors were informed that the 1st Defendant's residence at 249 Cleft Rd, Mill Neck, NY 11765 USA (the "**Cleft Rd Premises**") had also recently been sold. For background, as discussed in the 5th Affidavit of Sun Yingtong annexed to the 7th Affidavit of Eugene Jedidiah Low Yeow Chin filed herein on 15 November 2022 at [42(a)] and [57(a)]:

   (a)   the Cleft Rd Premises are owned by the 1st Defendant through Daibenewise Limited ("**Daibenewise**"), a Cayman Islands company solely owned by the 1st Defendant; and

   (b)   the 1st Defendant himself accepts that he was the owner of the Cleft Rd Premises through Daibenewise.

5.   The sale of the Cleft Rd Premises was discovered by Applied Facts, a US-based investigation firm, and was reported to the Plaintiff and its solicitors by an email dated 1 December 2022 (the "**1 December 2022 AF Email**"). A copy of this email was annexed to the Plaintiff's Written Submissions for SUM 4136 filed on 1 December 2022 as **Annex C** (page 53). A copy of this email is now annexed hereto and marked "**TAB 1**" of Exhibit "**SYT-7**". Parts of the email which do not relate to the discovery of the sale of the Cleft Rd Premises have been redacted.

3

6.      On 2 December 2022, the Plaintiff and its solicitors also received an email from Applied Facts attaching copies of:

(a)     a search carried out on 1 December 2022 on TLO, a third-party database aggregator of public records (see 2nd Affidavit of Sun Yingtong filed on 16 September 2021 at [11]) (the "**TLO Search**"); and

(b)     an Indenture dated 15 September 2022 for the sale and purchase of the Cleft Rd Premises by Daibenewise to 888 Cleft Rd LLC which was recorded with the Nassau County Clerk on 28 September 2022, which Applied Facts also obtained on 1 December 2022.

A copy of the aforesaid email with attachments is annexed hereto and marked "**TAB 2**" of Exhibit "**SYT-7**".

7.      The TLO Search showed that, while the 249 Cleft Rd Premises continues to be a current address of the 1st Defendant as of 30 November 2022 (the date range stated is "*08/14/2017 to 11/30/2022*"), the "*Owner*" of the Cleft Rd Premises is 888 Cleft Rd LLC and that the "*Purchase Date*" was 15 September 2022.

8.      For the avoidance of doubt, I confirm that the Plaintiff and its solicitors were not aware of the sale of the 249 Cleft Rd Premises before receiving the 1 December 2022 AF Email, and had believed that the 249 Cleft Rd Premises continued to be owned by the 1st Defendant through Daibenewise.

4

9.   As was explained in previous Affidavits, I am based in Shenzhen city and have not been able to travel to Guangzhou to have my Affidavits affirmed personally before the Consulate-General of the Republic of Singapore due to, among other things, the COVID-19 situation in Guangzhou (see the 6th Affidavit of Sun Yingtong annexed to the 8th Affidavit of Eugene Jedidiah Low Yeow Chin filed herein on 28 November 2022 at [6] to [9]). This is the case for this Affidavit as well.

10.   Notwithstanding that I have been unable to sign my Affidavits before the Consulate-General at this time, I have confirmed the contents of, and signed, each of my Affidavits. I will have the Affidavits signed before the Consulate-General as soon as possible once the COVID-19 situation in Guangzhou improves.

Affirmed by the abovenamed          )
**SUN YINGTONG**                    )
on this 5 day of December 2022      )
in Guangzhou, People's Republic of China   )

Before Me.

**5**

This is the exhibit marked "**SYT-7**"

referred to in the

**AFFIDAVIT**

**OF**

**SUN YINGTONG**

Affirmed before me

this          day of December 2022


Before Me

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 40 of 377

**6**

This is the Tab in Exhibit "**SYT-7**" marked "**TAB 1**"

referred to in the

**AFFIDAVIT**

**OF**

**SUN YINGTONG**

**7**

| | |
|---|---|
| **From:** | ████████████ <████████@appliedfacts.com> |
| **Sent:** | Thursday, December 1, 2022 3:29 AM |
| **To:** | Eugene Low |
| **Cc:** | 'Calvin Liang'; █████████████████████ aurill@legalclinic.com.sg; ██████ ████████████████████ |
| **Subject:** | INVOICE - Dai Updates to Report █████████████████████████████ |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Hi Eugene,

████████████████████████████████████████████████████████████████████████

Also, we wanted to let you know that TLO reports that 249 Cleft Rd was sold to 888 Cleft Rd LLC on September 15, 2022. The Nassau County Assessor's Office still shows the property is owned by Daibenewise Ltd. Real estate sites like Zillow and Trulia do not report a recent sale of the property.

The only information we have on 888 Cleft Rd LLC is that it filed for registration as a domestic limited liability company in NY on May 11, 2021. It is active. Its address is 10 Bank Street, Suite 560, White Plains, NY 10606. (Nassau County)

Please advise if you would like us to perform research on this transaction and/or 888 Cleft Rd LLC.

Regards,
Stephanie

# APPLIED FACTS+

Stephanie Woodhead
Senior Managing Director
Applied Facts Group, Inc.
901 Corporate Center Drive, Suite 104
Monterey Park, CA  91754
(213) 892-8700
emailaddress@appliedfacts.com
www.appliedfacts.com

PI License 188929

Note: The information contained in this transmission, including any attachment(s) is only for the use of the intended individual(s) or entity, and may contain information that is privileged and confidential. If the reader of this message is not an intended recipient, you are hereby notified that any dissemination, distribution, disclosure, or copying of this information is unauthorized and strictly prohibited. If you have received this communication in error, please contact the sender immediately by reply email and destroy all copies of the original message.

This is the Tab in Exhibit "**SYT-7**" marked "**TAB 2**"

referred to in the

**AFFIDAVIT**

**OF**

**SUN YINGTONG**

| | |
|---|---|
| **From:** | Stephanie Woodhead <███████@appliedfacts.com> |
| **Sent:** | Friday, December 2, 2022 2:53 AM |
| **To:** | Eugene Low |
| **Cc:** | Henry Kupperman |
| **Subject:** | 249 Cleft Rd |
| **Attachments:** | XUEFENG DAI-Comprehensive-Report-202212011049.pdf; 249 Cleft Rd 9.2022 Deed.pdf |

Eugene,

Attached please find the TLO report dated December 1, 2022 and the Deed from Nassau County.

Regards,
Stephanie

# APPLIED FACTS+

Stephanie Woodhead
Senior Managing Director
Applied Facts Group, Inc.
901 Corporate Center Drive, Suite 104
Monterey Park, CA  91754
(213) 892-8700
emailaddress@appliedfacts.com
www.appliedfacts.com

PI License 188929

Note: The information contained in this transmission, including any attachment(s) is only for the use of the intended individual(s) or entity, and may contain information that is privileged and confidential. If the reader of this message is not an intended recipient, you are hereby notified that any dissemination, distribution, disclosure, or copying of this information is unauthorized and strictly prohibited. If you have received this communication in error, please contact the sender immediately by reply email and destroy all copies of the original message.

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM   INDEX NO. 152210/2024
NYSCEF **FOR LICENSED INVESTIGATOR PURPOSES ONLY**   XUEFENG DAI-Comprehensive Report 2022T20100049/2024

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 44 of 377

**10**

# Table of Contents

Subject Information ............................................................................................ 2
Potential Subject Photos (None Found) .............................................................. 2
Possible Criminal Records (None Found) ........................................................... 2
Possible Employers (2 Found) ........................................................................... 2
Address Summary (5 Found) .............................................................................. 3
Address Details (5 Found) .................................................................................. 3
Cities History (3 Found) ..................................................................................... 3
Counties History (1 Found) ................................................................................ 4
Driver's License Information (2 Found) .............................................................. 4
Professional Affiliations (None Found) ............................................................... 4
Professional Licenses (None Found) .................................................................. 4
Bankruptcy Records (None Found) ..................................................................... 4
Liens (None Found) ............................................................................................ 4
Judgments (None Found) .................................................................................... 4
Current Property Deeds (None Found) ............................................................... 5
Past Property Deeds (None Found) .................................................................... 5
Property Foreclosures (None Found) ................................................................. 5
Property Assessments (None Found) ................................................................. 5
Evictions (None Found) ...................................................................................... 5
Current Vehicle Information (None Found) .......................................................... 5
Past Vehicle Information (None Found) ............................................................... 5
FL Accidents (None Found) ................................................................................ 5
Global Watch Lists (None Found) ....................................................................... 5
US Business Affiliations (None Found) ............................................................... 5
UCC Filings (None Found) .................................................................................. 5
US Corporate Affiliations (None Found) ............................................................. 5
Aircraft Records (None Found) ........................................................................... 5
Pilot Licenses (None Found) .............................................................................. 5
Voter Registrations (None Found) ...................................................................... 5
Hunting Permits (None Found) ........................................................................... 6
Weapon Permits (None Found) ........................................................................... 6
Possible Relatives - Summary (3 Found) ........................................................... 6
Likely Associates - Summary (7 Found) ............................................................. 6
Possible Associates - Summary (14 Found) ....................................................... 6
Neighbor Phones (30 Found) .............................................................................. 6

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024
NYSCEF DOC. NO. 49
RECEIVED NYSCEF: 03/12/2024

FOR LICENSED INVESTIGATOR PURPOSES ONLY          XUEFENG DAI-Comprehensive Report-20221201049

11

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 45 of 377

**Important:**

**ONLINE REPORT**

This is NOT a CONSUMER REPORT and does not constitute a "consumer report" under the Fair Credit Reporting Act ("FCRA"). This report may not be used to determine the eligibility for credit, insurance, employment or any other purpose regulated under the FCRA.

This system may be used only in accordance with your Subscriber Agreement, the Gramm-Leach-Bliley Act ("GLBA"), the Driver's Privacy Protection Act ("DPPA") and all other applicable laws.   User agrees to having knowledge of all applicable laws pertaining to the usage of data.  User accepts all responsibility civilly and criminally for any use of this system.

Violations of these restrictions or misuse of this system will cause your access to be terminated and will cause an immediate investigation.

## Comprehensive Report

**Comprehensive Report**
**Date:** 12/01/2022
Reference ID: **220621-1**

Report Legend

D - Deceased Person

Relatives
S > - 1st Degree of Separation
S >> - 2nd Degree of Separation
S >>> - 3rd Degree of Separation

## Subject Information

(Best Information for Subject)

Name: XUEFENG DAI (10/22/2015 to 10/03/2022)
Date of Birth: **10/04/1975**, Born **47 years ago**
SSN: 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

Other Individuals Observed with shared SSN: **None**

**Other Names Associated with Subject**
 None found

**Other DOBs Associated with Subject**
None found

**Possible Phones Associated with Subject:**
(516) 922-3896 (ET) (LandLine) (86%)
(929) 288-0725 (ET) (Mobile) (78%)
(516) 487-0964 (ET) (ActiveLandLine) (66%)
(516) 628-1286 (ET) (LandLine) (66%)
(929) 227-4532 (ET) (LandLine) (66%)
(929) 282-3699 (ET) (Mobile) (66%)
(929) 259-1229 (ET) (Mobile) (26%)
(646) 709-6552 (ET) (Mobile) (12%)

## Indicators

Bankruptcies: **No**
Liens: **No**
Judgments: **No**
Properties: **No**
Corporate Affiliations: **No**
Criminal/Traffic: **No**
Global Watch Lists Match: **No**

**Email Addresses Associated with Subject**
None found

## Potential Subject Photos (None Found)

## Possible Criminal Records (None Found)

## Possible Employers (2 Found)

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024
NYSCEF DOC. NO. 4 FOR LICENSED INVESTIGATOR PURPOSES ONLY
XUEFENG DAI-Comprehensive Report-2022T201104 RECEIVED NYSCEF: 03/12/2024
Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 46 of 377

12

Business Name: **KHAN FUNDS MANAGEMENT (09/01/2016)**
Phone: **(929) 282-3699 (ET) KHAN FUNDS MANAGEMENT**

Business Name: **KHAN FUNDS MANAGEMENT AMERICA (08/30/2016)**


## Address Summary (5 Found)

249 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY) (08/14/2017 to 11/30/2022)
43 CENTRE VIEW DR, OYSTER BAY, NY 11771-2815 (NASSAU COUNTY) (05/10/2016 to 10/03/2022)
251 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY) (06/2017 to 10/2017)
43 CENTRAL AVE, GLEN COVE, NY 11542-2904 (NASSAU COUNTY) (12/31/2016 to 01/01/2017)
31 MAPLE DR, GREAT NECK, NY 11021-1239 (NASSAU COUNTY) (10/22/2015 to 05/09/2016)


## Address Details (5 Found)


**249 CLEFT RD, MILL NECK NY 11765-1003 (NASSAU COUNTY)** (08/14/2017 to 11/30/2022) [ Back to Summary ]
  Address contains: **2 units**
  Owner:
    **888 CLEFT RD LLC**
  Purchase Date: **09/15/2022**
  Assessed Value: **$6,629**
  Living Square Feet: **16,434**
  Land Square Feet: **222,156**

**43 CENTRE VIEW DR, OYSTER BAY NY 11771-2815 (NASSAU COUNTY)** (05/10/2016 to 10/03/2022) [ Back to Summary ]
  Current Private Phone at address
    **(516) 624-4954(ET) - YARAGHI, ARASH**
  Subject's Phone
    **(516) 628-1286(ET) - DAI, XUEFENG**
  Owners:
    **ARMEN AVETISIAN** [ View Person Record ]
    **ASMIK AVETISIAN** [ View Person Record ]
  Purchase Date: **08/06/2021**
  Purchase Price: **$2,050,000**
  Assessed Value: **$2,321**
  Living Square Feet: **7,123**
  Land Square Feet: **96,703**

**251 CLEFT RD, MILL NECK NY 11765-1003 (NASSAU COUNTY)** (06/2017 to 10/2017) [ Back to Summary ]

**43 CENTRAL AVE, GLEN COVE NY 11542-2904 (NASSAU COUNTY)** (12/31/2016 to 01/01/2017) [ Back to Summary ]

**31 MAPLE DR, GREAT NECK NY 11021-1239 (NASSAU COUNTY)** (10/22/2015 to 05/09/2016) [ Back to Summary ]
  Owner:
    **XIU MIN WU** [ View Person Record ]
  Purchase Date: **07/15/2008**
  Purchase Price: **$970,000**
  Assessed Value: **$1,266**
  Living Square Feet: **2,562**
  Land Square Feet: **7,500**


## Cities History (3 Found)

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024

NYSCEF DOC. NO. 13
FOR LICENSED INVESTIGATOR PURPOSES ONLY
XUEFENG DAI-Comprehensive Report-2022T2010049
RECEIVED NYSCEF: 03/12/2024

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 47 of 377

13

OYSTER BAY, NY (NASSAU COUNTY)  (05/10/2016 to 10/03/2022)
MILL NECK, NY (NASSAU COUNTY)  (06/2017 to 11/30/2022)
GREAT NECK, NY (NASSAU COUNTY)  (10/22/2015 to 05/09/2016)

## Counties History (1 Found)

NASSAU, NY (10/22/2015 to 11/30/2022)

## Driver's License Information (2 Found)

XUEFENG DAI
6300 RIVERSIDE DR, PARKLAND, FL 33067-5001 (BROWARD COUNTY)
DL#: XXXX-XXX-XX-XXX-X
Issuing State: **FL**
License Type: **CLASS E**
Original Issue Date: **10/13/2020**
Issue Date: **10/13/2020**
Expiration Date: **03/23/2022**
Out Of State License: **NY xxxx-xxx-xx-xxx-x**
Date of Birth: **XX/XX/1975** , Born **47** years ago
Gender: **Male**
Race: **Asian**
Height: **5'5"**
Privacy Flag: **T**

XUEFENG DAI
249 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
DL#: XXXX-XXX-XX-XXX-X
DL State: **NY**
Reported Date: **09/16/2020**
Date of Birth: **XX/XX/1975** , Born **47** years ago

## Professional Affiliations (None Found)

## Professional Licenses (None Found)

## Bankruptcy Records (None Found)

## Liens (None Found)

## Judgments (None Found)

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM          INDEX NO. 152210/2024

NYSCEF DOC. NO. 14    FOR LICENSED INVESTIGATOR PURPOSES ONLY    XUEFENG DAI-Comprehensive Report-2022T201104    RECEIVED NYSCEF: 03/12/2024

**14**

**Current Property Deeds (None Found)**

**Past Property Deeds (None Found)**

**Property Foreclosures (None Found)**

**Property Assessments (None Found)**

**Evictions (None Found)**

**Current Vehicle Information (None Found)**

**Past Vehicle Information (None Found)**

**FL Accidents (None Found)**

**Global Watch Lists (None Found)**

**US Business Affiliations (None Found)**

**UCC Filings (None Found)**

**US Corporate Affiliations (None Found)**

**Aircraft Records (None Found)**

**Pilot Licenses (None Found)**

**Voter Registrations (None Found)**

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024
NYSCEF FOR LICENSED INVESTIGATOR PURPOSES ONLY
XUEFENG DAI-Comprehensive Report-2022T2010049
Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 49 of 377

**15**

**Hunting Permits (None Found)**


**Weapon Permits (None Found)**


**Possible Relatives - Summary (3 Found)**


> XUEFENG DAI
> XUEFENG DAI
>> XUEFENG DAI


**Likely Associates - Summary (7 Found)**


**LINNAN ZHAO** 1985 Age: 37
**XINMANNI XU** 1984 Age: 38
**XIAYU LIU**
**XIAYU LIU**
**HANLI WANG**
**JING WANG**
**GUOLI WANG**


**Possible Associates - Summary (14 Found)**


**PATRYK O ROGOWSKI** 1992 Age: 30
**MIROSLAW R ROGOWSKI** 1964 Age: 58
**ALINA W ROGOWSKI** 1970 Age: 51
**XINMANNI XU**
**XINMANNI XU**
**JUNQI ZHANG** 1985 Age: 37
**ALICE ZHANG** 1985 Age: 37
**ANTONELLA R RIVARA** 1960 Age: 62
**ANTHONY F RIVARA** 1950 Age: 72
**ANTHONY EUGENIO RIVARA SR** 1982 Age: 40
**XIAYU LIU** 1974 Age: 48
**LINNAN ZHAO**
**LORRAINE L MUELLER** 1956 Age: 66
**BARBARA A PFISTERER** 1985 Age: 37


**Neighbor Phones (30 Found)**


Neighbors' Phones for 249 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)( 08/14/2017 to 11/30/2022)

   251 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
**(516) 922-9051 (ET)- ROGOWSKI, MIROSLAW**
MIROSLAW ROGOWSKI [ View Person Record ]  Age: 58

   244 CLEFT RD, MILL NECK, NY 11765-1001 (NASSAU COUNTY)
**(516) 922-2911 (ET)- GLANZBERG, MICHAEL**
MICHAEL GLANZBERG [ View Person Record ]  Age: 52

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM INDEX NO. 152210/2024
NYSCEF **FOR LICENSED INVESTIGATOR PURPOSES ONLY** XUEFENG DAI-Comprehensive Report 2022 2011:04:12/2024

Case 1:24-cv-03142-UA Document 1-4 Filed 04/24/24 Page 50 of 377

**16**

242 CLEFT RD, MILL NECK, NY 11765-1001 (NASSAU COUNTY)
**(516) 922-1321 (ET)- NAVESKY, ROBERT**
[D] ROBERT NAVESKY [ View Person Record ]  Age: 88

239 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
**(516) 922-3016 (ET)- KOUFAKIS, SHAILJA    (516) 922-5395 (ET)- KOUFAKIS, SHAILJA**
SHAILJA KOUFAKIS [ View Person Record ]  Age: 63

237 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
**(516) 802-4154 (ET)- DEFRANCESCH, B**
B DEFRANCESCH [ View Person Record ]  Age: 61

236 CLEFT RD, MILL NECK, NY 11765-1001 (NASSAU COUNTY)
**(516) 922-2325 (ET)- DITKOFF, ROBERT DR**
ROBERT DITKOFF DR [ View Person Record ]  Age: 73

235 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
**(516) 922-3709 (ET)- SHAIKH, FEROZA**
FEROZA SHAIKH [ View Person Record ]  Age: 72

233 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
**(516) 624-7434 (ET)- SMITH, THEODORE**
THEODORE SMITH [ View Person Record ]  Age: 89

222 CLEFT RD, MILL NECK, NY 11765-1001 (NASSAU COUNTY)
**(516) 922-4631 (ET)- WILLIAM, WILLIAM**
WILLIAM WILLIAM


Neighbors' Phones for 43 CENTRE VIEW DR, OYSTER BAY, NY 11771-2815 (NASSAU COUNTY)( 05/10/2016 to 10/03/2022)

43 CENTRE VIEW DR, OYSTER BAY, NY 11771-2815 (NASSAU COUNTY)
**(516) 624-4954 (ET)- YARAGHI, ARASH**
ARASH YARAGHI [ View Person Record ]  Age: 64

37 CENTRE VIEW DR, OYSTER BAY, NY 11771-2815 (NASSAU COUNTY)
**(516) 922-0424 (ET)- HABIBI, KARIM**
KARIM HABIBI [ View Person Record ]  Age: 61

51 CENTRE VIEW DR, OYSTER BAY, NY 11771-2815 (NASSAU COUNTY)
**(516) 624-6963 (ET)- RESZELBACH, W & B**
W RESZELBACH [ View Person Record ]  Age: 72

51 CENTRE VIEW DR, OYSTER BAY, NY 11771-2815 (NASSAU COUNTY)
**(516) 624-6963 (ET)- RESZELBACH, W & B**
B RESZELBACH

55 CENTRE VIEW DR, OYSTER BAY, NY 11771-2815 (NASSAU COUNTY)
**(516) 922-6356 (ET)- SMOLINSKY, RONALD**
RONALD SMOLINSKY [ View Person Record ]  Age: 75

31 CENTRE VIEW DR, OYSTER BAY, NY 11771-2815 (NASSAU COUNTY)
**(516) 624-6760 (ET)- TCHILINGUIRIN, LEVON    (516) 922-0929 (ET)- TCHILINGUIRIN, LEVON**
LEVON TCHILINGUIRIN [ View Person Record ]  Age: 83

27 CENTRE VIEW DR, OYSTER BAY, NY 11771-2815 (NASSAU COUNTY)
**(516) 624-2813 (ET)- MIRODDI, JOHN J**
JOHN J MIRODDI [ View Person Record ]  Age: 77

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM   INDEX NO. 152210/2024
NYSCEF DOC. NO. FOR LICENSED INVESTIGATOR PURPOSES ONLY   XUEFENG DAI-Comprehensive Report-2022T201104 RECEIVED NYSCEF: 03/12/2024

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 51 of 377

17

21 CENTRE VIEW DR, OYSTER BAY, NY 11771-2815 (NASSAU COUNTY)
**(516) 624-0013 (ET)- STERN, ALAN**
ALAN STERN [ View Person Record ]  Age: 72

10 CENTRE VIEW DR, OYSTER BAY, NY 11771-2813 (NASSAU COUNTY)
**(516) 624-8561 (ET)- MARINO, J RICHARD**
J RICHARD MARINO [ View Person Record ]  Age: 80


Neighbors' Phones for 251 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)( 06/2017 to 10/2017)

251 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
**(516) 922-9051 (ET)- ROGOWSKI, MIROSLAW**
MIROSLAW ROGOWSKI [ View Person Record ]  Age: 58

244 CLEFT RD, MILL NECK, NY 11765-1001 (NASSAU COUNTY)
**(516) 922-2911 (ET)- GLANZBERG, MICHAEL**
MICHAEL GLANZBERG [ View Person Record ]  Age: 52

242 CLEFT RD, MILL NECK, NY 11765-1001 (NASSAU COUNTY)
**(516) 922-1321 (ET)- NAVESKY, ROBERT**
**D**      ROBERT NAVESKY [ View Person Record ]  Age: 88

239 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
**(516) 922-3016 (ET)- KOUFAKIS, SHAILJA    (516) 922-5395 (ET)- KOUFAKIS, SHAILJA**
SHAILJA KOUFAKIS [ View Person Record ]  Age: 63

237 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
**(516) 802-4154 (ET)- DEFRANCESCH, B**
B DEFRANCESCH [ View Person Record ]  Age: 61

236 CLEFT RD, MILL NECK, NY 11765-1001 (NASSAU COUNTY)
**(516) 922-2325 (ET)- DITKOFF, ROBERT DR**
ROBERT DITKOFF DR [ View Person Record ]  Age: 73

235 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
**(516) 922-3709 (ET)- SHAIKH, FEROZA**
FEROZA SHAIKH [ View Person Record ]  Age: 72

233 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
**(516) 624-7434 (ET)- SMITH, THEODORE**
THEODORE SMITH [ View Person Record ]  Age: 89

222 CLEFT RD, MILL NECK, NY 11765-1001 (NASSAU COUNTY)
**(516) 922-4631 (ET)- WILLIAM, WILLIAM**
WILLIAM WILLIAM

**** Electronically Filed Document ****                    **18**

Instrument Number: **2022-97898**

Recorded As:        **EX-D01 - RESIDENTIAL**

Recorded On:        **September 28, 2022**

Recorded At:        **11:23:31 am**              Receipt Number:     **2707456**

Number of Pages:    **6**                        Processed By:       **001 KS**

Book-VI/Pg:         **Bk-D  VI-14303  Pg-395**

Total Rec Fee(s):   **$510.00**

** Examined and Charged as Follows **

| 01 - RESIDENTIAL DEED | $ 70.00 | EX-Blocks - Deeds - $300 | | $ 300.00 | EX-DN - DEED NOTIFICATION | $ 10.00 |
|---|---|---|---|---|---|---|
| EX-RP5217 Residential Fee | $ 125.00 | EX-TP-584 Affidavit Fee | | $ 5.00 | | |

| | Tax Amount | Consid Amt | RS#/CS# | | |
|---|---|---|---|---|---|
| Tax-Transfer | $ 0 | $ 0 | RE 4945 | Basic | $ 0.00 |
| OYSTER BAY | | | | Local NY CITY | $ 0.00 |
| EXEMPT | | | | Additional MTA | $ 0.00 |
| | | | | Spec ASST | $ 0.00 |
| | | | | Spec ADDL SONYMA | $ 0.00 |
| | | | | Transfer | $ 0.00 |
| Tax Charge: | $ 0 | | | | |

Property Information:

| Section | Block | Lot | Unit | Town Name |
|---|---|---|---|---|
| 29 | L | 666 | | OYSTER BAY |
| 29 | L | 668 | | OYSTER BAY |
| 29 | L | 669 | | OYSTER BAY |
| 29 | L | 675 | | OYSTER BAY |

***********THIS PAGE IS PART OF THE INSTRUMENT ************

Any provision herein which restricts the Sale, Rental or use of the described REAL PROPERTY
because of color or race is invalid and unenforceable under federal law.



*Maureen O'Connell*

**County Clerk Maureen O'Connell**

First American Title
Insurance Company **9**
666 Third Avenue  5th fl
New York, N.Y. 10017
Phone: (212) 922-9700
Fax: (212) 922-0881

**Bargain and Sale Deed, with Covenants against Grantor's Acts – Individual or Corporation.**
CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT – THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY.

THIS INDENTURE, made as of the ___15___ day of September, 2022          *3020-1054476*

BETWEEN

**DAIBENEWISE LIMITED**, with an address at 249 Cleft Road, Mill Neck, NY 11765, party of the first part, and

**888 CLEFT RD LLC**, with an address at 249 Cleft Road, Mill Neck, NY 11765, party of the second part,

WITNESSETH, that the party of the first part, in consideration of ten dollars and other valuable consideration paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the County of Nassau and the State of New York, and more particularly described on Schedule A attached hereto.

Section:      29
Block:        L
Lots:         666, 668, 669 & 675

Being the same premises conveyed to the party of the first part herein by deed recorded on January 10, 2017 in(as) Liber 13460 Cp 658, Instrument No. 2017-00003086.

TOGETHER with all right, title and interest, if any, of the party of the first part, in and to any streets and roads abutting the above-described premises to the center lines thereof; TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises; TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

AND the party of the first part covenants that the party of the first part has not done or suffered anything whereby the said premises have been encumbered in any way whatever, except as aforesaid.

AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

[SIGNATURE ON FOLLOWING PAGE]

22733119.2

IN WITNESS WHEREOF, the party of the first part has duly executed this deed as of the day and year first above written.

IN PRESENCE OF

DAIBENEWISE LIMITED

_____
Witness

By_____
Name: Xuefeng Dai
Title: Director

Sep/15/2022

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 55 of 377

**21**

STATE OF   *FLORIDA*          )
                                        ) SS:
COUNTY OF   *BROWARD*     )


On the ___15___ day of ___SEPTEMBER___, in the year 2022, before me, the undersigned, personally appeared ___XUEFENG1 DAI___ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is(are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s) or the person(s) upon behalf of which the individual(s) acted, executed the instrument.

*FLDL00009407S3640* ✓

*TITAS BOSE*

_____

NOTARY PUBLIC

TITAS BOSE
Notary Public - State of Florida
Commission # HH 240545
My Comm. Expires Mar 14, 2026
Bonded through National Notary Assn.

22733119.2



**Title No. 3020-1054476**

## SCHEDULE "A"

ALL THAT CERTAIN PLOT PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING IN THE VILLAGE OF MILL NECK, TOWN OF OYSTER BAY, COUNTY OF NASSAU AND STATE OF NEW YORK, AND BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY SIDE OF CLEFT ROAD, AT THE EXTREME WESTERLY END OF THE ARC CONNECTING THE NORTHERLY SIDE OF CLEFT ROAD WITH THE WESTERLY SIDE OF WEST SHORE ROAD;

RUNNING THENCE ALONG THE NORTHERLY, NORTHEASTERLY AND EASTERLY SIDE OF CLEFT ROAD THE FOLLOWING FOURTEEN (14) COURSES AND DISTANCES:

(1) SOUTH 62° 10' 20" WEST 71.95 FEET;

(2) THENCE SOUTH 59° 57' 20" WEST 127.84 FEET;

(3) THENCE SOUTH 53° 58' 20" WEST 152.30 FEET;

(4) THENCE SOUTH 57° 04' 20" WEST 156.78 FEET;

(5) THENCE ALONG THE ARC OF A CIRCLE BEARING TO THE RIGHT THE RADIUS OF WHICH IS 328.50 FEET A DISTANCE ALONG SAID ARC OF 119.06 FEET;

(6) RUNNING THENCE SOUTH 77° 50' 20" WEST 161.13 FEET;

(7) THENCE SOUTH 70° 38' 20" WEST 132.50 FEET;

(8) THENCE ALONG THE ARC OF A CIRCLE BEARING TO THE LEFT THE RADIUS OF WHICH IS 676.50 FEET A DISTANCE ALONG SAID ARC OF 143.46 FEET;

(9) THENCE ALONG THE ARC OF A CIRCLE BEARING TO THE RIGHT THE RADIUS WHICH IS 197.33 FEET A DISTANCE ALONG SAID ARC OF 259.28 FEET;

(10) RUNNING THENCE NORTH 46° 13' 40" WEST 81.92 FEET;

(11) THENCE NORTH 38° 05' 40" WEST 181.72 FEET;

(12) THENCE NORTH 34° 59' 40" WEST 120.45 FEET;

(13) THENCE NORTH 21° 25' 40" WEST 185.50 FEET; AND

(14) THENCE NORTH 07° 34' 40" WEST 45.91 FEET TO THE SOUTHWEST CORNER OF LAND NOW OR FORMERLY OF KEATING;

THENCE ALONG LAND NOW OR FORMERLY OF KEATING THE FOLLOWING THREE (3) COURSES AND DISTANCES:

(1) NORTH 69° 51' EAST 448.20 FEET TO A STONE MONUMENT;

(2) NORTH 60° 12' EAST 556.81 FEET; AND

CONTINUED...

**23**



TITLE NO. 3020-1054476
SCHEDULE "A" CONTINUED

(3) NORTH 80° 07' 30" EAST 4.55 FEET TO THE NORTHWEST CORNER OF LAND OF GILLMORE, FORMERLY WORK;

THENCE ALONG LAND OF GILLMORE FORMERLY OF WORK THE FOLLOWING THREE (3) COURSES AND DISTANCES:

(1) SOUTH 12° 58' EAST 419.90 FEET;

(2) NORTH 83° 07' EAST 111.96 FEET; AND

(3) NORTH 68° 38' EAST 286.22 FEET TO THE WESTERLY SIDE OF WEST SHORE ROAD;

THENCE ALONG THE WESTERLY SIDE OF WEST SHORE ROAD A COURSE SOUTH 35° 00' 30" EAST 231.69 FEET TO THE EXTREME NORTHERLY END OF THE ARC CONNECTING THE WESTERLY SIDE OF WEST SHORE ROAD WITH THE NORTHERLY SIDE OF CLEFT ROAD; AND

RUNNING THENCE ALONG THE ARC OF A CIRCLE BEARING TO THE RIGHT THE RADIUS OF WHICH IS 25 FEET A DISTANCE ALONG SAID ARC OF 42.36 FEET TO THE NORTHERLY SIDE OF CLEFT ROAD AT THE POINT OR PLACE OF BEGINNING.

**THE** policy to be issued under this report will insure the title to such buildings and improvements erected on the premises, which by law constitute real property.

**FOR CONVEYANCING ONLY: TOGETHER** with all the right, title and interest of the party of the first part, of in and to the land lying in the street in front of and adjoining said premises.

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
NYSCEF DOC. NO. 15
INDEX NO. 152210/2024
RECEIVED NYSCEF: 03/12/2024

This is the exhibit marked "**EJLYC-12**"

referred to in the

**AFFIDAVIT**

**OF**

**EUGENE JEDIDIAH LOW YEOW CHIN**

Sworn before me

this 5th day of December 2022

Before Me

**A COMMISSIONER FOR OATHS**

7th: Sun Yingtong: Plaintiff:        .12.2022

## IN THE GENERAL DIVISION OF THE
## HIGH COURT OF THE REPUBLIC OF SINGAPORE

HC/S 1027/2020
HC/SUM 4136/2022

Between

**GUOTAIQIXING BIOMEDICAL INTERNATIONAL (S) PTE. LTD.**
(UEN No. 20150039K)

... Plaintiff(s)

And

(1) **DAI XUEFENG**
(PRC Passport No. ███2878)

(2) **ZHANG JUNQI**
(PRC Passport No. ███9520)

(3) **XU XINMANNI**
(PRC Passport No. ███7254)

... Defendant(s)

## AFFIDAVIT

I, Sun Yingtong (PRC Passport No. ███7101), care of Guotaiqixing Biomedical International (S) Pte. Ltd. of 60 Paya Lebar Road #11-01, Paya Lebar Square, Singapore 409051, do solemnly and sincerely affirm and say as follows:

1.   I am a Director of the Plaintiff and I am duly authorised to file this Affidavit on behalf of the Plaintiff in support of its application herein.

2.   Unless otherwise stated, the matters deposed to herein are within my knowledge and are true. Insofar as the matters deposed to herein are not within my knowledge, they are derived from the Plaintiff's documents and are true to the best of my information and belief.

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM INDEX NO. 152210/2024
NYSCEF DOC. NO. 15 RECEIVED NYSCEF: 03/12/2024
Case 1:24-cv-03142-UA Document 1-4 Filed 04/24/24 Page 60 of 377

2

3.  I make this Affidavit to update the Honourable Court about further information and documents that the Plaintiff has uncovered in recent days in relation to the 1st Defendant's dissipation of assets.

4.  On 1 December 2022, the Plaintiff and its solicitors were informed that the 1st Defendant's residence at 249 Cleft Rd, Mill Neck, NY 11765 USA (the "**Cleft Rd Premises**") had also recently been sold. For background, as discussed in the 5th Affidavit of Sun Yingtong annexed to the 7th Affidavit of Eugene Jedidiah Low Yeow Chin filed herein on 15 November 2022 at [42(a)] and [57(a)]:

    (a)  the Cleft Rd Premises are owned by the 1st Defendant through Daibenewise Limited ("**Daibenewise**"), a Cayman Islands company solely owned by the 1st Defendant; and

    (b)  the 1st Defendant himself accepts that he was the owner of the Cleft Rd Premises through Daibenewise.

5.  The sale of the Cleft Rd Premises was discovered by Applied Facts, a US-based investigation firm, and was reported to the Plaintiff and its solicitors by an email dated 1 December 2022 (the "**1 December 2022 AF Email**"). A copy of this email was annexed to the Plaintiff's Written Submissions for SUM 4136 filed on 1 December 2022 as **Annex C** (page 53). A copy of this email is now annexed hereto and marked "**TAB 1**" of Exhibit "**SYT-7**". Parts of the email which do not relate to the discovery of the sale of the Cleft Rd Premises have been redacted.

6.      On 2 December 2022, the Plaintiff and its solicitors also received an email from
Applied Facts attaching copies of:

(a)      a search carried out on 1 December 2022 on TLO, a third-party database
aggregator of public records (see 2nd Affidavit of Sun Yingtong filed on 16
September 2021 at [11]) (the "**TLO Search**"); and

(b)      an Indenture dated 15 September 2022 for the sale and purchase of the Cleft
Rd Premises by Daibenewise to 888 Cleft Rd LLC which was recorded with
the Nassau County Clerk on 28 September 2022, which Applied Facts also
obtained on 1 December 2022.

A copy of the aforesaid email with attachments is annexed hereto and marked "**TAB
2**" of Exhibit "**SYT-7**".

7.      The TLO Search showed that, while the 249 Cleft Rd Premises continues to be a
current address of the 1st Defendant as of 30 November 2022 (the date range stated
is "*08/14/2017 to 11/30/2022*"), the "*Owner*" of the Cleft Rd Premises is 888 Cleft Rd
LLC and that the "*Purchase Date*" was 15 September 2022.

8.      For the avoidance of doubt, I confirm that the Plaintiff and its solicitors were not
aware of the sale of the 249 Cleft Rd Premises before receiving the 1 December
2022 AF Email, and had believed that the 249 Cleft Rd Premises continued to be
owned by the 1st Defendant through Daibenewise.

4

9. As was explained in previous Affidavits, I am based in Shenzhen city and have not been able to travel to Guangzhou to have my Affidavits affirmed personally before the Consulate-General of the Republic of Singapore due to, among other things, the COVID-19 situation in Guangzhou (see the 6th Affidavit of Sun Yingtong annexed to the 8th Affidavit of Eugene Jedidiah Low Yeow Chin filed herein on 28 November 2022 at [6] to [9]). This is the case for this Affidavit as well.

10. Notwithstanding that I have been unable to sign my Affidavits before the Consulate-General at this time, I have confirmed the contents of, and signed, each of my Affidavits. I will have the Affidavits signed before the Consulate-General as soon as possible once the COVID-19 situation in Guangzhou improves.

Affirmed by the abovenamed        )
**SUN YINGTONG**                  )
on this 5 day of December 2022    )
in Guangzhou, People's Republic of China   )

Before Me.

This is the exhibit marked "**SYT-7**"

referred to in the

**AFFIDAVIT**

**OF**

**SUN YINGTONG**

Affirmed before me

this          day of December 2022


Before Me

This is the Tab in Exhibit "**SYT-7**" marked "**TAB 1**"

referred to in the

**AFFIDAVIT**

**OF**

**SUN YINGTONG**

**FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM**
INDEX NO. 152210/2024
NYSCEF DOC. NO. 15
Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 65 of 377
RECEIVED NYSCEF: 03/12/2024

7

| | |
|---|---|
| **From:** | ████████████ <████████@appliedfacts.com> |
| **Sent:** | Thursday, December 1, 2022 3:29 AM |
| **To:** | Eugene Low |
| **Cc:** | 'Calvin Liang'; ████████████████ aurill@legalclinic.com.sg; ████ ████████████████ |
| **Subject:** | INVOICE - Dai Updates to Report |

███████████████████████████████

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Hi Eugene,

████████████████████████████████████████████████████████████████

Also, we wanted to let you know that TLO reports that 249 Cleft Rd was sold to 888 Cleft Rd LLC on September 15, 2022. The Nassau County Assessor's Office still shows the property is owned by Daibenewise Ltd. Real estate sites like Zillow and Trulia do not report a recent sale of the property.

The only information we have on 888 Cleft Rd LLC is that it filed for registration as a domestic limited liability company in NY on May 11, 2021. It is active. Its address is 10 Bank Street, Suite 560, White Plains, NY 10606. (Nassau County)

Please advise if you would like us to perform research on this transaction and/or 888 Cleft Rd LLC.

Regards,
Stephanie


# APPLIED
# FACTS+

Stephanie Woodhead
Senior Managing Director
Applied Facts Group, Inc.
901 Corporate Center Drive, Suite 104
Monterey Park, CA  91754
(213) 892-8700
emailaddress@appliedfacts.com
www.appliedfacts.com

PI License 188929

Note: The information contained in this transmission, including any attachment(s) is only for the use of the intended individual(s) or entity, and may contain information that is privileged and confidential. If the reader of this message is not an intended recipient, you are hereby notified that any dissemination, distribution, disclosure, or copying of this information is unauthorized and strictly prohibited. If you have received this communication in error, please contact the sender immediately by reply email and destroy all copies of the original message.

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 66 of 377

**8**

This is the Tab in Exhibit "**SYT-7**" marked "**TAB 2**"

referred to in the

**AFFIDAVIT**

**OF**

**SUN YINGTONG**

**9**

| | |
|---|---|
| **From:** | Stephanie Woodhead <▇▇▇▇▇@appliedfacts.com> |
| **Sent:** | Friday, December 2, 2022 2:53 AM |
| **To:** | Eugene Low |
| **Cc:** | Henry Kupperman |
| **Subject:** | 249 Cleft Rd |
| **Attachments:** | XUEFENG DAI-Comprehensive-Report-202212011049.pdf; 249 Cleft Rd 9.2022 Deed.pdf |

Eugene,

Attached please find the TLO report dated December 1, 2022 and the Deed from Nassau County.

Regards,
Stephanie


# APPLIED
# FACTS+

Stephanie Woodhead
Senior Managing Director
Applied Facts Group, Inc.
901 Corporate Center Drive, Suite 104
Monterey Park, CA  91754
(213) 892-8700
emailaddress@appliedfacts.com
www.appliedfacts.com

PI License 188929

Note: The information contained in this transmission, including any attachment(s) is only for the use of the intended individual(s) or entity, and may contain information that is privileged and confidential. If the reader of this message is not an intended recipient, you are hereby notified that any dissemination, distribution, disclosure, or copying of this information is unauthorized and strictly prohibited. If you have received this communication in error, please contact the sender immediately by reply email and destroy all copies of the original message.

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024
NYSCEF DOC. NO. 4
FOR LICENSED INVESTIGATOR PURPOSES ONLY
XUEFENG DAI-Comprehensive Report-20221201004
RECEIVED NYSCEF: 03/12/2024

Case 1:24-cv-03142-JA   Document 1-4   Filed 04/24/24   Page 68 of 377

10

# Table of Contents

Subject Information .................................................................................... 2
Potential Subject Photos (None Found) ......................................................... 2
Possible Criminal Records (None Found) ....................................................... 2
Possible Employers (2 Found) ...................................................................... 2
Address Summary (5 Found) ........................................................................ 3
Address Details (5 Found) ........................................................................... 3
Cities History (3 Found) .............................................................................. 3
Counties History (1 Found) .......................................................................... 4
Driver's License Information (2 Found) .......................................................... 4
Professional Affiliations (None Found) ........................................................... 4
Professional Licenses (None Found) .............................................................. 4
Bankruptcy Records (None Found) ................................................................ 4
Liens (None Found) ..................................................................................... 4
Judgments (None Found) ............................................................................. 4
Current Property Deeds (None Found) ........................................................... 5
Past Property Deeds (None Found) ............................................................... 5
Property Foreclosures (None Found) ............................................................. 5
Property Assessments (None Found) ............................................................. 5
Evictions (None Found) ............................................................................... 5
Current Vehicle Information (None Found) ...................................................... 5
Past Vehicle Information (None Found) ........................................................... 5
FL Accidents (None Found) ........................................................................... 5
Global Watch Lists (None Found) .................................................................. 5
US Business Affiliations (None Found) ............................................................ 5
UCC Filings (None Found) ............................................................................ 5
US Corporate Affiliations (None Found) .......................................................... 5
Aircraft Records (None Found) ...................................................................... 5
Pilot Licenses (None Found) ......................................................................... 5
Voter Registrations (None Found) ................................................................. 5
Hunting Permits (None Found) ...................................................................... 6
Weapon Permits (None Found) ...................................................................... 6
Possible Relatives - Summary (3 Found) ........................................................ 6
Likely Associates - Summary (7 Found) .......................................................... 6
Possible Associates - Summary (14 Found) ..................................................... 6
Neighbor Phones (30 Found) ........................................................................ 6

**Important:**

<span style="color:blue">**ONLINE REPORT**</span>

This is NOT a CONSUMER REPORT and does not constitute a "consumer report" under the Fair Credit Reporting Act ("FCRA"). This report may not be used to determine the eligibility for credit, insurance, employment or any other purpose regulated under the FCRA.

This system may be used only in accordance with your Subscriber Agreement, the Gramm-Leach-Bliley Act ("GLBA"), the Driver's Privacy Protection Act ("DPPA") and all other applicable laws. User agrees to having knowledge of all applicable laws pertaining to the usage of data. User accepts all responsibility civilly and criminally for any use of this system.

Violations of these restrictions or misuse of this system will cause your access to be terminated and will cause an immediate investigation.

# Comprehensive Report

**Comprehensive Report**
**Date:** 12/01/2022
Reference ID: **220621-1**

**Report Legend**

D - Deceased Person

Relatives

S > - 1st Degree of Separation
S >> - 2nd Degree of Separation
S >>> - 3rd Degree of Separation

## Subject Information

(Best Information for Subject)

Name: XUEFENG DAI (10/22/2015 to 10/03/2022)
Date of Birth: **10/04/1975**, Born **47** years ago
SSN: 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

Other Individuals Observed with shared SSN: **None**

**Other Names Associated with Subject**
None found

**Other DOBs Associated with Subject**
None found

**Possible Phones Associated with Subject:**
(516) 922-3896 (ET) (LandLine) (86%)
(929) 288-0725 (ET) (Mobile) (78%)
(516) 487-0964 (ET) (ActiveLandLine) (66%)
(516) 628-1286 (ET) (LandLine) (66%)
(929) 227-4532 (ET) (LandLine) (66%)
(929) 282-3699 (ET) (Mobile) (66%)
(929) 259-1229 (ET) (Mobile) (26%)
(646) 709-6552 (ET) (Mobile) (12%)

## Indicators

Bankruptcies: **No**
Liens: **No**
Judgments: **No**
Properties: **No**
Corporate Affiliations: **No**
Criminal/Traffic: **No**
Global Watch Lists Match: **No**

**Email Addresses Associated with Subject**
None found

## Potential Subject Photos (None Found)

## Possible Criminal Records (None Found)

## Possible Employers (2 Found)

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024
NYSCEF DOC. NO. 4
RECEIVED NYSCEF: 03/12/2024

FOR LICENSED INVESTIGATOR PURPOSES ONLY
XUEFENG DAI-Comprehensive Report-20221201100449

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 70 of 377

12

Business Name: **KHAN FUNDS MANAGEMENT (09/01/2016)**
Phone: **(929) 282-3699 (ET) KHAN FUNDS MANAGEMENT**


Business Name: **KHAN FUNDS MANAGEMENT AMERICA (08/30/2016)**


## Address Summary (5 Found)

249 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY) (08/14/2017 to 11/30/2022)
43 CENTRE VIEW DR, OYSTER BAY, NY 11771-2815 (NASSAU COUNTY) (05/10/2016 to 10/03/2022)
251 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY) (06/2017 to 10/2017)
43 CENTRAL AVE, GLEN COVE, NY 11542-2904 (NASSAU COUNTY) (12/31/2016 to 01/01/2017)
31 MAPLE DR, GREAT NECK, NY 11021-1239 (NASSAU COUNTY) (10/22/2015 to 05/09/2016)


## Address Details (5 Found)


**249 CLEFT RD, MILL NECK NY 11765-1003 (NASSAU COUNTY)** (08/14/2017 to 11/30/2022) [ Back to Summary ]
  Address contains: **2 units**
  Owner:
    **888 CLEFT RD LLC**
  Purchase Date: **09/15/2022**
  Assessed Value: **$6,629**
  Living Square Feet: **16,434**
  Land Square Feet: **222,156**


**43 CENTRE VIEW DR, OYSTER BAY NY 11771-2815 (NASSAU COUNTY)** (05/10/2016 to 10/03/2022) [ Back to Summary ]
  Current Private Phone at address
    **(516) 624-4954(ET) - YARAGHI, ARASH**
  Subject's Phone
    **(516) 628-1286(ET) - DAI, XUEFENG**
  Owners:
    **ARMEN AVETISIAN** [ View Person Record ]
    **ASMIK AVETISIAN** [ View Person Record ]
  Purchase Date: **08/06/2021**
  Purchase Price: **$2,050,000**
  Assessed Value: **$2,321**
  Living Square Feet: **7,123**
  Land Square Feet: **96,703**


**251 CLEFT RD, MILL NECK NY 11765-1003 (NASSAU COUNTY)** (06/2017 to 10/2017) [ Back to Summary ]


**43 CENTRAL AVE, GLEN COVE NY 11542-2904 (NASSAU COUNTY)** (12/31/2016 to 01/01/2017) [ Back to Summary ]


**31 MAPLE DR, GREAT NECK NY 11021-1239 (NASSAU COUNTY)** (10/22/2015 to 05/09/2016) [ Back to Summary ]
  Owner:
    **XIU MIN WU** [ View Person Record ]
  Purchase Date: **07/15/2008**
  Purchase Price: **$970,000**
  Assessed Value: **$1,266**
  Living Square Feet: **2,562**
  Land Square Feet: **7,500**


## Cities History (3 Found)

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM

INDEX NO. 152210/2024

NYSCEF DOC. NO. 4    FOR LICENSED INVESTIGATOR PURPOSES ONLY    XUEFENG DAI-Comprehensive Report-2022T2010049    RECEIVED NYSCEF: 03/12/2024

**13**

OYSTER BAY, NY (NASSAU COUNTY)  (05/10/2016 to 10/03/2022)
MILL NECK, NY (NASSAU COUNTY)  (06/2017 to 11/30/2022)
GREAT NECK, NY (NASSAU COUNTY)  (10/22/2015 to 05/09/2016)

## Counties History (1 Found)

NASSAU, NY (10/22/2015 to 11/30/2022)

## Driver's License Information (2 Found)

XUEFENG DAI
6300 RIVERSIDE DR, PARKLAND, FL 33067-5001 (BROWARD COUNTY)
DL#: XXXX-XXX-XX-XXX-X
Issuing State: **FL**
License Type: **CLASS E**
Original Issue Date: **10/13/2020**
Issue Date: **10/13/2020**
Expiration Date: **03/23/2022**
Out Of State License: **NY xxxx-xxx-xx-xxx-x**
Date of Birth: **XX/XX/1975** , Born **47** years ago
Gender: **Male**
Race: **Asian**
Height: **5'5"**
Privacy Flag: **T**

XUEFENG DAI
249 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
DL#: XXXX-XXX-XX-XXX-X
DL State: **NY**
Reported Date: **09/16/2020**
Date of Birth: **XX/XX/1975** , Born **47** years ago

## Professional Affiliations (None Found)

## Professional Licenses (None Found)

## Bankruptcy Records (None Found)

## Liens (None Found)

## Judgments (None Found)

FOR LICENSED INVESTIGATOR PURPOSES ONLY
XUEFENG DAI-Comprehensive Report-2022T2010049

**Current Property Deeds (None Found)**

**Past Property Deeds (None Found)**

**Property Foreclosures (None Found)**

**Property Assessments (None Found)**

**Evictions (None Found)**

**Current Vehicle Information (None Found)**

**Past Vehicle Information (None Found)**

**FL Accidents (None Found)**

**Global Watch Lists (None Found)**

**US Business Affiliations (None Found)**

**UCC Filings (None Found)**

**US Corporate Affiliations (None Found)**

**Aircraft Records (None Found)**

**Pilot Licenses (None Found)**

**Voter Registrations (None Found)**

## Hunting Permits (None Found)

## Weapon Permits (None Found)

## Possible Relatives - Summary (3 Found)

> XUEFENG DAI
> XUEFENG DAI
>> XUEFENG DAI

## Likely Associates - Summary (7 Found)

**LINNAN ZHAO** 1985 Age: 37
**XINMANNI XU** 1984 Age: 38
**XIAYU LIU**
**XIAYU LIU**
**HANLI WANG**
**JING WANG**
**GUOLI WANG**

## Possible Associates - Summary (14 Found)

**PATRYK O ROGOWSKI** 1992 Age: 30
**MIROSLAW R ROGOWSKI** 1964 Age: 58
**ALINA W ROGOWSKI** 1970 Age: 51
**XINMANNI XU**
**XINMANNI XU**
**JUNQI ZHANG** 1985 Age: 37
**ALICE ZHANG** 1985 Age: 37
**ANTONELLA R RIVARA** 1960 Age: 62
**ANTHONY F RIVARA** 1950 Age: 72
**ANTHONY EUGENIO RIVARA SR** 1982 Age: 40
**XIAYU LIU** 1974 Age: 48
**LINNAN ZHAO**
**LORRAINE L MUELLER** 1956 Age: 66
**BARBARA A PFISTERER** 1985 Age: 37

## Neighbor Phones (30 Found)

Neighbors' Phones for 249 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)( 08/14/2017 to 11/30/2022)

251 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
**(516) 922-9051 (ET)- ROGOWSKI, MIROSLAW**
MIROSLAW ROGOWSKI [ View Person Record ] Age: 58

244 CLEFT RD, MILL NECK, NY 11765-1001 (NASSAU COUNTY)
**(516) 922-2911 (ET)- GLANZBERG, MICHAEL**
MICHAEL GLANZBERG [ View Person Record ]  Age: 52

FOR LICENSED INVESTIGATOR PURPOSES ONLY

XUEFENG DAI-Comprehensive Report-2022120100049

16

Case 1:24-cv-03142-UA  Document 1-4  Filed 04/24/24  Page 74 of 377

242 CLEFT RD, MILL NECK, NY 11765-1001 (NASSAU COUNTY)
**(516) 922-1321 (ET)- NAVESKY, ROBERT**
ROBERT NAVESKY [ View Person Record ]  Age: 88

239 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
**(516) 922-3016 (ET)- KOUFAKIS, SHAILJA    (516) 922-5395 (ET)- KOUFAKIS, SHAILJA**
SHAILJA KOUFAKIS [ View Person Record ]  Age: 63

237 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
**(516) 802-4154 (ET)- DEFRANCESCH, B**
B DEFRANCESCH [ View Person Record ]  Age: 61

236 CLEFT RD, MILL NECK, NY 11765-1001 (NASSAU COUNTY)
**(516) 922-2325 (ET)- DITKOFF, ROBERT DR**
ROBERT DITKOFF DR [ View Person Record ]  Age: 73

235 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
**(516) 922-3709 (ET)- SHAIKH, FEROZA**
FEROZA SHAIKH [ View Person Record ]  Age: 72

233 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
**(516) 624-7434 (ET)- SMITH, THEODORE**
THEODORE SMITH [ View Person Record ]  Age: 89

222 CLEFT RD, MILL NECK, NY 11765-1001 (NASSAU COUNTY)
**(516) 922-4631 (ET)- WILLIAM, WILLIAM**
WILLIAM WILLIAM

Neighbors' Phones for 43 CENTRE VIEW DR, OYSTER BAY, NY 11771-2815 (NASSAU COUNTY)( 05/10/2016 to 10/03/2022)

43 CENTRE VIEW DR, OYSTER BAY, NY 11771-2815 (NASSAU COUNTY)
**(516) 624-4954 (ET)- YARAGHI, ARASH**
ARASH YARAGHI [ View Person Record ]  Age: 64

37 CENTRE VIEW DR, OYSTER BAY, NY 11771-2815 (NASSAU COUNTY)
**(516) 922-0424 (ET)- HABIBI, KARIM**
KARIM HABIBI [ View Person Record ]  Age: 61

51 CENTRE VIEW DR, OYSTER BAY, NY 11771-2815 (NASSAU COUNTY)
**(516) 624-6963 (ET)- RESZELBACH, W & B**
W RESZELBACH [ View Person Record ]  Age: 72

51 CENTRE VIEW DR, OYSTER BAY, NY 11771-2815 (NASSAU COUNTY)
**(516) 624-6963 (ET)- RESZELBACH, W & B**
B RESZELBACH

55 CENTRE VIEW DR, OYSTER BAY, NY 11771-2815 (NASSAU COUNTY)
**(516) 922-6356 (ET)- SMOLINSKY, RONALD**
RONALD SMOLINSKY [ View Person Record ]  Age: 75

31 CENTRE VIEW DR, OYSTER BAY, NY 11771-2815 (NASSAU COUNTY)
**(516) 624-6760 (ET)- TCHILINGUIRIN, LEVON    (516) 922-0929 (ET)- TCHILINGUIRIN, LEVON**
LEVON TCHILINGUIRIN [ View Person Record ]  Age: 83

27 CENTRE VIEW DR, OYSTER BAY, NY 11771-2815 (NASSAU COUNTY)
**(516) 624-2813 (ET)- MIRODDI, JOHN J**
JOHN J MIRODDI [ View Person Record ]  Age: 77

21 CENTRE VIEW DR, OYSTER BAY, NY 11771-2815 (NASSAU COUNTY)
**(516) 624-0013 (ET)- STERN, ALAN**
ALAN STERN [ View Person Record ]  Age: 72

10 CENTRE VIEW DR, OYSTER BAY, NY 11771-2813 (NASSAU COUNTY)
**(516) 624-8561 (ET)- MARINO, J RICHARD**
J RICHARD MARINO [ View Person Record ]  Age: 80


Neighbors' Phones for 251 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)( 06/2017 to 10/2017)

251 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
**(516) 922-9051 (ET)- ROGOWSKI, MIROSLAW**
MIROSLAW ROGOWSKI [ View Person Record ] Age: 58

244 CLEFT RD, MILL NECK, NY 11765-1001 (NASSAU COUNTY)
**(516) 922-2911 (ET)- GLANZBERG, MICHAEL**
MICHAEL GLANZBERG [ View Person Record ]  Age: 52

242 CLEFT RD, MILL NECK, NY 11765-1001 (NASSAU COUNTY)
**(516) 922-1321 (ET)- NAVESKY, ROBERT**
**D**  ROBERT NAVESKY [ View Person Record ]  Age: 88

239 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
**(516) 922-3016 (ET)- KOUFAKIS, SHAILJA    (516) 922-5395 (ET)- KOUFAKIS, SHAILJA**
SHAILJA KOUFAKIS [ View Person Record ]  Age: 63

237 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
**(516) 802-4154 (ET)- DEFRANCESCH, B**
B DEFRANCESCH [ View Person Record ]  Age: 61

236 CLEFT RD, MILL NECK, NY 11765-1001 (NASSAU COUNTY)
**(516) 922-2325 (ET)- DITKOFF, ROBERT DR**
ROBERT DITKOFF DR [ View Person Record ]  Age: 73

235 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
**(516) 922-3709 (ET)- SHAIKH, FEROZA**
FEROZA SHAIKH [ View Person Record ]  Age: 72

233 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
**(516) 624-7434 (ET)- SMITH, THEODORE**
THEODORE SMITH [ View Person Record ]  Age: 89

222 CLEFT RD, MILL NECK, NY 11765-1001 (NASSAU COUNTY)
**(516) 922-4631 (ET)- WILLIAM, WILLIAM**
WILLIAM WILLIAM

**** Electronically Filed Document ****

**18**

Instrument Number: 2022-97898

Recorded As:      EX-D01 - RESIDENTIAL

Recorded On:      September 28, 2022

Recorded At:      11:23:31 am                Receipt Number:   2707456

Number of Pages:  6                          Processed By:     001 KS

Book-VI/Pg:       Bk-D  VI-14303  Pg-395

Total Rec Fee(s): $510.00

** Examined and Charged as Follows **

| 01 - RESIDENTIAL DEED | $ 70.00 | EX-Blocks - Deeds - $300 | | $ 300.00 | EX-DN - DEED NOTIFICATION | $ 10.00 |
|---|---|---|---|---|---|---|
| EX-RP5217 Residential Fee | $ 125.00 | EX-TP-584 Affidavit Fee | | $ 5.00 | | |

| | Tax Amount | Consid Amt | RS#/CS# | | |
|---|---|---|---|---|---|
| Tax-Transfer | $ 0 | $ 0 | RE 4945 | Basic | $ 0.00 |
| OYSTER BAY EXEMPT | | | | Local NY CITY | $ 0.00 |
| | | | | Additional MTA | $ 0.00 |
| | | | | Spec ASST | $ 0.00 |
| | | | | Spec ADDL SONYMA | $ 0.00 |
| | | | | Transfer | $ 0.00 |
| Tax Charge: | $ 0 | | | | |

Property Information:

| Section | Block | Lot | Unit | Town Name |
|---|---|---|---|---|
| 29 | L | 666 | | OYSTER BAY |
| 29 | L | 668 | | OYSTER BAY |
| 29 | L | 669 | | OYSTER BAY |
| 29 | L | 675 | | OYSTER BAY |

***********THIS PAGE IS PART OF THE INSTRUMENT ************

Any provision herein which restricts the Sale, Rental or use of the described REAL PROPERTY
because of color or race is invalid and unenforceable under federal law.



*Maureen O'Connell*

**County Clerk Maureen O'Connell**

First American Title
Insurance Company
666 Third Avenue  5th fl
New York, N.Y. 10017
Phone: (212) 922-9700
Fax: (212) 922-0881

**Bargain and Sale Deed, with Covenants against Grantor's Acts – Individual or Corporation.**
CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT – THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY.

THIS INDENTURE, made as of the ___15___ day of September, 2022

3020-1054476

BETWEEN

**DAIBENEWISE LIMITED**, with an address at 249 Cleft Road, Mill Neck, NY 11765, party of the first part, and

**888 CLEFT RD LLC**, with an address at 249 Cleft Road, Mill Neck, NY 11765, party of the second part,

WITNESSETH, that the party of the first part, in consideration of ten dollars and other valuable consideration paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the County of Nassau and the State of New York, and more particularly described on Schedule A attached hereto.

Section:      29
Block:        L
Lots:         666, 668, 669 & 675

Being the same premises conveyed to the party of the first part herein by deed recorded on January 10, 2017 in(as) Liber 13460 Cp 658, Instrument No. 2017-00003086.

TOGETHER with all right, title and interest, if any, of the party of the first part, in and to any streets and roads abutting the above-described premises to the center lines thereof; TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises; TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

AND the party of the first part covenants that the party of the first part has not done or suffered anything whereby the said premises have been encumbered in any way whatever, except as aforesaid.

AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

[SIGNATURE ON FOLLOWING PAGE]

22733119.2

IN WITNESS WHEREOF, the party of the first part has duly executed this deed as of the day and year first above written.

IN PRESENCE OF

DAIBENEWISE LIMITED

Witness

By

Name: Xuefeng Dai

Title:   Director        $Sep/15/2022$

**21**

STATE OF _FLORIDA_ )
                                    ) SS:
COUNTY OF _BROWARD_ )

On the _15_ day of _SEPTEMBER_, in the year 2022, before me, the undersigned, personally appeared _XUEFENG1 DAI_ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is(are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s) or the person(s) upon behalf of which the individual(s) acted, executed the instrument.

_FLDL000094075364O_ ✓

_TITAS BOSE_
_____
NOTARY PUBLIC

TITAS BOSE
Notary Public - State of Florida
Commission # HH 240545
My Comm. Expires Mar 14, 2026
Bonded through National Notary Assn.

**22**



**Title No. 3020-1054476**

## SCHEDULE "A"

ALL THAT CERTAIN PLOT PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING IN THE VILLAGE OF MILL NECK, TOWN OF OYSTER BAY, COUNTY OF NASSAU AND STATE OF NEW YORK, AND BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY SIDE OF CLEFT ROAD, AT THE EXTREME WESTERLY END OF THE ARC CONNECTING THE NORTHERLY SIDE OF CLEFT ROAD WITH THE WESTERLY SIDE OF WEST SHORE ROAD;

RUNNING THENCE ALONG THE NORTHERLY, NORTHEASTERLY AND EASTERLY SIDE OF CLEFT ROAD THE FOLLOWING FOURTEEN (14) COURSES AND DISTANCES:

(1) SOUTH 62° 10' 20" WEST 71.95 FEET;

(2) THENCE SOUTH 59° 57' 20" WEST 127.84 FEET;

(3) THENCE SOUTH 53° 58' 20" WEST 152.30 FEET;

(4) THENCE SOUTH 57° 04' 20" WEST 156.78 FEET;

(5) THENCE ALONG THE ARC OF A CIRCLE BEARING TO THE RIGHT THE RADIUS OF WHICH IS 328.50 FEET A DISTANCE ALONG SAID ARC OF 119.06 FEET;

(6) RUNNING THENCE SOUTH 77° 50' 20" WEST 161.13 FEET;

(7) THENCE SOUTH 70° 38' 20" WEST 132.50 FEET;

(8) THENCE ALONG THE ARC OF A CIRCLE BEARING TO THE LEFT THE RADIUS OF WHICH IS 676.50 FEET A DISTANCE ALONG SAID ARC OF 143.46 FEET;

(9) THENCE ALONG THE ARC OF A CIRCLE BEARING TO THE RIGHT THE RADIUS WHICH IS 197.33 FEET A DISTANCE ALONG SAID ARC OF 259.28 FEET;

(10) RUNNING THENCE NORTH 46° 13' 40" WEST 81.92 FEET;

(11) THENCE NORTH 38° 05' 40" WEST 181.72 FEET;

(12) THENCE NORTH 34° 59' 40" WEST 120.45 FEET;

(13) THENCE NORTH 21° 25' 40" WEST 185.50 FEET; AND

(14) THENCE NORTH 07° 34' 40" WEST 45.91 FEET TO THE SOUTHWEST CORNER OF LAND NOW OR FORMERLY OF KEATING;

THENCE ALONG LAND NOW OR FORMERLY OF KEATING THE FOLLOWING THREE (3) COURSES AND DISTANCES:

(1) NORTH 69° 51' EAST 448.20 FEET TO A STONE MONUMENT;

(2) NORTH 60° 12' EAST 556.81 FEET; AND

CONTINUED...



TITLE NO. 3020-1054476
SCHEDULE "A" CONTINUED

(3) NORTH 80° 07' 30" EAST 4.55 FEET TO THE NORTHWEST CORNER OF LAND OF GILLMORE, FORMERLY WORK;

THENCE ALONG LAND OF GILLMORE FORMERLY OF WORK THE FOLLOWING THREE (3) COURSES AND DISTANCES:

(1) SOUTH 12° 58' EAST 419.90 FEET;

(2) NORTH 83° 07' EAST 111.96 FEET; AND

(3) NORTH 68° 38' EAST 286.22 FEET TO THE WESTERLY SIDE OF WEST SHORE ROAD;

THENCE ALONG THE WESTERLY SIDE OF WEST SHORE ROAD A COURSE SOUTH 35° 00' 30" EAST 231.69 FEET TO THE EXTREME NORTHERLY END OF THE ARC CONNECTING THE WESTERLY SIDE OF WEST SHORE ROAD WITH THE NORTHERLY SIDE OF CLEFT ROAD; AND

RUNNING THENCE ALONG THE ARC OF A CIRCLE BEARING TO THE RIGHT THE RADIUS OF WHICH IS 25 FEET A DISTANCE ALONG SAID ARC OF 42.36 FEET TO THE NORTHERLY SIDE OF CLEFT ROAD AT THE POINT OR PLACE OF BEGINNING.

**THE** policy to be issued under this report will insure the title to such buildings and improvements erected on the premises, which by law constitute real property.

**FOR CONVEYANCING ONLY: TOGETHER** with all the right, title and interest of the party of the first part, of in and to the land lying in the street in front of and adjoining said premises.

# EXHIBIT 13

7th: Sun Yingtong: Plaintiff:     14.12.2022

### IN THE GENERAL DIVISION OF THE
### HIGH COURT OF THE REPUBLIC OF SINGAPORE

HC/S 1027/2020
HC/SUM 4136/2022

Between

**GUOTAIQIXING BIOMEDICAL INTERNATIONAL (S) PTE. LTD.**
(UEN No. 20150039K)

... Plaintiff(s)

And

(1) **DAI XUEFENG**
(PRC Passport No. ████2878)

(2) **ZHANG JUNQI**
(PRC Passport No. ████9520)

(3) **XU XINMANNI**
(PRC Passport No. ████7254)

... Defendant(s)

## AFFIDAVIT

I, Sun Yingtong (PRC Passport No. ████7101), care of Guotaiqixing Biomedical International (S) Pte. Ltd. of 60 Paya Lebar Road #11-01, Paya Lebar Square, Singapore 409051, do solemnly and sincerely affirm and say as follows:

1.    I am a Director of the Plaintiff and I am duly authorised to file this Affidavit on behalf of the Plaintiff in support of its application herein.

2.    Unless otherwise stated, the matters deposed to herein are within my knowledge and are true. Insofar as the matters deposed to herein are not within my knowledge, they are derived from the Plaintiff's documents and are true to the best of my information and belief.

3.   I make this Affidavit to update the Honourable Court about further information and documents that the Plaintiff has uncovered in recent days in relation to the 1st Defendant's dissipation of assets.

4.   On 1 December 2022, the Plaintiff and its solicitors were informed that the 1st Defendant's residence at 249 Cleft Rd, Mill Neck, NY 11765 USA (the "**Cleft Rd Premises**") had also recently been sold. For background, as discussed in the 5th Affidavit of Sun Yingtong annexed to the 7th Affidavit of Eugene Jedidiah Low Yeow Chin filed herein on 15 November 2022 at [42(a)] and [57(a)]:

(a)   the Cleft Rd Premises are owned by the 1st Defendant through Daibenewise Limited ("**Daibenewise**"), a Cayman Islands company solely owned by the 1st Defendant; and

(b)   the 1st Defendant himself accepts that he was the owner of the Cleft Rd Premises through Daibenewise.

5.   The sale of the Cleft Rd Premises was discovered by Applied Facts, a US-based investigation firm, and was reported to the Plaintiff and its solicitors by an email dated 1 December 2022 (the "**1 December 2022 AF Email**"). A copy of this email was annexed to the Plaintiff's Written Submissions for SUM 4136 filed on 1 December 2022 as **Annex C** (page 53). A copy of this email is now annexed hereto and marked "**TAB 1**" of Exhibit "**SYT-7**". Parts of the email which do not relate to the discovery of the sale of the Cleft Rd Premises have been redacted.

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 85 of 377

3

6.      On 2 December 2022, the Plaintiff and its solicitors also received an email from Applied Facts attaching copies of:

(a)     a search carried out on 1 December 2022 on TLO, a third-party database aggregator of public records (see 2nd Affidavit of Sun Yingtong filed on 16 September 2021 at [11]) (the "**TLO Search**"); and

(b)     an Indenture dated 15 September 2022 for the sale and purchase of the Cleft Rd Premises by Daibenewise to 888 Cleft Rd LLC which was recorded with the Nassau County Clerk on 28 September 2022, which Applied Facts also obtained on 1 December 2022.

A copy of the aforesaid email with attachments is annexed hereto and marked "**TAB 2**" of Exhibit "**SYT-7**".

7.      The TLO Search showed that, while the 249 Cleft Rd Premises continues to be a current address of the 1st Defendant as of 30 November 2022 (the date range stated is "*08/14/2017 to 11/30/2022*"), the "*Owner*" of the Cleft Rd Premises is 888 Cleft Rd LLC and that the "*Purchase Date*" was 15 September 2022.

8.      For the avoidance of doubt, I confirm that the Plaintiff and its solicitors were not aware of the sale of the 249 Cleft Rd Premises before receiving the 1 December 2022 AF Email, and had believed that the 249 Cleft Rd Premises continued to be owned by the 1st Defendant through Daibenewise.

Case 1:24-cv-03142-UA Document 1-4 Filed 04/24/24 Page 86 of 377

4

9.    As was explained in previous Affidavits, I am based in Shenzhen city and have not been able to travel to Guangzhou to have my Affidavits affirmed personally before the Consulate-General of the Republic of Singapore due to, among other things, the COVID-19 situation in Guangzhou (see the 6th Affidavit of Sun Yingtong annexed to the 8th Affidavit of Eugene Jedidiah Low Yeow Chin filed herein on 28 November 2022 at [6] to [9]). This is the case for this Affidavit as well.

10.   Notwithstanding that I have been unable to sign my Affidavits before the Consulate-General at this time, I have confirmed the contents of, and signed, each of my Affidavits. I will have the Affidavits signed before the Consulate-General as soon as possible once the COVID-19 situation in Guangzhou improves.

Affirmed by the abovenamed          )
**SUN YINGTONG**                    )
on this 13th day of December 2022   )
in Guangzhou, People's Republic of China   )

Before Me,

Ho Jia Yin
Attaché
(Admin & Consular)

1 3 DEC 2022



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM INDEX NO. 152210/2024
NYSCEF DOC. NO. 16 Case 1:24-cv-03142-UA Document 1-4 Filed 04/24/24 Page 87 of 377 RECEIVED NYSCEF: 03/12/2024

**5**

This is the exhibit marked "**SYT-7**"

referred to in the

**AFFIDAVIT**

**OF**

**SUN YINGTONG**

Affirmed before me

this 13ᵗʰ day of December 2022

Before Me

Ho Jia Yin
Attaché
(Admin & Consular)





1 3 DEC 2022

This is the Tab in Exhibit "**SYT-7**" marked "**TAB 1**"

referred to in the

**AFFIDAVIT**

**OF**

**SUN YINGTONG**

| From: | ██████████████ <████████@appliedfacts.com> |
|-------|---------------------------------------------|
| Sent: | Thursday, December 1, 2022 3:29 AM |
| To: | Eugene Low |
| Cc: | 'Calvin Liang'; ██████████████████aurill@legalclinic.com.sg; ████ ████████████ |
| Subject: | INVOICE - Dai Updates to Report |

| Follow Up Flag: | Follow up |
|-----------------|-----------|
| Flag Status: | Flagged |

Hi Eugene,

████████████████████████████████████████████████████████████

Also, we wanted to let you know that TLO reports that 249 Cleft Rd was sold to 888 Cleft Rd LLC on September 15, 2022. The Nassau County Assessor's Office still shows the property is owned by Daibenewise Ltd. Real estate sites like Zillow and Trulia do not report a recent sale of the property.

The only information we have on 888 Cleft Rd LLC is that it filed for registration as a domestic limited liability company in NY on May 11, 2021. It is active. Its address is 10 Bank Street, Suite 560, White Plains, NY 10606. (Nassau County)

Please advise if you would like us to perform research on this transaction and/or 888 Cleft Rd LLC.

Regards,
Stephanie

# APPLIED
# FACTS+

Stephanie Woodhead
Senior Managing Director
Applied Facts Group, Inc.
901 Corporate Center Drive, Suite 104
Monterey Park, CA  91754
(213) 892-8700
emailaddress@appliedfacts.com
www.appliedfacts.com

PI License 188929

Note: The information contained in this transmission, including any attachment(s) is only for the use of the intended individual(s) or entity, and may contain information that is privileged and confidential. If the reader of this message is not an intended recipient, you are hereby notified that any dissemination, distribution, disclosure, or copying of this information is unauthorized and strictly prohibited. If you have received this communication in error, please contact the sender immediately by reply email and destroy all copies of the original message.

This is the Tab in Exhibit "**SYT-7**" marked "**TAB 2**"

referred to in the

**AFFIDAVIT**

**OF**

**SUN YINGTONG**

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 91 of 377

**9**

| | |
|---|---|
| **From:** | Stephanie Woodhead <████████@appliedfacts.com> |
| **Sent:** | Friday, December 2, 2022 2:53 AM |
| **To:** | Eugene Low |
| **Cc:** | Henry Kupperman |
| **Subject:** | 249 Cleft Rd |
| **Attachments:** | XUEFENG DAI-Comprehensive-Report-202212011049.pdf; 249 Cleft Rd 9.2022 Deed.pdf |

Eugene,

Attached please find the TLO report dated December 1, 2022 and the Deed from Nassau County.

Regards,
Stephanie


# APPLIED
# FACTS+

Stephanie Woodhead
Senior Managing Director
Applied Facts Group, Inc.
901 Corporate Center Drive, Suite 104
Monterey Park, CA  91754
(213) 892-8700
emailaddress@appliedfacts.com
www.appliedfacts.com

PI License 188929

Note: The information contained in this transmission, including any attachment(s) is only for the use of the intended individual(s) or entity, and may contain information that is privileged and confidential. If the reader of this message is not an intended recipient, you are hereby notified that any dissemination, distribution, disclosure, or copying of this information is unauthorized and strictly prohibited. If you have received this communication in error, please contact the sender immediately by reply email and destroy all copies of the original message.

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024

NYSCEF DOC. NO. 10   FOR LICENSED INVESTIGATOR PURPOSES ONLY   XUEFENG DAI-Comprehensive Report-2022T201004   RECEIVED NYSCEF: 03/12/2024

10

# Table of Contents

Subject Information ........................................................................................ 2

Potential Subject Photos (None Found) ......................................................... 2

Possible Criminal Records (None Found) ....................................................... 2

Possible Employers (2 Found) ...................................................................... 2

Address Summary (5 Found) ........................................................................ 3

Address Details (5 Found) ............................................................................ 3

Cities History (3 Found) ............................................................................... 3

Counties History (1 Found) ........................................................................... 4

Driver's License Information (2 Found) .......................................................... 4

Professional Affiliations (None Found) ........................................................... 4

Professional Licenses (None Found) .............................................................. 4

Bankruptcy Records (None Found) ................................................................ 4

Liens (None Found) ...................................................................................... 4

Judgments (None Found) .............................................................................. 4

Current Property Deeds (None Found) ........................................................... 5

Past Property Deeds (None Found) ................................................................ 5

Property Foreclosures (None Found) ............................................................. 5

Property Assessments (None Found) ............................................................. 5

Evictions (None Found) ................................................................................ 5

Current Vehicle Information (None Found) ...................................................... 5

Past Vehicle Information (None Found) .......................................................... 5

FL Accidents (None Found) ........................................................................... 5

Global Watch Lists (None Found) .................................................................. 5

US Business Affiliations (None Found) ........................................................... 5

UCC Filings (None Found) ............................................................................. 5

US Corporate Affiliations (None Found) ......................................................... 5

Aircraft Records (None Found) ...................................................................... 5

Pilot Licenses (None Found) ......................................................................... 5

Voter Registrations (None Found) ................................................................. 5

Hunting Permits (None Found) ...................................................................... 6

Weapon Permits (None Found) ..................................................................... 6

Possible Relatives - Summary (3 Found) ....................................................... 6

Likely Associates - Summary (7 Found) ......................................................... 6

Possible Associates - Summary (14 Found) .................................................... 6

Neighbor Phones (30 Found) ........................................................................ 6

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024
NYSCEF DOC. NO. 49
Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 93 of 377
RECEIVED NYSCEF: 03/12/2024
FOR LICENSED INVESTIGATOR PURPOSES ONLY
XUEFENG DAI-Comprehensive Report-2022120110049

11

**Important:**

This is NOT a CONSUMER REPORT and does not constitute a "consumer report" under the Fair Credit Reporting Act ("FCRA"). This report may not be used to determine the eligibility for credit, insurance, employment or any other purpose regulated under the FCRA.

This system may be used only in accordance with your Subscriber Agreement, the Gramm-Leach-Bliley Act ("GLBA"), the Driver's Privacy Protection Act ("DPPA") and all other applicable laws.   User agrees to having knowledge of all applicable laws pertaining to the usage of data.  User accepts all responsibility civilly and criminally for any use of this system.

Violations of these restrictions or misuse of this system will cause your access to be terminated and will cause an immediate investigation.

**ONLINE REPORT**

# Comprehensive Report

**Comprehensive Report**
**Date:** 12/01/2022
Reference ID: **220621-1**

**Report Legend**

**D** - Deceased Person

Relatives

**S** &gt; - 1st Degree of Separation
**S** &gt;&gt; - 2nd Degree of Separation
**S** &gt;&gt;&gt; - 3rd Degree of Separation

## Subject Information

(Best Information for Subject)

Name: XUEFENG DAI (10/22/2015 to 10/03/2022)
Date of Birth: **10/04/1975**, Born **47** years ago
SSN: 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

Other Individuals Observed with shared SSN: **None**

**Other Names Associated with Subject**
None found

**Other DOBs Associated with Subject**
None found

**Possible Phones Associated with Subject:**
(516) 922-3896 (ET) (LandLine) (86%)
(929) 288-0725 (ET) (Mobile) (78%)
(516) 487-0964 (ET) (ActiveLandLine) (66%)
(516) 628-1286 (ET) (LandLine) (66%)
(929) 227-4532 (ET) (LandLine) (66%)
(929) 282-3699 (ET) (Mobile) (66%)
(929) 259-1229 (ET) (Mobile) (26%)
(646) 709-6552 (ET) (Mobile) (12%)

## Indicators

Bankruptcies: **No**
Liens: **No**
Judgments: **No**
Properties: **No**
Corporate Affiliations: **No**
Criminal/Traffic: **No**
Global Watch Lists Match: **No**

**Email Addresses Associated with Subject**
None found

## Potential Subject Photos (None Found)

## Possible Criminal Records (None Found)

## Possible Employers (2 Found)

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM

INDEX NO. 152210/2024

NYSCEF DOC. NO. 4

RECEIVED NYSCEF: 03/12/2024

Case 1:24-cv-03142-UA Document 1-4 Filed 04/24/24 Page 94 of 377

FOR LICENSED INVESTIGATOR PURPOSES ONLY

XUEFENG DAI-Comprehensive Report-2022T2010049

12

Business Name: **KHAN FUNDS MANAGEMENT (09/01/2016)**
Phone: **(929) 282-3699 (ET) KHAN FUNDS MANAGEMENT**


Business Name: **KHAN FUNDS MANAGEMENT AMERICA (08/30/2016)**


## Address Summary (5 Found)

249 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY) (08/14/2017 to 11/30/2022)
43 CENTRE VIEW DR, OYSTER BAY, NY 11771-2815 (NASSAU COUNTY) (05/10/2016 to 10/03/2022)
251 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY) (06/2017 to 10/2017)
43 CENTRAL AVE, GLEN COVE, NY 11542-2904 (NASSAU COUNTY) (12/31/2016 to 01/01/2017)
31 MAPLE DR, GREAT NECK, NY 11021-1239 (NASSAU COUNTY) (10/22/2015 to 05/09/2016)


## Address Details (5 Found)


**249 CLEFT RD, MILL NECK NY 11765-1003 (NASSAU COUNTY)** (08/14/2017 to 11/30/2022) [ Back to Summary ]
Address contains: **2 units**
Owner:
**888 CLEFT RD LLC**
Purchase Date: **09/15/2022**
Assessed Value: **$6,629**
Living Square Feet: **16,434**
Land Square Feet: **222,156**

**43 CENTRE VIEW DR, OYSTER BAY NY 11771-2815 (NASSAU COUNTY)** (05/10/2016 to 10/03/2022) [ Back to Summary ]
Current Private Phone at address
**(516) 624-4954(ET) - YARAGHI, ARASH**
Subject's Phone
**(516) 628-1286(ET) - DAI, XUEFENG**
Owners:
**ARMEN AVETISIAN** [ View Person Record ]
**ASMIK AVETISIAN** [ View Person Record ]
Purchase Date: **08/06/2021**
Purchase Price: **$2,050,000**
Assessed Value: **$2,321**
Living Square Feet: **7,123**
Land Square Feet: **96,703**

**251 CLEFT RD, MILL NECK NY 11765-1003 (NASSAU COUNTY)** (06/2017 to 10/2017) [ Back to Summary ]

**43 CENTRAL AVE, GLEN COVE NY 11542-2904 (NASSAU COUNTY)** (12/31/2016 to 01/01/2017) [ Back to Summary ]

**31 MAPLE DR, GREAT NECK NY 11021-1239 (NASSAU COUNTY)** (10/22/2015 to 05/09/2016) [ Back to Summary ]
Owner:
**XIU MIN WU** [ View Person Record ]
Purchase Date: **07/15/2008**
Purchase Price: **$970,000**
Assessed Value: **$1,266**
Living Square Feet: **2,562**
Land Square Feet: **7,500**


## Cities History (3 Found)

OYSTER BAY, NY (NASSAU COUNTY)  (05/10/2016 to 10/03/2022)
MILL NECK, NY (NASSAU COUNTY)  (06/2017 to 11/30/2022)
GREAT NECK, NY (NASSAU COUNTY)  (10/22/2015 to 05/09/2016)

## Counties History (1 Found)

NASSAU, NY (10/22/2015 to 11/30/2022)

## Driver's License Information (2 Found)

XUEFENG DAI
6300 RIVERSIDE DR, PARKLAND, FL 33067-5001 (BROWARD COUNTY)
DL#: XXXX-XXX-XX-XXX-X
Issuing State: **FL**
License Type: **CLASS E**
Original Issue Date: **10/13/2020**
Issue Date: **10/13/2020**
Expiration Date: **03/23/2022**
Out Of State License: **NY xxxx-xxx-xx-xxx-x**
Date of Birth: **XX/XX/1975** , Born **47** years ago
Gender: **Male**
Race: **Asian**
Height: **5'5"**
Privacy Flag: **T**

XUEFENG DAI
249 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
DL#: XXXX-XXX-XX-XXX-X
DL State: **NY**
Reported Date: **09/16/2020**
Date of Birth: **XX/XX/1975** , Born **47** years ago

## Professional Affiliations (None Found)

## Professional Licenses (None Found)

## Bankruptcy Records (None Found)

## Liens (None Found)

## Judgments (None Found)

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM    INDEX NO. 152210/2024
NYSCEF DOC. NO. FOR LICENSED INVESTIGATOR PURPOSES ONLY    XUEFENG DAI Comprehensive Report 2022T201100049 03/12/2024

**14**

**Current Property Deeds (None Found)**

**Past Property Deeds (None Found)**

**Property Foreclosures (None Found)**

**Property Assessments (None Found)**

**Evictions (None Found)**

**Current Vehicle Information (None Found)**

**Past Vehicle Information (None Found)**

**FL Accidents (None Found)**

**Global Watch Lists (None Found)**

**US Business Affiliations (None Found)**

**UCC Filings (None Found)**

**US Corporate Affiliations (None Found)**

**Aircraft Records (None Found)**

**Pilot Licenses (None Found)**

**Voter Registrations (None Found)**

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM   INDEX NO. 152210/2024
NYSCEF **FOR LICENSED INVESTIGATOR PURPOSES ONLY**   XUEFENG DAI-Comprehensive Report-2022-12-01-0049 03/12/2024

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 97 of 377

**15**

## Hunting Permits (None Found)

## Weapon Permits (None Found)

## Possible Relatives - Summary (3 Found)

> XUEFENG DAI
> XUEFENG DAI
>> XUEFENG DAI

## Likely Associates - Summary (7 Found)

**LINNAN ZHAO** 1985 Age: 37
**XINMANNI XU** 1984 Age: 38
**XIAYU LIU**
**XIAYU LIU**
**HANLI WANG**
**JING WANG**
**GUOLI WANG**

## Possible Associates - Summary (14 Found)

**PATRYK O ROGOWSKI** 1992 Age: 30
**MIROSLAW R ROGOWSKI** 1964 Age: 58
**ALINA W ROGOWSKI** 1970 Age: 51
**XINMANNI XU**
**XINMANNI XU**
**JUNQI ZHANG** 1985 Age: 37
**ALICE ZHANG** 1985 Age: 37
**ANTONELLA R RIVARA** 1960 Age: 62
**ANTHONY F RIVARA** 1950 Age: 72
**ANTHONY EUGENIO RIVARA SR** 1982 Age: 40
**XIAYU LIU** 1974 Age: 48
**LINNAN ZHAO**
**LORRAINE L MUELLER** 1956 Age: 66
**BARBARA A PFISTERER** 1985 Age: 37

## Neighbor Phones (30 Found)

Neighbors' Phones for 249 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)( 08/14/2017 to 11/30/2022)

251 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
**(516) 922-9051 (ET)- ROGOWSKI, MIROSLAW**
MIROSLAW ROGOWSKI [ View Person Record ] Age: 58

244 CLEFT RD, MILL NECK, NY 11765-1001 (NASSAU COUNTY)
**(516) 922-2911 (ET)- GLANZBERG, MICHAEL**
MICHAEL GLANZBERG [ View Person Record ] Age: 52

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM INDEX NO. 152210/2024
NYSEF DOC. NO. 49 FOR LICENSED INVESTIGATOR PURPOSES ONLY XUEFENG DAI-Comprehensive Report-2022T20110049 RECEIVED NYSCEF: 03/12/2024

Case 1:24-cv-03142-UA Document 1-4 Filed 04/24/24 Page 98 of 377

**16**

242 CLEFT RD, MILL NECK, NY 11765-1001 (NASSAU COUNTY)
**(516) 922-1321 (ET)- NAVESKY, ROBERT**
ROBERT NAVESKY [ View Person Record ]  Age: 88

239 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
**(516) 922-3016 (ET)- KOUFAKIS, SHAILJA    (516) 922-5395 (ET)- KOUFAKIS, SHAILJA**
SHAILJA KOUFAKIS [ View Person Record ]  Age: 63

237 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
**(516) 802-4154 (ET)- DEFRANCESCH, B**
B DEFRANCESCH [ View Person Record ]  Age: 61

236 CLEFT RD, MILL NECK, NY 11765-1001 (NASSAU COUNTY)
**(516) 922-2325 (ET)- DITKOFF, ROBERT DR**
ROBERT DITKOFF DR [ View Person Record ]  Age: 73

235 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
**(516) 922-3709 (ET)- SHAIKH, FEROZA**
FEROZA SHAIKH [ View Person Record ]  Age: 72

233 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
**(516) 624-7434 (ET)- SMITH, THEODORE**
THEODORE SMITH [ View Person Record ]  Age: 89

222 CLEFT RD, MILL NECK, NY 11765-1001 (NASSAU COUNTY)
**(516) 922-4631 (ET)- WILLIAM, WILLIAM**
WILLIAM WILLIAM

Neighbors' Phones for 43 CENTRE VIEW DR, OYSTER BAY, NY 11771-2815 (NASSAU COUNTY)( 05/10/2016 to 10/03/2022)

43 CENTRE VIEW DR, OYSTER BAY, NY 11771-2815 (NASSAU COUNTY)
**(516) 624-4954 (ET)- YARAGHI, ARASH**
ARASH YARAGHI [ View Person Record ]  Age: 64

37 CENTRE VIEW DR, OYSTER BAY, NY 11771-2815 (NASSAU COUNTY)
**(516) 922-0424 (ET)- HABIBI, KARIM**
KARIM HABIBI [ View Person Record ]  Age: 61

51 CENTRE VIEW DR, OYSTER BAY, NY 11771-2815 (NASSAU COUNTY)
**(516) 624-6963 (ET)- RESZELBACH, W & B**
W RESZELBACH [ View Person Record ]  Age: 72

51 CENTRE VIEW DR, OYSTER BAY, NY 11771-2815 (NASSAU COUNTY)
**(516) 624-6963 (ET)- RESZELBACH, W & B**
B RESZELBACH

55 CENTRE VIEW DR, OYSTER BAY, NY 11771-2815 (NASSAU COUNTY)
**(516) 922-6356 (ET)- SMOLINSKY, RONALD**
RONALD SMOLINSKY [ View Person Record ]  Age: 75

31 CENTRE VIEW DR, OYSTER BAY, NY 11771-2815 (NASSAU COUNTY)
**(516) 624-6760 (ET)- TCHILINGUIRIN, LEVON    (516) 922-0929 (ET)- TCHILINGUIRIN, LEVON**
LEVON TCHILINGUIRIN [ View Person Record ]  Age: 83

27 CENTRE VIEW DR, OYSTER BAY, NY 11771-2815 (NASSAU COUNTY)
**(516) 624-2813 (ET)- MIRODDI, JOHN J**
JOHN J MIRODDI [ View Person Record ]  Age: 77

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM    INDEX NO. 152210/2024
NYSCEF **FOR LICENSED INVESTIGATOR PURPOSES ONLY**    XUEFENG DAI-Comprehensive Report-2022T2010040/12/2024

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 99 of 377

**17**

21 CENTRE VIEW DR, OYSTER BAY, NY 11771-2815 (NASSAU COUNTY)
**(516) 624-0013 (ET)- STERN, ALAN**
ALAN STERN [ View Person Record ]  Age: 72

10 CENTRE VIEW DR, OYSTER BAY, NY 11771-2813 (NASSAU COUNTY)
**(516) 624-8561 (ET)- MARINO, J RICHARD**
J RICHARD MARINO [ View Person Record ]  Age: 80

Neighbors' Phones for 251 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)( 06/2017 to 10/2017)

251 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
**(516) 922-9051 (ET)- ROGOWSKI, MIROSLAW**
MIROSLAW ROGOWSKI [ View Person Record ]  Age: 58

244 CLEFT RD, MILL NECK, NY 11765-1001 (NASSAU COUNTY)
**(516) 922-2911 (ET)- GLANZBERG, MICHAEL**
MICHAEL GLANZBERG [ View Person Record ]  Age: 52

242 CLEFT RD, MILL NECK, NY 11765-1001 (NASSAU COUNTY)
**(516) 922-1321 (ET)- NAVESKY, ROBERT**
**D**    ROBERT NAVESKY [ View Person Record ]  Age: 88

239 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
**(516) 922-3016 (ET)- KOUFAKIS, SHAILJA    (516) 922-5395 (ET)- KOUFAKIS, SHAILJA**
SHAILJA KOUFAKIS [ View Person Record ]  Age: 63

237 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
**(516) 802-4154 (ET)- DEFRANCESCH, B**
B DEFRANCESCH [ View Person Record ]  Age: 61

236 CLEFT RD, MILL NECK, NY 11765-1001 (NASSAU COUNTY)
**(516) 922-2325 (ET)- DITKOFF, ROBERT DR**
ROBERT DITKOFF DR [ View Person Record ]  Age: 73

235 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
**(516) 922-3709 (ET)- SHAIKH, FEROZA**
FEROZA SHAIKH [ View Person Record ]  Age: 72

233 CLEFT RD, MILL NECK, NY 11765-1003 (NASSAU COUNTY)
**(516) 624-7434 (ET)- SMITH, THEODORE**
THEODORE SMITH [ View Person Record ]  Age: 89

222 CLEFT RD, MILL NECK, NY 11765-1001 (NASSAU COUNTY)
**(516) 922-4631 (ET)- WILLIAM, WILLIAM**
WILLIAM WILLIAM

## **** Electronically Filed Document ****

**18**

Instrument Number: **2022-97898**

Recorded As: **EX-D01 - RESIDENTIAL**

Recorded On: **September 28, 2022**

Recorded At: **11:23:31 am**       Receipt Number: **2707456**

Number of Pages: **6**                Processed By: **001 KS**

Book-VI/Pg: **Bk-D  VI-14303  Pg-395**

Total Rec Fee(s): **$510.00**

**\*\* Examined and Charged as Follows \*\***

| 01 - RESIDENTIAL DEED | $ 70.00 | EX-Blocks - Deeds - $300 | | $ 300.00 | EX-DN - DEED NOTIFICATION | $ 10.00 |
| EX-RP5217 Residential Fee | $ 125.00 | EX-TP-584 Affidavit Fee | | $ 5.00 | | |

| | Tax Amount | Consid Amt | RS#/CS# | | | |
|---|---|---|---|---|---|---|
| Tax-Transfer | $ 0 | $ 0 | RE 4945 | Basic | $ 0.00 | |
| OYSTER BAY | | | | Local NY CITY | $ 0.00 | |
| EXEMPT | | | | Additional MTA | $ 0.00 | |
| | | | | Spec ASST | $ 0.00 | |
| | | | | Spec ADDL SONYMA | $ 0.00 | |
| | | | | Transfer | $ 0.00 | |
| Tax Charge: | $ 0 | | | | | |

**Property Information:**

| Section | Block | Lot | Unit | Town Name |
|---|---|---|---|---|
| 29 | L | 666 | | OYSTER BAY |
| 29 | L | 668 | | OYSTER BAY |
| 29 | L | 669 | | OYSTER BAY |
| 29 | L | 675 | | OYSTER BAY |

---

### \*\*\*\*\*\*\*\*\*\*\*THIS PAGE IS PART OF THE INSTRUMENT \*\*\*\*\*\*\*\*\*\*\*\*

Any provision herein which restricts the Sale, Rental or use of the described REAL PROPERTY
because of color or race is invalid and unenforceable under federal law.

---



*Maureen O'Connell*
**County Clerk Maureen O'Connell**

Case 1:24-cv-03142-UA Document 1-4 Filed 04/24/24 Page 101 of 377

First American Title
Insurance Company
666 Third Avenue   5th fl
New York, N.Y. 10017
Phone: (212) 922-9700
Fax: (212) 922-0881

**Bargain and Sale Deed, with Covenants against Grantor's Acts – Individual or Corporation.**
CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT – THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY.

THIS INDENTURE, made as of the ___15___ day of September, 2022                    3020-1054476

BETWEEN

**DAIBENEWISE LIMITED**, with an address at 249 Cleft Road, Mill Neck, NY 11765, party of the first part, and

**888 CLEFT RD LLC**, with an address at 249 Cleft Road, Mill Neck, NY 11765, party of the second part,

WITNESSETH, that the party of the first part, in consideration of ten dollars and other valuable consideration paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the County of Nassau and the State of New York, and more particularly described on Schedule A attached hereto.

| | |
|---|---|
| Section: | 29 |
| Block: | L |
| Lots: | 666, 668, 669 & 675 |

Being the same premises conveyed to the party of the first part herein by deed recorded on January 10, 2017 in(as) Liber 13460 Cp 658, Instrument No. 2017-00003086.

TOGETHER with all right, title and interest, if any, of the party of the first part, in and to any streets and roads abutting the above-described premises to the center lines thereof; TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises; TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

AND the party of the first part covenants that the party of the first part has not done or suffered anything whereby the said premises have been encumbered in any way whatever, except as aforesaid.

AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

[SIGNATURE ON FOLLOWING PAGE]

22733119.2

FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM        INDEX NO. 152210/2024
NYSCEF DOC. NO. 16        Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 102 of 377   RECEIVED NYSCEF: 03/12/2024

**20**

IN WITNESS WHEREOF, the party of the first part has duly executed this deed as of the day and year first above written.

IN PRESENCE OF                     DAIBENEWISE LIMITED

_____        By: _____

Witness                            Name: Xuefeng Dai
                                   Title:  Director     Sep/15/2022

STATE OF ___FLORIDA___ )
                                          ) SS:
COUNTY OF ___BROWARD___ )


On the _15_ day of ___SEPTEMBER___, in the year 2022, before me, the undersigned, personally appeared ___XUEFENG1 DAI___ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is(are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s) or the person(s) upon behalf of which the individual(s) acted, executed the instrument.

_FLDL00009407536940_ ✓

_____  TITAS BOSE
                NOTARY PUBLIC

TITAS BOSE
Notary Public - State of Florida
Commission # HH 240545
My Comm. Expires Mar 14, 2026
Bonded through National Notary Assn.

**22**



Title No. 3020-1054476

## SCHEDULE "A"

ALL THAT CERTAIN PLOT PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING IN THE VILLAGE OF MILL NECK, TOWN OF OYSTER BAY, COUNTY OF NASSAU AND STATE OF NEW YORK, AND BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY SIDE OF CLEFT ROAD, AT THE EXTREME WESTERLY END OF THE ARC CONNECTING THE NORTHERLY SIDE OF CLEFT ROAD WITH THE WESTERLY SIDE OF WEST SHORE ROAD;

RUNNING THENCE ALONG THE NORTHERLY, NORTHEASTERLY AND EASTERLY SIDE OF CLEFT ROAD THE FOLLOWING FOURTEEN (14) COURSES AND DISTANCES:

(1) SOUTH 62° 10' 20" WEST 71.95 FEET;

(2) THENCE SOUTH 59° 57' 20" WEST 127.84 FEET;

(3) THENCE SOUTH 53° 58' 20" WEST 152.30 FEET;

(4) THENCE SOUTH 57° 04' 20" WEST 156.78 FEET;

(5) THENCE ALONG THE ARC OF A CIRCLE BEARING TO THE RIGHT THE RADIUS OF WHICH IS 328.50 FEET A DISTANCE ALONG SAID ARC OF 119.06 FEET;

(6) RUNNING THENCE SOUTH 77° 50' 20" WEST 161.13 FEET;

(7) THENCE SOUTH 70° 38' 20" WEST 132.50 FEET;

(8) THENCE ALONG THE ARC OF A CIRCLE BEARING TO THE LEFT THE RADIUS OF WHICH IS 676.50 FEET A DISTANCE ALONG SAID ARC OF 143.46 FEET;

(9) THENCE ALONG THE ARC OF A CIRCLE BEARING TO THE RIGHT THE RADIUS WHICH IS 197.33 FEET A DISTANCE ALONG SAID ARC OF 259.28 FEET;

(10) RUNNING THENCE NORTH 46° 13' 40" WEST 81.92 FEET;

(11) THENCE NORTH 38° 05' 40" WEST 181.72 FEET;

(12) THENCE NORTH 34° 59' 40" WEST 120.45 FEET;

(13) THENCE NORTH 21° 25' 40" WEST 185.50 FEET; AND

(14) THENCE NORTH 07° 34' 40" WEST 45.91 FEET TO THE SOUTHWEST CORNER OF LAND NOW OR FORMERLY OF KEATING;

THENCE ALONG LAND NOW OR FORMERLY OF KEATING THE FOLLOWING THREE (3) COURSES AND DISTANCES:

(1) NORTH 69° 51' EAST 448.20 FEET TO A STONE MONUMENT;

(2) NORTH 60° 12' EAST 556.81 FEET; AND

CONTINUED...



TITLE NO. 3020-1054476
SCHEDULE "A" CONTINUED

(3) NORTH 80° 07' 30" EAST 4.55 FEET TO THE NORTHWEST CORNER OF LAND OF GILLMORE, FORMERLY WORK;

THENCE ALONG LAND OF GILLMORE FORMERLY OF WORK THE FOLLOWING THREE (3) COURSES AND DISTANCES:

(1) SOUTH 12° 58' EAST 419.90 FEET;

(2) NORTH 83° 07' EAST 111.96 FEET; AND

(3) NORTH 68° 38' EAST 286.22 FEET TO THE WESTERLY SIDE OF WEST SHORE ROAD;

THENCE ALONG THE WESTERLY SIDE OF WEST SHORE ROAD A COURSE SOUTH 35° 00' 30" EAST 231.69 FEET TO THE EXTREME NORTHERLY END OF THE ARC CONNECTING THE WESTERLY SIDE OF WEST SHORE ROAD WITH THE NORTHERLY SIDE OF CLEFT ROAD; AND

RUNNING THENCE ALONG THE ARC OF A CIRCLE BEARING TO THE RIGHT THE RADIUS OF WHICH IS 25 FEET A DISTANCE ALONG SAID ARC OF 42.36 FEET TO THE NORTHERLY SIDE OF CLEFT ROAD AT THE POINT OR PLACE OF BEGINNING.

**THE** policy to be issued under this report will insure the title to such buildings and improvements erected on the premises, which by law constitute real property.

**FOR CONVEYANCING ONLY: TOGETHER** with all the right, title and interest of the party of the first part, of in and to the land lying in the street in front of and adjoining said premises.

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 106 of 377

# EXHIBIT 14

*1st Defendant: Xuefeng Dai; 5th: 07.12.2022*

## IN THE GENERAL DIVISION OF
## THE HIGH COURT OF THE REPUBLIC OF SINGAPORE

HC/S 1027/2020
HC/SUM 4136/2022

Between

**GUOTAIQIXING BIOMEDICAL
INTERNATIONAL (S) PTE. LTD.**
(UEN No. 20150039K)

...Plaintiff(s)

And

1. **DAI XUEFENG**
(PRC Passport No. ████2878)

2. **ZHANG JUNQI**
(PRC Passport No. ████9520)

3. **XU XINMANNI**
(PRC Passport No. ████7254)

...Defendant(s)

## AFFIDAVIT

I, Xuefeng Dai (Passport No. ████2878), care of 6300 Riverside Drive,

Parkland, Florida 33067, USA, do solemnly make oath/affirm and say as follows:

1. I am the 1st Defendant in this action.

2. Insofar as the matters hereto are within my knowledge, they are true. Insofar
as they are not within my personal knowledge, I believe them to be true to the

best of my knowledge, information, and belief based on the documents and records in my possession.

3. I make this affidavit in response to the 9th Affidavit filed by Mr Eugene Jedidiah Low Yeow Chin dated 5 December 2022 ("**Eugene's 9th Affidavit**") enclosing a draft of Mr Sun Yingtong's 7th Affidavit ("**SYT 7th Affidavit**").

4. I crave leave to refer to my 4th Affidavit dated 22 November 2022 ("**My 4th Affidavit**").

5. For the ease of reference, I adopt the abbreviations used in the pleadings filed in Suit 1027 and in My 4th Affidavit.

6. All documents which I will be referring to in this affidavit are exhibited and collectively marked "**XD-5**".



## **COVID-19 Situation in Guangzhou**

7. As a preliminary, I set out my responses to paragraph 4 of Eugene's 9th Affidavit which states that Mr Sun was unable to travel to Guangzhou to have his 5th, 6th and 7th Affidavit affirmed personally due to, "… *among other things, the COVID 19 situation in Guangzhou…*". Mr Sun had further stated that "… *since late-October 2022, which led to the imposition of enhanced COVID-19 restrictions during lockdowns in various parts of Guangzhou in accordance with the PRC government's zero-COVID policy… majority of the*

*public transport shut down and residents prohibited from leaving their homes except for essential purposes... **As of the date of this Affidavit, these restrictions continue to be in force**...".*

8.  I am puzzled by Mr Sun's claims that the COVID-19 restrictions in Guangzhou remain in force. To the best of my information and knowledge, Guangzhou has eased its restrictions on 30 November 2022, but it is represented in Eugene's 9th Affidavit (dated 5 December 2022) that the restrictions in Guangzhou remain in place. Annexed hereto and marked as **Tab 1** of **XD-5** is a copy of a news article from Chinadaily.com.cn.

9.  Further Mr Sun had stated that "... *[he] will have both Affidavits signed before the Consulate-General as soon as possible once the COVID-19 situation in Guangzhou improves.*". Clearly Mr Sun has not done so and continues to file his affidavit under cover of Mr Eugene Low. The fact that Mr Sun continues to refuse to physically affirm his affidavit is worrying given that Mr Sun is seeking such a draconian measure against me but does not wish to properly attest to the contents of his draft affidavits.

## Sale of Cleft Rd Premises

10. In respect of the sale of the premises at 249 Cleft Rd, Mill Neck, NY 11765 ("**Cleft Rd Premises**") from Daibenewise to 888 Cleft Rd LLC on 15 September 2022, I wish to inform the court that there has been no change in

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 110 of 377

4

beneficial ownership. I am still the beneficial owner of the Cleft Rd Premises because I am the beneficial owner of **888 Cleft Rd LLC**.

11. As the Plaintiff is aware, Daibenewise is an entity incorporated in the Cayman Islands, an offshore company as far as the USA is concerned. 888 Cleft Rd LLC is a corporate entity in the USA. I was advised that it is recommended for tax purposes that all of the properties I owned should be held by USA corporate entities as opposed to offshore companies. Accordingly, I restructured the ownership of the Cleft Rd Premises from Daibenewise to **888 Cleft Road LLC**, which represented a mere change of identity or form of ownership and no change in beneficial ownership. I was further advised by my conveyancing lawyers that the most economical way of doing this is by way of the Indenture Instrument set out in page 18 of SYT-7, Tab 2. To further show that I retained beneficial interest in the Cleft Road Premises at the time of transaction on 15 September 2022, I annex as **Tab 2** of **XD-5**, a Real Estate Transfer Report showing that I signed both as "Seller" and "Buyer" and that the full sale price of the conveyance was $0.00, a dispositive indication that the transaction was just a mere restructuring of the form of ownership and no change in beneficial ownership.

12. There is therefore no truth in the Plaintiff's allegation that I had disposed of the Cleft Road Premises in or around September 2022, or that this is another example of my attempt to dissipate assets.

13. The Plaintiff's solicitors wrote to my solicitors in an email dated 3 December 2022 stating that I had sold the Cleft Rd Premises. I instructed my solicitors to respond on 4 December 2022 to inform the Plaintiff that I had not sold the Cleft Rd Premises. Annexed hereto and marked as **Tab 3** of **XD-5** are letters between the Plaintiff's solicitors and my solicitors.

### Sale of University Place Premises

14. Finally, I wish to assist the court by substantiating my position regarding 6 University Pl, Great Neck, NY 11020 (the "**University Place Premises**").

15. As I had explained at paragraph 35(c) of XD's 4th Affidavit, the economic indicators forecast a potential worldwide recession and necessitated the sale of the University Place Premises. I now exhibit screenshots marked as **Tab 4** of **XD-5** to show that the University Place Premises was bought by U Place LLC on March 2018 at US$1,443,000. Subsequently, on 21 July 2022, it was sold at a profit of US$1,750,000. This means that based on my decision as manager of U Place LLC to sell the University Place Premises in March 2022, U Place LLC had made close to a net profit of 20%. This was only possible because of my investment acumen acquired over the years of closely monitoring the global financial market. I was therefore able to make financially savvy decisions at the opportune time. For context, as a hedge fund manager and CEO of Khan Funds Management America, Inc, I have over 20 years of experience with the financial market. The real estate market is closely



related to the stock market in the U.S. Further, as far as I am aware, it is a common practice for hedge fund managers based in Wall Street, New York to carry out dual capacities as advisor and/or manager for real estate business.

16. Further, annexed hereto and marked as **Tab 5** of **XD-5** is a news article from The New York Times dated 4 November 2022 which highlighted that property prices will fall and "... *predicted home prices will fall 7 percent, from the peak of pricing in June 2022 to December 2023... if a recession hits, **an increasingly likely scenario, prices could drop 20 percent**.*". This news article was published in November 2022 and only confirms that I had been prudent in managing the University Place Premises in July 2022 at the height of the housing bubble and at the start of a reversal of the rise of housing prices (i.e. housing prices have started to fall in months to come).

17. Therefore, there is no basis for Mr Sun to allege that I have sold the University Place Premises to dissipate assets. In fact, any injunction to prevent me from dealing with assets (be in buying or selling) whenever opportunities as part of my investment decisions can potentially cost substantial losses. It is without doubt that the Plaintiff has no money, and the controllers of the company are in fact situated overseas. Any undertaking as to damages by the Plaintiff is meaningless in my current situation.

## Disclosure of my Social Security Number ("SSN") to the Singapore court

18.  I wish to point out that in SYT's 7th affidavit filed under cover of Eugene's 7th Affidavit, my SSN was exposed and this is a serious infringement on my privacy. It is illegal in the U.S. to disclose a person's SSN. I have reason to believe that Applied Facts had unlawfully obtained my SSN and sold the information to the Plaintiff. As the Plaintiff has revealed my SSN to the Singapore Court, I humbly request that this information be redacted and to this end, I have requested that Emory Hans Hardy, an attorney qualified to practice law in the State of New York to elaborate on the illegality and breaches of US law committed by the Plaintiff. I will raise my objections regarding the Plaintiff's breach of US law at the appropriate forum.

19.  I will leave my solicitors to make the necessary legal submissions at the hearing for SUM 4136.

8

| Sworn/Affirmed by the abovenamed | ) |
| **DAI XUEFENG** | ) |
| On this 7th day of December 2022 | ) |
| In the State of Florida | ) |
| United States of America | ) |

BEFORE ME,

_____

**A NOTARY PUBLIC**

STATE OF FLORIDA

COUNTY OF BROWARD

Sworn to (or affirmed) and subscribed before me by means of ☑ physical presence or ☐ online

Notarization, this 7 day of DEC , 2022 by XUEFENG DAI

Produced _____ -364-U _____ . as identification.

STANLEY LEWIS
Notary Public - State of Florida
Commission # HH 108586
My Comm. Expires Jul 16, 2025
Bonded through National Notary Assn.

_____
Signature of notary

_____
Stanley Lewis

_____ Personally Known or _____ Produced Identification.    Print, type or stamp commissioned name of Notary

Type if Identification Produced_____

# TAB 1

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 116 of 377

 (//www.chinadaily.com.cn)

中文 (//cn.chinadaily.com.cn)

Home (//Www.Chinadaily.Com.Cn) / China (//Www.Chinadaily.Com.Cn/China)

/ Society (//Www.Chinadaily.Com.Cn/China/Society)

# Businesses reopen as Guangzhou eases controls

By LI WENFANG and ZHENG ERQI in Guangzhou | China Daily | Updated: 2022-12-02 08:39

Case 1:24-cv-03142-UA Document 1-64 Filed 04/24/24 Page 117 of 377



People have lunch at a restaurant in Guangzhou's Tianhe district on Thursday, as dine-in services resume in low-risk areas. [Photo by Zheng Erqi/China Daily]

Li Qunxin, who had suspended service at her small restaurant in Tianhe district in Guangzhou, Guangdong province, for a week, has happily opened her doors again.

Dine-in service at restaurants in low-risk areas in Haizhu, Liwan, Conghua, Panyu, Tianhe, Yuexiu and Huangpu districts in Guangzhou was allowed to resume starting on Wednesday or Thursday as COVID-19 controls were relaxed.

"I'm certainly happy. I have to pay the rent and workers' wages even when business is suspended," she said.

Chen Jianliang, who had lunch at Li's restaurant on Thursday, said it was good the ban had been lifted. "As long as you take care of personal protection, it's fine," he said.

Zhang Zhehao, another diner, said he was a little afraid to see many people dining together, although dine-in service is much more convenient.

Canadian coffee chain Tim Hortons has reopened the majority of its stores in Guangzhou for dine-in service as well.

"We see robust demand for our coffee and food. With both dine-in and take-away services, business is expected to recover very quickly," said Li Yihui, Tim Hortons' South China operations general manager.

Indoor entertainment and service venues such as cinemas, gyms and libraries in low-risk areas in some districts have also reopened.

Primary, middle schools and kindergartens in low-risk areas in Liwan district have been given the green-light to resume in-person classes.

Closed-off management measures, which were temporarily implemented across Guangzhou, were lifted on Wednesday afternoon after a decision to pursue more scientific and precise COVID-19 control measures.

Upon the lifting of the measures on Wednesday, online searches for train tickets leaving Guangzhou surged 250 percent on travel agency Qunar, with the main destinations being Sichuan, Hunan and Guizhou provinces.

Tongcheng Travel, another travel portal, saw a 400 percent surge in searches for tickets for flights from Guangzhou at around 3 pm on Wednesday, compared with the volume at the same time the day before.

The latest measures from the Guangzhou authorities are in line with the 20 adjusted COVID-19 control measures issued recently by the State Council's Joint Prevention and Control Mechanism. They aim to minimize the impact on risk-free people, said Cheng Chaogong, chief researcher with Tongcheng Travel.

They also retain strict management according to the country's ninth COVID-19 control protocol, which allows risk-free people to resume their normal lives and work in a safe and orderly manner.

The latest steps will have a positive impact on the orderly resumption of business and leisure travel and serve as a model for other cities, Cheng said.

Liao Caijuan and Dou Xiaomei, managers at two pharmacies in Tianhe district, have both seen an increase in customers looking for medicines for flu and respiratory symptoms as a preventive measure in the past two days.

"With this opening up, they are buying these medicines beforehand, just in case," Dou said.

Guangzhou reported 683 new local COVID-19 confirmed cases and 5,629 new local asymptomatic carriers on Wednesday.

*Zhu Wenqian contributed to this story.*

English

中文

(//cn.chinadaily.com.cn)

Desktop

Copyright 1995 - 2022 . All rights reserved. The content (including but not limited to text, photo, multimedia information, etc) published in this site belongs to China Daily Information Co (CDIC). Without written authorization from CDIC, such content shall not be republished or used in any form.

# TAB 2

INSTRUCTIONS(RP-5217-PDF-INS): www.orps.state.ny.us

**New York State Department of Taxation and Finance**
Office of Real Property Tax Services

**RP-5217-PDF**
Real Property Transfer Report (8/10)

## FOR COUNTY USE ONLY

**C1.** SWIS Code

**C2.** Date Deed Recorded _____ / _____ / _____
Month   Day   Year

**C3.** Book | **C4.** Page

## PROPERTY INFORMATION

**1. Property Location**
249 — STREET NUMBER
CLEFT ROAD — STREET NAME
OYSTER BAY — CITY OR TOWN
MILL NECK — VILLAGE
11765 — ZIP CODE

**2. Buyer Name**
888 CLEFT RD LLC — LAST NAME/COMPANY — FIRST NAME

**3. Tax Billing Address**
Indicate where future Tax Bills are to be sent if other than buyer address(at bottom of form)
LAST NAME/COMPANY — FIRST NAME
STREET NUMBER AND NAME — CITY OR TOWN — STATE — ZIP CODE

**4. Indicate the number of Assessment Roll parcels transferred on the deed** 4 # of Parcels OR ☐ Part of a Parcel

(Only if Part of a Parcel) Check as they apply:
**4A.** Planning Board with Subdivision Authority Exists ☐
**4B.** Subdivision Approval was Required for Transfer ☐
**4C.** Parcel Approved for Subdivision with Map Provided ☐

**5. Deed Property Size**
_____ X _____ OR 14.40
FRONT FEET   DEPTH   ACRES

**6. Seller Name**
DAIBENEWISE LIMITED — LAST NAME/COMPANY — FIRST NAME
LAST NAME/COMPANY — FIRST NAME

**\*7. Select the description which most accurately describes the use of the property at the time of sale:**
A. One Family Residential

Check the boxes below as they apply:
**8.** Ownership Type is Condominium ☐
**9.** New Construction on a Vacant Land ☐
**10A.** Property Located within an Agricultural District ☐
**10B.** Buyer received a disclosure notice indicating that the property is in an Agricultural District ☐

## SALE INFORMATION

**11.** Sale Contract Date

**\*12.** Date of Sale/Transfer 09/15/2022

**\*13.** Full Sale Price 0 .00
( Full Sale Price is the total amount paid for the property including personal property. This payment may be in the form of cash, other property or goods, or the assumption of mortgages or other obligations.) Please round to the nearest whole dollar amount.

**14.** Indicate the value of personal property included in the sale 0 .00

**15. Check one or more of these conditions as applicable to transfer:**
☐ A. Sale Between Relatives or Former Relatives
☐ B. Sale between Related Companies or Partners in Business.
☐ C. One of the Buyers is also a Seller
☐ D. Buyer or Seller is Government Agency or Lending Institution
☐ E. Deed Type not Warranty or Bargain and Sale (Specify Below)
☐ F. Sale of Fractional or Less than Fee Interest (Specify Below)
☐ G. Significant Change in Property Between Taxable Status and Sale Dates
☐ H. Sale of Business is Included in Sale Price
☐ I. Other Unusual Factors Affecting Sale Price (Specify Below)
☒ J. None
Comment(s) on Condition:

## ASSESSMENT INFORMATION - Data should reflect the latest Final Assessment Roll and Tax Bill

**16.** Year of Assessment Roll from which information taken(YY) 22
**\*17.** Total Assessed Value 10,868
**\*18.** Property Class 210
**\*19.** School District Name OYSTER BAY (9)
**\*20.** Tax Map Identifier(s)/Roll Identifier(s) (If more than four, attach sheet with additional identifier(s))
SEC:29 BLK:L LOT:666 | SEC:29 BLK:L LOT:668 | SEC:29 BLK:L LOT:669 | SEC:29 BLK:L LOT:675

## CERTIFICATION

I Certify that all of the items of information entered on this form are true and correct (to the best of my knowledge and belief) and I understand that the making of any willful false statement of material fact herein subject me to the provisions of the penal law relative to the making and filing of false instruments.

**SELLER SIGNATURE**
SELLER SIGNATURE — Sep/15/2022 — DATE

**BUYER SIGNATURE**
BUYER SIGNATURE — Sep/15/2022 — DATE

**BUYER CONTACT INFORMATION**
(Enter information for the buyer Note If buyer is LLC,society, association, corporation, joint stock company, estate or entity that is not an individual agent or fiduciary, then a name and contact information of an individual/responsible party who can answer questions regarding the transfer must be entered Type or print clearly )
888 CLEFT RD LLC — LAST NAME — FIRST NAME
AREA CODE — TELEPHONE NUMBER (Ex 9999999)
STREET NUMBER — STREET NAME
CITY OR TOWN — STATE — ZIP CODE

**BUYER'S ATTORNEY**
LAST NAME — FIRST NAME
AREA CODE — TELEPHONE NUMBER (Ex 9999999)

Scanned with CamScanner

# TAB 3

| | |
|---|---|
| **From:** | Eugene Low |
| **To:** | See Chee Ho; Eugene Quek |
| **Cc:** | auril@legalclinic.com.sg; Calvin Liang; Angie Liang; William Khoo; Philip Fong; Shirlene Phua; Mohammad Noor; Rachel Kline; Alekhya Kanteti |
| **Subject:** | RE: [URGENT] HC/S 1027/2020 - Application for Injunction; Application for Amendment of Statement of Claim [HEP-LITI.FID52188] |
| **Date:** | Saturday, December 3, 2022 9:43:58 AM |
| **Attachments:** | image003.png |
| | image006.png |
| | image007.png |
| | image001.png |
| | 20221202 - Email from Applied Facts.pdf |

Dear Sirs,

1. We had in our Written Submissions at paragraph [5(g)] referred to an email from our Applied Facts regarding the recent sale of your client's property at 249 Cleft Rd, Mill Neck, NY 11765 USA. A copy of an email from Applied Facts dated 1 December 2022 was annexed as Annex C to the Written Submissions (the "**1 December 2022 AF Email**"). In Footnote 14 accompanying paragraph [5(g)] of the Written Submissions, the Plaintiff had stated that it is following up with Applied Facts and undertakes to provide further information by way of Affidavit as soon as possible.

2. We write to notify you that the Plaintiff intends to file a further Affidavit annexing copies of:

   a. the 1 December 2022 AF Email; and

   b. a further email from Applied Facts dated 2 December 2022 at 2.53 a.m. and its annexes – a copy of this email is attached for your reference.

3. The Affidavit is to formally place these documents into evidence before the Court. To the extent that leave is required for the filing of this Affidavit, the Plaintiff will seek leave from the Honourable Court.

4. In the meantime, all our client's rights are expressly reserved.

*Best Regards,*
*Eugene Low*
*Managing Director*

COVID-19 Notice: We continue to offer our full suite of services during this period, while adopting alternative working arrangements. (1) All our staff will be working remotely through secure IT systems and advanced technology to continue to deliver the same standard of service. All phone lines continue to be manned at regular hours. (2) While our offices will open during regular working hours for receiving regular mail and courier deliveries, for service or exchange of documents a prior appointment will be necessary.



**Ark Law Corporation**
**Advocates & Solicitors, Singapore**
1 Pickering Street, Level 8, Great Eastern Centre, Singapore 048659 (please note our change in address wef 29 June 2022)
**T** (65) 6592 8632
**D** (65) 6592 8634
**We** EugeneLowYC
**E** eugene.low@arklaw.com.sg
**W** www.arklaw.com.sg

This email is intended solely for the abovenamed addressee(s) and may contain confidential and/or legally privileged information. If this email has reached you in error, please delete it immediately and inform us of the error. Thank you for your co-operation.

Internet communications cannot be guaranteed to be secured or error-free as information can be intercepted, corrupted, lost, or it may arrive late or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message which arise as a result of Internet transmission.

**Ark Law Corporation**
1 Pickering Street
Level 8, Great Eastern Centre
Singapore 048659

| | |
|---|---|
| **Date**: | 4 December 2022 |
| **Your ref**: | EJL.20200077 |
| **Our ref**: | PF/QYC/LEK/2022033868 |
| **Direct**: | +65 6361 9819 / 9837 / 9344 |
| **Email**: | PhilipFong@harryelias.com / EugeneQuek@harryelias.com / AlekhyaKanteti@harryelias.com / |

**Attention: Mr Eugene Jedidiah Low**

**BY EMAIL ONLY**
(eugene.low@arklaw.com.sg /
info@arklaw.com.sg)

Dear Sirs,

**HC/ S 1027/2020 ("SUIT 1027")**
**HC/SUM 4136/2022 ("SUM 4136")**

1.   We refer to your email dated 3 December 2022 ("**3 December Email**").

2.   We are instructed by our client that he denies the contents stated in your 3 December Email in its entirety and will respond appropriately at the appropriate juncture.

3.   All our client's rights are expressly reserved.

Yours faithfully,

**Philip Fong / Eugene Quek / Alekhya Kanteti**
Harry Elias Partnership LLP

Cc.   (1)   **Client**

     (2)   **Ms Aurill Kam**
         Legal Clinic LLC- By Email Only

     (3)   **Mr Calvin Liang**
         Calvin Liang LLC – By Email Only

# TAB 4

    

     removed

Source: Charles Rutenberg Realty Inc

---

9/27/2018    Listed for    $6,500
             rent

Source: Charles Rutenberg Realty Inc

---

8/3/2018    Listing    $6,500
           removed

Source: Charles Rutenberg Realty Inc

---

4/5/2018    Listed for    $6,500
           rent

Source: Charles Rutenberg Realty Inc

---

3/7/2018    Sold    $1,443,000 $382/sqft
                 (-11.2%)

Source: Public Record

---

10/16/2012    Listing    $1,625,000 $431/sqft
            removed

Source: edna mashaal realty

---

5/19/2012    Listed for    $1,625,000 $431/sqft
           sale      (-5.8%)

Source: edna mashaal realty

---

10/1/2010    Listing    $1,725,000 $457/sqft
           removed

    

 **See more facts and features**

# Price and tax history

## Price history

| Date | Event | Price | |
|------|-------|-------|---|
| 7/21/2022 | Sold | $1,750,000 (-2.2%) | $464/sqft |
| | Source: OneKey OneKey® MLS #3391337 | | |
| 5/10/2022 | Pending sale | $1,790,000 | $474/sqft |
| | Source: OneKey OneKey® MLS #3391337 | | |
| 4/25/2022 | Price change | $1,790,000 (+5.9%) | $474/sqft |
| | Source: OneKey OneKey® MLS #3391337 | | |
| 4/14/2022 | Listed for sale | $1,690,000 (+17.1%) | $448/sqft |
| | Source: OneKey OneKey® MLS #3391337 | | |
| 2/22/2019 | Listing removed | $6,500 | |

# TAB 5



The New York Times | https://www.nytimes.com/2022/11/04/realestate/housing-market-interest-rates.html

G Sign in to The New York Times with Google ✕

Eric Dai
eric.xuefeng.dai@gmail.com

Continue as Eric

To create your account, Google will share your name, email address, and profile picture with The New York Times. See The New York Times's privacy policy and terms of service.

**MARKET REPORT**

# The Housing Market Is Worse Than You Think

Buyers, sellers and renters are in for more twists and turns, as soaring mortgage rates and stubborn inflation signal belt tightening ahead.

 **By Stefanos Chen**

Nov. 4, 2022

Everyone is feeling the squeeze.

"Mortgage rates are sky high, prices are sky high, and there's no inventory," said Mark Zandi, the chief economist at Moody's Analytics. "This may be the worst time in my living history for the home buyer — it just doesn't make sense."

Mortgage rates recently broke 7 percent, the highest since 2002, and more than double what most borrowers paid near the start of the pandemic.

Between soaring prices and rising rates, the typical home buyer in October paid 77 percent more on their loan, per month, than they would have last year, according to Realtor.com. With a national median asking price of $425,000 and a 10 percent down payment, that works out to an additional $1,117 every month.

Home contract signings fell for the fourth straight month in September, down 31 percent, compared with September 2021, according to the National Association of Realtors. The same month, search interest in the phrase "U.S. Housing Bubble" reached a 15-year high, according to Google trends data. The searches were most popular in Idaho, where the median home price in Boise was $549,900 — an eye-popping 51 percent increase since September 2019, according to Realtor.com.

The days of record-low mortgage rates are over, but juiced-up home prices have not fallen in kind. And sales are stalling, as both buyers and sellers wait for the other shoe to drop.

To make sense of the current housing market, we spoke with economists, mortgage brokers and real estate agents to plot the course ahead. Much can change, especially with economic headwinds on the horizon, but they all agreed that the market is cooling fast. Home prices are going to drop, just not to the extent some buyers have hoped for. Sellers are going to have to work for their closings again. And renters may finally get a reprieve from surging prices, even as prices stay well above prepandemic levels.



Case 1:24-cv-03142-UA Document 1-4 Filed 04/24/24 Page 131 of 377



How Housing Market Is Worse Your Times

Marialena Caputi

## How low will home prices go?

Most analysts don't expect home prices to free fall as they did after the subprime mortgage crisis in 2008, in part because of stricter underwriting practices, a big bump in home price appreciation and a class of all-cash investors waiting to swoop in when prices dip. But the cuts are coming, analysts said, perhaps as deep as 20 to 30 percent in markets that saw the most appreciation, particularly in the Mountain West region and the South. Still, most homeowners will have gained some equity over the past two years, even after a slide in home values.

Existing home prices soared 45 percent from December 2019 to June 2022, the start of the pandemic to the summer peak in pricing, the biggest jump ever recorded in such a short window of time, according to Standard & Poor's CoreLogic Case-Shiller Home Price Index.

In July, the same index recorded its first month-to-month price drop since January 2019, a relatively small decline of 0.3 percent — a sign that a reversal could be underway, though prices were still up a whopping 15.8 percent above July 2021.

Morgan Stanley, the investment management firm, predicted home prices will fall 7 percent, from the peak of pricing in June 2022 to December 2023. Moody's Analytics expects prices to drop 10 percent, from June to summer 2024, but if a recession hits, an increasingly likely scenario, prices could drop 20 percent. In some supercharged markets, like Boise and Phoenix, Moody's predicts prices could drop by more than 30 percent.

Another firm, John Burns Real Estate Consulting, predicted in May, when mortgage rates reached 5 percent, that national home prices would fall 10 percent through 2024. But with mortgage rates climbing higher, the cuts will be deeper, said Rick Palacios Jr., the company's director of research.

"Affordability was the worst it's ever been, and that was before 7 percent mortgage rates," Mr. Palacios said, adding that the only option for sellers will be to cut prices.

Other predictions are less dire. Rick Sharga, an executive vice president of market intelligence at ATTOM, a real estate data company, said he expects prices to fall about 5 percent over the next six to 12 months before stabilizing.



**A More Populous Country, but Fewer Homes for Sale**

Fewer single-family homes are listed for sale than in previous decades, even though the U.S. population has risen more than 40 percent since 1982.

By The New York Times | Source: National Association of Realtors

"This is about weakness in sales volume, more than sales prices," Mr. Sharga said, adding that the forces that caused prices to plummet after the great recession — irresponsible lending and a glut of supply — aren't in play. There is very limited inventory for sale, he said, and because the typical homeowner now has a mortgage with a low 3.5 percent interest rate, few would choose to sell today for fear of facing much higher borrowing costs on their next property.

Case 1:24-cv-03142-UA Document 1-4 Filed 04/24/24 Page 132 of 377

"People are in wait-and-see mode, because the numbers don't work out," said Danielle Hale, the chief economist at Realtor.com.

Inventory has shot up since the summer, when mortgage rates started to climb, but still remains far below normal levels, Ms. Hale said. Active listings were up nearly 27 percent in September, compared to September 2021, but still 40 percent below September 2019, before the pandemic.

### Listings Pile Up

While few markets have given up pandemic-era price gains, big jumps in supply in September could be a precursor to price drops.

| METRO AREA | ACTIVE LISTING COUNT YEAR-OVER-YEAR |
|---|---|
| Phoenix | 167% |
| Raleigh, N.C. | 166 |
| Nashville | 125 |
| Austin, Texas | 124 |
| Tampa, Fla. | 110 |
| Las Vegas | 90 |
| Jacksonville, Fla. | 84 |
| Dallas | 84 |
| Orlando, Fla. | 79 |
| Seattle | 79 |
| Riverside, Calif. | 73 |
| Denver | 69 |
| Memphis | 65 |
| San Antonio | 64 |
| Charlotte, N.C. | 62 |
| Sacramento | 52 |
| Atlanta | 46 |
| Portland, Ore. | 46 |
| San Diego | 45 |
| New Orleans | 44 |
| Indianapolis | 44 |
| Los Angeles | 37 |
| Oklahoma City | 35 |
| Birmingham, Ala. | 31 |
| San Francisco | 29 |
| Kansas City, Mo. | 27 |

Case 1:24-cv-03142-UA Document 1-4 Filed 04/24/24 Page 133 of 377

| | |
|---|---|
| Houston | 26 |
| San Jose, Calif. | 21 |
| Detroit | 19 |
| Louisville, Ky. | 11 |
| Miami | 11 |
| Columbus, Ohio | 10 |
| Buffalo | 9 |
| Cleveland | 6 |
| Pittsburgh | 2 |
| Richmond, Va. | 2 |
| St. Louis | 0 |
| Boston | −2 |
| Philadelphia | −2 |
| Washington | −3 |
| Baltimore | −5 |
| Minneapolis | −8 |
| Rochester, N.Y. | −8 |
| New York | −9 |
| Providence, R.I. | −9 |
| Cincinnati | −12 |
| Chicago | −12 |
| Virginia Beach | −14 |
| Milwaukee | −19 |
| Hartford, Conn. | −28 |

Source: Realtor.com • By The New York Times

While few markets so far have given up price gains from last year, she said, big jumps in supply could be a precursor to price drops. The Phoenix metro area saw prices rise more than 4 percent in September, compared to September 2021, but inventory shot up 167 percent in the same period, the most among the 50 largest metros. It also had the biggest share of homes with price cuts, with two out of every five listings taking a trim — an average discount of nearly 8 percent, or about $47,000.

1/25/22, 8:33 PM
Case 1:24-cv-03142-UA The Housing Market Is Worse Filed 04/24/24 New York Times 134 of 377



Mariaelena Caputi

## What's going on with mortgage rates?

Today's rates are far from record territory — some loans in 1981 had over 18 percent interest.

But in late October, the average 30-year fixed-rate mortgage, the most popular home loan, hit 7.08 percent, more than double the rate that millions of buyers relied on to calculate their budget. This week, the rate dipped slightly to 6.95 percent. In January 2021, the loan sank to a record low 2.65 percent, according to Freddie Mac.

The spike in mortgage rates has largely been the result of the Federal Reserve raising the rate at which banks lend to each other, in an effort to cool inflation. The rate hikes tend to drive up the rate of the 10-year treasury note, a close proxy for mortgage costs.

Average 30-year fixed mortgage rate

7/25/22, 8:33 PM



Source: Freddie Mac • By The New York Times

The rapid reversal has been head spinning, with the added pressure of surging prices.

Tahera Tilson, 44, a nurse educator who was living in New York, bought a one-bedroom condo in Harlem for $399,000 in 2019, with a 3.75 percent mortgage. After two years of isolation in the pandemic, she decided to buy a two-bedroom townhouse in Clifton, N.J., for $425,000, with a 5.25 percent mortgage, and planned to sell the Harlem apartment.

But just as she listed the apartment in late spring of this year, the Fed announced plans for more aggressive rate hikes, and mortgage rates soon pushed 6 percent.

"I got a lot of traffic, but no offers at all," she said about the listing, which she started at $460,000, but soon dropped to $450,000. "It basically came down to the interest rate — that is what was scaring people off."

Unable to carry two mortgages at the same time, Ms. Tilson had to change tack, and decided to rent it out instead. In the rental market, which is especially starved for affordable listings, she quickly found a tenant willing to pay $2,500 a month. The median rent in Manhattan was nearly $4,000 in September, according to Douglas Elliman, a real estate brokerage.

The Fed raised its benchmark rate by three-quarters of a point this week, its sixth increase this year, and suggested more increases are coming. Lawrence Yun, the chief economist of the National Association of Realtors, said it "may be another year or two" before mortgage rates begin to fall.

The Mortgage Bankers Association, a large trade group, has a more optimistic view, with rates for the 30-year fixed mortgage dropping to 5.4 percent by the end of next year.

In the meantime, agents and mortgage brokers have dusted off a prepandemic slogan: "Date the rate, marry the house." In other words, buy the house you can afford now, and refinance when mortgage rates dip.

"We've been spoiled — 7 percent is not crazy," said Maria Kazakos, the senior vice president of sales at Berkshire Hathaway HomeServices Carolinas Companies.

As power shifts to buyers in Charlotte and nearby markets, she said she is seeing requests for the seller to cover the cost of a lender fee, called points, to reduce the buyer's mortgage interest rate.

Other buyers are reconsidering adjustable-rate mortgages, or ARMs, a type of loan that drew scrutiny after the subprime mortgage crisis. A 5-1 ARM, for instance, is a 30-year loan with an enticing fixed rate for the first five years, which then resets once a year for the duration of the mortgage, based on the prevailing interest rate and other guidelines. Many are offered with a starting interest rate of around 1 percentage point lower than a 30-year fixed-rate mortgage.

Adjustable-rate loans have gone from about 4 percent of the mortgage market in 2021, to more than 12 percent in the last several weeks, the highest share in more than a decade, said Mike Fratantoni, the chief economist at the Mortgage Bankers Association. In 2005, when rates hovered around 5.5 to 6 percent, more than a third of borrowers had adjustable rate loans.

The loans, which were widely criticized for saddling borrowers with ballooning debt, are safer today, because of new regulations enacted after the financial crisis, Mr. Fratantoni said.

But borrowers can still get in over their heads, if rates are higher when mortgages reset, increasing the overall cost of the loan, said Andrew Pizor, a lawyer with the National Consumer Law Center. He expects lenders to offer even more enticing versions of the adjustable loans in the coming months, as high interest rates slow down the mortgage business.

"But just because they say you can afford it, doesn't mean it's a good idea," he said.



Mariaelena Caputi

## What can sellers do?

A few months ago, sellers were turning down bids that were $100,000 over the asking price, said Jasmine Harris, a real estate agent with Redfin in Atlanta. Now, offers are coming in at, or even below, the list price, and sellers are hearing an unfamiliar word: concessions.

"I'm still in the shock of the past two years, so whenever I write an offer and ask for closing costs, I've been holding my breath," she said, referring to the once common practice of sellers paying some of the buyer's transaction fees. "But I've been getting it."

Even in markets where prices have not declined, sellers are becoming more open to sweeteners, agents said, like agreeing to contract contingencies in the case of financing trouble, or offering to pay for loose ends to lubricate the deal.

But the best strategy for sellers is to start at the right price, said Steven James, the president and chief executive of Berkshire Hathaway HomeServices New York Properties. He expects prices to come down 5 to 10 percent in Manhattan because of higher mortgage rates, and said sellers should get ahead of the curve, because lingering on the market has its risks.

Case 1:24-cv-03142-UA Document 1-4 Filed 04/24/24 Page 137 of 377

"The last thing you want in a shifting market is to have something sit," he said. "The consumers are watching, and they're thinking, 'That one's tainted.'"



Mariaelena Caputi

## Are rents finally cooling?

There may be some moderate relief for renters, but a return to prepandemic pricing isn't likely, analysts said.

After record levels of demand for rental housing in 2021, there has been a significant slowdown in leasing this year, and price growth is also beginning to slow, according to Jay Parsons, the head of economics for RealPage, a rental housing software company.

Demand for market-rate rentals in the third quarter was negative, meaning there were more people moving out of apartments than into them — the first time this has happened in the typically busy summer months in 30 years, Mr. Parsons said.

The slowdown led to the first month-to-month price reduction since December 2020 — a measly 0.2 percent drop in September. Still, the national market-rate rent — $1,797 a month — was up 9 percent from the same month a year ago, in part because inventory remains low.

RealPage predicts that national market-rate rent will rise 3.3 percent next year, which is more in line with typical rent growth.

That is cold comfort for renters in high-cost markets like New York City, where rent growth outpaced increases in wages by 23 percent in August, when adjusted for inflation, according to Kenny Lee, an economist with StreetEasy, a listing website. Besides the major real estate disruption early in the pandemic, that marks the widest gap since the 2008 financial crisis.

The median rent in September, $3,982, was up nearly 24 percent from a year ago, though it was down 2 percent from the previous month, according to a report from Douglas Elliman, a real estate brokerage. Renters could have more leverage in the typically slower winter months, said Jon Leckie, a researcher with Rent, a listing portal.

"If you've got a few months to work with, and you don't need to sign now, I'd just hold off," he said.

For weekly email updates on residential real estate news, sign up here. Follow us on Twitter: @nytrealestate

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 138 of 377

# EXHIBIT 15



SUPREME COURT OF SINGAPORE
LEGAL REGISTRY

## IN THE GENERAL DIVISION OF THE HIGH COURT OF THE REPUBLIC OF SINGAPORE

Date: 08-December-2022

To:

1. Ark Law Corporation
1, PICKERING STREET, # 08-01, GREAT EASTERN CENTRE, Singapore - 048659
Tel No: 65928632
Fax No: -
Email: info@arklaw.com.sg
File Ref No: EJL 20200077
Solicitor in charge: EUGENE JEDIDIAH LOW YEOW CHIN

2. Harry Elias Partnership LLP
SGX CENTRE 2 #17-01 4 SHENTON WAY SINGAPORE 068807
Tel No: 65350550
Fax No: 64380550
File Ref No: PF/KWM/QYC/2022 033868/noor
Solicitor in charge: 1. KANTETI SAI ALEKHYA
2. PHILIP FONG YENG FATT
3. Quek Yu Chung, Eugene
4. WILLIAM KHOO WEI MING

Dear Sir/Madam,

**HC/S 1027/2020**
**HC/SUM 4136/2022**
**GUOTAIQIXING BIOMEDICAL INTERNATIONAL (S) PTE. LTD. V DAI XUEFENG & 2 ORS**
**- CORRESPONDENCE FROM COURTS**

We refer to the hearing of HC/SUM 4136/2022 before the Honourable Judicial Commissioner Goh Yihan on 8 December 2022 at 10am.

2.    Please find enclosed His Honour's decision for HC/SUM 4136/2022.

Attachments

1.    Decision of the General Division of the High Court (delivered by Goh Yihan JC)

Yours faithfully,
NG XIN YU
FOR REGISTRAR
SUPREME COURT
SINGAPORE

Tel No: 63324302

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

Email: SUPCOURT_Registry@supcourt.gov.sg

A subscriber of eLitigation will receive notices and communications from the Court by eLitigation, and may also receive the same notices and communications from the Court by other means. A person who is not a subscriber of eLitigation will receive notices and communications from the Court by email and/or post. For any response or query relating to any matter arising from the contents of any such notice or communication, please comply with the requirement in the applicable practice directions that all correspondence to the Court must be copied to all other parties or to their solicitors unless there are good reasons for not so doing.

This is computer-generated and requires no signature.

1 SUPREME COURT LANE SINGAPORE 178879
Tel: 1800 338 1034 | www.judiciary.gov.sg

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

**SUPREME COURT OF SINGAPORE**

8 December 2022

Suit No 1027 of 2020 (Summons No 4136 of 2022)

*Guotaiqixing Biomedical International (S) Pte Ltd v Dai Xuefeng and others*

--------------------------------------------------------------------------------------------------

**Decision of the General Division of the High Court (delivered by Goh Yihan JC):**

1        This is the Plaintiff's application for the granting of interim and temporary measures pending a full *inter partes* hearing of HC/SUM 4136/2022 ("SUM 4136") in January 2023. I should mention at the outset that the temporary measures being sought (which are set out in Annex A of the Plaintiff's written submissions) are more limited than those sought at the full hearing of SUM 4136. Importantly, the temporary measures do not require any disclosure of the First Defendant's assets. These measures will also only continue for a short time until the full hearing of SUM 4136 in January 2023.

2        After hearing the parties and considering the relevant documents, I allow the Plaintiff's application and grant the interim and temporary measures set out in Annex A of the Plaintiff's written submissions. In my view, not only are the four elements for an injunction satisfied, the balance of interests between the parties falls in favour of the Plaintiff. However, in granting the temporary measures sought, I am not expressing any views on the viability of the measures which the Plaintiff will seek at the full hearing of SUM 4136, which are different from the temporary ones being sought now.

3        These are the brief reasons for my decision, which may be amplified as necessary.

**The generally applicable law**

4        I begin with the generally applicable law. The decision whether to grant the temporary measures sought is governed by slightly different principles as those that will guide the court at the full hearing. At the hearing before me, Mr Calvin Liang ("Mr Liang"), counsel for the Plaintiff, referred me to three Hong Kong cases which he says lays down the applicable principles for grant of an interim injunction. He submits that a court should seek to do practical justice and balance fairness between the parties, while bearing in mind that any order granted

Case 1:24-cv-03142-UA    Document 1-4    Filed 04/24/24    Page 142 of 377

would be provisional and parties are at liberty to seek clarity subsequently. However, Mr Liang further maintains, as he had submitted in his written submissions, that the Plaintiff's case would meet the requirements for a full injunction in any case. Despite being confronted with these cases only during the hearing, Mr Phillip Fong ("Mr Fong"), counsel for the First Defendant, argued that the cases do not involve a freezing injunction and are therefore inapplicable in the present case.

5      To be fair to Mr Fong, I will apply the requirements for a full injunction since that was the primary focus of the parties' written submissions. I do, however, bear in mind Mr Liang's reference to the Hong Kong cases as an overarching consideration, which would apply equally to a full injunction as well. Thus, to succeed in its present application, the Plaintiff needs to establish four elements for a freezing injunction to be granted (see *Singapore Civil Procedure 2021* at [29/1/58]):

(a)      That it has a valid cause of action over which the court has jurisdiction;

(b)      That it has a "good arguable case";

(c)      That the First Defendant has assets within or outside of the jurisdiction; and

(d)      That there is a real risk that the assets may be disposed of or dissipated so that the judgment cannot be enforced.

6      Further, since the temporary measures sought by the Plaintiff are interim in nature, the court could consider the degree of prejudice occasioned to either party depending on whether the injunction is granted or not. In particular, as pointed out by the learned authors in David Bean, Isabel Perry & Andrew Burns, *Injunctions* (Sweet & Maxwell, 14th Ed, 2022) at [3-26]–[3-27], it needs to be kept in mind that being interim, any such measures granted or refused may turn out to have been wrongly granted or refused.

**The First Defendant's objections**

7      While the Plaintiff bears the burden of satisfying the necessary elements, it is helpful to keep the First Defendant's objections in mind. In his written submissions, the First Defendant raises eight objections to resist the Plaintiff's application. Some of these objections are repetitive. For present purposes, these objections may thus be summarised as such:

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

(a)     The Plaintiff has failed to put before the court any sworn or affirmed affidavit but has, instead, filed its affidavits under the cover of their solicitor's affidavit.

(b)     SUM 4136 is being pursued for a collateral or ulterior purpose and is an abuse of process. In particular, the First Defendant alleges that SUM 4136 is filed in retaliation against the First Defendant for his disclosures in this action and the RICO lawsuit in the US Federal Court. This can be shown by, among others, the Plaintiff not attempting to enforce the default judgments it obtained against the Second and Third Defendants, as well as the cost orders it obtained against the First Defendant, until recently.

(c)     The Plaintiff has not proved that there is a real risk of dissipation of the assets concerned.

(d)     The Plaintiff has not shown any urgent circumstances which requires the court to convene twice. Indeed, the Plaintiff's inordinate delay in taking out a freezing injunction shows the lack of urgency. There has been such delay because the Plaintiff has known the many factors allegedly showing a risk of dissipation before 2020.

(e)     The balance of convenience lies in favour of not granting the temporary measures.

8     I will address the First Defendant's objections in the course of considering whether the Plaintiff has satisfied the four elements it needs to establish in order to succeed in the present application.

**The First Defendant's preliminary objection**

9     I deal briefly with the First Defendant's preliminary objection that the Plaintiff has failed to put before the court any sworn or affirmed affidavit but has instead filed its affidavits under the cover of their solicitor's affidavit. This is a non-starter. It is common knowledge that the COVID-19 situation in China is rather serious now and this has resulted in new lock-downs. I accept the Plaintiff's explanation that he has not been able to travel to Guangzhou to have his affidavits affirmed personally before the Consulate-General of the Republic of Singapore. He has, however, confirmed and signed the contents of both affidavits. The First Defendant's

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

objection, in this regard, in the face of a commonly accepted practice when deponents cannot have their affidavits affirmed personally, cannot be accepted.

**The first element: jurisdiction of the court**

10    This element is not disputed as the First Defendant has thus far been unsuccessful in challenging the jurisdiction of the Singapore courts. Indeed, I do not see the First Defendant making any arguments against this first element in his written submissions resisting the Plaintiff's application.

**The second element: good arguable case**

11    Despite setting out the principles that determine whether there is a good arguable case (see the First Defendant's written submissions at [30]), the First Defendant does not actually refer to and *apply* those principles in relation to the present case. Indeed, the key words "arguable case" never appear again in the First Defendant's written submissions after being referred to as such in the description of the relevant principles. It therefore appears that the First Defendant does not clearly challenge that the Plaintiff has a good arguable case. To be fair, Mr Fong did bring me through several reasons during oral submissions to challenge this point. I will come to these reasons later.

12    Of course, the burden remains on the Plaintiff to show that there is a good arguable case. I accept the Plaintiff's point that there is at least an arguable case that the First Defendant had admitted that the funds that are the subject of the present dispute belong to the Plaintiff, and that he had procured the transfer of these funds into entities belonging to him, but without explaining where those funds are and what has become of them. More specifically, in his Second Affidavit filed on 9 July 2022 in HC/SUM 2515/2022, the First Defendant stated that he had procured the diversion of funds from "the Plaintiff's bank account to the various Khan entities [under his beneficial ownership and control]", and those funds rightly "belong to Shenzhen Guotaiqixing Industry Investment Fund Management Centre LLP and the Plaintiff".

13    While the First Defendant has tried to backtrack on this admission, I do not think that he has provided a complete answer. There, therefore, remains a good arguable case. Indeed, in so far as the First Defendant's written submissions refer to this admission, these submissions really treated the admission as being relevant to the factor of risk of dissipation, as opposed to a good, arguable case (see p 24). Further, while Mr Fong very helpfully brought me through

4 of 8

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

Case 1:24-cv-03142-UA Document 1-4 Filed 04/24/24 Page 145 of 377

several exchanges of letters between the parties, which he characterises as imputing unto the First Defendant admissions to matters that the First Defendant does not expressly deny, the fact remains that the First Defendant never satisfactorily explains away his statement in his Second Affidavit filed on 9 July 2022. While it may well be the First Defendant can do so at a later stage, I am satisfied that the Plaintiff has a good arguable case against him for the purposes of the present application.

14     In this regard, I also reject the First Defendant's objection that SUM 4136 is being pursued for a collateral or ulterior purpose and is an abuse of process. I do not understand how the First Defendant's claims of espionage are relevant to the Plaintiff's claims against him. I also do not think that the First Defendant has shown that the Plaintiff has commenced the present application as a "retaliation"; indeed, the First Defendant's submissions, in this regard, are conjectural in nature.

**The third element: the First Defendant's assets**

15     The Plaintiff has set out the First Defendant's assets within and outside of Singapore in the Schedule to its written submissions. I accept that the First Defendant has not provided a complete picture of whether the value of his assets in Singapore will be sufficient to meet any judgment obtained against him. As such, I am of the view that a worldwide freezing order is appropriate in the circumstances. In any event, the temporary measures sought by the Plaintiff do not affect the entirety of the First Defendant's assets. Rather, these measures will only have an impact if the First Defendant has less than the USD 34,650,158.34 in assets that is the subject of the Plaintiff's claim.

**The fourth element: risk of dissipation**

16     It is in relation to the fourth element that the parties' arguments largely cross. The Plaintiff has explained in several paragraphs (paras 10 to 48) of its written submissions why there is a real risk of dissipation by the First Defendant. In essence, the Plaintiff points to the First Defendant's Fourth Affidavit filed on 23 November 2022, where he considers himself entitled to continue the sale of his properties and other assets without accounting for them. The Plaintiff points to the very recent sale of two assets, namely, the University Place Premises, and the Cleft Rd Premises, to show that there is a very real risk of dissipation and the need for temporary measures to be granted in lieu of a full hearing in January 2023. In fact, at the hearing

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

Case 1:24-cv-03142-UA    Document 1-4    Filed 04/24/24    Page 146 of 377

itself, the Plaintiff says it discovered at least one other property in Florida belonging to the First Defendant that has been listed for sale.

17    The First Defendant's explanation is that he is a hedge fund manager and an asset manager by profession. It is therefore common for him to hold and manage several properties through several holding companies. This course of business requires him to buy and sell shares and properties based on market trends to ensure that his asset portfolio(s) are profit-yielding. Thus, the sale and purchases of assets are done by the First Defendant in his capacity as a manager, and not as an owner.

18    In my view, the First Defendant has not successfully rebutted the Plaintiff's arguments that there is a real risk of dissipation. First, it is undisputed, even by his own case, that the First Defendant was behind the sale of the two properties in recent times. Second, despite the First Defendant's disavowal of ownership in those properties, it is clear that a freezing injunction can extend to assets of entitles over which a defendant has "effective control" (see *Pek Seng Co Pte Ltd and others v Low Tin Kee and others* [1989] 2 SLR(R) 314 at [12]–[14]). It is therefore immaterial that the First Defendant is not the owner so long as it is clear (and it is so) that he has effective control over the assets. Third, the Plaintiff has exhibited public records and primary evidence of the First Defendant's ownership of the properties. The First Defendant has not, in my view, rebutted these public records. I therefore agree with the Plaintiff that, in particular, the timing and the sale of the University Place Premises gives rise to concerns that he was trying to dissipate his assets pending the adjudication of the Plaintiff's claim against him.

19    At the hearing before me, Mr Fong brought me through some searches on the website Zillow, which showed that the University Place Premises was listed for sale as early as 14 April 2022. According to Mr Fong, this showed that the intention to sell the property had already crystallised earlier this year and was not being done in response to pending judgment against the First Defendant. I reject this evidence as being one from the Bar; indeed, the First Defendant could easily have filed an affidavit attesting to this given that he filed an affidavit on the eve of today's hearing. In any event, even if I were to accept that the University Place Premises was listed for sale earlier, what is crucial is when it was eventually *sold*.

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

Case 1:24-cv-03142-UA    Document 1-4    Filed 04/24/24    Page 147 of 377

20      The First Defendant also points out that the list of factors which the Plaintiff relies on in support of its application have been known to it for a long time. In my view, however, the Plaintiff's application in SUM 4136 was triggered by its discovery of the sale of the University Place Premises. It discovered this on 11 November 2022. SUM 4136 was filed a mere four days later on 15 November 2022. In fact, it only discovered the sale of the Cleft Rd Premises on the day it was due to file its written submissions (*ie*, 1 December 2022). Accordingly, I do not see cause for the First Defendant to complaint about undue delay. If anything, the facts clearly show the urgency felt by the Plaintiff in bringing the present application.

**Balance of interests**

21      Finally, I am of the view that the balance of interests lies in favour of granting the temporary measures sought by the Plaintiff. First, as I have said above, the temporary measures only kick in if the First Defendant has less than the amount in assets allegedly diverted from the Plaintiff. The onus thus is on the First Defendant to disclose the amount and whereabouts of its assets, but if it does, the impact of the temporary measures can be much mitigated. Second, the temporary measures are only interim in nature for a period of a month or so. In saying this, I recognise the broad reach of a freezing injunction, whether interim or not. However, the measures sought also expressly permit the disposal of assets in "the ordinary and proper course of business" and to consensually increase the spending limit if needed. Third, there is a real prejudice to the Plaintiff if the temporary measures were not granted and the First Defendant dissipates the assets, of which there is a real possibility.

**Conclusion**

22      In the premises, I allow the Plaintiff's prayer for the grant of interim and temporary measures as set out in Annex A of its written submissions for this application. For ease of reference, I reproduce the Annex A, without the accompanying Schedules, below.

23      I will reserve the question of the costs of this application to the learned judge hearing the full application of SUM 4136 in January 2023.

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

7 of 8

Case 1:24-cv-03142-UA Document 1-4 Filed 04/24/24 Page 148 of 377

## TERMS OF THE INTERIM AND TEMPORARY MEASURES SOUGHT BY THE PLAINTIFF

*NB: In order to save the time and resources of the Court and the Parties, the Plaintiff limits the interim and temporary measures sought at the urgent hearing of SUM 4136 to what was proposed in paragraph 6 of ALC's letter dated 17 November 2022 (referred to in paragraph 9(b)), which is set out below.*

(a) The 1st Defendant must not, until the hearing for the determination of SUM 4136 before a Judge:

  (i) remove from Singapore any of his assets which are in Singapore whether in his own name or not and whether solely or jointly owned up to the value of USD 34,650,158.34; or

  (ii) in any way dispose of or deal with or diminish the value of any of his assets whether they are in or outside Singapore whether in his own name or not and whether solely or jointly owned up to the same value. For this purpose, the list of entities attached at Schedule 3 to the draft Order annexed to SUM 4136 are to be treated non-exhaustively as the 1st Defendant's nominees and the assets owned by those entities whether legally or beneficially owned by them, whether in their own name or not and whether solely or jointly owned are to be covered by this Order.

(b) This prohibition includes but are not limited to the assets listed in Schedule 2 to the draft Order annexed to SUM 4136.

(c) If the total unencumbered value of the 1st Defendant's assets in Singapore exceeds USD 34,650,158.34, the 1st Defendant may remove any of those assets from Singapore or may dispose of or deal with them so long as the total unencumbered value of his assets still in Singapore remains not less than USD 34,650,158.34. If the total unencumbered value of the 1st Defendant's assets in Singapore does not exceed USD 34,650,158.34, the 1st Defendant must not remove any of those assets from Singapore and must not dispose of or deal with any of them, but if he has other assets outside Singapore, the 1st Defendant may dispose of or deal with those assets so long as the total unencumbered value of all his assets whether in or outside Singapore remains not less than USD 34,650,158.34.

(d) The aforementioned (a), (b) and (c) be subject to the following exceptions:

  (i) This order does not prohibit the 1st Defendant from spending a sum (to be agreed between the parties or fixed by the Court) towards his ordinary living expenses and also a sum (to be agreed between the parties or fixed by the Court) on legal advice and representation.

  (ii) This order does not prohibit the 1st Defendant from dealing with or disposing of any of his assets in the ordinary and proper course of business.

  (iii) The 1st Defendant may agree with the Plaintiff's solicitors that the above spending limits should be increased or that this order should be varied in any other respect but any such agreement must be in writing.

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 149 of 377

# EXHIBIT 16

Case 1:24-cv-03142-UA Document 1-4 Filed 04/24/24 Page 150 of 377

# IN THE GENERAL DIVISION OF
# THE HIGH COURT OF THE REPUBLIC OF SINGAPORE

1     HC/S 1027 of 2020 (SUM 4/2023 & SUM 4136/2022)

2

3                      Between

4

5     **GUOTAIQIXING BIOMEDICAL INTERNATIONAL (S) PTE. LTD.**

6

7                                                … Plaintiff(s)

8                      And

9

10            **1. DAI XUEFENG**

11            **2. ZHANG JUNQI**

12            **3. XU XINMANNI**

13                                        … Defendant(s)

14

15

16     Coram   :    Justice Valerie Thean               <u>In Chamber (by Zoom)</u>

17

18     *Eugene Jedidiah Low Yeow Chin / See Chee Hoe (paralegal) (Ark law*

19     *Corporation) / Calvin Liang (Calvin Liang LLC)* for the Plaintiff ("PC"); and

20

21     *Quek Yu Chung Eugene / Kanteti Sai Alekhya (Harry Elias Partnership LLP)* for

22     the 1st Defendant ("1DC").

23

24     *1st Defendant* absent.

25

26                               <u>**NOTES OF ARGUMENT**</u>

27

28     <u>**12 January 2023**</u>

29

30     SUM 4/2023

31

| | | |
|---|---|---|
| 1 | 1DC: | We do not know if D1 is turning up. We were instructed to arrange an |
| 2 | | interpreter by SAR Ng in case he turns up. I just also tried to call him twice |
| 3 | | and unable to contact him. |
| 4 | | Could we have the discharge application heard first. We are unable to get |
| 5 | | instructions from our client for the main summons. |
| 6 | | |
| 7 | | On 30 Dec D1 informed that he would not pay bills and would have no |
| 8 | | objection if we discharge. We have no instructions for the application. |
| 9 | | |
| 10 | | Affid and Sums have been served on D1 – DHL (10 Jan) and email 3 |
| 11 | | January. Email address was that used up to 30 Dec and DHL delivery |
| 12 | | address (in Florida which is also the e-litigation address). Email address |
| 13 | | used by Registry is same email address. We have also served his lawyers in |
| 14 | | the USA. |
| 15 | | |
| 16 | Ct: | Does PC have anything to add. |
| 17 | | |
| 18 | PC: | May I check addresses for D1 as I was not served summons. |
| 19 | | |
| 20 | | [Addresses as per notice for hearing summons to discharge verified with PC |
| 21 | | and D1C] |
| 22 | | |
| 23 | PC: | Nothing further. 2 engagements for HEP, the first was entered into when Mr |
| 24 | | Dai was saying he was not represented. |
| 25 | | |
| 26 | 1DC: | First engagement was for investigations. Both investigations terminated. |
| 27 | | |
| 28 | | Prayer 1 mentions O64 r5(1) – will serve order on him. Ask costs $2,500 |
| 29 | | based on Appendix G discharge $1,000 - $4,000. We had to see duty |
| 30 | | Registrar and effort to get in touch. |
| 31 | | |
| 32 | Ct: | **OIT para 1 of Sum 4/2023.** |

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 152 of 377

| | | |
|---|---|---|
| 1 | | **Costs fixed at $2,000 inclusive of disbursements.** |
| 2 | | |
| 3 | | SUM 4136/2022 |
| 4 | | |
| 5 | PC: | Application for Mareva and proprietary injunctions. |
| 6 | | |
| 7 | | Instructions are to proceed today. No new affids, no new submissions. |
| 8 | | Elements remain satisfied. |
| 9 | | |
| 10 | | Situation has worsened since 8 Dec. On morning of 8 Dec we found out 191 |
| 11 | | Northeast (Fort Lauderdale property) listed for sale. Explanation from the |
| 12 | | bar – Tab C p6 was that D1 was manager for third parties. Still listed for |
| 13 | | sale. JC Goh – limited in time and did not include the disclosure orders. |
| 14 | | |
| 15 | | SOC is for US$34m and S290,000 over. |
| 16 | | |
| 17 | | Para 4 – sum claimed plus unpaid costs. 14 Dec 2022. 5th affid of Sun. |
| 18 | | |
| 19 | Ct: | These are interlocutory injunctions. Tracing order has not yet been ordered. |
| 20 | | So for para 5 are there authorities. |
| 21 | | |
| 22 | PC: | Para 22 PWS. Relying on A v C. 1BOA Tab 5. 959 at D. |
| 23 | | |
| 24 | | Timing of purchase of properties around time of diversions. |
| 25 | | |
| 26 | | Immediate owners of the properties discussed on 8 Dec already listed. Need |
| 27 | | to add 888 Cleft Road LLC. (disclosed by him on affid filed 8 Dec morning |
| 28 | | that he is beneficial owner of 88 Cleft Road LLC). |
| 29 | | |
| 30 | Ct: | Orders: |
| 31 | | |
| 32 | | **Pending final determination of S1027/2020:** |

**OIT para 4. Per draft order shown save for inclusions and amendments. Insert date and time of hearing. Amounts at para 8. Time for compliance 21 days for disclosure per para 9. Spending limit $12,500 per week, same as requested for at the interim order arguments, legal advice also $12,500. Para 11 – 28th of each month. Schedule 2 – to include 888 Cleft Road LLC Schedule 3 – also included that.**

**OIT para 3.**

**OIT para 5 save that the first line be modified. After "an order for the D1 to disclose" – "the monies remain in accounts listed at para 3(a) – (d) or if they have been transferred out". 21 days for para 5.**

May I hear you as to costs.

PC:  For costs. Appendix G $4-11,000. Contested $9,000. This was not contested but we have had three R's hearings contested duty Registrar (30 mins) and SAR Ng twice (45 mins, 25 mins). Had to write to court on temporary measures. Asking $62,000 in legal fees. JC Goh – costs were reserved. Today's hearing. Ask $62,000. Or perhaps $55,000 in addition to disbursements. We prepared on basis of contested. Disbursements $23,940.26 (1st Affid, fees $6,000. Applied Facts Report on his properties: $4,900. Second affid $1,000. Courier for serving of order on third parties, included banks and his solicitors in US. Another Applied facts report $6,000 to follow on earlier one. First hearing before JC Goh – served with affid at midnight.

Ct:  **Costs to plaintiffs, fixed inclusive of disbursements, at $60,000.**

**Liberty to apply.**

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 154 of 377

1
2                                                  Sgd by: Valerie Thean
3                                                           Judge

Certified True Copy

Manager, Judge's Chambers
Supreme Court Singapore

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 155 of 377

# EXHIBIT 17

**IN THE GENERAL DIVISION OF THE HIGH COURT OF THE REPUBLIC OF SINGAPORE**

Case No.: HC/S 1027/2020

Sub Case No.: HC/SUM 4136/2022

Doc No.: HC/ORC 258/2023

Filed: 17-January-2023 02:48 PM

Between

GUOTAIQIXING BIOMEDICAL INTERNATIONAL (S)
PTE. LTD.
(Singapore UEN No. 20150039K)

...Plaintiff(s)

And



1. DAI XUEFENG
   (China Passport No. ███2878)

2. ZHANG JUNQI
   (China Passport No. ███9520)

3. XU XINMANNI
   (China Passport No. ███7254)

...Defendant(s)



**ORDER OF COURT**

Before:      Justice Valerie Thean in Chambers

Date of Order : 12-January-2023

Upon the application of GUOTAIQIXING BIOMEDICAL INTERNATIONAL (S) PTE.

LTD. (Singapore UEN No. 20150039K) the Plaintiff in this action coming on for

hearing on 12 January 2023 at 10.00 a.m. and upon reading the 7th Affidavit of Eugene

Jedidiah Low Yeow Chin filed on 15 November 2022, the 1st Affidavit of Brian P.

Fredericks filed on 23 November 2022, the 4th Affidavit of Xuefeng Dai filed on 23

November 2022, the 8th Affidavit of Eugene Jedidiah Low Yeow Chin filed on 28 November

2022, the 9th Affidavit of Eugene Jedidiah Low Yeow Chin filed on 5 December 2022, the

1st Affidavit of Emory Hans Hardy filed on 7 December 2022, the 5th Affidavit of Xuefeng

Dai filed on 7 December 2022, the 5th Affidavit of Sun Yingtong filed on 14 December

2022, the 6th Affidavit of Sun Yingtong filed on 14 December 2022 and the 7th Affidavit of

Sun Yingtong filed on 14 December 2022, and the exhibits referred to therein, and upon

hearing counsel for the Plaintiff,

It is ordered that:

1. Pending the final determination of HC/S 1027/2020, the Plaintiff be granted a proprietary

injunction prohibiting the 1st Defendant from dealing with, disposing of, or diminishing the

monies set out below, which were transferred out from the Plaintiff's USD-denominated account held with DBS Bank Ltd in Singapore bearing number ███████7-01-3 (the "**Plaintiff's DBS Account (USD)**") between 29 December 2015 and 6 April 2017 to and received by the entities and person set out below in their respective bank accounts and any traceable product therefrom, which the 1st Defendant holds on trust for the Plaintiff:

> (a) Khan Funds Oriental Medicine Fund SPC (Cayman Islands Registration No. 304036) – the net sum of USD 22,600,000.00 received in its bank account held with DBS Bank Ltd. bearing number ███████4-01-5;

> (b) Khan Funds Management America, Inc. (New York DOS ID 4650514) – the sum of USD 3,210,025 received in its bank account held with JPMorgan Chase Bank N.A. bearing number ██████8765;



> (c) Khan Funds Global Limited (Cayman Islands Registration No. 304037) – the sum of USD 8,100,000 received in its bank account held with DBS Bank Ltd. bearing number ███████5-010; and

> (d) The 2nd Defendant – the sum of USD 353,356.89 received in her bank account held with DBS Bank Ltd. bearing number ██████9664.

In the alternative, payment of the sum of USD 34,263,381.89 into Court.

2. Pending the final determination of HC/S 1027/2020, the Plaintiff be granted an order in terms of the order annexed as Annex A hereto for an Injunction Prohibiting Disposal of Assets Worldwide.

3. The 1st Defendant is to disclose to the Plaintiff within 21 days whether the monies remain in the bank accounts listed in paragraphs 1(a) to 1(d) herein, or if they have been transferred out and payment into Court *per* paragraph 1(d) herein has not been met, the 1st Defendant is to disclose to the Plaintiff the full details of what has become of such monies, proceeds and funds listed in paragraphs 1(a) to 1(d) herein, their present location(s), and the assets (if any) representing such monies, proceeds and funds or into which such monies, proceeds and funds have flowed, whether such monies, proceeds, funds and assets are in or outside Singapore, whether legally or beneficially owned by him, whether in his own name or not, and whether solely or jointly owned.

4. The costs of this application be fixed at SGD 60,000 (inclusive of disbursements) to be paid by the 1st Defendant to the Plaintiff.

5. There be liberty to apply.

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 158 of 377

<u>Notice:</u>

(a) If you, the within-named 1st Defendant neglect to obey this order by the time therein limited, you will be liable to process of execution for the purpose of compelling you to obey the same.

(b) If you, the within-named 1st Defendant disobey this order, you will be liable to process of execution for the purpose of compelling you to obey the same.

| 1 | Name of Document: Annex: | Annex A |





*https://www.courtorders.gov.sg*
*Access code: 8hf6u983m*

Getting this document from the Authentic Court Orders Portal verifies:
(a) that it was issued by the Courts of the Republic of Singapore or, in the case of a Schedule of Assets, that it was filed with the Courts in relation to an application for a Grant of Probate/Letter of Administration; and (b) the text of the document was issued on 12 Jan 2023

TAN BOON HENG
REGISTRAR
SUPREME COURT
SINGAPORE



**IN THE GENERAL DIVISION OF THE
HIGH COURT OF THE REPUBLIC OF SINGAPORE**

HC/S 1027/2020
HC/SUM 4136/2022

Between

**GUOTAIQIXING BIOMEDICAL INTERNATIONAL (S) PTE. LTD.**
(UEN No. 20150039K)

... Plaintiff(s)

And

**(4)  DAI XUEFENG**
(PRC Passport No. 2878)

**(5)  ZHANG JUNQI**
(PRC Passport No. 9520)

**(6)  XU XINMANNI**
(PRC Passport No. 7254)

... Defendant(s)



# INJUNCTION PROHIBITING
# DISPOSAL OF ASSETS WORLDWIDE

**BEFORE THE HONOURABLE**

**JUSTICE VALERIE THEAN**                                      **IN CHAMBERS**

**IMPORTANT:- NOTICE TO THE 1ST DEFENDANT**

**(a)  This order prohibits you from dealing with your assets up to the amount stated. The order is subject to the exceptions stated at the end of the order. You should read all the terms of the order very carefully. You are advised to consult a solicitor as soon as possible. You have a right to ask the Court to vary or discharge this order.**

**(b)  If you disobey this order you will be guilty of contempt of Court and may be sent to prison or fined.**

**THE ORDER**

An application was made by counsel for the Plaintiff, Ark Law Corporation, to Justice Valerie Thean by way of HC/SUM 4136/2022. Justice Thean heard the application on 12 January 2023 at 10.00 a.m. and read the 7th Affidavit of Eugene Jedidiah Low Yeow Chin filed on 15 November 2022, the 1st Affidavit of Brian P. Fredericks filed on 23 November 2022, the 4th Affidavit of Xuefeng Dai filed on 23 November 2022, the 8th

2

Affidavit of Eugene Jedidiah Low Yeow Chin filed on 28 November 2022, the 9th Affidavit of Eugene Jedidiah Low Yeow Chin filed on 5 December 2022, the 1st Affidavit of Emory Hans Hardy filed on 7 December 2022, the 5th Affidavit of Xuefeng Dai filed on 7 December 2022, the 5th Affidavit of Sun Yingtong filed on 14 December 2022 ("**SYT's 5th Affidavit**"), the 6th Affidavit of Sun Yingtong filed on 14 December 2022 and the 7th Affidavit of Sun Yingtong filed on 14 December 2022, and the exhibits referred to therein, and heard counsel for the Plaintiff.

As a result of the application IT IS ORDERED by Justice Valerie Thean that:

<u>Disposal of assets</u>



1.   (a)   The 1st Defendant must not:

    (i)   remove from Singapore any of his assets which are in Singapore whether in his own name or not and whether solely or jointly owned up to the value of USD 34,650,158.34; and

    (ii)   in any way dispose of or deal with or diminish the value of any of his assets whether they are in or outside Singapore whether in his own name or not and whether solely or jointly owned up to the same value. For this purpose, the list of entities attached at Schedule 3 to this Order are to be treated non-exhaustively as the 1st Defendant's nominees and the assets owned by those entities whether legally or beneficially owned by them, whether in their own name or not and whether solely or jointly owned are to be covered by this Order.

  (b)   This prohibition includes but are not limited to the assets listed in Schedule 2 to this Order.

  (c)   If the total unencumbered value of the 1st Defendant's assets in Singapore exceeds USD 34,650,158.34, the 1st Defendant may remove any of those assets from Singapore or may dispose of or deal with them so long as the total unencumbered value of his assets still in Singapore remains not less than USD 34,650,158.34. If the total unencumbered value of the 1st Defendant's assets in Singapore does not exceed USD 34,650,158.34, the 1st Defendant must not remove any of those assets from Singapore and must not dispose of or deal with any of them, but if he has other assets outside Singapore, the 1st Defendant may dispose of or deal with those assets so long as the total unencumbered value of all his assets whether in or outside Singapore remains not less than USD 34,650,158.34.

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 162 of 377

3

### Disclosure of Information

2.    The 1st Defendant must inform the Plaintiff in writing at once of all his assets whether in or outside Singapore and whether in his own name or not and whether solely or jointly owned, giving the value, location and details of all such assets. For this purpose, the list of entities attached at Schedule 3 to this Order are to be treated non-exhaustively as the 1st Defendant's nominees and covered by this Order. The information must be confirmed in an affidavit which must be served on the Plaintiff's solicitors within 21 days after this order has been served on the 1st Defendant.

**EXCEPTIONS TO THIS ORDER**



3.    This order does not prohibit the 1st Defendant from spending US$12,500 a week towards his ordinary living expenses and also US$12,500 a week on legal advice and representation. But before spending any money, the 1st Defendant must tell the Plaintiff's solicitors where the money is to come from.

4.    This order does not prohibit the 1st Defendant from dealing with or disposing of any of his assets in the ordinary and proper course of business. The 1st Defendant shall account to the Plaintiff on the 28th of each month for the amount of money spent in this regard.

5.    The 1st Defendant may agree with the Plaintiff's solicitors that the above spending limits should be increased or that this order should be varied in any other respect but any such agreement must be in writing.

**EFFECT OF THIS ORDER**

6.    A defendant who is an individual who is ordered not to do something must not do it himself or in any other way. He must not do it through others acting on his behalf or on his instructions or with his encouragement.

7.    A defendant which is a corporation and which is ordered not to do something must not do it itself or by its directors, officers, employees or agents or in any other way.

4

## THIRD PARTIES

<u>Effect of this order</u>

8.    It is a contempt of Court for any person notified of this order knowingly to assist in or permit a breach of the order. Any person doing so may be sent to prison or fined.

<u>Effect of this order outside Singapore</u>

9.    The terms of this order do not affect or concern anyone outside the jurisdiction of this Court until it is declared enforceable or is enforced by a Court in the relevant country and then they are to affect him only to the extent they have been declared enforceable or have been enforced UNLESS such person is:



(a)    a person to whom this order is addressed or an officer or an agent appointed by power of attorney of such a person; or

(b)    a person who is subject to the jurisdiction of this Court; and

(i)    has been given written notice of this order at his residence or place of business within the jurisdiction of this Court; and

(ii)    is able to prevent acts or omissions outside the jurisdiction of this Court which constitute or assist in a breach of the terms of this order.

<u>Assets located outside Singapore</u>

10.    Nothing in this order shall, in respect of assets located outside Singapore, prevent any third party from complying with:

(a)    what it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between itself and the 1st Defendant; and

(b)    any orders of the Courts of that country or state, provided that reasonable notice of any application for such an order is given to the Plaintiff's solicitors.

<u>Set-off by banks</u>

Case 1:24-cv-03142-UA    Document 1-4    Filed 04/24/24    Page 164 of 377

5

11.    This injunction does not prevent any bank from exercising any right of set-off it may have in respect of any facility which it gave to the 1st Defendant before it was notified of the order.

<u>Withdrawals by the 1st Defendant</u>

12.    No bank need enquire as to the application or proposed application of any money withdrawn by the 1st Defendant if the withdrawal appears to be permitted by this order.

**UNDERTAKINGS**

13.    The Plaintiff gives to the Court the undertakings set out in Schedule 1 to this order.



**DURATION OF THIS ORDER**

14.    This order will remain in force until the trial or further order.

**VARIATION OR DISCHARGE OF THIS ORDER**

15.    The 1st Defendant (or anyone notified of this order) may apply to the Court at any time to vary or discharge this order (or so much of it as affects that person), but anyone wishing to do so must inform the Plaintiff's solicitors.

**NAME AND ADDRESS OF PLAINTIFF'S SOLICITORS**

16.    The Plaintiff's solicitors are:

>    **Eugene Jedidiah Low Yeow Chin**
>    **Ark Law Corporation**
>    1 Pickering Street
>    Level 8, Great Eastern Centre
>    Singapore 048659
>    Tel: +65 6592 8634
>    Email: info@arklaw.com.sg
>    <u>Ref: EJL.20200077</u>

                                        **REGISTRAR**

## SCHEDULE 1

*Undertakings given to the Court by the Plaintiff*

1.  If the Court later finds that this order has caused loss to the 1st Defendant, and decides that the 1st Defendant should be compensated for that loss, the Plaintiff shall comply with any order the Court may make.

2.  Anyone notified of this order will be given a copy of it by the Plaintiff's solicitors.



3.  The Plaintiff shall pay the reasonable costs of anyone other than the 1st Defendant which have been incurred as a result of this order including the costs of ascertaining whether that person holds any of the 1st Defendant's assets and if the Court later finds that this order has caused such person loss, and decides that such person should be compensated for that loss, the Plaintiff will comply with any order the Court may make.

4.  If this order ceases to have effect, the Plaintiff will immediately take all reasonable steps to inform in writing anyone to whom he has given notice of this order, or who he has reasonable grounds for supposing may act upon this order, that it has ceased to have effect.

5.  The Plaintiff shall not without the leave of the Court begin proceedings against the 1st Defendant in any other jurisdiction or use information obtained as a result of an order of the Court in this jurisdiction for the purpose of civil or criminal proceedings in any other jurisdiction.

6.  The Plaintiff shall not without the leave of the Court seek to enforce this order in any country outside Singapore or seek an order of a similar nature including

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 166 of 377

2

orders conferring a charge or other security against the 1st Defendant or the 1st

Defendant's assets.



Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 167 of 377

**<u>SCHEDULE 2</u>**

1.  All accounts in which the 1st Defendant has a legal or beneficial interest including monies in the following bank accounts:

| Entity Holding the Account | Bank | Currency | Account No. |
|---|---|---|---|
| KFG | DBS Bank | USD | ███████5-010 |
| KFG | DBS Bank | SGD | ██████614-4 |
| KOM | DBS Bank | USD | ██████████4-01-5 |
| KOM | DBS Bank | USD | ████████5-02-2 |
| KOM | DBS Bank | USD | ██████████-6-022 |
| KOM | DBS Bank | SGD | ██████587-3 |
| KOM | UOB Kay Hian | HKD/USD | █████6-001 |
| SGKFM | DBS Bank | SGD | ██████128-0 |
| SGKFM | DBS Bank | SGD | ██████-601-4 |
| SQKFM | China Construction Bank | USD | ██████████-5451 |
| SQKFM | China Construction Bank | USD | ████████████8237 |
| SQKFM | China Merchants Bank | RMB | ███████0588 |
| SQKFM | China Merchants Bank | RMB | ███████0802 |
| SQKFM | DBS Bank | USD | ████████3-01-9 |
| SQKFM | DBS Bank | SGD | ██████147-4 |
| KOM | KGI Asia Ltd | USD | ███████5022 |
| KOM | KGI Asia Ltd | HKD/USD | ███████044-2 |
| KOM | KGI Asia Ltd | USD | ████044F |
| KFA | JPMorgan Chase Bank | USD | █████8765 |
| KFA | JPMorgan Chase Bank | USD | █████3752 |
| KFA | JPMorgan Chase Bank | USD | █████2301 |



2.  The shares held directly or indirectly by the 1st Defendant in the following entities:

(a)  Khan Funds Management Asia Pte. Ltd. (Singapore)

(b)  深圳市旗隆投资管理有限公司 (also known as Shenzhen Khan Investment Management Co. Ltd.) (China)

(c)  重庆市旗隆投资管理有限公司 (also known as Chongqing Khan Investment Management Co. Ltd.) (China)

(d)  深圳前海旗隆基金管理有限公司 (also known as Shenzhen Qianhai Genghis Khan Fund Management Co., Ltd. and Shenzhen Qianhai Khan Fund Management Co., Ltd.) (China)

2

(e)     北京旗隆医药控股有限公司 (also known as Beijing Khan Pharmaceutical Holdings Co., Ltd.) (China)

(f)     Khan Funds Management America, Inc. (United States of America)

(g)     Chinese Fund Management of America Association, Inc. (United States of America)

(h)     SP Avatar Management LLC (United States of America)

(i)     U Place LLC (United States of America)

(j)     Springfield Beacon Holding LLC (United States of America)

(k)     Sandalfoot Boca Holdings LLC (United States of America)

(l)     Seven Isles Drive LLC (United States of America)

(m)    Riverside Oasis Holdings LLC (United States of America)

(n)     Mars Springs Farm & Ranch LLC (United States of America)

(o)     Khan Funds Global Limited (Cayman Islands)

(p)     Khan Funds Oriental Medicine Fund (Cayman Islands)

(q)     Daibenewise Limited (Cayman Islands)

(r)     Genghis Khan Investment, Inc. (British Virgin Islands)

(s)     888 Cleft Rd LLC (United States of America)



3.     The assets, including any real properties and bank accounts, held in the names of the entities listed above or in Schedule 3, including but not limited to the following assets:

(a)     249 Cleft Rd, Mill Neck, NY 11765

(b)     4 / 6 University Place, Great Neck, NY 11020

(c)     11886 Anchorage Way, Boca Raton, FL 33428

(d)     10580 Sandalfoot Blvd, Boca Raton, FL

(e)     19944 Flotilla Pl, Boca Raton, FL

(f)     11914 Anchorage Way, Boca Raton, FL

(g)     The property at Lot 46, of Sea Island Unit Three, according to the Plat thereof as recorded in Plat Book 27, Page 19, of the Public Records of Broward County, Florida

(h)     191 NE 23 Avenue, Fort Lauderdale, FL 33301

(i)     6300 Riverside Drive, Parkland, FL 33067, United States of America

(j)     The 6.681-acre property described as a portion of Parcel A of Tall-Pines, according to the Plat thereof as recorded in Plat Book 152, Book 30 of the Public Records of Broward County, Florida

Case 1:24-cv-03142-UA    Document 1-4    Filed 04/24/24    Page 169 of 377

## SCHEDULE 3

The 1st Defendant's nominees:

(a)  Khan Funds Management Asia Pte. Ltd. (Singapore)

(b)  深圳市旗隆投资管理有限公司 (also known as Shenzhen Khan Investment Management Co. Ltd.) (China)

(c)  重庆市旗隆投资管理有限公司 (also known as Chongqing Khan Investment Management Co. Ltd.) (China)

(d)  深圳前海旗隆基金管理有限公司 (also known as Shenzhen Qianhai Genghis Khan Fund Management Co., Ltd. and Shenzhen Qianhai Khan Fund Management Co., Ltd.) (China)

(e)  北京旗隆医药控股有限公司 (also known as Beijing Khan Pharmaceutical Holdings Co., Ltd.) (China)



(f)  Khan Funds Management America, Inc. (United States of America)

(g)  Chinese Fund Management of America Association, Inc. (United States of America)

(h)  SP Avatar Management LLC (United States of America)

(i)  U Place LLC (United States of America)

(j)  Springfield Beacon Holding LLC (United States of America)

(k)  Sandalfoot Boca Holdings LLC (United States of America)

(l)  Seven Isles Drive LLC (United States of America)

(m)  Riverside Oasis Holdings LLC (United States of America)

(n)  Mars Springs Farm & Ranch LLC (United States of America)

(o)  Khan Funds Global Limited (Cayman Islands)

(p)  Khan Funds Oriental Medicine Fund (Cayman Islands)

(q)  Daibenewise Limited (Cayman Islands)

(r)  Genghis Khan Investment, Inc. (British Virgin Islands)

(s)  888 Cleft Rd LLC (United States of America)

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 170 of 377

# EXHIBIT 18

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 171 of 377



SUPREME COURT OF SINGAPORE
LEGAL REGISTRY

# IN THE GENERAL DIVISION OF THE HIGH COURT OF THE REPUBLIC OF SINGAPORE

Date: 02-February-2023

To:

1. Ark Law Corporation
1, PICKERING STREET, # 08-01, GREAT EASTERN CENTRE, Singapore - 048659
Tel No: 65928632
Email: info@arklaw.com.sg
File Ref No: EJL 20200077
Solicitor in charge: EUGENE JEDIDIAH LOW YEOW CHIN

2. DAI XUEFENG     **(by email only)**
6300 Riverside Dr Parkland FL 33067
United States
Email: eric.dai@khanfunds.com

Dear Sir/Madam,

**HC/S 1027/2020**
**HC/SUM 4147/2022**
**GUOTAIQIXING BIOMEDICAL INTERNATIONAL (S) PTE. LTD. V DAI XUEFENG & 2 ORS**

We refer to the letter dated 30 January 2023 from Messrs Ark Law Corporation, which has been placed before AR Kenneth Wang.

The 1st Defendant has a final opportunity to comply with the Court's direction that the Defence (Amendment No 3) be re-filed without the non-consequential amendments, by 5pm on 9 February. If he fails to do so by such time, the Plaintiff may write in to expunge the Defence (Amendment No 3) in its entirety. It will not be appropriate to allow the Plaintiff to pick and choose which amendment to the Defence ought to be permitted.

 Thank you.

Yours faithfully,
IRENE NG
FOR REGISTRAR
SUPREME COURT
SINGAPORE

Tel No: 63324248
Email: SUPCOURT_Registry@supcourt.gov.sg

A subscriber of eLitigation will receive notices and communications from the Court by eLitigation, and may also receive the same notices and communications from the Court by other means. A person who is not a subscriber of eLitigation will receive notices and communications from the Court by email and/or post. For any response or query relating to any matter arising from the contents of any such notice or communication, please comply with the requirement in the applicable practice directions that all correspondence to the Court must be copied to all other parties or to their solicitors unless there are good

reasons for not so doing.

This is computer-generated and requires no signature.

**1 SUPREME COURT LANE SINGAPORE 178879**
**Tel: 1800 338 1034 | www.judiciary.gov.sg**

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 173 of 377

# EXHIBIT 19

## IN THE GENERAL DIVISION OF THE HIGH COURT OF THE REPUBLIC OF SINGAPORE

Case No.: HC/S 1027/2020

Sub Case No.: HC/SUM 771/2023

Doc No.: HC/ORC 1691/2023

Filed: 14-April-2023 11:00 AM

Between

GUOTAIQIXING BIOMEDICAL INTERNATIONAL (S) PTE. LTD.
(Singapore UEN No. 20150039K)

...Plaintiff(s)

And

1. DAI XUEFENG
   (China Passport No.    2878)

2. ZHANG JUNQI
   (China Passport No.    9520)

3. XU XINMANNI
   (China Passport No.    7254)

...Defendant(s)



## ORDER OF COURT

Before:    Assistant Registrar Wong Hee Jinn in Chambers

Date of Order : 14-April-2023

Upon the application of GUOTAIQIXING BIOMEDICAL INTERNATIONAL (S) PTE. LTD. (Singapore UEN No. 20150039K) the Plaintiff in this action coming on for hearing this day and upon reading the 12th Affidavit of Eugene Jedidiah Low Yeow Chin filed on 20 March 2023 and the 10th Affidavit of Sun Yingtong filed on 4 April 2023, and the exhibits referred to therein, and upon hearing counsel for the Plaintiff,

It is ordered that:

1. The 1st Defendant shall have another 14 days from the date of this Order to comply with the Order of Court dated 30 January 2023 (HC/ORC 465/2023 ("**ORC 465**")) ordering the 1st Defendant to:

   (a) file and serve on the Plaintiff a Supplementary List of Documents setting out the documents listed in Annex A to ORC 465 (Annex 1 to this Order ("**Annex 1**")), and an Affidavit verifying the same; and
   (b) provide inspection of the documents listed at Annex 1 to this Order within 14 days of the service of the aforesaid Affidavit or List.

2. The 1st Defendant shall have another 14 days from the date of this Order to comply with the Order of Court dated 12 January 2023 (HC/ORC 258/2023 ("**ORC 258**")) ordering the 1st Defendant to:

   (a) in respect of the monies which were transferred out from the Plaintiff's USD-denominated account held with DBS Bank Ltd in Singapore bearing number    07013 (the "**Plaintiff's DBS Account (USD)**") between 29 December 2015 and 6 April 2017 to and received by the entities and

person set out below in their respective bank accounts and any traceable product therefrom, which the 1st Defendant holds on trust for the Plaintiff:

(i) Khan Funds Oriental Medicine Fund SPC (Cayman Islands Registration No. 304036) – the net sum of USD 22,600,000.00 received in its bank account held with DBS Bank Ltd. bearing number ████4015;

(ii) Khan Funds Management America, Inc. (New York DOS ID 4650514) – the sum of USD 3,210,025 received in its bank account held with JPMorgan Chase Bank N.A. bearing number ████8765;

(iii) Khan Funds Global Limited (Cayman Islands Registration No. 304037) – the sum of USD 8,100,000 received in its bank account held with DBS Bank Ltd. bearing number ████5010; and

(iv) The 2nd Defendant – the sum of USD 353,356.89 received in her bank account held with DBS Bank Ltd. bearing number ████9664,



disclose to the Plaintiff whether the monies remain in the bank accounts listed above, or if they have been transferred out, to disclose to the Plaintiff the full details of what has become of such monies, proceeds and funds listed above, their present location(s), and the assets (if any) representing such monies, proceeds and funds or into which such monies, proceeds and funds have flowed, whether such monies, proceeds, funds and assets are in or outside Singapore, whether legally or beneficially owned by him, whether in his own name or not, and whether solely or jointly owned; and

(b) inform the Plaintiff in writing, by an affidavit served on the Plaintiff's solicitors, of all his assets whether in or outside Singapore and whether in his own name or not and whether solely or jointly owned, giving the value, location and details of all such assets (for this purpose, the list of entities in Schedule 3 of Annex A to ORC 258 (Annex 2 to this Order ("**Annex 2**")) are to be treated non-exhaustively as the 1st Defendant's nominees and covered by this Order).

3. Unless the 1st Defendant complies with each of paragraphs 1(a), 1(b), 2(a) and 2(b) above within the time stipulated by each of paragraphs 1(a), 1(b), 2(a) and 2(b) respectively, the 1st Defendant's Defence herein shall be struck out without further order, and the Plaintiff shall be at liberty to enter final Judgment against the 1st Defendant for the following reliefs:

(a) pursuant to prayers (1)(a)(ii), (4)(a), (5)(a) and/or (5)(c)(i) of the Statement of Claim (Amendment No. 1) filed on 12 December 2022 (the "**SOC**"), the 1st Defendant is to pay the Plaintiff the sum of USD 34,264,935.99;

(b) pursuant to prayers (1)(b), (4)(a), (5)(a) and/or (5)(c)(i) of the SOC, the 1st Defendant is to pay the Plaintiff the sum of SGD 290,153.97;

(c) pursuant to prayer (1)(a)(i) of the SOC, a declaration that the 1st Defendant is liable to account to the Plaintiff for the sums, received in the bank accounts set out in paragraphs 2(a)(i) to 2(a)(iv) above, comprising the aggregate sum of USD 34,264,935.99, on the ground of his breaches of fiduciary duties;

(d) pursuant to prayer (1)(a)(iii) of the SOC, a declaration that the Plaintiff is entitled to trace the sums received in the bank accounts set out in paragraphs 2(a)(i) to 2(a)(iv) above, comprising the aggregate sum of USD

34,264,935.99, into any traceable product and entitled to claim a beneficial interest in, alternatively an equitable lien over, that traceable product, which the 1st Defendant holds on trust for the Plaintiff;

(e) pursuant to prayer 6(a) of the SOC, the 1st Defendant is to pay pre-judgment interest on each of the aforesaid sums in paragraphs 3(a) and 3(b) above to the date of judgment at the Court's default rate of interest of 5.33% per annum;

(f) pursuant to prayer 6(a) of the SOC, the 1st Defendant is to pay post-judgment interest on each of the aforesaid sums in paragraphs 3(a) and 3(b) above, from the day after the date of judgment to the date of payment at the Court's default rate of interest of 5.33% per annum;

(g) pursuant to prayer 6(b) of the SOC, the costs of the action be paid by the 1st Defendant to the Plaintiff and fixed or taxed; and

(h) pursuant to paragraphs 6(a) and 6(b) of the SOC, the 1st Defendant is to pay interest on the aforesaid costs of the action in paragraph 3(f) above, from the day after the date of judgment to the date of payment at the Court's default rate of interest of 5.33% per annum.

4. The costs of and occasioned by this application be fixed at S$4,900 (all in) and paid by the 1st Defendant to the Plaintiff.

5. The 1st Defendant is to pay interest on the aforesaid costs of and occasioned by this application in paragraph 4 above, from the day after this Order to the date of payment at the Court's default rate of interest of 5.33% per annum.



| 1 | Name of Document: | Annex 1 |
|---|---|---|
| | Annex: | |

| 2 | Name of Document: | Annex 2 |
|---|---|---|
| | Annex: | |

TAN BOON HENG

REGISTRAR

SUPREME COURT

SINGAPORE



*https://www.courtorders.gov.sg*
*Access code: 8hf6gx597*

Getting this document from the Authentic Court Orders
Portal verifies:
(a) that it was issued by the Courts of the Republic of
Singapore or, in the case of a Schedule of Assets, that it was
filed with the Courts in relation to an application for a Grant
of Probate/Letter of Administration; and (b) the text of the
document was issued on 14 Apr 2023



FILED: NEW YORK COUNTY CLERK 03/12/2024 10:18 AM
INDEX NO. 152210/2024
NYSCEF DOC. NO. 22
RECEIVED NYSCEF: 03/12/2024

TAN BOON HENG

REGISTRAR

SUPREME COURT

SINGAPORE



## ANNEX 1

| S/N | Requested Documents |
|---|---|
| 1 | In relation to the sums that were withdrawn from the Plaintiff's USD-denominated account held with DBS Bank Ltd in Singapore with account no.     7-01-3 (referred to as the "**Plaintiff's DBS Account (USD)**" in the Statement of Claim filed on 27 October 2020) between 29 December 2015 and 6 April 2017 and transferred to the 2nd Defendant, Khan Funds Management America, Inc., Khan Funds Global Limited or Khan Oriental Medicine Fund SPC: |
| | (a)   All documents (including, without limitation, bank statements, wire transfer instructions, receipts, SWIFT messages, transaction confirmations / advices, emails, messages, financial statements, management accounts, payment vouchers), relating to or in connection with the said transfers **as well as** their traceable proceeds, showing in respect of each of the said transfer and traceable proceeds without limitation, (i) the person(s) to whom payment was made, (ii) the bank account(s) into which payment was made, (iii) or the asset(s) (if any) representing such sums, into which such sums had and have flowed, and their present location(s). |
| | (b)   All documents (including, without limitation, invoices, receipts, contracts, wire transfer instructions, emails, messages) relating to or in connection with the "*genuine commercial basis*" transactions asserted by the 1st Defendant in the Defence (Amendment No. 1) filed on 17 June 2022 at [22]. |



## ANNEX 2

The 1st Defendant's nominees:

(a) Khan Funds Management Asia Pte. Ltd. (Singapore)

(b) 深圳市旗隆投资管理有限公司 (also known as Shenzhen Khan Investment Management Co. Ltd.) (China)

(c) 重庆市旗隆投资管理有限公司 (also known as Chongqing Khan Investment Management Co. Ltd.) (China)

(d) 深圳前海旗隆基金管理有限公司 (also known as Shenzhen Qianhai Genghis Khan Fund Management Co., Ltd. and Shenzhen Qianhai Khan Fund Management Co., Ltd.) (China)

(e) 北京旗隆医药控股有限公司 (also known as Beijing Khan Pharmaceutical Holdings Co., Ltd.) (China)



(f) Khan Funds Management America, Inc. (United States of America)

(g) Chinese Fund Management of America Association, Inc. (United States of America)

(h) SP Avatar Management LLC (United States of America)

(i) U Place LLC (United States of America)

(j) Springfield Beacon Holding LLC (United States of America)

(k) Sandalfoot Boca Holdings LLC (United States of America)

(l) Seven Isles Drive LLC (United States of America)

(m) Riverside Oasis Holdings LLC (United States of America)

(n) Mars Springs Farm & Ranch LLC (United States of America)

(o) Khan Funds Global Limited (Cayman Islands)

(p) Khan Funds Oriental Medicine Fund (Cayman Islands)

(q) Daibenewise Limited (Cayman Islands)

(r) Genghis Khan Investment, Inc. (British Virgin Islands)

(s) 888 Cleft Rd LLC (United States of America)

# EXHIBIT 20

IN THE GENERAL DIVISION OF THE HIGH COURT OF THE REPUBLIC OF SINGAPORE

Case No.: HC/S 1027/2020
Doc No.: HC/JUD 248/2023
Filed: 27-June-2023 04:33 PM



Between

GUOTAIQIXING BIOMEDICAL INTERNATIONAL (S) PTE. LTD.
(Singapore UEN No. 20150039K)

...Plaintiff(s)

And

1. DAI XUEFENG
   (China Passport No.　2878)
2. ZHANG JUNQI
   (China Passport No.　9520)
3. XU XINMANNI
   (China Passport No.　7254)



...Defendant(s)

### JUDGMENT PURSUANT TO ORDER OF COURT

**PURSUANT TO THE ORDER OF COURT** dated the 27th day of June 2023 (the **"Order"**) whereby it was ordered, among other things, that final Judgment be entered against the 1st Defendant for the reliefs specified in paragraph 1 of the Order,

**IT IS THIS DAY ADJUDGED** that:

1. the 1st Defendant is to pay the Plaintiff the sum of **USD 34,264,935.99**;

2. the 1st Defendant is to pay the Plaintiff the sum of **SGD 290,153.97**;

3. the 1st Defendant is to account to the Plaintiff for the sum of **USD 34,264,935.99** as trustee on the ground of his breaches of fiduciary duties;

4. the 1st Defendant is to pay pre-judgment interest on the aforesaid sums in paragraphs 1 and 2 above from the dates on which the relevant loss was caused to the Plaintiff to the date of judgment at the Court's default rate of interest of 5.33% per annum, amounting to the sums of **USD 13,626,721.72 and SGD 99,768.80**, as set out in **ANNEX A** to this Judgment; and

5. the 1st Defendant is to pay post-judgment interest on each of the aforesaid sums in paragraphs 1 and 2 above, from the day after the date of Judgment to the date of payment at the Court's default rate of interest of 5.33% per annum.

1. ANNEX A

Certified True Copy

∕2∕2∕

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

1



*https://www.courtorders.gov.sg*
*Access code: 8hgisd54o*

Getting this document from the Authentic Court Orders
Portal verifies:
(a) that it was issued by the Courts of the Republic of
Singapore or, in the case of a Schedule of Assets, that it was
filed with the Courts in relation to an application for a Grant
of Probate/Letter of Administration; and (b) the text of the
document was issued on 27 Jun 2023

TAN BOON HENG
REGISTRAR
SUPREME COURT
SINGAPORE



Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

2

Case 1:24-cv-03142-UA    Document 1-4    Filed 04/24/24    Page 184 of 377

# ANNEX A

3

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

A-2

## CALCULATION OF PRE-JUDGMENT INTEREST

Section 1: Calculation of Pre-Judgment Interest on Transfers Made Pursuant to the Diversion (based on schedule at paragraph 49 of the SOC (Amendment No. 1))

| Date of Withdrawal / Deposit | Withdrawal / Deposit | Sum Transferred out of / Returned to the Plaintiff (USD) | Bank Charges Incurred (USD) | Balance | Period of Interest | Interest Accrued During Period at Rate of 5.33% p.a. (USD) |
|---|---|---|---|---|---|---|
| 29-Dec-2015 | Withdrawal | 33,600,000.00 | - | 33,600,000.00 | From 29 December 2015 to 5 January 2016 | 39,252.16 |
| 6-Jan-2016 | Wilhdrawal | 310,000.00 | 179.24 | 33,910,179.24 | From 6 January 2016 to 29 August 2016 | 1,173,580.21 |
| 30-Aug-2016 | Withdrawal | 250,000.00 | 203.53 | 34,160,382.77 | From 30 August 2016 to 17 November 2016 | 399,068.14 |
| 18-Nov-2016 | Deposit | -10,000,000.00 | - | 24,160,382.77 | - | - |
| 18-Nov-2016 | Withdrawal | 500,000.00 | - | 24,660,382.77 | - | - |
| 18-Nov-2016 | Withdrawal | 500,000.00 | - | 25,160,382.77 | From 18 November 2016 to 30 November 2016 | 47,763.37 |
| 1-Dec-2016 | Withdrawal | 500,000.00 | - | 25,660,382.77 | - | - |
| 1-Dec-2016 | Withdrawal | 500,000.00 | - | 26,160,382.77 | From 1 December 2016 to 4 December 2016 | 15,280.53 |
| 5-Dec-2016 | Withdrawal | 550,025.00 | 195.18 | 26,710,602.95 | From 5 December 2016 to 26 December 2016 | 85,810.56 |

Annex A: Calculation of Pre-Judgment Interest

4

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

A-3

| 27-Dec-2016 | Withdrawal | 500,000.00 | 192.14 | 27,210,795.09 | From 27 December 2016 to 27 December 2016 | 3,973.52 |
|---|---|---|---|---|---|---|
| 28-Dec-2016 | Withdrawal | 6,000,000.00 | - | 33,210,795.09 | From 28 December 2016 to 3 January 2017 | 33,947.80 |
| 4-Jan-2017 | Withdrawal | 400,000.00 | 192.48 | 33,610,987.57 | From 4 January 2017 to 21 February 2017 | 240,498.13 |
| 22-Feb-2017 | Withdrawal | 353,356.89 | | 33,964,344.46 | From 22 February 2017 to 8 March 2017 | 74,395.87 |
| 9-Mar-2017 | Withdrawal | 200,000.00 | 195.75 | 34,164,540.21 | From 9 March 2017 to 20 March 2017 | 59,867.51 |
| 21-Mar-2017 | Withdrawal | 100,000.00 | | 34,264,540.21 | From 21 March 2017 to 5 April 2017 | 80,056.99 |
| 6-Apr-2017 | Deposit | -1,000,000.00 | - | 33,264,540.21 | - | - |
| 6-Apr-2017 | Withdrawal | 500,000.00 | 197.89 | 33,764,738.10 | - | - |
| 6-Apr-2017 | Withdrawal | 500,000.00 | 197.89 | 34,264,935.99 | From 6 April 2017 to 27 June 2023 | 11,373,226.94 |
| | | | | | TOTAL: | USD 13,626,721.72 |

**Annex A: Calculation of Pre-Judgment Interest**

5

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 187 of 377

A-4

**Section 2: Calculation of Pre-Judgment Interest on Unjustified Use of Plaintiff's Office Premises (based on schedule at paragraph 69 of the SOC (Amendment No. 1)**

| Relevant Year | Month | Date | Amount paid by the Plaintiff (SGD) | Balance (SGD) | Period of Interest | Interest Accrued During Period at Rate of 5.33% p.a. (SGD) |
|---|---|---|---|---|---|---|
| 2016 | March (only 30th and 31st) | 1-Mar-2016 | 932.97 (pro-rated) | 932.97 | From 1 March 2016 to 31 March 2016 | 4.22 |
| | April | 1-Apr-2016 | 14,461.05 | 15,394.02 | From 1 April 2016 to 30 April 2016 | 67.44 |
| | May | 1-May-2016 | 14,461.05 | 29,855.07 | From 1 May 2016 to 31 May 2016 | 135.15 |
| | June | 1-Jun-2016 | 14,461.05 | 44,316.12 | From 1 June 2016 to 30 June 2016 | 194.14 |
| | July | 1-Jul-2016 | 14,461.05 | 58,777.17 | From 1 July 2016 to 31 July 2016 | 266.08 |
| | August | 1-Aug-2016 | 14,461.05 | 73,238.22 | From 1 August 2016 to 31 August 2016 | 331.54 |
| | September | 1-Sep-2016 | 14,461.05 | 87,699.27 | From 1 September 2016 to 30 September 2016 | 384.19 |
| | October | 1-Oct-2016 | 14,461.05 | 102,160.32 | From 1 October 2016 to 31 October 2016 | 462.46 |
| | November | 1-Nov-2016 | 14,461.05 | 116,621.37 | From 1 November 2016 to 30 November 2016 | 510.90 |
| | December | 1-Dec-2016 | 14,461.05 | 131,082.42 | From 1 December 2016 to 31 December 2016 | 593.39 |

**Annex A: Calculation of Pre-Judgment Interest**

6

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 188 of 377

A-5

| | | | | | | |
|---|---|---|---|---|---|---|
| | January | 1-Jan-2017 | 14,461.05 | 145,543.47 | From 1 January 2017 to 31 January 2017 | 658.85 |
| | February | 1-Feb-2017 | 14,461.05 | 160,004.52 | From 1 February 2017 to 28 February 2017 | 654.22 |
| | March | 1-Mar-2017 | 14,461.05 | 174,465.57 | From 1 March 2017 to 31 March 2017 | 789.76 |
| | April | 1-Apr-2017 | 14,461.05 | 188,926.62 | From 1 April 2017 to 30 April 2017 | 827.65 |
| | May | 1-May-2017 | 14,461.05 | 203,387.67 | From 1 May 2017 to 31 May 2017 | 920.71 |
| 2017 | June | 1-Jun-2017 | 14,461.05 | 217,848.72 | From 1 June 2017 to 30 June 2017 | 954.36 |
| | July | 1-Jul-2017 | 14,461.05 | 232,309.77 | From 1 July 2017 to 31 July 2017 | 1,051.63 |
| | August | 1-Aug-2017 | 14,461.05 | 246,770.82 | From 1 August 2017 to 31 August 2017 | 1,117.09 |
| | September | 1-Sep-2017 | 14,461.05 | 261,231.87 | From 1 September 2017 to 30 September 2017 | 1,144.41 |
| | October | 1-Oct-2017 | 14,461.05 | 275,692.92 | From 1 October 2017 to 31 October 2017 | 1,248.02 |
| | November | 1-Nov-2017 | 14,461.05 | 290,153.97 | From 1 November 2017 to 27 June 2023 | 87,452.57 |
| | | | | | TOTAL: | SGD 99,768.80 |

**Annex A: Calculation of Pre-Judgment Interest**

7

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 189 of 377

# EXHIBIT 21

IN THE GENERAL DIVISION OF THE HIGH COURT OF THE REPUBLIC OF SINGAPORE

Case No.: HC/S 1027/2020

Sub Case No.: HC/SUM 1440/2023

Doc No.: HC/ORC 2878/2023

Filed: 27-June-2023 04:27 PM

Between

GUOTAIQIXING BIOMEDICAL INTERNATIONAL (S) PTE. LTD.
(Singapore UEN No. 20150039K)

...Plaintiff(s)

And

1.  DAI XUEFENG
    (China Passport No. ████ 2878)

2.  ZHANG JUNQI
    (China Passport No. ████ 9520)

3.  XU XINMANNI
    (China Passport No. ████ 7254)

...Defendant(s)



## ORDER OF COURT

Before:     The Honourable Justice Valerie Thean in Chambers

Date of Order : 27-June-2023

UPON THE APPLICATION of GUOTAIQIXING BIOMEDICAL INTERNATIONAL (S) PTE. LTD. (Singapore UEN No. 20150039K) the Plaintiff in this action coming on for hearing on 27 June 2023 at 10.00 a.m., UPON READING the 13th Affidavit of Eugene Jedidiah Low Yeow Chin filed on 12 May 2023, the 11th Affidavit of Sun Yingtong filed on 24 May 2023, and the exhibits referred to therein, and UPON HEARING counsel for the Plaintiff,

It is ordered that:

1.  The 1st Defendant having failed to comply with each of subparagraphs (1)(a), (1)(b), (2)(a) and (2)(b) of HC/ORC 1691/2023 ("ORC 1691") within the time stipulated by the said sub-paragraphs (1)(a), (1)(b), (2)(a) and (2)(b) of ORC 1691 respectively, and consequently the 1st Defendant's Defence having been struck out, final Judgment be entered against the 1st Defendant as follows:

    (a)  the 1st Defendant is to pay the Plaintiff the sum of USD **34,264,935.99**;

    (b)  the 1st Defendant is to pay the Plaintiff the sum of **SGD 290,153.97**;

    (c)  the 1st Defendant is to account to the Plaintiff for the sum of **USD 34,264,935.99** as trustee on the ground of his breaches of fiduciary duties;

    (d)  the 1st Defendant is to pay pre-judgment interest on the aforesaid sums in sub-paragraphs (1)(a) and (1)(b) above from the dates on which the relevant loss was caused to the Plaintiff to the date of judgment at the

Certified True Copy

~~~~

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

1

Court's default rate of interest of 5.33% per annum, amounting to the sums of **USD 13,626,721.72** and **SGD 99,768.80**, as set out in **ANNEX A** to this Order; and

(e)   the 1st Defendant is to pay post-judgment interest on each of the aforesaid sums in sub-paragraphs (1)(a) and 1(b) above, from the day after the date of Judgment to the date of payment at the Court's default rate of interest of 5.33% per annum; and

2.   The Plaintiff is to write to Court for fixing of the costs of the action, and the costs of and occasioned by HC/SUM 1440/2023 and HC/SUM 1441/2023, and the orders as to interest thereon.

| 1 | Name of Document: Annex: | ANNEX A |
|---|---|---|





https://www.courtorders.gov.sg
Access code: 8hf6mc7ry

Getting this document from the Authentic Court Orders Portal verifies:
(a) that it was issued by the Courts of the Republic of Singapore or, in the case of a Schedule of Assets, that it was filed with the Courts in relation to an application for a Grant of Probate/Letter of Administration; and (b) the text of the document was issued on 27 Jun 2023

TAN BOON HENG
REGISTRAR
SUPREME COURT
SINGAPORE

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

2

# ANNEX A

3

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

A-2

## CALCULATION OF PRE-JUDGMENT INTEREST

**Section 1: Calculation of Pre-Judgment Interest on Transfers Made Pursuant to the Diversion (based on schedule at paragraph 49 of the SOC (Amendment No. 1))**

| Date of Withdrawal / Deposit | Withdrawal / Deposit | Sum Transferred out of / Returned to the Plaintiff (USD) | Bank Charges Incurred (USD) | Balance | Period of Interest | Interest Accrued During Period at Rate of 5.33% p.a. (USD) |
|---|---|---|---|---|---|---|
| 29-Dec-2015 | Withdrawal | 33,600,000.00 | - | 33,600,000.00 | From 29 December 2015 to 5 January 2016 | 39,252.16 |
| 6-Jan-2016 | Withdrawal | 310,000.00 | 179.24 | 33,910,179.24 | From 6 January 2016 to 29 August 2016 | 1,173,580.21 |
| 30-Aug-2016 | Withdrawal | 250,000.00 | 203.53 | 34,160,382.77 | From 30 August 2016 to 17 November 2016 | 399,068.14 |
| 18-Nov-2016 | Deposit | -10,000,000.00 | - | 24,160,382.77 | - | - |
| 18-Nov-2016 | Withdrawal | 500,000.00 | - | 24,660,382.77 | - | - |
| 18-Nov-2016 | Withdrawal | 500,000.00 | - | 25,160,382.77 | From 18 November 2016 to 30 November 2016 | 47,763.37 |
| 1-Dec-2016 | Withdrawal | 500,000.00 | - | 25,660,382.77 | - | - |
| 1-Dec-2016 | Withdrawal | 500,000.00 | - | 26,160,382.77 | From 1 December 2016 to 4 December 2016 | 15,280.53 |
| 5-Dec-2016 | Withdrawal | 550,025.00 | 195.18 | 26,710,602.95 | From 5 December 2016 to 26 December 2016 | 85,810.56 |

**Annex A: Calculation of Pre-Judgment Interest**

4

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

A-3

| 27-Dec-2016 | Withdrawal | 500,000.00 | 192.14 | 27,210,795.09 | From 27 December 2016 to 27 December 2016 | 3,973.52 |
| 28-Dec-2016 | Withdrawal | 6,000,000.00 | - | 33,210,795.09 | From 28 December 2016 to 3 January 2017 | 33,947.80 |
| 4-Jan-2017 | Withdrawal | 400,000.00 | 192.48 | 33,610,987.57 | From 4 January 2017 to 21 February 2017 | 240,498.13 |
| 22-Feb-2017 | Withdrawal | 353,356.89 | | 33,964,344.46 | From 22 February 2017 to 8 March 2017 | 74,395.87 |
| 9-Mar-2017 | Withdrawal | 200,000.00 | 195.75 | 34,164,540.21 | From 9 March 2017 to 20 March 2017 | 59,867.51 |
| 21-Mar-2017 | Withdrawal | 100,000.00 | | 34,264,540.21 | From 21 March 2017 to 5 April 2017 | 80,056.99 |
| 6-Apr-2017 | Deposit | -1,000,000.00 | - | 33,264,540.21 | - | - |
| 6-Apr-2017 | Withdrawal | 500,000.00 | 197.89 | 33,764,738.10 | - | - |
| 6-Apr-2017 | Withdrawal | 500,000.00 | 197.89 | 34,264,935.99 | From 6 April 2017 to 27 June 2023 | 11,373,226.94 |
| | | | | | TOTAL: | USD 13,626,721.72 |

**Annex A: Calculation of Pre-Judgment Interest**

5

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

A-4

**Section 2: Calculation of Pre-Judgment Interest on Unjustified Use of Plaintiff's Office Premises (based on schedule at paragraph 69 of the SOC (Amendment No. 1)**

| Relevant Year | Month | Date | Amount paid by the Plaintiff (SGD) | Balance (SGD) | Period of Interest | Interest Accrued During Period at Rate of 5.33% p.a. (SGD) |
|---|---|---|---|---|---|---|
| 2016 | March (only 30th and 31st) | 1-Mar-2016 | 932.97 (pro-rated) | 932.97 | From 1 March 2016 to 31 March 2016 | 4.22 |
| | April | 1-Apr-2016 | 14,461.05 | 15,394.02 | From 1 April 2016 to 30 April 2016 | 67.44 |
| | May | 1-May-2016 | 14,461.05 | 29,855.07 | From 1 May 2016 to 31 May 2016 | 135.15 |
| | June | 1-Jun-2016 | 14,461.05 | 44,316.12 | From 1 June 2016 to 30 June 2016 | 194.14 |
| | July | 1-Jul-2016 | 14,461.05 | 58,777.17 | From 1 July 2016 to 31 July 2016 | 266.08 |
| | August | 1-Aug-2016 | 14,461.05 | 73,238.22 | From 1 August 2016 to 31 August 2016 | 331.54 |
| | September | 1-Sep-2016 | 14,461.05 | 87,699.27 | From 1 September 2016 to 30 September 2016 | 384.19 |
| | October | 1-Oct-2016 | 14,461.05 | 102,160.32 | From 1 October 2016 to 31 October 2016 | 462.46 |
| | November | 1-Nov-2016 | 14,461.05 | 116,621.37 | From 1 November 2016 to 30 November 2016 | 510.90 |
| | December | 1-Dec-2016 | 14,461.05 | 131,082.42 | From 1 December 2016 to 31 December 2016 | 593.39 |

**Annex A: Calculation of Pre-Judgment Interest**

6

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

A-5

| | | | | | | |
|---|---|---|---|---|---|---|
| | January | 1-Jan-2017 | 14,461.05 | 145,543.47 | From 1 January 2017 to 31 January 2017 | 658.85 |
| | February | 1-Feb-2017 | 14,461.05 | 160,004.52 | From 1 February 2017 to 28 February 2017 | 654.22 |
| | March | 1-Mar-2017 | 14,461.05 | 174,465.57 | From 1 March 2017 to 31 March 2017 | 789.78 |
| | April | 1-Apr-2017 | 14,461.05 | 188,926.62 | From 1 April 2017 to 30 April 2017 | 827.65 |
| | May | 1-May-2017 | 14,461.05 | 203,387.67 | From 1 May 2017 to 31 May 2017 | 920.71 |
| 2017 | June | 1-Jun-2017 | 14,461.05 | 217,848.72 | From 1 June 2017 to 30 June 2017 | 954.36 |
| | July | 1-Jul-2017 | 14,461.05 | 232,309.77 | From 1 July 2017 to 31 July 2017 | 1,051.63 |
| | August | 1-Aug-2017 | 14,461.05 | 246,770.82 | From 1 August 2017 to 31 August 2017 | 1,117.09 |
| | September | 1-Sep-2017 | 14,461.05 | 261,231.87 | From 1 September 2017 to 30 September 2017 | 1,144.41 |
| | October | 1-Oct-2017 | 14,461.05 | 275,692.92 | From 1 October 2017 to 31 October 2017 | 1,248.02 |
| | November | 1-Nov-2017 | 14,461.05 | 290,153.97 | From 1 November 2017 to 27 June 2023 | 87,452.57 |
| TOTAL: | | | | | | SGD 99,768.80 |

**Annex A: Calculation of Pre-Judgment Interest**

7

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

Case 1:24-cv-03142-UA Document 1-4 Filed 04/24/24 Page 197 of 377

# EXHIBIT 22

## IN THE GENERAL DIVISION OF THE HIGH COURT OF THE REPUBLIC OF SINGAPORE

Case No.: HC/S 1027/2020

Sub Case No.: HC/SUM 1441/2023

Doc No.: HC/ORC 2874/2023

Filed: 27-June-2023 03:10 PM

Between

GUOTAIQIXING BIOMEDICAL INTERNATIONAL (S)
PTE. LTD.
(Singapore UEN No. 20150039K)

...Plaintiff(s)



And

1. DAI XUEFENG
   (China Passport No. ▇2878)

2. ZHANG JUNQI
   (China Passport No. ▇9520)

3. XU XINMANNI
   (China Passport No. ▇7254)



...Defendant(s)

## ORDER OF COURT

Before:     The Honourable Justice Valerie Thean in Chambers

Date of Order : 27-June-2023

UPON THE APPLICATION of GUOTAIQIXING BIOMEDICAL
INTERNATIONAL (S) PTE. LTD. (Singapore UEN No. 20150039K) the Plaintiff in
this action coming on for hearing on 27 June 2023 at 10.00 a.m., UPON READING the
13th Affidavit of Eugene Jedidiah Low Yeow Chin filed on 12 May 2023, the 11th
Affidavit of Sun Yingtong filed on 24 May 2023, and the exhibits referred to therein, and
UPON HEARING counsel for the Plaintiff,

It is ordered that:

1.   The Plaintiff be granted an order in terms of the Injunction Prohibiting Disposal of
Assets Worldwide annexed as **ANNEX A** to this Order.

2.   The Plaintiff be granted leave to begin proceedings against the 1st Defendant or use
information obtained in this jurisdiction for the purpose of enforcement of any Judgment
obtained in HC/S 1027/2020, and to enforce any order made herein or to seek an order of
similar nature against the 1st Defendant in the United States, the People's Republic of
China, the Cayman Islands, the British Virgin Islands and/or Hong Kong.

3.   The Plaintiff is to write to Court for fixing of the costs of the action, and the costs of
and occasioned by HC/SUM 1440/2023 and HC/SUM 1441/2023, and the orders as to
interest thereon.

4.   There be liberty to apply.

Certified True Copy

1    Name of        ANNEX A

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

1

Document:
Annex:



*https://www.courtorders.gov.sg*
*Access code: 8hf7rh9oa*

Getting this document from the Authentic Court Orders
Portal verifies:
(a) that it was issued by the Courts of the Republic of
Singapore or, in the case of a Schedule of Assets, that it was
filed with the Courts in relation to an application for a Grant
of Probate/Letter of Administration; and (b) the text of the
document was issued on 27 Jun 2023



TAN BOON HENG
REGISTRAR
SUPREME COURT
SINGAPORE



Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

2

# ANNEX A

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

**3**

**IN THE GENERAL DIVISION OF THE
HIGH COURT OF THE REPUBLIC OF SINGAPORE**

HC/S 1027/2020
HC/SUM 1441/2023

Between

**GUOTAIQIXING BIOMEDICAL INTERNATIONAL
(S) PTE. LTD.**
(UEN No. 20150039K)

... Plaintiff(s)

And

(1) **DAI XUEFENG**
(PRC Passport No.      2878)

(2) **ZHANG JUNQI**
(PRC Passport No.      9520)

(3) **XU XINMANNI**
(PRC Passport No.      7254)

... Defendant(s)

# INJUNCTION PROHIBITING
# DISPOSAL OF ASSETS WORLDWIDE

**BEFORE THE HONOURABLE
JUSTICE VALERIE THEAN**                                  **IN CHAMBERS**

**IMPORTANT:- NOTICE TO THE 1ST DEFENDANT**

**(a)** **This order prohibits you from dealing with your assets up to the amount stated. The order is subject to the exceptions stated at the end of the order. You should read all the terms of the order very carefully. You are advised to consult a solicitor as soon as possible. You have a right to ask the Court to vary or discharge this order.**

**(b)** **If you disobey this order you will be guilty of contempt of Court and may be sent to prison or fined.**

**THE ORDER**

An application was made by counsel for the Plaintiff, Ark Law Corporation, to Justice Valerie Thean by way of HC/SUM 1441/2023. Justice Valerie Thean heard the application on 27 June 2023 at 10.00 a.m. and read the 13th Affidavit of Eugene Jedidiah Low Yeow Chin filed on 12 May 2023, the 11th Affidavit of Sun Yingtong filed on 24 May 2023, and the exhibits referred to therein, and heard counsel for the Plaintiff.

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

4

2

As a result of the application IT IS ORDERED by Justice Valerie Thean that:

Disposal of assets

1.  (a)  The 1st Defendant must not:

    (i)  remove from Singapore any of his assets which are in Singapore whether in his own name or not and whether solely or jointly owned up to the value of USD 48,500,000; and

    (ii)  in any way dispose of or deal with or diminish the value of any of his assets whether they are in or outside Singapore whether in his own name or not and whether solely or jointly owned up to the same value. For this purpose, the list of entities attached at Schedule 3 to this Order are to be treated non-exhaustively as the 1st Defendant's nominees and the assets owned by those entities whether legally or beneficially owned by them, whether in their own name or not and whether solely or jointly owned are to be covered by this Order.

    (b)  This prohibition includes but are not limited to the assets listed in Schedule 2 to this Order.

    (c)  If the total unencumbered value of the 1st Defendant's assets in Singapore exceeds USD 48,500,000, the 1st Defendant may remove any of those assets from Singapore or may dispose of or deal with them so long as the total unencumbered value of his assets still in Singapore remains not less than USD 48,500,000. If the total unencumbered value of the 1st Defendant's assets in Singapore does not exceed USD 48,500,000, the 1st Defendant must not remove any of those assets from Singapore and must not dispose of or deal with any of them, but if he has other assets outside Singapore, the 1st Defendant may dispose of or deal with those assets so long as the total unencumbered value of all his assets whether in or outside Singapore remains not less than USD 48,500,000.

Disclosure of Information

2.  The 1st Defendant must inform the Plaintiff in writing at once of all his assets whether in or outside Singapore and whether in his own name or not and whether solely or jointly owned, giving the value, location and details of all such assets. For this purpose, the list of entities attached at Schedule 3 to this Order are to

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

5

3

be treated non-exhaustively as the 1st Defendant's nominees and covered by this Order. The information must be confirmed in an affidavit which must be served on the Plaintiff's solicitors within 21 days after this order has been served on the 1st Defendant.

## EXCEPTIONS TO THIS ORDER

3.    This order does not prohibit the 1st Defendant from spending USD 12,500 a week towards his ordinary living expenses and also USD 12,500 a week on legal advice and representation. But before spending any money, the 1st Defendant must tell the Plaintiff's solicitors where the money is to come from.

4.    This order does not prohibit the 1st Defendant from dealing with or disposing of any of his assets in the ordinary and proper course of business. The 1st Defendant shall account to the Plaintiff on the 15th day of each month for the amount of money spent in this regard.

5.    The 1st Defendant may agree with the Plaintiff's solicitors that the above spending limits should be increased or that this order should be varied in any other respect but any such agreement must be in writing.

## EFFECT OF THIS ORDER

6.    A defendant who is an individual who is ordered not to do something must not do it himself or in any other way. He must not do it through others acting on his behalf or on his instructions or with his encouragement.

7.    A defendant which is a corporation and which is ordered not to do something must not do it itself or by its directors, officers, employees or agents or in any other way.

## THIRD PARTIES

Effect of this order

8.    It is a contempt of Court for any person notified of this order knowingly to assist in or permit a breach of the order. Any person doing so may be sent to prison or fined.

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

6

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 204 of 377

4

### Effect of this order outside Singapore

9.    The terms of this order do not affect or concern anyone outside the jurisdiction of this Court until it is declared enforceable or is enforced by a Court in the relevant country and then they are to affect him only to the extent they have been declared enforceable or have been enforced UNLESS such person is:

    (a)    a person to whom this order is addressed or an officer or an agent appointed by power of attorney of such a person; or

    (b)    a person who is subject to the jurisdiction of this Court; and

        (i)    has been given written notice of this order at his residence or place of business within the jurisdiction of this Court; and

        (ii)   is able to prevent acts or omissions outside the jurisdiction of this Court which constitute or assist in a breach of the terms of this order.

### Assets located outside Singapore

10.    Nothing in this order shall, in respect of assets located outside Singapore, prevent any third party from complying with:

    (a)    what it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between itself and the 1st Defendant; and

    (b)    any orders of the Courts of that country or state, provided that reasonable notice of any application for such an order is given to the Plaintiff's solicitors.

### Set-off by banks

11.    This injunction does not prevent any bank from exercising any right of set-off it may have in respect of any facility which it gave to the 1st Defendant before it was notified of the order.

### Withdrawals by the 1st Defendant

12.    No bank need enquire as to the application or proposed application of any money withdrawn by the 1st Defendant if the withdrawal appears to be permitted by this order.

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

7

5

**UNDERTAKINGS**

13.   The Plaintiff gives to the Court the undertakings set out in Schedule 1 to this order.

**DURATION OF THIS ORDER**

14.   This order will remain in force until full satisfaction of the Judgment sums ordered in HC/S 1027/2020 (the "**Suit**") and payment of all outstanding costs ordered in the Suit (including interest as applicable).

**VARIATION OR DISCHARGE OF THIS ORDER**

15.   The 1st Defendant (or anyone notified of this order) may apply to the Court at any time to vary or discharge this order (or so much of it as affects that person), but anyone wishing to do so must inform the Plaintiff's solicitors.

**NAME AND ADDRESS OF PLAINTIFF'S SOLICITORS**

16.   The Plaintiff's solicitors are:

Eugene Jedidiah Low Yeow Chin
Ark Law Corporation
1 Pickering Street
Level 8, Great Eastern Centre
Singapore 048659
Tel: +65 6592 8634
Email: info@arklaw.com.sg
Ref: EJL.20200077

**REGISTRAR**

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

8

## SCHEDULE 1

*Undertakings given to the Court by the Plaintiff*

1. If the Court later finds that this order has caused loss to the 1st Defendant, and decides that the 1st Defendant should be compensated for that loss, the Plaintiff shall comply with any order the Court may make.

2. Anyone notified of this order will be given a copy of it by the Plaintiff's solicitors.

3. The Plaintiff shall pay the reasonable costs of anyone other than the 1st Defendant which have been incurred as a result of this order including the costs of ascertaining whether that person holds any of the 1st Defendant's assets and if the Court later finds that this order has caused such person loss, and decides that such person should be compensated for that loss, the Plaintiff will comply with any order the Court may make.

4. If this order ceases to have effect, the Plaintiff will immediately take all reasonable steps to inform in writing anyone to whom he has given notice of this order, or who he has reasonable grounds for supposing may act upon this order, that it has ceased to have effect.

5. Save as hereinafter excepted, the Plaintiff shall not without the leave of the Court begin proceedings against the 1st Defendant in any other jurisdiction or use information obtained as a result of an order of the Court in this jurisdiction for the purpose of civil or criminal proceedings in any other jurisdiction. The aforesaid restriction will not apply insofar as the Plaintiff is given leave to begin proceedings against the 1st Defendant or use information obtained in this jurisdiction for the purpose of proceedings against the 1st Defendant in the United States, the People's Republic of China, the Cayman Islands, the British Virgin Islands and/or Hong Kong.

6. Save as hereinafter excepted, the Plaintiff shall not without the leave of the Court seek to enforce this order in any country outside Singapore or seek an order of a similar nature including orders conferring a charge or other security against the 1st Defendant or the 1st Defendant's assets. The aforesaid restriction will not apply insofar as the Plaintiff is given leave to enforce this order or seek an order of similar nature, against the 1st Defendant in the United States, the People's Republic of China, the Cayman Islands, the British Virgin Islands and/or Hong Kong.

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

9

## SCHEDULE 2

1.  All accounts in which the 1st Defendant has a legal or beneficial interest including monies in the following bank accounts:

| Entity Holding the Account | Bank | Currency | Account No. |
|---|---|---|---|
| KFG | DBS Bank | USD | ▮5-010 |
| KFG | DBS Bank | SGD | ▮614-4 |
| KOM | DBS Bank | USD | ▮4-01-5 |
| KOM | DBS Bank | USD | ▮5-02-2 |
| KOM | DBS Bank | USD | ▮6-022 |
| KOM | DBS Bank | SGD | ▮587-3 |
| KOM | UOB Kay Hian | HKD/USD | ▮6-001 |
| SGKFM | DBS Bank | SGD | ▮128-0 |
| SGKFM | DBS Bank | SGD | ▮601-4 |
| SQKFM | China Construction Bank | USD | ▮5451 |
| SQKFM | China Construction Bank | USD | ▮8237 |
| SQKFM | China Merchants Bank | RMB | ▮0588 |
| SQKFM | China Merchants Bank | RMB | ▮0802 |
| SQKFM | DBS Bank | USD | ▮3-01-9 |
| SQKFM | DBS Bank | SGD | ▮147-4 |
| KOM | KGI Asia Ltd | USD | ▮5022 |
| KOM | KGI Asia Ltd | HKD/USD | ▮044-2 |
| KOM | KGI Asia Ltd | USD | ▮044F |
| KFA | JPMorgan Chase Bank | USD | ▮8765 |
| KFA | JPMorgan Chase Bank | USD | ▮6-3752 |
| KFA | JPMorgan Chase Bank | USD | ▮2301 |

2.  The shares held directly or indirectly by the 1st Defendant in the following entities:

    (a)  Khan Funds Management Asia Pte. Ltd. (Singapore)

    (b)  深圳市旗隆投资管理有限公司 (also known as Shenzhen Khan Investment Management Co. Ltd.) (China)

    (c)  重庆市旗隆投资管理有限公司 (also known as Chongqing Khan Investment Management Co. Ltd.) (China)

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

2

> (d) 深圳前海旗隆基金管理有限公司 (also known as Shenzhen Qianhai Genghis Khan Fund Management Co., Ltd. and Shenzhen Qianhai Khan Fund Management Co., Ltd.) (China)
>
> (e) 北京旗隆医药控股有限公司 (also known as Beijing Khan Pharmaceutical Holdings Co., Ltd.) (China)
>
> (f) Khan Funds Management America, Inc. (United States of America)
>
> (g) Chinese Fund Management of America Association, Inc. (United States of America)
>
> (h) SP Avatar Management LLC (United States of America)
>
> (i) U Place LLC (United States of America)
>
> (j) Springfield Beacon Holding LLC (United States of America)
>
> (k) Sandalfoot Boca Holdings LLC (United States of America)
>
> (l) Seven Isles Drive LLC (United States of America)
>
> (m) Riverside Oasis Holdings LLC (United States of America)
>
> (n) Mars Springs Farm & Ranch LLC (United States of America)
>
> (o) Khan Funds Global Limited (Cayman Islands)
>
> (p) Khan Funds Oriental Medicine Fund (Cayman Islands)
>
> (q) Daibenewise Limited (Cayman Islands)
>
> (r) Genghis Khan Investment, Inc. (British Virgin Islands)
>
> (s) 888 Cleft Rd LLC (United States of America)

3.  The assets, including any real properties and bank accounts, held in the names of the entities listed above or in Schedule 3, including but not limited to the following assets:

> (a) 249 Cleft Rd, Mill Neck, NY 11765
>
> (b) 4 / 6 University Place, Great Neck, NY 11020
>
> (c) 11886 Anchorage Way, Boca Raton, FL 33428
>
> (d) 10580 Sandalfoot Blvd, Boca Raton, FL
>
> (e) 19944 Flotilla Pl, Boca Raton, FL
>
> (f) 11914 Anchorage Way, Boca Raton, FL
>
> (g) The property at Lot 46, of Sea Island Unit Three, according to the Plat thereof as recorded in Plat Book 27, Page 19, of the Public Records of Broward County, Florida
>
> (h) 191 NE 23 Avenue, Fort Lauderdale, FL 33301
>
> (i) 6300 Riverside Drive, Parkland, FL 33067, United States of America
>
> (j) The 6.681-acre property described as a portion of Parcel A of Tall-Pines, according to the Plat thereof as recorded in Plat Book 152, Book 30 of the Public Records of Broward County, Florida

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

## SCHEDULE 3

The 1st Defendant's nominees:

(a)   Khan Funds Management Asia Pte. Ltd. (Singapore)

(b)   深圳市旗隆投资管理有限公司 (also known as Shenzhen Khan Investment Management Co. Ltd.) (China)

(c)   重庆市旗隆投资管理有限公司 (also known as Chongqing Khan Investment Management Co. Ltd.) (China)

(d)   深圳前海旗隆基金管理有限公司 (also known as Shenzhen Qianhai Genghis Khan Fund Management Co., Ltd. and Shenzhen Qianhai Khan Fund Management Co., Ltd.) (China)

(e)   北京旗隆医药控股有限公司 (also known as Beijing Khan Pharmaceutical Holdings Co., Ltd.) (China)

(f)   Khan Funds Management America, Inc. (United States of America)

(g)   Chinese Fund Management of America Association, Inc. (United States of America)

(h)   SP Avatar Management LLC (United States of America)

(i)   U Place LLC (United States of America)

(j)   Springfield Beacon Holding LLC (United States of America)

(k)   Sandalfoot Boca Holdings LLC (United States of America)

(l)   Seven Isles Drive LLC (United States of America)

(m)  Riverside Oasis Holdings LLC (United States of America)

(n)   Mars Springs Farm & Ranch LLC (United States of America)

(o)   Khan Funds Global Limited (Cayman Islands)

(p)   Khan Funds Oriental Medicine Fund (Cayman Islands)

(q)   Daibenewise Limited (Cayman Islands)

(r)   Genghis Khan Investment, Inc. (British Virgin Islands)

(s)   888 Cleft Rd LLC (United States of America)

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 210 of 377

# EXHIBIT 23

## IN THE GENERAL DIVISION OF THE HIGH COURT OF THE REPUBLIC OF SINGAPORE

Case No.: HC/S 1027/2020

Doc No.: HC/ORC 3130/2023
Filed: 13-July-2023 10:37 AM

Between

GUOTAIQIXING BIOMEDICAL INTERNATIONAL (S)
PTE. LTD.
(Singapore UEN No. 20150039K)

...Plaintiff(s)



And

1.   DAI XUEFENG
     (China Passport No.     2878)

2.   ZHANG JUNQI
     (China Passport No.     0520)

3.   XU XINMANNI
     (China Passport No.     7254)



...Defendant(s)

### ORDER OF COURT

Before:       The Honourable Justice Valerie Thean in Chambers

Date of Order : 11-July-2023

UPON THE APPLICATION OF GUOTAIQIXING BIOMEDICAL
INTERNATIONAL (S) PTE. LTD. (Singapore UEN No. 20150039K), the Plaintiff in
this action coming on for hearing this 11th day of July 2023, and UPON READING
the letter from counsel for the Plaintiff to the Court filed on 7 July 2023,

It is ordered that:

(a) Costs (including disbursements) of and occasioned in HC/SUM 1440/2023 and
HC/SUM 1441/2023 are to be included as costs of the action;

(b) The 1st Defendant, Dai Xuefeng, is to pay costs of the action fixed at SGD 100,000
inclusive of disbursements to the Plaintiff; and

(c) The 1st Defendant, Dai Xuefeng, is to pay interest on the aforesaid costs and
disbursements of the action from 28 June 2023 (being the day after the date of Judgment)
to the date of payment at the Court's default rate of interest of 5.33% per annum.

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

TAN BOON HENG

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 212 of 377



https://www.courtorders.gov.sg
Access code: 8hf6kfmu2

Getting this document from the Authentic Court Orders
Portal verifies:
(a) that it was issued by the Courts of the Republic of
Singapore or, in the case of a Schedule of Assets, that it was
filed with the Courts in relation to an application for a Grant
of Probate/Letter of Administration; and (b) the text of the
document was issued on 11 Jul 2023

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024

Case 1:24-cv-03142-UA Document 1-4 Filed 04/24/24 Page 213 of 377

REGISTRAR
SUPREME COURT
SINGAPORE

Certified True Copy

Pearly Ang
Assistant Registrar
Supreme Court of Singapore
29 January 2024



Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 214 of 377

# EXHIBIT A

Case 2:22-cv-03055-ERD Document 4-1 Filed 04/06/22 Page 215 of 377

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| KHAN FUNDS MANAGEMENT<br>AMERICA, INC. and XUEFENG DAI,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONS TECHNOLOGIES INC.,<br>NATIONS TECHNOLOGIES (USA) INC.,<br>YINGTONG SUN, ZHAOXUE LUO,<br>BAOXIN HUANG, JUNJIE YU, and DOES<br>1-20,<br><br>Defendants. | Index No.:<br><br>**SUMMONS**<br><br>Plaintiffs designate New<br>York County as the place<br>For trial.<br><br>The basis for venue is<br>CPLR 503(a) and 503(c). |

**TO THE ABOVE NAMED DEFENDANTS:**

**YOU ARE HEREBY SUMMONED** to answer the annexed Complaint in this action and to serve a copy of your Answer on the undersigned attorneys for plaintiffs within twenty (20) days after the service of this summons, exclusive of the day of service, or within thirty (30) days after service is complete if service is made by any method other than personal delivery to you within the State of New York. If you fail to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

Dated: Garden City, New York
      April 6, 2022

                              **KENNETH S. FERARU, P.C.**

                          By:    /s/ Kenneth S. Feraru
                                  Kenneth Feraru, Esq.
                                  1225 Franklin Ave., Ste. 325
                                  Garden City, New York 11530
                                  P: (516)535-3333
                                  KFeraruesq@aol.com

1

## LAW OFFICES OF WEI GU, ESQ., P.C.

By:     /s/ Wei Gu

Wei Gu, Esq.
13514 Northern Blvd., Flr. 2
Flushing, New York 11354
P: (718) 600-6886
WeiGulaw@gmail.com

*Attorneys for Plaintiffs*

To:  **NATIONS TECHNOLOGIES INC.**
National Technology Building, No. 109
Baoshen Road, Gaoxin North District
Nanshan District
Shenzhen Guangdong 518057
P.R. China

**NATIONS TECHNOLOGIES (USA) INC.**
3509 Langdon Common
Fremont, California 94538

**YINGTONG SUN**
National Technology Building, No. 109
Baoshen Road, Gaoxin North District
Nanshan District
Shenzhen Guangdong 518057
P.R. China

**YINGTONG SUN**
3509 Langdon Common
Fremont, California 94538

**ZHAOXUE LUO**
National Technology Building, No. 109
Baoshen Road, Gaoxin North District
Nanshan District
Shenzhen Guangdong 518057
P.R. China

**BAOXIN HUANG**
National Technology Building, No. 109
Baoshen Road, Gaoxin North District
Nanshan District
Shenzhen Guangdong 518057
P.R. China

**JUNJIE YU**
National Technology Building, No. 109
Baoshen Road, Gaoxin North District
Nanshan District
Shenzhen Guangdong 518057
P.R. China

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| KHAN FUNDS MANAGEMENT AMERICA, INC. and XUEFENG DAI, | Index No.: |
| Plaintiffs, | |
| v. | **VERIFIED COMPLAINT** |
| NATIONS TECHNOLOGIES INC., NATIONS TECHNOLOGIES (USA) INC., YINGTONG SUN, ZHAOXUE LUO, BAOXIN HUANG, JUNJIE YU, and DOES 1-20, | |
| Defendants. | |

Plaintiffs, KHAN FUNDS MANAGEMENT AMERICA, INC. ("KHAN FUNDS") and

XUEFENG DAI ("DAI") (together with KHAN FUNDS, "Plaintiffs"), bring this Complaint

against defendants, NATIONS TECHNOLOGIES INC. ("NATIONS"), NATIONS

TECHNOLOGIES (USA) INC. ("NATIONS USA"), YINGTONG SUN ("SUN"), ZHAOXUE

LUO ("LUO"), BAOXIN HUANG ("HUANG"), JUNJIE YU ("YU") and DOES 1-20

(collectively, "Defendants"), and allege as follows:

## NATURE OF THE ACTION

### I.    RICO ALLEGATIONS

1.    In this action, Plaintiffs seek to end an illegal pattern of racketeering by

Defendants and seek relief from ongoing unlawful activity.   Defendants have harmed and

continue to harm Plaintiffs, and their racketeering enterprise remains a direct threat to Plaintiffs'

interests.

2.    Defendants and others sought to illicitly procure protected technologies for end

use in China, and to that end, Defendants recruited, solicited, financed, and managed a

worldwide network of individuals and entities in New York, California, and elsewhere in

1

furtherance of their scheme. Defendants and others committed multiple predicate acts of racketeering activity on multiple occasions and in violation of various federal and state statutes, including the misappropriation of certain commodities and technologies in violation of, *inter alia*, the International Emergency Economic Powers Act ("IEEPA" or the "Economic Powers Act"), 50 U.S.C. § 1701 et seq., which restricts the export of commodities and technologies outside the United States; the unlawful laundering of racketeering proceeds in violation of, *inter alia*, 18 U.S.C. § 1956; and the commission of extortionate and solicitation schemes in violation of, *inter alia*, 18 U.S.C. § 1951, New York Penal Law § 155.05(2)(e), and 18 U.S.C. § 1831.

3.      For more than a decade and in a plan which is ongoing, Defendants and others worked in concert with one another, committing numerous and repeated violations of various federal and state statutes. Defendants knowingly agreed to carry out a scheme to solicit, defraud, and harm Plaintiffs economically and otherwise through a pattern of interstate racketeering activity, which included the operation and/or management of a RICO enterprise constituting LUO, SUN, HUANG, and YU (the "Individual Members"), together with NATIONS and NATIONS USA (the "Corporate Members") and others known and unknown.

## II.      OVERVIEW OF THE ENTERPRISE

4.      Beginning on a date unknown, but no later than in or around June 2011 and continuing through the date of this Complaint, in New York County and elsewhere, Defendants and others entered into a scheme to illicitly acquire protected technologies from companies headquartered or with offices in the United States and elsewhere for end use in China. Defendants and several of their associates share long-standing personal, professional, and financial ties, and these pre-existing affiliations and common ties facilitated the ability of Defendants to combine, merge, and conspire with themselves and others to form their

2

Case 1:22-cv-03055-ER  Document 1-4  Filed 04/14/22  Page 219 of 377

racketeering enterprise with the common purpose of illicitly procuring protected technologies for end use in China (hereinafter referred to as the "Enterprise").

5.    Defendants and other members of the Enterprise committed deliberate and repeated acts of misappropriation and the illicit procurement of protected commodities and technologies from locations in the United States and elsewhere, and each received income and other benefits and enriched themselves directly and indirectly from such efforts. To support the Enterprise, Defendants recruited, solicited, groomed, financed, and managed various business, finance, science, and technology professionals like DAI to illicitly access and acquire protected technologies, and Defendants conspired to recruit, solicit, direct, and incentivize Plaintiffs and others to commit crimes in furtherance of Enterprise objectives.

6.    At the time the Enterprise sought to solicit and recruit Plaintiffs to the Enterprise, DAI was a renowned hedge fund manager who would establish KHAN FUNDS as the global headquarters for his businesses in New York County. KHAN FUNDS served as the umbrella company to all of DAI's affiliated entities located in China, Singapore, and elsewhere, and the financial strength and reputation of KHAN FUNDS and DAI presented the Enterprise with an opportunity to use Plaintiffs to facilitate the illicit acquisition of protected technologies and launder the proceeds of illegal racketeering activity and finance the Enterprise.

7.    Beginning on a date unknown but no later than in or around May 2014 through no earlier than in or around November 2017, in New York County and elsewhere, Defendants, together with others, knowingly and with the intent to solicit, recruit, and defraud Plaintiffs, devised, participated in, and executed a scheme to solicit Plaintiffs' membership and participation in the Enterprise, defraud Plaintiffs as to material matters, and to use threats of force to compel Plaintiffs to commit multiple crimes in furtherance of the Enterprise, including

3

the illicit acquisition of protected technologies in violation of the Economic Powers Act and crimes indictable under Title 18, United States Code, Sections 1343 (relating to wire fraud), 1344 (relating to financial institution fraud), 1831 (relating to economic espionage), 1832 (relating to theft of trade secrets), and 1956 (relating to the laundering of monetary instruments). Defendants and others further devised, participated in, and executed a scheme to extort RMB 300,000,000 from Plaintiffs in violation of 18 U.S.C. § 1951 and New York Penal Law § 155.05(2)(e) by use of threats of force, violence, and fear in an effort to use Plaintiffs to launder racketeering proceeds of the Enterprise and finance members of the Enterprise, in furtherance of Enterprise objectives.

## III.    THE OBSTRUCTION AND RETALIATION SCHEME AND OTHER HARM

8.    Beginning in September 2017, DAI immediately reported the criminal activity, solicitation efforts, and extortionate scheme of the Enterprise to the New York Field Office of the Federal Bureau of Investigation (the "FBI") and initiated investigatory proceedings with United States Department of Justice's ("DOJ") prosecutors at the United States Attorney's Office in the Southern District of New York.

9.    Beginning on a date unknown but no later than in or around November 2017 through no earlier than in or around September 2021 and continuing through the date of this Complaint, Defendants, together with others, did knowingly, intentionally, and corruptly conspire to inflict harm upon DAI using the tactic of criminalizing DAI and forcibly repatriating him to the PRC. In furtherance of Defendants' scheme to inflict harm upon DAI, Defendants adopted the telltale tactics of a forced repatriation scheme, by providing false information that DAI had committed various acts of criminal wrongdoing as a means to cause the issuance, and thereafter the global broadcast, of an arrest warrant for DAI in the PRC, and then activated a campaign to

4

surveil DAI and collected certain photo and/or video evidence in the State of New York about
and concerning DAI.

10.     As set forth herein, non-party culpable person Yi-Chi Shih ("Shih") was arrested
by federal authorities in January 2018 for violations of, *inter alia,* the Economic Powers Act, and
approximately one year into Plaintiffs' cooperation with the FBI and the United States Attorney's
Office, including disclosure of defendant LUO's relationship with non-party culpable person
Yaping Chen ("Chen"), Chen and others were indicted on October 18, 2018, in the United States
District Court for the Central District of California in the case titled, United States of America v.
Yi-Chi Shih, et al., CR No. 18-00050 (the "Shih Matter"). As set forth herein, LUO admitted to
financing and supervising Chen in furtherance of Enterprise business, and in the Shih Matter,
Chen was indicted as a co-conspirator for his work in connection with the unlawful scheme to
illicitly procure and export restricted commodities and technologies in violation of the Economic
Powers Act. Upon information and belief, Chen caused substantial sums of money provided by
the Enterprise to be deposited in the name of an offshore shell company organized in the British
Virgin Islands, and Chen, at the direction of LUO and SUN, directed these funds to ultimately be
distributed to other members of the Enterprise, including Shih. NATIONS USA and the non-
party culpable entities in the State of New York associated with the Enterprise serve as the
domestic nerve centers of the Enterprise and helped facilitate the operation and management of
Enterprise affairs in the United States, including exercising oversight over Shih, Chen, and
others. Thus, LUO and SUN, in their capacity as the ringleaders of the Enterprise, financed and
directed Chen using Enterprise funds provided by NATIONS and others, and in turn, Chen used
Enterprise funds to finance and pay Shih and other co-conspirators as compensation for their
work in the development of the high technology industries in the PRC, and the Enterprise relied

5

on NATIONS USA and non-party culpable entities and individuals associated with the Enterprise located in the State of New York to oversee Enterprise activities in the United States.

11.     After becoming aware of the DOJ's criminal investigation of the Enterprise initiated by Plaintiffs, including the arrests and indictments of non-party culpable persons in the Shih Matter, and in an effort to avoid potential criminal prosecution in the United States and impede the government's investigation, Defendants engaged in a pattern of obstruction and retaliation by knowingly promulgating false and defamatory information accusing Plaintiffs of wrongdoing in an effort to deflect and distract attention from law enforcement and intimidate and influence Plaintiffs in violation of 18 USC § 1512 (relating to tampering with a witness, victim, or an informant) and 18 USC § 1513 (relating to retaliating against a witness, victim, or an informant).  By attempting to impede the criminal investigation into the Enterprise and deter Plaintiffs' cooperation with law enforcement, Defendants sought to avoid criminal prosecution for the illicit acquisition of protected commodities and technologies and sought to tamper, influence, and retaliate against Plaintiffs for their cooperation with law enforcement and accompanying interference with the Enterprise's unlawful scheme.

12.     As set forth herein, beginning on a date unknown but no later than in or around May 2018 and continuing through the present, Defendants arranged for the commencement of a corrupt and fraudulent lawsuit against DAI in the High Court of the Republic of Singapore.  The corrupt lawsuit commenced by Defendants was not pursued by lawful means, and constitutes a continued attempt of Defendants to extort and retaliate against Plaintiffs for cooperating with law enforcement in violation of, *inter alia*, 18 U.S.C. § 1951 (relating to extortion), 18 U.S.C. § 1512 (relating to tampering with a witness, victim, or an informant), and 18 U.S.C. § 1513 (relating to retaliating against a witness, victim, or an informant).

6

13.     Plaintiffs continue to be a victim of Defendants' racketeering and extortionate activity and other harmful conduct. Defendants and other members of the Enterprise must answer for their actions, and Plaintiffs bring this action to address the individual and collective conduct of Defendants under the statutes and common law discussed herein.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over Defendants pursuant to CPLR § 302(a)(2) because, as set forth in greater detail below, many of the acts, tortious conduct, transactions, practices, and other courses of conduct giving rise to the causes of action alleged in this Complaint occurred in New York County. Such acts, transactions, practices, and courses of conduct include, but are not limited to, the illicit acquisition of protected technologies in violation of the Economic Powers Act and crimes indictable under Title 18, United States Code, Sections 1343 (relating to wire fraud), 1344 (relating to financial institution fraud of banks located in New York County), 1956 (relating to the laundering of monetary instruments from bank accounts located in New York County, and the use of the New York County bank accounts as the conduit through which the Enterprise scheme and extortionate activity was to advance), 1030 (relating to the intentional access of KHAN FUNDS computers in New York County without authorization), 1951 (relating to extortion), and New York Penal Law § 155.05(2)(e).

15.     Jurisdiction over each of the defendants is also proper pursuant to CPLR § 302(a)(2) because the facts set forth herein establish conspiracies among Defendants. Each defendant was a member of the conspiracy, each defendant had an awareness of the effects of their activity on Plaintiffs in New York County, and all of the defendant conspirators committed an overt act in the State of New York to further the conspiracy and/or orchestrated the conspiracy as set forth in greater detail below. Defendants acted in concert with each other and with each

7

other's active support and approval to accomplish their common objectives.

16.     This Court has jurisdiction over Defendants pursuant to CPLR § 302(a)(3) because, as set forth in greater detail below, Defendants were directly involved in the coordination and organization of acts and courses of tortious conduct giving rise to the causes of action alleged in this Complaint, including, but not limited to, violations of 18 U.S.C. § 1512 (relating to tampering with a witness, victim, or an informant), 18 U.S.C. § 1513 (relating to retaliating against a witness, victim, or an informant), 18 U.S.C. § 1951 (relating to extortion), and directing the commission of a prima facie tort. Such acts and courses of tortious conduct caused injury to Plaintiffs in the State of New York and elsewhere, Defendants knew or should have known that such acts and courses of tortious conduct would have consequences in New York, and Defendants deliberately directed tortious conduct and communications to Plaintiffs in the State of New York knowing that those acts and communications would be received by Plaintiffs in the State of New York and would have consequence in New York.

17.     Jurisdiction over each of the Defendants is also proper pursuant to CPLR § 302(a)(1) because, as set forth in greater detail below, Defendants' activities in New York constitute transacting business in the State of New York, including, but not limited to, the maintenance of the Enterprise bank account in New York County with the deliberate intention of using the bank account to facilitate the Enterprise's scheme giving rise to Plaintiffs' causes of action, and Defendants' deliberate intention to project themselves into the State of New York by deliberately directing tortious and other communications using electronic and telephonic means to Plaintiffs in the State of New York to facilitate the transactions and communications giving rise to Plaintiffs' claims. Defendants' activities in New York further constitute transacting business in the State of New York because Defendants solicit business in the State of New York

8

Case 1:22-cv-05055-ER   Document 41   Filed 06/24/22   Page 273 of 877

and non-party culpable persons and entities of the Enterprise have offices and employees in the State of New York.

18.     Venue is proper in this Court pursuant to CPLR § 503 because plaintiff KHAN FUNDS maintains its principal office in New York County, and because a substantial part of the events giving rise to the claims occurred in New York County.

## PARTIES

19.     Plaintiff KHAN FUNDS MANAGEMENT AMERICA, INC. is a financial investment business incorporated on or around October 15, 2014 with its principal place of business located in New York County.  KHAN FUNDS was established to serve as the global headquarters for all of DAI's affiliated businesses, including, to wit, Shenzhen Qianhai Qilong Fund Management Co., Ltd. a/k/a Shenzhen Qianhai Khan Fund Management ("Khan Funds China") and Beijing Qilong Pharmaceutical Holdings Co., Ltd. ("Beijing Khan").  At all relevant times herein, KHAN FUNDS and all related affiliated entities of KHAN FUNDS were wholly owned by DAI.

20.     Plaintiff XUEFENG DAI a/k/a Eric Dai is the founder, Chief Executive Officer, President, and sole shareholder of KHAN FUNDS and was approved for United States permanent residency status through the EB1-A (Alien of Extraordinary Ability) classification on the basis of his qualifications as a hedge fund manager in the PRC.

21.     Defendant NATIONS TECHNOLOGIES INC. is principally engaged in the design, manufacture, and distribution of semiconductors, also known as integrated circuits, and related key components.  NATIONS is headquartered in Shenzhen, Guangdong, in the People's Republic of China ("PRC") and maintains satellite offices in the United States and Singapore.

22.     Defendant NATIONS TECHNOLOGIES (USA) INC. is a semiconductor research

9

Case 1:22-cv-00530-ER   Document 41   Filed 06/24/22   Page 226 of 877

and development company located in Fremont, California. NATIONS USA is a subsidiary of NATIONS.

23.     Defendant YINGTONG SUN is a citizen of the PRC. Since approximately 2005 and continuing through the present, SUN serves as General Manager and Chief Executive Officer of NATIONS. More recently, from 2018 and continuing through the present, SUN also serves as Chairman of the Board of Directors of NATIONS. Beginning on a date unknown, but no later than in or around August 2018 and continuing through the present, SUN serves as Chief Executive Officer of NATIONS USA.

24.     Defendant ZHAOXUE LUO, is a citizen of the PRC. Between approximately 2014 through 2018, LUO served as Chairman of the Board of Directors of NATIONS.Since no later than in or around April 2017, LUO has served as Vice-President of the China Association for Public Companies.

25.     Defendant BAOXIN HUANG, is a citizen of the PRC. HUANG previously served as Director of the Ministry of Supervision of the Office of State Council, at all relevant times a cabinet-level department of the PRC government. HUANG also served as Deputy Head of the Disciplinary Inspection Team for the Central Commission for Discipline Inspection. From approximately 2015 and continuing through the present, HUANG serves as Deputy Manager of Ping An Insurance (Group) Co. of China Ltd.

26.     Defendant JUNJIE YU, is a citizen of the PRC. From approximately 2014 through no earlier than 2018, YU served as CFO and Vice General Manager of NATIONS.

27.     Does 1-20 are named as additional defendants, whose identities are unknown at this time, noting that Plaintiffs have reason to believe that other individuals and/or entities may be willingly and knowingly working with one or more of the Defendants to support or authorize

10

the unlawful the acts, tortious conduct, transactions, practices, and other courses of conduct giving rise to the causes of action alleged in this Complaint. Plaintiffs' investigation into the identities and locations of Does 1-20 is continuing and Plaintiffs believe that substantial additional evidentiary support will exist to reveal the identifies and locations of Does 1-20.

## FACTUAL ALLEGATIONS

### I.    THE CONSPIRACY TO MISAPPROPRIATE PROTECTED TECHNOLOGIES

28.    The allegations herein alleged on information and belief are based on the investigation conducted by Plaintiffs. The investigation into the allegations herein is continuing and Plaintiffs believe that substantial additional evidentiary support will exist for the allegations herein after further investigation. Many of the relevant facts are known only by Defendants or are exclusively within their custody and control, and Plaintiffs believe that substantial additional evidentiary support will exist for the allegations herein after an opportunity to conduct discovery.

29.    According to estimates by the National Counterintelligence and Security Center, theft of American technologies and trade secrets by China costs the U.S. upwards of $600BN each year. Theft is widespread – the FBI estimates active "investigations involving China's attempted theft of US-based technology in all 56 of our field offices and spanning just about every industry sector."

30.    Against this backdrop of rapid PRC technological development through the misappropriation of protected technologies and other unlawful activity, beginning on a date unknown, but no later than in or about June 2011, and continuing through the date of this Complaint, Defendants and others, united by long-standing personal, professional, and financial ties, combined, merged, and conspired with themselves and others to form a racketeering enterprise with the common purpose of illicitly procuring protected technologies and

11

commodities for end use in China and entered into a scheme to illicitly acquire American and other foreign technologies, located in the United States, by any means, including through the commission of the crimes and acts set forth herein.

31.     Defendant NATIONS is a "leader in China's information security IC [integrated circuit] design industry" and is recognized as an "enterprise of integrated circuit design" and an "R&D powerhouse." NATIONS is the current-day incarnation of the semiconductor research and development division of ZTE Corporation ("ZTE"), a Chinese telecommunications and technology company with a tortured history of illegal activity including the unlawful export of restricted U.S technologies to countries including Iran and North Korea.

32.     NATIONS and others were well positioned to develop China's high technology industries benefiting from the misappropriation of restricted technologies, and beginning on a date unknown, but no later than June 2011, NATIONS assumed a role in the Enterprise to, in part, finance Enterprise activities and implement misappropriated technologies, in furtherance of Enterprise affairs.

33.     Defendant NATIONS USA is a wholly-owned California subsidiary of NATIONS and is nominally engaged in semiconductor research and development. At all times relevant herein, upon information and belief, the Enterprise has leveraged NATIONS USA to conceal its illicit activities and serve as the Enterprise's California base for the management of field operatives in the United States.

34.     Defendant LUO admits to a multi-decade history of engaging in illicit commercial and industrial theft across a broad range of industries for end use in the PRC and admits to personally profiting from his efforts thereon, including personally profiting from his work in connection with the Enterprise. At all relevant times herein, LUO led the Enterprise and was

12

Case 1:22-cv-00550-ER Document 41 Filed 00/04/22 Page 220 of 877

responsible for developing the objectives of the Enterprise, managing Enterprise finances, recruitment, and the coordination of member roles and responsibilities.

35.     Defendant SUN is a chief lieutenant of LUO in the Enterprise. At all relevant times herein, SUN has conducted affairs of the Enterprise at the direction of LUO, including but not limited to acting in place and stead of LUO in Enterprise affairs, serving as a conduit between LUO and other members of the Enterprise, and supervising the operation of the Enterprise's California base. Upon information and belief, SUN has personally profited from his work in connection with the Enterprise.

36.     At all relevant times herein, defendant YU was a chief lieutenant of LUO and SUN, and, at the direction of LUO and SUN, YU conducted the affairs of the Enterprise, including but not limited to executing the day-to-day administrative affairs of the Enterprise and managing Enterprise communications, including communications with Plaintiffs. YU was personally enriched and rewarded by the Enterprise and was appointed to lucrative management positions in various Enterprise projects.

37.     Defendants HUANG and LUO share a longstanding personal and professional relationship spanning decades, and HUANG leveraged his cabinet-level positions in the PRC government and his decades-long relationship and common ties with LUO to participate in the affairs of the Enterprise and recruit members to the Enterprise, including his solicitation and recruitment of Plaintiffs as described herein.

38.     Non-party culpable person Chen has decades of experience in semiconductor, photoelectric, and microwave transmission product development and management, and since 2007, Chen has served as General Manager of Chengdu RML Technology Company ("Chengdu RML"). Together with non-party culpable person Shih, Chen also served on the Board of

13

Case 1:22-cv-00535-ER   Document 41   Filed 06/24/22   Page 230 of 377

Directors of Chengdu Ganide Technology Co., Ltd. ("Chengdu Ganide"), a PRC entity engaged in the planning and construction of a semiconductor fabrication plant (also known as a "foundry") in which monolithic microwave integrated circuits ("MMICs"), a type of integrated circuit device, would be manufactured. As admitted by LUO, Chen has conducted the affairs of the Enterprise, including but not limited to the illicit acquisition of blueprints and raw materials, used in the production of semiconductors, from U.S. and other foreign companies in the United States for end use in China, and, upon information and belief, the payment and management of other enterprise members, including Shih.

39.     Non-party culpable person Shih is a dual citizen of Taiwan and the United States and worked as an electrical engineer with expertise in all aspects of MMIC technology. Since at least 2010, Shih was employed and compensated by Chengdu GaStone Technology Co., Ltd. ("CGTC"), a PRC entity that had established a MMIC foundry in Chengdu, PRC, and which was designated in 2014 by the U.S. Department of Commerce as being a risk to U.S. national security or foreign policy interests. Together with Chen, Shih served on the Board of Directors of Chengdu Ganide since no later than 2010. Shih was financed by Chen – and as admitted by LUO, the Enterprise financed Chen, and upon information and belief, the Enterprise financed Shih via Chen – and thus Shih conducted the affairs of the Enterprise at the direction and oversight of defendants SUN and NATIONS USA and non-party Chen, and was tasked with, among other things, acquiring for the Enterprise the technical knowledge and designs necessary for the mass production of MMIC semiconductors in the PRC.

40.     The association-in-fact enterprise described herein functions much like a modern military unit: (i) strategic level command (including defendants LUO and SUN), who are responsible for preparing, planning, conducting, and executing Enterprise operations to achieve

14

Case 1:22-cv-00355-ER  Document 41  Filed 06/24/22  Page 238 of 877

the strategic objectives of the Enterprise; (ii) operational level units (including defendants YU, HUANG, NATIONS, and NATIONS USA), who must be prepared to plan, conduct, and sustain Enterprise operations; and (iii) component level units (including non-party culpable persons such as Chen, Shih, and others), who provide field level operational expertise and support to operational level units.

41.    LUO and SUN, as strategic level command and masterminds of the Enterprise, are responsible for its overall direction and coordination, with final say on all important decisions of the Enterprise. In this capacity, LUO and SUN are responsible for Enterprise finances and would cause money to be collected and disseminated, by way of bank accounts controlled by the Enterprise, including bank accounts maintained at financial institutions located in New York County, to finance the activities of the Enterprise. LUO and SUN would cause Enterprise funds to be disseminated to various members of the Enterprise, including Chen and others, as compensation for their contributions to the illicit acquisition of U.S. technologies for end use in China. Together with SUN, LUO is also responsible for creating, approving, and implementing the policies, practices, and instrumentalities used by the Enterprise to accomplish its common goals and purposes. Together with HUANG, LUO and SUN are further responsible for the recruitment of talent to the Enterprise. Stated differently, at all times relevant herein, LUO and SUN were and have been the hub of the Enterprise as strategic level command, around which all other defendants and non-party culpable persons and entities revolve, and have combined into a single cohesive and self-sustaining unit with the common purpose and goal of illicitly acquiring and transferring U.S. and other foreign technologies in the United States for end use in China. The Enterprise strategically aggregated individuals and entities with different specialties and expertise to take on tasks no existing individual or entity was properly configured to tackle alone,

Case 1:22-cv-00535-ER Document 41 Filed 06/24/22 Page 232 of 377

and provided overarching headquarters, management, funding, communications, and logistical capabilities and support.

42. SUN and YU are LUO's chief lieutenants, and are responsible for the day-to-day operations of the Enterprise, directing other members of the Enterprise to take actions necessary to accomplish Enterprise objectives, and implementing the policies, practices, and instrumentalities of the Enterprise. LUO would direct YU and SUN to orchestrate, plan, implement, and execute command level decisions, including which controlled commodities and technologies to acquire and the manner and means of acquiring and exporting the same for end use in China.

43. HUANG's role in the Enterprise, as directed by LUO and SUN, is primarily to identify and assist in the recruitment and solicitation of talent to the Enterprise, including, to wit, the solicitation of Plaintiffs, and to otherwise leverage his PRC relationships to facilitate the business and activities of the Enterprise and otherwise coerce Enterprise membership.

44. Chen is one of the longest-standing, most successful, and trusted associates of the Enterprise, and upon information and belief, Shih is financed and managed by Chen. Chen, Shih, and others are field operatives of the Enterprise and active participants and central persons in the operation and execution of Enterprise activities at all relevant times herein.

## II. RICO PREDICATE ACTS

### A. The Enterprise's Historical Predicate Acts

45. Defendants and other culpable members of the Enterprise committed deliberate and repeated acts of misappropriation and illicit procurement of protected commodities and technologies from locations in the United States and elsewhere, and each received income and other benefits and enriched themselves directly and indirectly from such efforts.

16

Case 1:22-cv-00503-ER Document 41 Filed 06/24/22 Page 20 of 67

46.     As admitted by LUO, in or around 2011 – at the direction of LUO and SUN and utilizing capital funding and access provided by the Enterprise – the Enterprise facilitated the acquisition of a New York-based high technology company.  The acquisition facilitated the transfer of critical technology to the Enterprise and also established a domestic base for Enterprise operations in the State of New York.  Based on meetings and other Enterprise activities admitted by LUO to have occurred in the State of New York, this New York entity serves as strategic base for Enterprise activities and operations including a base from which to manage the Enterprise's technical experts.

47.     As set forth herein, LUO admitted to financing Chen in furtherance of Enterprise objectives, and upon information and belief, on or about June 1, 2011, the Enterprise, via funding provided by NATIONS and other non-party culpable Enterprise members, and facilitated by LUO and SUN, caused Chen to deposit approximately $3.4MM into a bank account held by a British Virgin Islands company and controlled by the Enterprise.  Upon information and belief, the $3.4MM was used to finance the Enterprise and compensate Shih and others for the illicit acquisition and unauthorized export of MMIC chips and designs to be fraudulently obtained by Shih and others from an American MMIC foundry.  Upon information and belief, on or about August 2011 – with the support of NATIONS USA in the supervision of Enterprise field operatives and at the ultimate authorization of LUO and SUN – Chen used the Enterprise funding to approve monthly payments of $67,000 to Shih as compensation for Shih's ongoing role in the Enterprise with respect to the planning and execution of illicit acquisitions of sensitive U.S. export-controlled technologies and related materials, such as MMICs.

48.     As set forth herein, LUO admitted to financing Chen in furtherance of Enterprise objectives, and upon information and belief, the $3.4MM ultimately distributed by Chen to Shih

17

and other Enterprise members provided them substantial Enterprise financing and a clear incentive to carry out field operations in furtherance of Enterprise objectives. Upon information and belief, Chen and Shih further used this Enterprise financing to continue their efforts in connection with Chengdu Ganide's plans to utilize and further develop the technologies illicitly acquired by the Enterprise, as well as CGTC's plans to utilize the illicitly obtained technology for specialization in, among other things, the design, testing, and manufacturing of gallium nitride and gallium arsenide MMIC wafers and chips for end use in China.

49. Shih – upon information and belief, financed by the Enterprise via funding provided by NATIONS and other Enterprise members and under the management of NATIONS USA and Chen – committed a number of crimes in furtherance of Enterprise objectives, including, to wit: (i) in or around April 2012, under Chen's guidance, Shih planned for the development of a MMIC semiconductor foundry in the PRC, and in furtherance of this foundry, on or about September 24, 2012, Shih caused the unlawful export of semiconductor-related equipment from the United States to Chengdu, PRC in violation of, *inter alia*, the Export Administration Regulations, 15 C.F.R. §§ 730-744; (ii) from February 2013, Shih caused a subordinate field operative to provide false information to a leading American MMIC semiconductor foundry ("U.S. MMIC Foundry") for the purpose of illicitly inducing the sale of MMICs produced by U.S. MMIC Foundry to entities controlled by Shih in furtherance of Enterprise objectives and in violation of, *inter alia,* 18 U.S.C. § 1341; (iii) on or about September 3, 2013 through December 1, 2014, Shih caused the submission to U.S. MMIC Foundry of multiple purchase orders for MMIC wafers totaling $247,000, and – utilizing Enterprise money and at the ultimate authorization of LUO and SUN – caused payments to be made for said illicit purchases of MMIC chips fabricated by U.S. MMIC Foundry totaling

18

Case 1:22-cv-00350-ER Document 1-41 Filed 09/14/22 Page 28 of 67

$247,000, along with payments to Shih's subordinate totaling $38,028, in furtherance of Enterprise objectives; and (iv) on or about January 2, 2014 through April 6, 2015, Shih caused packages containing the MMIC chips obtained from U.S. MMIC Foundry to be unlawfully shipped from the United States and ultimately delivered to the PRC in furtherance of Enterprise objectives.

### B.     The Enterprise Scheme to Solicit, Coerce, and Defraud Plaintiffs

50.     To support the Enterprise, Defendants recruited, solicited, groomed, financed, and managed various business, finance, science, and technology professionals like DAI and Chen and others to illicitly access and acquire protected American technologies. Defendants sought to solicit, direct, and incentivize DAI and others to commit crimes against companies headquartered or with offices in the United States in furtherance of Enterprise objectives.

51.     To wit, upon information and belief, around the time the Enterprise was arranging for Shih to illicitly acquire and export MMIC chips, LUO and SUN recognized the Enterprise's need to use financial and investment professionals as field operatives to arrange for sophisticated transactions and directed HUANG to recruit and solicit suitable candidates whose responsibilities would be the management, laundering, and growth of Enterprise finances. One such candidate was plaintiff DAI, by then already a successful hedge fund manager in China. As recounted by LUO, the Enterprise ultimately "chose" to solicit and recruit DAI to the Enterprise for three reasons: first, LUO's long-standing, trusted associate HUANG had arranged their relationship; second, DAI shared an ancestral birthplace with LUO; and third, as admitted by LUO, "in the private fund field, [DAI had] strong professionalism, [was] well-educated, low-key, hardworking, pragmatic, and professional. [LUO] need[ed] to find someone like this" for the Enterprise.

19

52.     In furtherance of the scheme to recruit and solicit Plaintiffs, HUANG arranged a social engagement at the direction of LUO and SUN, in or around May 2014, to create the opportunity for LUO and SUN to solicit DAI to the Enterprise. Unaware of the criminality of the Enterprise or the Individual Defendants association with same, at the behest of HUANG, DAI accepted LUO's claimed interest in subscribing to a fund managed by Khan Funds China, DAI's wholly-owned, registered private fund management company.

53.     On or around October 15, 2014, DAI incorporated plaintiff KHAN FUNDS in New York County to serve as the global headquarters for DAI's businesses and the umbrella parent company to all of DAI's wholly-owned affiliated entities located in China, Singapore, and elsewhere, including Khan Funds China.

54.     In or about August 2015, plaintiff KHAN FUNDS formed a mergers and acquisitions team to execute DAI's investment strategy of acquiring U.S.-based biopharma companies and merging the same with similarly situated China-based companies in an effort to grow enterprise value and total shareholder returns. In furtherance of this investment strategy, DAI concurrently established Beijing Khan as a wholly-owned subsidiary of Khan Funds China.

55.     Despite the biopharma sector being completely outside of NATIONS' ordinary scope of business, LUO recognized this as a strategic opportunity to ensnare Plaintiffs into the Enterprise, thereby allowing the Enterprise to use the financial strength and reputation of KHAN FUNDS and DAI to facilitate Enterprise activities and launder illicit racketeering proceeds. To that end, from about October 2015 and continuing through no earlier than November 2017, in New York County and elsewhere, Defendants, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud Plaintiffs, and to obtain money and property from Plaintiffs, by means of one or more materially false and fraudulent pretenses,

20

Case 1:22-cv-00535-ER Document 41 Filed 06/24/22 Page 23 of 877

representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, contrary to 18 U.S.C. § 1343. Specifically, beginning from approximately October 2015 through no earlier than November of 2015, the Enterprise directed YU to cause NATIONS to commit to an investment in KHAN FUNDS' biopharma project, something that far exceeded NATIONS' ordinary course of business; in turn, NATIONS and YU caused the transmission of fraudulent communications to Plaintiffs in New York County and elsewhere concerning the negotiation of the purported investment. As a result of these negotiations, on or around November 23, 2015, Beijing Khan, as General Partner and Executive Partner, and non-party culpable entity Shenzhen Qianhai Nations Investment Management Co., Ltd. (hereinafter referred to as "Nations Investment"), a wholly-owned subsidiary of NATIONS, as Limited Partner, entered into the Shenzhen Guotai Qixing Industry Investment Fund Management Centre [Limited Partnership] Partnership Agreement (hereinafter referred to as the "Partnership Agreement"), establishing non-party Shenzhen Guotai Qixing Industry Investment Fund Management Centre [Limited Partnership] (hereinafter referred to as "Shenzhen Guotai" or the "Partnership"). The Enterprise caused Nations Investment to invest capital in the amount of RMB 300MM, on or around November 30, 2015, into the Partnership, with an additional investment of RMB 200MM to the Partnership, on or around July 4, 2016. By these investments, NATIONS committed approximately one quarter of its cash reserves at that time to Enterprise goals and objectives that were outside of NATIONS' ordinary scope of business.

56. Pursuant to the terms of the Partnership Agreement, KHAN FUNDS, by and through affiliate entity Beijing Khan, as General Partner and Executive Partner, had the exclusive

21

Case 1:22-cv-00535-ER   Document 41   Filed 06/24/22   Page 28 of 817

right and authority to make independent investment and management decisions for the
Partnership, while NATIONS, via Nations Investment as Limited Partner, was expressly
forbidden from participating in or interfering with such decisions.    KHAN FUNDS' sole
authority to make these decisions had been negotiated ad nauseam and was of such importance
that this limiting clause was set forth in the Partnership Agreement in no less than ten different
sections or subsections, to wit: sections 2.6.5 and 2.6.6, which bestowed upon KHAN FUNDS
the right to "independently manage the daily operations of" and "make investment decisions
independently for" the Partnership, respectively, while also stating that the Limited Partner "may
not participate nor interfere;" sections 4.2.3 and 4.2.5, which noted that the Limited Partner shall
not "participate in or interfere in the normal operation and management" or "be involved in the
management," respectively, of the Partnership; section 5.1, which granted KHAN FUNDS the
power to "execute the Partnership affairs on behalf of the Partnership;" section 5.3.2, which
stated that "[a]dministering maintaining, and disposing of Partnership assets, including but not
limited to investment assets, non-investment assets, intellectual property rights, etc." was one of
the "[a]uthorit[ies] and responsibilities of the Executive Partner;" and the entirety of section 6,
comprising sections 6.1, 6.2, 6.3, and 6.4, which authorized KHAN FUNDS to make decisions
for the Partnership, specifically "exercis[ing] the investment decision-making authority;"
"determin[ing] if the investment conditions of the projects are in line with the overall interest of
the Partnership, and ultimately decid[ing] whether to invest;" "with regards to the transfer and
disposition of the Partnership's investment assets, real estates held for various reasons, and
intellectual property;" and "with regards to other investment related matters of the Partnership."

57.    NATIONS, via its affiliated entity Nations Investment, however, had no present or
future intention of abiding by terms of the Partnership Agreement or the underlying intended

purpose of the Partnership, that is, investment into the U.S. biopharma sector. Rather, the Enterprise sought to leverage the investment for the fraudulent purpose of co-opting Plaintiffs into the Enterprise; the Enterprise's intermingling into DAI's businesses encumbered Plaintiffs with the legal obligation and responsibility to unwittingly manage racketeering funds of the Enterprise, and Defendants sought to exploit this obligation as a means to solicit and coerce Plaintiffs' involvement in the Enterprise. As described herein,    LUO, SUN, and others employed threats of violence against DAI's person, family, and associates, and issued threats of governmental and regulatory scrutiny against KHAN FUNDS in furtherance of the scheme to solicit and coerce Plaintiffs' involvement in the Enterprise.

58.     Between January through September of 2016, in furtherance of the business of the Partnership, KHAN FUNDS expended in excess of $1MM in consulting, legal, and other fees with respect to China Merchants Bank New York Branch, Deloitte, and Baker McKinsey, as well as countless hours and resources expended on extensive research, due diligence, meetings, and assessments on numerous acquisition candidates, eventually culminating in overseas roadshows in the PRC showcasing the target acquisitions.

59.     During this time, in or about March 2016, LUO telephoned DAI in the State of New York and summoned DAI to China to accompany him on a trip to New York for, among other things, assistance with a "personal favor" unrelated to Luo's position at NATIONS. Specifically, LUO sought DAI's assistance in establishing an account at a banking and financial institution in the United States for a British Virgin Islands private company controlled by the Enterprise. Unbeknownst to DAI, LUO sought to establish this bank account for the purposes of laundering illegal racketeering proceeds of the Enterprise and financing Enterprise activities. After arriving in New York County together with LUO on or around May 7, 2016, DAI arranged

23

Case 1:22-cv-00550-ER  Document 41  Filed 06/24/22  Page 27 of 67

for LUO to meet with China Merchants Bank New York Branch, for the purpose of establishing an account with a banking institution in the United States, specifically within the State of New York, County of New York, that would be used to launder the Enterprise's funds and finance the illicit acquisition and transfer of protected U.S. technologies for end use in China, as well as activities conducted in furtherance thereof. Between approximately May 7, 2016 through May 14, 2016, within New York County and elsewhere, Defendants, together with others, did knowingly and intentionally conspire to execute a scheme and artifice to defraud China Merchants Bank New York Branch, a multi-national banking and financial services institution that operated in New York County and elsewhere, and to obtain moneys, funds, credits, and other property owned by and under the custody and control of said financial institution, by means of one or more materially false and fraudulent pretenses, representations, and promises, contrary to 18 U.S.C. § 1344, with the intent to promote the carrying on of specified unlawful activity, to wit: a conspiracy to violate the Economic Powers Act.

60.     During this trip to New York, LUO also visited the Enterprise's New York base, and later admitted that the Enterprise had "already acquired this team 4 or 5 years ago" by way of a "comrade-in-arms partner who [LUO] arranged in Beijing." Upon information and belief, LUO met with the Enterprise's field level operatives and others for the purpose of transferring illicitly-acquired, critical American process knowledge for the benefit of the Enterprise.

61.     In furtherance of the Enterprise's scheme to solicit, coerce, and defraud Plaintiffs, during this visit, LUO suggested that KHAN FUNDS change the investment focus of the Partnership from biopharma and use the funds invested by the Enterprise to instead acquire an American semiconductor company to advance the development of the high technology industries in the PRC. Given this suggestion was in direct contravention of the terms of Partnership

24

Case 1:22-cv-00535-ER  Document 41  Filed 06/24/22  Page 243 of 377

Agreement, the fact that there was no expertise within the KHAN FUNDS mergers and acquisitions team in connection with a high technology acquisition, and the fact that RMB 500MM could not fund a transaction of this type, Plaintiffs disregarded this suggestion and continued to proceed with the biopharma transaction as planned. To that end, Plaintiffs continued the efforts of identifying suitable biopharma candidates for acquisition and expended considerable resources in pursuit thereof. After conducting extensive due diligence, countless meetings and assessments, and travel with acquisition targets on various road shows, Plaintiffs finally identified an attractive biopharma candidate that had the potential to return significant profits to the Partnership. Despite this, the Enterprise's demand to switch the investment focus of the Partnership to a high technology enterprise only increased in frequency, urgency, and intensity. LUO and SUN directed YU to manage the communications between Plaintiffs and the Enterprise, and, to that end, YU directed repeated communications to Plaintiffs in New York County pressuring Plaintiffs to agree to Enterprise demands and threatened harsh consequences for the refusal thereof.

62.     On or about September 12, 2016, LUO again traveled to New York. No later than September 20, 2016, LUO met with DAI in New York County, at which point DAI presented KHAN FUNDS' biopharma investment findings and recommendations to LUO. LUO again repeated the demand that Partnership funds be used to acquire an American high technology company and not the intended biopharma investment.

63.     Following LUO's visit, LUO and SUN caused YU to initiate a pressure campaign against Plaintiffs. To that end, on or around September 26, 2016, Yu transmitted extortionate and fraudulent communications to Plaintiffs in New York threatening the immediate dissolution of the Partnership if Plaintiffs failed to submit to Enterprise demands. To that end, in or around

25

Case 1:22-cv-00505-ER Document 41 Filed 06/24/22 Page 242 of 877

May 2017, at NATIONS' headquarters in Shenzhen, PRC, LUO summoned and captured two of KHAN FUNDS' most senior employees. LUO, knowing that his message would be relayed to Plaintiffs in New York, angrily confronted these KHAN FUNDS employees and made direct threats demonstrating the reach and power of the Enterprise to inflict harmful consequences upon Plaintiffs for refusing Enterprise demands.

64. On or around September 10, 2017, LUO traveled to New York for the purpose of finalizing and delivering Plaintiffs' membership to the Enterprise and securing Plaintiffs' agreement to facilitate the proposed acquisition by the Partnership. Further, LUO admitted that his visit's purpose was to attend various meetings the Enterprise arranged to be held at the Enterprise's New York base to bring together certain of the Enterprise's field operatives located in New York and overseas. Beginning on or around September 10, 2017 through September 17, 2017, DAI met with LUO on multiple occasions at multiple locations in New York County, including the offices of KHAN FUNDS. On or around September 10, 12, and 14, 2017, LUO admitted in multiple conversations with DAI that the primary reason for his visit to New York was to bring together members of the Enterprise's collected team of international technical experts to meet with their American counterparts at the Enterprise base in New York in furtherance of the Enterprise's scheme to illicitly acquire and transfer protected U.S. technologies for end use in China. As admitted by LUO, "[the Enterprise's New York team of experts] now has two or three of the world's top technology experts capable of competing with [the most advanced American companies in the industry]. The reason I came here this time is to communicate with them about technology. This technology can completely fill the domestic gap." LUO had "brought the core expert technical team [from China], and some experts will fly from Europe." LUO further revealed that the purpose of the Enterprise meeting was to

Case 1:22-cv-00530-ER Document 41 Filed 06/24/22 Page 29 of 877

coordinate the activities of Enterprise members and cause them to commit crimes in furtherance
of Enterprise objectives, including the illicit acquisition of restricted technologies in violation of
the Economic Powers Act and crimes indictable under Title 18, United States Code, Sections
1343 (relating to wire fraud), 1344 (relating to financial institution fraud), 1831 (relating to
economic espionage), 1832 (relating to theft of trade secrets), and 1956 (relating to the
laundering of monetary instruments). To wit, LUO admitted, "[t]his time, my team came here to
coordinate with them and clearly communicate about all the core details, and some things have to
be brought back [to the PRC]," and that "[at this meeting], I will take action to do the second
most important thing [the Enterprise] planned. After I finish this matter, the thing I bring back
will help our country resolve many problems." In other words, the Enterprise was on the
precipice of obtaining illicitly acquired technologies that would significantly advance the goals
of the Enterprise and PRC technological capabilities, and on or around September 13, 2017,
LUO and other members of the Enterprise met at the Enterprise's New York base in furtherance
of these objectives.

65. In the course of these same conversations with DAI in New York, LUO admitted,
to wit: (i) LUO's role as a mastermind of the Enterprise and his leadership position with respect
to Enterprise members: "I asked them [other members of the Enterprise] to work here for several
days and communicate with them. They really respect me now ... I directly lead them for this;"
(ii) the achievements of the Enterprise, claiming that "the top [technology] that we have
purchased, the [technology] has already been brought back to China, it has been figured out;"
(iii) that the semiconductor facility that NATIONS sought to establish in Chengdu, PRC was
built upon the Enterprise's illicit technology acquisitions; (iv) that the "Framework Agreement"
between NATIONS and CHEN, concerning the production and commercialization of

27

Case 1:22-cv-00850-ER Document 141 Filed 06/16/22 Page 31 of 877

semiconductor IC wafers, was actually made possible by illicit Enterprise activity and the very technologies Chen had been dispatched to acquire for the Enterprise; (v) the Enterprise's financing of Chen's activities and Chen's essential role as a field operative for the Enterprise, as "there are many things [Chen had done for the Enterprise] that cannot be told," and that "[i]n these ten years or so, including from Canada and from the U.S. ... the things [Chen] was responsible for, how the researchers came back to the country, and how the technology was brought back, how can I talk about these things? It's not that easy." LUO continued, "Chen had been working for [the Enterprise] for 15 years," and the Enterprise "relied on Chen" because Chen was instrumental in advancing PRC technologies, starting from "no drawings, no technology, no talent" to having obtained for the Enterprise "a full set of drawings and talents." As admitted by LUO, Chen and others acted in furtherance of Enterprise objectives in the theft of restricted commodities and technologies and the misappropriation of critical intellectual capital; (vi) that LUO's work for the Enterprise was wholly unrelated to his public-facing position at NATIONS and that he neither worked for any one single person or entity nor was he accountable to any one single person or entity; rather, LUO worked to advance the Enterprise goal of the development of PRC technology; (vii) the extensive global reach of the Enterprise and its operation; as admitted by LUO, "[t]he people on my team, throughout the world, there are 1,500 people in the U.S who can operate this (technology), several hundred in Canada and several hundred in Germany, and for these people, I have already... These people (technical experts) have already returned." LUO continued, of the 1,700 U.S.-based engineers with expertise in producing gallium nitride and gallium carbide, there were "107 Chinese-Americans, all of whom are under my control;" and (vii) the expansive interest of the Enterprise in acquiring varied forms of technology, from the Enterprise's efforts in the fields of artificial intelligence and

28

its applications to predictive decision making to various supercomputer technologies.

66.     At the same time LUO was admitting to the workings of the Enterprise, in New York County, Defendants knowingly and with the intent to solicit, coerce, and defraud Plaintiffs, devised, participated in, and executed a scheme to solicit Plaintiffs' membership and participation in the Enterprise, defraud Plaintiffs as to material matters, and to use threats of force to compel Plaintiffs to commit multiple crimes in furtherance of the Enterprise, including the illicit acquisition of restricted technologies in violation of the Economic Powers Act and crimes indictable under Title 18, United States Code, Sections 1343 (relating to wire fraud), 1344 (relating to financial institution fraud), 1831 (relating to economic espionage), 1832 (relating to theft of trade secrets), and 1956 (relating to the laundering of monetary instruments). To wit, on or around September 10, 12, and 14, 2017, LUO admitted to his intention of soliciting Plaintiffs to the Enterprise for the purposes of giving the Enterprise access to capital that could be readily sourced and thus allow the Enterprise to finance operations through legitimate channels. LUO explained that he had "kept a special path for" Plaintiffs to orchestrate and manage the Enterprise's finances, and "hope[d] that everyone can work together in the funding strategy aspect." LUO activated his pressure campaign to solicit Plaintiffs' membership to the Enterprise with promises of profit, access, and influence: "[b]y helping [the Enterprise] with your intelligence, you can both receive such profits and at the same time, help me personally, also, through such circumstances you're able to make friends with these people [Enterprise members and other influential people]. This is a special channel to develop …" Luo continued, "this cooperation will bring you key influence" and this "collaborative relationship with Khan Funds [and the Enterprise]" would be "extraordinary." In sum, Luo admitted that the Enterprise never intended to invest in a biopharma acquisition via the Partnership; rather, the Enterprise had

29

always sought to leverage its investment in the Partnership to solicit and coerce Plaintiffs'
membership in the Enterprise and exploit Plaintiffs in the scheme to covertly acquire an
American semiconductor company and transfer protected American technologies for end use in
China.

67.    At the same time LUO sought to solicit and coerce Plaintiffs to the Enterprise, in
New York County, Defendants devised, participated in, and executed a scheme to extort
RMB 300,000,000 from Plaintiffs in violation of 18 U.S.C. § 1951 and New York Penal Law
§ 155.05(2)(e) by use of threats of force, violence, and fear in an effort to use Plaintiffs to
launder the racketeering proceeds of the Enterprise and finance members of the Enterprise in
furtherance of Enterprise objectives. To wit, on or around September 10, 12, and 14, 2017, LUO
repeatedly attempted to extort RMB 300,000,000 from Plaintiffs and demanded that the money
be used to finance Enterprise activities, ordering DAI in one instance, for example, to "[j]ust
follow the arrangements on your end. I will give half of the 300 million [RMB] to someone
else." LUO continued, "I need to use the money to complete my mission [of the technological
development of the PRC]" and instructed DAI to "give me what you ought to give, and follow
your arrangement." LUO proposed, among other things, that the illicit proceeds obtained
through the Enterprise's extortionate demand be laundered through the Enterprise's China
Merchants Bank New York Branch account located in New York County.

68.    LUO resorted to naked threats of violence and reminded DAI of the reach and
power of the Enterprise, and warned, to wit, of DAI's family members in China and the
Enterprise's close ties to Chinese authorities to disrupt KHAN FUNDS business. The force of
LUO's myriad threats is perhaps best exemplified by LUO cornering and blockading DAI in his
hotel room at the Ritz Carlton in Lower Manhattan in September 2017 and demanding that DAI

30

Case 1:22-cv-00503-ER Document 141 Filed 00/04/22 Page 247 of 877

kneel down and grovel as a demonstration of LUO's authority. This humiliating and violent act of degradation left DAI trapped and fearful for his personal safety until the time LUO ultimately allowed for his release.

## III. THE OBSTRUCTION AND RETALIATION SCHEME AND OTHER HARM

### A. Plaintiffs Report of the Enterprise to Law Enforcement

69.     Following DAI's meetings with LUO in New York County on or around September 10, 12, and 14 2017, DAI made immediate arrangements to report LUO and the Enterprise to the FBI on or about September 21, 2017, for violations of, to wit, the Economic Powers Act and crimes indictable under Title 18, United States Code, Sections 1343 (relating to wire fraud), 1344 (relating to financial institution fraud), 1831 (relating to economic espionage), 1832 (relating to theft of trade secrets), 1956 (relating to the laundering of monetary instruments), 2314 (relating to the transportation in foreign commerce any commodities and technologies converted or taken by fraud), and 1951 (relating to extortion), and New York Penal Law § 155.05(2)(e).

70.     On account of initiating the FBI investigation of the Enterprise, DAI knew and understood the threat and reach of the Enterprise and caused KHAN FUNDS to dissolve its affiliated entities in the PRC, in the process liquidating more than one dozen private equity funds that managed in excess of $1BN in capital. Further to these efforts, DAI expended in excess of RMB 10MM to fulfill obligations triggered as a result of dissolution, including compensation to former clients and employees, as well as penalties and damages for contractual breaches.

71.     Being unaware of the FBI investigation initiated against them, between September 2017 through November 2017, YU, at the direction of LUO and SUN, caused the transmission of repeated communications by wire to Plaintiffs in New York, in furtherance of the Enterprise's

31

scheme to extort RMB 300MM from Plaintiffs and solicit and coerce Plaintiffs' membership to the Enterprise.

72. On or about January 19, 2018, federal authorities arrested Shih in connection with his illicit acquisition and export of export-controlled U.S. technologies, and on October 18, 2018 – or approximately one year into the DOJ investigation initiated by Plaintiffs – Chen, Shih, and others were indicted in the United States District Court for the Central District of California in the Shih Matter. Chen was indicted as a co-conspirator in an alleged conspiracy to violate the IEEPA in connection with the illicit procurement of commodities and technologies for unauthorized end use in China, and as alleged herein, LUO admitted to financing Chen, and upon information and belief, Chen caused substantial amounts of Enterprise money to be deposited to an offshore bank account and directed these funds to be distributed to Shih and other members of the Enterprise. In or about July 2019, Shih was convicted of conspiracy to violate the IEEPA and the Export Administration Regulations, as well as various other crimes related to and in furtherance of this illegitimate activity. Upon information and belief, Chen remains a fugitive from justice as of the date of this Complaint and has remained in the PRC since the date of his indictment.

**B. Defendants Obstruction and Retaliation Scheme and Other Harm**

73. Beginning on a date unknown but no later than November 2017, Defendants, together with others, did knowingly, intentionally, and corruptly conspire to inflict harm upon DAI using the tactic of criminalizing DAI and forcibly repatriating him to the PRC. The forced repatriation of targeted overseas Chinese nationals – including those who are residents or citizens of other countries – is prevalent worldwide, including in the United States. Typically, an overseas target is intimidated through a variety of oppressive tactics aimed at forcing a target's

32

return to China, and the use of "soft" tactics and other forms of "persuasion" – tactics that facially do not constitute kidnapping but nonetheless have the same purpose and effect – is encouraged to avoid potential diplomatic disputes and "the complicated legal procedures and long judicial cooperation procedures of the countr[y] where the [target is] hid[ing]." In furtherance of Defendants' scheme to inflict harm upon DAI, Defendants adopted the telltale tactics of a forced repatriation scheme, by supplying to PRC law enforcement false information that DAI had committed various acts of criminal wrongdoing as a means to cause the issuance, and thereafter the global broadcast, of an arrest warrant for DAI in the PRC. Apart from the mental anguish caused to DAI and the threat of being jailed in the PRC, the global broadcast and criminalization of DAI had the effect of restricting DAI's physical movements, as DAI would be prevented from worldwide travel to any of the countries who honored PRC extradition requests, not to mention the countless other jurisdictions where the Enterprise and PRC spheres of influence respectively extended. Thus, the foregoing scheme had the effect of disabling DAI from running KHAN FUNDS' worldwide businesses and restricted DAI's ability to serve as the primary executive and global figurehead of KHAN FUNDS.

74.     In reliance on the false information provided by Defendants in criminalizing DAI in furtherance of Defendants' scheme, the PRC police bureau in Shenzhen initiated criminal proceedings against DAI and other KHAN FUNDS employees and subsequently issued warrants of arrest for DAI and other KHAN FUNDS employees. The consummation of the scheme and the eventual issuance and global broadcast of arrest warrants for DAI and other KHAN FUNDS employees in the PRC was carried out without excuse or justification and with disinterested malevolence to harm DAI. As a result of the foregoing, DAI expended, to wit, remediation costs in the form of legal fees in excess of $200,000 and continuing to accrue to cause the revocation

33

of the issued arrest warrant, and fees excess of $40,000 for psychiatric treatment. Further to this effort, and adopting the continued tactics employed of criminalizing DAI and forcibly repatriating him to the PRC, at the direction of SUN, and, upon information and belief, via financing provided by NATIONS USA, beginning from a date unknown, but no later than November 2020 through no earlier than September 2021 and continuing to the date of this Complaint, Defendants, together with others, caused no less than three individuals to carry out multiple instances of surveillance against DAI and his properties in the State of New York and caused the collection of certain photo and/or video evidence on various dates during this period. Defendants did knowingly and willfully conspire to engage in conduct that caused, attempted to cause, and reasonably expected to cause substantial emotional distress and harm to DAI in the campaign to surveil DAI without excuse or justification, and Defendants participated in the stalking of DAI by directing surveillance activities and the recruitment of others into the conspiracy. As a result of the foregoing, DAI expended, to wit, remediation costs in the form of security personnel fees in excess of $118,000 and continuing to accrue to protect his person and properties.

75.     Shih's arrest in January 2018, and Chen's indictment in October 2018, alerted the Enterprise to DAI's cooperation with law enforcement. In retaliation thereof, at the direction of SUN, starting no later than January 2018 and continuing through no earlier than on or around July 9, 2021, Defendants, together with others, knowingly, intentionally, and corruptly conspired to obstruct, influence and impede, hinder, delay, and prevent the communication to a law enforcement officer of the United States of information relating to the commission of a Federal offense, and intentionally and knowingly retaliated against an informant for providing to a law enforcement officer of the United States any truthful information relating to the commission or

34

possible commission of any Federal offense, in violation of, to wit, 18 U.S.C. §§ 1512 and 1513.
Defendants engaged in a pattern of obstruction and retaliation by knowingly promulgating false
and defamatory information – including false claims that Plaintiffs had disappeared and had
embezzled and absconded with millions of dollars – in the form of public announcements, as
well as causing the worldwide syndicated publication of false and defamatory content delivered
to New York in an effort to deflect and distract attention from law enforcement in violation of
18 U.S.C. § 1512 (relating to tampering with a witness, victim, or an informant) and 18 USC
§ 1513 (relating to retaliating against a witness, victim, or an informant). By attempting to
impede the criminal investigation of the Enterprise, Defendants sought to avoid criminal
prosecution for the illicit acquisition of protected commodities and technologies and sought to
retaliate against Plaintiffs for their cooperation with law enforcement.

76.    Further to Defendants' obstruction and retaliation efforts, at the time of Shih's
arrest, Plaintiffs discovered that the corporate offices of a KHAN FUNDS affiliated entity in
Singapore had been burglarized and the office door lock changed without authorization. Upon
information and belief, this illegal activity was directed by SUN and carried out by the Enterprise
to discourage Plaintiffs from cooperating with law enforcement. Further, on or around
December 6, 2018, or shortly following Chen's indictment in the Shih Matter, Plaintiffs
discovered that KHAN FUNDS' email system had been accessed without authorization and
compromised to expose certain confidential and proprietary information in violation of 18 U.S.C.
§ 1030. Upon information and belief, this unlawful cyberattack on KHAN FUNDS' computer
systems was arranged by SUN to be carried out on American soil owing to the fact that all of
KHAN FUNDS' computers and computer networks accessed were physically located in New
York County and the State of New York, and was executed in furtherance of the Enterprise's

35

Case 1:22-cv-00050-ER Document 41 Filed 06/24/22 Page 252 of 377

scheme to retaliate against Plaintiffs for their cooperation with law enforcement.

**C.    Defendants Extortionate and Retaliatory Scheme**

77.    At the direction of SUN, and in furtherance of the Enterprise's scheme to retaliate and deter Plaintiffs from cooperating with law enforcement and defraud Plaintiffs, beginning from a date unknown but no later than on or about May 2, 2018, Defendants, together with others, did knowingly, intentionally, and corruptly conspire to commence a baseless and corrupt lawsuit intended to extort Plaintiffs in violation of, to wit, 18 U.S.C. § 1951 and New York Penal Law § 155.05(2)(e), and obstruct, influence and impede, hinder, delay, and prevent the communication to a law enforcement officer of the United States of information relating to the commission of a Federal offense, and intentionally and knowingly retaliated against an informant for providing to a law enforcement officer of the United States any truthful information relating to the commission or possible commission of any Federal offense, in violation of, to wit, 18 U.S.C. §§ 1512 and 1513. First, Defendants caused the covert filing of corrupt and fraudulent lawsuit initiated by wrongful means in the PRC to remove the KHAN FUNDS related entity as the General Partner and Executive Partner of the Partnership. By fraudulently concealing the location of the actual entities and individuals controlling the Partnership from, and providing fraudulent information to, the court – —and thus leveraging the corrupt connections between the Enterprise and the Chinese judiciary branch, the very type of government access LUO threatened that the Enterprise could activate against KHAN FUNDS – Defendants, through fraudulent and corrupt means, obtained an unlawful and defective judgment of default on or around February 14, 2019 enabling the Enterprise to wrongfully appoint an affiliated entity of NATIONS to the Partnership as General Partner and Executive Partner.

78.    In furtherance of Defendants' retaliatory and extortionate scheme, on or around

36

October 27, 2020, NATIONS took advantage of its ill-gotten position in the Partnership to cause

the filing of more spurious litigation against DAI individually, together with other KHAN

FUNDS employees, in Singapore (the "Singapore Action"). At the direction of SUN and others,

the Singapore Action employed a similar strategy and playbook to the spurious litigation in

China: fraudulently conceal the actual location of DAI and others from the court in an effort to

fraudulently obtain a default judgment against DAI, in the millions, in contravention of New

York law.

79. In sum, DAI's cooperation with the DOJ has extended over a number of years and

contributed to the indictments of certain members of the Enterprise as stated herein, and it is

incontrovertible that these individuals along with other members of the Enterprise have

committed a number of serious crimes against U.S. interests and continue to conspire against

DAI in retaliation for his cooperation with law enforcement. Accordingly, Defendants and other

members of the Enterprise must answer to Plaintiffs for their actions.

## IV. DAMAGES

80. As a direct result of the racketeering activity alleged above, as well as the conduct

of the other participants in the RICO enterprise, Plaintiffs have been injured in their business and

property as follows: (i) Defendants made intentional material misrepresentations of fact and

omissions in entering into the Partnership Agreement with the KHAN FUNDS affiliated entity

Khan Funds China. Among other things, Defendants misrepresented that they intended to abide

by the Partnership Agreement, including, to wit, § 2.6.5 (allowing KHAN FUNDS to manage the

affairs of the Partnership without participation or interference), § 2.6.6 (allowing KHAN FUNDS

to independently make investment decisions for the Partnership without participation or

interference), and § 6.1 of the Partnership Agreement (providing KHAN FUNDS investment

37

decision-making authority for the Partnership). KHAN FUNDS relied on Defendants false and misleading representations to its detriment, including by entering into the Partnership Agreement with NATIONS, and Defendants knew that the representations and omissions were false and misleading and made with the intent and expectation that KHAN FUNDS would rely on them. KHAN FUNDS has suffered injury as a direct and proximate result of Defendants false and misleading representations and omissions, including but not limited to monetary damage in excess of $1MM relating to money expended on consulting and research services, extensive due diligence costs and legal fees expended in connection with the investigation of potential target acquisitions, and extensive travel, operational, and related overhead costs expended in connection with facilitating the proposed transactions; (ii) in or around October 2017, resulting from the initiation of the DOJ investigation of the Enterprise and DAI's inability to return to China on account of the threats issued by the Enterprise, KHAN FUNDS was forced to dissolve affiliated entities Khan Funds China and liquidate all fourteen hedge funds under KHAN FUNDS' management. KHAN FUNDS has suffered injury as a direct and proximate result of Defendants' conduct, including but not limited to monetary damage in excess of $150MM in management fees and related profits arising from the liquidation of the fourteen hedge funds and closure of affiliated entities and RMB 10MM to fulfill obligations triggered as a result of dissolution, including compensation to former clients and employees, as well as penalties and damages for contractual breaches; (iii) in or around March 2018, KHAN FUNDS was denied custodian services by First Republic Bank for KHAN FUNDS' planned U.S.-based hedge fund offerings, citing the false and derogatory information promulgated by Defendants in violation of 18 U.S.C. § 1512 (relating to tampering with a witness, victim, or an informant) and 18 U.S.C. § 1513 (relating to retaliating against a witness, victim, or an informant). KHAN FUNDS has

38

Case 1:22-cv-00035-ER Document 41 Filed 03/14/22 Page 253 of 877

suffered injury as a direct and proximate result of Defendants' conduct, including but not limited to monetary damage in the form of lost management fees and related fund profits, and being forced to incur the overhead and operating expenses of KHAN FUNDS without the benefit of a U.S.-based hedge fund offering. The monetary damage incurred by KHAN FUNDS relating to its inability to commence its planned U.S.-based hedge fund offerings is in excess of $50MM and is continuing, including but not limited to with monthly overhead and operating expenses of KHAN FUNDS in excess of $200,000 and continuing to accrue through the date of this Complaint; (iv) KHAN FUNDS has lost its goodwill and business reputation in the United States and elsewhere owing to the false and derogatory information promulgated by Defendants in violation of 18 U.S.C. § 1512 (relating to tampering with a witness, victim, or an informant) and 18 U.S.C. § 1513 (relating to retaliating against a witness, victim, or an informant), resulting in loss of business opportunities; (v) DAI has spent and continues to spend significant amounts of money to defend the corrupt and fraudulent legal proceedings instituted by Defendants in the Singapore Action in an attempt of the Enterprise to extort and retaliate against Plaintiffs in violation of 18 U.S.C. § 1951 and the federal mail and wire fraud statutes. DAI has suffered injury as a direct and proximate result of Defendants' conduct, including but not limited to monetary damage in the amount of nearly $1MM in legal fees expended in connection with the forced defense of the corrupt and fraudulent Singapore Action and continuing to accrue through the date of this Complaint.

81.    As a direct result of the racketeering activity and other unlawful activity as alleged above, DAI has been injured as follows: (i) KHAN FUNDS and its affiliated entities are closely associated and identified in the public's mind with DAI as its founder and lead executive, and the false and derogatory information promulgated by Defendants concerning DAI in violation of

18 U.S.C. § 1512 (relating to tampering with a witness, victim, or an informant) and 18 U.S.C. § 1513 (relating to retaliating against a witness, victim, or an informant) have damaged DAI, KHAN FUNDS, and its related entities through the loss of goodwill and irreparable harm to DAI's business reputation, resulting in loss of business opportunities; (ii) as stated herein, Defendants' scheme to inflict harm upon DAI caused DAI to expend, to wit, legal fees to cause the revocation of the issued arrest warrant against him in excess of $200,000 and continuing to accrue, and remediation costs in the form of security personnel fees in excess of $118,000 and continuing to accrue to protect DAI's person and properties, and legal fees to protect against the extradition of DAI and KHAN FUNDS' employees in excess of $1MM and continuing to accrue; and (iii) in or around October 2018, resulting from Defendants' actions and harm issued against DAI, DAI was diagnosed with Major Depressive Disorder and prescribed a regimen of antidepressant medication and expended in excess of $40,000 for psychiatric treatment, and has further suffered from other consequential physical infirmities resulting from the foregoing. The aforementioned psychological deficits and physical infirmities have caused significant impairment to DAI's cognitive abilities in connection with his profession and impaired and obstructed his ability to function at the same professional standards achieved prior to sustaining the suffered injuries. Accordingly, DAI has suffered injury as a direct and proximate result of Defendants' conduct in an amount to be determined at trial, and taken together with the aforementioned damages and all damages sustained by KHAN FUNDS, no less than $260MM and continuing to accrue as stated herein.

40

## CAUSES OF ACTION

### COUNT I
### RICO (18 U.S.C. § 1962(C))

82. Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

83. Defendants are all "persons" within the meaning of 18 U.S.C. § 1961(3). At all times relevant, Defendants conducted the affairs of an association-in-fact enterprise, as that term is used in 18 U.S.C. § 1961(4), compromised of themselves and additional entities and individuals known and unknown through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

84. As described above, from a date unknown, but no later than in or around June 2011 and continuing through the date of this Complaint, the members of the Enterprise worked together to further their mutual goals of illicitly procuring protected technologies for end use in China.

85. As described above, each of the Defendants participated in the creation, operation, or management of the Enterprise, and each received income or other benefits and enriched themselves directly and indirectly from such efforts.

86. As described above, the Enterprise operated within the States of New York and California and elsewhere, including overseas.

87. As described above, the Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

88. As described above, the Enterprise had an ongoing organizational framework for carrying out its objectives. The Enterprise has organized itself into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to

41

Case 1:22-cv-00035-JR Document 141 Filed 06/24/22 Page 258 of 877

accomplish the common goals and purposes of illicitly procuring protected commodities and technologies for end use in China.

89.     As described above, Defendants and several of their associates share long-standing personal, professional, and financial ties, and these pre-existing affiliations and common ties facilitated the ability of Defendants to combine, merge, and conspire with themselves and others to form their racketeering enterprise with the common purpose of illicitly procuring protected technologies for end use in China.

90.     By and through each of the defendants' business, personal, and financial relationships with one another and their coordination with one another in the affairs of the Enterprise, each defendant knew the nature of the Enterprise and each defendant knew that the Enterprise extended beyond each defendant's individual role.

91.     As described above, each defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to illicitly acquire and export protected technologies and commodities in violation of 18 U.S.C. § 1962(c).

92.     As described above, SUN and LUO are the masterminds of the Enterprise.  In their capacity as the masterminds of the Enterprise, SUN and LUO had final authority on all significant business decisions of the Enterprise, and together with YU and others, are responsible for creating, approving, and implementing the policies, practices, and instrumentalities used by the Enterprise to accomplish its common goals and purposes.  Together with YU, SUN and LUO are responsible for the day-to-day operations of the Enterprise.  SUN and LUO have also taken actions and directed other members of the Enterprise, including HUANG, to take actions necessary to accomplish the overall goals and purposes of the Enterprise, including directing the affairs of the Enterprise, funding the Enterprise, soliciting and recruiting members of the

42

Enterprise, and directing members of the Enterprise.

93.     As described above, NATIONS and NATIONS USA have been active participants and central persons in the operation and management of the Enterprise and its affairs, and in the orchestration, perpetration, and execution of the Enterprise's scheme to illicitly procure protected technologies and commodities for end use in China.

94.     As described above, HUANG associated with the Enterprise and participated in the conduct of its affairs, including HUANG's intentional solicitation and encouragement of Plaintiffs to become members of the Enterprise and inducement of Plaintiffs to commit crimes in furtherance of Enterprise objectives.

95.     As described above, each defendant conducted and/or participated in the affairs of the Enterprise through a pattern of racketeering activity, including the illicit acquisition of restricted technologies in violation of the Economic Powers Act and crimes indictable under Title 18, United States Code, Sections 1343 (relating to wire fraud), 1344 (relating to financial institution fraud), 1831 (relating to economic espionage), 1832 (relating to theft of trade secrets), 1956 (relating to the laundering of monetary instruments), 2314 (relating to the transportation in foreign commerce any commodities and technologies converted or taken by fraud), and 1951 (relating to extortion) and New York Penal Law § 155.05(2)(e).

96.     As described above, beginning on a date unknown but no later than in or around May 2014 through no earlier than in or around November 2017, in New York County and elsewhere, Defendants, together with others, knowingly and with the intent to solicit, recruit, and defraud Plaintiffs, devised, participated in, and executed a scheme to solicit Plaintiffs' membership and participation in the Enterprise, defraud Plaintiffs as to material matters, and to use threats of force to compel Plaintiffs to commit multiple crimes in furtherance of the

43

Enterprise, including the illicit acquisition of restricted technologies in violation of the Economic Powers Act and crimes indictable under Title 18, United States Code, Sections 1343 (relating to wire fraud), 1344 (relating to financial institution fraud), 1831 (relating to economic espionage), 1832 (relating to theft of trade secrets), and 1956 (relating to the laundering of monetary instruments). Defendants and others further devised, participated in, and executed a scheme to extort RMB 300MM from Plaintiffs in violation of 18 U.S.C. § 1951 and New York Penal Law § 155.05(2)(e) by use of threats of force, violence, and fear in an effort to use Plaintiffs to launder the racketeering proceeds of the Enterprise and finance members of the Enterprise in furtherance of Enterprise objectives.

97.    To wit, as described above, from no later than in or around November 23, 2015 and continuing no earlier than November 2017, in New York County and elsewhere, Defendants, together with others, did knowingly and intentionally devise a scheme and artifice to defraud Plaintiffs, and to obtain money and property from Plaintiffs, by means of one or more materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, contrary to 18 U.S.C. § 1343 and 18 U.S.C. § 1951.

98.    To wit, as described above, no later than in or around September 2017 and continuing through no earlier than November 2017, in New York County and elsewhere, Defendants knowingly aided, abetted, counseled, commanded, induced, solicited, and procured another person to transport, transmit, and transfer a monetary instrument and funds, that is, RMB 300MM, to a place in the United States, within New York County, specifically, a China Merchants Bank New York Branch account, with the intent to promote the carrying on of

44

specified unlawful activity in violation of 18 U.S.C. § 1956.

99.     To wit, as described above, no later than in or around September 2017 and continuing through no earlier than November 2017, in New York County and elsewhere, Defendants, together with others, did knowingly and intentionally attempted to transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from one or more places in the United States to and through one or more places outside the United States and to one or more places in the United States from and through one or more places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: conspiracy to violate the Economic Powers Act, all contrary to 18 U.S.C. § 1956.

100.    As described above, from January 2018 and continuing through July 9, 2021, at the direction of SUN, each defendant together with others, did knowingly, intentionally, and corruptly attempted to obstruct, influence and impede, hinder, delay, and prevent the communication to a law enforcement officer of the United States of information relating to the commission of a Federal offense, and intentionally and knowingly retaliated against an informant for providing to a law enforcement officer of the United States any truthful information relating to the commission or possible commission of any Federal offense, in violation of, to wit, 18 U.S.C. §§ 1512 and 1513.

101.    As described above, from on or about May 2018 and continuing through the present, at the direction of SUN, Defendants, together with others, knowingly, intentionally and corruptly commenced a corrupt lawsuit intended to extort Plaintiffs in violation of, to wit, 18 U.S.C. § 1951 and New York Penal Law § 155.05(2)(e), and obstruct, influence, and impede, hinder, delay, and prevent the communication to a law enforcement officer of the United States of information relating to the commission of a Federal offense, and intentionally and knowingly

45

retaliated against an informant for providing to a law enforcement officer of the United States any truthful information relating to the commission or possible commission of any Federal offense, in violation of, to wit, 18 U.S.C. §§ 1512 and 1513.

102.    As described above, each defendant received income and other benefits and enriched themselves directly and indirectly from the pattern of racketeering alleged herein.

103.    As described above, Plaintiffs have been and continue to be injured in their business and property by Defendants' violation of 18 U.S.C. § 1962(c). All of Plaintiffs' injuries occurred within the United States.

<div align="center">

**COUNT II**
**RICO CONSPIRACY (18 U.S.C. § 1962(D))**

</div>

104.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

105.    As described above, from a date unknown, but no later than in or around June 2011 and continuing through the date of this Complaint, within New York County and elsewhere, Defendants, together with others, knowingly and intentionally conspired and agreed with each other to illicitly acquire and export protected commodities and technologies from the United States to the PRC for unauthorized end use in China.   The manner and means of the aforementioned conspiracy include the preceding allegations, which are realleged and incorporated by referenced as though set forth fully herein.

106.    As described above, Defendants and others agreed to develop the high technology industries in the PRC, including the high-powered integrated circuit industry and the establishment of a foundry in the PRC in which MMICs would be manufactured.

107.    As described above, by and through each of the defendant's business, personal, and financial relationships with one another and their coordination with one another in the affairs

<div align="center">46</div>

of the Enterprise, each defendant knew the nature of the Enterprise and each defendant knew that the Enterprise extended beyond each defendant's individual role. Moreover, through the same connections and coordination, each defendant knew that the other defendants were engaged in the conspiracies described herein.

108. As described above, each defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, defraud, and harm Plaintiffs economically and otherwise. The participation and agreement of each defendant was necessary to allow the commission of this scheme.

109. As described above, Defendants, together with others, conspired with each other to violate 18 U.S.C. § 1962(c). Defendants knowingly agreed, combined, and conspired to conduct or participate in the affairs of the association-in-fact Enterprise and each defendant agreed that the operation would involve repeated violations of the Economic Powers Act and crimes indictable under Title 18, United States Code, Sections 1343 (relating to wire fraud), 1344 (relating to financial institution fraud), 1831 (relating to economic espionage), 1832 (relating to theft of trade secrets), 1956 (relating to the laundering of monetary instruments), 2314 (relating to the transportation in foreign commerce any commodities and technologies converted or taken by fraud), and 1951 (relating to extortion) and New York Penal Law § 155.05(2)(e).

110. As described above, Defendants, together with others, conspired with each other to violate 18 U.S.C. § 1962(a). Defendants knowingly agreed, combined, and conspired to use or invest the proceeds of racketeering activity, to wit, income derived from crimes indictable under 18 U.S.C. § 1951 (relating to extortion) and New York Penal Law § 155.05(2)(e), in the operation of a RICO enterprise, an enterprise that engaged in, and the activities of which

47

affected, interstate and foreign commerce.

111.    As described above, from January 2018 and continuing through July 9, 2021, Defendants, together with others, conspired with each other to violate 18 U.S.C. § 1962(c). Defendants knowingly agreed, combined, and conspired to obstruct, influence and impede, hinder, delay, and prevent Plaintiffs from providing information to the FBI and intentionally retaliated against Plaintiffs for providing information to the FBI in violation of, to wit, 18 U.S.C. §§ 1512 and 1513.

112.    As described above, from on or about May 2018 and continuing through the present, Defendants, together with others, conspired with each other to violate 18 U.S.C. § 1962(c).  Defendants knowingly agreed, combined, and conspired to commence a corrupt lawsuit intended to extort Plaintiffs in violation of, to wit, 18 U.S.C. § 1951 and New York Penal Law § 155.05(2)(e), and obstruct, influence and impede, hinder, delay, and prevent Plaintiffs from providing information to the FBI and intentionally retaliated against Plaintiffs for providing information to the FBI in violation of, to wit, 18 U.S.C. §§ 1512 and 1513.

113.    As described above, Plaintiffs have been and continue to be injured in their business and property by Defendants' violation of 18 U.S.C. § 1962(d).  All of Plaintiffs' injuries occurred within the United States.

## COUNT III
## FRAUD

114.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

115.    As described above, among other things, Defendants made intentional material misrepresentations of fact and omissions in entering into the Partnership Agreement, including, to wit, § 2.6.5 (allowing KHAN FUNDS to manage the affairs of the Partnership without

48

participation or interference), § 2.6.6 (allowing KHAN FUNDS to independently make investment decisions for the Partnership without participation or interference), and § 6.1 of the Partnership Agreement (providing KHAN FUNDS investment decision-making authority for the Partnership).

116.    At the time Defendants knowingly made and caused the above-described material false and fraudulent pretenses, representations, and promises, and concealed and omitted, and caused to be concealed and omitted, material facts as set forth above, Defendants knew that the material pretenses, representations, and promises were false, that material information was concealed and omitted, and that their facts and omissions were fraudulent and deceptive.

117.    KHAN FUNDS relied on Defendants' false and misleading representations to its detriment, including entering into the Partnership Agreement with NATIONS.

118.    Defendants knew that the representations and omissions were false and misleading and made with the intent and expectation that KHAN FUNDS would rely on them.

119.    KHAN FUNDS reasonably relied on Defendants' misrepresentations and omissions, without which KHAN FUNDS would not have agreed to enter into the Partnership Agreement.

120.    As described above, the above-described false and fraudulent pretenses, representations, and promises, and concealment and omissions made by and caused by Defendants were material because if Plaintiffs had known that the Enterprise had sought to solicit their involvement in the illicit procurement of protected commodities and technologies for end use in China and other crimes as described herein, they would not have entered into the Partnership Agreement or expended money on consulting and research services, due diligence costs and legal fees, and extensive travel, operational, and related overhead costs in connection

49

Case 1:22-cv-00305-ER Document 41 Filed 06/14/22 Page 266 of 877

with the biopharma acquisition.

121.    As described above, KHAN FUNDS has suffered injury as a direct and proximate result of Defendants' false and misleading representations and omissions, including but not limited to monetary damage in excess of $1MM relating to money expended on consulting and research services, extensive due diligence costs, and legal fees expended in connection with the investigation of potential target acquisitions, and extensive travel, operational, and related overhead costs expended in connection with consummating the proposed transactions.

122.    As described above, Defendants sought to obtain money from DAI and KHAN FUNDS by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts, in violation of 18 U.S.C. § 1951 and New York Penal Law § 155.05(2)(e) in an effort to use Plaintiffs to launder the racketeering proceeds of the Enterprise and finance members of the Enterprise and others.  Defendants sought to leverage Plaintiffs' contractual obligations in connection with the Partnership Agreement to solicit and recruit Plaintiffs to the Enterprise and to defraud Plaintiffs of RMB 300MM.  As a result of the foregoing, Plaintiffs have suffered injury as a direct and proximate result of Defendants' false and misleading representations and omissions, including but not limited to certain remediation costs as described above.

<div align="center">

**COUNT IV**
**DEFAMATION**

</div>

123.    On July 9, 2021, defendant NATIONS published Announcement No. 2021-058, about and concerning Plaintiffs, with the headline, "Announcement Regarding Major Litigation" (the "Announcement").

124.    The Announcement concerned the Singapore Action, and described the litigation as a demand that DAI "return embezzled funds" after NATIONS had suffered "loss of contact"

<div align="center">50</div>

with DAI and an affiliated entity of KHAN FUNDS in November 2017. NATIONS repeated the false and defamatory claim that in November 2017 NATIONS was "unable to contact the relevant personnel of [Beijing Khan]" and that NATIONS initiated litigation to recover the allegedly embezzled funds "[a]fter the loss of contact" with DAI and others."

125. These statements are false and defamatory because they falsely state, suggest, and depict that: (i) DAI is a criminal who had embezzled money, (ii) DAI is an absconding thief, and (iii) DAI is a fugitive with whom justice had "lost contact" after embezzling money.

126. At no time was DAI a criminal who had embezzled money. At no time was DAI an absconding thief. At no time was DAI a fugitive from justice who had "lost contact" after embezzling money.

127. The foregoing defamatory and libelous statements have caused and continue to cause irreparable harm to DAI's personal and professional reputations, and have caused DAI to suffer severe embarrassment, humiliation, and emotional distress and mental anguish.

128. The foregoing defamatory and libelous statements have caused and continue to cause irreparable harm to KHAN FUNDS' business reputation, business operations, and financial condition.

129. The foregoing defamatory statements were untrue and defamatory in that they falsely reported and mischaracterized DAI's character and actions, and NATIONS knew that such statements were false.

130. NATIONS knowingly and intentionally published, or caused to be published, these false and defamatory statements with actual malice toward Plaintiffs and with knowledge of their falsity.

131. The foregoing statements constitute defamation and/or libel per se because they

51

Case 1:22-cv-00553-ER   Document 1-41   Filed 06/24/22   Page 268 of 377

falsely portray DAI as a criminal who intentionally, maliciously, and deliberately embezzled money and then "disappeared" with the money as an absconding thief and fugitive from justice.

132.   The foregoing statements constitute defamation and/or libel per se because they falsely portray KHAN FUNDS as a sham and fraudulent company that is led by DAI, a criminal who intentionally, maliciously, and deliberately embezzled money and then "disappeared" with the money as an absconding thief and fugitive from justice.

133.   These foregoing statements constitute defamation and/or libel per se because they falsely impugn Plaintiffs' honesty, integrity, trustworthiness, dependability, and professional fitness and abilities, and falsely charged DAI with engaging in criminal conduct, fraud, dishonesty, theft, and/or other conduct that would tend to injure Plaintiffs in their trade or business, and any trade, business, or profession which Plaintiffs may seek to pursue.

134.   NATIONS' defamatory statements about Plaintiffs and NATIONS causing the worldwide syndicated publication thereof and endorsement by leading financial information/services companies throughout the world, has had, and will continue to have, a devastating and irreparable impact on Plaintiffs' personal, professional, business, and financial future.

## COUNT V
## PRIMA FACIE TORT

135.   Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

136.   As described above, among other things, Defendants jointly and severally sought to intentionally inflict harm upon DAI through the use of tactics criminalizing DAI and forcibly repatriating him to the PRC. Defendants acted without excuse or justification in providing false information to the PRC police that DAI had committed various acts of criminal wrongdoing as a

52

Case 1:22-cv-00595-ER Document 41 Filed 06/24/22 Page 269 of 877

means to cause the issuance, and thereafter the global broadcast, of an arrest warrant for DAI in the PRC, and causing the stalking of DAI in the State of New York by directing surveillance activities that caused, attempted to cause, and reasonably expected to cause substantial emotional distress and harm to DAI.

137.    As described above, DAI has suffered injuries as a direct and proximate result of Defendants' conduct, including, to wit, remediation costs in the form of legal fees to cause the revocation of the issues arrest warrant and legal fees to protect against the extradition of DAI and KHAN FUNDS' employees, fees for psychiatric treatment from the emotional distress caused to DAI, fees for security personnel to remediate Defendants' surveillance campaign, and the limitations caused by preventing DAI from worldwide travel to any of the countries which honored PRC extradition requests and elsewhere, and thus disabling DAI from running KHAN FUNDS' worldwide businesses and restricting his ability to serve as the primary executive and global figurehead of KHAN FUNDS.

### COUNT VI
### CIVIL CONSPIRACY

138.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as though set forth fully herein.

139.    As described above,    Defendants, together with others, did knowingly, intentionally, and corruptly conspire to inflict harm upon DAI using the tactic of criminalizing DAI and forcibly repatriating him to the PRC.

140.    To this end, as described above and upon information and belief, Defendants had a meeting of the minds on the object or course of action of the conspiracy and formed one or more agreements for the purpose of carrying out the objective of the conspiracy to inflict harm upon DAI. Accordingly, each of the defendants had direct involvement in coordinating and organizing

53

the campaign to inflict harm upon DAI.

141.    As described above, at least one member of the conspiracy committed at least one over act to further the object or course of action of Defendants' conspiratorial agreement and each defendant knowingly agreed to conspire with each other to commit the acts described herein in furtherance of this common scheme.

142.    As described above, pursuant to, and in furtherance of, this common scheme, SUN committed overt acts, including arranging for providing false information to the PRC police bureau and encouraging and planning for the scheme to occur.

143.    As described above, the affirmative steps Defendants have taken in furtherance of the conspiracy have proximately damaged Plaintiffs and Plaintiffs suffered injury as a proximate result of these wrongful acts.

144.    As described above, all of the surveillance carried out against DAI in the State of New York was for the benefit of, with the knowledge and consent of, and under the control of, SUN and the other defendants.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand judgment against Defendants on all Counts, and seeks such relief as specified below for all Counts for which such relief is provided by law:

(i)     Awarding Plaintiffs damages in an amount to be determined, including but not limited to all damages and losses suffered by Plaintiffs, and Plaintiffs' subsequent response to and remediation related thereto;

(ii)    Awarding Plaintiffs compensatory and treble damages, as available, in an amount to be proven at trial;

(iii)   Awarding Plaintiffs the financial gain earned by Defendants as a consequence of

Case 1:22-cv-06505-ER Document 1-41 Filed 06/24/22 Page 271 of 377

the violations described herein;

      (iv)    Awarding Plaintiffs statutory damages, as available;

      (v)    Awarding Plaintiffs punitive damages, as available;

      (vi)    Issuing an injunction preventing and restraining Defendants and their officers, agents, servants, employees, assigns, and those acting in active concert or participation with them, from any continued violation of 18 U.S.C. §§ 1962(c) and 1962(d).

      (vii)    Awarding Plaintiffs all costs and attorneys' fees to the full extent permitted under the applicable law;

      (viii)    Awarding Plaintiff pre- and post-judgment interest as permitted by law; and

      (ix)    Awarding any other relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiffs demand trial by jury in this action of all issues so triable.

Dated: Garden City, New York
      April 6, 2022

                      **KENNETH S. FERARU, P.C.**

                      By:    /s/ Kenneth S. Feraru
                              Kenneth Feraru, Esq.
                              1225 Franklin Ave., Ste. 325
                              Garden City, New York 11530
                              P: (516)535-3333
                              KFeraruesq@aol.com

Case 1:22-cv-00350-ER   Document 141   Filed 06/24/22   Page 272 of 377

**LAW OFFICES OF WEI GU, ESQ., P.C.**

By:   /s/ Wei Gu
      Wei Gu, Esq.
      13514 Northern Blvd., Flr. 2
      Flushing, New York 11354
      P: (718) 600-6886
      WeiGulaw@gmail.com

*Attorneys for Plaintiffs*

56

Case 1:22-cv-00535-ER   Document 41   Filed 06/24/22   Page 260 of 877

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

KHAN FUNDS MANAGEMENT
AMERICA, INC. and XUEFENG DAI,    Index No.:

           Plaintiffs,

    v.

NATIONS TECHNOLOGIES INC.,    **VERIFICATION**
NATIONS TECHNOLOGIES (USA) INC.,
YINGTONG SUN, ZHAOXUE LUO,
BAOXIN HUANG, JUNJIE YU, and DOES
1-10 and ROES 1-10,

           Defendants.

STATE OF FLORIDA      :
                SS:
COUNTY OF [ Palm Beach  ]:

XUEFENG DAI, being duly sworn, deposes and says that:

1.    I am a plaintiff in the above-captioned action, as well as the President and Chief Executive Officer of the plaintiff, KHAN FUNDS MANAGEMENT AMERICA, INC., in this action. As such, I have personal knowledge of the facts and matters set forth herein and am authorized to make the foregoing verification.

2.    I have read and reviewed the foregoing Complaint and am fully familiar with the facts and allegations contained therein. I hereby state, affirm and verify that each of the allegations contained in this Complaint is true and accurate to the best of my knowledge and information, except as for those allegations pled therein upon information and belief, and as to each of those allegations, I believe each of them to be true and accurate.

3.    My belief that the allegations pled in the Complaint "upon information and belief," are true and accurate is based upon my first-hand knowledge of certain facts averred therein and various communications with various individuals about or concerning the matters alleged therein.

                                      XUEFENG DAI

Sworn to before me on this 6th
day of April, 2022

NOTARY PUBLIC

AXEL ROJAS
Notary Public - State of Florida
Commission # GG 335535
My Comm. Expires May 16, 2023
Bonded through National Notary Assn.

Case 1:22-cv-00535-ER Document 41 Filed 00/04/22 Page 274 of 877

## CERTIFICATE OF CONFORMITY PURSUANT TO CPLR 2309(C)

STATE OF FLORIDA )
) s.s.
COUNTY OF [ Palm Beach ])

I, _Matthew J. Bstnitzky, ESq._, an attorney at law duly
admitted to practice in the State of Florida and residing in the State of Florida, do herby certify
that the jurat or proof upon the annexed Verification of Xuefeng Dai, named in the foregoing
instrument taken before Axel Rojas, a Notary in the State of Florida, was taken in the manner
prescribed by the laws of the State of Florida, and, based upon my review, duly conforms to the
laws thereof.

Sworn to before me on
this _6th_ day of _April_ , 2022

Notary Public

AXEL ROJAS
Notary Public - State of Florida
Commission # GG 339535
My Comm. Expires May 18, 2023
Bonded through National Notary Assn.

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

KHAN FUNDS MANAGEMENT
AMERICA, INC. and XUEFENG DAI,

                Plaintiffs,

      -against-

NATIONS TECHNOLOGIES INC.,
NATIONS TECHNOLOGIES (USA) INC.,
SHENZHEN QIANHAI NATIONS
INVESTMENT MANAGEMENT CO. LTD.,
ZHAOXUE LUO, YINGTONG SUN,
BAOXIN HUANG, JUNEE YU, YAPING
CHEN, HUAXIA GENERAL PROCESSOR
TECHNOLOGIES INC., OPTIMUM
SEMICONDUCTOR TECHNOLOGIES
INC. d/b/a GENERAL PROCESSOR
TECHNOLOGIES, KEYI LI, and DOES 1-
20,

                Defendants.

:
:
:
:
:
:
:
:
:      Case No. 22-cv-05055 (ER)
:
:
:
:
:
:
:
:
:
:
:
:

------------------------------------------------------- X

## AMENDED COMPLAINT

GIBSON, DUNN & CRUTCHER LLP
200 PARK AVENUE
NEW YORK, NY 10166-0193
TELEPHONE: 212.351.4000
FACSIMILE: 212.351.6235
*Attorneys for Plaintiff*

# TABLE OF CONTENTS

NATURE OF THE CASE ................................................................. 1

PARTIES ....................................................................................... 10

JURISDICTION AND VENUE ....................................................... 12

FACTUAL ALLEGATIONS ............................................................ 15

    A. Defendants Establish A Worldwide Enterprise Designed To Procure Critical
    Military Technology By Any Means Necessary .................................... 15

    B. Dai Runs Successful Investment Businesses In China And Brings His
    Exceptional Abilities And Expertise To The United States ................................. 22

    C. Defendants Attempt To Ensnare Dai In Their Criminal Conspiracy. ......................... 23

    D. Luo Reveals The Full Scope Of The Conspiracy And Threatens Dai, His
    Family, And His Employees ................................................................... 30

    E. Dai Reports The Enterprise To The FBI And Defendants Launch Their
    Retaliation Campaign, Which Is Ongoing .......................................... 35

CAUSES OF ACTION .................................................................... 46

    FIRST CLAIM FOR RELIEF  (Violations Of RICO, 18 U.S.C. §  1962(c) –
    Against All Defendants) ........................................................... 46

    SECOND CLAIM FOR RELIEF (Conspiracy To Violate Civil RICO, 18 U.S.C.
    § 1962(d) – Against All Defendants) ................................................. 64

    THIRD CLAIM FOR RELIEF  (Common Law Fraud – Against Defendants
    Nations, Nations USA, Nations Investment, Luo, Yu, and Huang) ................... 66

    FOURTH CLAIM FOR RELIEF  (Violation Of Computer Fraud And Abuse Act,
    18 U.S.C. § 1030 – Against Defendants Nations, Nations USA, Luo, and
    Sun) ............................................................................................ 69

JURY TRIAL DEMAND ................................................................ 70

PRAYER FOR RELIEF ................................................................. 70

Plaintiffs Khan Funds Management America, Inc. ("Khan Funds") and Xuefeng Dai, bring this Complaint against Defendants, Nations Technologies Inc. ("Nations"), Nations Technologies (USA) Inc. ("Nations USA"), Shenzhen Qianhai Nations Investment Management Co., Ltd. ("Nations Investment"), Zhaoxue Luo, Yingtong Sun, Baoxin Huang, Junee Yu (a/k/a Junjie Yu), Yaping Chen, HuaXia General Processor Technologies, Inc. ("HuaXia GPT"), Optimum Semiconductor Technologies Inc. ("OST") d/b/a General Processor Technologies (GPT), Keyi Li ("Kerry Li"), and Does 1-20 and allege as follows:

<u>**NATURE OF THE CASE**</u>

1.       Plaintiffs bring this action to seek redress for Defendants' civil racketeering, conspiracy, and fraud.  That conduct was directed principally at retaliating against Plaintiffs Xuefeng Dai and Khan Funds for refusing to participate in a long-running scheme to facilitate the theft of American technology for the benefit of the military of the People's Republic of China ("PRC").  When Dai—a permanent U.S. resident designated as an "Alien of Extraordinary Ability" by U.S. Citizenship and Immigration Services—did the right thing and immediately reported this criminal conduct to American law enforcement authorities, Defendants launched a global campaign of harassment and retaliation against Plaintiffs.  That campaign left Dai and his colleagues at Khan Funds who sought refuge in the United States fearful for their lives, with business reputations in shambles, and subject to bogus criminal and civil proceedings.  Defendants also initiated an ongoing "Fox Hunt" operation against them.  Fox Hunts are a tactic in which PRC agents and their U.S.-based co-conspirators stalk and intimidate dissidents and leverage the dissident's relatives through threats, imprisonment, and intimidation to force the dissident to return to China under duress.  Defendants have done all of this in a brazen attempt to punish Plaintiffs for their cooperation with a federal criminal investigation on a matter of grave national security.

1

Case 1:24-cv-03058-ERD Document 1-35 Filed 04/24/24 Page 279 of 377

Defendants' tactics have included surveilling Dai at his home on U.S. soil, hacking Plaintiffs' computer systems in New York to steal confidential documents, threatening and intimidating Plaintiffs in face-to-face and telephonic communications, weaponizing Plaintiff Dai's family members for the Fox Hunt, providing false testimony to PRC police, leveraging government connections to cause the issuance of an arrest warrant in China for Dai and his colleagues at Khan Funds, and trying to domesticate in the United States judgments obtained in Singapore in violation of Plaintiffs' due process and other rights. These activities constitute violations of the civil RICO and RICO conspiracy statute (18 U.S.C. § 1962(c) & (d)), including predicate acts of wire fraud, extortion, witness intimidation, witness retaliation, attempted kidnapping, and obstruction of justice, as well as common law fraud, and violations of the Computer Fraud and Abuse Act (18 U.S.C. § 1030). With Defendants launching and actively prosecuting their campaign against Plaintiffs in three countries—the United States, the PRC, and the Republic of Singapore—Plaintiffs urgently seek to avail themselves of the rights afforded them by the federal court system to expose, defend against, and remedy this ongoing abusive and egregious misconduct.

2.      Plaintiff Khan Funds is an innovative hedge fund focused on merging American-based healthcare, pharmaceutical and/or biotechnology companies with publicly traded companies based in China. Plaintiff Dai is Khan Funds' manager and chief executive officer. Dai immigrated to the United States in October 2015 from Shenzhen, China, where he served as a manager for various hedge funds that traded shares of publicly held companies listed on the Chinese exchanges. Since 2013, Dai, now a U.S. permanent resident, has dreamed of bringing his knowledge and investment expertise to the United States to try to build bridges between the American and Chinese business communities. Dai was granted an EB1-A (Alien of Extraordinary Ability) visa in 2017 within days of submitting his application to U.S. Citizenship and Immigration Services. To receive

an EB-1 visa, he had to "demonstrate extraordinary ability in the sciences, arts, education, business, or athletics through sustained national or international acclaim."[1]

3.    Defendant Nations is a publicly traded Chinese company, headquartered in Shenzhen, China.  Nations is principally engaged in the design, manufacture, and distribution of integrated circuits.  In 2015, Nations—with the active assistance of former Chinese Communist Party ("CCP") official Defendant Baoxin Huang—offered to serve as the exclusive partner for Dai's investments in the biomedical field.  After heavy negotiations, a Khan Funds subsidiary (Beijing Qilong Medical and Pharmaceutical Holding Co., Ltd. ("Khan Funds Beijing")), entered into a Partnership Agreement with a Nations subsidiary (Shenzhen Qianhai Nations Investment Management Co., Ltd. ("Nations Investment")).  In that Partnership Agreement, Nations invested RMB 300 million (approximately $42 million) for Khan Funds to implement its biomedical investment strategy.  The Partnership Agreement also conferred on Khan Funds exclusive control over investment decisions to implement that strategy.

4.    Ultimately and unbeknownst to Plaintiffs, however, Nations' offer, the parties' negotiation, and the Partnership Agreement were a carefully crafted ruse.  Nations and its cadre of co-conspirators *never* intended to invest in Khan Funds' biomedical strategy and core competencies, even though they had throughout the parties' negotiations stated their interest in working with Khan Funds to take advantage of the economic opportunity Plaintiff Dai's strategy represented.  Instead, Nations concocted the investment to bait Plaintiffs into joining a partnership that Nations and the other Defendants planned to employ as a front to launder money from China into the United States to fund the activities of the conspiracy and procure semiconductor-related companies to plunder their technology.

---

[1] *See* https://www.uscis.gov/forms/explore-my-options/eb-1-employment-based-immigration-permanent-workers-extraordinary-abilityoutstanding-professor-or.

5.      Within just three months of the execution of the Partnership Agreement, Defendants Zhaoxue Luo and Junjie Yu, Nations' then President and then CFO/Vice General Manager, respectively, abandoned their previously professed interest in Khan Funds' biomedical investment plans.  Instead, they told Dai they wanted the Partnership to acquire a semiconductor company.  Plaintiffs had no expertise in investing in the semiconductor industry, let alone identifying attractive semiconductor merger and acquisition targets or conducting due diligence on businesses leveraging that sophisticated technology.  The parties had also never discussed semiconductor investments in negotiating the Partnership Agreement, and the executed Agreement conferred on Khan Funds the exclusive authority to direct investment strategy.  Plaintiffs therefore refused to pursue Luo and Yu's proposed change of plans.

6.      Nations did not give up.  Instead, they increased the pressure on Plaintiffs.  Luo now began to *demand* that the fund shift its strategy to acquire semiconductor companies.  He backed up his demands with a series of extortionate threats.  Luo, for instance, shouted at Plaintiffs that there were "very serious" "consequences for lying to me" and that Dai "should know who I am!"

7.      The disagreement between the partners culminated in a series of meetings between September 10 and September 14, 2017 in New York between Dai and Luo.  Concerned by Luo's proposal to completely change the Partnership's planned investment strategy and the nature of Luo's escalating and threatening demands, Dai recorded their conversations.  As the recordings confirm, during those meetings Luo admitted that Nations was a government agent whose mission was to steal semiconductor and related technologies from the United States and elsewhere.  Luo admitted Nations engaged in this espionage with the help of a global enterprise Luo had cultivated over more than a decade (the "Enterprise").  Members of the Enterprise worked at Luo's direction

to further its goals.  As part of the Enterprise's master plan, American-based members of the Enterprise in California and New York would acquire and secretly export American blueprints, technical designs, and raw materials necessary to build a semiconductor fabrication plant in Chengdu, China (the "Chengdu Project").  That plant would produce the computer chips necessary for next-generation PRC military technology such as fighter jets and surface-to-air missiles.  The Enterprise included former PRC government officials, PRC military personnel, nominally legitimate companies and commercial actors, financiers, rogue cyber-actors and hackers and numerous technical experts who reported to Luo, including Yi-Chi Shih, Ishiang Shih, and Yaping Chen.  All three were indicted in 2018 in the U.S. District Court for the Southern District of California on charges of economic espionage and other crimes related to the Enterprise.  The Enterprise also had a foothold in New York, where Plaintiffs were located.  Semiconductor expert Defendant Kerry Li and his companies, Defendant Optimum Semiconductor Technologies ("OST") d/b/a General Processor Technologies were responsible for managing the Enterprise's New York activities.

8.    Unbeknownst to Dai, Defendants had earmarked Dai to fit into their plan and were expecting him to serve the Enterprise.  Luo in fact admitted to Dai in those recorded meetings in New York that Defendants recruited Dai to launder funds and facilitate the corporate acquisitions required to steal semiconductor technology.  Luo also told Dai he would be amply rewarded if he cooperated with the Enterprise.  And he made clear that Dai's refusal to cooperate would yield severe consequences.  Luo threatened the safety of Dai, his family, and his associates.  Luo also made clear any refusal would result in campaigns to harass Plaintiffs and encourage the PRC to deploy the organs of State to investigate, arrest, and even prosecute Dai and his associates on false

pretenses—which is exactly what ended up happening, subjecting Dai to the years-long retaliation campaign that is the primary subject of the instant lawsuit.

9.     Dai did not accede to these threats and demands.  Frightened for himself, his loved ones, and his fifty employees, Dai immediately reported Defendants' unlawful activities to American authorities.  He ended up providing critical information to the federal government on Defendants' activities that would lead to the indictments of Chen, Yi-Chi Shih, Ishiang Shih, and others one year later.  Fearing reprisal against his family if Defendants discovered his cooperation with law enforcement, he quickly evacuated his eldest sister and mother from China and applied for asylum in the U.S.  That asylum application—which would provide Dai immigration status independent of his already extant EB-1A visa—is pending.  In the face of Luo's threats to blacklist Dai and have him arrested, Dai also dissolved the China-based Khan Funds entities and hedge funds, returning all capital to his investors.

10.     Defendants then made good on their threats.  Once it became apparent to Defendants that Dai was not going along with their scheme, Defendants moved to punish Dai and to compel him to stay silent about what he knew.  They first activated a press campaign to smear Dai and malign him.  They then corruptly influenced the PRC to remove Khan Funds' license to trade in China.  And when American officials arrested Yi-Chi Shih for his Enterprise activities, Defendants realized Dai was not only failing to cooperate with the Enterprise but was actually threatening it by working with American law enforcement.  In response, Defendants' retaliation escalated to new heights.

11.     Specifically, Defendants began a "Fox Hunt."  A Fox Hunt is a tactic the PRC government has used to bring Chinese dissidents back to China under duress to face prosecution for bogus crimes.  In a typical Fox Hunt, PRC agents and their U.S.-based co-conspirators

Case 1:22-cv-03258-ER Document 45 Filed 04/24/24 Page 284 of 377

relentlessly stalk and intimidate dissidents and threaten to harm, imprison, and even torture the dissident's relatives to force the dissident to return to China.[2]  The PRC government has employed these tactics to repatriate 8,000 so-called "fugitives" (actually dissidents) through Fox Hunts since 2014.[3]  Indeed, just weeks ago, the federal government indicted seven Chinese nationals "over an alleged long-running plot to intimidate a US resident into returning to China to face criminal charges."[4]

12.     The Fox Hunt against Dai followed the unfortunately standard, but harrowing, playbook.  Defendants threatened Dai's family and friends to coordinate a relentless harassment campaign designed to force him under duress to return to China.  On January 18, 2018—the very day Yi-Chi Shih was arrested by U.S. federal authorities with the assistance of information Dai had provided—Defendants burglarized Khan Funds' Singapore office to harass and intimidate Plaintiffs.  The next month, Defendant Huang commanded Dai's younger sister, who lived in China, to travel to New York to learn whether her brother had cooperated with U.S. law enforcement.  When Dai told her that he reported Luo to American authorities, she immediately returned to China.

13.     The retaliation continued.  In May 2018, Nations Investment initiated a lawsuit in the PRC to remove Khan Funds Beijing as General Partner of the Partnership.  Nations did not serve Khan Funds Beijing in that action, and instead relied on falsehoods that Dai could have disproven if he had been given notice of the suit and an opportunity to be heard, and if he did not fear for his life if he were to return to China to defend himself.  Ultimately, the Chinese court

---

[2] *See* Sebastian Rotella & Kristen Berg, *Operation Fox Hunt: How China Exports Repression Using A Network of Spies Hidden in Plain Sight*, PROPUBLICA (Jan. 22, 2021), https://www.propublica.org/article/operation-fox-hunt-how-china-exports-repression-using-a-network-of-spies-hidden-in-plain-sight.

[3] *Id.*

[4] *See* Samantha Beech, *US charges seven Chinese nationals in alleged plot to bring fugitive back to China* (Oct. 20, 2022), https://www.cnn.com/2022/10/20/china/us-justice-department-charged-china-fugitive-family-intl-hnk.

awarded Defendants a default judgement against Plaintiffs in February 2019 allowing Nations Investment to remove Khan Funds Beijing as general manager of the Nations-Khan Funds partnership. On top of that lawsuit, in December 2018, Defendants leveraged their political connections to obtain an arrest warrant for Dai and his colleagues from the Shenzhen People's Procuratorate, making good on yet another threat.

14. Approximately one year after Dai had reported Defendants' unlawful activities to the American government, the Department of Justice indicted Yaping Chen and Yi-Chi Shih in the U.S. District Court for the Central District of California. *See United States v. Yi-Chi Shih, et al.*, CR No. 18-00050 (C.D.C.A. 2018). Weeks later, Defendants ordered a cyberattack on Khan Funds' computers in New York, stealing confidential documents they would later use in litigation against Dai. At the same time, Defendants provided false testimony to PRC police and leveraged their government connections to cause the issuance of an arrest warrant in China for Dai and his colleagues at Khan Funds. A few weeks later, they ordered an associate to attempt to gather information about Dai from one of his friends, and then coordinated a relentless attack on his public Twitter account, replete with death threats and degrading comments.

15. Defendants' retaliation and harassment campaign has continued unabated. In October 2020, Nations Investment took advantage of the February 2019 PRC default judgement removing the Khan Funds subsidiary as general partner of the Nations-Khan Funds partnership to file spurious litigation in Singapore nominally seeking recoupment of the allegedly "diverted" funds, but in fact intended to harass and financially ruin Dai and two of his most loyal employees who sought refuge in the United States in fear of persecution and are named defendants in the Singapore action. Defendants' Singapore filings are replete with false allegations and stolen and forged documents. But Dai must defend himself from afar, through Singaporean counsel, because

he fears that he will be snatched up by PRC agents operating in Singapore if he were to go to Singapore for legal proceedings or an eventual trial. The Singaporean action continues to this day as part of the greater effort to retaliate against Plaintiffs for reporting against Defendants' illegal activities. Defendants have even sought in Singapore a worldwide asset-freezing order against Dai, seeking to cut off his ability to fund the prosecution of this and other legal actions in the United States. Defendants' end goal with the Singaporean litigation appears to be to provide a vehicle—through an eventual Singapore judgment and U.S. judgment enforcement—for the Enterprise's tentacles to reach Dai's assets here in the United States.

16.     At the same time, the Enterprise hired a powerhouse American investigation firm—Applied Facts Group, a company that describes itself as the "leading global investigations firm you have never heard of"—to surveil and harass Dai over the course of at least a year, with surveillance taking place from morning to night and on Dai's private property. The investigative firm was purportedly retained to serve process on Dai for the Singaporean litigation, but their tactics went far beyond generic service of process. Indeed, in transcripts and emails submitted in the Singapore action, employees of this company identified themselves as "investigators" carrying out various activities. At the same time, the Singaporean court granted Nations Investment permission to effectuate substitute service—obviating the need for any physical service of Singaporean litigation documents at all. Yet Defendants' investigators inexplicably continued to surveil Dai's property in New York.

17.     Plaintiffs have suffered immensely from Defendants' illicit scheme and relentless retaliation and repatriation efforts. At all times, Plaintiff Dai knows he faces the risk that he could be forcibly returned to the PRC, where he will face still more reprisal and retribution. Plaintiffs fear for their safety and have had to expend massive sums on personal security. And their business

in the United States has been severely harmed. Indeed, Dai has been forced to give up the lucrative investment businesses he spent a lifetime building in China due to Defendants' attempt to tarnish his and his companies' reputations. These falsehoods have also rendered Plaintiffs unable to effectively conduct business in the United States and caused them severe trauma, fear, and anguish.

18.    Enough is enough. Plaintiffs seek in this action to stop the abusive, unlawful activity they face at every turn and to procure a remedy in the form of treble damages and injunctive relief for Defendants' ongoing illegal racketeering enterprise that has caused so much harm. Plaintiffs have done everything right. They have proactively reported efforts to steal American technology. They have worked with law enforcement to thwart economic espionage in the United States. And Dai has obtained residency status here based on his extraordinary abilities and contributions, and is currently seeking asylum status given the danger the Enterprises poses to him if he were to return to China. Yet Defendants continue to attack and harass Plaintiffs at every turn. Plaintiffs ask the Court to protect them from, and provide redress for, Defendants' relentless campaign against Plaintiffs merely for doing the right thing. Without further action, Defendants will continue to retaliate against Plaintiffs in furtherance of their ultimate goal: stealing American technology for the benefit of foreign powers.

## PARTIES

19.    Plaintiff Khan Funds Management America, Inc. is a New York corporation with its principal place of business located in New York County.

20.    Plaintiff Xuefeng "Eric" Dai is the Chief Executive Officer and owner of Khan Funds. Dai is a permanent resident of the United States, having received an EB1-A (Alien of Extraordinary Ability) visa. Recipients of EB1-A visas must "demonstrate extraordinary ability in the sciences, arts, education, business, or athletics through sustained national or international

Case 1:22-cv-03550-JLR Document 35 Filed 04/19/22 Page 288 of 377

acclaim."[5]  The recipient's "achievements must be recognized in [his or her] field through extensive documentation."[6]  Dai was a resident of New York State between 2015 and 2020 and currently lives in Florida.

21.     Defendant Nations Technologies Inc. is a Chinese semiconductor company with its principal place of business in Shenzhen, China.

22.     Defendant Nations Technologies (USA) Inc. is California company with its principal place of business in Fremont, California.  Nations USA is a wholly owned subsidiary of Nations.

23.     Defendant Zhaoxue Luo served as Independent Director of Nations from 2009 to 2012 and as President of Nations from approximately 2014 through 2018.

24.     Defendant Yingtong Sun is the General Manager and current President of Nations.

25.     Defendant Junjie Yu served as CFO and Vice General Manager of Nations from approximately 2014 through no earlier than 2018.

26.     Defendant Baoxin Huang is Deputy Manager of Ping An Insurance (Group) Co. of China Ltd. and a former cabinet-level official in the PRC.

27.     Defendant Yaping Chen is a founder of semiconductor company Chengdu RML Technology Co. who was indicted in the U.S. District Court for the Southern District of California on October 18, 2018 as a co-conspirator for efforts to assist in economic espionage.

28.     Defendant HuaXia GPT is a Chinese company focused on semiconductor research with operations in New York and China.

---

[5] *See* https://www.uscis.gov/forms/explore-my-options/eb-1-employment-based-immigration-permanent-workers-extraordinary-abilityoutstanding-professor-or.
[6] *Id.*

29.     Defendant Optimum Semiconductor Technologies ("OST") d/b/a General Processor Technologies is a Delaware company focused on semiconductor research with its principal place of business in Tarrytown, New York.  OST is registered to do business in New York and New Hampshire.  OST is a wholly owned subsidiary of HuaXia GPT.  While GPT appears to be a d/b/a name for OST, GPT holds itself out as a separate entity, describing OST as an "affiliate company."  However, GPT and OST share the same Chairman of the Board (Defendant Keyi "Kerry" Li), CEO (John Glossner), President & COO (Gary Nacer), and CTO (Mayan Moudgill).  To the extent OST and GPT are separate entities, actions taken by Li, Glossner, or other shared officers and employees were taken on behalf of both companies.

30.     Defendant Keyi "Kerry" Li is the Chairman of the Board of both OST and GPT (to the extent GPT is a separate entity) and a semiconductor expert.  He resides in New York State.

31.     Does 1-20 are named as additional defendants, whose identities are unknown at this time, noting that Plaintiffs have reason to believe that other individuals and/or entities may be willingly and knowingly working with one or more of the Defendants to support or authorize the unlawful acts, tortious conduct, transactions, practices, and other courses of conduct giving rise to the causes of action alleged in this Complaint.  Plaintiffs' investigation into the identities and locations of Does 1-20 is continuing and Plaintiffs believe that substantial additional evidentiary support will exist to reveal the identifies and locations of Does 1-20.

### JURISDICTION AND VENUE

32.     This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over Plaintiffs' common law claim pursuant to 28 U.S.C. § 1367.

33. This Court has general personal jurisdiction over Defendant OST because its principal places of business is in Tarrytown, New York. *See Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014). This Court also has general personal jurisdiction over Defendant Kerry Li because he is domiciled in New York State.

34. This Court has specific personal jurisdiction over Defendants OST, HuaXia GPT, and Kerry Li pursuant to CPLR § 302(a)(1) because they conduct business in the state of New York. This Court has specific personal jurisdiction over Defendants Nations, Nations USA, Zhaoxue Luo, Yingtong Sun, and Junjie Yu pursuant to CPLR § 302(a)(1) because they transacted business in the state through their systematic and continuous business dealings with Plaintiffs, OST, HuaXia GPT, and Kerry Li in New York. Nations' use of a New York bank account provides additional support for jurisdiction under CPLR § 302(a)(1).

35. This Court has specific personal jurisdiction over Defendants Zhaoxue Luo, Nations, Nations Investment, Kerry Li, and OST pursuant to CPLR § 302(a)(2) because each of these Defendants has "commit[ed] a tortious act within the state." While in New York, Luo committed violations of civil RICO (18 U.S.C. § 1962(c)), including the predicate acts of wire fraud through his communications in furtherance of defrauding Plaintiffs and extortion through his threats against Plaintiffs; Luo committed common law fraud based on his repeated misrepresentations relating to the Partnership while in New York. Kerry Li and OST, while in New York, committed violations of civil RICO (18 U.S.C. § 1962(c)), including acts of wire fraud in furtherance of their deception relating to their partnership.

36. Jurisdiction over all Defendants in this action is also proper pursuant to CPLR § 302(a)(2) because the facts set forth herein establish conspiracies among Defendants. Each Defendant was a member of the conspiracy, each Defendant had an awareness of the effects of

their activity on Plaintiffs in New York, and all of the Defendant conspirators committed an overt act to further the conspiracy or orchestrated the conspiracy as set forth in greater detail below. Defendants acted in concert with each other and with each other's active support and approval to accomplish their common objectives.

37.     This Court has specific personal jurisdiction over Defendants Nations, Nations USA, Nations Investment, Zhaoxue Luo, Yingtong Sun, Junjie Yu, Baoxin Huang, Yaping Chen, HuaXia GPT, OST, and Kerry Li pursuant to CPLR § 302(a)(3) because each of these Defendants has "commit[ed] a tortious act without the state causing injury to person or property within the state."  Such tortious acts include, but are not limited to, violations of civil RICO (18 U.S.C. § 1962(c)), including predicate acts of extortion, witness intimidation, witness retaliation, obstruction of justice, as well as behavior amounting to common law fraud, and violations of the Computer Fraud and Abuse Act (18 U.S.C. § 1030).  Pursuant to CPLR § 302(a)(3)(i), each of Defendants Nations, Nations USA, Nations Investment, Zhaoxue Luo, Yingtong Sun, Junjie Yu, and Yaping Chen "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state" through their systematic and continuous business dealings with Plaintiffs, Kerry Li, and OST in New York; through the substantial profits derived from these dealings with Plaintiffs, Kerry Li, OST; and through the operation of a bank account in New York.  Similarly, each of Defendants Kerry Li, OST, and HuaXia GPT do the same through their continuous business activities and substantial profits derived in New York.  *Id.*  Furthermore, each of these Defendants "expect[ed] or should [have] reasonably expect[ed]" their tortious acts "to have consequences in the state" and "derive[d]  substantial revenue from interstate or international commerce" pursuant to CPLR § 302(a)(3)(ii).

38.     If this Court finds that Yaping Chen, who is currently a fugitive at large, is not subject to jurisdiction in any state's courts of general jurisdiction, this Court would have jurisdiction over Chen pursuant to F.R.C.P. 4(k)(2) through Plaintiffs' civil RICO (18 U.S.C. § 1962(c)) claim, *see* 18 U.S.C. § 1965 ("In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States.").  F.R.C.P. 4(k)(2) provides that "serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant" if "exercising jurisdiction is consistent with the United States Constitution and law."  Defendant Chen has sufficient minimum contacts in the U.S. pursuant to his prior residency, continuous business dealings in the U.S., and tortious activities conducted in the U.S. as described in this Amended Complaint.

39.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claims occurred in New York County.

## **FACTUAL ALLEGATIONS**

**A.    Defendants Establish A Worldwide Enterprise Designed To Procure Critical Military Technology By Any Means Necessary.**

40.     Chinese leader Xi Jinping has called on the People's Liberation Army to accelerate its transformation to a "world-class military."  A necessary component of this overhaul is the semiconductor chip—a tiny circuit that powers the processing of vast quantities of data.  These chips and related technologies play a pivotal role in next-generation weapons systems, such as stealth fighter jets and surface-to-air missiles.

41.     But the PRC has fallen behind in this next-generation arms race, lacking the technical designs and the expertise required to produce critical semiconductor technology.  Rather

than develop this capacity through legal means, the PRC has engaged in a coordinated effort to steal these technical designs and expertise by any means necessary. According to FBI Director Christopher Wray, "the Chinese government is determined to acquire American technology, and they're willing to use a variety of means to do that—from foreign investments, corporate acquisitions, and cyber intrusions to obtaining the services of current or former company employees to get inside information."[7] As a part of this effort, the PRC uses wide-ranging talent recruitment programs to acquire technology from abroad through illegal means and export it to China. In fact, experts have concluded the PRC retains a network of tens of thousands of professionals around the world who have agreed, through various means, to help China increase its military prowess.

42. Defendants, operating through the Enterprise, sit at the vanguard of this global effort. Defendants have coordinated the recruitment, grooming, financing, and management of various business, finance, science, and technology professionals all over the world, and the nominally legitimate organizations they work for or control, in order to accomplish the aims of their criminal enterprise.

43. Nations is a core part of the scheme. The company was incorporated in China in 2000 and is a leader in China's information security and integrated circuit design industry. Nations has deep and longstanding connections to the PRC government, including with the government serving as a major client. At the time of its 2009 IPO, Nations' controlling shareholder was a PRC-owned entity named China Integrated Circuit Design Corp., Ltd. As Defendant Luo has explained, "Nations' aim" is "converting civilian technology to develop military technology."

---

[7] Department of Justice Office of Public Affairs, *PRC State-Owned Company, Taiwan Company, and Three Individuals Charged With Economic Espionage* (Nov. 1, 2018), https://www.justice.gov/opa/pr/prc-state-owned-company-taiwan-company-and-three-individuals-charged-economic-espionage

Nations USA is Nations' wholly owned American subsidiary. That company was incorporated in 2010 and is based in Fremont, California. Nations USA acts as a research and development center for Nations with a focus on chip technology. Nations maintains further subsidiaries incorporated in Hong Kong, Singapore, and Japan.

44.    As a result of their connections to the PRC government, Sun and Luo were appointed to serve as Nations' leaders. Luo has admitted, in fact, that "top leaders" of the PRC handed him control over Nations to accomplish state aims. Specifically, as Luo would later explain to Dai in a meeting held in New York in 2017, "the country gives [sic] me Nations Technologies." In particular, he described a China Securities Regulatory Commission meeting around the time of Nations' IPO at which it was announced that "[a] decision was made by the Standing Committee of the Central Government Political Bureau to let the state-owned enterprise [China Integrated Circuit Design Corp] retreat and let Luo Zhaoxue to serve [sic] as the Chairman." Luo was therefore "responsible to the country." Luo served as Independent Director of Nations from 2009 to 2012, and as Chairman of the Board of Directors from 2014 to 2018. Sun was appointed as Deputy General Manager of Nations in 2003 and General Manager and Chief Executive Officer in 2005, a role he holds today.

45.    Luo's history in business and military espionage made him uniquely well suited to lead Nations. As a teenager, he fought in the People's Liberation Army in the Vietnam War. Later, in the 1990s, he spied for the PRC in Russia, where he acquired technical blueprints for military aircraft. From an unknown date to at the latest 2014, Luo held the rank of a Lieutenant General in the People's Liberation Army. Luo has also served as a consultant for an affiliate of China Aerospace Science and Industry Company, a Chinese state-owned company that designs, develops, and manufactures a range of spacecraft, missile systems and ground equipment and is

closely associated with the PRC military. Luo also has significant leadership experience in various Chinese businesses, including as a deputy editor of a news organization and as the chairman of multiple manufacturing companies in China. These roles provided Luo with the contacts and connections across the private and public sectors that enabled him to establish Defendants' criminal enterprise.

46.     Sun also had a strong connection to the PRC government before he started his role at Nations. Before joining Nations, Sun worked as a manager at the State Development & Investment Corporation, China's largest state-owned investment holding company. He also served as a delegate on the Shenzhen City National People's Congress.

47.     Luo and Sun also worked to recruit and manage Yaping Chen, Yi-Chi Shih, Kerry Li, John Glossner, Optimum Semiconductor Technologies, and countless others around the world to staff the various needs of their conspiracy. Luo began soliciting Chen's participation in the Enterprise as early as around 2006. Chen is an expert in semiconductor technology. He has served as General Manager of Chengdu RML Technology Co., a publicly traded semiconductor production company in China controlled by Jieru Deng. RML Technology also manufactures and sells radar components, with the PRC military representing 90 percent of its sales. Chen has also served on the Board of Directors of Chengdu Ganide Technology Co., a PRC-owned semiconductor producer in China. Chen has been a core member of the Enterprise: Over the course of several years, he has illicitly acquired blueprints and raw materials used in the production of semiconductors from U.S. and other foreign companies in the United States for use in China. Chen also played a key role in managing and compensating other Enterprise members.

48.     Yi-Chi Shih, another co-conspirator, worked closely with Chen. Shih served as Chen's on-the-ground technical expert who facilitated the theft of the semiconductor technology.

Shih's connections to Chen are longstanding: On information and belief, Shih was solicited to join the Enterprise as early as 2006. When Chen applied for a US visa, he listed Shih as a local contact. Before his arrest and April 2019 conviction for economic espionage, Shih worked in the U.S. defense industry for twenty-five years and served as a professor at UCLA. He had previously managed Chengdu GaStone Technology Co., Ltd., a PRC entity that established a semiconductor foundry in Chengdu, PRC; in 2014, the U.S. Department of Commerce designated Chengdu GaStone as being a risk to U.S. national security or foreign policy interests. Along with Chen, he served as a member of the Board of Directors of Chengdu Ganide Technology Company and co-founder Chengdu RML.

49.     On information and belief, Shih and Chen engaged in criminal conduct to advance the aims of the activities of the Enterprise that is at the heart of this case. For example, in or about June 2011 Chen deposited approximately $3.4 million of funds that, on information and belief, were derived from Nations, into a bank account held by Reach Perfect Inc., a British Virgin Islands company controlled by Nations. Despite having possession of those funds, Chen had no formal relationship with Nations. On information and belief, these funds were used to finance Defendants' criminal scheme and to compensate Shih and others for the illicit acquisition and unauthorized export of certain semiconductor chips and designs. On information and belief, in or about August 2011, with Nations' support and Luo and Sun's authorization, Chen used Nations' funding to approve monthly payments of $67,000 to Shih as compensation for Shih's work in planning and executing illicit acquisitions and exports. On information and belief, Chen and Shih further used Nations' financing to continue to utilize and further develop the technologies Defendants were illicitly acquiring.

50.     Further cementing the partnership between Nations and its California base, in July 2017 Nations publicly announced that its subsidiary, Nations Investment, had begun a joint project with Chen and another entity that would invest RMB eight billion (approximately $1.5 billion) to develop and produce semiconductors in Chengdu province (the "Chengdu Project"). Nations' 2017 annual report stated that Yaping Chen and his technical team contributed the necessary designs and expertise to manufacture these semiconductor wafers.  As part of the project, Yaping Chen's team received RMB 100 million (approximately $14 million) from Nations.

51.     Defendants Kerry Li and OST along with non-party (but member of the RICO Enterprise) John Glossner have also served as a part of Defendants' racketeering activities and conspiracy.  OST (and GPT to the extent it is a separate entity[8]) is a prominent developer of processor cores and licensable semiconductor intellectual property that is partially and indirectly owned by Nations.  Li is OST's and GPT's Chairman and a leading semiconductor expert.  Li is also associated with several other Chinese and international semiconductor companies.  Glossner is OST's and GPT's CEO.  On information and belief, he first came into contact with Nations through his work with the nonprofit Heterogenous System Architecture Foundation.  Glossner founded Sandbridge Technologies, Inc. in 2001, which he eventually sold to HuaXia GPT, the parent company of OST, in 2010.

52.     Both Li and Glossner are linked to the PRC government and the CCP.  In interviews published in the official media arm of the CCP, Li has advocated for China to be on the forefront of chip technology and manufacturing, including "winning the dominance" of industrial development in the context of international competition.  He has stated that he dreams of "serving his country" through advancing technological innovation.  Glossner is also listed as a professor of

---

[8] Allegations hereafter relating to OST are also made about GPT to the extent GPT is a separate legal entity.

Case 1:24-cv-00505-JLR Document 1-35 Filed 01/24/24 Page 298 of 377

the University of Science and Technology Beijing, where he also serves as the head of one of its research laboratories. That university is associated with the CCP's Ministry of Education. Glossner received these prestigious appointments just two months after Luo visited OST's New York headquarters in 2017. Both Li and Glossner were named to China's "Thousand Talents Plan" in 2009. The Thousand Talents Plan was one of China's central efforts in the recruitment of talent to further its economic espionage. The FBI has concluded that members of the Thousand Talents Plan, such as Li and Glossner, are "usually contractually obligated to essentially use the knowledge they have obtained from their foreign employers to successfully fulfill the terms of their contract." In response to U.S. government scrutiny, China has attempted to delete all online references to the Thousand Talents Plan. On information and belief, the Thousand Talents Plan was one means to solicit Li and Glossner to join Defendants' conspiracy.

53. In or around 2006, Luo solicited Li to join the Enterprise. On information and belief, Li agreed. As a consequence, OST serves as the strategic base for Enterprise activities and operations, including the management of the Enterprise's technical experts. Pursuant to this relationship, Luo visited OST's offices in September 2016 and 2017. The relationship between Luo and Li expanded in 2017, when Nations entered into research and development cooperation projects with related Chinese chip design entities Huaxia GPT and Wuxi DSPU Technology Co Limited ("Wuxi DSPU"), which later became Optimum Semiconductor Technologies. Li controlled each of these companies.

54. In June 2018, Nations, via Nations Investment, acquired a 21.37% stake in Huaxia GPT for RMB 140 million (approximately $21 million). This investment was subject to media scrutiny in China, with articles questioning why Nations invested in a company with an audited net asset book value of negative RMB 12 million (approximately $1.7 million). In actuality,

business considerations played no role in the acquisition:  Its sole purpose was to further the aims of the Enterprise by securing a base from which to steal semiconductor technology.

55.     On information and belief, the Enterprise's web spreads far beyond Chen, Shih, OST, Li, and Glossner.  A subsidiary of Nations, Nations Hong Kong, Inc., has invested in at least one other U.S. semiconductor company, Ambiq Micro, Inc.  The investment is highly suspect: Nations' 2018 annual report records a payment of RMB 1,965,706.21 (around $275,000) to Ambiq Micro for the purchase of "raw materials."  Their relationship is ongoing, with Nations' 2021 annual report recording a payment of RMB 7,328,451.08 (approximately $1 million) from Ambiq Micro for Nations' provision of services.  On information and belief, the Enterprise intended to leverage this investment to steal semiconductor technology just as it attempted to do with OST, and has succeeded in illicitly exporting semiconductor materials to China through this relationship with Ambiq Micro.  On information and belief, the technical experts at Ambiq Micro are just a small sampling of the numerous technical experts that Luo has boasted work at his behest.

*  *  *

56.     In sum, over the course of a decade, Luo, Sun, and Nations developed a broad range technical team across the United States and around the world.  With this team in place, they needed legitimate financial and investment professionals in the U.S. to help them launder funds and facilitate the acquisitions required to steal high technology for the ultimate benefit of the PRC military.

57.     One such candidate was Plaintiff Eric Dai and his company, Khan Funds.

**B.     Dai Runs Successful Investment Businesses In China And Brings His Exceptional Abilities And Expertise To The United States.**

58.     Plaintiff Xuefeng ("Eric") Dai was born in Chongqing, China.  After graduating from medical school and while working as a dentist, he began to make investments that yielded

substantial returns. Dai eventually switched careers to work in finance. In 2006, he founded his own company, Khan Funds, then based in Shenzhen, China. Harnessing his medical background, he developed innovative methods for analyzing biomedical and pharmaceutical companies. Soon, he turned Khan Funds into an industry giant. Under Dai's leadership, Khan Funds employed more than fifty people and ran fourteen hedge funds with assets totaling over a billion dollars at its height. Dai's success brought him worldwide renown as a leading expert in the biomedical investment sphere, and he has even been called the "Chinese Warren Buffet."

59.     In 2014, Dai sought to expand his burgeoning firm to the U.S. market. Dai formed a mergers and acquisitions team to work to acquire U.S.-based biomedical companies and merge them with similarly situated China-based companies. With his reputation in China and expertise in the Chinese biomedical market, he could market his proposed U.S. acquisitions at a premium in China. As part of this effort, in October 2014 he founded Plaintiff Khan Funds Management America, Inc. to serve as the global headquarters for his businesses and the umbrella parent company to all of his wholly-owned affiliated entities located in China, Singapore, and elsewhere. Khan Funds America would also serve as the base for hedge fund offerings Dai planned to facilitate in the United States. Dai also established Beijing Qilong Medical and Pharmaceutical Holding Co., Ltd. ("Beijing Khan") as a wholly-owned subsidiary of Khan Funds China to serve as the China-based entity for the project. In October 2015 Dai moved to New York permanently to run Khan Funds, having received a visa in January 2014.

**C.     Defendants Attempt To Ensnare Dai In Their Criminal Conspiracy.**

60.     By 2014, Dai had established himself as successful hedge fund manager in China and Luo had taken notice. Luo believed Dai was the ideal candidate to further the Enterprise's goals in the United States. As Luo would explain years later, Luo thought Dai was "well-educated,

low-key, hardworking, pragmatic, and professional." Luo needed to find someone like Dai to achieve the Enterprise's aims.

61. In May 2014, Luo's longtime friend Baoxin Huang introduced Dai to Luo and Sun, leveraging Huang's acquaintance with Dai's cousin. Huang was a former PRC cabinet-level official who served in various roles in the government's national security apparatus. During their initial meeting, Luo expressed his interest in partnering with Dai, and Huang encouraged that partnership. This group met again in August 2014 and May 2015, with Huang again encouraging the parties to cooperate. Dai took Luo's claimed interest in investing in Khan Funds at face value and—particularly with Huang's endorsement—believed Luo had been acting in good faith.

62. In early September 2015, Dai informed Luo that he planned to relocate to the United States to expand Khan Funds' hedge fund business. As planned, Dai moved to New York in October 2015. Shortly thereafter, Nations' Chief Financial Officer and Vice General Manager Junjie Yu indicated that Luo wanted Nations to invest part of Nations' RMB two billion (approximately $286 million) cash holdings in a partnership with Khan Funds. In early October 2015, Dai traveled to China and met with Luo at a private social club in Shenzhen, where Luo himself again confirmed his interest in the proposed Nations' investment and his hope that Nations would be the sole and exclusive outside investor. Specifically, they discussed Dai's planned strategy of making investments in the biomedical industry in the U.S. and Europe through the purchase of investment products Khan Funds entities would offer. Luo confirmed Nations' interest in participating in such a strategy. On October 8, 2015, Yu contacted Dai and restated Nations' intention to invest in the fund as its sole and exclusive investor. Shortly after these meetings, Dai returned to New York. Over the next few weeks, Yu called Dai multiple times indicating that the

partnership negotiations were moving along and that he would continue to work with Dai's associates to finalize the Partnership Agreement.

63.     On November 23, 2015, Beijing Khan and a wholly-owned subsidiary of Nations, Shenzhen Qianhai Nations Investment Management Co., Ltd. ("Nations Investment") entered into the Shenzhen Guotai Qixing Industry Investment Fund Management Centre Partnership Agreement (the "Partnership Agreement").  Under the terms of that agreement, Beijing Khan would serve as General Partner and Executive Partner of the resulting Partnership, and Nations Investment would be only a Limited Partner.  Partnership Agreement §§ 2.31; 2.32.  The agreement also conferred on Khan Funds the sole and exclusive right to make independent investment and management decisions for the Partnership.  *See, e.g., id*. §§ 2.6.5; 2.6.6; 6.1.  Nations Investment, the limited partner, was expressly forbidden from participating in or interfering with such decisions.  Khan Funds' investment authority was a material part of the Partnership Agreement— indeed, this conferral of exclusive authority was set forth a dozen times in the Partnership Agreement.  *See id*. §§ 2.6.5; 2.6.6; 4.25; 4.3.1; 4.3.2; 4.3.3; 5.3.1; 5.3.2; 6.1; 6.2; 6.3; 6.4. Following the execution of the Partnership Agreement, Nations Investment invested RMB 300 million (approximately $42 million) in one of Khan Funds' investment vehicles.

64.     In mid-to-late 2015, Dai relocated to the U.S. on a long-term, permanent basis to work on developing Khan Funds America as the U.S. headquarters of his business on Wall Street. Ultimately, Dai became a lawful permanent resident of the United States, receiving an EB1-A (Alien of Extraordinary Ability) visa.  The U.S. government approved Dai's request for an exceptional abilities visa within five days of his submission.

65.     Now settled in New York, between January and September 2016 Dai worked tirelessly to identify suitable biomedical investment targets in furtherance of the fund.  Plaintiffs

expended countless hours and resources on extensive research, due diligence, meetings, and assessments on numerous acquisition candidates, and expended more than \$1 million in consulting, legal, and other fees related to these efforts. These efforts eventually culminated in overseas roadshows in the PRC showcasing the target acquisitions, which generated significant interest in the industry. By May 2016, Khan Funds had identified a suitable San Diego-based target focused on clinical research related to diabetes and other endocrine diseases.

66.     Nations, however, never intended to abide by the Partnership Agreement. Nor did Nations have any interest in Dai's strategy to acquire biomedical companies. Rather, from the moment Luo, Sun, Nations, and Huang solicited Plaintiffs, they intended to lure Plaintiffs into creating the Partnership and then leverage Nations' investment to co-opt Plaintiffs into participating in Defendants' criminal scheme to steal U.S. semiconductor technology and develop it for military use in China.

67.     Luo began to implement the next phase of that scheme in early 2016. On February 2, 2016, at Luo's demand, Khan Funds created a hedge fund called Zhongxinanxin. Luo hoped Zhongxinanxin would serve as a semiconductor-focused fund. Dai, however, was unwilling to manage a semiconductor-focused fund. He had no experience in semiconductors, no knowledge of the industry, and no interest in taking his business in that direction. As a consequence, Khan Funds never procured a license for Zhongxinanxin with the China Securities Regulatory Commission (the PRC equivalent of the SEC), nor registered any capital for that firm. Luo soon found out. Once he realized Plaintiffs had failed to license the new semiconductor fund, Defendant Yu personally went to Khan Funds' office in Shenzhen to demand that Khan China properly license Zhongxinanxin with the China Securities Regulatory Commission and inject 10MM RMB (approximately \$1,500,000) registered capital into the fund. Dai refused.

68.     Around March 2016, Luo called Dai (then located in New York) from China.  Luo summoned Dai to meet Luo in New York for assistance with a "personal favor" nominally unrelated to Luo's position at Nations.  Specifically, Luo sought Dai's assistance in establishing an account at a financial institution in the United States for a British Virgin Islands company.  Unbeknownst to Dai, Luo intended to use this bank account for the purposes of laundering the Enterprise's illegal racketeering proceeds and financing its activities.  As planned, Luo visited New York on May 7, 2016.  Upon Luo's arrival, Dai arranged for Luo to meet with China Merchants Bank's New York Branch to establish Luo's new account.

69.     Days later, Dai went to visit Luo in his hotel, and Luo pushed the scheme even further.  Luo informed Dai that Luo had just met with an old friend from upstate New York in the semiconductor industry.  Dai was surprised, as Luo had previously represented to Dai that he had no contacts in New York.  On information and belief, Luo's contact was Defendant Kerry Li of OST, both based in Westchester County, New York.  Luo also told Dai that he hoped Dai would acquire semiconductor companies through the Partnership.  Given that Luo and Nations had no right to manage the Partnership's affairs, that Khan Funds had no expertise in connection with acquisition of that type of complex technology, and that RMB 500MM (approximately $72 million) was insufficient to fund such a transaction anyway, Dai disregarded Luo's suggestion.  Dai proceeded with his plans for his biomedical transaction.

70.     Following Luo's trip, Plaintiffs continued their efforts to acquire a biomedical industry target.  Around this time, Dai traveled to Beijing for the roadshow effort to market potential biomedical acquisitions.  Before Dai departed to China, Baoxin Huang called Dai in New York encouraging Dai to meet to discuss Partnership business.  As planned, Dai met with Baoxin Huang and two executives of the San Diego biomedical company that Plaintiffs planned to market

in China.  This meeting was only one instance of Huang's involvement in the activities of the Khan Funds-Nations partnership.  Despite holding no formal role at Nations, Huang called Dai, located in New York, around once each month between around October 2015 and November 2017.  During these calls, Huang often asked about the status of the partnership as well as Dai's relationship and dealings with Luo.  On information and belief, Huang conducted these calls at the direction of or in concert with Luo to encourage Dai to continue with the Partnership and gather information on Dai's perspective and intentions in furtherance of the scheme.

71.    In June 2016, while Dai was in New York, Dai telephoned Yu in China.  Dai mentioned to Yu that he did not think that Luo seriously intended to invest in the biomedical industry as the Partnership had originally imagined.  Yu reassured Dai that his fears were unfounded and told him to proceed as originally planned.  Unbeknownst to Dai, Yu was misleading Dai to gain his trust so that Nations could facilitate an additional capital contribution and bring more money to the United States to further the Enterprise's aims.  Satisfied with Yu's reassurances, Dai approved Nations' RMB 200 million (approximately $29 million) capital contribution in July 2016.

72.    That additional capital contribution provided Nations added leverage over Khan Funds.  And with that leverage in hand, in August 2016, Yu, located in China, called Dai in New York.  Yu told Dai that Luo was angry with Dai's refusal to move forward with the semiconductor effort.  Yu threatened the termination of the Partnership if Dai did not meet Luo's demand.  Dai, surprised at the sudden shift in Nations' approach, again refused.

73.    Frustrated with Dai's unwillingness to go along with his plans, Luo tried a new approach.  In early September 2016, Yu asked a Khan Funds executive named Xinmanni "Sophie" Xu to visit Beijing, nominally so he could introduce her to new business contacts.  Xu agreed.  But

just before meeting with the unidentified business contacts, Yu informed her that they would be
meeting representatives from HuaXia GPT—OST's parent company. Yu indicated that Luo hoped
Khan Funds would invest in the company. Subsequently, Xu and Yu had an introductory meeting
with two HuaXia GPT representatives. The meeting yielded no transaction or investment. On
information and belief, Kerry Li, located in New York, worked with Nations, Luo, and Yu to help
coordinate this meeting.

74.    In September 2016, Luo travelled to New York to again try to convince Dai to
purchase a semiconductor company. As part of this visit, Luo visited OST's office in Tarrytown,
New York, to maintain his connections with Kerry Li, John Glossner, and the technical experts at
OST and to coordinate the activities of the Enterprise's overall scheme.

75.    On September 26, 2016, Yu met with Dai in Beijing and escalated his approach
even further. Yu threatened the immediate dissolution of the Partnership if Plaintiffs failed to
acquire a semiconductor company. Immediate termination of the fund was a serious threat—it
would lead to scrutiny from the Chinese SEC and potentially other repercussions. Dai proposed
to terminate the fund in stages in 2018 and 2020 provided no acquisition could be consummated
by that time. Yu agreed. A month later, in a meeting in or around November 2016 with Luo in
Beijing, Luo told Dai that OST/GPT had offices in both Beijing and New York and hoped that
Khan Funds could invest in OST/GPT through the Partnership. In a separate meeting around that
time, Yu also pushed Dai to acquire OST/GPT. Again, Dai did not budge.

76.    On December 7, 2016 two officials from the PRC's Ministry of State Security
(MSS) visited the offices of Khan Funds in Shenzen. On arrival, they displayed their badges and
identification and indicated they were investigating an American employee of Khan Funds, but at
the same time specifically named Dai, Xu, and Junqi "Alice" Zhang, another Khan Funds

executive.  After being refused entry, these "agents" stated they would return after a few days, but never did.  The MSS is no ordinary police organization; it controls its own police force and has strong connections to the People's Liberation Army.  On information and belief, Defendants caused the MSS to investigate Khan Funds in an effort to demonstrate Defendants' reach and to back up their demands with coercive force.

77.     Between December 2016 and May 2017, Yu repeatedly requested to meet with Sophie Xu and Alice Zhang and repeatedly inquired about Plaintiffs' efforts to acquire a semiconductor company.  On March 17, 2017, Luo directed Yu to summon Sophie Xu and Alice Zhang to Nations' headquarters in Shenzhen.  Once they arrived, Luo expressed his anger over the fact that Plaintiffs failed to make progress on a semiconductor acquisition.  Luo angrily banged on the table, pointed to Ms. Xu and Ms. Zhang, and yelled in sum and substance, "You only claim to have worked on the M&A, but in fact you have done nothing.  There are consequences for lying to me, and [these consequences are] very serious!"  He further stated that Plaintiffs must move forward on the semiconductor acquisition, and that Nations had no interest in the biomedical industry.  Alice replied that Khan Funds' focus lay in the biomedical industry, not the semiconductor industry, and that Khan Funds could not be expected to make such an acquisition. In response, Luo angrily banged the table again, and shouted "You should take notice of what you say, and what you do! You should know who I am!"

**D.     Luo Reveals The Full Scope Of The Conspiracy And Threatens Dai, His Family, And His Employees**

78.     A few months later, in September 2017, Luo traveled to New York to maintain the pressure campaign on Plaintiffs and coordinate with members of the conspiracy's New York base. In meetings in New York with Dai on September 10, 2017, September 12, 2017, and September 14, 2017, Luo finally revealed the true scope of Defendants' scheme.  He also made a series of

demands and extortionate threats against Dai, his family, and his associates. Dai, at this point suspicious of Luo, recorded these meetings.

79.     In these recorded encounters, Luo made a series of chilling statements. He admitted Nations never intended to invest in a biomedical acquisition via the Partnership. Instead, Nations—on a "special mission from the state" (the PRC)—had always sought to use Plaintiffs to gain access to readily sourced capital that would allow Defendants to finance their criminal operations through nominally legitimate channels.

80.     Luo explained that he had "kept a special path for" Plaintiffs to orchestrate and manage Defendants' finances, and "hope[d] that everyone can work together in the funding strategy aspect." He went on:

> "However, I am shouldering a special mission for the state and I told you at the time that I particularly needed this money. However, I was following instructions from Beijing. I said it to you clearly at the time, but I couldn't say it too clearly. It wouldn't be safe if I had said it too clearly. Including Taiwan, these global experts all make contacts with me unilaterally. I have to be directly responsible for their safety. Can the state directly give this money to them? Can it be sent from the state's finances? Not possible. I am entrusting such important information and hope to you."

81.     Luo also finally revealed the overarching purpose of the Enterprise's original scheme—to acquire high technology for the benefit of the PRC military:

> "I think you should understand, to work with me, why the state gave me Nationz Technologies.[9] I believe [Huang] Baoxin also told you this. There are some things I cannot clearly say to you or Baoxin. This is the country's long-term and important strategic plan. I am shouldering a special mission of the country. I also can't tell you about these, right? After all, a lot of people know about this, and want to work with me and make friends with me."

> "Therefore, these, including Nationz Technologies, including this project in Chengdu, will greatly contribute to our country in three or five years . . . in the next two years, the J-20 Fighter will elevate the technological power for our country's national defense and will impact the U.S. for at least ten years."

---

[9] Nations was known as "Nationz Technologies" until 2018.

82.     Luo boasted of the true scope of the conspiracy, and how it had already succeeded in stealing and exporting valuable semiconductor technology.  *See* Appendix A, Section V.  Luo repeatedly emphasized how he had worked with Yaping Chen's team over the past decade to steal and export technology for use in missiles and jet fighters.  Specifically, he mentioned how he had asked Chen to start a "rear team" in Canada "a few years" before to send stolen American technology to China; on information and belief, Ishiang Shih was a member of this Canadian "rear team."  He also explained how Chen's team had provided key materials and designs for the Chengdu project, and how the Enterprise had provided RMB 100 million (approximately $14 million) to Chen's team for their work.  *See also* Appendix A, Section III.  He further explained how he hosted a summit for the Enterprise at the OST headquarters in New York.  This summit, as he described, served to develop the Enterprise's personal and professional connections with technical experts across North America, and helped Luo cement his personal leadership over the Enterprise:  "I asked them [other members of the Enterprise] to work here for several days and communicate with them. They really respect me now . . . I directly lead them for this."  *See also* Appendix A, Section IV.

83.     With the rest of his New York base firmly in place and ready to do the bidding of the Enterprise, Luo had lost patience with Dai's refusal to cooperate.  Luo made his demands clear: Dai would provide RMB 300 million (approximately $42 million) to finance the Enterprise's purposes.  Dai would finally license and provide capital for the Zhongxinanxin, semiconductor fund that Luo insisted Dai create the previous year.  And Dai would launder money for the Enterprise for years to come.

84.     Luo promised profit, access, and influence if Dai cooperated.  As he stated during the recorded meeting:  "[b]y helping [the Enterprise] with your intelligence, you can both receive

such profits and at the same time, help me personally, also, through such circumstances you're able to make friends with these people. This is a special channel to develop." Luo continued, "this cooperation will bring you key influence" and this "collaborative relationship with Khan Funds [and the Enterprise]" would be "extraordinary."

85.     Luo also made clear that the consequences of Dai's refusal to cooperate would be dire. In a meeting on September 12, 2017, Luo made the following extortionary threats, all of which were recorded:

> i.   <u>Luo</u>: "From now on, we can cut our ties. However, regarding this matter, you should watch your back, you will regret it. Because on the territory of China, let me tell you, I can say that, after all, you have so many relatives in China. I am not doing it for myself . . . as I told you, you will regret it. Because, you really get me into serious trouble! About this matter, I have been calling you for the past few months and you did not answer any phone call. I also sent you messages, and you never replied. You even refused to meet with me. For so many years in China for me, no matter what I do, who dares to treat me like this?! How can you treat me like this? You think you can just go to the U.S. and not return? Are you joking? I don't believe you won't return to China in your whole life!"

> ii.  <u>Luo</u>: "You also failed me . . . the top leaders asked me to explain . . . you actually did this, Xuefeng, you should think about it! You still have family in China, your mother and sister are in China!"

> iii. <u>Dai</u>: "Don't be angry, don't be angry, Mr. Luo."

> iv.  <u>Luo</u>: "I'm not angry. If you do things and be a person like this, you will regret!"

86.     That evening, Dai frantically arranged for his mother and older sister to flee China before the Enterprise could reach them; the following day, they evacuated to safety in South Korea. On September 14, in a meeting that was again recorded, Luo continued to threaten Dai, with Dai pleading for Luo not to hurt him:

> i.   <u>Luo</u>: " . . . from the beginning, three years ago I never doubted."
>
>      <u>Dai</u>: "Mr. Luo, I know. We are just like young brothers, please don't hurt me."

> ii.  <u>Dai</u>: "because I won't cut off relations with China, it has to continue."

Luo: "the things I'm doing have zero room for failure. If I fail, it means that my entire team would be subject to great impact. Therefore, things must succeed. Let me tell you, I do in fact need funding."

iii. Dai: "What can I do? I beg you sir I can kneel and kowtow, really. [*Dai kneels*]. We still will continue."

iv. Luo: "For someone like you who performs private fund management, it is really so easy for the state to get you into troubles. Whether it is funds that you contributed five years ago or a product you did ten years ago, once it is looked into, it can be investigated thoroughly."

Dai: "It would be terrible to be listed as wanted all over the world. You guys can arrest anybody you wish."

v. Luo: " . . . you still have relatives in China, but when you are old, you may not even have a true friend or partner that you can rely on."

vi. Luo: " . . . we have established this channel for communication and to send messages, I have said not to call me 'Mr. Luo' in your messages. We could just find a code word, 'President Wang' or whatever the case may be. But you insisted to say, 'Mr. Luo.' What can I say to you if you do things like this?"

Dai: "I was scared that day at noon, I was dizzy."

Luo: "What else did I tell you? Be rigorous in everything you do. You cannot lose focus on what you intended to do even when there is a knife to your throat. Be a man!"

Dai: " . . . when you said that, I was thinking my mother and older sister, they don't want to come to the US and don't like it here. I still learned some English, but they don't understand English at all and don't want to come to the us at all."

Luo: "Xuefeng, I have entrusted my overall strategic purpose to you. However you didn't fulfill the commitment in the past year . . . whether it is in Shenzhen, or whether it is with the public security, it is very simple to find a way to put someone in a bad situation . . . You can't go against the country. Whether it is national security or public security, when the state asks you a favor, don't dare refuse to help! For the state's interest, these types of things are very easy. If you fly on an airplane and go through customs, they can randomly put drugs in your luggage and you will be arrested all of a sudden. Let me tell you, there are many ways to arrest someone. We can't be this way between us. Firstly, I will not harm my friends. I am someone who values friends . . ."

Dai: "Mr. Luo, please be generous and don't hurt me at any given point in time. I will even kneel to you." [*Dai kneels*].

Luo: "Xuefeung, us two brothers are here today to discuss and make our words clear. You are still young. We will still have connections in the future and you will still go back to China."

Dai: "You are the one who just lifted me up . . . please remember at any given time that you were the one who lifted me up. Please remember at any time and you must not push me in a ditch. With such understanding I will certainly support you at any time."

Luo: "Go back to China if you want to go back. Your relatives are in China and you also don't need to worry about them. Why? You chose to work with Nationz Technologies, but you don't understand the status of Nationz Technologies in this circle and in the system. Our cooperation with Khan Funds means giving you honor."

vii. Luo: "Brothers or whatnot, think about how you are supposed to cooperate. Privately, you should honor your commitment. How to honor it? You have to consider your safety and can't leave your problems."

87. In the exchange transcribed and translated above, Luo repeatedly mentions Dai's family in China in connection with trying to force Dai to cooperate; makes threats to Mr. Dai's safety; and threatens that the Enterprise can use the PRC government to harass, investigate, and even arrest him on false pretenses. During these calls, Luo repeatedly mentioned both his power to influence the China Securities Regulatory Commission and his deep connections with the PRC military, bolstering these threats. *See* Appendix A, Sections I-II. Dai, feeling that he was in serious danger, repeatedly pleads for Luo not to hurt him and to not be angry with him. These extortionate and coercive threats put Dai in fear of his safety, the safety of his family, and the safety of his employees.

**E.  Dai Reports The Enterprise To The FBI And Defendants Launch Their Retaliation Campaign, Which Is Ongoing**

88. Shortly after this frightening episode, Dai reported the Enterprise's activities to the New York Field Office of the Federal Bureau of Investigation. A few weeks later, he also initiated investigatory proceedings with the United States Attorney's Office for the Southern District of New York. Dai met with the FBI four times over the next two months. Between April 2018 and

June 2018, the FBI asked Dai about Yaping Chen, Dingtian Technology, Chengdu GaStone Technology, China Electronic Technology, and trading company Qing'An.  In other meetings, Dai provided key information about Nations, Luo, Yu, Jay Liang, and other members of the Enterprise. The FBI later noted that Dai served as crucial contributor to the FBI's investigations into the PRC's efforts to steal and export American high technology.  Ultimately, over the course of two and a half years, Dai met with federal investigators a total of sixteen times.

89.     Days after Dai first reported the Enterprise, Luo in China called Dai in New York, again requesting that Dai fund Luo's operations via a British Virgin Islands company, and providing explicit instructions on how to wire the funds.  Dai equivocated, hoping to buy time, as Luo was unaware that Dai was cooperating with law enforcement.  In the meantime, knowing that he would be blacklisted in the PRC and fearing that the Enterprise would find a way to freeze his assets there, Dai dissolved Khan Funds' Chinese affiliates.  All told, Dai liquidated fourteen private equity funds that had once managed more than one billion dollars in capital, returning all of this capital to his investors.  Further to these efforts, Dai expended more than RMB 10 million (approximately $1.5 million) to fulfill obligations triggered as a result of his fund dissolutions, including compensation to former clients and employees, as well as penalties and damages for contractual breaches.

90.     In November 2017, Defendant Yu, located in China and not yet knowing that Dai was cooperating with the FBI, called Dai in New York, imploring him to help "lead" and "manage" the financing for the RMB eight billion (approximately $1.5 billion) semiconductor fabrication project Nations had been trying to establish in Chengdu.  Dai again equivocated.  But in late November 2017, Sophie Xu informed Yu that Plaintiffs refused to join the Enterprise.

91.     Dai's refusal to cooperate represented both a major failure and significant risk to the Enterprise.  Dai had wasted years of their time.  They had identified him, invested in him, and cultivated him to join the Enterprise and help launder money towards their goal of procuring semiconductor technology and advancing the Chengdu Project.  But their "investment" in Dai had, in their view, had been wasted.  Worse, Dai knew too much.  Luo's September 2017 revelations had exposed the purpose and scope of the Enterprise, including the identities of Yaping Chen, Kerry Li, and OST/GPT.  Dai had thus become one of the few people in the world who knew the extent of the Enterprise—and one of the few people in the world who could destroy the  intricate web the Enterprise had spun over more than a decade.  In doing so, he could also jeopardize the Chengdu Project, throwing a wrench into the PRC's mission to modernize its military.

92.     In an effort to frighten Dai from exposing the Enterprise and punish him for his refusal to join their efforts, Defendants made good on Luo's prior threats.  Defendants initiated a "Fox Hunt" designed to oppress, retaliate, and punish Plaintiffs.  Fox Hunts are a honed and by now well-reported PRC government strategy to force the repatriation of dissidents back to China under duress to stand trial for their "crimes" against the state.  As part of such an operation, the PRC uses illegal and inhumane tactics, including threatening a dissident's family and friends, conducting intrusive surveillance, and harassing the dissident and their family members to demonstrate the PRC's reach and the country's ability to harm a dissident or her loved ones.

93.     The "Fox Hunt" directed at Dai began around November 30, 2017, after Sophie Xu told Yu that Plaintiffs would not cooperate with the Enterprise.  Within days, Nations activated a coordinated and harassing press campaign against Plaintiffs with an initial false announcement that Dai and his colleagues had absconded from China.  This act was the first of numerous violations of 18 U.S.C. § 1512 (relating to tampering with a witness, victim, or an informant) by

members of the Enterprise directed at Plaintiffs and their employees and associates. The press campaign—which would last for years—involved countless articles and announcements with false claims that Dai and his associates had embezzled funds. It also included an extensive so-called "documentary" on Dai's purported wrongdoing shown in China. This press campaign falsely tarring Dai as a fraudster rendered Dai a persona non grata even amongst many members of his family and longtime friends, ruined his reputation in the business community in China and around the world, and caused severe trauma and anguish.

94. In December 2017, the retaliatory Fox Hunt picked up even more steam. The Funds Association of China suspended the financial license of Khan Funds China. The Funds Association, a government agency, provided no notice to Plaintiffs nor any opportunity to dispute or appeal the suspension. On information and belief, Defendants caused the Funds Association's suspension—effectuating one of many of Luo's threats to weaponize the PRC government against Plaintiffs. As the Enterprise hoped, this suspension crippled Plaintiffs' ability to do business in the PRC and further damaged their reputations.

95. A few weeks later, federal authorities arrested Yi-Chi Shih and a co-conspirator, charging Shih with violations of the International Emergency Economic Powers Act and conspiracy. According to the arrest warrant, Shih and his co-conspirator accessed the victim semiconductor company's computer systems after the co-conspirator had posed as a domestic customer seeking semiconductor products that would be used solely in the United States. In doing so, Shih hid from that U.S. company his true intent to transfer the company's technology and products to China. Assuming that Dai had reported their activities to the authorities, the very day of the Shih arrest the Enterprise burglarized Khan Funds' Singapore office and changed its locks, sending a clear message to Dai. Defendants' retaliation for Dai's cooperation and attempts to

intimidate Dai from further cooperation violated 18 U.S.C. § 1512, and was the first of many violations of 18 U.S.C. § 1513 (relating to retaliating against a witness, victim, or an informant) and 18 U.S.C. § 1503 (obstruction of justice) by members of the Enterprise directed at Plaintiffs and their employees and associates. As a result of this burglary, Dai was forced to spend at least $50,000 to retain a law firm to investigate the incident.

96.     A few weeks later, in February 2018, Dai's younger sister traveled to New York. Upon her arrival, she told Dai that she had come to permanently move to America out of her fear that the PRC would retaliate against her. During her visit, she asked a number of questions about the Enterprise's activity, and Dai revealed that he had reported Luo to the authorities. The next day, she unexpectedly announced that she was returning home to China. On information and belief, Luo ordered Baoxin Huang to arrange for Dai's sister to travel to New York to collect intelligence on her brother—a textbook Fox Hunt maneuver. Indeed, Huang would later admit that Luo asked him to reach out to Dai's sister to gather information about Dai at this time.

97.     In May 2018, the Enterprise initiated a lawsuit in the PRC to remove Khan Funds Beijing as General Partner of the Partnership. In their filing, Nations Investment made a series of false assertions to the court, including that Nations could not locate or reach Dai. Ultimately, the Enterprise procured a default judgment against Khan Funds Beijing and Dai in February 2019. In so doing, the Enterprise again fulfilled Luo's threat to use the Enterprise's government access against Plaintiffs. The Enterprise was able to achieve a default judgment without ever serving Dai or notifying him of the proceedings, even though at all times they knew Plaintiffs' address and contact information. Dai was, in fact, unaware of the suit or the default judgment until June 2021 when he first reviewed the initiating documents for litigation against Dai, Xu, and Zhang in

Singapore alleging they had embezzled funds from the Nations Investments-Khan Funds partnership, and the PRC lawsuit filings were provided as exhibits.

98.    The Assistant U.S. Attorney assigned to the investigation initiated by Dai's initial outreach declined to bring a case, citing the fact that key members of the Enterprise were Chinese nationals and would be too difficult to prosecute.  However, on October 18, 2018, approximately one year after Dai had reported to law enforcement, the Department of Justice indicted Yaping Chen, Yi-Chi Shih, Ishiang Shih, Jieru Deng, and others in the U.S. District Court for the Central District of California. *See United States v. Yi-Chi Shih, et al.*, CR No. 18-00050 (C.D.C.A. 2018). Yi-Chi Shih was indicted for conspiracy to violate the International Emergence Economic Powers Act and Export Administration Regulations, as well as a host of other criminal violations in furtherance of this activity.  According to the indictment, Yi-Chi Shih sent stolen technology to Shih's brother, Ishiang Shih, in Canada.  Ishiang sent the technology from Canada to Chengdu GaStone's semiconductor foundry in Chengdu, China, which Yi-Chi Shih managed.  Chen was indicted as a co-conspirator, with specific allegations that he had laundered funds in furtherance of the criminal activity and paid both Yi-Chi Shih and Ishiang Shih for their work.  Chengdu RML, which Yi-Chi Shih and Chen co-founded, was implicated in the conspiracy along with Chengdu RML's manager, Jieru Deng.  Chengdu Ganide, of which Chen and Yi-Chi Shih sat on the Board of Directors, was also implicated in the scheme.  Importantly, the indictment describes Chen and Shih's activity as beginning just around the time that Luo admitted engaging with Yaping Chen's team.

99.    The indictment had a severe effect on the Enterprise.  Specifically, it  hobbled the RMB eight billion dollar (approximately $1.5 billion) Chengdu project, which had relied on technology Chen's team procured from the United States and elsewhere.  Within weeks, in

December 2018 Nations pulled out of the RMB eight billion partnership with Chen to build the Chengdu project entirely. The indictment's allegations about Ishiang's role in exporting stolen technology from Canada further corroborated Luo's prior statements to Dai that the Enterprise, through Chen, had established operations in Canada.

100. Weeks after the indictment was filed, Defendants retaliated against Plaintiffs yet again. On December 6, 2018, on information and belief, Defendants ordered a cyberattack on Khan Funds' computer systems. This cyberattack targeted computers and computer networks that were physically located in New York. On information and belief, through this attack, the Enterprise was able to steal a raft of confidential documents, including copies of certain contracts between Khan Funds China and Khan Funds America, as well as certain correspondence with legal counsel. Nations Investments later filed these confidential documents in its baseless embezzlement litigation in Singapore on October 27, 2020. This cyberattack caused Plaintiffs to incur the cost of legal fees and enhanced protections from future cyberattacks and ultimately led to the exposure of confidential business information, among other damages.

101. The Enterprise continued to ramp up the pressure on Plaintiffs. On December 25, 2018, Nations announced that Dai and his colleagues were approved for arrest by the Shenzhen People's Procuratorate as fugitives suspected of embezzlement. The Shenzhen People's Procuratorate is a local branch of the highest State legal prosecretory authority in China—an agency under direct supervision of the National People's Congress and its Standing Committee, the highest organ of the CCP. On information and belief, Nations used false testimony and utilized its connections with the PRC government to secure this arrest warrant. In doing so, it fulfilled Luo's threats from 2017. Apart from the mental anguish resulting from the threat of being jailed in the PRC, the Shenzen arrest warrant restricted Dai's ability to travel to any country that honors

PRC extradition requests.  It further led the PRC to freeze Dai's assets in China, including real estate he owns in China and multiple bank accounts.

102.    The Enterprise's relentless campaign continued.  In January 2019, a friend of Dai's, Xianhua Ning, a pro-democracy Chinese dissident, was introduced to Yifu Yang, who claimed to be wealthy businessman interested in supporting Ning in his pro-democracy efforts.  When Ning met with Yang and his team over dinner, Yang repeatedly asked about Dai and whether Ning had any relationship with Dai.  Ning disclaimed any relationship, and Yang left abruptly, never contacting Ning again.  On information and belief, Yang was operating on Defendants' orders to uncover information about Dai, as part of the scheme to investigate, intimidate, retaliate against, and repatriate Dai.

103.    Next, between January 2019 and March 2019, Dai received a series of threatening and degrading messages and comments on his public Twitter account by the user "glgl123456".  The user's profile photograph depicts Jian Rong, a relation of former Chinese vice premier Yiren Rong.  These messages, as translated, include the following:

i.    "[Y]ou must die, if you remain alive then the heavens would not agree."

ii.    In response to Mr. Dai's tweet criticizing Xi's leadership style, user glgl1234567 commented, "you should be careful, you would be killed, not by a single bullet but a barrage of bullets."

iii.    "[E]veryone will die, some by the mountain, others like a feather, you will die by the shit of a cow."

iv.    "[Y]ou [Eric] are not human.  You are a slavish running dog."

v.    "[Y]ou are fighting with an egg to challenge a rock," implying that Dai cannot challenge the CCP.

vi.    "[Y]ou are given a license to be a slavish running dog, you are not human."

vii.    "[Y]ou are weak, not a man but a weak stay at home person kept hidden like a spy."

    viii.    In response to Mr. Dai's tweet about the number of Chinese in attendance at the Berkshire Hathaway annual shareholder meeting, User glgl1234567 commented, "if you wake up in the middle of the night to go to the bathroom you will get scared," implying that someone will be waiting for Dai in the middle of the night to harm him.

    ix.    In response to Mr. Dai's comparison of the Chinese government to an organized crime unit, user glgl1234567 commented, "this is not your business, worry about your father in America," implying that Dai is wrongfully aligned with the United States.

104.    Due to Jian Rong's connection to the PRC government and the timing of these unprovoked attacks following the Chen indictment, Jian Rong likely used the "glgl123456" account to harass, intimidate, and retaliate against Dai on behalf of the Enterprise.

105.    In August 2019, the FBI asked Dai about Jay Liang, the director of Nations USA in California. Following this inquiry, the FBI in October 2019 requested that Dai assist in an investigation of Fox Hunt activities. The FBI's request coincided with defendant Yingtong Sun's arrival in the U.S. in November 2019. At that time, Sun was the CEO of Nations. Around the same time as Sun's arrival, the FBI again met with Dai and again requested his participation in the investigation of Fox Hunt activities. On information and belief, this investigation was geared towards Sun, underscoring the continued attention the FBI maintained on the Enterprise even two years after Dai's initial report.

106.    The Enterprise's activities in prosecuting the baseless Singapore litigation has been equally harassing and confirms the ongoing nature of their retaliatory scheme. Through the fraudulently obtained February 2019 default judgment against Khan Funds Beijing in the PRC action, Nations Investment formally removed Dai from his position as director of the Partnership on October 16, 2019. Approximately one year later, as directed by Sun, Nations Investment took advantage of its ill-gotten position in the Partnership to sue Dai, Sophie Xu, and Alice Zhang in Singapore, alleging that they had embezzled funds from the Partnership. Baoxin Huang later

admitted to Dai during a phone call in February 2022, during which Dai was located in the United States, that the lawsuit was inspired by the Enterprise's personal animosity toward Dai. The Enterprise used the Singapore lawsuit to leverage documents Defendants likely procured through the December 2018 cyberattack on Khan Funds and even included as "evidence" raw forgeries.

107.    Nations Investments also abused the Singaporean service of process procedure as cover to surveil, intimidate, and retaliate against Dai. Between November 2020 and September 2021, Nations Investment employed three process serving entities in the United States in a purported attempt to serve Dai with a subpoena to properly initiate the Singaporean litigation. As part of this effort, the process servers conducted extensive surveillance of Dai's property in New York, collecting photo and video evidence on private property. Most of this activity was clearly unnecessary:    On February 14, 2021, the Singapore court permitted Nations Investment to effectuate service in the action by email to Dai and to an unmonitored general Khan Funds company email address.

108.    And the "process servers" Nations Investment hired appear to be no process servers at all. For example, one of them—Applied Facts—bills itself as "the leading global investigations firm you have never heard of"—hardly the skillset required for standard service of litigation process. And unlike standard process servers, Applied Facts employs "experts in computer forensics, forensic accounting, information technology, as well as clinical psychology [to] cover every angle." Documents obtained by Plaintiffs through filings in the Singapore lawsuit reveal that Applied Facts agents called themselves "investigators," and that Applied Facts sought to obtain private information about Dai. It did so through, among other things, running a background check on him in the United States (certifying that they were doing so for "investigative" purposes).

In the process, Applied Facts obtained Dai's Social Security Number, which Nations Investment's lawyers disclosed in public filings in the Singapore litigation.

109.    Given these suspicious facts, Nations Investment's "service of process" effort appears to have served to further the Enterprise's Fox Hunt efforts.  Indeed, the PRC frequently engages U.S.-based investigators to assist in their Fox Hunt operations; U.S. law enforcement has recognized and even attempted to crack down on this practice.  *See, e.g., United States v. Feng et al.*, No. 20-MJ-1025 (PK) (E.D.N.Y. 2020).  Defendants press the Singapore lawsuit to this day, expecting to obtain a judgement against Dai based on Defendants' false representations that they then hope to domesticate and enforce in the United States—all as part of the overarching effort to harass and retaliate against Plaintiffs for refusing to bend to the Enterprise's will.  Indeed, they have already moved to domesticate in Florida default judgments obtained against Xu and Zhang in Singapore.  And they have sought a worldwide interim asset-freezing injunction designed to prevent Dai from defending himself in litigation and funding the prosecution of this and other legal actions pursued to protect his rights.  Indeed, on December 8, 2022, the Singaporean court granted a short-lived freezing injunction pending a hearing in January—predominantly on the basis of false representations by Defendants that Dai's management of properties in Florida (which includes putting properties on the market in the ordinary course to maximize returns) represents a risk of asset dissipation to justify a temporary freeze.  Nations has made clear that it will seek in the January hearing to cut off Dai's litigation funding and his ability to protect his rights.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### (Violations Of RICO, 18 U.S.C. § 1962(c) – Against All Defendants)

110.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

111.   At all relevant times, Plaintiffs and Defendants were and are each a "person" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c).

112.   Defendants created and ran a wide-ranging association-in-fact enterprise with a clear command structure and operatives in the United States, as well as China and elsewhere. Defendants originally coordinated this Enterprise to accomplish the common goal of stealing high technology for the benefit of the PRC military.  In furtherance of this goal, the Enterprise defrauded and extorted Plaintiffs in an attempt to coerce them to join the Enterprise, and went on to commit numerous additional predicate acts aimed at the Enterprise's related but separate goal and scheme to intimidate and retaliate against Plaintiffs for reporting the technology theft scheme to law enforcement.  The Enterprise's twin goals of stealing high technology, on the one hand, and retaliating against, intimidating, and harming Plaintiffs, on the other, are ongoing, as are its activities in furtherance of these goals.

113.   Plaintiffs were damaged immensely as a direct and proximate result of this pattern of racketeering.  These damages include, among other things, expenditures relating to security personnel out of fear for their own safety, legal, and investigative fees relating to the Enterprise's intimidation and retaliation efforts, and lost U.S. business due to the reputational harm that the Enterprise has wrought on Plaintiffs.  All of these losses have occurred in the U.S. and were the direct and proximate result of activities that occurred in or were directed to New York.

## *The RICO Enterprise*

114.    Nations Technologies Inc., Nations Technologies (USA) Inc., Nations Investment, Zhaoxue Luo, Yingtong Sun, Junjie Yu, Jie Liang (Director of Nations USA), Xu Hui (Chief Financial Officers of Nations USA), Baoxin Huang, Yaping Chen, Yi-Chi Shih, Ishiang Shih, Jieru Deng, Chengdu RML, Chengdu Ganide, Chengdu GaStone, HuaXia GPT, Optimum Semiconductor Technologies, Kerry Li, John Glossner, Jian Rong, Yifu Yang, Applied Facts Group, Reach Perfect, Ambiq Micro, along with additional individuals and entities whose existence, identities and roles have been concealed from Plaintiffs by the Defendants, constitute an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

115.    The members of the Enterprise are a group of persons associated together for the common purpose of carrying on two related but distinct ongoing schemes.  In particular, the Enterprise originally formed with the common goal of stealing semiconductor technology for the benefit of the PRC military.  In furtherance of this scheme, the Enterprise defrauded and extorted Plaintiffs in an effort to coerce them into participating and cooperating in the scheme.  When Plaintiffs refused, and instead reported the Enterprise and its activities to law enforcement authorities, the Enterprise hatched a second, related scheme, intimidating and retaliating against Plaintiffs as punishment for refusing to participate in and reporting the scheme.

116.    The members of the Enterprise share long-standing personal, professional, and financial ties, and these pre-existing affiliations and common ties facilitated the ability of Defendants to combine, merge, and conspire with themselves and others to form their racketeering enterprise with the common purposes of illicitly procuring protected technologies for end use in China and defrauding and then retaliating against Plaintiffs to Defendants' profit and benefit.

117.  The Enterprise has longevity sufficient to permit the Defendants to pursue the Enterprise's goals.  The Enterprise has been in operation since at least 2006 and it is ongoing and continuing.

118.  The Enterprise has organized itself into a cohesive group with specific and assigned responsibilities and command structure, operating in, and directed from New York, California, and Florida, as well as China, Singapore, Canada, and other locations unknown to Plaintiffs.  While the organization of the Enterprise may have changed over time, and its members may have held different roles at different times, the Enterprise has been structured to operate as a unit in order to accomplish the common goals and purposes of its scheme.

119.  The Enterprise was created and used as a tool to effectuate Defendants' pattern of racketeering activity.

120.  Each Defendant was and is responsible for command and control of the Enterprise; held and holds positions of responsibility within the Enterprise; or was and is otherwise responsible for the operation and management of the Enterprise and its affairs.

121.  Each Defendant was involved in the orchestration, planning, perpetration, and execution of the scheme to defraud Plaintiffs, and has taken actions, and directed other conspirators to take actions, necessary to accomplish the overall aims of the Enterprise.

  i.  Zhaoxue Luo acts as a mastermind of the Enterprise.  He retains final authority on all significant decisions of the Enterprise, and is responsible for creating, approving, and implementing the policies, practices, and instrumentalities the Enterprises uses to accomplish its common goals and purposes.  Luo has also taken actions and directed other members of the Enterprise, including Nations Technologies Inc., Nations Technologies (USA) Inc., Nations Investment, Yingtong Sun, Junjie Yu, Jie Liang (Director of Nations USA), Xu Hui (Chief Financial Officers of Nations USA), Baoxin Huang, Yaping Chen, Yi-Chi Shih, Ishiang Shih, Jieru Deng, Chengdu RML, Chengdu Ganide, Chengdu GaStone, HuaXia GPT, OST, Kerry Li, John Glossner, Jian Rong, Yifu Yang, Applied Facts Group, Reach Perfect, Ambiq Micro, and others to take actions necessary to accomplish the Enterprise's overall goals and purposes, including directing the

48

affairs of the Enterprise, funding the Enterprise, soliciting and recruiting members of the Enterprise, and directing members of the Enterprise. Luo has been personally enriched by conducting the affairs of the Enterprise through financial rewards from Nations, as well as financial rewards and government access awarded to him by the PRC government.

ii.    Yingtong Sun acts as a leader of the Enterprise. Along with Luo, he contributes to significant decisions of the Enterprise, and is responsible for creating, approving, and implementing the policies, practices, and instrumentalities the Enterprise uses to accomplish its common goals and purposes. Sun has also taken actions and directed other members of the Enterprise, including Nations Technologies Inc., Nations Technologies (USA) Inc., Nations Investment, Zhaoxue Luo, Junjie Yu, Jie Liang, Xu Hui, Baoxin Huang, Yaping Chen, Yi-Chi Shih, Ishiang Shih, Jieru Deng, Chengdu RML, Chengdu Ganide, Chengdu GaStone, HuaXia GPT, OST, Kerry Li, John Glossner, Jian Rong, Yifu Yang, Applied Facts Group, Reach Perfect, Ambiq Micro, and others to take actions necessary to accomplish the Enterprise's overall goals and purposes, including directing the affairs of the Enterprise, funding the Enterprise, soliciting and recruiting members of the Enterprise, and directing members of the Enterprise. Sun has also taken a lead role in coordinating the Enterprise's Fox Hunt efforts, including the fraudulent Singapore litigation, which is intended to harass, intimidate and serve as retaliation against Plaintiffs. Sun has been personally enriched by conducting the affairs of the Enterprise through financial rewards from Nations, as well as financial rewards and government access awarded to him by the PRC government.

iii.    Nations has been an active participant in the operation and management of the Enterprise and its affairs, and in the orchestration, perpetration, and execution of the Enterprise's schemes to illicitly procure protected technologies and commodities for end use in China and retaliate against Plaintiffs. Nations benefitted from conducting the affairs of the Enterprise through financial rewards, the confiscation of Plaintiffs' assets, obtaining Plaintiffs' confidential information, and government access awarded to it by the PRC government.

iv.    Nations USA, serving as the Enterprise's California base, has been an active participant in the operation and management of the Enterprise and its affairs, and in the orchestration, perpetration, and execution of the Enterprise's scheme to illicitly procure protected technologies and commodities for end use in China. Nations USA benefitted from conducting the affairs of the Enterprise through financial rewards.

v.    Nations Investment has been an active participant in the operation and management of the Enterprise and its affairs, and in the orchestration, perpetration, and execution of the Enterprise's schemes to illicitly procure protected technologies and commodities for end use in China and retaliate against Plaintiffs. Nations Investment defrauded Plaintiffs pursuant to the Partnership and then filed two spurious lawsuits against Plaintiffs involving fraud on the court. Nations benefitted from conducting the affairs of the Enterprise through financial rewards,

confiscating Plaintiffs' assets, obtaining Plaintiffs' confidential information, and government access awarded to it by the PRC government.

vi. Junjie Yu conducted the affairs of the Enterprise, including but not limited to executing the day-to-day administrative affairs of the Enterprise and managing Enterprise communications, including fraudulent, deceptive, and extortionate communications with Plaintiffs relating to the Partnership. Yu was personally enriched and rewarded by participating in the affairs of the Enterprise, including by being appointed to lucrative management positions in various Enterprise projects, and has benefitted from the government access afforded to him by his association with Nations.

vii. Baoxin Huang participated in the conduct of the Enterprise's affairs, including by intentionally (if unsuccessfully) soliciting and encouraging Plaintiffs to join the Enterprise, trying to induce Plaintiffs to commit crimes in furtherance of Enterprise objectives, and instructing Dai's sister to travel to New York to determine if Dai had cooperated with American law enforcement authorities in reporting the Enterprise's criminal activities. Huang was personally enriched and rewarded by participating in the affairs of the Enterprise.

viii. Yaping Chen participated in the conduct of the Enterprise's affairs, and coordinated with Nations, Luo, and Sun on the retaliation and intimidation campaign in an effort to protect himself from prosecution for participating in the Enterprise's criminal activities and to limit interference related to the Chengdu Project. Chen was personally enriched and rewarded by participating in the affairs of the Enterprise and has benefitted from the government access afforded to him by his association with Nations.

ix. OST (and GPT, to the extent it is a separate legal entity) serves as the New York base of the Enterprise. OST/GPT played a lead role in coordinating the deceptive scheme to lure Plaintiffs into the Partnership, aided other members of the Enterprise to solicit Plaintiffs' involvement with OST/GPT, and aided the Enterprise in its campaign to retaliate against and intimidate Plaintiffs. OST/GPT did so, among other reasons, to hide its identity from disclosure and to protect itself from the legal repercussions of its activities in furtherance of the Enterprise's goals. OST/GPT has benefitted from its participation in the affairs of the Enterprise with financial rewards and a profitable association with Nations.

x. Kerry Li serves as the coordinator of OST's and GPT's, and therefore the Enterprise's, activities in New York, at Luo and Sun's behest. On information and belief, Li played a lead role in coordinating the deceptive scheme to lure Plaintiffs into the Partnership, aided other members of the Enterprise to solicit Plaintiffs involvement with OST, and aided the Enterprise in its campaign to retaliate against and intimidate Plaintiffs. Li did so, among other reasons, to hide his identity from disclosure and protect himself from the legal repercussions of his actions in furtherance of the Enterprise's goals. Li has personally benefitted from his

participation in the affairs of the Enterprise with financial rewards from OST and his profitable association with Nations.

xi.    HuaXia GPT serves as the Chinese base for OST/GPT.  HuaXia GPT played a lead role in coordinating the deceptive scheme to lure Plaintiffs into the Partnership, aided other members of the Enterprise to solicit Plaintiffs involvement with OST/GPT, and aided the Enterprise in its campaign to retaliate against and intimidate Plaintiffs.  It did so, among other reasons, to cover up its identity and protect itself from the legal repercussions of its activities in furtherance of the Enterprise's goals.

122.    At all relevant times, each Defendant was, and is, a person who exists separate and distinct from each other Defendant.

123.    At all relevant times, each member of the Enterprise was, and is, a person who exists separate and distinct from each other member of the Enterprise.

124.    At all relevant times, each Defendant was, and is, a person who exists separate and distinct from the Enterprise.

125.    At all relevant times, the Enterprise engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c).  The Enterprise's schemes entailed communications via email, telephone, and other forms of electronic communication between New York, California, Florida, Singapore, China, Canada, and other locations not known to Plaintiffs. Moreover, the Enterprise held and transferred funds and assets across state and international lines and used national and international financial institutions in furtherance of its schemes.

*Pattern of Racketeering Activity*

126.    Each Defendant has conducted and participated in, directly or indirectly, the management or operation of the Enterprise and its affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), in violation of 18 U.S.C. § 1962(c).  The Defendants have consistently and regularly committed acts of racketeering activity spanning from at least 2006 to the present; only Defendants know precisely when their schemes commenced.

Their schemes are continuing. Their multiple acts shared a common or related purpose, goal, result, participants, victims, and methods of commission.

127.    Defendants, through and using the Enterprise, engaged in a wide-ranging scheme to deceive and later extort Plaintiffs into joining a partnership designed to further their scheme to steal and export high technology for the benefit of the PRC military. When Plaintiffs refused to join the scheme and reported it to U.S. legal authorities, the Defendants coordinated a scheme of retaliation and intimidation to protect the Enterprise and punish Plaintiffs. This pattern of racketeering activity directed at Plaintiffs includes wire fraud via a pattern of fraudulent misrepresentations and material omissions as part of the scheme to defraud Plaintiffs into the Partnership, as well as other acts of wire fraud, extortion, witness intimidation, witness tampering and retaliation, attempted kidnapping, and obstruction of justice. As part of their original, larger scheme, Defendants also repeatedly conducted economic espionage, stole protected trade secrets, laundered money, and committed bank fraud, among other criminal acts.

128.    The Defendants, through and using the Enterprise, engaged in, and continue to engage in, a coordinated effort to accomplish these schemes. These coordinated efforts amount to a set of related predicate acts with similar purposes, results, and methods, both with respect to each scheme and in furtherance of the combined, related schemes. In its early stages, the Enterprise schemed to steal protected high technology for use by the PRC military. In furtherance of this scheme, it defrauded and mislead Plaintiffs into entering the Partnership, allowing the Enterprise to gain leverage to attempt to coerce and extort Plaintiffs to do their bidding to accomplish the aims of the Enterprise—i.e., to launder funds from Defendants to purchase semiconductor companies in the U.S. and plunder their technology in an effort to further the Chengdu Project. Once Plaintiffs refused to participate in this illicit activity and reported the Enterprise to law

enforcement, the Enterprise coordinated a scheme to retaliate against them for their suspected cooperation and to try to intimidate Plaintiffs against further cooperation. Defendants' retaliation and intimidation scheme, through and using the Enterprise, continues to this day, including through suspected Fox Hunt activities, Defendants' Singapore Action, efforts to domesticate and enforce multiple judgments obtained in the Singapore Action against Plaintiffs' employees (including Sophie Xu and Alice Zhang), Defendants' effort to mislead the Singaporean court into entering a worldwide freezing injunction designed to defund Dai's ability to protect his rights, and other activities that Plaintiffs will expose through the discovery process. These activities will likely continue unless and until Dai is repatriated under duress to the PRC. Defendants' technology theft scheme is also ongoing.

129.    Predicate acts directed at Plaintiffs include the following:

130.    Wire Fraud.    Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. 1343 (relating to wire fraud). A scheme to defraud includes any plan to deprive a person of something of value by trick, deceit, chicanery, or overreaching, including through affirmative misrepresentations, material omissions of fact, or any deceptive or dishonest behavior. As part of and in furtherance of the scheme to defraud Plaintiffs, the Defendants made repeated use of, or caused members of the Enterprise to repeatedly make use of, interstate wires to transmit various documents, communications, or payments, including with knowledge that the use of such wires would follow in the ordinary course of business or where such use could be reasonably foreseen. Each transmission constituted the transmittal by means of wire communication in interstate commerce of signals, sounds or writings for the purpose of executing or attempting to execute the scheme to defraud. Each of the Defendants, through their control of the Enterprise, knew of, and participated in, numerous acts of wire fraud. In particular,

each of the Defendants, through their control of the Enterprise, sent or caused to be sent numerous wire communications or acted with knowledge that wire communications would follow in the ordinary operation of the Enterprise, or could reasonably have foreseen that the wires would be used in the ordinary course of business as a result of the Defendants' acts. Each of the Defendants committed numerous additional and similar acts of wire fraud in furtherance of their scheme or artifice that will be proven at trial.

131.    For example, in furtherance of the scheme to defraud Plaintiffs, Luo, Yu, and Huang, with the knowledge and permission of the other Defendants, sent numerous electronic communications and/or made numerous phone calls to Plaintiffs that crossed interstate and international lines; these communications were transmitted from China and elsewhere to New York. These messages affirmatively misled Plaintiffs, located in New York, by reassuring Plaintiffs that the Enterprise intended to abide by the terms of the Partnership agreement, while hiding the fact that the Enterprise intended to use the Partnership as a means to provide financing and launder funds to further economic espionage.

132.    On information and belief, further discovery will reveal that, in furtherance of the scheme to defraud Plaintiffs, the Defendants and other members of the Enterprise, engaged in numerous additional email and phone communications that crossed state lines and international boundaries, including between China and New York, to coordinate and perpetuate the ongoing scheme. For example, on information and belief, Kerry Li, OST, and HuaXia GPT conducted a series of communications between China and New York to help coordinate the campaign aimed at ensuring Plaintiffs would invest in OST; and on information and belief, Yaping Chen, who was involved in the transfer of funds for Enterprise goals and efforts to steal technology for the Chengdu Project, coordinated with the Enterprise pursuant to procuring Plaintiffs' involvement to

launder funds for the Enterprise. Further discovery will also reveal additional actions taken by the Defendants in furtherance of the scheme to defraud Plaintiffs, including emails and other communications between and among the Defendants and the members of the Enterprise, and interstate wire payments and bank transfers in furtherance of the scheme. *See Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008) ("Indeed, even in the context of Federal Rule of Civil Procedure 9's more stringent pleading requirements . . . we have held that 'allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge.'") (citing *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1057 (2d Cir. 1993)).

133. Witness Tampering, Retaliation, and Obstruction of Justice. Section 1961(1) of RICO also provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1512 (relating to tampering with a witness, victim, or informant), 18 U.S.C. § 1513 (relating to retaliating against a witness, victim, or informant), or 18 U.S.C. § 1503 (relating to obstruction of justice). The numerous activities listed above, including but not limited to the coordinated negative press campaign, corruption of the Funds Association of China to revoke Khan Funds' financial license, inducement of Dai's younger sister to investigate him, burglary of the Khan Funds Singapore office, cyberattack, filing of fraudulent lawsuits in China and Singapore, filing of a false report to lead to the issuance of Dai's arrest warrant in the PRC, pervasive surveillance and investigation activities, attempted kidnapping, and death threats on social media amount to witness intimidation, witness retaliation, and obstruction of justice. Through this behavior, which Defendants targeted at Plaintiffs located in New York and Florida, Defendants attempted to intentionally harass Plaintiffs and thereby hinder, delay, prevent, or dissuade their reporting to a law enforcement officer of the United States. *See* 18 U.S.C. § 1512(d)(2). Additionally, through this behavior, Defendants attempted to knowingly use intimidation or threaten Plaintiffs with the

intent to hinder, delay, or prevent the communication to a law enforcement officer of the United States information relating to the commission or possible commission of a Federal offense. *See* 18 U.S.C. § 1512(b)(3). Defendants' activities also amounted to witness retaliation under 18 U.S.C. § 1513(b)(2): Defendants knowingly attempted to damage the tangible property of Plaintiffs, or threatened to do so, with the intent of retaliating against Plaintiffs for their cooperation with federal law enforcement. Both statutes provide for extraterritorial jurisdiction, providing standing for acts of intimidation or retaliation regardless of location. Through these activities, Defendants also violated 18 U.S.C. § 1503(a) by using threats or force in an attempt to obstruct or impede the due administration of justice.

134.    Extortion. Section 1961(1) of RICO also provides that "racketeering activity" includes any violation of 18 U.S.C. § 1951 or "any act or threat involving . . . extortion" that is "chargeable under State law and punishable by imprisonment for more than one year." Defendants and others devised, participated in, and executed a scheme to attempt to extort from Plaintiffs, among other things, RMB 300 million (approximately $42 million) in cash, RMB 10 million (approximately $1.5 million) in capital contributions to Zhongxinanxin, and the control of the Partnership, in violation of 18 U.S.C. § 1951 and New York Penal Law § 155.05(2)(e), which is punishable by imprisonment for more than one year. They did so by use of threats of force, violence, and fear. These threats included the threat to dissolve the Nations Investment-Khan Funds Partnership and threats to Dai's person, family, and associates. Defendants made good on at least some of these threats by leveraging the PRC judiciary to remove Dai from his position of control over the Partnership, by harassing Plaintiffs, by weaponizing Dai's family members against him, and by encouraging Dai's arrest and prosecution in the PRC.

135.   Kidnapping.  Section 1961(1) of RICO also provides that "racketeering activity" includes "any act or threat involving . . . kidnapping" that is "chargeable under State law and punishable by imprisonment for more than one year."  Defendants and others further devised, participated in, and executed a scheme to attempt to repatriate Dai to the PRC through a coordinated Fox Hunt campaign in violation of New York Penal Law § 135.20 (Kidnapping in the Second Degree).  In furtherance of this scheme, Defendants used Dai's sister to pressure and investigate him, conducted a cyberattack, filed a false report leading to the issuance of Dai's arrest warrant in the PRC, conducted pervasive surveillance activities, and issued death threats to Dai on social media.  Defendants committed these acts to carry forward their purpose of moving Dai from the United States to the PRC and preventing his escape by threat of deadly physical force.

136.   Money laundering.  Section 1961(1) of RICO also provides that "racketeering activity" includes any violation of 18 U.S.C. § 1956 (laundering of monetary instruments).  By commanding and extorting Plaintiffs to acquire semiconductor companies in the United States on behalf of the Partnership, and thus the Enterprise, Defendants attempted to transfer, transmit, or transport Enterprise funds infused into the Partnership to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of or to further their economic espionage and other specific unlawful activities in violation of 18 U.S.C. § 1956(a)(2)(A).  Defendants also repeatedly requested that Dai transfer RMB 300 million (approximately $42 million) to an entity of the Enterprise called Reach Perfect.  Specifically, they instructed Dai to split the transfers to the entity's HSBC account in Hong Kong and the entity's China Merchant Bank account in New York, the latter of which they had instructed Dai to create on behalf of the Enterprise to launder funds.  In doing so, Defendants knowingly attempted to cause the transfer, transmittal, or transportation of funds (a) from a place in the United States to or

through a place outside the United States and (b) to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of and further economic espionage and other specified unlawful activities in violation of 18 U.S.C. § 1956(a)(2)(A).

137.    Other predicate acts.  As part of their larger scheme to steal American technology for the benefit of the PRC military, Defendants committed a host of predicate acts starting in at least 2006 and continuing to this day.  Through their efforts to steal technology, they repeatedly violated 18 U.S.C. § 1831 (relating to economic espionage) and 18 U.S.C § 1832 (relating to theft of trade secrets).  By exporting these technologies out of the United States to their ultimate destination in the PRC, Defendants repeatedly violated 18 U.S.C. § 2314 (relating to the transportation in foreign commerce of any commodities and technologies converted or taken by fraud).  And through their efforts to fund the criminal activities of the Enterprise through U.S. bank accounts, including misleading Dai into creating the China Merchants Bank account for Enterprise use, Defendants repeatedly violated 18 U.S.C. § 1344 (relating to financial institution fraud) and 18 U.S.C. § 1956 (relating to the laundering of monetary instruments).

138.    The Enterprise's pattern of racketeering began at least in 2006 and is ongoing and open-ended.  The relentless and continuing pattern of acts of intimidation, retaliation, and harassment as part of the Enterprise's Fox Hunt effort suggests that the Enterprise will continue in their campaign unless and until Dai is repatriated to the PRC.  Such activity is even more likely given Plaintiffs' exposure of GPT and Kerry Li's involvement in the Enterprise's activities pursuant to this Amended Complaint.

139.    Each predicate act is part of the same continuous and overarching set of related schemes.  These instances of racketeering took place after 1970 and the last act occurred within ten years after the commission of a prior act of racketeering.

*Injury and Causation*

140.    The racketeering activity set forth herein was the direct and proximate cause of Plaintiffs' injuries.

141.    Due to reasonable fears to Dai's personal safety, Dai has incurred security personnel fees of $208,418.16, which continue to accrue.  Legal fees connected to Dai's attempted revocation of the arrest warrant issued against him in the PRC are in excess of $200,000 and continue to accrue; legal fees in furtherance of Dai's attempts to apply for asylum and protect against his extradition on account of Enterprise threats exceed $1 million; retainers for attorneys to contact on an emergency basis to protect Dai from any immediate threats that arise amounting to $75,000; and fees to report the Enterprise to the FBI on account of Enterprise threats were also substantial.  All of these expenses were paid from U.S. bank accounts and were the direct and proximate result of activities that occurred in or were directed to New York or Florida.

142.    The negative press campaign and announcement of Dai's arrest warrant led to severe reputational harm for Plaintiffs, which in turn had severe impacts on Plaintiffs' U.S. business operations.  In March 2018, First Republic denied custodian services for Khan Funds' planned U.S. hedge fund offerings, explicitly citing that Khan Funds had failed its basic background check due to the false and defamatory allegations made by the Enterprise.  Without clearing their reputations, Plaintiffs cannot maintain the trust of U.S. financial players or financial institutions to successfully participate in hedge fund offerings.  As Khan Funds waits to deploy its long-cultivated expertise and carefully built infrastructure to participate in these offerings, it remains liable for monthly overhead expenses in excess of $200,000, not to mention the millions in expectancy damages of lost management fees and related fund profits that would have otherwise flowed to Plaintiffs in the absence of the Enterprise's activities.  On information and belief, these

reputational harms also prompted China Merchants Bank to revoke Khan Funds' account. Khan Funds did ultimately find a willing banker in Signature Bank around October 2020, but the terms of that relationship were significantly worse that what Khan Funds had enjoyed with China Merchants Bank, amounting to tens of thousands of dollars in added expenses. All of these expenses were paid from U.S. bank accounts and were the direct and proximate result of activities that occurred in or were directed to New York.

143.    The Enterprise's burglary of the Singapore office caused Dai to expend over $50,000 in investigative fees. These expenses were paid from U.S. bank accounts. The Enterprise's cyberattack, in which the Enterprise accessed and stole confidential documents from computers located in New York, caused Plaintiffs to incur legal fees relating to advice following the attack, as well as the added expenses of implementing enhanced protections from cyberattack. These expenses were paid from U.S. bank accounts and were the direct and proximate result of activities that occurred in or were directed to New York and/or Florida.

144.    Plaintiffs also relied on the Enterprise's false and misleading representations to their detriment, including by entering into the Partnership Agreement and expending huge sums pursuant to the Partnership. As a result of this fraudulent scheme, Plaintiffs spent in excess of $1 million on the effort to identify suitable biomedical candidates and huge sums building the internal infrastructure and capacity to handle the expected transactions, including hiring a biomedical expert. Through this fraudulent scheme, the Enterprise ensnared Dai into a Partnership with a criminal enterprise. As a direct result of his entanglement with these nefarious criminal actors who threatened violence against Dai, his family, and his associates, Dai was forced to dissolve their Khan Funds China operation, resulting in the liquation of all fourteen hedge funds under Khan Funds management to protect and return the capital of Dai's investors. As a direct result of

these forced and premature liquidations, Dai was contractually obligated to pay RMB 10 million

(approximately $1.5 million) to compensate former clients and employees in addition to various

penalties and damages.  Dai also suffered a loss of the expectancy of $150 million in lost

management fees and profits that would have otherwise accrued to Plaintiffs.  And because

Plaintiffs made sizable investments in their U.S. operations around the expectancy interest of the

growth of Khan Funds China and the growth pursuant to the Partnership, with the aim that clients

of Khan Funds China would become clients of Khan Funds U.S. based funds, Khan Funds suffered

U.S.-based losses.  Additionally, as a result of the dissolution of Khan Funds China, Khan Funds'

suffered from the loss of Khan Funds China's employees, who provided critical operational

assistance to Khan Funds' American and global operations.  All of these damages were the direct

and proximate result of fraudulent and extortionate activities that occurred in or were directed to

New York.

145.    Through its continuing activities in the Singapore action, the Enterprise has caused

Dai to incur over $1.5 million in legal fees.  Further, as Defendants seek domestication and

enforcement activities in the United States, the Enterprise seeks to enforce fraudulently obtained

judgements gained against Plaintiffs' employees by domesticating the judgment in the state of

Florida, where Xu and Zhang currently reside.  It also plans to seek to domesticate any judgment

obtained against Dai in Florida or New York.  If Defendants are successful in these efforts, the

judgements will amount to further domestic losses for Plaintiffs as a direct result of the fraudulent,

extortionate, and criminal scheme.

146.    In addition to the damages alleged above, Plaintiffs have suffered an enormous

emotional toll as a result of the Enterprise's racketeering activity.  For example, the Enterprise

caused Dai constant fear for his safety and that of his loved ones, being blacklisted from his home

country, loss of family and friends, the implosion of his business, and the shame of being rejected

by financial institutions and even a surrogacy organization due to the Enterprise's press campaign.

Dai has spent tens of thousands of dollars on treatment for depression as a result of these harms.

<p align="center"><em>Timeliness</em></p>

147.    The civil RICO allegations are timely.  Civil RICO imports its four year statute of

limitations from the Clayton Act.  Numerous predicate acts were committed, and injuries caused,

within the four years prior to the commencement of the instant lawsuit.

148.    In addition, predicate acts causing injuries discovered after October 31, 2015 are

actionable and timely due to the operation of Section 16(i) of the Clayton Act.  Section 16(i) tolls

the statute of limitations for a plaintiff if the government files a parallel criminal complaint, and

courts apply the same provision to civil RICO.   Tolling runs through the pendency of the

enforcement proceeding plus an additional year thereafter.  15 U.S.C. § 16(i).  Section 16(i) tolling

applies against "all participants in a conspiracy which is the object of a Government suit, whether

or not they are named as defendants or conspirators therein."  *Zenith Radio Corp. v. Hazeltine

Rsch., Inc.*, 401 U.S. 321, 336 (1971).  Even if "the government does not prove that a specific

defendant was a co-conspirator, § 16(i) may still apply if the later private plaintiff can prove as

much."  *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 885 F. Supp. 2d 617, 629 (S.D.N.Y. 2012)

(citing *Zenith Radio Corp.*, 401 U.S. at 335).  Nor does the conspiracy pleaded by a private plaintiff

need to have "the same breadth and scope in time and participants as the conspiracy described in

the government action."  *Discover Fin. Servs. v. Visa U.S.A. Inc.*, 598 F. Supp. 2d 394, 403

(S.D.N.Y. 2008) (citing *Leh v. General Petroleum Corp.*, 382 U.S. 54, 63 (1965)).  If there is a

"significant, although incomplete, overlap of subject matter, the statute is tolled even as to the

differences."  *Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 830 (citing *Leh*, 382

U.S. 54). Here, DOJ brought a criminal complaint against Yi-Chi Shih on January 19, 2018 and issued a formal indictment for Yi-Chi Shih, Ishiang Shih, and Yaping Chen, among others, on October 18, 2018. Yi-Chi Shih was convicted on June 26, 2019, and Chen and Ishiang Shih remain fugitives at large. As alleged, Luo recruited Chen, Yi-Chi Shih and Ishiang Shih into the Enterprise and served as the mastermind behind the activities laid out in their indictments. In doing so, Luo and Sun provided the orders and directions coordinating the theft and export of the technology. Luo and Sun financed and directed Chen using Enterprise funds provided by Nations, and in turn, Chen used Enterprise funds to finance and pay Shih and other co-conspirators as compensation for their work in the development of the high technology industries in the PRC. For example, in 2011, Luo and Sun coordinated with Chen to finance the activities of the Enterprise, who then made a series of payments to Shih, all in furtherance of Enterprise objectives. Further, through Chen's 2017 partnership with Nations for the Chengdu Project—for which Nations provided Chen's team RMB 100 million (approximately $14 million)—Chen worked with Luo, Sun, and Nations, as well as the larger Enterprise, to develop and produce semiconductor wafers at a foundry in Chengdu province. Nations' 2017 annual report stated that Yaping Chen and his technical team contributed the necessary designs and expertise to manufacture of the wafers. In recorded conversations, Luo repeatedly mentions the project, land acquisition related to this project, and Chen's contribution to the project. Based on the fact that Luo's relationship with Chen began around the time Yi-Chi Shih began his economic espionage; Chen's payments to Yi-Chi Shih and Ishiang Shih as described in their indictment; the nature of Chen's "team" of experts as described in Luo's recorded conversations that align with Yi-Chi Shih's espionage activities; and the fact that Chen's "rear team" in Canada began its work around the time Ishiang Shih exported semiconductor technology from Canada, on information and belief, Yi-Chi Shih and Ishiang Shih were key

participants in the Enterprise. Accordingly, the activities for which Yi-Chi Shih was arrested, indicted, and convicted, and for which Ishaing Shih was also indicted, were part and parcel of the Enterprise's effort. Therefore, tolling based on Yi-Chi Shih's arrest, which established a parallel case prosecuting Enterprise activities, provides that injuries discovered after October 31, 2015 are actionable under the statute of limitations.

149.    Alternatively, the pendency of an FBI investigation related to a private complaint provides a basis for equitable tolling of the statute of limitations. On the repeated and consistent legal advice of numerous counsel, Plaintiffs did not file this complaint in order to maintain the confidentiality of the FBI investigation. At great personal risk, Dai repeatedly and consistently met with the FBI from September 2017 through January 2020, providing critical information on an issue of grave national security. Because it would be inequitable to penalize Dai for cooperating with the FBI and accordingly deferring filing suit, equitable tolling for the period of this investigation should apply, establishing that all RICO-related allegations in this Amended Complaint are timely.

### SECOND CLAIM FOR RELIEF
### (Conspiracy To Violate Civil RICO, 18 U.S.C. § 1962(d) – Against All Defendants)

150.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

151.    Defendants have knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

152.    By and through each of the Defendants' close and longstanding business relationships with one another, and their close coordination with one another in the affairs of the Enterprise, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond the Defendant's individual role. Moreover, through the same

connections and coordination, each Defendant knew that the Defendants were engaged in a conspiracy to commit the predicate acts detailed above, and that the predicate acts were part of a pattern of racketeering activity, and each agreed to pursue the same criminal objective.

153.   Each Defendant agreed to facilitate, conduct, and participate in the conduct management, or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), as set forth above.  In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared the common purposes of stealing high technology for the benefit of the PRC military and retaliating against and intimidating Plaintiffs for refusing to participate in the original scheme and reporting it to U.S. law enforcement authorities.  In the absence of an agreement, the Enterprise could not have operated as it did.  Further evidence of an agreement among the Defendants is particularly within the control of the Defendants.

154.   The participation and agreement of each of the Defendants was necessary to allow the commission of this pattern of racketeering activity.  Plaintiffs have been and will continue to be injured in its business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.  The injuries to Plaintiffs directly and proximately resulting from these violations of 18 U.S.C. § 1962(d) include, but are not limited to, legal fees related to the attempted revocation of the PRC arrest warrant; legal fees to protect against extradition; legal fees to defend against the spurious litigation filed by Defendants in Singapore; fees relating to reporting the Enterprise to the FBI; fees to investigate Defendants' various acts of wrongdoing; overhead in managing Khan Funds as it waits to clear its name to participate in hedge fund offerings; and sums spent in reliance on Defendants' misrepresentations related to the Partnership Agreement.

### THIRD CLAIM FOR RELIEF
### (Common Law Fraud – Against Defendants Nations, Nations USA, Nations Investment, Luo, Yu, and Huang)

155.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

156.    Prior to and following the execution of the Partnership Agreement, Defendants Nations, Nations USA, Nations Investment, Luo, Yu, and Huang (the "Common Law Fraud Defendants") made a series of material misrepresentations by conveying, *inter alia*, that they intended to follow and support Plaintiffs' plans to acquire biomedical entities. The Common Law Fraud Defendants also made numerous material omissions by failing to disclose, *inter alia*, that they did not intend to abide by the exclusive authority clauses of the Partnership Agreement (despite knowing at the time that they had no plans to do so) and by failing to disclose that they intended to co-opt the Partnership into a vehicle to acquire semiconductor companies for the purpose of espionage. The Common Law Fraud Defendants then doubled down on these material misrepresentations and omissions over the next two years. These material misrepresentations and omissions include but are not limited to:

    i.  Phone calls between Yu (China) and Dai (New York) in October to November 2015. During these calls, Yu indicated that the Partnership negotiations were continuing and that he would work with Dai's associates to finalize the deal. Yu omitted that Nations Investment was negotiating in bad faith, did not plan to abide by the heavily negotiated agreement, would refuse to honor the exclusive investment authority for which Dai had negotiated, had no interest in pursuing Dai's biomedical investments strategy, and intended to use the Partnership as a vehicle for economic espionage. Dai entered the Partnership with Nations Investment in reliance on these omissions of material fact.

    ii. Phone calls between Huang (China) and Dai (New York) beginning in October 2015 and continuing until November 2017 occurring approximately once a month. During these calls, Huang asked about the status of the Partnership as well as Dai's relationship with Luo. On information and belief, Huang conducted these calls at the direction of or in concert with Luo to encourage Dai to continue with the Partnership and gather information on Dai's perspective and intentions in furtherance of the scheme. During these calls, Huang omitted that he was soliciting Dai to join a criminal conspiracy devoted to the theft of semiconductor technology and omitted that Luo and Nations Investment did not intend to abide by the

agreement or pursue Dai's biomedical investment strategy. Dai relied on Huang's representations relating to Luo and the Partnership to continue to spend money pursuant to Partnership goals.

iii.   Phone call between Luo (China) and Dai (New York) on February 2, 2016. Luo asked Dai to create Zhongxinanxin, a semiconductor-focused fund for the purposes of a profitable investment opportunity. Luo omitted that he actually intended for Zhongxinanxin to serve as a money laundering entity for the Enterprise to further its espionage activities. Dai created the fund and continued to spend money in furtherance of the Partnership in reliance on Luo's apparent good faith representation.

iv.   Phone call between Luo (China) and Dai (New York) in March 2016. Luo requested that Dai open a bank account for Luo in New York as a "personal favor." Luo omitted that he actually intended for the Enterprise to use the account to launder money in furtherance of its espionage activities. In reliance on Luo's statement, Dai opened the bank account and continued to spend money in furtherance of the Partnership.

v.    Discussion between Luo and China in New York in May 2016. Luo requested that Dai acquire a semiconductor company in furtherance of the Partnership. Luo omitted that he actually intended for the semiconductor acquisition to further the Enterprise's espionage activities. Dai declined the request but continued to spend money in furtherance of the Partnership in reliance on Luo's apparent good faith in making the request.

vi.   Phone call between Yu (China) and Dai (New York) in June 2016. Dai relayed his suspicions that Luo did not seriously intend to invest in the biomedical industry; Yu reassured him that his fears were irrelevant and told him to proceed as originally planned. Unbeknownst to Dai, Yu was placating and misleading Dai so that Nations could facilitate an additional capital contribution and bring more money to the United States to further the Enterprise's aims. Dai relied on this misrepresentation to go forward with Nations' RMB 200 million (approximately $29 million) capital contribution and continue to spend money in furtherance of the Partnership.

vii.  Phone call between Yu (China) and Dai (New York) in August 2016. Yu told Dai that Luo was angry with Dai's refusal to move forward with the semiconductor acquisition and threatened the termination of the Partnership if Dai did not meet Luo's demand. Yu omitted that the Enterprise intended for Dai to make this acquisition to further economic espionage. Dai relied on this material omission to continue to spend money in furtherance of the Partnership.

157.   Plaintiffs reasonably relied on the Common Law Fraud Defendants' false and misleading representations and omissions to their detriment by, *inter alia*, entering into the

Partnership Agreement and expending significant sums of money pursuant to the Partnership Agreement and for the benefit of the Partnership, suffering damages as a result. As a result of these misrepresentations and omissions, Plaintiffs spent in excess of $1 million on the effort to identify suitable biopharma candidates and huge sums building the internal infrastructure and capacity to handle the expected transactions, including hiring a biopharma expert. They have not been able to recover these sums because the Common Law Fraud Defendants knew from the outset that they had entered the Partnership on false pretenses and without any intent to fulfill their obligations or to support acquisitions within the scope of the parties' agreement and understanding. Plaintiffs also planned their operations around the expectancy interest that some clients of Khan Funds China would become Dai's clients in his Khan Funds U.S. based funds, which has led to huge losses in potential income.

158.    The Enterprise's representations and omissions were material. For example, they amounted to promises that the execution of a massive investment partnership would be fulfilled, and thereby induced Plaintiffs to enter into the Partnership and to expend resources in executing on the agreed-upon Partnership terms.

159.    Plaintiffs' reliance on the affirmative misrepresentations and omissions set forth herein was reasonable, including due to the formality of the highly negotiated Partnership Agreement and the reputation of Luo, Sun, and Nations. Plaintiffs could not have reasonably known that Nations, Luo, Sun and others were misleading them in an attempt to exploit them to launder money to help steal high technology for the PRC military.

160.    In New York, fraud claims have a statute of limitations of six years. N.Y. C.P.L.R. § 213(8). Governor Cuomo's Executive Order No. 202.8 extended tolling deadlines by 228 days.

With an original filing date of April 7, 2022, this Order allows for injuries caused from this fraud

discovered after August 23, 2015 to be actionable.  As such, all fraud allegations are timely.

## FOURTH CLAIM FOR RELIEF
### (Violation Of Computer Fraud And Abuse Act, 18 U.S.C. § 1030 – Against Defendants Nations, Nations USA, Luo, and Sun)

161.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

162.    Khan Funds' computers and servers are used in or affect interstate and foreign

commerce and communication through their facilitation of Khan Funds' international business,

and are therefore protected computers pursuant to 18 U.S.C. § 1030(e)(2).  These computers and

servers are located in New York.

163.    Defendants Nations, Nations USA, Luo, and Sun, directly or through agents

working at their direction and control, intentionally accessed Khan Funds' protected computers or

servers without authorization to obtain information from protected American computers or servers,

including confidential contracts and other sensitive internal documents, in violation of 18 U.S.C.

§ 1030(a)(2)(C).  Plaintiffs took reasonable measures to protect this confidential information,

including by hosting it on Plaintiffs' servers and protecting it behind passwords and other security

measures.

164.    In or around June 2021, Plaintiffs learned that confidential documents were stolen

only after reviewing the initiating documents provided by Dai's Singaporean counsel, which

included notice of the filing of certain documents obtained from Khan Funds' protected computer

servers.  These documents could only have been obtained through Defendants' illegal accessing

of Khan Funds' protected computers or servers.

165.    Plaintiffs suffered damage by reason of these violations, including the exposure of

confidential documents, expenses from being forced to investigate the unauthorized access and

abuse of its computers and servers, with other losses and damages in an amount to be proven at trial, over $5,000 aggregated over a one-year period.

## JURY TRIAL DEMAND

166.    Plaintiffs demand a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants on all claims, and request a judgment providing the following relief:

i.      Judgment in Plaintiffs' favor and against Defendants on all causes of actions;

ii.     For compensatory damages in an amount to be proven at trial;

iii.    For punitive damages and exemplary damages according to proof at trial;

iv.     For treble damages pursuant to 18 U.S.C. § 1964(c) and 18 U.S.C. § 1964(d);

v.      For an injunction directing Nations Investments to dismiss the Singaporean action;

vi.     For an injunction directing Nations Investments to take such steps and actions as are necessary to effectuate Dai's reinstatement to his position as director of the Partnership and to effectuate the transfer to Plaintiffs of all Khan Funds and Beijing Khan assets and funds seized by the Enterprise;

vii.    For an injunction prohibiting Nations Investment from purporting to domesticate, confirm, or enforce the PRC or any Singaporean judgment against Plaintiffs or their employees, including Sophie Xu and Alice Zhang, in any U.S. state or federal jurisdiction;

viii.   For an order, pursuant to 18 U.S.C. § 1964(a), directing Defendants to divest themselves of any interest, direct or indirect, in the RICO Enterprise and its profits;

ix.     For an order, pursuant to 18 U.S.C. § 1964(a), prohibiting Defendants from engaging with one another in the same type of endeavor as the Enterprise engaged in previously or is currently engaged in;

x.      For costs of suit incurred herein;

xi.     For prejudgment interest;

xii.    For attorneys' fees and costs, including as warranted by applicable laws; and

xiii.   For such other and further relief as the Court may deem to be just and proper.

Dated:
December 12, 2022

By:    /s/ *Akiva Shapiro*

Akiva Shapiro
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035
ashapiro@gibsondunn.com

*Attorneys for Plaintiffs*

Case 1:24-cv-03142-UA    Document 1-4    Filed 04/24/24    Page 349 of 377

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GUOTAIQIXING BIOMEDICAL
INTERNATIONAL (S) PTE. LTD.,

                                   Plaintiff,            Index No. _____

                    -against-

XUEFENG DAI,

                                   Defendant.

## MEMORANDUM OF LAW IN SUPPORT OF GUOTAIQIXING BIOMEDICAL INTERNATIONAL (S) PTE. LTD.'S MOTION FOR SUMMARY JUDGMENT IN LIEU OF COMPLAINT

**NORTON ROSE FULBRIGHT US LLP**
1301 Avenue of the Americas
New York, New York 10019
Tel:    (212) 318-3000
Fax:    (212) 318-3400

*Attorneys for Plaintiff  Guotaiqixing Biomedical International (S) Pte. Ltd*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................. 1

BACKGROUND ..................................................................................................... 2

   I.    The Parties ................................................................................................ 2

   II.   The Joint Venture And Diversions Therefrom ............................................ 3

   III.  The Singapore Action ................................................................................ 5

      A.   Dai's Transfers of Assets And Resulting Interim Freezing Order .................. 6

      B.   The Final Singapore Judgment ................................................................ 7

ARGUMENT ......................................................................................................... 8

   I.    Legal Standard ........................................................................................... 8

      A.   Summary Judgment In Lieu Of Complaint .................................................. 8

      B.   Uniform Foreign Country Money-Judgments Recognition Act ..................... 9

   II.   The Singapore Judgment Is Final, Conclusive, Enforceable, and Preclusive ............... 10

   III.  There Is No Valid Basis For This Court To Refuse To Recognize The Singapore Judgment ..................................................................................................... 12

      A.   The Three Mandatory Grounds Do Not Provide a Basis for Denying Recognition ...... 12

          1.   The Singapore System is Impartial And Affords Due Process ................... 12

          2.   The Singapore Court Had Personal Jurisdiction Over Dai ........................ 13

          3.   The Singapore Court Had Subject Matter Jurisdiction .............................. 14

      B.   None of the Permissive Grounds for Nonrecognition Apply ......................... 14

      C.   Although Not Required, This Court Has Personal Jurisdiction Over Dai .................. 16

CONCLUSION ..................................................................................................... 17

CERTIFICATION OF COUNSEL ............................................................................. 20

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 351 of 377

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abu Dhabi Com. Bank PJSC v. Saad Trading, Contracting & Fin. Servs. Co.*,
   117 A.D.3d 609 (1st Dep't 2014) ...........................................18

*Ackermann v. Levine*,
   788 F.2d 830 (2d Cir. 1986)................................................15

*Akhmedova v. Akhmedov*,
   189 A.D.3d 602 (1st Dep't 2020) ...........................................16

*Alfadda v. Fenn*,
   966 F. Supp. 1317 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 41 (2d Cir. 1998) .................11

*Baker & McKenzie Zurich v. Frisone*,
   47 Misc. 3d 1227(A), (Sup. Ct. Nassau Cty. 2015) ................................18

*Batbrothers LLC v. Paushok*,
   101 N.Y.S.3d 297 (1st Dep't 2019) ..........................................9

*Bond v. Lichtenstein*,
   11 N.Y.S.3d 63 (1st Dep't 2015) ............................................8

*Can. Imperial Bank of Com. v. Saxony Carpet Co.*,
   899 F. Supp. 1248 (S.D.N.Y. 1995), *aff'd*, 104 F.3d 352 (2d Cir. 1996) .........15, 16

*CIBC Mellon Tr. Co. v. Mora Hotel Corp.*,
   743 N.Y.S.2d 408 (1st Dep't 2002), *aff'd*, 100 N.Y.2d 215 (2003) ...........10, 13, 15

*D & R Glob. Selections, S.L. v. Bodega Olegario Falcon Pineiro*,
   29 N.Y.3d 292 (2017) .....................................................17

*Gemstar Can., Inc. v. George A. Fuller Co.*,
   6 N.Y.S.3d 552 (2d Dep't 2015)..........................................8, 9, 10

*ICC Chem. Corp. v. TCL Indus. (Malaysia) SDN*,
   206 F. App'x 68 (2d Cir. 2006) ...........................................11, 12

*Italverde Trading, Inc. v. Four Bills of Lading*,
   2009 WL 499502 (E.D.N.Y. Feb. 27, 2009).....................................11

*J.G. Mailaender Druckmaschinenfabrik GmbH & Co. K.G. v. Otto Isenschmid Corp.*,
   450 N.Y.S.2d 533 (2d Dep't 1982)...........................................10

*John Galliano, S.A. v. Stallion,*
   15 N.Y.3d 75 (2010) ..................................................................................8, 16

*Kensington Int'l Ltd. v. Itoua,*
   505 F.3d 147 (2d Cir. 2007)........................................................................9, 12

*Kim v. Co-op. Centrale Raiffeisen-Boerenleebank B.A.,*
   364 F. Supp. 2d 346 (S.D.N.Y. 2005).............................................................12

*L & R Explor. Venture v. Grynberg,*
   22 A.D.3d 221 (1st Dep't 2005) .....................................................................17

*Reg'l Mun. of York v. LeBlanc,*
   207 A.D.3d 1033 (4th Dep't 2022).................................................................16

*In re Sayeh R.,*
   91 N.Y.2d 306 (1997) ....................................................................................17

*Sea Trade Mar. Corp. v. Coutsodontis,*
   978 N.Y.S.2d 115 (1st Dep't 2013) ................................................................10

*Standard Chartered Bank v. Ahmad Hamad Al Gosaibi & Bros. Co.,*
   957 N.Y.S.2d 602 (Sup. Ct. N.Y. Cnty. 2012) ...............................................13

*Sung Hwan Co. v. Rite Aid Corp.,*
   850 N.E.2d 647 (N.Y. 2006)........................................................................9, 15

*USI Sys. AG v. Gliklad,*
   176 A.D.3d 555 (1st Dept. 2019)....................................................................13

*Weissman v. Sinorm Deli, Inc.,*
   88 N.Y.2d 437 (1996) ......................................................................................8

*Wells, Fargo & Co. v. Davis,*
   105 N.Y. 670 (1887) .......................................................................................18

*Wimmer Can., Inc. v. Abele Tractor & Equip. Co.,*
   299 A.D.2d 47 (3d Dep't 2002) ......................................................................14

**Rules and Statutes**

CPLR § 302.......................................................................................................17

CPLR § 3213.......................................................................................................8

CPLR § 5004.....................................................................................................18

CPLR § 5302.....................................................................................................11

iv

CPLR § 5303 .................................................................................................................... 10

CPLR § 5304 ............................................................................................................... *passim*

CPLR § 5305 .................................................................................................................... 13

Judiciary Law §27 ............................................................................................................ 18

**Other Authorities**

Gary Chan Kok Yew, *Access to Justice for the Poor: The Singapore Judiciary at Work*, 17 Pac. Rim L. & Pol'y J. 595 (2008) .......................................................... 12

Karen Blochlinger, *Primus Inter Pares: Is the Singapore Judiciary First Among Equals*, 9 Pac. Rim L. & Pol'y J. 591 (2000) ...................................................... 12

Restatement (Second) of Judgments § 13 ........................................................................ 10

Weinstein, Korn & Miller, New York Civil Practice: CPLR ¶ 5302.01 (David L. Ferstendig ed., LexisNexis Matthew Bender 2d Ed.) ....................................... 10, 11

v

Plaintiff Guotaiqixing Biomedical International (S) Pte. Ltd. ("GTQX" or "Plaintiff") respectfully submits this Memorandum of Law in support of its Motion for Summary Judgment in Lieu of Complaint (the "Motion") against Defendant Xuefeng Dai ("Dai" or "Defendant"), pursuant to New York Civil Practice Law and Rules ("CPLR") Sections 3213 and 5301 *et seq.* (the "Recognition Act"), to recognize and enforce a foreign judgment in Plaintiff's favor in the amount of $34,264,935.99 USD, plus $290,153.97 Singapore Dollars ("SGD"), pre-judgment interest on the foregoing sums amounting to $13,626,721.72 USD and $99,768.80 SGD, respectively, with post-judgment interest accruing at 9% per annum from June 27, 2023, the date of the foreign judgment, costs fixed at $100,000 SGD with post-judgment interest thereon accruing from June 28, 2023 at the same rate, and to award such other and further relief as the Court deems just and proper.

In support of the Motion, Plaintiff states as follows:

## PRELIMINARY STATEMENT

On June 27, 2023, the General Division of the High Court of Singapore (the "Singapore Court") entered final judgment in favor of GTQX and against Dai (the "Singapore Judgment," and the preceding litigation, the "Singapore Action").

Dai was a director of GTQX during the material time, and thereby owed fiduciary duties (including statutory duties under Singapore law) to the Plaintiff. In breach of his duties to GTQX, Dai undertook a series of diversions, resulting in the transfer of almost $35 million of GTQX's funds to himself, his associates, and entities he controls. After the diversions were complete in 2017, Dai abruptly ceased all communications and absconded to New York.

GTQX initiated the Singapore Action on October 27, 2020 against Dai and two of his associates asserting among other claims, breach of fiduciary duty, dishonest assistance, and conspiracy by lawful and unlawful means, seeking return of the diverted funds. Dai appeared

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 355 of 377

voluntarily in the Singapore Court through counsel and vigorously defended himself on the merits. In the course of his defense, Dai admitted that he diverted the funds from GTQX.  Further, during the pendency of the litigation, GTQX discovered that Dai had transferred or sold certain real properties, held through a complex web of entities, with the intention of concealing them from judgment creditors.  The Singapore Court agreed that Dai's mid-litigation transfers gave "rise to concerns that he was trying to dissipate his assets pending the adjudication of the Plaintiff's claim against him" and on December 8, 2022, entered an interim injunction enjoining Dai from transferring or selling any assets until further hearing (the injunction was extended at a further hearing on January 12, 2023 until the final adjudication of the Singapore Action).  Upon entry of the injunction, Dai discharged his counsel and ceased participating in the litigation, resulting in his defense being struck out and the Singapore Judgment being entered by default on June 27, 2023. The Singapore Judgment is the only judgment against Dai for the funds he diverted, and it remains unsatisfied.  Because the judgment is final, enforceable, and unencumbered by any statutory grounds for non-recognition, GTQX seeks summary judgment in lieu of complaint to recognize and enforce the Singapore Judgment against Dai in New York.

## **BACKGROUND**

### I.     **The Parties**

Plaintiff GTQX is a company incorporated in Singapore.  *See* Affirmation of Liang Hanwen Calvin in Support of Plaintiff's Motion for Summary Judgment in Lieu of Complaint ("Liang Aff.") ¶ 7.  It is a wholly-owned subsidiary of Shenzhen Guotaiqixing Industry Investment Fund Management Centre LLP (the "Limited Partnership"), a limited partnership formed under the laws of the People's Republic of China (the "PRC").  *Id*.  At all times prior to May 2019, the partners of the Limited Partnership were limited partner Qianhai Nations Investment Management Co., Ltd., ("Nations Investment") and general partner Beijing Khan Pharmaceutical Holdings Co.,

Case 1:24-cv-03142-UA Document 1-4 Filed 04/24/24 Page 356 of 377

Ltd. ("Beijing Khan"). *See id.* ¶ 6, Exhibits ("Exs.") 1, ¶ 3 & Ex. 2, ¶ 3. Dai wholly owns Beijing Khan. *See* Affirmation of Benjamin D. Bloodstein in Support of Plaintiff's Motion for Summary Judgment in Lieu of Complaint ("Bloodstein Aff."), Ex. A, ¶ 19. The Limited Partnership is an investment fund in which Nations Investment invested approximately $75 million USD[1] to be managed by Beijing Khan pursuant to a joint venture between it and Nations Investment (the "Joint Venture") memorialized by the parties' partnership agreement dated November 23, 2015 (the "Partnership Agreement"). *Id.* ¶ 63.

Dai (referred to in the Singapore Action as "1st Defendant") is a current or former citizen of the PRC and currently lives in Florida. *See* Bloodstein Aff. Ex. B, ¶ 20. Dai lived in New York from 2015 until at least March 2020. *Id.* During that time, Dai initiated several legal actions, including an ongoing litigation against Nations Investment, and also at least three wide-ranging complaints primarily against PRC-based corporations and their officers. *See* Bloodstein Aff. ¶ 5.

In addition to Beijing Khan, Dai conducts business through several "wholly-owned affiliated entities located in China, Singapore, and elsewhere." *See* Bloodstein Aff. Ex. A, ¶ 53. The "global headquarters for all of Dai's affiliated businesses" including Beijing Khan and the "umbrella parent company" to all of Dai's wholly-owned entities is Khan Funds Management America, Inc. ("Khan Funds"), a New York corporation with its principal place of business in New York County. *Id.* ¶¶ 6, 19, 53.

## II.     The Joint Venture And Diversions Therefrom

Pursuant to the Partnership Agreement, Beijing Khan, by and through Dai, agreed to invest funds into the Limited Partnership and to honestly and diligently maximize returns on the investment monies through equity, debenture and other investments. Liang Aff. Ex. 2, ¶ 47(a).

---

[1] For simplicity, except where otherwise specified, currency is converted to USD using current exchange rates.

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 357 of 377

Dai was also a director of GTQX, and Beijing Khan through Dai was granted the exclusive power to manage the operations of the Limited Partnership and to make all investment decisions. *Id*. Ex. 3 § 2.6.5.

Beginning on or about December 23, 2015, Dai caused the Limited Partnership to transfer to Plaintiff GTQX about $34.5 million USD of the funds that Nations Investment had paid to the Limited Partnership, which were subsequently diverted to entities Dai controls, including Khan Funds, as well as Khan Funds Global Limited ("KFG") and Khan Funds Oriental Medicine Fund SPC (the "Diversions"). Liang Aff. Ex. 4, ¶ 19. The Diversions continued for more than 27 months between December 2015 and April 2017 but were concealed to give the appearance that the funds transferred were being used in relation to genuine investments; many were given manufactured justifications such as "consultancy fee." *Id*. ¶¶ 19, 51. For example, transfers to Khan Funds in the sum were recorded as "loan[s]," but there were no genuine loan agreements between GTQX and Khan Funds, and in any event, notwithstanding that the tenures for the purported loans all expired, none of the purported "loans" have been repaid, and no interest has been paid to Plaintiff thereon. *Id*. ¶ 53(d) & (j).

In December 2016, following a routine audit of the Limited Partnership, it was revealed that Shenzhen Qianhai Khan Fund Management Co., Ltd., another of Dai's Khan entities, owed significant sums to, and was owed significant sums by, the Limited Partnership, and that only limited investment had been made into derivatives, raising questions about the Limited Partnership's investment activity. *Id*. ¶¶ 57-60. Soon thereafter, Dai absconded from the PRC and moved to New York, and in or around November 2017, it was discovered that the Limited Partnership had vacated its office. *See id*. ¶ 67. By this time, Dai had cut off all contact with and ceased to carry out his responsibilities to the Limited Partnership and GTQX. *Id*. ¶ 68.

4

Subsequently, in early 2019, Beijing Khan was removed as a partner of the Limited Partnership. *Id*. ¶ 8.

### III. The Singapore Action

On October 27, 2020, GTQX filed a lawsuit in in the Singapore Court against Dai and two of Dai's associates to recover the funds that they improperly diverted from GTQX for their own benefit. *See* Liang Aff. Ex. 1. Dai initially appeared through counsel and filed an application to contest service and personal jurisdiction. *See* Liang Aff. ¶ 10. The parties tendered extensive written submissions to the Court on Dai's application, and the Singapore Court held two hearings on October 15, 2021 and November 15, 2021, before dismissing Dai's application at the second hearing. *Id.* Ex. 5. Dai appealed, and the Singapore Court held hearings on January 11, 2022, March 15, 2022, and May 11, 2022. Liang Aff. ¶ 11. At the third hearing on May 11, 2022, the Singapore Court dismissed Dai's appeal and ordered Dai to pay costs to Plaintiff. *See id*., Ex. 6.

Shortly thereafter on June 2, 2022, Dai filed his written defense on the merits, which he subsequently amended on June 17, 2022. *See id*., Exs. 7-8. Dai then filed another application seeking a stay on the basis that the Singapore Court was not a convenient forum for the dispute. Liang Aff. ¶ 14. The parties again tendered extensive written submissions to the Court on Dai's further application, and further hearings were held on September 9, 2022 and September 16, 2022, which Dai again attended through counsel. *Id*. At the second hearing on September 16, 2022, the Singapore Court again dismissed Dai's application. *See id*., Ex. 10.

In the midst of his defense, in an affidavit sworn to and filed by Dai by and through counsel on July 8, 2022, Dai conceded that he "transferr[ed] the monies from the Plaintiff to the various Khan entities." Liang Aff. ¶ 13, Ex. 9, ¶ 95(e).

<div align="center">5</div>

### A.     Dai's Transfers of Assets And Resulting Interim Freezing Order

On November 15, 2022, after GTQX discovered that Dai had, among other things, sold real property in New York, GTQX applied to the Singapore Court for interim orders prohibiting the disposal of assets beneficially owned by GTQX and for the freezing of Dai's assets.  Liang Aff. ¶ 15; Ex. 11.  While the parties were briefing their submissions, on December 1, GTQX discovered that Dai had sold a second New York property. Liang Aff. ¶ 16; Ex. 13.  When GTQX brought this to the Singapore Court's attention, Dai admitted in a sworn affidavit that he was behind the sale of the second property but asserted that he remained the beneficial owner of that property and that he owned and controlled the entities on both sides of the transaction.  Liang Aff. Ex. 14, ¶¶ 10-11.  Finally, hours before a December 8, 2022 hearing, Plaintiff discovered that Dai was attempting to sell a third property located in Florida.  Liang Aff. Ex. 15, ¶ 16.

Throughout the pendency of Plaintiff's application culminating in a hearing on December 8, 2022, although Dai's counsel raised eight objections, Dai's counsel never denied that Dai owns and/or controls any of the real properties.  *Id*. ¶ 7.  Further, as the Singapore Court recognized in its decision, Dai had failed to rebut the public records and primary evidence of his ownership of the properties.  *Id*. ¶ 18.

The December 8, 2022 hearing culminated with the Singapore Court granting "interim and temporary measures" to enjoin Dai from in any way disposing of, dealing with or diminishing the value of his assets, including the aforementioned real properties, up to the value of the Plaintiff's claims in the Singapore Action until a further hearing over Dai's objection. *Id*. ¶ 2.  The Singapore Court specifically noted that Plaintiff "has exhibited public records and primary evidence of [Dai's] ownership of the properties" and that Dai "was trying to dissipate his assets pending the adjudication of the Plaintiff's claim against him." *See id*. ¶ 18.  Further, the Singapore Court credited Dai's admission that he procured the Diversions, explaining that Dai "stated that he had

6

procured the diversion of funds from 'the Plaintiff's bank account to the various Khan entities [under his beneficial ownership and control' and those funds rightly 'belong to [the Limited Partnership] and the Plaintiff.'" *Id.* ¶ 12.

### B.    The Final Singapore Judgment

Although Dai had pursued a vigorous defense in the Singapore Action with the assistance of three different sets of counsel, Dai opted to abruptly disengage on or around December 30, 2022, following entry of the temporary injunction and freezing order.  Liang Aff. ¶ 21; Ex. 16 (then-counsel for Dai stating on the record, "We do not know if [Dai] is turning up. . . . On 30 Dec [Dai] informed that he would not pay bills and would have no objection if we discharge.").  On January 12, 2023, the Court extended the interim and temporary measures made on December 8, 2022, and enjoined Dai from in any way disposing of, dealing with, or diminishing the value of his assets in the aforementioned real properties, up to the value of the Plaintiff's claims in the Singapore Action pending final determination of the Singapore Action.  Liang Aff. ¶ 22; Ex. 17.

While the Singapore Court continued to give Dai opportunities to defend himself, he declined to participate further.  Liang Aff. ¶ 23; *see also id.* Ex. 18 (providing Dai a "final opportunity to comply with Court's direction" to file amended defense); Ex. 19 (April 14, 2023 Order of the Singapore Court giving Dai another 14 days to comply with various orders). Consequently, on June 27, 2023, the Singapore Court issued by default the final Singapore Judgment against Dai for the full amount of funds that he diverted from GTQX.  Liang Aff. ¶ 24, Ex. 20 (Final Judgment); Ex. 21 (accompanying order).  The Singapore Court concurrently issued a post-judgment freezing order, which extended the prohibition on the dissipation and disposal of Dai's assets made in the January 12, 2023 Order, and remains in place.  Liang Aff. Ex. 22.

The post-judgment freezing order identifies Dai's known assets including three JPMorgan Chase Bank accounts, shares in various entities located in New York, and New York real

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 361 of 377

properties.  *Id.*  Schedule 3 lists the entities Dai controls including Khan Funds as nominees of Defendant and states that they are "covered by this Order." *Id.* at 13.  The Singapore Court also granted an injunction against Dai prohibiting disposal of assets worldwide, ordering Dai to not "remove from Singapore any of his assets . . . up to the value of USD 48,500,000" and not "in any way dispose of or deal with or diminish the value of any of his assets whether they are in or outside Singapore . . . up to the same value." *Id.* at 6.

<div align="center"><strong><u>ARGUMENT</u></strong></div>

The Court should grant summary judgment in GTQX's favor because the evidence conclusively establishes the validity of the Singapore Judgment.

**I.     Legal Standard**

**A.     Summary Judgment In Lieu Of Complaint**

A party may commence an action by motion for summary judgment in lieu of complaint "based upon an instrument for the payment of money only or upon any judgment." CPLR § 3213. "[A] document comes within CPLR 3213 if a prima facie case would be made out by the instrument and a failure to make the payments called for by its terms." *Weissman v. Sinorm Deli, Inc.*, 88 N.Y.2d 437, 444 (1996) (internal quotations and citations omitted).  Summary judgment is routinely used to recognize and enforce foreign money judgments in New York. *See, e.g., John Galliano, S.A. v. Stallion*, 15 N.Y.3d 75, 79–82 (2010) (affirming summary judgment for plaintiff on French judgment); *Gemstar Can., Inc. v. George A. Fuller Co.*, 6 N.Y.S.3d 552 (2d Dep't 2015) (upholding summary judgment in lieu of complaint granted to plaintiff on Canadian judgment);

<div align="center">8</div>

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 362 of 377

*Bond v. Lichtenstein*, 11 N.Y.S.3d 63 (1st Dep't 2015) (same, with respect to Hong Kong judgment).[2]

### B.  Uniform Foreign Country Money-Judgments Recognition Act

A foreign country judgment that is final and conclusive is expressly enforceable by a motion for summary judgment in lieu of complaint. CPLR §§ 5302-5303.

The Recognition Act provides that a foreign judgment for money damages is "conclusive between the parties" if it "meet[s] the requirements of section 5302"—that is, if the judgment is "final, conclusive[,] and enforceable where rendered." *Id.* A recognition proceeding is limited to the "ministerial function of recognizing the foreign country money judgment and converting it" *Batbrothers LLC v. Paushok*, 101 N.Y.S.3d 297, 298 (1st Dep't 2019). The party seeking to enforce or recognize a foreign judgment bears the burden of proving that it satisfies the requirements of section 5302.  *See Gemstar Can.*, 127 A.D.3d at 690.

Section 5304 of the CPLR lists ten grounds for nonrecognition of a judgment that otherwise complies with section 5302. The two grounds listed in section 5304(a) "mandate nonrecognition," while the eight grounds in section 5304(b) leave "the question of nonrecognition to the court's discretion." *Id.* The grounds for refusal are "narrow," *Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 159 (2d Cir. 2007), and if they do not apply, the Court should enforce the judgment "under well-settled comity principles without microscopic analysis of the underlying proceeding," *Sung Hwan Co. v. Rite Aid Corp.*, 850 N.E.2d 647, 651 (2006).

---

[2] While Plaintiff submits that the law and the facts entitling it to summary judgment are clear, it respectfully requests, in the event the Court concludes otherwise, to convert the action into an ordinary action in which Plaintiff's moving papers would become the equivalent of a complaint and the answering papers the equivalent of an answer.  *See* CPLR § 3213 ("If the motion is denied, the moving and answering papers shall be deemed the complaint and answer, respectively, unless the court orders otherwise.").

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 363 of 377

Section 5304(a) renders a judgment unenforceable if it (1) "was rendered under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law;" or was issued by a court that lacked (2) "personal jurisdiction over the defendant;" or (3) subject matter jurisdiction over the defendant.  The plaintiff seeking judgment enforcement bears the burden of making a "prima facie showing" that section 5304(a) does not apply. *Gemstar Can.*, 127 A.D.3d at 690.

Section 5304(b) provides in relevant part that a foreign judgment "need not be recognized" if the defendant "did not receive notice of the proceedings in sufficient time to enable him to defend"; "the judgment was obtained by fraud"; the cause of action is "repugnant to the public policy" of New York; the judgment "conflicts with another final and conclusive judgment"; the foreign suit "was contrary" to a settlement agreement between the parties; or "in the case of jurisdiction based only on personal service, the foreign court was a seriously inconvenient for the trial of the action."  The defendant resisting enforcement bears the burden of proving that the section 5304(b) discretionary grounds apply.  *See CIBC Mellon Tr. Co. v. Mora Hotel Corp.*, 743 N.Y.S.2d 408, 423 (1st Dep't 2002) ("*CIBC I*") ("It is undisputed that defendants bear the burden of proving these discretionary grounds for non-recognition"), *aff'd*, 100 N.Y.2d 215 (2003) ("*CIBC II*").

## II.     The Singapore Judgment Is Final, Conclusive, Enforceable, and Preclusive

The Singapore Judgment satisfies the Recognition Act.  At the outset, the Court must determine that GTQX possesses a document or set of documents that is "enforceable as a final judgment" on the money award. *Sea Trade Mar. Corp. v. Coutsodontis*, 978 N.Y.S.2d 115, 116 (1st Dep't 2013); *see also J.G. Mailaender Druckmaschinenfabrik GmbH & Co. K.G. v. Otto Isenschmid Corp.*, 450 N.Y.S.2d 533, 533–34 (2d Dep't 1982) (granting summary judgment in

lieu of complaint solely on portion of judgment related to money award). "The judgment is considered final when the litigation has been disposed of and no issues remain for determination." 11-5302 Weinstein-Korn-Miller, NY Civ Prac. CPLR ¶ 5302.01. A foreign judgment is conclusive "to the extent that it grants . . . recovery of a sum of money." CPLR § 5303(a); *see also* Restatement (Second) of Judgments § 13 cmt. a (2023) (the money award must not be a "merely tentative" pronouncement but rather be a "firm and stable . . . 'last word.'"). Finally, the judgment must be enforceable where rendered. CPLR § 5302(a)(2).

In this case, the Singapore Judgment is final, conclusive, and enforceable. It grants GTQX certain a sum of money as damages, and the Singapore Court even instructed GTQX that it may enforce the award. *See* Liang Aff. Ex. 20; (ordering that "final Judgment be entered" against Dai); *id*. Ex. 22 ¶ 2 (Freezing Order) (ordering that "Plaintiff be granted leave to begin proceedings against [Dai] or use information obtained in this jurisdiction for the purpose of enforcement of [the] Judgment").

Accordingly, because the Singapore Judgment is final, conclusive, and enforceable, it should be recognized by this Court and given preclusive effect. *See Italverde Trading, Inc. v. Four Bills of Lading*, 2009 WL 499502, at *6 (E.D.N.Y. Feb. 27, 2009) (Italian judgment barred re-litigation of issues in U.S. action because "[i]f a foreign court's judgment is final and enforceable in the forum state, it can be used to preclude a claim or issue in a domestic court); *ICC Chem. Corp. v. TCL Indus. (Malaysia) SDN*, 206 F. App'x 68, 70 (2d Cir. 2006) (Singapore judgment was entitled to preclusive effect as a matter of comity); *Alfadda v. Fenn*, 966 F. Supp. 1317, 1327-30 (S.D.N.Y. 1997) (French judgment barred re-litigation of claims), *aff'd*, 159 F.3d 41 (2d Cir. 1998); *see also* 11-5302 Weinstein-Korn-Miller, NY Civ Prac. CPLR ¶ 5302.01(3) ("A judgment

11

is deemed to be conclusive when it is entitled to res judicata effect and is free from collateral attack").

## III.  There Is No Valid Basis For This Court To Refuse To Recognize The Singapore Judgment

Pursuant to CPLR Section 5304, the Court may not recognize a foreign judgment under the mandatory grounds set forth in subdivision (a), or the permissive grounds set forth in subdivision (b).  None of Section 5304's "narrow" CPLR grounds for nonrecognition apply here. *Kensington Int'l Ltd.*, 505 F.3d at 159.

### A.  The Three Mandatory Grounds Do Not Provide a Basis for Denying Recognition

#### 1.  The Singapore System is Impartial And Affords Due Process

Should Dai attempt to claim the Singapore legal system is anything but impartial, his argument will fail.  Courts in this state have concluded that the Singapore System affords due process and is fundamentally fair, satisfying CPLR 5304(a)(1).  *See Kim v. Co-op. Centrale Raiffeisen-Boerenleebank B.A.*, 364 F. Supp. 2d 346, 352 (S.D.N.Y. 2005) (finding the movant "easily carried its burden" and enforcing a judgment because "it is clear . . . that the Singapore legal system affords due process"); *see also ICC Chem. Corp.*, 206 F. App'x at 70 ("We are also confident that, in the event the Singapore Court renders a money judgment against ICC, a New York court would not deny it recognition").

The Singapore judiciary is part of the English common law tradition, with foundational principles of fairness, impartiality, and due process of law, and is well-respected internationally. *See, e.g.,* Karen Blochlinger, *Primus Inter Pares:  Is the Singapore Judiciary First Among Equals?*, 9 PAC. RIM L. & POL'Y J. 591, 617 (2000) (citing studies and rankings that consistently evidence the Singapore judiciary's excellent reputation internationally in areas such as efficiency and fairness); Gary Chan Kok Yew, *Access to Justice for the Poor:  The Singapore Judiciary at Work,*

12

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 366 of 377

17 Pac. Rim L. & Pol'y J. 595, 600 (2008) (explaining that the "Singapore legal system is part of the English common law tradition with stare decisis . . . as a fundamental pillar").

Accordingly, this ground cannot reasonably prevent recognition of the Singapore Judgment.

### 2. The Singapore Court Had Personal Jurisdiction Over Dai

Under the Recognition Act, a court shall not recognize a foreign country judgment if "the foreign court did not have personal jurisdiction over the defendant." CPLR § 5304(a)(2). The Singapore Court had personal jurisdiction over Dai, who participated in defending the Singapore Action for 26 months. CPLR 5305 provides statutory grounds upon which "a foreign country judgment may not be refused recognition for lack of personal jurisdiction." CPLR § 5305(a) (emphasis added). One such ground is a defendant's voluntary in-court appearance beyond protecting property seized or threatened with seizure or contesting jurisdiction. CPLR § 5305(a)(2). Further, Before Dai elected to end his participation, that is precisely what occurred in Singapore. Dai appeared with counsel in the Singapore Action to defend himself, filing thousands of pages in his defense, only to later decide to disengage after an unfavorable ruling. *See* Background § III.B., *supra*. As such, Dai submitted to personal jurisdiction in the Singapore Court. *See CIBC II*, 100 N.Y.2d at 225 (holding that for purposes of 5305(a)(2), defendants' application to the foreign court to set aside the default judgments entered against them and to defend on the merits "did more than they had to do to preserve a jurisdictional objection" and in so doing, "they voluntarily appeared in the foreign proceeding within the meaning of CPLR 5305(a)(2)"); *USI Sys. AG v. Gliklad*, 176 A.D.3d 555, 556 (1st Dept. 2019) (determining that "whether the [foreign] Court had jurisdiction over defendant in the first instance [wa]s academic, since . . . he voluntarily submitted to the court's jurisdiction over him"); *Standard Chartered Bank v. Ahmad Hamad Al Gosaibi & Bros. Co.*, 957 N.Y.S.2d 602, 604 n.2 (Sup. Ct. N.Y. Cnty. 2012)

13

(rejecting challenge to personal jurisdiction in light of defendants' "apparently voluntary—and lengthy—participation, through their counsel, in the [foreign] proceedings"). Like the respondents in the foregoing cases, by entering his appearance and vigorously defending himself in the Singapore Action prior to ceasing his participation, Dai too voluntarily appeared within the meaning of CPLR 5305(a)(2). *See* Background § III.B., *supra*. None of the mandatory grounds to deny recognition of a foreign judgment exist here.

### 3.       The Singapore Court Had Subject Matter Jurisdiction

Under CPLR § 5304(a)(3), the Singapore Court must have had subject matter jurisdiction as well. The relevant question is whether the foreign court that rendered the judgment at issue had subject matter jurisdiction over plaintiff's action under Singapore law. *See Wimmer Can., Inc. v. Abele Tractor & Equip. Co.*, 299 A.D.2d 47, 51 (3d Dep't 2002). As previously discussed, the Singapore Action stems from Dai's Diversions of funds from a Singaporean entity, supporting a finding of subject matter jurisdiction. Moreover, in the Singapore Action, GTQX, a Singapore entity, alleged subject matter jurisdiction in its application for alternative service, and Dai, represented by counsel, did not challenge these grounds then or at any time. *See* Liang Aff. ¶ 30; *see also* Ex. 4 ¶¶ 92-95.

### B.       None of the Permissive Grounds for Nonrecognition Apply

The Recognition Act provides additional permissive grounds upon consideration of which the Court "need not" recognize a foreign judgment—CPLR § 5304(b); *see also* I.B, *supra*. None of these discretionary grounds apply here to warrant nonrecognition of the Singapore Judgment.

Because Dai appeared in and defended the Action before later voluntarily disengaging, it is undisputable that Dai had notice of the proceeding in sufficient time to defend as is section 5304(b)(1). *See, e.g., CIBC I*, 296 A.D.2d at 91 (defendants' "decision not to participate in litigating the merits of the proceeding, in an effort to protect their rights to interpose a collateral

14

challenge to enforcement of a final judgment, cannot form the basis of a claimed denial of due process"). For the same reasons, Dai was therefore not "deprived . . . of an adequate opportunity" to present his case, whether by fraud or otherwise. CPLR § 5304(b)(2). Subdivisions (b)(7) and (b)(8) are similarly inapplicable given that the default judgment was entered only after Dai decided to continue defending the action. *See Can. Imperial Bank of Com. v. Saxony Carpet Co.*, 899 F. Supp. 1248, 1254 (S.D.N.Y. 1995) (respondent's allegations "might have constituted a valid defense on the merits had Defendant chosen to appear in the [foreign] action[;]" however, absent fraud, "a foreign default judgment is as conclusive an adjudication as a contested judgment"), *aff'd*, 104 F.3d 352 (2d Cir. 1996). Dai voluntarily abandoned his defense, and any procedural issues he may seem to raise here could just have easily been raised in the Singapore Action.

Further, nothing about the Singapore Judgment is repugnant to public policy. As the Court of Appeals instructs, "[t]he public policy inquiry rarely results in refusal to enforce a judgment unless it is "inherently vicious, wicked or immoral, and shocking to the prevailing moral sense." *Sung Hwan Co.*, 850 N.E.2d at 650. The Singapore Judgment is a default judgment in a breach of fiduciary duty action, a routine occurrence in this Court, and foreign judgments resulting from default judgments are regularly recognized as consistent with public policy, especially where as here Dai discontinued his defense and a respected court issued an appropriate judgment. *See Ackermann v. Levine, 788 F.2d 830, 842 (2d Cir. 1986)* (holding that enforcement of foreign default judgment would not violate New York public policy, because "[b]y defaulting [in the foreign adjudication], a defendant ensures that a judgment will be entered against him, and assumes the risk that an irrevocable mistake of law or fact may underlie that judgment."); *John Galliano, S.A.*, 15 N.Y.3d at 82 (enforcing foreign default judgment).

<div align="center">15</div>

Case 1:24-cv-03142-UA    Document 1-4    Filed 04/24/24    Page 369 of 377

Similarly, there can be no argument that the Singapore Judgment is repugnant to public policy based upon objections to the Partnership Agreement itself. The Partnership Agreement was litigated in Singapore, and "having defaulted in the foreign action, defendant may not now challenge the merits of plaintiff's claims collaterally." *Reg'l Mun. of York v. LeBlanc*, 207 A.D.3d 1033, 1035 (4th Dep't 2022); *see also Saxony Carpet Co.*, 899 F. Supp. at 1254 (defendant could not raise "defense involving the merits of the original action"). Indeed, Dai made these arguments in Singapore before he disengaged and the Court ultimately concluded that they were "conjectural in nature." Liang Aff. Ex. 15, ¶ 14 (Dec. 8, 2022 decision). Therefore, Dai is foreclosed from collaterally attacking the Singapore Court based on the underlying agreements.

Next, as of the date of filing, there are no conflicting judgments, and the Agreement upon which the Singapore Action was based contained no clause designating a different country's courts to hear disputes. *See* Liang Aff. ¶ 31 (no conflicting judgments); Ex. 3 (Partnership Agreement). Finally, Section 5304(b)(6) is inapplicable because personal jurisdiction was based on Dai's voluntary participation. *See* § Background III.A.2, *supra*.

### C. Although Not Required, This Court Has Personal Jurisdiction Over Dai

Because the Singapore Judgment is valid and enforceable such that any potential defenses are "wholly lacking in evidentiary support and otherwise meritless on their face," no showing of personal jurisdiction over Dai is required. *Akhmedova v. Akhmedov*, 189 A.D.3d 602, 603 (1st Dep't 2020) (declining to require in personam or in rem jurisdiction where defendant "failed to place in question the [foreign] judgment's entitlement to recognition") (internal quotations and citations omitted). Nevertheless, for the avoidance of doubt, this Court has personal jurisdiction over Dai, including through his ongoing transaction of business in this state.

Although Dai purports to have moved out of the state, Dai's contacts with New York easily satisfy long-arm jurisdiction because he has "transact[ed] . . . business within the state" (CPLR

16

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 370 of 377

302(a)(1)), and his transactions bear a "substantial relationship" to the subject matter of this action.

*D & R Glob. Selections, S.L. v. Bodega Olegario Falcon Pineiro*, 29 N.Y.3d 292, 299 (2017). By

way of example, in the RICO Action,[3] Dai pleaded with detail his transactions of business within

the state, all of which he has expressly tied to the Joint Venture underpinning the Singapore

Judgment. *See* Bloodstein Aff. Ex. B, ¶ 156(ii) (Dai relied on [Limited] Partnership-related phone

calls he conducted from New York from 2015 to 2017 to "continue to spend money [on Limited]

Partnership goals") ¶ 131 (Dai received "numerous" electronic communications and/or phone calls

relating to the [Limited] Partnership in New York); ¶ 65 (after settling in New York, Dai "worked

tirelessly to identify suitable . . . investment targets in furtherance of the [Joint Venture]").

Even were it necessary to establish personal jurisdiction, the foregoing contacts alone are

sufficient to establish long-arm jurisdiction. *See, e.g., L & R Explor. Venture v. Grynberg*, 22

A.D.3d 221, 221 (1st Dep't 2005) (finding personal jurisdiction where defendant had solicited

funds from New York investors, communicated by telephone and mail with the investors in New

York, and had visited New York to discuss the parties' joint venture).

## CONCLUSION

For the foregoing reasons, GTQX respectfully requests that the Court grant its Motion for

Summary Judgment pursuant to the Recognition Act against Dai, enter judgment recognizing and

converting the Singapore Judgment into a New York judgment in the amount of $34,264,935.99

---

[3] Dai's extensive history of litigation prosecuted in both in his individual capacity and through his New York "global headquarters" and "umbrella parent company," Khan Funds (see Background, *supra*), also establishes long-arm jurisdiction through Dai's availment of the benefits and protections of New York's legal system. *See* Bloodstein Aff. ¶¶ 3-5. "Use of the New York courts is a traditional justification for the exercise of personal jurisdiction over a nonresident." *In re Sayeh R*., 91 N.Y.2d 306, 319 (1997) ("respondent deliberately and affirmatively sought the protection of this State's laws, and thereby [was] rendered ... amenable to our general long-arm jurisdiction").

17

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 371 of 377

USD, plus $290,153.97 SGD, plus pre-judgment interest on the foregoing sums amounting to $13,626,721.72 USD and $99,768.80 SGD,[4] respectively, with post-judgment interest accruing at 9% per annum as set forth in CPLR Section 5004[5] from June 27, 2023, the date of the foreign judgment; costs of the Singapore Action fixed at $100,000 SGD with post-judgment interest accruing from June 28, 2023 at the same rate; and award such other and further relief as the Court deems just and proper.

---

[4] Should the Court grant this Motion, Plaintiff requests that the Court render in SGD those sums comprising the Singapore Judgment previously rendered by the Singapore Court in SGD, and those sums should then be converted to USD at the rate of exchange prevailing on the date that the New York Judgment is entered. Judiciary Law §27(b); *Baker & McKenzie Zurich v. Frisone*, 47 Misc. 3d 1227(A), at *10 (Sup. Ct. Nassau Cty. 2015) (applying Judiciary Law Section 27(b)).

[5] *See Abu Dhabi Com. Bank PJSC v. Saad Trading, Contracting & Fin. Servs. Co.*, 117 A.D.3d 609, 613 (1st Dep't 2014) ("Postjudgment interest is a procedural matter governed by the law of the forum. Thus, the [lower] court properly concluded that New York's statutory postjudgment interest rate should apply to the [foreign] judgment.") (citing *Wells, Fargo & Co. v. Davis*, 105 N.Y. 670, 672 (1887)).

18

Case 1:24-cv-03142-UA Document 1-4 Filed 04/24/24 Page 372 of 377

Dated: March 12, 2024

Respectfully submitted,

NORTON ROSE FULBRIGHT US LLP

By: */s/ Victoria V. Corder*

Victoria V. Corder
Benjamin D. Bloodstein
1301 Avenue of the Americas
New York, New York 10019
Tel:    (212) 318-3000
Fax:    (212) 318-3400
victoria.corder@nortonrosefulbright.com
benjamin.bloodstein@nortonrosefulbright.com

Brian A. Sun (*pro hac vice forthcoming*)
Christopher Pelham (*pro hac vice forthcoming*)
555 South Flower Street
Forty-First Floor
Los Angeles California 90071
Tel:    (213) 892-9200
brian.sun@nortonrosefulbright.com
christopher.pelham@nortonrosefulbright.com

*Attorneys for Plaintiff Guotaiqixing Biomedical*
*International (S) Pte. Ltd.*

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 373 of 377

## <u>CERTIFICATION OF COUNSEL</u>

I hereby state that the foregoing Memorandum of Law was prepared on a computer using Microsoft Word.  Pursuant to the word count system in Microsoft Word, the total number of words in the Brief, excluding the caption, table of contents, table of authorities, signature block, and this certification is 6,157.

Dated:   March 12, 2024

<div style="text-align: right;">

<u>/s/ Benjamin D. Bloodstein</u>
Benjamin D. Bloodstein

</div>

20

INDEX NO. 152210/2024
NYSCEF DOC. NO. 7    RECEIVED NYSCEF: 03/12/2024
CtSF 624-cv-00162-JJM   Document 1-4   Filed 04/24/24   Page 374 of 377

# REQUEST FOR JUDICIAL INTERVENTION

UCS-840 (7/2012)

**Supreme** _____ COURT, COUNTY OF _____ **New York**

Index No.: _____ Date Index Issued: _____

| | For Court Use Only: |
|---|---|
| | IAS Entry Date |
| | Judge Assigned |
| | RJI Date |

**CAPTION:** Enter the complete case caption. Do not use et al or et ano. If more space is required, attach a caption rider sheet.

GUOTAIQIXING BIOMEDICAL INTERNATIONAL (S) PTE. LTD.

**Plaintiff(s)/Petitioner(s)**

-against-

XUEFENG DAI

**Defendant(s)/Respondent(s)**

## NATURE OF ACTION OR PROCEEDING: Check ONE box only and specify where indicated.

**MATRIMONIAL**
- ○ Contested

  **NOTE:** For all Matrimonial actions where the parties have children under the age of 18, complete and attach the **MATRIMONIAL RJI Addendum.**

  For Uncontested Matrimonial actions, use RJI form UD-13.

**TORTS**
- ○ Asbestos
- ○ Breast Implant
- ○ Environmental: _____ (specify)
- ○ Medical, Dental, or Podiatric Malpractice
- ○ Motor Vehicle
- ○ Products Liability: _____ (specify)
- ○ Other Negligence: _____ (specify)
- ○ Other Professional Malpractice: _____ (specify)
- ○ Other Tort: _____ (specify)

**OTHER MATTERS**
- ○ Certificate of Incorporation/Dissolution [see **NOTE** under Commercial]
- ○ Emergency Medical Treatment
- ○ Habeas Corpus
- ○ Local Court Appeal
- ○ Mechanic's Lien
- ○ Name Change
- ○ Pistol Permit Revocation Hearing
- ○ Sale or Finance of Religious/Not-for-Profit Property
- ○ Other: _____ (specify)

**COMMERCIAL**
- ○ Business Entity (including corporations, partnerships, LLCs, etc.)
- ○ Contract
- ○ Insurance (where insurer is a party, except arbitration)
- ○ UCC (including sales, negotiable instruments)
- ○ Other Commercial: _____ (specify)

  **NOTE:** For Commercial Division assignment requests [22 NYCRR § 202.70(d)], complete and attach the **COMMERCIAL DIV RJI Addendum.**

**REAL PROPERTY**: How many properties does the application include? _____
- ○ Condemnation
- ○ Mortgage Foreclosure (specify): ○ Residential ○ Commercial

  Property Address: _____
  Street Address   City   State   Zip

  **NOTE:** For Mortgage Foreclosure actions involving a one- to four-family, owner-occupied, residential property, or an owner-occupied condominium, complete and attach the **FORECLOSURE RJI Addendum.**
- ○ Tax Certiorari - Section: _____ Block: _____ Lot: _____
- ○ Tax Foreclosure
- ○ Other Real Property: _____ (specify)

**SPECIAL PROCEEDINGS**
- ○ CPLR Article 75 (Arbitration) [see **NOTE** under Commercial]
- ○ CPLR Article 78 (Body or Officer)
- ○ Election Law
- ○ MHL Article 9.60 (Kendra's Law)
- ○ MHL Article 10 (Sex Offender Confinement-Initial)
- ○ MHL Article 10 (Sex Offender Confinement-Review)
- ○ MHL Article 81 (Guardianship)
- ○ Other Mental Hygiene: _____ (specify)
- ◉ Other Special Proceeding: Article 53 Recognition of Foreign Country Judgment (specify)

## STATUS OF ACTION OR PROCEEDING: Answer YES or NO for EVERY question AND enter additional information where indicated.

| | YES | NO | |
|---|---|---|---|
| Has a summons and complaint or summons w/notice been filed? | ◉ | ○ | If yes, date filed: 03/12/2024 |
| Has a summons and complaint or summons w/notice been served? | ○ | ◉ | If yes, date served: _____ |
| Is this action/proceeding being filed post-judgment? | ○ | ◉ | If yes, judgment date: _____ |

## NATURE OF JUDICIAL INTERVENTION:

*Check ONE box only AND enter additional information where indicated.*

- ○ Infant's Compromise
- ○ Note of Issue and/or Certificate of Readiness
- ○ Notice of Medical, Dental, or Podiatric Malpractice    Date Issue Joined: _____
- ◉ Notice of Motion    Relief Sought: Judgment - Summary in Lieu of Complaint    Return Date: 04/24/2024
- ○ Notice of Petition    Relief Sought: _____    Return Date: _____
- ○ Order to Show Cause    Relief Sought: _____    Return Date: _____
- ○ Other Ex Parte Application    Relief Sought: _____
- ○ Poor Person Application
- ○ Request for Preliminary Conference
- ○ Residential Mortgage Foreclosure Settlement Conference
- ○ Writ of Habeas Corpus
- ○ Other  (specify): _____

### RELATED CASES:
List any related actions.  For Matrimonial actions, include any related criminal and/or Family Court cases.
If additional space is required, complete and attach the **RJI Addendum**.  If none, leave blank.

| Case Title | Index/Case No. | Court | Judge (if assigned) | Relationship to Instant Case |
|---|---|---|---|---|
| Khan Funds Mgmt Am. & X. Dai v. Nations Techs., et al. | 22-cv-5055 | S.D.N.Y. | Hon. Edgardo Ramos | Related parties |
| | | | | |
| | | | | |

### PARTIES:
For parties without an attorney, check "Un-Rep" box AND enter party address, phone number and e-mail address in space provided.
If additional space is required, complete and attach the **RJI Addendum**.

| Un-Rep | Parties:<br>List parties in caption order and indicate party role(s) (e.g. defendant; 3rd-party plaintiff) | Attorneys and/or Unrepresented Litigants:<br>Provide attorney name, firm name, business address, phone number and e-mail address of all attorneys that have appeared in the case.  For unrepresented litigants, provide address, phone number and e-mail address. | Issue Joined (Y/N): | Insurance Carrier(s): |
|---|---|---|---|---|
| ☐ | GUOTAIQIXING BIOMEDICAL INTERNATI ➕ (Last Name)<br>(First Name)<br>Primary Role: Plaintiff<br>Secondary Role (if any): | Corder (Last Name)    Victoria (First Name)<br>Norton Rose Fulbright US LLP (Firm Name)<br>1301 Avenue of the Americas (Street Address)    New York (City)    New York (State)    10019 (Zip)<br>+1 (212) 318-3000 (Phone)    +1 (212) 318-3400 (Fax)    victoria.corder@nortonrosefulbright. ➕ (e-mail) | ○ YES<br>○ NO | |
| ☐ | Dai (Last Name)<br>Xuefeng (First Name)<br>Primary Role: Defendant<br>Secondary Role (if any): | (Last Name)    (First Name)<br>(Firm Name)<br>(Street Address)    (City)    (State)    (Zip)<br>(Phone)    (Fax)    (e-mail) | ○ YES<br>○ NO | |
| ☐ | (Last Name)<br>(First Name)<br>Primary Role:<br>Secondary Role (if any): | (Last Name)    (First Name)<br>(Firm Name)<br>(Street Address)    (City)    (State)    (Zip)<br>(Phone)    (Fax)    (e-mail) | ○ YES<br>○ NO | |
| ☐ | (Last Name)<br>(First Name)<br>Primary Role:<br>Secondary Role (if any): | (Last Name)    (First Name)<br>(Firm Name)<br>(Street Address)    (City)    (State)    (Zip)<br>(Phone)    (Fax)    (e-mail) | ○ YES<br>○ NO | |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, TO MY KNOWLEDGE, OTHER THAN AS NOTED ABOVE, THERE ARE AND HAVE BEEN NO RELATED ACTIONS OR PROCEEDINGS, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION PREVIOUSLY BEEN FILED IN THIS ACTION OR PROCEEDING.**

Dated: 03/12/2024 _____    /s/ Victoria V. Corder
_____    _____
                                    **SIGNATURE**
4881686    Victoria V. Corder
**ATTORNEY REGISTRATION NUMBER**    **PRINT OR TYPE NAME**

Print Form

Reset Form



**New York State Unified Court System**     *nycourts.gov*

## Request for Judicial Intervention
## Commercial Division Addendum

**UCS-840C** (12/2023)
Page **1** of **2**
*nycourthelp.gov*

**Supreme Court**
**County of** NEW YORK

**Plaintiff/Petitioner** (persons/entities that started the case)**:**     **Index #:**

GUOTAIQIXING BIOMEDICAL INTERNATIONAL (S) PTE. LTD.     _____

**Defendant/Respondent** (persons/entities the case is against)**:**

XUEFENG DAI

**Plaintiff/Petitioner's cause(s) of action** [check all that apply]:

✕ Breach of contract or fiduciary duty, fraud, misrepresentation, business tort (e.g., unfair competition), or statutory and/or common law violation where the breach or violation is alleged to arise out of business dealings (e.g., sales of assets or securities; corporate restructuring; partnership, shareholder, joint venture, and other business agreements; trade secrets; restrictive covenants; and employment agreements not including claims that principally involve alleged discriminatory practices)

    Transactions governed by the Uniform Commercial Code, excluding those concerning individual cooperative or condominium units

    Transactions involving commercial real property, including Yellowstone injunctions and excluding actions for the payment of rent only

    Shareholder derivative actions (without consideration of the monetary threshold)

    Commercial class actions (without consideration of the monetary threshold)

    Business transactions involving or arising out of dealings with commercial banks and other financial institutions

    Internal affairs of business organizations

    Malpractice by accountants or actuaries, and legal malpractice arising out of representation in commercial matters

    Environmental insurance coverage

    Commercial insurance coverage (e.g., directors and officers, errors and omissions, and business interruption coverage)

    Dissolution of corporations, partnerships, limited liability companies, limited liability partnerships and joint ventures (without consideration of the monetary threshold)

    Applications to stay or compel arbitration and affirm or disaffirm arbitration awards and related injunctive relief pursuant to CPLR Article 75 involving any of the foregoing enumerated commercial issues (where the applicable agreement provides for the arbitration to be heard outside the United States, the monetary threshold set forth in 22 NYCRR 202.70(a) shall not apply)



**ADA Accommodations**
ada@nycourts.gov     **Spoken or Sign Language Interpreters**
interpreter@nycourts.gov     **COURT Help**   **1-800-COURT-NY**
**(268-7869)**

INDEX NO. 152210/2024
RECEIVED NYSCEF: 03/12/2024

Case 1:24-cv-03142-UA   Document 1-4   Filed 04/24/24   Page 377 of 377

**UCS-840C** (12/2023)         Page **2** of **2**      **Index #:** _____

Plaintiff/Petitioner's claim for compensatory damages, excluding punitive damages, interest, costs, and counsel fees claimed: $ **35,000,000.00**_____

Plaintiff/Petitioner's claim for equitable or declaratory relief [brief description]:

Recognition of foreign judgment based in breach of fiduciary duty

Defendant/Respondent's counterclaims, including claims for monetary relief [brief description]:

I request that this case is assigned to the Commercial Division. I certify that the case meets the Commercial Division's jurisdictional requirements as set forth in 22 NYCRR 202.70(a), (b) and (c).

Dated: _____**03/12/2024**_____          */s/ Victoria V. Corder*
                                    _____
                                              Signature
                                          **Victoria V. Corder**
                                    _____
                                             Print Name

Print Form