# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------- X

KHAN FUNDS MANAGEMENT
AMERICA, INC. and XUEFENG DAI,

        Plaintiffs,

    -against-

NATIONS TECHNOLOGIES INC.,
NATIONS TECHNOLOGIES (USA) INC.,
SHENZHEN QIANHAI NATIONS
INVESTMENT MANAGEMENT CO. LTD.,
ZHAOXUE LUO, YINGTONG SUN,
BAOXIN HUANG, JUNEE YU, YAPING
CHEN, HUAXIA GENERAL PROCESSOR
TECHNOLOGIES INC., OPTIMUM
SEMICONDUCTOR TECHNOLOGIES
INC. d/b/a GENERAL PROCESSOR
TECHNOLOGIES, KEYI LI, and DOES 1-
20,

        Defendants.

Case No. 22-cv-05055 (ER)

---------------------------------------------------- X

## AMENDED COMPLAINT

GIBSON, DUNN & CRUTCHER LLP
200 PARK AVENUE
NEW YORK, NY 10166-0193
TELEPHONE: 212.351.4000
FACSIMILE: 212.351.6235
*Attorneys for Plaintiff*

# TABLE OF CONTENTS

NATURE OF THE CASE ................................................................................. 1

PARTIES ....................................................................................................... 10

JURISDICTION AND VENUE ...................................................................... 12

FACTUAL ALLEGATIONS ........................................................................... 15

    A. Defendants Establish A Worldwide Enterprise Designed To Procure Critical
        Military Technology By Any Means Necessary.................................................. 15

    B. Dai Runs Successful Investment Businesses In China And Brings His
        Exceptional Abilities And Expertise To The United States................................ 22

    C. Defendants Attempt To Ensnare Dai In Their Criminal Conspiracy. ........................ 23

    D. Luo Reveals The Full Scope Of The Conspiracy And Threatens Dai, His
        Family, And His Employees ...................................................................... 30

    E. Dai Reports The Enterprise To The FBI And Defendants Launch Their
        Retaliation Campaign, Which Is Ongoing ..................................................... 35

CAUSES OF ACTION .................................................................................... 46

    FIRST CLAIM FOR RELIEF  (Violations Of RICO, 18 U.S.C. §  1962(c) –
        Against All Defendants) ............................................................................ 46

    SECOND CLAIM FOR RELIEF (Conspiracy To Violate Civil RICO, 18 U.S.C.
        § 1962(d) – Against All Defendants)............................................................ 64

    THIRD CLAIM FOR RELIEF  (Common Law Fraud – Against Defendants
        Nations, Nations USA, Nations Investment, Luo, Yu, and Huang) ................... 66

    FOURTH CLAIM FOR RELIEF  (Violation Of Computer Fraud And Abuse Act,
        18 U.S.C. § 1030 – Against Defendants Nations, Nations USA, Luo, and
        Sun).................................................................................................... 69

JURY TRIAL DEMAND ................................................................................ 70

PRAYER FOR RELIEF .................................................................................. 70

Plaintiffs Khan Funds Management America, Inc. ("Khan Funds") and Xuefeng Dai, bring this Complaint against Defendants, Nations Technologies Inc. ("Nations"), Nations Technologies (USA) Inc. ("Nations USA"), Shenzhen Qianhai Nations Investment Management Co., Ltd. ("Nations Investment"), Zhaoxue Luo, Yingtong Sun, Baoxin Huang, Junee Yu (a/k/a Junjie Yu), Yaping Chen, HuaXia General Processor Technologies, Inc. ("HuaXia GPT"), Optimum Semiconductor Technologies Inc. ("OST") d/b/a General Processor Technologies (GPT), Keyi Li ("Kerry Li"), and Does 1-20 and allege as follows:

## NATURE OF THE CASE

1.     Plaintiffs bring this action to seek redress for Defendants' civil racketeering, conspiracy, and fraud.  That conduct was directed principally at retaliating against Plaintiffs Xuefeng Dai and Khan Funds for refusing to participate in a long-running scheme to facilitate the theft of American technology for the benefit of the military of the People's Republic of China ("PRC").  When Dai—a permanent U.S. resident designated as an "Alien of Extraordinary Ability" by U.S. Citizenship and Immigration Services—did the right thing and immediately reported this criminal conduct to American law enforcement authorities, Defendants launched a global campaign of harassment and retaliation against Plaintiffs.  That campaign left Dai and his colleagues at Khan Funds who sought refuge in the United States fearful for their lives, with business reputations in shambles, and subject to bogus criminal and civil proceedings.  Defendants also initiated an ongoing "Fox Hunt" operation against them.  Fox Hunts are a tactic in which PRC agents and their U.S.-based co-conspirators stalk and intimidate dissidents and leverage the dissident's relatives through threats, imprisonment, and intimidation to force the dissident to return to China under duress.  Defendants have done all of this in a brazen attempt to punish Plaintiffs for their cooperation with a federal criminal investigation on a matter of grave national security.

1

Defendants' tactics have included surveilling Dai at his home on U.S. soil, hacking Plaintiffs' computer systems in New York to steal confidential documents, threatening and intimidating Plaintiffs in face-to-face and telephonic communications, weaponizing Plaintiff Dai's family members for the Fox Hunt, providing false testimony to PRC police, leveraging government connections to cause the issuance of an arrest warrant in China for Dai and his colleagues at Khan Funds, and trying to domesticate in the United States judgments obtained in Singapore in violation of Plaintiffs' due process and other rights.  These activities constitute violations of the civil RICO and RICO conspiracy statute (18 U.S.C. § 1962(c) & (d)), including predicate acts of wire fraud, extortion, witness intimidation, witness retaliation, attempted kidnapping, and obstruction of justice, as well as common law fraud, and violations of the Computer Fraud and Abuse Act (18 U.S.C. § 1030).  With Defendants launching and actively prosecuting their campaign against Plaintiffs in three countries—the United States, the PRC, and the Republic of Singapore— Plaintiffs urgently seek to avail themselves of the rights afforded them by the federal court system to expose, defend against, and remedy this ongoing abusive and egregious misconduct.

2.      Plaintiff Khan Funds is an innovative hedge fund focused on merging American-based healthcare, pharmaceutical and/or biotechnology companies with publicly traded companies based in China.  Plaintiff Dai is Khan Funds' manager and chief executive officer.  Dai immigrated to the United States in October 2015 from Shenzhen, China, where he served as a manager for various hedge funds that traded shares of publicly held companies listed on the Chinese exchanges. Since 2013, Dai, now a U.S. permanent resident, has dreamed of bringing his knowledge and investment expertise to the United States to try to build bridges between the American and Chinese business communities.  Dai was granted an EB1-A (Alien of Extraordinary Ability) visa in 2017 within days of submitting his application to U.S. Citizenship and Immigration Services.  To receive

an EB-1 visa, he had to "demonstrate extraordinary ability in the sciences, arts, education, business, or athletics through sustained national or international acclaim."[1]

3.      Defendant Nations is a publicly traded Chinese company, headquartered in Shenzhen, China.  Nations is principally engaged in the design, manufacture, and distribution of integrated circuits.  In 2015, Nations—with the active assistance of former Chinese Communist Party ("CCP") official Defendant Baoxin Huang—offered to serve as the exclusive partner for Dai's investments in the biomedical field.  After heavy negotiations, a Khan Funds subsidiary (Beijing Qilong Medical and Pharmaceutical Holding Co., Ltd. ("Khan Funds Beijing")), entered into a Partnership Agreement with a Nations subsidiary (Shenzhen Qianhai Nations Investment Management Co., Ltd. ("Nations Investment")).  In that Partnership Agreement, Nations invested RMB 300 million (approximately $42 million) for Khan Funds to implement its biomedical investment strategy.  The Partnership Agreement also conferred on Khan Funds exclusive control over investment decisions to implement that strategy.

4.      Ultimately and unbeknownst to Plaintiffs, however, Nations' offer, the parties' negotiation, and the Partnership Agreement were a carefully crafted ruse.  Nations and its cadre of co-conspirators *never* intended to invest in Khan Funds' biomedical strategy and core competencies, even though they had throughout the parties' negotiations stated their interest in working with Khan Funds to take advantage of the economic opportunity Plaintiff Dai's strategy represented.  Instead, Nations concocted the investment to bait Plaintiffs into joining a partnership that Nations and the other Defendants planned to employ as a front to launder money from China into the United States to fund the activities of the conspiracy and procure semiconductor-related companies to plunder their technology.

---

[1] *See* https://www.uscis.gov/forms/explore-my-options/eb-1-employment-based-immigration-permanent-workers-extraordinary-abilityoutstanding-professor-or.

5.      Within just three months of the execution of the Partnership Agreement, Defendants Zhaoxue Luo and Junjie Yu, Nations' then President and then CFO/Vice General Manager, respectively, abandoned their previously professed interest in Khan Funds' biomedical investment plans.  Instead, they told Dai they wanted the Partnership to acquire a semiconductor company.  Plaintiffs had no expertise in investing in the semiconductor industry, let alone identifying attractive semiconductor merger and acquisition targets or conducting due diligence on businesses leveraging that sophisticated technology.  The parties had also never discussed semiconductor investments in negotiating the Partnership Agreement, and the executed Agreement conferred on Khan Funds the exclusive authority to direct investment strategy.  Plaintiffs therefore refused to pursue Luo and Yu's proposed change of plans.

6.      Nations did not give up.  Instead, they increased the pressure on Plaintiffs.  Luo now began to *demand* that the fund shift its strategy to acquire semiconductor companies.  He backed up his demands with a series of extortionate threats.  Luo, for instance, shouted at Plaintiffs that there were "very serious" "consequences for lying to me" and that Dai "should know who I am!"

7.      The disagreement between the partners culminated in a series of meetings between September 10 and September 14, 2017 in New York between Dai and Luo.  Concerned by Luo's proposal to completely change the Partnership's planned investment strategy and the nature of Luo's escalating and threatening demands, Dai recorded their conversations.  As the recordings confirm, during those meetings Luo admitted that Nations was a government agent whose mission was to steal semiconductor and related technologies from the United States and elsewhere.  Luo admitted Nations engaged in this espionage with the help of a global enterprise Luo had cultivated over more than a decade (the "Enterprise").  Members of the Enterprise worked at Luo's direction

to further its goals.  As part of the Enterprise's master plan, American-based members of the Enterprise in California and New York would acquire and secretly export American blueprints, technical designs, and raw materials necessary to build a semiconductor fabrication plant in Chengdu, China (the "Chengdu Project").  That plant would produce the computer chips necessary for next-generation PRC military technology such as fighter jets and surface-to-air missiles.  The Enterprise included former PRC government officials, PRC military personnel, nominally legitimate companies and commercial actors, financiers, rogue cyber-actors and hackers and numerous technical experts who reported to Luo, including Yi-Chi Shih, Ishiang Shih, and Yaping Chen.  All three were indicted in 2018 in the U.S. District Court for the Southern District of California on charges of economic espionage and other crimes related to the Enterprise.  The Enterprise also had a foothold in New York, where Plaintiffs were located.  Semiconductor expert Defendant Kerry Li and his companies, Defendant Optimum Semiconductor Technologies ("OST") d/b/a General Processor Technologies were responsible for managing the Enterprise's New York activities.

8.     Unbeknownst to Dai, Defendants had earmarked Dai to fit into their plan and were expecting him to serve the Enterprise.  Luo in fact admitted to Dai in those recorded meetings in New York that Defendants recruited Dai to launder funds and facilitate the corporate acquisitions required to steal semiconductor technology.  Luo also told Dai he would be amply rewarded if he cooperated with the Enterprise.  And he made clear that Dai's refusal to cooperate would yield severe consequences.  Luo threatened the safety of Dai, his family, and his associates.  Luo also made clear any refusal would result in campaigns to harass Plaintiffs and encourage the PRC to deploy the organs of State to investigate, arrest, and even prosecute Dai and his associates on false

pretenses—which is exactly what ended up happening, subjecting Dai to the years-long retaliation campaign that is the primary subject of the instant lawsuit.

9.     Dai did not accede to these threats and demands.  Frightened for himself, his loved ones, and his fifty employees, Dai immediately reported Defendants' unlawful activities to American authorities.  He ended up providing critical information to the federal government on Defendants' activities that would lead to the indictments of Chen, Yi-Chi Shih, Ishiang Shih, and others one year later.  Fearing reprisal against his family if Defendants discovered his cooperation with law enforcement, he quickly evacuated his eldest sister and mother from China and applied for asylum in the U.S.  That asylum application—which would provide Dai immigration status independent of his already extant EB-1A visa—is pending.  In the face of Luo's threats to blacklist Dai and have him arrested, Dai also dissolved the China-based Khan Funds entities and hedge funds, returning all capital to his investors.

10.     Defendants then made good on their threats.  Once it became apparent to Defendants that Dai was not going along with their scheme, Defendants moved to punish Dai and to compel him to stay silent about what he knew.  They first activated a press campaign to smear Dai and malign him.  They then corruptly influenced the PRC to remove Khan Funds' license to trade in China.  And when American officials arrested Yi-Chi Shih for his Enterprise activities, Defendants realized Dai was not only failing to cooperate with the Enterprise but was actually threatening it by working with American law enforcement.  In response, Defendants' retaliation escalated to new heights.

11.     Specifically, Defendants began a "Fox Hunt."  A Fox Hunt is a tactic the PRC government has used to bring Chinese dissidents back to China under duress to face prosecution for bogus crimes.  In a typical Fox Hunt, PRC agents and their U.S.-based co-conspirators

relentlessly stalk and intimidate dissidents and threaten to harm, imprison, and even torture the dissident's relatives to force the dissident to return to China.[2]  The PRC government has employed these tactics to repatriate 8,000 so-called "fugitives" (actually dissidents) through Fox Hunts since 2014.[3]  Indeed, just weeks ago, the federal government indicted seven Chinese nationals "over an alleged long-running plot to intimidate a US resident into returning to China to face criminal charges."[4]

12.     The Fox Hunt against Dai followed the unfortunately standard, but harrowing, playbook.  Defendants threatened Dai's family and friends to coordinate a relentless harassment campaign designed to force him under duress to return to China.  On January 18, 2018—the very day Yi-Chi Shih was arrested by U.S. federal authorities with the assistance of information Dai had provided—Defendants burglarized Khan Funds' Singapore office to harass and intimidate Plaintiffs.  The next month, Defendant Huang commanded Dai's younger sister, who lived in China, to travel to New York to learn whether her brother had cooperated with U.S. law enforcement.  When Dai told her that he reported Luo to American authorities, she immediately returned to China.

13.     The retaliation continued.  In May 2018, Nations Investment initiated a lawsuit in the PRC to remove Khan Funds Beijing as General Partner of the Partnership.  Nations did not serve Khan Funds Beijing in that action, and instead relied on falsehoods that Dai could have disproven if he had been given notice of the suit and an opportunity to be heard, and if he did not fear for his life if he were to return to China to defend himself.  Ultimately, the Chinese court

---

[2] *See* Sebastian Rotella & Kristen Berg, *Operation Fox Hunt: How China Exports Repression Using A Network of Spies Hidden in Plain Sight*, PROPUBLICA (Jan. 22, 2021), https://www.propublica.org/article/operation-fox-hunt-how-china-exports-repression-using-a-network-of-spies-hidden-in-plain-sight.

[3] *Id.*

[4] *See* Samantha Beech, *US charges seven Chinese nationals in alleged plot to bring fugitive back to China* (Oct. 20, 2022), https://www.cnn.com/2022/10/20/china/us-justice-department-charged-china-fugitive-family-intl-hnk.

awarded Defendants a default judgement against Plaintiffs in February 2019 allowing Nations Investment to remove Khan Funds Beijing as general manager of the Nations-Khan Funds partnership.  On top of that lawsuit, in December 2018, Defendants leveraged their political connections to obtain an arrest warrant for Dai and his colleagues from the Shenzhen People's Procuratorate, making good on yet another threat.

14.     Approximately one year after Dai had reported Defendants' unlawful activities to the American government, the Department of Justice indicted Yaping Chen and Yi-Chi Shih in the U.S. District Court for the Central District of California.  *See United States v. Yi-Chi Shih, et al.*, CR No. 18-00050 (C.D.C.A. 2018).  Weeks later, Defendants ordered a cyberattack on Khan Funds' computers in New York, stealing confidential documents they would later use in litigation against Dai.  At the same time, Defendants provided false testimony to PRC police and leveraged their government connections to cause the issuance of an arrest warrant in China for Dai and his colleagues at Khan Funds.  A few weeks later, they ordered an associate to attempt to gather information about Dai from one of his friends, and then coordinated a relentless attack on his public Twitter account, replete with death threats and degrading comments.

15.     Defendants' retaliation and harassment campaign has continued unabated.  In October 2020, Nations Investment took advantage of the February 2019 PRC default judgement removing the Khan Funds subsidiary as general partner of the Nations-Khan Funds partnership to file spurious litigation in Singapore nominally seeking recoupment of the allegedly "diverted" funds, but in fact intended to harass and financially ruin Dai and two of his most loyal employees who sought refuge in the United States in fear of persecution and are named defendants in the Singapore action.  Defendants' Singapore filings are replete with false allegations and stolen and forged documents.  But Dai must defend himself from afar, through Singaporean counsel, because

he fears that he will be snatched up by PRC agents operating in Singapore if he were to go to Singapore for legal proceedings or an eventual trial. The Singaporean action continues to this day as part of the greater effort to retaliate against Plaintiffs for reporting against Defendants' illegal activities. Defendants have even sought in Singapore a worldwide asset-freezing order against Dai, seeking to cut off his ability to fund the prosecution of this and other legal actions in the United States. Defendants' end goal with the Singaporean litigation appears to be to provide a vehicle—through an eventual Singapore judgment and U.S. judgment enforcement—for the Enterprise's tentacles to reach Dai's assets here in the United States.

16. At the same time, the Enterprise hired a powerhouse American investigation firm— Applied Facts Group, a company that describes itself as the "leading global investigations firm you have never heard of"—to surveil and harass Dai over the course of at least a year, with surveillance taking place from morning to night and on Dai's private property. The investigative firm was purportedly retained to serve process on Dai for the Singaporean litigation, but their tactics went far beyond generic service of process. Indeed, in transcripts and emails submitted in the Singapore action, employees of this company identified themselves as "investigators" carrying out various activities. At the same time, the Singaporean court granted Nations Investment permission to effectuate substitute service—obviating the need for any physical service of Singaporean litigation documents at all. Yet Defendants' investigators inexplicably continued to surveil Dai's property in New York.

17. Plaintiffs have suffered immensely from Defendants' illicit scheme and relentless retaliation and repatriation efforts. At all times, Plaintiff Dai knows he faces the risk that he could be forcibly returned to the PRC, where he will face still more reprisal and retribution. Plaintiffs fear for their safety and have had to expend massive sums on personal security. And their business

in the United States has been severely harmed.  Indeed, Dai has been forced to give up the lucrative investment businesses he spent a lifetime building in China due to Defendants' attempt to tarnish his and his companies' reputations.  These falsehoods have also rendered Plaintiffs unable to effectively conduct business in the United States and caused them severe trauma, fear, and anguish.

18.     Enough is enough.  Plaintiffs seek in this action to stop the abusive, unlawful activity they face at every turn and to procure a remedy in the form of treble damages and injunctive relief for Defendants' ongoing illegal racketeering enterprise that has caused so much harm.  Plaintiffs have done everything right.  They have proactively reported efforts to steal American technology.  They have worked with law enforcement to thwart economic espionage in the United States.  And Dai has obtained residency status here based on his extraordinary abilities and contributions, and is currently seeking asylum status given the danger the Enterprises poses to him if he were to return to China.  Yet Defendants continue to attack and harass Plaintiffs at every turn.  Plaintiffs ask the Court to protect them from, and provide redress for, Defendants' relentless campaign against Plaintiffs merely for doing the right thing.  Without further action, Defendants will continue to retaliate against Plaintiffs in furtherance of their ultimate goal: stealing American technology for the benefit of foreign powers.

## **PARTIES**

19.     Plaintiff Khan Funds Management America, Inc. is a New York corporation with its principal place of business located in New York County.

20.     Plaintiff Xuefeng "Eric" Dai is the Chief Executive Officer and owner of Khan Funds.  Dai is a permanent resident of the United States, having received an EB1-A (Alien of Extraordinary Ability) visa.  Recipients of EB1-A visas must "demonstrate extraordinary ability in the sciences, arts, education, business, or athletics through sustained national or international

acclaim."[5]   The recipient's "achievements must be recognized in [his or her] field through extensive documentation."[6]   Dai was a resident of New York State between 2015 and 2020 and currently lives in Florida.

21.      Defendant Nations Technologies Inc. is a Chinese semiconductor company with its principal place of business in Shenzhen, China.

22.      Defendant Nations Technologies (USA) Inc. is California company with its principal place of business in Fremont, California.  Nations USA is a wholly owned subsidiary of Nations.

23.      Defendant Zhaoxue Luo served as Independent Director of Nations from 2009 to 2012 and as President of Nations from approximately 2014 through 2018.

24.      Defendant Yingtong Sun is the General Manager and current President of Nations.

25.      Defendant Junjie Yu served as CFO and Vice General Manager of Nations from approximately 2014 through no earlier than 2018.

26.      Defendant Baoxin Huang is Deputy Manager of Ping An Insurance (Group) Co. of China Ltd. and a former cabinet-level official in the PRC.

27.      Defendant Yaping Chen is a founder of semiconductor company Chengdu RML Technology Co. who was indicted in the U.S. District Court for the Southern District of California on October 18, 2018 as a co-conspirator for efforts to assist in economic espionage.

28.      Defendant HuaXia GPT is a Chinese company focused on semiconductor research with operations in New York and China.

---

[5] *See* https://www.uscis.gov/forms/explore-my-options/eb-1-employment-based-immigration-permanent-workers-extraordinary-abilityoutstanding-professor-or.
[6] *Id.*

29.     Defendant Optimum Semiconductor Technologies ("OST") d/b/a General Processor Technologies is a Delaware company focused on semiconductor research with its principal place of business in Tarrytown, New York.  OST is registered to do business in New York and New Hampshire.  OST is a wholly owned subsidiary of HuaXia GPT.  While GPT appears to be a d/b/a name for OST, GPT holds itself out as a separate entity, describing OST as an "affiliate company."  However, GPT and OST share the same Chairman of the Board (Defendant Keyi "Kerry" Li), CEO (John Glossner), President & COO (Gary Nacer), and CTO (Mayan Moudgill).  To the extent OST and GPT are separate entities, actions taken by Li, Glossner, or other shared officers and employees were taken on behalf of both companies.

30.     Defendant Keyi "Kerry" Li is the Chairman of the Board of both OST and GPT (to the extent GPT is a separate entity) and a semiconductor expert.  He resides in New York State.

31.     Does 1-20 are named as additional defendants, whose identities are unknown at this time, noting that Plaintiffs have reason to believe that other individuals and/or entities may be willingly and knowingly working with one or more of the Defendants to support or authorize the unlawful acts, tortious conduct, transactions, practices, and other courses of conduct giving rise to the causes of action alleged in this Complaint.  Plaintiffs' investigation into the identities and locations of Does 1-20 is continuing and Plaintiffs believe that substantial additional evidentiary support will exist to reveal the identifies and locations of Does 1-20.

## JURISDICTION AND VENUE

32.     This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over Plaintiffs' common law claim pursuant to 28 U.S.C. § 1367.

33.     This Court has general personal jurisdiction over Defendant OST because its principal places of business is in Tarrytown, New York.  *See Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014).  This Court also has general personal jurisdiction over Defendant Kerry Li because he is domiciled in New York State.

34.     This Court has specific personal jurisdiction over Defendants OST, HuaXia GPT, and Kerry Li pursuant to CPLR § 302(a)(1) because they conduct business in the state of New York.  This Court has specific personal jurisdiction over Defendants Nations, Nations USA, Zhaoxue Luo, Yingtong Sun, and Junjie Yu pursuant to CPLR § 302(a)(1) because they transacted business in the state through their systematic and continuous business dealings with Plaintiffs, OST, HuaXia GPT, and Kerry Li in New York.  Nations' use of a New York bank account provides additional support for jurisdiction under CPLR § 302(a)(1).

35.     This Court has specific personal jurisdiction over Defendants Zhaoxue Luo, Nations, Nations Investment, Kerry Li, and OST pursuant to CPLR § 302(a)(2) because each of these Defendants has "commit[ed] a tortious act within the state."  While in New York, Luo committed violations of civil RICO (18 U.S.C. § 1962(c)), including the predicate acts of wire fraud through his communications in furtherance of defrauding Plaintiffs and extortion through his threats against Plaintiffs; Luo committed common law fraud based on his repeated misrepresentations relating to the Partnership while in New York.  Kerry Li and OST, while in New York, committed violations of civil RICO (18 U.S.C. § 1962(c)), including acts of wire fraud in furtherance of their deception relating to their partnership.

36.     Jurisdiction over all Defendants in this action is also proper pursuant to CPLR § 302(a)(2) because the facts set forth herein establish conspiracies among Defendants.  Each Defendant was a member of the conspiracy, each Defendant had an awareness of the effects of

their activity on Plaintiffs in New York, and all of the Defendant conspirators committed an overt act to further the conspiracy or orchestrated the conspiracy as set forth in greater detail below. Defendants acted in concert with each other and with each other's active support and approval to accomplish their common objectives.

37.     This Court has specific personal jurisdiction over Defendants Nations, Nations USA, Nations Investment, Zhaoxue Luo, Yingtong Sun, Junjie Yu, Baoxin Huang, Yaping Chen, HuaXia GPT, OST, and Kerry Li pursuant to CPLR § 302(a)(3) because each of these Defendants has "commit[ed] a tortious act without the state causing injury to person or property within the state." Such tortious acts include, but are not limited to, violations of civil RICO (18 U.S.C. § 1962(c)), including predicate acts of extortion, witness intimidation, witness retaliation, obstruction of justice, as well as behavior amounting to common law fraud, and violations of the Computer Fraud and Abuse Act (18 U.S.C. § 1030). Pursuant to CPLR § 302(a)(3)(i), each of Defendants Nations, Nations USA, Nations Investment, Zhaoxue Luo, Yingtong Sun, Junjie Yu, and Yaping Chen "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state" through their systematic and continuous business dealings with Plaintiffs, Kerry Li, and OST in New York; through the substantial profits derived from these dealings with Plaintiffs, Kerry Li, OST; and through the operation of a bank account in New York. Similarly, each of Defendants Kerry Li, OST, and HuaXia GPT do the same through their continuous business activities and substantial profits derived in New York. *Id.* Furthermore, each of these Defendants "expect[ed] or should [have] reasonably expect[ed]" their tortious acts "to have consequences in the state" and "derive[d]  substantial revenue from interstate or international commerce" pursuant to CPLR § 302(a)(3)(ii).

38. If this Court finds that Yaping Chen, who is currently a fugitive at large, is not subject to jurisdiction in any state's courts of general jurisdiction, this Court would have jurisdiction over Chen pursuant to F.R.C.P. 4(k)(2) through Plaintiffs' civil RICO (18 U.S.C. § 1962(c)) claim, *see* 18 U.S.C. § 1965 ("In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States."). F.R.C.P. 4(k)(2) provides that "serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant" if "exercising jurisdiction is consistent with the United States Constitution and law." Defendant Chen has sufficient minimum contacts in the U.S. pursuant to his prior residency, continuous business dealings in the U.S., and tortious activities conducted in the U.S. as described in this Amended Complaint.

39. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claims occurred in New York County.

## FACTUAL ALLEGATIONS

### A. Defendants Establish A Worldwide Enterprise Designed To Procure Critical Military Technology By Any Means Necessary.

40. Chinese leader Xi Jinping has called on the People's Liberation Army to accelerate its transformation to a "world-class military." A necessary component of this overhaul is the semiconductor chip—a tiny circuit that powers the processing of vast quantities of data. These chips and related technologies play a pivotal role in next-generation weapons systems, such as stealth fighter jets and surface-to-air missiles.

41. But the PRC has fallen behind in this next-generation arms race, lacking the technical designs and the expertise required to produce critical semiconductor technology. Rather

than develop this capacity through legal means, the PRC has engaged in a coordinated effort to steal these technical designs and expertise by any means necessary.  According to FBI Director Christopher Wray, "the Chinese government is determined to acquire American technology, and they're willing to use a variety of means to do that—from foreign investments, corporate acquisitions, and cyber intrusions to obtaining the services of current or former company employees to get inside information."[7]  As a part of this effort, the PRC uses wide-ranging talent recruitment programs to acquire technology from abroad through illegal means and export it to China.  In fact, experts have concluded the PRC retains a network of tens of thousands of professionals around the world who have agreed, through various means, to help China increase its military prowess.

42.     Defendants, operating through the Enterprise, sit at the vanguard of this global effort.  Defendants have coordinated the recruitment, grooming, financing, and management of various business, finance, science, and technology professionals all over the world, and the nominally legitimate organizations they work for or control, in order to accomplish the aims of their criminal enterprise.

43.     Nations is a core part of the scheme.  The company was incorporated in China in 2000 and is a leader in China's information security and integrated circuit design industry.  Nations has deep and longstanding connections to the PRC government, including with the government serving as a major client.  At the time of its 2009 IPO, Nations' controlling shareholder was a PRC-owned entity named China Integrated Circuit Design Corp., Ltd.  As Defendant Luo has explained, "Nations' aim" is "converting civilian technology to develop military technology."

---

[7] Department of Justice Office of Public Affairs, *PRC State-Owned Company, Taiwan Company, and Three Individuals Charged With Economic Espionage* (Nov. 1, 2018), https://www.justice.gov/opa/pr/prc-state-owned-company-taiwan-company-and-three-individuals-charged-economic-espionage

Nations USA is Nations' wholly owned American subsidiary.  That company was incorporated in 2010 and is based in Fremont, California.  Nations USA acts as a research and development center for Nations with a focus on chip technology.  Nations maintains further subsidiaries incorporated in Hong Kong, Singapore, and Japan.

44.     As a result of their connections to the PRC government, Sun and Luo were appointed to serve as Nations' leaders.  Luo has admitted, in fact, that "top leaders" of the PRC handed him control over Nations to accomplish state aims.  Specifically, as Luo would later explain to Dai in a meeting held in New York in 2017, "the country gives [sic] me Nations Technologies." In particular, he described a China Securities Regulatory Commission meeting around the time of Nations' IPO at which it was announced that "[a] decision was made by the Standing Committee of the Central Government Political Bureau to let the state-owned enterprise [China Integrated Circuit Design Corp] retreat and let Luo Zhaoxue to serve [sic] as the Chairman."  Luo was therefore "responsible to the country."  Luo served as Independent Director of Nations from 2009 to 2012, and as Chairman of the Board of Directors from 2014 to 2018.  Sun was appointed as Deputy General Manager of Nations in 2003 and General Manager and Chief Executive Officer in 2005, a role he holds today.

45.     Luo's history in business and military espionage made him uniquely well suited to lead Nations.  As a teenager, he fought in the People's Liberation Army in the Vietnam War.  Later, in the 1990s, he spied for the PRC in Russia, where he acquired technical blueprints for military aircraft.  From an unknown date to at the latest 2014, Luo held the rank of a Lieutenant General in the People's Liberation Army.  Luo has also served as a consultant for an affiliate of China Aerospace Science and Industry Company, a Chinese state-owned company that designs, develops, and manufactures a range of spacecraft, missile systems and ground equipment and is

closely associated with the PRC military.  Luo also has significant leadership experience in various Chinese businesses, including as a deputy editor of a news organization and as the chairman of multiple manufacturing companies in China.  These roles provided Luo with the contacts and connections across the private and public sectors that enabled him to establish Defendants' criminal enterprise.

46.     Sun also had a strong connection to the PRC government before he started his role at Nations.  Before joining Nations, Sun worked as a manager at the State Development & Investment Corporation, China's largest state-owned investment holding company.  He also served as a delegate on the Shenzhen City National People's Congress.

47.     Luo and Sun also worked to recruit and manage Yaping Chen, Yi-Chi Shih, Kerry Li, John Glossner, Optimum Semiconductor Technologies, and countless others around the world to staff the various needs of their conspiracy.  Luo began soliciting Chen's participation in the Enterprise as early as around 2006.  Chen is an expert in semiconductor technology.  He has served as General Manager of Chengdu RML Technology Co., a publicly traded semiconductor production company in China controlled by Jieru Deng.  RML Technology also manufactures and sells radar components, with the PRC military representing 90 percent of its sales.  Chen has also served on the Board of Directors of Chengdu Ganide Technology Co., a PRC-owned semiconductor producer in China.  Chen has been a core member of the Enterprise:  Over the course of several years, he has illicitly acquired blueprints and raw materials used in the production of semiconductors from U.S. and other foreign companies in the United States for use in China. Chen also played a key role in managing and compensating other Enterprise members.

48.     Yi-Chi Shih, another co-conspirator, worked closely with Chen.  Shih served as Chen's on-the-ground technical expert who facilitated the theft of the semiconductor technology.

Shih's connections to Chen are longstanding:  On information and belief, Shih was solicited to join the Enterprise as early as 2006.  When Chen applied for a US visa, he listed Shih as a local contact.  Before his arrest and April 2019 conviction for economic espionage, Shih worked in the U.S. defense industry for twenty-five years and served as a professor at UCLA.  He had previously managed Chengdu GaStone Technology Co., Ltd., a PRC entity that established a semiconductor foundry in Chengdu, PRC; in 2014, the U.S. Department of Commerce designated Chengdu GaStone as being a risk to U.S. national security or foreign policy interests.  Along with Chen, he served as a member of the Board of Directors of Chengdu Ganide Technology Company and co-founder Chengdu RML.

49.     On information and belief, Shih and Chen engaged in criminal conduct to advance the aims of the activities of the Enterprise that is at the heart of this case.  For example, in or about June 2011 Chen deposited approximately $3.4 million of funds that, on information and belief, were derived from Nations, into a bank account held by Reach Perfect Inc., a British Virgin Islands company controlled by Nations.  Despite having possession of those funds, Chen had no formal relationship with Nations.  On information and belief, these funds were used to finance Defendants' criminal scheme and to compensate Shih and others for the illicit acquisition and unauthorized export of certain semiconductor chips and designs.  On information and belief, in or about August 2011, with Nations' support and Luo and Sun's authorization, Chen used Nations' funding to approve monthly payments of $67,000 to Shih as compensation for Shih's work in planning and executing illicit acquisitions and exports.  On information and belief, Chen and Shih further used Nations' financing to continue to utilize and further develop the technologies Defendants were illicitly acquiring.

50.     Further cementing the partnership between Nations and its California base, in July 2017 Nations publicly announced that its subsidiary, Nations Investment, had begun a joint project with Chen and another entity that would invest RMB eight billion (approximately $1.5 billion) to develop and produce semiconductors in Chengdu province (the "Chengdu Project"). Nations' 2017 annual report stated that Yaping Chen and his technical team contributed the necessary designs and expertise to manufacture these semiconductor wafers.  As part of the project, Yaping Chen's team received RMB 100 million (approximately $14 million) from Nations.

51.     Defendants Kerry Li and OST along with non-party (but member of the RICO Enterprise) John Glossner have also served as a part of Defendants' racketeering activities and conspiracy.  OST (and GPT to the extent it is a separate entity[8]) is a prominent developer of processor cores and licensable semiconductor intellectual property that is partially and indirectly owned by Nations.  Li is OST's and GPT's Chairman and a leading semiconductor expert.  Li is also associated with several other Chinese and international semiconductor companies.  Glossner is OST's and GPT's CEO.  On information and belief, he first came into contact with Nations through his work with the nonprofit Heterogenous System Architecture Foundation.  Glossner founded Sandbridge Technologies, Inc. in 2001, which he eventually sold to HuaXia GPT, the parent company of OST, in 2010.

52.     Both Li and Glossner are linked to the PRC government and the CCP.  In interviews published in the official media arm of the CCP, Li has advocated for China to be on the forefront of chip technology and manufacturing, including "winning the dominance" of industrial development in the context of international competition.  He has stated that he dreams of "serving his country" through advancing technological innovation.  Glossner is also listed as a professor of

_____

[8] Allegations hereafter relating to OST are also made about GPT to the extent GPT is a separate legal entity.

the University of Science and Technology Beijing, where he also serves as the head of one of its research laboratories. That university is associated with the CCP's Ministry of Education. Glossner received these prestigious appointments just two months after Luo visited OST's New York headquarters in 2017. Both Li and Glossner were named to China's "Thousand Talents Plan" in 2009. The Thousand Talents Plan was one of China's central efforts in the recruitment of talent to further its economic espionage. The FBI has concluded that members of the Thousand Talents Plan, such as Li and Glossner, are "usually contractually obligated to essentially use the knowledge they have obtained from their foreign employers to successfully fulfill the terms of their contract." In response to U.S. government scrutiny, China has attempted to delete all online references to the Thousand Talents Plan. On information and belief, the Thousand Talents Plan was one means to solicit Li and Glossner to join Defendants' conspiracy.

53.     In or around 2006, Luo solicited Li to join the Enterprise. On information and belief, Li agreed. As a consequence, OST serves as the strategic base for Enterprise activities and operations, including the management of the Enterprise's technical experts. Pursuant to this relationship, Luo visited OST's offices in September 2016 and 2017. The relationship between Luo and Li expanded in 2017, when Nations entered into research and development cooperation projects with related Chinese chip design entities Huaxia GPT and Wuxi DSPU Technology Co Limited ("Wuxi DSPU"), which later became Optimum Semiconductor Technologies. Li controlled each of these companies.

54.     In June 2018, Nations, via Nations Investment, acquired a 21.37% stake in Huaxia GPT for RMB 140 million (approximately $21 million). This investment was subject to media scrutiny in China, with articles questioning why Nations invested in a company with an audited net asset book value of negative RMB 12 million (approximately $1.7 million). In actuality,

business considerations played no role in the acquisition:  Its sole purpose was to further the aims of the Enterprise by securing a base from which to steal semiconductor technology.

55.     On information and belief, the Enterprise's web spreads far beyond Chen, Shih, OST, Li, and Glossner.  A subsidiary of Nations, Nations Hong Kong, Inc., has invested in at least one other U.S. semiconductor company, Ambiq Micro, Inc.  The investment is highly suspect: Nations' 2018 annual report records a payment of RMB 1,965,706.21 (around $275,000) to Ambiq Micro for the purchase of "raw materials."   Their relationship is ongoing, with Nations' 2021 annual report recording a payment of RMB 7,328,451.08 (approximately $1 million) from Ambiq Micro for Nations' provision of services.  On information and belief, the Enterprise intended to leverage this investment to steal semiconductor technology just as it attempted to do with OST, and has succeeded in illicitly exporting semiconductor materials to China through this relationship with Ambiq Micro.  On information and belief, the technical experts at Ambiq Micro are just a small sampling of the numerous technical experts that Luo has boasted work at his behest.

* * *

56.     In sum, over the course of a decade, Luo, Sun, and Nations developed a broad range technical team across the United States and around the world.  With this team in place, they needed legitimate financial and investment professionals in the U.S. to help them launder funds and facilitate the acquisitions required to steal high technology for the ultimate benefit of the PRC military.

57.     One such candidate was Plaintiff Eric Dai and his company, Khan Funds.

**B.     Dai Runs Successful Investment Businesses In China And Brings His Exceptional Abilities And Expertise To The United States.**

58.     Plaintiff Xuefeng ("Eric") Dai was born in Chongqing, China.  After graduating from medical school and while working as a dentist, he began to make investments that yielded

substantial returns.  Dai eventually switched careers to work in finance.  In 2006, he founded his own company, Khan Funds, then based in Shenzhen, China.  Harnessing his medical background, he developed innovative methods for analyzing biomedical and pharmaceutical companies.  Soon, he turned Khan Funds into an industry giant.  Under Dai's leadership, Khan Funds employed more than fifty people and ran fourteen hedge funds with assets totaling over a billion dollars at its height.  Dai's success brought him worldwide renown as a leading expert in the biomedical investment sphere, and he has even been called the "Chinese Warren Buffet."

59.     In 2014, Dai sought to expand his burgeoning firm to the U.S. market.  Dai formed a mergers and acquisitions team to work to acquire U.S.-based biomedical companies and merge them with similarly situated China-based companies.  With his reputation in China and expertise in the Chinese biomedical market, he could market his proposed U.S. acquisitions at a premium in China.  As part of this effort, in October 2014 he founded Plaintiff Khan Funds Management America, Inc. to serve as the global headquarters for his businesses and the umbrella parent company to all of his wholly-owned affiliated entities located in China, Singapore, and elsewhere.  Khan Funds America would also serve as the base for hedge fund offerings Dai planned to facilitate in the United States.  Dai also established Beijing Qilong Medical and Pharmaceutical Holding Co., Ltd. ("Beijing Khan") as a wholly-owned subsidiary of Khan Funds China to serve as the China-based entity for the project.  In October 2015 Dai moved to New York permanently to run Khan Funds, having received a visa in January 2014.

## C.     Defendants Attempt To Ensnare Dai In Their Criminal Conspiracy.

60.     By 2014, Dai had established himself as successful hedge fund manager in China and Luo had taken notice.  Luo believed Dai was the ideal candidate to further the Enterprise's goals in the United States.  As Luo would explain years later, Luo thought Dai was "well-educated,

low-key, hardworking, pragmatic, and professional."  Luo needed to find someone like Dai to achieve the Enterprise's aims.

61.     In May 2014, Luo's longtime friend Baoxin Huang introduced Dai to Luo and Sun, leveraging Huang's acquaintance with Dai's cousin.  Huang was a former PRC cabinet-level official who served in various roles in the government's national security apparatus.  During their initial meeting, Luo expressed his interest in partnering with Dai, and Huang encouraged that partnership.  This group met again in August 2014 and May 2015, with Huang again encouraging the parties to cooperate.  Dai took Luo's claimed interest in investing in Khan Funds at face value and—particularly with Huang's endorsement—believed Luo had been acting in good faith.

62.     In early September 2015, Dai informed Luo that he planned to relocate to the United States to expand Khan Funds' hedge fund business.  As planned, Dai moved to New York in October 2015.  Shortly thereafter, Nations' Chief Financial Officer and Vice General Manager Junjie Yu indicated that Luo wanted Nations to invest part of Nations' RMB two billion (approximately $286 million) cash holdings in a partnership with Khan Funds.  In early October 2015, Dai traveled to China and met with Luo at a private social club in Shenzhen, where Luo himself again confirmed his interest in the proposed Nations' investment and his hope that Nations would be the sole and exclusive outside investor.  Specifically, they discussed Dai's planned strategy of making investments in the biomedical industry in the U.S. and Europe through the purchase of investment products Khan Funds entities would offer.  Luo confirmed Nations' interest in participating in such a strategy.  On October 8, 2015, Yu contacted Dai and restated Nations' intention to invest in the fund as its sole and exclusive investor.  Shortly after these meetings, Dai returned to New York.  Over the next few weeks, Yu called Dai multiple times indicating that the

partnership negotiations were moving along and that he would continue to work with Dai's associates to finalize the Partnership Agreement.

63.     On November 23, 2015, Beijing Khan and a wholly-owned subsidiary of Nations, Shenzhen Qianhai Nations Investment Management Co., Ltd. ("Nations Investment") entered into the Shenzhen Guotai Qixing Industry Investment Fund Management Centre Partnership Agreement (the "Partnership Agreement").   Under the terms of that agreement, Beijing Khan would serve as General Partner and Executive Partner of the resulting Partnership, and Nations Investment would be only a Limited Partner.  Partnership Agreement §§ 2.31; 2.32.  The agreement also conferred on Khan Funds the sole and exclusive right to make independent investment and management decisions for the Partnership.  *See, e.g., id*. §§ 2.6.5; 2.6.6; 6.1.  Nations Investment, the limited partner, was expressly forbidden from participating in or interfering with such decisions.  Khan Funds' investment authority was a material part of the Partnership Agreement— indeed, this conferral of exclusive authority was set forth a dozen times in the Partnership Agreement.  *See id*. §§ 2.6.5; 2.6.6; 4.25; 4.3.1; 4.3.2; 4.3.3; 5.3.1; 5.3.2; 6.1; 6.2; 6.3; 6.4. Following the execution of the Partnership Agreement, Nations Investment invested RMB 300 million (approximately $42 million) in one of Khan Funds' investment vehicles.

64.     In mid-to-late 2015, Dai relocated to the U.S. on a long-term, permanent basis to work on developing Khan Funds America as the U.S. headquarters of his business on Wall Street. Ultimately, Dai became a lawful permanent resident of the United States, receiving an EB1-A (Alien of Extraordinary Ability) visa.  The U.S. government approved Dai's request for an exceptional abilities visa within five days of his submission.

65.     Now settled in New York, between January and September 2016 Dai worked tirelessly to identify suitable biomedical investment targets in furtherance of the fund.  Plaintiffs

expended countless hours and resources on extensive research, due diligence, meetings, and assessments on numerous acquisition candidates, and expended more than $1 million in consulting, legal, and other fees related to these efforts. These efforts eventually culminated in overseas roadshows in the PRC showcasing the target acquisitions, which generated significant interest in the industry. By May 2016, Khan Funds had identified a suitable San Diego-based target focused on clinical research related to diabetes and other endocrine diseases.

66. Nations, however, never intended to abide by the Partnership Agreement. Nor did Nations have any interest in Dai's strategy to acquire biomedical companies. Rather, from the moment Luo, Sun, Nations, and Huang solicited Plaintiffs, they intended to lure Plaintiffs into creating the Partnership and then leverage Nations' investment to co-opt Plaintiffs into participating in Defendants' criminal scheme to steal U.S. semiconductor technology and develop it for military use in China.

67. Luo began to implement the next phase of that scheme in early 2016. On February 2, 2016, at Luo's demand, Khan Funds created a hedge fund called Zhongxinanxin. Luo hoped Zhongxinanxin would serve as a semiconductor-focused fund. Dai, however, was unwilling to manage a semiconductor-focused fund. He had no experience in semiconductors, no knowledge of the industry, and no interest in taking his business in that direction. As a consequence, Khan Funds never procured a license for Zhongxinanxin with the China Securities Regulatory Commission (the PRC equivalent of the SEC), nor registered any capital for that firm. Luo soon found out. Once he realized Plaintiffs had failed to license the new semiconductor fund, Defendant Yu personally went to Khan Funds' office in Shenzhen to demand that Khan China properly license Zhongxinanxin with the China Securities Regulatory Commission and inject 10MM RMB (approximately $1,500,000) registered capital into the fund. Dai refused.

68.     Around March 2016, Luo called Dai (then located in New York) from China.  Luo summoned Dai to meet Luo in New York for assistance with a "personal favor" nominally unrelated to Luo's position at Nations.  Specifically, Luo sought Dai's assistance in establishing an account at a financial institution in the United States for a British Virgin Islands company.  Unbeknownst to Dai, Luo intended to use this bank account for the purposes of laundering the Enterprise's illegal racketeering proceeds and financing its activities.  As planned, Luo visited New York on May 7, 2016.  Upon Luo's arrival, Dai arranged for Luo to meet with China Merchants Bank's New York Branch to establish Luo's new account.

69.     Days later, Dai went to visit Luo in his hotel, and Luo pushed the scheme even further.  Luo informed Dai that Luo had just met with an old friend from upstate New York in the semiconductor industry.  Dai was surprised, as Luo had previously represented to Dai that he had no contacts in New York.  On information and belief, Luo's contact was Defendant Kerry Li of OST, both based in Westchester County, New York.  Luo also told Dai that he hoped Dai would acquire semiconductor companies through the Partnership.  Given that Luo and Nations had no right to manage the Partnership's affairs, that Khan Funds had no expertise in connection with acquisition of that type of complex technology, and that RMB 500MM (approximately $72 million) was insufficient to fund such a transaction anyway, Dai disregarded Luo's suggestion.  Dai proceeded with his plans for his biomedical transaction.

70.     Following Luo's trip, Plaintiffs continued their efforts to acquire a biomedical industry target.  Around this time, Dai traveled to Beijing for the roadshow effort to market potential biomedical acquisitions.  Before Dai departed to China, Baoxin Huang called Dai in New York encouraging Dai to meet to discuss Partnership business.  As planned, Dai met with Baoxin Huang and two executives of the San Diego biomedical company that Plaintiffs planned to market

in China.  This meeting was only one instance of Huang's involvement in the activities of the Khan Funds-Nations partnership.  Despite holding no formal role at Nations, Huang called Dai, located in New York, around once each month between around October 2015 and November 2017.  During these calls, Huang often asked about the status of the partnership as well as Dai's relationship and dealings with Luo.  On information and belief, Huang conducted these calls at the direction of or in concert with Luo to encourage Dai to continue with the Partnership and gather information on Dai's perspective and intentions in furtherance of the scheme.

71.    In June 2016, while Dai was in New York, Dai telephoned Yu in China.  Dai mentioned to Yu that he did not think that Luo seriously intended to invest in the biomedical industry as the Partnership had originally imagined.  Yu reassured Dai that his fears were unfounded and told him to proceed as originally planned.  Unbeknownst to Dai, Yu was misleading Dai to gain his trust so that Nations could facilitate an additional capital contribution and bring more money to the United States to further the Enterprise's aims.  Satisfied with Yu's reassurances, Dai approved Nations' RMB 200 million (approximately $29 million) capital contribution in July 2016.

72.    That additional capital contribution provided Nations added leverage over Khan Funds.  And with that leverage in hand, in August 2016, Yu, located in China, called Dai in New York.  Yu told Dai that Luo was angry with Dai's refusal to move forward with the semiconductor effort.  Yu threatened the termination of the Partnership if Dai did not meet Luo's demand.  Dai, surprised at the sudden shift in Nations' approach, again refused.

73.    Frustrated with Dai's unwillingness to go along with his plans, Luo tried a new approach.  In early September 2016, Yu asked a Khan Funds executive named Xinmanni "Sophie" Xu to visit Beijing, nominally so he could introduce her to new business contacts.  Xu agreed.  But

just before meeting with the unidentified business contacts, Yu informed her that they would be meeting representatives from HuaXia GPT—OST's parent company. Yu indicated that Luo hoped Khan Funds would invest in the company. Subsequently, Xu and Yu had an introductory meeting with two HuaXia GPT representatives. The meeting yielded no transaction or investment. On information and belief, Kerry Li, located in New York, worked with Nations, Luo, and Yu to help coordinate this meeting.

74. In September 2016, Luo travelled to New York to again try to convince Dai to purchase a semiconductor company. As part of this visit, Luo visited OST's office in Tarrytown, New York, to maintain his connections with Kerry Li, John Glossner, and the technical experts at OST and to coordinate the activities of the Enterprise's overall scheme.

75. On September 26, 2016, Yu met with Dai in Beijing and escalated his approach even further. Yu threatened the immediate dissolution of the Partnership if Plaintiffs failed to acquire a semiconductor company. Immediate termination of the fund was a serious threat—it would lead to scrutiny from the Chinese SEC and potentially other repercussions. Dai proposed to terminate the fund in stages in 2018 and 2020 provided no acquisition could be consummated by that time. Yu agreed. A month later, in a meeting in or around November 2016 with Luo in Beijing, Luo told Dai that OST/GPT had offices in both Beijing and New York and hoped that Khan Funds could invest in OST/GPT through the Partnership. In a separate meeting around that time, Yu also pushed Dai to acquire OST/GPT. Again, Dai did not budge.

76. On December 7, 2016 two officials from the PRC's Ministry of State Security (MSS) visited the offices of Khan Funds in Shenzen. On arrival, they displayed their badges and identification and indicated they were investigating an American employee of Khan Funds, but at the same time specifically named Dai, Xu, and Junqi "Alice" Zhang, another Khan Funds

executive.  After being refused entry, these "agents" stated they would return after a few days, but never did.  The MSS is no ordinary police organization; it controls its own police force and has strong connections to the People's Liberation Army.  On information and belief, Defendants caused the MSS to investigate Khan Funds in an effort to demonstrate Defendants' reach and to back up their demands with coercive force.

77.     Between December 2016 and May 2017, Yu repeatedly requested to meet with Sophie Xu and Alice Zhang and repeatedly inquired about Plaintiffs' efforts to acquire a semiconductor company.  On March 17, 2017, Luo directed Yu to summon Sophie Xu and Alice Zhang to Nations' headquarters in Shenzhen.  Once they arrived, Luo expressed his anger over the fact that Plaintiffs failed to make progress on a semiconductor acquisition.  Luo angrily banged on the table, pointed to Ms. Xu and Ms. Zhang, and yelled in sum and substance, "You only claim to have worked on the M&A, but in fact you have done nothing.  There are consequences for lying to me, and [these consequences are] very serious!"  He further stated that Plaintiffs must move forward on the semiconductor acquisition, and that Nations had no interest in the biomedical industry.  Alice replied that Khan Funds' focus lay in the biomedical industry, not the semiconductor industry, and that Khan Funds could not be expected to make such an acquisition. In response, Luo angrily banged the table again, and shouted "You should take notice of what you say, and what you do! You should know who I am!"

**D.     Luo Reveals The Full Scope Of The Conspiracy And Threatens Dai, His Family, And His Employees**

78.     A few months later, in September 2017, Luo traveled to New York to maintain the pressure campaign on Plaintiffs and coordinate with members of the conspiracy's New York base. In meetings in New York with Dai on September 10, 2017, September 12, 2017, and September 14, 2017, Luo finally revealed the true scope of Defendants' scheme.  He also made a series of

demands and extortionate threats against Dai, his family, and his associates.  Dai, at this point suspicious of Luo, recorded these meetings.

79.     In these recorded encounters, Luo made a series of chilling statements.  He admitted Nations never intended to invest in a biomedical acquisition via the Partnership.  Instead, Nations—on a "special mission from the state" (the PRC)—had always sought to use Plaintiffs to gain access to readily sourced capital that would allow Defendants to finance their criminal operations through nominally legitimate channels.

80.     Luo explained that he had "kept a special path for" Plaintiffs to orchestrate and manage Defendants' finances, and "hope[d] that everyone can work together in the funding strategy aspect."  He went on:

> "However, I am shouldering a special mission for the state and I told you at the time that I particularly needed this money.  However, I was following instructions from Beijing.  I said it to you clearly at the time, but I couldn't say it too clearly. It wouldn't be safe if I had said it too clearly.  Including Taiwan, these global experts all make contacts with me unilaterally. I have to be directly responsible for their safety.  Can the state directly give this money to them? Can it be sent from the state's finances? Not possible.  I am entrusting such important information and hope to you."

81.     Luo also finally revealed the overarching purpose of the Enterprise's original scheme—to acquire high technology for the benefit of the PRC military:

> "I think you should understand, to work with me, why the state gave me Nationz Technologies.[9]  I believe [Huang] Baoxin also told you this.  There are some things I cannot clearly say to you or Baoxin. This is the country's long-term and important strategic plan. I am shouldering a special mission of the country. I also can't tell you about these, right? After all, a lot of people know about this, and want to work with me and make friends with me."

> "Therefore, these, including Nationz Technologies, including this project in Chengdu, will greatly contribute to our country in three or five years . . . in the next two years, the J-20 Fighter will elevate the technological power for our country's national defense and will impact the U.S. for at least ten years."

---

[9] Nations was known as "Nationz Technologies" until 2018.

82. Luo boasted of the true scope of the conspiracy, and how it had already succeeded in stealing and exporting valuable semiconductor technology. *See* Appendix A, Section V. Luo repeatedly emphasized how he had worked with Yaping Chen's team over the past decade to steal and export technology for use in missiles and jet fighters. Specifically, he mentioned how he had asked Chen to start a "rear team" in Canada "a few years" before to send stolen American technology to China; on information and belief, Ishiang Shih was a member of this Canadian "rear team." He also explained how Chen's team had provided key materials and designs for the Chengdu project, and how the Enterprise had provided RMB 100 million (approximately $14 million) to Chen's team for their work. *See also* Appendix A, Section III. He further explained how he hosted a summit for the Enterprise at the OST headquarters in New York. This summit, as he described, served to develop the Enterprise's personal and professional connections with technical experts across North America, and helped Luo cement his personal leadership over the Enterprise: "I asked them [other members of the Enterprise] to work here for several days and communicate with them. They really respect me now . . . I directly lead them for this." *See also* Appendix A, Section IV.

83. With the rest of his New York base firmly in place and ready to do the bidding of the Enterprise, Luo had lost patience with Dai's refusal to cooperate. Luo made his demands clear: Dai would provide RMB 300 million (approximately $42 million) to finance the Enterprise's purposes. Dai would finally license and provide capital for the Zhongxinanxin, semiconductor fund that Luo insisted Dai create the previous year. And Dai would launder money for the Enterprise for years to come.

84. Luo promised profit, access, and influence if Dai cooperated. As he stated during the recorded meeting: "[b]y helping [the Enterprise] with your intelligence, you can both receive

such profits and at the same time, help me personally, also, through such circumstances you're able to make friends with these people. This is a special channel to develop." Luo continued, "this cooperation will bring you key influence" and this "collaborative relationship with Khan Funds [and the Enterprise]" would be "extraordinary."

85.     Luo also made clear that the consequences of Dai's refusal to cooperate would be dire. In a meeting on September 12, 2017, Luo made the following extortionary threats, all of which were recorded:

    i.    <u>Luo</u>: "From now on, we can cut our ties. However, regarding this matter, you should watch your back, you will regret it. Because on the territory of China, let me tell you, I can say that, after all, you have so many relatives in China. I am not doing it for myself . . . as I told you, you will regret it. Because, you really get me into serious trouble! About this matter, I have been calling you for the past few months and you did not answer any phone call. I also sent you messages, and you never replied. You even refused to meet with me. For so many years in China for me, no matter what I do, who dares to treat me like this?! How can you treat me like this? You think you can just go to the U.S. and not return? Are you joking? I don't believe you won't return to China in your whole life!"

    ii.    <u>Luo</u>: "You also failed me . . . the top leaders asked me to explain . . . you actually did this, Xuefeng, you should think about it! You still have family in China, your mother and sister are in China!"

    iii.    <u>Dai</u>: "Don't be angry, don't be angry, Mr. Luo."

    iv.    <u>Luo</u>: "I'm not angry. If you do things and be a person like this, you will regret!"

86.     That evening, Dai frantically arranged for his mother and older sister to flee China before the Enterprise could reach them; the following day, they evacuated to safety in South Korea. On September 14, in a meeting that was again recorded, Luo continued to threaten Dai, with Dai pleading for Luo not to hurt him:

    i.    <u>Luo</u>: " . . . from the beginning, three years ago I never doubted."

            <u>Dai</u>: "Mr. Luo, I know. We are just like young brothers, please don't hurt me."

    ii.    <u>Dai</u>: "because I won't cut off relations with China, it has to continue."

Luo: "the things I'm doing have zero room for failure.  If I fail, it means that my entire team would be subject to great impact. Therefore, things must succeed.  Let me tell you, I do in fact need funding."

iii.   Dai: "What can I do? I beg you sir I can kneel and kowtow, really. [*Dai kneels*]. We still will continue."

iv.   Luo: "For someone like you who performs private fund management, it is really so easy for the state to get you into troubles. Whether it is funds that you contributed five years ago or a product you did ten years ago, once it is looked into, it can be investigated thoroughly."

Dai: "It would be terrible to be listed as wanted all over the world. You guys can arrest anybody you wish."

v.   Luo: " . . . you still have relatives in China, but when you are old, you may not even have a true friend or partner that you can rely on."

vi.   Luo: " . . . we have established this channel for communication and to send messages, I have said not to call me 'Mr. Luo' in your messages.  We could just find a code word, 'President Wang' or whatever the case may be. But you insisted to say, 'Mr. Luo.'  What can I say to you if you do things like this?"

Dai: "I was scared that day at noon, I was dizzy."

Luo: "What else did I tell you?  Be rigorous in everything you do.  You cannot lose focus on what you intended to do even when there is a knife to your throat.  Be a man!"

Dai: " . . . when you said that, I was thinking my mother and older sister, they don't want to come to the US and don't like it here.  I still learned some English, but they don't understand English at all and don't want to come to the us at all."

Luo: "Xuefeng, I have entrusted my overall strategic purpose to you.  However you didn't fulfill the commitment in the past year . . . whether it is in Shenzhen, or whether it is with the public security, it is very simple to find a way to put someone in a bad situation . . .  You can't go against the country.  Whether it is national security or public security, when the state asks you a favor, don't dare refuse to help!  For the state's interest, these types of things are very easy.  If you fly on an airplane and go through customs, they can randomly put drugs in your luggage and you will be arrested all of a sudden.  Let me tell you, there are many ways to arrest someone.  We can't be this way between us.  Firstly, I will not harm my friends. I am someone who values friends . . ."

Dai: "Mr. Luo, please be generous and don't hurt me at any given point in time. I will even kneel to you." [*Dai kneels*].

Luo:  "Xuefeung, us two brothers are here today to discuss and make our words clear.  You are still young.  We will still have connections in the future and you will still go back to China."

Dai:  "You are the one who just lifted me up . . . please remember at any given time that you were the one who lifted me up.  Please remember at any time and you must not push me in a ditch.  With such understanding I will certainly support you at any time."

Luo:  "Go back to China if you want to go back.  Your relatives are in China and you also don't need to worry about them.  Why?  You chose to work with Nationz Technologies, but you don't understand the status of Nationz Technologies in this circle and in the system. Our cooperation with Khan Funds means giving you honor."

vii.  Luo:  "Brothers or whatnot, think about how you are supposed to cooperate.  Privately, you should honor your commitment.  How to honor it?  You have to consider your safety and can't leave your problems."

87.    In the exchange transcribed and translated above, Luo repeatedly mentions Dai's family in China in connection with trying to force Dai to cooperate; makes threats to Mr. Dai's safety; and threatens that the Enterprise can use the PRC government to harass, investigate, and even arrest him on false pretenses.  During these calls, Luo repeatedly mentioned both his power to influence the China Securities Regulatory Commission and his deep connections with the PRC military, bolstering these threats.  *See* Appendix A, Sections I-II. Dai, feeling that he was in serious danger, repeatedly pleads for Luo not to hurt him and to not be angry with him.  These extortionate and coercive threats put Dai in fear of his safety, the safety of his family, and the safety of his employees.

**E.    Dai Reports The Enterprise To The FBI And Defendants Launch Their Retaliation Campaign, Which Is Ongoing**

88.    Shortly after this frightening episode, Dai reported the Enterprise's activities to the New York Field Office of the Federal Bureau of Investigation.  A few weeks later, he also initiated investigatory proceedings with the United States Attorney's Office for the Southern District of New York.  Dai met with the FBI four times over the next two months.  Between April 2018 and

June 2018, the FBI asked Dai about Yaping Chen, Dingtian Technology, Chengdu GaStone Technology, China Electronic Technology, and trading company Qing'An.  In other meetings, Dai provided key information about Nations, Luo, Yu, Jay Liang, and other members of the Enterprise. The FBI later noted that Dai served as crucial contributor to the FBI's investigations into the PRC's efforts to steal and export American high technology.  Ultimately, over the course of two and a half years, Dai met with federal investigators a total of sixteen times.

89.    Days after Dai first reported the Enterprise, Luo in China called Dai in New York, again requesting that Dai fund Luo's operations via a British Virgin Islands company, and providing explicit instructions on how to wire the funds.  Dai equivocated, hoping to buy time, as Luo was unaware that Dai was cooperating with law enforcement.  In the meantime, knowing that he would be blacklisted in the PRC and fearing that the Enterprise would find a way to freeze his assets there, Dai dissolved Khan Funds' Chinese affiliates.  All told, Dai liquidated fourteen private equity funds that had once managed more than one billion dollars in capital, returning all of this capital to his investors.  Further to these efforts, Dai expended more than RMB 10 million (approximately $1.5 million) to fulfill obligations triggered as a result of his fund dissolutions, including compensation to former clients and employees, as well as penalties and damages for contractual breaches.

90.    In November 2017, Defendant Yu, located in China and not yet knowing that Dai was cooperating with the FBI, called Dai in New York, imploring him to help "lead" and "manage" the financing for the RMB eight billion (approximately $1.5 billion) semiconductor fabrication project Nations had been trying to establish in Chengdu.  Dai again equivocated.  But in late November 2017, Sophie Xu informed Yu that Plaintiffs refused to join the Enterprise.

91.     Dai's refusal to cooperate represented both a major failure and significant risk to the Enterprise.  Dai had wasted years of their time.  They had identified him, invested in him, and cultivated him to join the Enterprise and help launder money towards their goal of procuring semiconductor technology and advancing the Chengdu Project.  But their "investment" in Dai had, in their view, had been wasted.  Worse, Dai knew too much.  Luo's September 2017 revelations had exposed the purpose and scope of the Enterprise, including the identities of Yaping Chen, Kerry Li, and OST/GPT.  Dai had thus become one of the few people in the world who knew the extent of the Enterprise—and one of the few people in the world who could destroy the  intricate web the Enterprise had spun over more than a decade.  In doing so, he could also jeopardize the Chengdu Project, throwing a wrench into the PRC's mission to modernize its military.

92.     In an effort to frighten Dai from exposing the Enterprise and punish him for his refusal to join their efforts, Defendants made good on Luo's prior threats.  Defendants initiated a "Fox Hunt" designed to oppress, retaliate, and punish Plaintiffs.  Fox Hunts are a honed and by now well-reported PRC government strategy to force the repatriation of dissidents back to China under duress to stand trial for their "crimes" against the state.  As part of such an operation, the PRC uses illegal and inhumane tactics, including threatening a dissident's family and friends, conducting intrusive surveillance, and harassing the dissident and their family members to demonstrate the PRC's reach and the country's ability to harm a dissident or her loved ones.

93.     The "Fox Hunt" directed at Dai began around November 30, 2017, after Sophie Xu told Yu that Plaintiffs would not cooperate with the Enterprise.  Within days, Nations activated a coordinated and harassing press campaign against Plaintiffs with an initial false announcement that Dai and his colleagues had absconded from China.  This act was the first of numerous violations of 18 U.S.C. § 1512 (relating to tampering with a witness, victim, or an informant) by

members of the Enterprise directed at Plaintiffs and their employees and associates.  The press campaign—which would last for years—involved countless articles and announcements with false claims that Dai and his associates had embezzled funds.  It also included an extensive so-called "documentary" on Dai's purported wrongdoing shown in China.  This press campaign falsely tarring Dai as a fraudster rendered Dai a persona non grata even amongst many members of his family and longtime friends, ruined his reputation in the business community in China and around the world, and caused severe trauma and anguish.

94.    In December 2017, the retaliatory Fox Hunt picked up even more steam.  The Funds Association of China suspended the financial license of Khan Funds China.  The Funds Association, a government agency, provided no notice to Plaintiffs nor any opportunity to dispute or appeal the suspension.  On information and belief, Defendants caused the Funds Association's suspension—effectuating one of many of Luo's threats to weaponize the PRC government against Plaintiffs.  As the Enterprise hoped, this suspension crippled Plaintiffs' ability to do business in the PRC and further damaged their reputations.

95.    A few weeks later, federal authorities arrested Yi-Chi Shih and a co-conspirator, charging Shih with violations of the International Emergency Economic Powers Act and conspiracy.  According to the arrest warrant, Shih and his co-conspirator accessed the victim semiconductor company's computer systems after the co-conspirator had posed as a domestic customer seeking semiconductor products that would be used solely in the United States.  In doing so, Shih hid from that U.S. company his true intent to transfer the company's technology and products to China.  Assuming that Dai had reported their activities to the authorities, the very day of the Shih arrest the Enterprise burglarized Khan Funds' Singapore office and changed its locks, sending a clear message to Dai.  Defendants' retaliation for Dai's cooperation and attempts to

intimidate Dai from further cooperation violated 18 U.S.C. § 1512, and was the first of many violations of 18 U.S.C. § 1513 (relating to retaliating against a witness, victim, or an informant) and 18 U.S.C. § 1503 (obstruction of justice) by members of the Enterprise directed at Plaintiffs and their employees and associates.  As a result of this burglary, Dai was forced to spend at least $50,000 to retain a law firm to investigate the incident.

96.     A few weeks later, in February 2018, Dai's younger sister traveled to New York. Upon her arrival, she told Dai that she had come to permanently move to America out of her fear that the PRC would retaliate against her.  During her visit, she asked a number of questions about the Enterprise's activity, and Dai revealed that he had reported Luo to the authorities.  The next day, she unexpectedly announced that she was returning home to China.  On information and belief, Luo ordered Baoxin Huang to arrange for Dai's sister to travel to New York to collect intelligence on her brother—a textbook Fox Hunt maneuver.  Indeed, Huang would later admit that Luo asked him to reach out to Dai's sister to gather information about Dai at this time.

97.     In May 2018, the Enterprise initiated a lawsuit in the PRC to remove Khan Funds Beijing as General Partner of the Partnership.  In their filing, Nations Investment made a series of false assertions to the court, including that Nations could not locate or reach Dai.  Ultimately, the Enterprise procured a default judgment against Khan Funds Beijing and Dai in February 2019.  In so doing, the Enterprise again fulfilled Luo's threat to use the Enterprise's government access against Plaintiffs.  The Enterprise was able to achieve a default judgment without ever serving Dai or notifying him of the proceedings, even though at all times they knew Plaintiffs' address and contact information.  Dai was, in fact, unaware of the suit or the default judgment until June 2021 when he first reviewed the initiating documents for litigation against Dai, Xu, and Zhang in

Singapore alleging they had embezzled funds from the Nations Investments-Khan Funds partnership, and the PRC lawsuit filings were provided as exhibits.

98.     The Assistant U.S. Attorney assigned to the investigation initiated by Dai's initial outreach declined to bring a case, citing the fact that key members of the Enterprise were Chinese nationals and would be too difficult to prosecute.  However, on October 18, 2018, approximately one year after Dai had reported to law enforcement, the Department of Justice indicted Yaping Chen, Yi-Chi Shih, Ishiang Shih, Jieru Deng, and others in the U.S. District Court for the Central District of California.  *See United States v. Yi-Chi Shih, et al.*, CR No. 18-00050 (C.D.C.A. 2018). Yi-Chi Shih was indicted for conspiracy to violate the International Emergence Economic Powers Act and Export Administration Regulations, as well as a host of other criminal violations in furtherance of this activity.  According to the indictment, Yi-Chi Shih sent stolen technology to Shih's brother, Ishiang Shih, in Canada.  Ishiang sent the technology from Canada to Chengdu GaStone's semiconductor foundry in Chengdu, China, which Yi-Chi Shih managed.  Chen was indicted as a co-conspirator, with specific allegations that he had laundered funds in furtherance of the criminal activity and paid both Yi-Chi Shih and Ishiang Shih for their work.  Chengdu RML, which Yi-Chi Shih and Chen co-founded, was implicated in the conspiracy along with Chengdu RML's manager, Jieru Deng.  Chengdu Ganide, of which Chen and Yi-Chi Shih sat on the Board of Directors, was also implicated in the scheme.  Importantly, the indictment describes Chen and Shih's activity as beginning just around the time that Luo admitted engaging with Yaping Chen's team.

99.     The indictment had a severe effect on the Enterprise.  Specifically, it  hobbled the RMB eight billion dollar (approximately $1.5 billion) Chengdu project, which had relied on technology Chen's team procured from the United States and elsewhere.  Within weeks, in

December 2018 Nations pulled out of the RMB eight billion partnership with Chen to build the Chengdu project entirely.   The indictment's allegations about Ishiang's role in exporting stolen technology from Canada further corroborated Luo's prior statements to Dai that the Enterprise, through Chen, had established operations in Canada.

100.    Weeks after the indictment was filed, Defendants retaliated against Plaintiffs yet again.  On December 6, 2018, on information and belief, Defendants ordered a cyberattack on Khan Funds' computer systems.  This cyberattack targeted computers and computer networks that were physically located in New York.   On information and belief, through this attack, the Enterprise was able to steal a raft of confidential documents, including copies of certain contracts between Khan Funds China and Khan Funds America, as well as certain correspondence with legal counsel.    Nations Investments later filed these confidential documents in its baseless embezzlement litigation in Singapore on October 27, 2020.  This cyberattack caused Plaintiffs to incur the cost of legal fees and enhanced protections from future cyberattacks and ultimately led to the exposure of confidential business information, among other damages.

101.    The Enterprise continued to ramp up the pressure on Plaintiffs.  On December 25, 2018, Nations announced that Dai and his colleagues were approved for arrest by the Shenzhen People's Procuratorate as fugitives suspected of embezzlement.   The Shenzhen People's Procuratorate is a local branch of the highest State legal prosecretory authority in China—an agency under direct supervision of the National People's Congress and its Standing Committee, the highest organ of the CCP.  On information and belief, Nations used false testimony and utilized its connections with the PRC government to secure this arrest warrant.  In doing so, it fulfilled Luo's threats from 2017.  Apart from the mental anguish resulting from the threat of being jailed in the PRC, the Shenzen arrest warrant restricted Dai's ability to travel to any country that honors

PRC extradition requests. It further led the PRC to freeze Dai's assets in China, including real estate he owns in China and multiple bank accounts.

102.    The Enterprise's relentless campaign continued. In January 2019, a friend of Dai's, Xianhua Ning, a pro-democracy Chinese dissident, was introduced to Yifu Yang, who claimed to be wealthy businessman interested in supporting Ning in his pro-democracy efforts. When Ning met with Yang and his team over dinner, Yang repeatedly asked about Dai and whether Ning had any relationship with Dai. Ning disclaimed any relationship, and Yang left abruptly, never contacting Ning again. On information and belief, Yang was operating on Defendants' orders to uncover information about Dai, as part of the scheme to investigate, intimidate, retaliate against, and repatriate Dai.

103.    Next, between January 2019 and March 2019, Dai received a series of threatening and degrading messages and comments on his public Twitter account by the user "glgl123456". The user's profile photograph depicts Jian Rong, a relation of former Chinese vice premier Yiren Rong. These messages, as translated, include the following:

     i.   "[Y]ou must die, if you remain alive then the heavens would not agree."

     ii.   In response to Mr. Dai's tweet criticizing Xi's leadership style, user glgl1234567 commented, "you should be careful, you would be killed, not by a single bullet but a barrage of bullets."

     iii.   "[E]veryone will die, some by the mountain, others like a feather, you will die by the shit of a cow."

     iv.   "[Y]ou [Eric] are not human. You are a slavish running dog."

     v.   "[Y]ou are fighting with an egg to challenge a rock," implying that Dai cannot challenge the CCP.

     vi.   "[Y]ou are given a license to be a slavish running dog, you are not human."

     vii.   "[Y]ou are weak, not a man but a weak stay at home person kept hidden like a spy."

viii.   In response to Mr. Dai's tweet about the number of Chinese in attendance at the Berkshire Hathaway annual shareholder meeting, User glgl1234567 commented, "if you wake up in the middle of the night to go to the bathroom you will get scared," implying that someone will be waiting for Dai in the middle of the night to harm him.

ix.   In response to Mr. Dai's comparison of the Chinese government to an organized crime unit, user glgl1234567 commented, "this is not your business, worry about your father in America," implying that Dai is wrongfully aligned with the United States.

104.   Due to Jian Rong's connection to the PRC government and the timing of these unprovoked attacks following the Chen indictment, Jian Rong likely used the "glgl123456" account to harass, intimidate, and retaliate against Dai on behalf of the Enterprise.

105.   In August 2019, the FBI asked Dai about Jay Liang, the director of Nations USA in California.  Following this inquiry, the FBI in October 2019 requested that Dai assist in an investigation of Fox Hunt activities.  The FBI's request coincided with defendant Yingtong Sun's arrival in the U.S. in November 2019.  At that time, Sun was the CEO of Nations.  Around the same time as Sun's arrival, the FBI again met with Dai and again requested his participation in the investigation of Fox Hunt activities.  On information and belief, this investigation was geared towards Sun, underscoring the continued attention the FBI maintained on the Enterprise even two years after Dai's initial report.

106.   The Enterprise's activities in prosecuting the baseless Singapore litigation has been equally harassing and confirms the ongoing nature of their retaliatory scheme.  Through the fraudulently obtained February 2019 default judgment against Khan Funds Beijing in the PRC action, Nations Investment formally removed Dai from his position as director of the Partnership on October 16, 2019.  Approximately one year later, as directed by Sun, Nations Investment took advantage of its ill-gotten position in the Partnership to sue Dai, Sophie Xu, and Alice Zhang in Singapore, alleging that they had embezzled funds from the Partnership.  Baoxin Huang later

admitted to Dai during a phone call in February 2022, during which Dai was located in the United States, that the lawsuit was inspired by the Enterprise's personal animosity toward Dai. The Enterprise used the Singapore lawsuit to leverage documents Defendants likely procured through the December 2018 cyberattack on Khan Funds and even included as "evidence" raw forgeries.

107. Nations Investments also abused the Singaporean service of process procedure as cover to surveil, intimidate, and retaliate against Dai. Between November 2020 and September 2021, Nations Investment employed three process serving entities in the United States in a purported attempt to serve Dai with a subpoena to properly initiate the Singaporean litigation. As part of this effort, the process servers conducted extensive surveillance of Dai's property in New York, collecting photo and video evidence on private property. Most of this activity was clearly unnecessary: On February 14, 2021, the Singapore court permitted Nations Investment to effectuate service in the action by email to Dai and to an unmonitored general Khan Funds company email address.

108. And the "process servers" Nations Investment hired appear to be no process servers at all. For example, one of them—Applied Facts—bills itself as "the leading global investigations firm you have never heard of"—hardly the skillset required for standard service of litigation process. And unlike standard process servers, Applied Facts employs "experts in computer forensics, forensic accounting, information technology, as well as clinical psychology [to] cover every angle." Documents obtained by Plaintiffs through filings in the Singapore lawsuit reveal that Applied Facts agents called themselves "investigators," and that Applied Facts sought to obtain private information about Dai. It did so through, among other things, running a background check on him in the United States (certifying that they were doing so for "investigative" purposes).

In the process, Applied Facts obtained Dai's Social Security Number, which Nations Investment's lawyers disclosed in public filings in the Singapore litigation.

109.    Given these suspicious facts, Nations Investment's "service of process" effort appears to have served to further the Enterprise's Fox Hunt efforts.  Indeed, the PRC frequently engages U.S.-based investigators to assist in their Fox Hunt operations; U.S. law enforcement has recognized and even attempted to crack down on this practice.  *See, e.g., United States v. Feng et al.*, No. 20-MJ-1025 (PK) (E.D.N.Y. 2020).  Defendants press the Singapore lawsuit to this day, expecting to obtain a judgement against Dai based on Defendants' false representations that they then hope to domesticate and enforce in the United States—all as part of the overarching effort to harass and retaliate against Plaintiffs for refusing to bend to the Enterprise's will.  Indeed, they have already moved to domesticate in Florida default judgments obtained against Xu and Zhang in Singapore.  And they have sought a worldwide interim asset-freezing injunction designed to prevent Dai from defending himself in litigation and funding the prosecution of this and other legal actions pursued to protect his rights.  Indeed, on December 8, 2022, the Singaporean court granted a short-lived freezing injunction pending a hearing in January—predominantly on the basis of false representations by Defendants that Dai's management of properties in Florida (which includes putting properties on the market in the ordinary course to maximize returns) represents a risk of asset dissipation to justify a temporary freeze.  Nations has made clear that it will seek in the January hearing to cut off Dai's litigation funding and his ability to protect his rights.

45

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### (Violations Of RICO, 18 U.S.C. § 1962(c) – Against All Defendants)

110.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

111.    At all relevant times, Plaintiffs and Defendants were and are each a "person" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c).

112.    Defendants created and ran a wide-ranging association-in-fact enterprise with a clear command structure and operatives in the United States, as well as China and elsewhere. Defendants originally coordinated this Enterprise to accomplish the common goal of stealing high technology for the benefit of the PRC military.  In furtherance of this goal, the Enterprise defrauded and extorted Plaintiffs in an attempt to coerce them to join the Enterprise, and went on to commit numerous additional predicate acts aimed at the Enterprise's related but separate goal and scheme to intimidate and retaliate against Plaintiffs for reporting the technology theft scheme to law enforcement.  The Enterprise's twin goals of stealing high technology, on the one hand, and retaliating against, intimidating, and harming Plaintiffs, on the other, are ongoing, as are its activities in furtherance of these goals.

113.    Plaintiffs were damaged immensely as a direct and proximate result of this pattern of racketeering.  These damages include, among other things, expenditures relating to security personnel out of fear for their own safety, legal, and investigative fees relating to the Enterprise's intimidation and retaliation efforts, and lost U.S. business due to the reputational harm that the Enterprise has wrought on Plaintiffs.  All of these losses have occurred in the U.S. and were the direct and proximate result of activities that occurred in or were directed to New York.

*The RICO Enterprise*

114.    Nations Technologies Inc., Nations Technologies (USA) Inc., Nations Investment, Zhaoxue Luo, Yingtong Sun, Junjie Yu, Jie Liang (Director of Nations USA), Xu Hui (Chief Financial Officers of Nations USA), Baoxin Huang, Yaping Chen, Yi-Chi Shih, Ishiang Shih, Jieru Deng, Chengdu RML, Chengdu Ganide, Chengdu GaStone, HuaXia GPT, Optimum Semiconductor Technologies, Kerry Li, John Glossner, Jian Rong, Yifu Yang, Applied Facts Group, Reach Perfect, Ambiq Micro, along with additional individuals and entities whose existence, identities and roles have been concealed from Plaintiffs by the Defendants, constitute an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

115.    The members of the Enterprise are a group of persons associated together for the common purpose of carrying on two related but distinct ongoing schemes.  In particular, the Enterprise originally formed with the common goal of stealing semiconductor technology for the benefit of the PRC military.  In furtherance of this scheme, the Enterprise defrauded and extorted Plaintiffs in an effort to coerce them into participating and cooperating in the scheme.  When Plaintiffs refused, and instead reported the Enterprise and its activities to law enforcement authorities, the Enterprise hatched a second, related scheme, intimidating and retaliating against Plaintiffs as punishment for refusing to participate in and reporting the scheme.

116.    The members of the Enterprise share long-standing personal, professional, and financial ties, and these pre-existing affiliations and common ties facilitated the ability of Defendants to combine, merge, and conspire with themselves and others to form their racketeering enterprise with the common purposes of illicitly procuring protected technologies for end use in China and defrauding and then retaliating against Plaintiffs to Defendants' profit and benefit.

117.    The Enterprise has longevity sufficient to permit the Defendants to pursue the Enterprise's goals.  The Enterprise has been in operation since at least 2006 and it is ongoing and continuing.

118.    The Enterprise has organized itself into a cohesive group with specific and assigned responsibilities and command structure, operating in, and directed from New York, California, and Florida, as well as China, Singapore, Canada, and other locations unknown to Plaintiffs.  While the organization of the Enterprise may have changed over time, and its members may have held different roles at different times, the Enterprise has been structured to operate as a unit in order to accomplish the common goals and purposes of its scheme.

119.    The Enterprise was created and used as a tool to effectuate Defendants' pattern of racketeering activity.

120.    Each Defendant was and is responsible for command and control of the Enterprise; held and holds positions of responsibility within the Enterprise; or was and is otherwise responsible for the operation and management of the Enterprise and its affairs.

121.    Each Defendant was involved in the orchestration, planning, perpetration, and execution of the scheme to defraud Plaintiffs, and has taken actions, and directed other conspirators to take actions, necessary to accomplish the overall aims of the Enterprise.

     i.    Zhaoxue Luo acts as a mastermind of the Enterprise.  He retains final authority on all significant decisions of the Enterprise, and is responsible for creating, approving, and implementing the policies, practices, and instrumentalities the Enterprises uses to accomplish its common goals and purposes.  Luo has also taken actions and directed other members of the Enterprise, including Nations Technologies Inc., Nations Technologies (USA) Inc., Nations Investment, Yingtong Sun, Junjie Yu, Jie Liang (Director of Nations USA), Xu Hui (Chief Financial Officers of Nations USA), Baoxin Huang, Yaping Chen, Yi-Chi Shih, Ishiang Shih, Jieru Deng, Chengdu RML, Chengdu Ganide, Chengdu GaStone, HuaXia GPT, OST, Kerry Li, John Glossner, Jian Rong, Yifu Yang, Applied Facts Group, Reach Perfect, Ambiq Micro, and others to take actions necessary to accomplish the Enterprise's overall goals and purposes, including directing the

affairs of the Enterprise, funding the Enterprise, soliciting and recruiting members of the Enterprise, and directing members of the Enterprise. Luo has been personally enriched by conducting the affairs of the Enterprise through financial rewards from Nations, as well as financial rewards and government access awarded to him by the PRC government.

ii.   Yingtong Sun acts as a leader of the Enterprise. Along with Luo, he contributes to significant decisions of the Enterprise, and is responsible for creating, approving, and implementing the policies, practices, and instrumentalities the Enterprise uses to accomplish its common goals and purposes. Sun has also taken actions and directed other members of the Enterprise, including Nations Technologies Inc., Nations Technologies (USA) Inc., Nations Investment, Zhaoxue Luo, Junjie Yu, Jie Liang, Xu Hui, Baoxin Huang, Yaping Chen, Yi-Chi Shih, Ishiang Shih, Jieru Deng, Chengdu RML, Chengdu Ganide, Chengdu GaStone, HuaXia GPT, OST, Kerry Li, John Glossner, Jian Rong, Yifu Yang, Applied Facts Group, Reach Perfect, Ambiq Micro, and others to take actions necessary to accomplish the Enterprise's overall goals and purposes, including directing the affairs of the Enterprise, funding the Enterprise, soliciting and recruiting members of the Enterprise, and directing members of the Enterprise. Sun has also taken a lead role in coordinating the Enterprise's Fox Hunt efforts, including the fraudulent Singapore litigation, which is intended to harass, intimidate and serve as retaliation against Plaintiffs. Sun has been personally enriched by conducting the affairs of the Enterprise through financial rewards from Nations, as well as financial rewards and government access awarded to him by the PRC government.

iii.   Nations has been an active participant in the operation and management of the Enterprise and its affairs, and in the orchestration, perpetration, and execution of the Enterprise's schemes to illicitly procure protected technologies and commodities for end use in China and retaliate against Plaintiffs. Nations benefitted from conducting the affairs of the Enterprise through financial rewards, the confiscation of Plaintiffs' assets, obtaining Plaintiffs' confidential information, and government access awarded to it by the PRC government.

iv.   Nations USA, serving as the Enterprise's California base, has been an active participant in the operation and management of the Enterprise and its affairs, and in the orchestration, perpetration, and execution of the Enterprise's scheme to illicitly procure protected technologies and commodities for end use in China. Nations USA benefitted from conducting the affairs of the Enterprise through financial rewards.

v.   Nations Investment has been an active participant in the operation and management of the Enterprise and its affairs, and in the orchestration, perpetration, and execution of the Enterprise's schemes to illicitly procure protected technologies and commodities for end use in China and retaliate against Plaintiffs. Nations Investment defrauded Plaintiffs pursuant to the Partnership and then filed two spurious lawsuits against Plaintiffs involving fraud on the court. Nations benefitted from conducting the affairs of the Enterprise through financial rewards,

confiscating Plaintiffs' assets, obtaining Plaintiffs' confidential information, and government access awarded to it by the PRC government.

vi.     Junjie Yu conducted the affairs of the Enterprise, including but not limited to executing the day-to-day administrative affairs of the Enterprise and managing Enterprise communications, including fraudulent, deceptive, and extortionate communications with Plaintiffs relating to the Partnership.  Yu was personally enriched and rewarded by participating in the affairs of the Enterprise, including by being appointed to lucrative management positions in various Enterprise projects, and has benefitted from the government access afforded to him by his association with Nations.

vii.    Baoxin Huang participated in the conduct of the Enterprise's affairs, including by intentionally (if unsuccessfully) soliciting and encouraging Plaintiffs to join the Enterprise, trying to induce Plaintiffs to commit crimes in furtherance of Enterprise objectives, and instructing Dai's sister to travel to New York to determine if Dai had cooperated with American law enforcement authorities in reporting the Enterprise's criminal activities.  Huang was personally enriched and rewarded by participating in the affairs of the Enterprise.

viii.   Yaping Chen participated in the conduct of the Enterprise's affairs, and coordinated with Nations, Luo, and Sun on the retaliation and intimidation campaign in an effort to protect himself from prosecution for participating in the Enterprise's criminal activities and to limit interference related to the Chengdu Project.  Chen was personally enriched and rewarded by participating in the affairs of the Enterprise and has benefitted from the government access afforded to him by his association with Nations.

ix.     OST (and GPT, to the extent it is a separate legal entity) serves as the New York base of the Enterprise.  OST/GPT played a lead role in coordinating the deceptive scheme to lure Plaintiffs into the Partnership, aided other members of the Enterprise to solicit Plaintiffs' involvement with OST/GPT, and aided the Enterprise in its campaign to retaliate against and intimidate Plaintiffs.  OST/GPT did so, among other reasons, to hide its identity from disclosure and to protect itself from the legal repercussions of its activities in furtherance of the Enterprise's goals.  OST/GPT has benefitted from its participation in the affairs of the Enterprise with financial rewards and a profitable association with Nations.

x.      Kerry Li serves as the coordinator of OST's and GPT's, and therefore the Enterprise's, activities in New York, at Luo and Sun's behest.  On information and belief, Li played a lead role in coordinating the deceptive scheme to lure Plaintiffs into the Partnership, aided other members of the Enterprise to solicit Plaintiffs involvement with OST, and aided the Enterprise in its campaign to retaliate against and intimidate Plaintiffs.  Li did so, among other reasons, to hide his identity from disclosure and protect himself from the legal repercussions of his actions in furtherance of the Enterprise's goals.  Li has personally benefitted from his

participation in the affairs of the Enterprise with financial rewards from OST and his profitable association with Nations.

xi. HuaXia GPT serves as the Chinese base for OST/GPT. HuaXia GPT played a lead role in coordinating the deceptive scheme to lure Plaintiffs into the Partnership, aided other members of the Enterprise to solicit Plaintiffs involvement with OST/GPT, and aided the Enterprise in its campaign to retaliate against and intimidate Plaintiffs. It did so, among other reasons, to cover up its identity and protect itself from the legal repercussions of its activities in furtherance of the Enterprise's goals.

122. At all relevant times, each Defendant was, and is, a person who exists separate and distinct from each other Defendant.

123. At all relevant times, each member of the Enterprise was, and is, a person who exists separate and distinct from each other member of the Enterprise.

124. At all relevant times, each Defendant was, and is, a person who exists separate and distinct from the Enterprise.

125. At all relevant times, the Enterprise engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c). The Enterprise's schemes entailed communications via email, telephone, and other forms of electronic communication between New York, California, Florida, Singapore, China, Canada, and other locations not known to Plaintiffs. Moreover, the Enterprise held and transferred funds and assets across state and international lines and used national and international financial institutions in furtherance of its schemes.

*Pattern of Racketeering Activity*

126. Each Defendant has conducted and participated in, directly or indirectly, the management or operation of the Enterprise and its affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), in violation of 18 U.S.C. § 1962(c). The Defendants have consistently and regularly committed acts of racketeering activity spanning from at least 2006 to the present; only Defendants know precisely when their schemes commenced.

Their schemes are continuing.  Their multiple acts shared a common or related purpose, goal, result, participants, victims, and methods of commission.

127.    Defendants, through and using the Enterprise, engaged in a wide-ranging scheme to deceive and later extort Plaintiffs into joining a partnership designed to further their scheme to steal and export high technology for the benefit of the PRC military.  When Plaintiffs refused to join the scheme and reported it to U.S. legal authorities, the Defendants coordinated a scheme of retaliation and intimidation to protect the Enterprise and punish Plaintiffs.  This pattern of racketeering activity directed at Plaintiffs includes wire fraud via a pattern of fraudulent misrepresentations and material omissions as part of the scheme to defraud Plaintiffs into the Partnership, as well as other acts of wire fraud, extortion, witness intimidation, witness tampering and retaliation, attempted kidnapping, and obstruction of justice.  As part of their original, larger scheme, Defendants also repeatedly conducted economic espionage, stole protected trade secrets, laundered money, and committed bank fraud, among other criminal acts.

128.    The Defendants, through and using the Enterprise, engaged in, and continue to engage in, a coordinated effort to accomplish these schemes.  These coordinated efforts amount to a set of related predicate acts with similar purposes, results, and methods, both with respect to each scheme and in furtherance of the combined, related schemes.  In its early stages, the Enterprise schemed to steal protected high technology for use by the PRC military.  In furtherance of this scheme, it defrauded and mislead Plaintiffs into entering the Partnership, allowing the Enterprise to gain leverage to attempt to coerce and extort Plaintiffs to do their bidding to accomplish the aims of the Enterprise—i.e., to launder funds from Defendants to purchase semiconductor companies in the U.S. and plunder their technology in an effort to further the Chengdu Project.  Once Plaintiffs refused to participate in this illicit activity and reported the Enterprise to law

enforcement, the Enterprise coordinated a scheme to retaliate against them for their suspected cooperation and to try to intimidate Plaintiffs against further cooperation.  Defendants' retaliation and intimidation scheme, through and using the Enterprise, continues to this day, including through suspected Fox Hunt activities, Defendants' Singapore Action, efforts to domesticate and enforce multiple judgments obtained in the Singapore Action against Plaintiffs' employees (including Sophie Xu and Alice Zhang), Defendants' effort to mislead the Singaporean court into entering a worldwide freezing injunction designed to defund Dai's ability to protect his rights, and other activities that Plaintiffs will expose through the discovery process.  These activities will likely continue unless and until Dai is repatriated under duress to the PRC.  Defendants' technology theft scheme is also ongoing.

129.    Predicate acts directed at Plaintiffs include the following:

130.    Wire Fraud.   Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. 1343 (relating to wire fraud).  A scheme to defraud includes any plan to deprive a person of something of value by trick, deceit, chicanery, or overreaching, including through affirmative misrepresentations, material omissions of fact, or any deceptive or dishonest behavior.  As part of and in furtherance of the scheme to defraud Plaintiffs, the Defendants made repeated use of, or caused members of the Enterprise to repeatedly make use of, interstate wires to transmit various documents, communications, or payments, including with knowledge that the use of such wires would follow in the ordinary course of business or where such use could be reasonably foreseen.  Each transmission constituted the transmittal by means of wire communication in interstate commerce of signals, sounds or writings for the purpose of executing or attempting to execute the scheme to defraud.  Each of the Defendants, through their control of the Enterprise, knew of, and participated in, numerous acts of wire fraud.  In particular,

53

each of the Defendants, through their control of the Enterprise, sent or caused to be sent numerous wire communications or acted with knowledge that wire communications would follow in the ordinary operation of the Enterprise, or could reasonably have foreseen that the wires would be used in the ordinary course of business as a result of the Defendants' acts.  Each of the Defendants committed numerous additional and similar acts of wire fraud in furtherance of their scheme or artifice that will be proven at trial.

131.    For example, in furtherance of the scheme to defraud Plaintiffs, Luo, Yu, and Huang, with the knowledge and permission of the other Defendants, sent numerous electronic communications and/or made numerous phone calls to Plaintiffs that crossed interstate and international lines; these communications were transmitted from China and elsewhere to New York.  These messages affirmatively misled Plaintiffs, located in New York, by reassuring Plaintiffs that the Enterprise intended to abide by the terms of the Partnership agreement, while hiding the fact that the Enterprise intended to use the Partnership as a means to provide financing and launder funds to further economic espionage.

132.    On information and belief, further discovery will reveal that, in furtherance of the scheme to defraud Plaintiffs, the Defendants and other members of the Enterprise, engaged in numerous additional email and phone communications that crossed state lines and international boundaries, including between China and New York, to coordinate and perpetuate the ongoing scheme.  For example, on information and belief, Kerry Li, OST, and HuaXia GPT conducted a series of communications between China and New York to help coordinate the campaign aimed at ensuring Plaintiffs would invest in OST; and on information and belief, Yaping Chen, who was involved in the transfer of funds for Enterprise goals and efforts to steal technology for the Chengdu Project, coordinated with the Enterprise pursuant to procuring Plaintiffs' involvement to

launder funds for the Enterprise.  Further discovery will also reveal additional actions taken by the Defendants in furtherance of the scheme to defraud Plaintiffs, including emails and other communications between and among the Defendants and the members of the Enterprise, and interstate wire payments and bank transfers in furtherance of the scheme.  *See Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008) ("Indeed, even in the context of Federal Rule of Civil Procedure 9's more stringent pleading requirements . . . we have held that 'allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge.'") (citing *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1057 (2d Cir. 1993)).

133.   Witness Tampering, Retaliation, and Obstruction of Justice.  Section 1961(1) of RICO also provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1512 (relating to tampering with a witness, victim, or informant), 18 U.S.C. § 1513 (relating to retaliating against a witness, victim, or informant), or 18 U.S.C. § 1503 (relating to obstruction of justice).  The numerous activities listed above, including but not limited to the coordinated negative press campaign, corruption of the Funds Association of China to revoke Khan Funds' financial license, inducement of Dai's younger sister to investigate him, burglary of the Khan Funds Singapore office, cyberattack, filing of fraudulent lawsuits in China and Singapore, filing of a false report to lead to the issuance of Dai's arrest warrant in the PRC, pervasive surveillance and investigation activities, attempted kidnapping, and death threats on social media amount to witness intimidation, witness retaliation, and obstruction of justice.  Through this behavior, which Defendants targeted at Plaintiffs located in New York and Florida, Defendants attempted to intentionally harass Plaintiffs and thereby hinder, delay, prevent, or dissuade their reporting to a law enforcement officer of the United States.  *See* 18 U.S.C. § 1512(d)(2).  Additionally, through this behavior, Defendants attempted to knowingly use intimidation or threaten Plaintiffs with the

intent to hinder, delay, or prevent the communication to a law enforcement officer of the United States information relating to the commission or possible commission of a Federal offense. *See* 18 U.S.C. § 1512(b)(3). Defendants' activities also amounted to witness retaliation under 18 U.S.C. § 1513(b)(2): Defendants knowingly attempted to damage the tangible property of Plaintiffs, or threatened to do so, with the intent of retaliating against Plaintiffs for their cooperation with federal law enforcement. Both statutes provide for extraterritorial jurisdiction, providing standing for acts of intimidation or retaliation regardless of location. Through these activities, Defendants also violated 18 U.S.C. § 1503(a) by using threats or force in an attempt to obstruct or impede the due administration of justice.

134. Extortion. Section 1961(1) of RICO also provides that "racketeering activity" includes any violation of 18 U.S.C. § 1951 or "any act or threat involving . . . extortion" that is "chargeable under State law and punishable by imprisonment for more than one year." Defendants and others devised, participated in, and executed a scheme to attempt to extort from Plaintiffs, among other things, RMB 300 million (approximately $42 million) in cash, RMB 10 million (approximately $1.5 million) in capital contributions to Zhongxinanxin, and the control of the Partnership, in violation of 18 U.S.C. § 1951 and New York Penal Law § 155.05(2)(e), which is punishable by imprisonment for more than one year. They did so by use of threats of force, violence, and fear. These threats included the threat to dissolve the Nations Investment-Khan Funds Partnership and threats to Dai's person, family, and associates. Defendants made good on at least some of these threats by leveraging the PRC judiciary to remove Dai from his position of control over the Partnership, by harassing Plaintiffs, by weaponizing Dai's family members against him, and by encouraging Dai's arrest and prosecution in the PRC.

135. Kidnapping. Section 1961(1) of RICO also provides that "racketeering activity" includes "any act or threat involving . . . kidnapping" that is "chargeable under State law and punishable by imprisonment for more than one year." Defendants and others further devised, participated in, and executed a scheme to attempt to repatriate Dai to the PRC through a coordinated Fox Hunt campaign in violation of New York Penal Law § 135.20 (Kidnapping in the Second Degree). In furtherance of this scheme, Defendants used Dai's sister to pressure and investigate him, conducted a cyberattack, filed a false report leading to the issuance of Dai's arrest warrant in the PRC, conducted pervasive surveillance activities, and issued death threats to Dai on social media. Defendants committed these acts to carry forward their purpose of moving Dai from the United States to the PRC and preventing his escape by threat of deadly physical force.

136. Money laundering. Section 1961(1) of RICO also provides that "racketeering activity" includes any violation of 18 U.S.C. § 1956 (laundering of monetary instruments). By commanding and extorting Plaintiffs to acquire semiconductor companies in the United States on behalf of the Partnership, and thus the Enterprise, Defendants attempted to transfer, transmit, or transport Enterprise funds infused into the Partnership to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of or to further their economic espionage and other specific unlawful activities in violation of 18 U.S.C. § 1956(a)(2)(A). Defendants also repeatedly requested that Dai transfer RMB 300 million (approximately $42 million) to an entity of the Enterprise called Reach Perfect. Specifically, they instructed Dai to split the transfers to the entity's HSBC account in Hong Kong and the entity's China Merchant Bank account in New York, the latter of which they had instructed Dai to create on behalf of the Enterprise to launder funds. In doing so, Defendants knowingly attempted to cause the transfer, transmittal, or transportation of funds (a) from a place in the United States to or

through a place outside the United States and (b) to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of and further economic espionage and other specified unlawful activities in violation of 18 U.S.C. § 1956(a)(2)(A).

137.    Other predicate acts.  As part of their larger scheme to steal American technology for the benefit of the PRC military, Defendants committed a host of predicate acts starting in at least 2006 and continuing to this day.  Through their efforts to steal technology, they repeatedly violated 18 U.S.C. § 1831 (relating to economic espionage) and 18 U.S.C § 1832 (relating to theft of trade secrets).  By exporting these technologies out of the United States to their ultimate destination in the PRC, Defendants repeatedly violated 18 U.S.C. § 2314 (relating to the transportation in foreign commerce of any commodities and technologies converted or taken by fraud).  And through their efforts to fund the criminal activities of the Enterprise through U.S. bank accounts, including misleading Dai into creating the China Merchants Bank account for Enterprise use, Defendants repeatedly violated 18 U.S.C. § 1344 (relating to financial institution fraud) and 18 U.S.C. § 1956 (relating to the laundering of monetary instruments).

138.    The Enterprise's pattern of racketeering began at least in 2006 and is ongoing and open-ended.  The relentless and continuing pattern of acts of intimidation, retaliation, and harassment as part of the Enterprise's Fox Hunt effort suggests that the Enterprise will continue in their campaign unless and until Dai is repatriated to the PRC.  Such activity is even more likely given Plaintiffs' exposure of GPT and Kerry Li's involvement in the Enterprise's activities pursuant to this Amended Complaint.

139.    Each predicate act is part of the same continuous and overarching set of related schemes.  These instances of racketeering took place after 1970 and the last act occurred within ten years after the commission of a prior act of racketeering.

*Injury and Causation*

140.   The racketeering activity set forth herein was the direct and proximate cause of Plaintiffs' injuries.

141.   Due to reasonable fears to Dai's personal safety, Dai has incurred security personnel fees of $208,418.16, which continue to accrue.  Legal fees connected to Dai's attempted revocation of the arrest warrant issued against him in the PRC are in excess of $200,000 and continue to accrue; legal fees in furtherance of Dai's attempts to apply for asylum and protect against his extradition on account of Enterprise threats exceed $1 million; retainers for attorneys to contact on an emergency basis to protect Dai from any immediate threats that arise amounting to $75,000; and fees to report the Enterprise to the FBI on account of Enterprise threats were also substantial.  All of these expenses were paid from U.S. bank accounts and were the direct and proximate result of activities that occurred in or were directed to New York or Florida.

142.   The negative press campaign and announcement of Dai's arrest warrant led to severe reputational harm for Plaintiffs, which in turn had severe impacts on Plaintiffs' U.S. business operations.  In March 2018, First Republic denied custodian services for Khan Funds' planned U.S. hedge fund offerings, explicitly citing that Khan Funds had failed its basic background check due to the false and defamatory allegations made by the Enterprise.  Without clearing their reputations, Plaintiffs cannot maintain the trust of U.S. financial players or financial institutions to successfully participate in hedge fund offerings.  As Khan Funds waits to deploy its long-cultivated expertise and carefully built infrastructure to participate in these offerings, it remains liable for monthly overhead expenses in excess of $200,000, not to mention the millions in expectancy damages of lost management fees and related fund profits that would have otherwise flowed to Plaintiffs in the absence of the Enterprise's activities.  On information and belief, these

reputational harms also prompted China Merchants Bank to revoke Khan Funds' account.  Khan Funds did ultimately find a willing banker in Signature Bank around October 2020, but the terms of that relationship were significantly worse that what Khan Funds had enjoyed with China Merchants Bank, amounting to tens of thousands of dollars in added expenses.  All of these expenses were paid from U.S. bank accounts and were the direct and proximate result of activities that occurred in or were directed to New York.

143.    The Enterprise's burglary of the Singapore office caused Dai to expend over $50,000 in investigative fees.  These expenses were paid from U.S. bank accounts. The Enterprise's cyberattack, in which the Enterprise accessed and stole confidential documents from computers located in New York, caused Plaintiffs to incur legal fees relating to advice following the attack, as well as the added expenses of implementing enhanced protections from cyberattack. These expenses were paid from U.S. bank accounts and were the direct and proximate result of activities that occurred in or were directed to New York and/or Florida.

144.    Plaintiffs also relied on the Enterprise's false and misleading representations to their detriment, including by entering into the Partnership Agreement and expending huge sums pursuant to the Partnership.  As a result of this fraudulent scheme, Plaintiffs spent in excess of $1 million on the effort to identify suitable biomedical candidates and huge sums building the internal infrastructure and capacity to handle the expected transactions, including hiring a biomedical expert.  Through this fraudulent scheme, the Enterprise ensnared Dai into a Partnership with a criminal enterprise.  As a direct result of his entanglement with these nefarious criminal actors who threatened violence against Dai, his family, and his associates, Dai was forced to dissolve their Khan Funds China operation, resulting in the liquation of all fourteen hedge funds under Khan Funds management to protect and return the capital of Dai's investors.  As a direct result of

these forced and premature liquidations, Dai was contractually obligated to pay RMB 10 million (approximately $1.5 million) to compensate former clients and employees in addition to various penalties and damages.  Dai also suffered a loss of the expectancy of $150 million in lost management fees and profits that would have otherwise accrued to Plaintiffs.  And because Plaintiffs made sizable investments in their U.S. operations around the expectancy interest of the growth of Khan Funds China and the growth pursuant to the Partnership, with the aim that clients of Khan Funds China would become clients of Khan Funds U.S. based funds, Khan Funds suffered U.S.-based losses.  Additionally, as a result of the dissolution of Khan Funds China, Khan Funds' suffered from the loss of Khan Funds China's employees, who provided critical operational assistance to Khan Funds' American and global operations.  All of these damages were the direct and proximate result of fraudulent and extortionate activities that occurred in or were directed to New York.

145.    Through its continuing activities in the Singapore action, the Enterprise has caused Dai to incur over $1.5 million in legal fees.  Further, as Defendants seek domestication and enforcement activities in the United States, the Enterprise seeks to enforce fraudulently obtained judgements gained against Plaintiffs' employees by domesticating the judgment in the state of Florida, where Xu and Zhang currently reside.  It also plans to seek to domesticate any judgment obtained against Dai in Florida or New York.  If Defendants are successful in these efforts, the judgements will amount to further domestic losses for Plaintiffs as a direct result of the fraudulent, extortionate, and criminal scheme.

146.    In addition to the damages alleged above, Plaintiffs have suffered an enormous emotional toll as a result of the Enterprise's racketeering activity.  For example, the Enterprise caused Dai constant fear for his safety and that of his loved ones, being blacklisted from his home

country, loss of family and friends, the implosion of his business, and the shame of being rejected by financial institutions and even a surrogacy organization due to the Enterprise's press campaign. Dai has spent tens of thousands of dollars on treatment for depression as a result of these harms.

*Timeliness*

147.     The civil RICO allegations are timely.  Civil RICO imports its four year statute of limitations from the Clayton Act.  Numerous predicate acts were committed, and injuries caused, within the four years prior to the commencement of the instant lawsuit.

148.     In addition, predicate acts causing injuries discovered after October 31, 2015 are actionable and timely due to the operation of Section 16(i) of the Clayton Act.  Section 16(i) tolls the statute of limitations for a plaintiff if the government files a parallel criminal complaint, and courts apply the same provision to civil RICO.   Tolling runs through the pendency of the enforcement proceeding plus an additional year thereafter.  15 U.S.C. § 16(i).  Section 16(i) tolling applies against "all participants in a conspiracy which is the object of a Government suit, whether or not they are named as defendants or conspirators therein*." Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 336 (1971).  Even if "the government does not prove that a specific defendant was a co-conspirator, § 16(i) may still apply if the later private plaintiff can prove as much." *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 885 F. Supp. 2d 617, 629 (S.D.N.Y. 2012) (citing *Zenith Radio Corp.*, 401 U.S. at 335).  Nor does the conspiracy pleaded by a private plaintiff need to have "the same breadth and scope in time and participants as the conspiracy described in the government action." *Discover Fin. Servs. v. Visa U.S.A. Inc.*, 598 F. Supp. 2d 394, 403 (S.D.N.Y. 2008) (citing *Leh v. General Petroleum Corp.*, 382 U.S. 54, 63 (1965)).  If there is a "significant, although incomplete, overlap of subject matter, the statute is tolled even as to the differences." *Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 830 (citing *Leh*, 382

U.S. 54).  Here, DOJ brought a criminal complaint against Yi-Chi Shih on January 19, 2018 and issued a formal indictment for Yi-Chi Shih, Ishiang Shih, and Yaping Chen, among others, on October 18, 2018.  Yi-Chi Shih was convicted on June 26, 2019, and Chen and Ishiang Shih remain fugitives at large.  As alleged, Luo recruited Chen, Yi-Chi Shih and Ishiang Shih into the Enterprise and served as the mastermind behind the activities laid out in their indictments.  In doing so, Luo and Sun provided the orders and directions coordinating the theft and export of the technology. Luo and Sun financed and directed Chen using Enterprise funds provided by Nations, and in turn, Chen used Enterprise funds to finance and pay Shih and other co-conspirators as compensation for their work in the development of the high technology industries in the PRC.  For example, in 2011, Luo and Sun coordinated with Chen to finance the activities of the Enterprise, who then made a series of payments to Shih, all in furtherance of Enterprise objectives.  Further, through Chen's 2017 partnership with Nations for the Chengdu Project—for which Nations provided Chen's team RMB 100 million (approximately $14 million)—Chen worked with Luo, Sun, and Nations, as well as the larger Enterprise, to develop and produce semiconductor wafers at a foundry in Chengdu province.  Nations' 2017 annual report stated that Yaping Chen and his technical team contributed the necessary designs and expertise to manufacture of the wafers.  In recorded conversations, Luo repeatedly mentions the project, land acquisition related to this project, and Chen's contribution to the project.  Based on the fact that Luo's relationship with Chen began around the time Yi-Chi Shih began his economic espionage; Chen's payments to Yi-Chi Shih and Ishiang Shih as described in their indictment; the nature of Chen's "team" of experts as described in Luo's recorded conversations that align with Yi-Chi Shih's espionage activities; and the fact that Chen's "rear team" in Canada began its work around the time Ishiang Shih exported semiconductor technology from Canada, on information and belief, Yi-Chi Shih and Ishiang Shih were key

participants in the Enterprise. Accordingly, the activities for which Yi-Chi Shih was arrested, indicted, and convicted, and for which Ishaing Shih was also indicted, were part and parcel of the Enterprise's effort. Therefore, tolling based on Yi-Chi Shih's arrest, which established a parallel case prosecuting Enterprise activities, provides that injuries discovered after October 31, 2015 are actionable under the statute of limitations.

149.   Alternatively, the pendency of an FBI investigation related to a private complaint provides a basis for equitable tolling of the statute of limitations. On the repeated and consistent legal advice of numerous counsel, Plaintiffs did not file this complaint in order to maintain the confidentiality of the FBI investigation. At great personal risk, Dai repeatedly and consistently met with the FBI from September 2017 through January 2020, providing critical information on an issue of grave national security. Because it would be inequitable to penalize Dai for cooperating with the FBI and accordingly deferring filing suit, equitable tolling for the period of this investigation should apply, establishing that all RICO-related allegations in this Amended Complaint are timely.

## SECOND CLAIM FOR RELIEF
### (Conspiracy To Violate Civil RICO, 18 U.S.C. § 1962(d) – Against All Defendants)

150.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

151.   Defendants have knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

152.   By and through each of the Defendants' close and longstanding business relationships with one another, and their close coordination with one another in the affairs of the Enterprise, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond the Defendant's individual role. Moreover, through the same

connections and coordination, each Defendant knew that the Defendants were engaged in a conspiracy to commit the predicate acts detailed above, and that the predicate acts were part of a pattern of racketeering activity, and each agreed to pursue the same criminal objective.

153.    Each Defendant agreed to facilitate, conduct, and participate in the conduct management, or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), as set forth above.  In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared the common purposes of stealing high technology for the benefit of the PRC military and retaliating against and intimidating Plaintiffs for refusing to participate in the original scheme and reporting it to U.S. law enforcement authorities.  In the absence of an agreement, the Enterprise could not have operated as it did.  Further evidence of an agreement among the Defendants is particularly within the control of the Defendants.

154.    The participation and agreement of each of the Defendants was necessary to allow the commission of this pattern of racketeering activity.  Plaintiffs have been and will continue to be injured in its business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.  The injuries to Plaintiffs directly and proximately resulting from these violations of 18 U.S.C. § 1962(d) include, but are not limited to, legal fees related to the attempted revocation of the PRC arrest warrant; legal fees to protect against extradition; legal fees to defend against the spurious litigation filed by Defendants in Singapore; fees relating to reporting the Enterprise to the FBI; fees to investigate Defendants' various acts of wrongdoing; overhead in managing Khan Funds as it waits to clear its name to participate in hedge fund offerings; and sums spent in reliance on Defendants' misrepresentations related to the Partnership Agreement.

## THIRD CLAIM FOR RELIEF
### (Common Law Fraud – Against Defendants Nations, Nations USA, Nations Investment, Luo, Yu, and Huang)

155.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

156.    Prior to and following the execution of the Partnership Agreement, Defendants Nations, Nations USA, Nations Investment, Luo, Yu, and Huang (the "Common Law Fraud Defendants") made a series of material misrepresentations by conveying, *inter alia*, that they intended to follow and support Plaintiffs' plans to acquire biomedical entities.  The Common Law Fraud Defendants also made numerous material omissions by failing to disclose, *inter alia*, that they did not intend to abide by the exclusive authority clauses of the Partnership Agreement (despite knowing at the time that they had no plans to do so) and by failing to disclose that they intended to co-opt the Partnership into a vehicle to acquire semiconductor companies for the purpose of espionage.  The Common Law Fraud Defendants then doubled down on these material misrepresentations and omissions over the next two years.  These material misrepresentations and omissions include but are not limited to:

    i.    Phone calls between Yu (China) and Dai (New York) in October to November 2015.  During these calls, Yu indicated that the Partnership negotiations were continuing and that he would work with Dai's associates to finalize the deal.  Yu omitted that Nations Investment was negotiating in bad faith, did not plan to abide by the heavily negotiated agreement, would refuse to honor the exclusive investment authority for which Dai had negotiated, had no interest in pursuing Dai's biomedical investments strategy, and intended to use the Partnership as a vehicle for economic espionage.  Dai entered the Partnership with Nations Investment in reliance on these omissions of material fact.

    ii.    Phone calls between Huang (China) and Dai (New York) beginning in October 2015 and continuing until November 2017 occurring approximately once a month.  During these calls, Huang asked about the status of the Partnership as well as Dai's relationship with Luo.  On information and belief, Huang conducted these calls at the direction of or in concert with Luo to encourage Dai to continue with the Partnership and gather information on Dai's perspective and intentions in furtherance of the scheme.  During these calls, Huang omitted that he was soliciting Dai to join a criminal conspiracy devoted to the theft of semiconductor technology and omitted that Luo and Nations Investment did not intend to abide by the

66

agreement or pursue Dai's biomedical investment strategy. Dai relied on Huang's representations relating to Luo and the Partnership to continue to spend money pursuant to Partnership goals.

iii.   Phone call between Luo (China) and Dai (New York) on February 2, 2016. Luo asked Dai to create Zhongxinanxin, a semiconductor-focused fund for the purposes of a profitable investment opportunity. Luo omitted that he actually intended for Zhongxinanxin to serve as a money laundering entity for the Enterprise to further its espionage activities. Dai created the fund and continued to spend money in furtherance of the Partnership in reliance on Luo's apparent good faith representation.

iv.   Phone call between Luo (China) and Dai (New York) in March 2016. Luo requested that Dai open a bank account for Luo in New York as a "personal favor." Luo omitted that he actually intended for the Enterprise to use the account to launder money in furtherance of its espionage activities. In reliance on Luo's statement, Dai opened the bank account and continued to spend money in furtherance of the Partnership.

v.   Discussion between Luo and China in New York in May 2016. Luo requested that Dai acquire a semiconductor company in furtherance of the Partnership. Luo omitted that he actually intended for the semiconductor acquisition to further the Enterprise's espionage activities. Dai declined the request but continued to spend money in furtherance of the Partnership in reliance on Luo's apparent good faith in making the request.

vi.   Phone call between Yu (China) and Dai (New York) in June 2016. Dai relayed his suspicions that Luo did not seriously intend to invest in the biomedical industry; Yu reassured him that his fears were irrelevant and told him to proceed as originally planned. Unbeknownst to Dai, Yu was placating and misleading Dai so that Nations could facilitate an additional capital contribution and bring more money to the United States to further the Enterprise's aims. Dai relied on this misrepresentation to go forward with Nations' RMB 200 million (approximately $29 million) capital contribution and continue to spend money in furtherance of the Partnership.

vii.   Phone call between Yu (China) and Dai (New York) in August 2016. Yu told Dai that Luo was angry with Dai's refusal to move forward with the semiconductor acquisition and threatened the termination of the Partnership if Dai did not meet Luo's demand. Yu omitted that the Enterprise intended for Dai to make this acquisition to further economic espionage. Dai relied on this material omission to continue to spend money in furtherance of the Partnership.

157.   Plaintiffs reasonably relied on the Common Law Fraud Defendants' false and misleading representations and omissions to their detriment by, *inter alia*, entering into the

Partnership Agreement and expending significant sums of money pursuant to the Partnership Agreement and for the benefit of the Partnership, suffering damages as a result. As a result of these misrepresentations and omissions, Plaintiffs spent in excess of $1 million on the effort to identify suitable biopharma candidates and huge sums building the internal infrastructure and capacity to handle the expected transactions, including hiring a biopharma expert. They have not been able to recover these sums because the Common Law Fraud Defendants knew from the outset that they had entered the Partnership on false pretenses and without any intent to fulfill their obligations or to support acquisitions within the scope of the parties' agreement and understanding. Plaintiffs also planned their operations around the expectancy interest that some clients of Khan Funds China would become Dai's clients in his Khan Funds U.S. based funds, which has led to huge losses in potential income.

158. The Enterprise's representations and omissions were material. For example, they amounted to promises that the execution of a massive investment partnership would be fulfilled, and thereby induced Plaintiffs to enter into the Partnership and to expend resources in executing on the agreed-upon Partnership terms.

159. Plaintiffs' reliance on the affirmative misrepresentations and omissions set forth herein was reasonable, including due to the formality of the highly negotiated Partnership Agreement and the reputation of Luo, Sun, and Nations. Plaintiffs could not have reasonably known that Nations, Luo, Sun and others were misleading them in an attempt to exploit them to launder money to help steal high technology for the PRC military.

160. In New York, fraud claims have a statute of limitations of six years. N.Y. C.P.L.R. § 213(8). Governor Cuomo's Executive Order No. 202.8 extended tolling deadlines by 228 days.

With an original filing date of April 7, 2022, this Order allows for injuries caused from this fraud discovered after August 23, 2015 to be actionable.  As such, all fraud allegations are timely.

**FOURTH CLAIM FOR RELIEF**
**(Violation Of Computer Fraud And Abuse Act, 18 U.S.C. § 1030 – Against Defendants Nations, Nations USA, Luo, and Sun)**

161.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

162.    Khan Funds' computers and servers are used in or affect interstate and foreign commerce and communication through their facilitation of Khan Funds' international business, and are therefore protected computers pursuant to 18 U.S.C. § 1030(e)(2).  These computers and servers are located in New York.

163.    Defendants Nations, Nations USA, Luo, and Sun, directly or through agents working at their direction and control, intentionally accessed Khan Funds' protected computers or servers without authorization to obtain information from protected American computers or servers, including confidential contracts and other sensitive internal documents, in violation of 18 U.S.C. § 1030(a)(2)(C).  Plaintiffs took reasonable measures to protect this confidential information, including by hosting it on Plaintiffs' servers and protecting it behind passwords and other security measures.

164.    In or around June 2021, Plaintiffs learned that confidential documents were stolen only after reviewing the initiating documents provided by Dai's Singaporean counsel, which included notice of the filing of certain documents obtained from Khan Funds' protected computer servers.  These documents could only have been obtained through Defendants' illegal accessing of Khan Funds' protected computers or servers.

165.    Plaintiffs suffered damage by reason of these violations, including the exposure of confidential documents, expenses from being forced to investigate the unauthorized access and

abuse of its computers and servers, with other losses and damages in an amount to be proven at trial, over $5,000 aggregated over a one-year period.

## JURY TRIAL DEMAND

166.    Plaintiffs demand a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants on all claims, and request a judgment providing the following relief:

i.     Judgment in Plaintiffs' favor and against Defendants on all causes of actions;

ii.     For compensatory damages in an amount to be proven at trial;

iii.     For punitive damages and exemplary damages according to proof at trial;

iv.     For treble damages pursuant to 18 U.S.C. § 1964(c) and 18 U.S.C. § 1964(d);

v.     For an injunction directing Nations Investments to dismiss the Singaporean action;

vi.     For an injunction directing Nations Investments to take such steps and actions as are necessary to effectuate Dai's reinstatement to his position as director of the Partnership and to effectuate the transfer to Plaintiffs of all Khan Funds and Beijing Khan assets and funds seized by the Enterprise;

vii.     For an injunction prohibiting Nations Investment from purporting to domesticate, confirm, or enforce the PRC or any Singaporean judgment against Plaintiffs or their employees, including Sophie Xu and Alice Zhang, in any U.S. state or federal jurisdiction;

viii.     For an order, pursuant to 18 U.S.C. § 1964(a), directing Defendants to divest themselves of any interest, direct or indirect, in the RICO Enterprise and its profits;

ix.     For an order, pursuant to 18 U.S.C. § 1964(a), prohibiting Defendants from engaging with one another in the same type of endeavor as the Enterprise engaged in previously or is currently engaged in;

x.     For costs of suit incurred herein;

xi.     For prejudgment interest;

xii.     For attorneys' fees and costs, including as warranted by applicable laws; and

xiii.     For such other and further relief as the Court may deem to be just and proper.

Dated:
December 12, 2022

By:  /s/ *Akiva Shapiro*

Akiva Shapiro
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035
ashapiro@gibsondunn.com

*Attorneys for Plaintiffs*

## APPENDIX A

*The following quotes are excerpts from a translated transcription of recorded meetings between Plaintiff Xuefeng Dai and Defendant Zhaoxue Luo, held in September 2017 in New York.  The full text of the transcriptions totals 89 pages.*

## I. Luo's References to the China Securities Regulatory Commission

September 10, 2017:

- Luo: "A few days ago, Liu Shiyu [Chairman of the China Securities Regulatory Commission] organized a closed-door meeting of high specifications, which I attended. No photos were allowed during the meeting, and no cell phones could be brought in. Only leaders and chairmen of more than 10 enterprises attended. I attended the whole process. Nationz technologies. Now, on April 8 this year, the listed company has an election at the expiration of office terms. Nationz Technologies is the only enterprise leader of 700 enterprises in the Growth Enterprise Market. I serve as the vice chairman once again. In addition, there was an internal speech on the afternoon of the 7th in Beijing. Media were not allowed to attend, about 200 people attended. The attendees were top-level leaders of Securities Regulatory Bureau from provinces across the country and top leaders of the China Securities Regulatory Commission; the meeting was presided over by Jiang Yang, who was the chairman of the Securities Regulatory Commission in charge of supervision."

- Luo: "That day, a meeting was held in Beijing; it was originally a closed-door meeting. I was still with Liu Shiyu. Look [shows photos], this is Liu Shiyu, this is the Secretary of the Commission for Discipline Inspection of the China Securities Regulatory Commission, this is the chairman of the Association of Listed Companies, this is Song Liping, even she sat aside."

. . .

  Luo: "We chat in the VIP lounge. This is, look, I sat in the front row in the meeting, and the person from the Industrial and Commercial Bank sat behind."

- Luo: "Look [shows photos on cell phone], now the director of China Securities Regulatory Commission's supervision department is called Deng Ke. He is from Yibin City. After the meeting, everyone came to attend a send-off Party. The three of them approached me to exchange business cards. I have never been in contact with them before, but he took the initiative to fawn over me and introduce himself as a person from my hometown. He also exchanged business cards with me, and insisted to add WeChat for communication. He said, 'President Luo, we must find some time to talk alone.' He is from Yibin. He said that his wife was from Yuzhong District, Chongqing. He said that he respected me. He was always looking for opportunities to make friends with me. I said, 'If you have time in the future, you can come to Shenzhen for fun.' In addition, there was another time, last time after I finished the meeting [April 7th], the Secretary of the Disciplinary Commission of the China Securities Regulatory Commission contacted our Board Secretary specifically and said that my last speech was too short and the speech was too wonderful. They wanted to communicate with me alone. I said: 'I'm too busy,

there is no need.' Later, they actually flew to Shenzhen on Sunday and asked for a separate communication with me alone. Three leaders of the China Securities Regulatory Commission had come. They said: 'I can meet them whenever I have time.' Later, we met and talked at one o'clock in the afternoon. Originally, I had a very important feast that night. I think that all eight rules have been established now, the leaders of China Securities Regulatory Commission and I should not have any dinner together. We chatted till past 5 o'clock. We talked deeply and sincerely all our discussion was about things it is impossible to talk about externally . . . As a result, when we chatted until 6 o'clock, I said: 'Let's go for dinner.' But they still wanted to continue communication with me, until 6:30 when we went to the hotel for dinner. There are usually eight rules stipulating that it is not allowed to have any dinner like this. I asked: 'Do you want to drink liquor?' They also replied, 'Yes.' We drank Maotai. After ordering some dishes, we drank and had dinner, until it was past 8 o'clock. They had a strong interest in me, and they also want to make friends with me." (Third ellipses added).

September 12, 2017:

- Luo: "Another matter, the matter regarding Evergrande Group [Evergrande Group's speculations on Nationz Technologies' stocks] last year, it was you who made me [very passive]. You can ask Junjie, for [your matters] in those six months. Fortunately, the Securities Regulatory Commission knew my reputation."

- Luo: "You can ask Junjie that Evergrande [matter], if it wasn't for the fact that I went to ask for a favor, the full list of more than forty accounts of rat traders was printed out. You can ask Junjie, I said to them, don't do any further inquiry about this matter, Nationz Technologies had never been investigated like this, I knew about this matter, in the end, I took responsibility [for this matter], you can ask Junjie! [The Securities Regulatory Commission] came to me, I did not even meet with them. I asked Junjie to talk to them, this matter, 43 or 47 accounts of rat traders, some accounts were funded 5 times, some accounts were funded 3 times. All were dug out during investigation. It is just that I did not tell you, but the things you did disturbed leaders in Beijing, caused Nationz Technologies to . . . in the society."

- Luo: "You have been doing private hedge fund for so many years. In March, more than ten of us were here . . . those contents were absolutely confidential, I don't want to tell you. More than ten of us [participated in the meeting], even that Director Zheng was outside [outside of the conference room], because after the discussion, now the Securities Regulatory Commission is going to . . ., regarding the Party . . . "

  Dai: "Mr. Luo, please do give me a chance! You totally scared me just now!"

  Luo: "How would you become scared? This is how I talk."

  Dai: "Even if you did not say it, I should be able to figure out these things."

<u>September 14, 2017</u>:

- Luo: "Afterwards, the Evergrande incident brought me a lot of trouble. Originally, the Securities Regulatory Commission wanted to investigate this, and they searched out more than 42 rat traders and their identification cards. I said, 'No need to investigate. I knew about this matter involving Nationz Technologies. This matter should be ended now.' You can ask Junjie. I said 'this thing is over, just let it go.'"

## II. Luo's Military and Political Connections

<u>September 12, 2017</u>:

- Luo: "And then, I returned to Beijing and told tops in Beijing the truth. If you ask Junjie, you would know, including the Board of Directors, including the top leaders, top leaders in China . . . the part that you are responsible for, in the end, you failed us [Sichuan dialect: means "did not fulfill the promises"] and caused trouble on us . . ."

  Dai: "I am sorry."

- Luo: " . . . thereafter if there is a chance for you to meet with Junjie [you would know], the several things [I have done] are providing important vital effects, and I've stepped over several major obstacles. Including the Chengdu project, my Chengdu team has helped the country resolve a major military problem. For the top leaders, I have already made significant contributions for the country."

<u>September 14, 2017</u>:

- Luo: "There's no point in telling details about my work. I certainly acted for my country and not for myself. In all of China, you can't find another company like this [Nationz Technologies] which a central government-owned enterprise was asked to withdraw and was completely designed according to my requirements. Such a good platform, Nationz Technologies, was given to me, definitely because I shouldered the country's mission and the enterprise's growth."

- Luo: "Fortunately, whenever I do anything, I always have other preparations, including the Chengdu project and other matters for which I always have other preparations, it's just I never told you. I have been working on security work within the Party for more than 20 years, what else have I not seen? No matter who the leader is, no matter it was Jiang, Xi, or Wang, they all need someone like me. I work for the country. I don't work for any individual leader and I don't try to get benefits for any individual leader; I have made a lot of contributions to the country, including in the area of today's space technology, including in areas of gallium nitride and gallium carbide, including Yang Liwei [China's first astronaut to go to space], when he went to our company earlier and took photos with my employees, he said, 'Your Chairman is someone that I will absolutely never forget in my lifetime.' These are his original words. Also, not long ago, my wife, Ma Xingrui [Deputy Secretary of Guangdong Province and Governor of Guangdong Government] also invited her. You see, look at the WeChat he sent.[shows WeChat photos on mobile phone] I won't say it."

Dai: "Oh, J-20 fighter."

Luo: "Right, J-20 fighter."

- Luo: "Therefore, these, including Nationz Technologies, including this project in Chengdu, will greatly contribute to our country in three or five years. Just like the photo sent by Liu Yiqian, in the next two years, The J-20 Fighter will elevate the technological power for our country's national defense and will impact the U.S. for at least 10 years. I am all for the country, and originally from my conscience and well-intentioned desire, hope . . ."

- Luo: "The country gave this platform to me. It is impossible, from a financing standpoint, for the state to pay from its budget or give money from elsewhere. I work for the state, there is a tacit understanding., I brought back 1,547 drawings for the country from Russia [in 1992] and resolved the core problems with our country's aerospace, which allowed our country to advance the development of aerospace by more than 20 years. I did not request the country to give me an award for such major contributions like this. The country gave me a house but I did not take it. However, the country gave me this platform, and gave it only to me. As long as the core is not breached, [I] personally can make money however I wanted to make money. After making money, first . . .when I was in front of you, I implied that to you three times. You thought that I was [working] for the leaders in Beijing? Throughout my entire life, it has been impossible for me to give the leader any gift because I made contributions to the country through my own abilities. You haven't participated in any of our internal meetings."

- Luo: "About this Peng Xiaofeng, let me tell you, he is someone who is very trusted by General Secretary Xi, and by whether it is the Jiang group or whatever group . . . General Secretary Xi respects him the most. Moreover, he was also one of my several superiors and one of my leaders, which include him, Liu Yazhou [General Rank of the Chinese People's Liberation Army and served as Political Commissar of the National Defense University of the People's Liberation of Army]. Liu Yazhou was also a commander and three-star general of the Rocket Army and was very respectful towards me. It can be said that I can see him anytime and give him a call anytime."

- Luo: "You are an ordinary person. Come back if you ought to come back. No need to mention these very words. You have to pay attention. Right now, there are three channels . . . these three people are responsible, and only responsible to Xi. The country also knows about my situation, including those working for me. I don't mind. However, you are different. There's one day in the future that a national high-ranking leader will say, what support is there for the development of Nationz Technologies to this day. I can still say that the only existing cooperation is with Khan Funds. In 5 or 10 years, this cooperation will bring you key influence. Because this public news . . .is just like us going to Chengdu this time . . . if I am just a private enterprise, how can I get the land for free? Therefore, Yu Junjie finally understood that Nationz Technologies is not an ordinary enterprise."

Dai: "It costs 500,000 yuan per mu of land even in Fuling."

Luo: "You can see it after you come back. My building in Shenzhen has been almost completed and the cost is basically zero. The land cost was 1,000 yuan [each square meter], the market price after renovation will be several billion. After it is renovated, there will be a place for you to dine and live in when you come back to Shenzhen. The renovation plan is really good."

## III. References to Yaping Chen

September 10, 2017:

- Luo: "Fortunately, the expert technical team of Chen Yaping, who has been working for me for 15 years, returned after finishing PhD study in the USA, and has been in touch with me on a single line. It is not brought into Nationz Technologies, just used for national space technology. This project fills the domestic gap, in addition, previously I have always asked him to communicate with the Canada technical team. You are unfamiliar with this industry."

    Dai: "Yes. Unfamiliar."

    Luo: "For the semiconductor industry in our country, the first generation has been behind Japan and the USA for more than 20 years. I have been asking him [Chen Yaping] to do a job for so many years: Corner overtaking and start from the second and third generations, but there are no drawings, no technology, no talent; there are currently less than 2,000 engineers producing gallium nitride and gallium carbide in the world, 1,700 engineers are in the USA, and there are only 107 Chinese-Americans, all of whom are under my control. There are dozens of engineers in Canada, and there are some engineers in Germany. I asked him to start from Canada, a few years ago. Originally, I had never thought of operating at Nationz Technologies. Speaking in this way, I don't talk about the process in detail. Basically, I have got a full set of drawings and talents. These talents returned to China after studying abroad. This is showing my sword . . ."

- Luo: "However, the government subsidized the land demolition and river renovation with more than 100,000 yuan per mu, so basically I did not need to spend a penny. The first batch of land has been hung up. Yu Junjie went to Chengdu to delist on the 14th. Before these projects, gallium nitride and gallium carbide are handled by the team of Chen Yaping, and this information has been published online. He brought them back through Canada, and brought back through the USA, and they have been used in military demonstrations in our country. During the Zhurihe military exercise this time, all three weapons used in the initiative attack need this material, which are all obtained by my team and through such intermediate methods during the early stages. One is the stealth missile J-20 Fighter. The combination of my chips is inseparable from materials. One is the H-9 Bomber, our core H-9 Bomber, the missile interception system of our country. One was the J-10 Fighter-Bomber, and this was brought from India. Another is called the J-16 Fighter."

A-5

- Luo: "Later, I brought [Junjie Yu] to Beijing to meet with . . . including the activation of this Chengdu project, including the Chengdu project that he is now responsible for. Chen Yaping's team has been working for me for over ten years. Including our country's, including airborne radar of the J-20 Fighter, including the monitor on HQ-9 long range surface-to-air missile, I am in charge of all these things by myself. This is the work I've been doing. These people have been working for me all the time. This time, in the second and third generation Gallium Nitride project, our entire technical drawings are in place. More than 100 million yuan. I was in Hong Kong, through Canada I . . . the entire rear team in Canada, the 7 personnel all returned safely. Things about this, the two . . . I started it immediately in Chengdu. I take care of a lot of things like this every day. Xuefeng, these things are not for me personally, you think about it, as a . . . Nationz Technologies . . ."

September 12, 2017:

- Luo: "The things I did can't even be told to the highest leaders. This is a type of discipline. This is to make contributions to the country. Just like Chen Yaping's team, although it was announced that he took 20% shares based on technology, but there are many things that cannot be told. In these ten years or so, including from Canada and from the U.S. . . . the things he was responsible for, how the researchers came back to the country, and how the technology was brought back, how can I talk about these things?"

- Luo: "They only knew afterwards that Nationz Technologies had a special mission. Because they knew these epitaxial wafers are used in our country's core military and must be used for the J-20 Fighter, and that epitaxial wafers are inseparable from many core military weapons. What did [we] rely on all these years? We relied on Chen Yaping's technical team. The Chengdu project was tossed around many times before the problem with the materials was resolved. Nationz Technologies has already invested in it. Shanghai is investing, Xiamen is investing, and Suzhou is investing. Over these years, they invested tens of billions and there has been no production. After five years or even ten years, it's still impossible for them to produce it. However, I am able to mass produce after two years. Why? The people on my team, throughout the world, there're 1,500 people in the U.S who can operate this [technology], several hundred in Canada and several hundred in Germany, and for these people, I have already . . . These people [technical experts] have already returned. All these things that I've done are for this project. Right now, it is merely one project. What Nationz Technologies will do in the future, including the [matter] that Junjie has written to you about, is for financial security."

## IV. Luo's References to Optimum Semiconductor Technologies d/b/a General Processor Technologies and Keyi "Kerry" Li

September 12, 2017:

- Luo: "You see, this is Li Keyi [founder and Chairman of Huaxiaxin [Beijing] General Processor Technology Co., Ltd., selected to be one of China's "Thousand Talent

Program" in 2009]. I'm visiting him tomorrow night. Compared to Xuefeng, you see, his hair is all [grey]."

Dai: "We are not that [high-end] in finance."

Luo: "He is engaged in technology which is different of course."

Dai: "He is engaged in scientific research, then of course."

Luo: "Did you come with me to their place last year? There are dozens of people, and all of them are Americans, Israeli, Indonesians, Indian American, Israeli American. The dozens of people over there are all like this."

September 14, 2017:

- Luo: "[Shows photos] This one is from Washington, DC. His wife and child both studied medical. His name is Li Keyi [Founder and Chairman of Hua Xia General Processor Technologies [Beijing] Co., Ltd. He joined China's "Thousand Talents Program" in 2009"]. He has also been working for me for more than ten years, and it is him who operated all these in the surface, including Beijing's Hua Xia General Processor Technologies. He manages these people, Nationz Technologies has not surfaced . . . For Chen Yaping's team, chip is the most important . . . This one is also really famous in China and is a leading Postdoc. I asked them to work here for several days and communicate with them. They really respect me now. I am the chairman, and I directly lead them for this. This is our young expert, Chen Shaowei, he also came this time. This team will bring fundamental and core terminals to our country, and would not be subjected to the U.S. anymore. This is what they will research in the future."

Dai: "President Trump just vetoed an acquisition of a chip [company] last night."

Luo: "These can't be vetoed. Because I have already acquired this team 4 or 5 years ago."

Dai: "Because you are going through the technology route, that one is to directly acquire."

Luo: "No, I also directly acquired this, this is R&D team, 5 years ago."

Dai: "Oh. Not acquiring the large enterprise, but directly acquiring the team."

Luo: "Not a team, it is a research institute. There are only three of them in the U.S., and it was prohibited to purchase them later on. I've already . . ."

Dai: "Also core things."

Luo: "I already purchased 100% equity of the core research institute. The ownership has already been transferred. They cannot reverse it nor manage it. The contract has been signed."

A-7

Dai: "The foreigners only cared about making money. They made money by selling the equity."

Luo: "This time, my team came here to coordinate with them and clearly communicate about all the core details, and some things have to be brought back. What I mean is that Xuefeng, you should calmly recall, that it's fine if we do not work together. I only mean that in the future, when you go back to China . . ."

## V. Luo's References to the Larger Global Enterprise

September 12, 2017:

- Luo: "Research Institute . . . 5 years ago, I asked a domestic enterprise to acquire this research institute in the USA. The US government would never agree to this acquisition if it was done two or three or more years later. It now has two or three of the world's top technology experts capable of competing with Intel. The reason I came here this time is to communicate with them about technology. This technology can completely fill the domestic gap, that is, the computer CPU, which is currently subject to restrictions from the United States from the terminal server . . . The acquisition was completed long ago, but it was not acquired by Nationz Technologies. It was acquired by a comrade- in-arms partner who I arranged in Beijing. This company did not come to surface. After it was acquired, he also served me throughout the process. Junjie is also following up. This time I am here to better communicate with them. The development of artificial intelligence Internet of Things in our country is inseparable from this technology. This is also the main task of my visit this time. The staff in Europe will arrive here by flight on the 16th, and after they arrive, I will return on the 17th, and they will stay in the USA for a few more days before return. Generally speaking, we, including both the company and individuals in China, are definitely full of positive energy."

- Luo: "Later, I came to the U.S. for my child's matter. My child's matter is just an excuse. Starting tomorrow, I will take action to do the second most important thing I planned. After I finish this matter, the thing I bring back will help our country resolve many problems. Seven technicians will come to the U.S., they will arrive in the U.S. tomorrow. I am just doing things for the country, it's just a consideration of strategic arrangement. You see, the land of Industrial Park, you see [shows photo from the phone], it has been approved today, it will be delisted on the 18th. It can be said that in Chengdu, there is no other enterprise that can get the land this quickly. The government officials have not taken breaks on Saturdays and Sundays to help us, working overtime on this matter."

September 14, 2017:

- Luo: "Just look at these three people. This person is the CEO of the American company, he is . . . there are no more than 5 experts in this field in the world including the U.S. He is one of the 5 people and works on the most advanced chips worldwide. This person is Indian with U.S. citizenship. This person is even more remarkable. His wife is also involved in arts and has met my wife Mrs. Chen a few times. He is the only core expert

A-8

who can work out products that can compete with the CPU made by Intel, and there are only three experts in this field in the U.S. Right now, now he is also working for me. It's just that Nationz Technologies hasn't emerged to the surface yet. Not to mention this person, he arrived yesterday and is employed by Nationz Technologies. Look inside that book. He was also cultivated by me, graduated from Tsinghua University."

- Luo: "Liang Songhai, our core expert, he wrote an article for this book, and I was the one who helped revise the article. [Liang Songhai] Nationz Technologies' chief core expert, Postdoc of Tsinghua University, who was cultivated by me. I arrived yesterday and asked him to come over and let them connect with him. A lot of the core technologies were learned through our oral communication. It could only be done through oral communication. Technologies shared orally. This one is Wang Hongbo, I also cultivated him. He arrived yesterday."

Dai: "It's fully teamed up."