UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
GUOTAIQIXING BIOMEDICAL INTERNATIONAL (S) PTE. LTD.,

Plaintiff and Counterclaim-Defendant,

-against-

XUEFENG DAI,

Defendant and Counterclaim-Plaintiff.
------------------------------------------------------------------X

Case No. 24-cv-03142 (ER)

**ANSWER WITH COUNTERCLAIMS**

ECF FILED

Defendant Xuefeng Dai ("Dai"), for his Answer with Counterclaims to the Motion for Summary Judgment in Lieu of Complaint and Memorandum in Support of Motion for Summary Judgment in Lieu of Complaint filed by plaintiff Guotaiqixing Biomedical International (S) PTE. LTD. ("GTQX") in March 2024 in New York state court pursuant to Article 53 of New York's Uniform Foreign Country Money Judgment Act ("Article 53"), N.Y. C.P.L.R. § 5301 et seq., (the "Article 53 Proceeding"),[1] alleges as follows:

## PRELIMINARY STATEMENT

1. This is not an ordinary foreign-judgment recognition case. This Court has already held that this recognition action (the "MJA Action") and the related RICO action are *"mirror images,"* that *"on the facts of this case, the MJA Action is functionally a request for declaratory judgment,"* and that *"[r]ecognition of a judgment is a prerequisite to its enforcement."* The Court also found that GTQX *"shares the same management with Nations Investment, Nations*

[1] The term "Article 53 Proceeding" shall mean to include, without limitation, the Summons and 3213 Motion, the Notice of Motion, the Affirmation of Liang Hanwen Calvin, the Affirmation of Benjamin D. Bloodstein, the Memorandum in Support of Motion for Summary Judgment in Lieu of Complaint, and all exhibits and materials thereto filed in *Guotaiqixing Biomedical International (S) Pte. Ltd. v. Dai*, Index No. 152210/2024.

*Technologies, and Nations Technologies (USA) Inc.*" and that GTQX "*does not deny that it is in privity with several of the defendants in the RICO Action*." Doc. 16 at 3, 7–8 & n.5.

2. In the RICO Action, moreover, Dai expressly sought *"an injunction prohibiting [the defendants] from purporting to domesticate, confirm or enforce the . . . Singaporean judgment against Plaintiffs or their employees . . . in any U.S. state or federal jurisdiction*."

3. The present recognition demand must thus be analyzed as part of the same larger controversy already before this Court, not as a neutral, stand-alone collection proceeding.

4. The Court has also already sustained, at the pleading stage, the core RICO theory that the action concerns "*an alleged enterprise to coerce Plaintiffs into stealing American technology for the Chinese military*," and denied dismissal after concluding that Plaintiffs plausibly alleged predicate acts including witness tampering, witness retaliation, and obstruction of justice tied to Dai's cooperation with U.S. law enforcement. Doc. 146 at 1, 39–42. (22-cv-05055 ER)

5. The facts pleaded here form a continuous sequence:

**(a) in 2017, Luo's New York-recorded admissions disclosed the purpose of the Enterprise;**

(b) in 2019–2020, the Nations side obtained control of the GTQX vehicle and built a U.S.-side investigation and service chain;

**(c) on September 21, 2022, a recorded New York meeting disclosed the method by which the same side intended to proceed—globally, with a China-linked "mandate," and through aggressive multi-forum pressure ;** and

(d) from 2023 through 2026, that method was carried out through Singapore restraint orders and a Singapore judgment, Florida property filings that clouded title to

properties owned or controlled by Dai despite the absence of any domestic recognition of the judgment, repeated lis pendens that were serially filed and withdrawn once challenged by Dai, and other attachment efforts.

6. GTQX is not a passive or accidental judgment holder. GTQX's own Florida counsel swore that GTQX "*has been the only Petitioner/Plaintiff in all the Florida actions described above, as well as the sole filer of all lis pendens described above*." Doc. 255 ¶ 30. （22-cv-05055 ER） That admission is incompatible with any attempt to portray GTQX as a detached foreign creditor merely seeking ministerial recognition.

7. The same pattern also affected not only Dai, but Dai's employees and family. The RICO pleadings and related record show that Sophie Xu and Alice Zhang were pressured during the semiconductor technology-theft phase and later became Singapore and Florida targets, and that Dai's sister and family members were used as intelligence and intimidation instruments in what the RICO pleadings describe as a Fox Hunt pattern. Doc. 32 at 31–37, 44–46; Doc. 146 at 40–41; Doc. 255 ¶ 31. （22-cv-05055 ER）

8. For all of the reasons set forth herein, the Singapore judgment should not be recognized and its recognition and enforcement should be permanently enjoined.

**ANSWER**

9. Dai denies each and every allegation, characterization, implication, and legal conclusion contained in the Article 53 Proceeding, including GTQX's motion papers, all supporting affirmations, memorandum of law, and exhibits and materials thereto, except that Dai admits only that GTQX seeks recognition of a June 27, 2023 Singapore judgment, and that GTQX has filed papers in this Court to that effect.

10. Dai denies that Plaintiff is entitled to recognition, enforcement, or any interim recognition-like relief with respect to the Article 53 Proceeding, any Singapore judgment or any Singapore injunctive relief.

11. Dai denies that any Singapore judgment or any Singapore injunction are recognizable, enforceable, or entitled to any operative effect in the United States.

12. Dai denies that any Singapore injunction is self-executing in the United States, or confers upon GTQX any right to record any Singapore-based instrument against Dai's U.S.-based real property before it is declared enforceable or is enforced by a Court in the United States. To the contrary, Singapore-based instruments do not have self-executing force in the United States and GTQX was accordingly not entitled, prior to valid domestic recognition, to record or cause to be recorded instruments affecting U.S. property, to file or maintain lis pendens based on Singapore-based instruments, or to use such instruments to create title, financing, sale, or have attachment-like effect in the United States. GTQX was represented by counsel in these efforts and knew or should have known that in doing so, GTQX acted unlawfully, improperly interfered with Dai's property rights, and caused tremendous damage and injury to him.

13. Dai denies that GTQX is entitled to any injunctive relief permitting GTQX, pending final adjudication of recognition in this Court, from recording or causing to be recorded any Singapore-based instrument against Dai's U.S.-based real property.

14. Dai denies that the Singapore action afforded constitutionally or statutorily sufficient notice, afforded sufficient service of process, and/or afforded constitutionally sufficient due process.

15. Dai denies waiving any defense to the Article 53 Proceeding and/or any objection to notice, service of process, personal jurisdiction, due process, and/or non-recognition in connection with the Article 53 Proceeding.

16. Dai denies that the Singapore actin was "full and fair" for purposes of U.S. recognition law.

17. Dai denies that GTQX is entitled to the relief it seeks and affirmatively avers that GTQX is not entitled to any of the requested relief against Dai whatsoever and demands judgment dismissing the Article 53 Proceeding together with interest, costs, disbursements or judgment over as required by law, and for any other such further relief as the Court deems just and proper.

## AFFIRMATIVE DEFENSES

18. Dai has not completed his investigation of the facts of this case, has not completed discovery in this matter, and has not completed their preparation for trial. The affirmative defenses asserted below are based on Dai's knowledge, information and belief at this time, and Dai specifically reserves the right to modify, amend, or supplement his affirmative defenses at any time. Supporting allegations are set forth herein, including in Dai's Counterclaims. Subject to the preceding qualifications, Dai assert the following affirmative defenses to the Article 53 Proceeding:

19. **FIRST AFFIRMATIVE DEFENSE**: Recognition is barred pursuant to NY CPLR § 5304(a)(2) because the Singapore court lacked personal jurisdiction over Dai.

20. **SECOND AFFIRMATIVE DEFENSE**: Pursuant to NY CPLR § 5304(b)(2), the Court should not recognize the Singapore judgment because the Singapore judgment was obtained by fraud that deprived Dai of an adequate opportunity to present his case. Dai alleges,

among other things, that GTQX's case in Singapore relied in part on incomplete records, unsigned documents, the use of stolen documents and raw forgeries, as set out in more detail in the Amended Complaint in the RICO Action.

21. **THIRD AFFIRMATIVE DEFENSE**: Pursuant to NY CPLR § 5304(b)(3), the Court should not recognize the Singapore judgment because giving the Singapore judgment effect would be repugnant to the public policy of the State of New York and the United States.

22. **FOURTH AFFIRMATIVE DEFENSE**: Pursuant to NY CPLR § 5304(b)(7), the Court should not recognize the Singapore judgment because the judgment was rendered in circumstances that raise substantial doubt about the integrity of the rendering courts with respect to the judgment.

23. **FIFTH AFFIRMATIVE DEFENSE**: Pursuant to NY CPLR § 5304(b)(6), the Court should not recognize the Singapore judgment because purported jurisdiction was based only on personal service and the foreign court was a seriously inconvenient forum for the trial of the action.

24. **SIXTH AFFIRMATIVE DEFENSE**: Pursuant to NY CPLR § 5304(b)(8), the Court should not recognize the Singapore judgment because the specific proceeding in the foreign court leading to the judgment was not compatible with the requirements of due process of law.

25. **SEVENTH AFFIRMATIVE DEFENSE**: Recognition is barred because Dai did not receive sufficient notice of process in the Singapore action.

26. **EIGHTH AFFIRMATIVE DEFENSE**: GTQX's claims are barred, in whole or in part, by the equitable doctrine of estoppel, and GTQX is estopped from enforcing any of the alleged rights, claims and obligations that it seeks to enforce hereunder.

27. **NINTH AFFIRMATIVE DEFENSE**: GTQX's claims are barred, in whole or in part, by the doctrine of unclean hands. Among other things, GTQX repeatedly treated Singapore-based instruments as if they already had operative effect in the United States despite the absence of domestic recognition. The Court, however, has already denied attachment, stated that the Singapore judgment "has not yet been recognized," and was "unable to determine" likelihood of success on the merits on the then-record at the February 17, 2026 hearing.

28. **TENTH AFFIRMATIVE DEFENSE**: Dai and Khan Funds Management America, Inc. filed in the Southern District of New York an action against Nations Technologies Inc., Nations Technologies (USA) Inc., Qianhai Nations Investment Management Co. Ltd., Yingtong Sun, Zhaoxue Luo, Baoxin Huang, Junjie Yu, and related individuals, and related entities asserting claims under the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO"), along with a number of claims arising under state law. This action was later amended by the filing of the Amended Complaint on December 13, 2022, the allegations of which are incorporated by reference herein (the "RICO Action"). A judgment obtained in Dai's favor in the RICO Action precludes all claims for relief of GTQX in this Article 53 Proceeding.

29. **ELEVENTH AFFIRMATIVE DEFENSE**: GTQX does not have standing or authority to pursue this action because those who purport to control GTQX and direct its action do not lawfully control the company.

**WHEREFORE**, having fully answered the Article 53 Proceeding, Dai's Prayer for Relief is set forth below.

## COUNTERCLAIM

30. Plaintiff GTQX is a wholly owned subsidiary of Shenzhen Guotaiqixing Industry Investment Fund Management Centre LLP ("Shenzhen Guotaiqixing"). Nations Investment is a limited partner in Shenzhen Guotaiqixing, and a defendant in the RICO Action. Nations Investment is also a subsidiary of Nations, another defendant in the federal RICO Action. GTQX shares the same management with Nations Investment, Nations, and another RICO defendant called Nations Technologies (USA) Inc., as the Court has already recognized. Doc. 16 at 1–3.

31. GTQX shares the same management with three of the entity defendants in the RICO Action—Nations, Nations Technologies (USA) Inc., and Nations Investment. One individual defendant in the RICO Action, Yingtong Sun, is President of the Board of Directors of all four entities. Another individual defendant in the RICO Action, Zhaoxue Luo, is the former director of GTQX, former president of Nations, and former president of Nations Investment.

32. In September 2017, DAI recorded Luo in New York and later provided that recording to the FBI and the U.S. Attorney's Office.

33. In December 2019, Yuanjun Tang, who presented himself as a pro-democracy activist opposed to the Chinese Communist Party, visited Khan Funds' and DAI's office at One World Trade Center in New York with several companions (Tang learned that there was a spy-related story involving the Chinese military, Nations, and Luo, connected to DAI and KhanFunds.), and a DAI-affiliated company thereafter made a $21,000 donation to Tang & his entity. *(In August 2024, Tang was arrested and charged in the Southern District of New York with acting and conspiring to act in the United States as an unregistered agent of the People's Republic of China and with making false statements to the FBI; the charging papers alleged that*

*he had worked at the direction of the PRC's Ministry of State Security ("MSS") from at least 2018 through at least June 2023, and in September 2025 Tang pleaded guilty to conspiracy to act as an unregistered agent of the PRC)* (EXHIBIT D)

34. GTQX filed the Singapore action on October 27, 2020. GTQX's complaint falsely accused Dai and two of his employees of diverting funds from GTQX to entities that Dai controlled. The action was purportedly brought in an effort to recover the allegedly diverted funds. In reality, though, Dai's opponents sought to use the case to harass and financially ruin Dai and two of his most loyal employees in retaliation for their efforts to thwart the Enterprise's espionage scheme in the United States. The filings in the Singapore Action were rife with false allegations, and appended stolen and forged documents. Dai was forced to defend himself from afar, through Singaporean counsel, given his legitimate fears that if he traveled to Singapore himself he could be snatched up by PRC agents operating in Singapore. As set out in the Amended Complaint in the RICO Action, the Enterprise (through GTQX) in 2020 hired an "*investigation firm*" called Applied Facts, nominally to serve process of the Singapore proceeding on Dai in Florida but whose actions "went far beyond generic service of process" and in fact was deployed to "*abuse[] the Singaporean service of process procedure as cover to surveil, intimidate, and retaliate against Dai.*" Doc. 32 at 44–47. (22-cv-05055 ER)

35. Applied Facts prepared a U.S. investigative memorandum for Ark Law, counsel to GTQX in the Singapore action, on September 28, 2020. That memorandum identified addresses (The data is sourced from a third-party internet source and is dated June 2020.), work location, and other U.S.-based information concerning Dai. On October 27, 2020, a summons for service out of jurisdiction was prepared in the Singapore case, and on October 29, 2020, the Singapore court entered the corresponding order. **On Oct 16, 2020**, and On November 5, 2020,

Ark Law sent detailed instructions to a process server to attempt personal service at multiple New York and Florida locations, to positively identify targets, to document each attempt, and, "if possible," to take "photographs / video with audio." The same email copied " Yantao Ye"( Vice General Manager and Secretary to the Board at Nations Technologies Inc. Dkt 49, P1, 22-cv-05055 ER), and three **Zhong Lun lawyers** ( *Zhong Lun's own website states that the firm has served as* ***legal counsel for the Ministry of Justice and other PRC regulatory authorities****. EXHIBITS A*) In other words, the same side that later invoked the Singapore judgment had, from the outset, deployed a coordinated U.S. execution strategy that combined investigation, surveillance, process service, documentation, and immediate reporting.

36. On June 14, 2022, DAI, through counsel, sent a letter to Enterprise counsel Brian Sun and enclosed materials bearing on the claims in this action. Those materials included the FBI letter and Luo's recording concerning Defendants' extortion demands and other threats. (EXHIBIT C)

37. On June 16, 2022, Enterprise counsel Brian Sun responded by email and stated that Enterprise would move to dismiss and "seek sanctions against you and your client" unless the complaint was voluntarily dismissed within one week. Sun further described the complaint as frivolous and part of a purported pattern of vexatious litigation. (EXHIBIT C)

38. On September 21, 2022, Dai and his counsel met in New York with Brian Sun, counsel for the Nations entities (counsel for the GTQX since March 2024). Those entities are alleged Enterprise members and were working in close coordination with GTQX in furtherance of the Enterprise's goals, including through the misuse of the Singapore judgment. In that meeting, Sun said, among other things, that "*we're about the money*," that "*we're about ready to launch*," that "*certain hawks in our*

*camp*" were *"ready to move*," that *"[t]his will be global,"* that *"we will follow you,"* that *"[i]t's not meant to be a threat. It's the mandate we have*," that *"I can talk to China, and they will listen to me,"* that "I can catch you," and that the "*Singapore guys" "have the same mandate to move forward aggressively there."* , "*I think, as soon as you can, because I got to apply my internal forces. I got to persuade China* "; *"Let's say you write it, say, I'll offer you 80 million tomorrow. I'm not saying you will. But China is going to say to me, "Well, why is he doing that? He must have 100 more stashed away."* And "*And then the way we do it, as you probably know, as I talk to China at night. And so I'm sure I'm going to talk to him before the end of the week. So, anything you can tell me, at least by way of going forward steps that you have in mind that you can put in writing to me and Victoria that I can send to China, that would be great. "* **,** and *"Okay? If you want to have some follow-up and your questions you want me to pose, maybe we can call China tonight or tomorrow night. Okay? I'm here"*In other words, the Nations entities' lawyer admitted that Nations and GTQX are coordinating with one another and have "the same mandate" to "move forward aggressively" against Dai using methods that are intended to have global reach to "follow" and "catch" Dai.

39. After the September meeting ended, DAI retained counsel to submit an inquiry to INTERPOL's Commission for the Control of INTERPOL's Files. INTERPOL later advised counsel **that DAI was subject to a Red Notice requested by INTERPOL's National Central Bureau in China on September 16, 2022,** which was five days before DAI's September 21, 2022 New York meeting with Enterprise counsels. (EXHIBIT B)

40. In December 2022, Dai stopped participating in the Singaporean forum on the grounds that the action was infected by the Enterprise's fraud, that his inability to appear to defend himself denied him due process, and that draconian attorneys' fees limitations imposed on him by the court in an interim injunction order made it impossible for him to defend himself properly through counsel.

*41.* On May 12, 2023, Nations/GTQX counsel Brian Sun wrote to FBI Special Agent Haslbauer "in response to the FBI's inquiry," described Dai as involved in "misappropriation of approximately $80 million USD," referred to efforts to "recover these stolen funds," and urged the FBI to reject Dai's account. Wrote that "*A self-described FBI informant who claims to have exposed an unlawful technology transfer scheme involving NTI and the subject of a campaign of harassment by NTI, its legal counsel and the PRC government. In this regard, Dai approached the DOJ, the FBI and the media and made wild and unfounded accusations which are totally belied by unrefuted evidence presented to courts in Singapore, New York and Florida"*. and *"An unscrupulous fraudster who stole tens of millions of dollars from a Singapore based affiliate of NTI and is now the subject of a worldwide Mareva injunction issued by a Singapore court, restraining and freezing any assets in the world under Dai's control." And "We hope these materials will lead the FBI to see through Dai's disingenuous efforts to portray himself as a "victim." We are also available to address or respond to any further queries you may have regarding Dai and his reprehensible conduct as described herein.".*

42. Besides the coordinated U.S. execution strategy that combined investigation, surveillance, process service, documentation, and immediate reporting, the Enterprise was thus also advancing the same criminal smear campaign in the U.S. to align with its foreign litigation strategy.

43. On January 12 and January 17, 2023, the Singapore court entered interim worldwide restraint orders affecting Dai's assets, and on June 27, 2023, it entered final judgment and an accompanying injunction, together with leave to begin proceedings or seek similar relief in other jurisdictions.

44. The Florida record shows the repeated use of GTQX as the plaintiff and filer in multiple property-directed actions and lis pendens, including actions involving Dai, Zhang, and Xu, notwithstanding the absence of any recognition of the Singapore judgment in any United States jurisdiction. Doc. 255 ¶¶ 5–24, 30–32. （22-cv-05055 ER） The record also shows that GTQX repeatedly filed and dismissed these actions in an effort to interfere with Dai's property rights, cloud the title of property he owns or controls, and block his ability to sell property, thereby strangling him financially and making it impossible for him to afford counsel. GTQX did this knowing that it had no legal basis to file or deploy the Singapore judgment or seek lis pendens or similar restraints in the absence of a recognized, U.S.-domesticated judgment.

45. On September 15, 2023, the Commission for the Control of INTERPOL's Files informed Dai's counsel that the challenged red notice data had been deleted and certified that, as of that date, Dai was "not subject to an INTERPOL Notice or diffusion." In other words, Chinese authorities had filed a "red notice" with INTERPOL claiming Dai was a criminal, but INTERPOL, upon investigation, found there to be no basis for such a red notice and deleted it. (EXHIBIT B)

46. Ten days later, on September 25, 2023, PRC authorities rejected Hague service in the RICO Action and invoked Article 13 of the Hague Convention on the ground that execution of the request would infringe "the sovereignty or security of the People's Republic of China." Doc. 115 at 6–7. （22-cv-05055 ER） This together with the filing (and deletion) of the

INTERPOL red notice make clear that the PRC is behind the retaliation and intimidation campaign against Dai.

47. The retaliation was not merely reputational or commercial. It also reached family and home.

48. The Court's March 31, 2025 opinion already described the Fox Hunt maneuver involving Dai's sister. Doc. 146 at 40–41（22-cv-05055 ER）. The Amended Complaint in the RICO Action likewise pleaded that Defendants weaponized family members and later escalated their retaliatory campaign against Dai through burglary, cyberattack, and other criminal wrongdoing. Doc. 32 at 37–44.（22-cv-05055 ER）.

49. In addition, Dai's January 2026 TRO memorandum, supported by exhibits, sets out that on December 15, 2022, his sister's home in Nassau County, New York was unlawfully entered, and that on February 6, 2023, the FBI memorialized formal preservation steps on a DOJ/FBI Consent to Search form, documenting collection or preservation relating to "multiple pieces" of paper and a digital video device. Doc. 239 at 11,（22-cv-05055 ER）.

50. The pattern alleged in the RICO Action was, in other words, serious enough to trigger federal evidence-preservation steps and later federal adjudicatory attention.

51. In February 2026, GTQX also sought attachment-like relief in this Court. The Court denied that request, stated that "[t]he Singapore judgment, in fact, has not yet been recognized," and indicated that the proper sequence was the filing of an answer followed by targeted discovery subject to reasonable objections.

52. As more fully set forth in the RICO Action, the allegations of which are incorporated by reference herein, the Enterprise retaliated after Dai reported the scheme to the

FBI, including by filing foreign proceedings and misusing the judgment obtained in Singapore in the United States prior to any recognition or domestication.

53. The RICO enterprise retaliated against Dai by, *inter alia*, causing Nations Investment to unlawfully gain control of GTQX and unlawfully appoint themselves as GTQX's director.

54. The RICO enterprise retaliated against Dai by leveraging Nations Investment control over GTQX to file a sham lawsuit against him in Singapore that was intended to harass and financially ruin Dai and two of his most loyal employees. The filings in the Singapore action were rife with false allegations, as well as stolen and forged documents.

55. The RICO enterprise retaliated against Dai by causing GTQX to commit numerous additional predicate acts aimed at the Enterprise's scheme to intimidate and retaliate against Dai for reporting the technology theft scheme to law enforcement.

56. GTQX's tactics included surveilling Dai at his home on U.S. soil and trying to domesticate in the United States judgments obtained in Singapore in violation of Dai's due process and other rights. These activities constitute violations of the civil RICO and RICO conspiracy statute (18 U.S.C. § 1962(c) & (d)), including predicate acts of wire fraud, witness intimidation and obstruction of justice.

57. The RICO enterprise retaliated against Dai by causing GTQX to file false instruments and other documents against Dai and make false statements concerning Dai in Singapore and throughout the United States. These activities constitute violations of the civil RICO and RICO conspiracy statute (18 U.S.C. § 1962(c) & (d)), including predicate acts of wire fraud, witness intimidation and obstruction of justice.

58. GTQX's role in the Enterprise is shown by the Court's prior opinions, GTQX's own sworn materials, and the Nations entities' counsel's statements at the parties' September 2022 meeting.

59. In the remand opinion, the Court explained the structure surrounding GTQX, Nations Investment, and the broader affiliated entities, and found that GTQX shared management with Nations Investment, NTI, and NTI USA. Doc. 16 at 1–3.

60. In Sun Yingtong's 1500pages affidavit of Singapore, Sun stated that GTQX was a wholly owned subsidiary of Shenzhen Guotai, that Nations Investment was wholly owned by Nations, that Nations Investment was appointed liquidator of Shenzhen Guotai, and that in October 2019 Dai was removed from GTQX's board and new directors were appointed.

61. The Amended Complaint in the RICO Action expressly connected that vehicle capture to the later litigation phase: after the PRC default judgment, Nations Investment removed Dai from the Partnership structure and then, approximately a year later, used its position to sue Dai, Sophie Xu, and Alice Zhang in Singapore. Doc. 32 at 44–46.（22-cv-05055 ER）.

62. GTQX's own Florida counsel later confirmed that GTQX had been "the only Petitioner/Plaintiff in all the Florida actions described above" and "the sole filer of all lis pendens described above." Doc. 255 ¶ 30. （22-cv-05055 ER）

63. This means GTQX was not merely holding a foreign judgment. It was actively deployed in the United States as the plaintiff and filer in the property-directed phase of the Enterprise's activities, notwithstanding that the judgment has not been recognized anywhere in the United States.

## CAUSES OF ACTION

### FIRST COUNTERCLAIM
### (Declaratory Judgment)

64. Dai incorporates by reference the allegations in the preceding paragraphs.

65. An actual controversy exists as to whether the Singapore judgment and related Singapore-based instruments are entitled to recognition or any operative effect in New York or anywhere in the United States.

66. In the RICO Action, Dai expressly sought "an injunction prohibiting [the defendants] from purporting to domesticate, confirm or enforce the . . . Singaporean judgment against Plaintiffs or their employees . . . in any U.S. state or federal jurisdiction."

67. Dai now seeks a declaration that recognition, domestication, and enforcement in New York or anywhere in the United States is unavailable for the reasons set forth herein, including insufficient notice, fraud, lack of personal jurisdiction, incompatibility of the specific proceeding with due process, repugnancy to public policy, substantial doubt about integrity, and material misuse and mischaracterization in U.S. fora.

68. Dai further seeks a declaration that GTQX may not obtain recognition-like interim relief in these proceedings, whether in the form of an injunction, an escrow, or otherwise.

**SECOND COUNTERCLAIM**
**(Violations Of RICO, 18 U.S.C. § 1962(c))**

69. Dai incorporates by reference the allegations in the preceding paragraphs.

70. At all relevant times, Dai and GTQX were and are each a "person" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c).

71. The existence, members, and structure of the association-in-fact RICO Enterprise is alleged in detail in Dai's Amended Complaint in the RICO Action, as are the relevant pattern

of racketeering activity, predicate acts, and other elements of a RICO claim, which the Court has already determined were sufficiently pleaded. As noted above, the allegations of that Amended Complaint are incorporated herein by reference.

72. GTQX was and is responsible for command and control of the Enterprise; held and holds positions of responsibility within the Enterprise; or was and is otherwise responsible for the operation and management of the Enterprise and its affairs, particularly as it relates to the Singapore Action and efforts to deploy the resulting Singapore judgment in the United States, including through recognition and enforcement efforts, in furtherance of the Enterprise's goals.

73. GTQX was involved in the orchestration, planning, perpetration, and execution of the scheme to defraud Dai (as well as Khan Funds), and has taken actions, and directed other conspirators to take actions, necessary to accomplish the overall aims of the Enterprise, particularly as it relates to the Singapore action and the resulting Singapore judgment.

74. GTQX conducted and participated, directly and indirectly, in the management, operation, and conduct of the Enterprise's affairs through a pattern of racketeering activity by, *inter alia*: (a) bringing and pursuing the Singapore Action; (b) deploying Applied Facts in the manner set forth in the Amended Complaint in the RICO Action, nominally to serve papers relating to the Singapore action; (c) serving as the vehicle through which foreign injunctions, judgments and orders that had and have no actual legal force or effect in the United States were translated into U.S.-side pressure on Dai, in furtherance of the Enterprise's Fox Hunt campaign and retaliation and intimidation efforts. Among other things, GTQX played a central and indispensable role in the Enterprise's efforts to domesticate and enforce judgments obtained in the Singapore Action against Dai and Dai's employees (including Sophie Xu and Alice Zhang); to mislead the Singaporean court into entering a freezing injunction and judgment designed to

defund Dai's ability to protect his rights and hire counsel; and has waged a campaign to corruptly deploy the Singapore injunctions and judgment in an effort to cloud title to and block Dai's sale of real property he owns or controls, including in serially filing actions directed at property that Dai controls and then voluntarily dismissing those actions in the face of Dai's strong legal challenges—with the damage already done to Dai's efforts to sell those properties. Prior filings in the RICO Action setting out this pattern of behavior are incorporated herein by reference. Other activities will be exposed through the discovery process.

75. These acts were related in purpose, participants, victim, and method. They formed a continuing course of conduct designed to punish a cooperating witness, silence exposure of the Enterprise, and convert foreign proceedings into a pressure campaign in furtherance of the Enterprise's goals.

76. Dai was damaged immensely as a direct and proximate result of this pattern of racketeering. These damages include, among other things, expenditures relating to security personnel out of fear for his own safety, legal, and investigative fees relating to the Enterprise's intimidation and retaliation efforts, and lost U.S. business due to the reputational harm that the Enterprise has wrought on Dai. Through its continuing activities in the Singapore Action and in efforts to deploy the resulting judgment in the United States, the Enterprise, through GTQX, has caused Dai to incur millions of dollars in legal fees. Moreover, GTQX has knowingly, corruptly, and without any basis in U.S. law clouded title to real property that Dai owns or controls and has sought to sell, causing Dai to incur significant losses and lost opportunities. Dai's injuries thus include title impairment, interference with specific transactions, contracts, and business opportunities, financing pressure, and loss of business opportunities. All of these losses have

occurred in the U.S. and were the direct and proximate result of activities that occurred in or were directed to New York.

**THIRD COUNTERCLAIM**
**(Conspiracy To Violate Civil RICO, 18 U.S.C. § 1962(d))**

77. Dai incorporates by reference the allegations in the preceding paragraphs.

78. GTQX has knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

79. That agreement is supported by, among other things:

(a) the Court's findings regarding shared management and privity, Doc. 16 at 3, 8 n.5;

(b) the capture of the GTQX vehicle and removal of Dai from GTQX's board; and

(c) GTQX's role as sole Florida plaintiff and sole lis pendens filer.

80. By and through each of the Enterprise members' (including GTQX's) close and longstanding business relationships with one another, and their close coordination with one another in the affairs of the Enterprise, GTQX knew the nature of the Enterprise and knew that the Enterprise extended beyond GTQX's individual role. Moreover, through the same connections and coordination, GTQX knew that the Enterprise's members were engaged in a conspiracy to commit the predicate acts detailed above and in the Amended Complaint in the RICO Action, and that the predicate acts were part of a pattern of racketeering activity, and each participant agreed to pursue the same criminal objective.

81. GTQX agreed to facilitate, conduct, and participate in the conduct management, or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), as set forth above. In particular, GTQX was a knowing, willing, and active

participant in the Enterprise and its affairs, and GTQX shared with the other Enterprise members the common purposes of stealing high technology for the benefit of the PRC military and retaliating against and intimidating Dai (and Khan Funds) for refusing to participate in the original scheme and reporting it to U.S. law enforcement authorities. In the absence of an agreement, the Enterprise could not have operated as it did. Further evidence of an agreement among the members of the Enterprise is particularly within their control.

82. The participation and agreement of GTQX and the other members of the Enterprise was necessary to allow the commission of this pattern of racketeering activity.

83. Dai has been and will continue to be injured in his business and property by reason of GTQX's violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

84. The injuries to Dai directly and proximately resulting from these violations of 18 U.S.C. § 1962(d) include, but are not limited to, legal fees related to the attempted revocation of the PRC arrest warrant; legal fees to protect against extradition; legal fees to defend against the spurious litigation filed by GTQX in Singapore; fees relating to reporting the Enterprise to the FBI; fees to investigate GTQX's various acts of wrongdoing; and legal fees to combat GTQX's repeated efforts to improperly deploy the unrecognized and undomesticated Singapore injunctions and judgment in the United States in furtherance of the Enterprise's scheme. Dai's injuries also include title impairment, interference with specific transactions, contracts, and business opportunities, financing pressure, and loss of business opportunities.

## **PRAYER FOR RELIEF**

WHEREFORE, Dai prays for judgment in his favor and against the Counterclaim-Defendant on all claims and counterclaims, and request a judgment providing the following relief:

i. Judgment in Dai's favor and against GTQX on all causes of actions;

ii. For an order declaring that the Singapore judgment and all related Singapore-based orders, injunctions, or instruments are not recognizable and not enforceable in New York or anywhere in the United States;

iii. For an order denying recognition and enforcement in New York or anywhere in the United States of the Singapore judgment and all related Singapore-based orders, injunctions, or instruments;

iv. For an order declaring that GTQX may not obtain recognition-like interim relief, whether in the form of an injunction, an escrow, or otherwise;

v. Dismissal of GTQX's recognition claim with prejudice;

vi. For compensatory damages in an amount to be proven at trial;

vii. For punitive damages and exemplary damages according to proof at trial;

viii. For treble damages pursuant to 18 U.S.C. § 1964(c) and 18 U.S.C. § 1964(d);

ix. For an injunction prohibiting GTQX from purporting to domesticate, confirm, or enforce the Singapore judgment against Dai, in any U.S. state or federal jurisdiction;

x. For an order, pursuant to 18 U.S.C. § 1964(a), directing GTQX to divest itself of any interest, direct or indirect, in the RICO Enterprise and its profits;

xi. For an order, pursuant to 18 U.S.C. § 1964(a), prohibiting GTQX from engaging with other members of the RICO Enterprise in the same type of endeavor as the Enterprise engaged in previously or is currently engaged in;

xii. For all other relief available under 18 U.S.C. § 1964;

xiii. For costs of suit incurred herein;

xiv. For pre- and post-judgment interest;

xv. For attorneys' fees and costs, including as warranted by applicable laws; and

xvi. For such other and further relief as the Court may deem to be just and proper.

Respectfully submitted,

Dated: April 13, 2026

/s/ Xuefeng Dai

Xuefeng Dai (Pro Se)

Nassau County, New York

Eric.xuefeng.dai@gmail.com

# EXHIBIT A

# Compliance & Investigation

Zhong Lun has been highly recommended for years in the field of compliance and investigation by renowned rating agencies

Our compliance and investigation team houses nearly 40 partners and over 100 associates, an impressive scale that gives the practice a distinct competitive edge. Many of our practitioners have extensive local experience, global perspective, and diverse expertise. Our global reach is also reflected in our lawyers' overseas educational background, overseas work experience, and bar admissions in multiple jurisdictions, which allows us to provide integrated domestic and international legal services.

We have long been favored by discerning clients for our work in compliance, response to government investigations, and corporate internal investigations. Our extensive experience includes serving as legal counsel for the Ministry of Justice, People's Bank of China, China Banking and Insurance Regulatory Commission, Ministry of Commerce, Ministry of Finance, Ministry of Natural Resources, Ministry of Ecology and Environment, and other regulatory bodies. This extensive track record has equipped us with a deep understanding and solid grasp of regulatory policies and government investigations. In addition, central state-owned enterprises, multinationals, and large private-sector companies also feature on our client roster for compliance matters, giving us deep insights into operational models of various industries, including finance, trusts, construction, mechanics, aviation, energy, big health, food, pharmaceuticals, luxury goods, and natural resources. Our experiences include development of corporate compliance management systems for a host of businesses, assistance in conducting internal investigation and responding to different government regulatory investigations, joint investigations carried out across multiple jurisdictions, investigations and sanctions by multilateral financial institutions, and comprehensive management and control of major compliance crises, showcasing our stellar performance when dealing with

# EXHIBIT B

Commission de Contrôle des Fichiers de l'O.I.P.C. - INTERPOL
Commission for the Control of INTERPOL's Files
Comisión de Control de los Ficheros de la OIPC-INTERPOL
لجنة الرقابة على محفوظات المنظمة الدولية للشرطة الجنائية (الإنتربول)
*INTERPOL's Independent Authority for the Control and Protection of Personal Data*

15 September 2023

**By e-mail only**

Our ref: CCF/126/R1298.22
Subject: Request for access to and correction/deletion of data concerning Mr Xuefeng Dai

Dear Madam,

As provided in our letter dated 02 November 2022, the Commission studied your request in accordance with the procedure described in our letter of the same date.

After a thorough examination of the elements before it, the Commission found that the data challenged provided by China raised questions as to compliance with applicable rules. As a result, it considered that the retention of these data in the INTERPOL Information System was not compliant with INTERPOL's rules and decided that they should be deleted.

This decision was forwarded to the INTERPOL General Secretariat, which deleted these data from INTERPOL's files, on 08 September 2023.

Additionally, please be advised that the INTERPOL General Secretariat has informed all INTERPOL National Central Bureaus (NCBs) that:

- in application of the decision made by the Commission for the Control of INTERPOL's Files, the General Secretariat has deleted the data relating to your client;
- all international police cooperation via INTERPOL's channels in this case would not be in conformity with INTERPOL's Constitution and Rules.

The INTERPOL General Secretariat also urged all NCBs to update their national databases accordingly, as well as to verify that the same is done by all national entities that have access to INTERPOL information.

You will find enclosed the Decision of the Commission concerning your client and an official letter from the INTERPOL General Secretariat, certifying that, as of 15 September 2023, he is not subject to an INTERPOL Red Notice or diffusion.

To undertake any measure you deem appropriate for the follow up of your client's case at national level, we invite you to contact the relevant national authorities.

Yours faithfully,

Secretariat to the Commission
for the Control of INTERPOL's Files

*Encl. (2)*

Ms Sandra Grossman
Grossman Young & Hammond, LLC
4922 Fairmont Avenue, Suite 200
Bethesda, MD 20814
United States of America

Commission de Contrôle des Fichiers de l'O.I.P.C. - INTERPOL
Commission for the Control of INTERPOL's Files
Comisión de Control de los Ficheros de la OIPC-INTERPOL
لجنة الرقابة على محفوظات المنظمة الدولية للشرطة الجنائية (الإنتربول)

*INTERPOL's Independent Authority for the Control and Protection of Personal Data*

# DECISION OF THE COMMISSION

## REQUESTS CHAMBER

### Request concerning Xuefeng DAI

*(Ref. CCF/126/R1298.22)*

1. The Commission for the Control of INTERPOL's Files (the Commission), sitting as the Requests Chamber, having delegated powers to the Rapporteur of the Requests Chamber on the basis of Article 17 of the Statute of the Commission, delivered the following Decision on 19 July 2023.

2. The Commission refers to the applicable legal framework in the present case, namely:

   - the INTERPOL General Assembly Resolution (ref. AGN/2017/86/RES/09) on INTERPOL's policy on refugees,
   - the implementation of this Resolution by the Commission,
   - Article 10(1) of INTERPOL's Rules on the Processing of data (RPD) which states *"that the processing of data in the INTERPOL Information System may only be carried out for a given, explicit purpose which is in conformity with the Organization's aims and activities."*
   - Article 12 of the RPD which states that *"data processing in the INTERPOL Information System must be (...) relevant, not excessive in relation to their purpose."*

3. The INTERPOL National Central Bureau (NCB) of the protecting country was consulted by the Commission:

   - On 17 July 2023, the NCB of the United States confirmed that the Applicant has applied for asylum in the United States, that his application is pending and has not yet been adjudicated and that there has been no grant or denial of asylum or refugee status to date.

4. In view of the above, the Commission:

   - Establishes that the Applicant is the subject of data processed in the INTERPOL Information System (IIS) for his extradition to China, he is a national of the country source of the data challenged, and he has been granted a status that protects him against *refoulement* to his country of origin;

   - Establishes that due to this status, the data cannot serve the purpose for which they were processed in the IIS;

   - Finds that their retention would therefore not be compliant with Articles 10(1) of the RPD and with the requirements of Article 12(1) of the RPD that data are relevant and not excessive in relation to their purpose.

**FOR THESE REASONS, THE COMMISSION**

- Decides that the data challenged are not compliant with INTERPOL's rules applicable to the processing of personal data and shall be deleted from INTERPOL's files.

Commission for the Control of INTERPOL's Files

COMMISSION FOR THE CONTROL OF INTERPOL'S FILES

Secretariat to the Commission for the Control of INTERPOL's Files

**NOT INTENDED FOR PUBLIC DISSEMINATION**

INTERNATIONAL CRIMINAL POLICE ORGANIZATION
ORGANIZACIÓN INTERNACIONAL DE POLICÍA CRIMINAL

INTERPOL

ORGANISATION INTERNATIONALE DE POLICE CRIMINELLE
المنظمة الدولية للشرطة الجنائية

## TO WHOM IT MAY CONCERN

Ref: LA/88732-2015

The General Secretariat of the International Criminal Police Organization-INTERPOL hereby certifies that, as of today, Mr DAI Xuefeng, born on 04 October 1975, is not subject to an INTERPOL Notice or diffusion.

Done in Lyon, on 15 September 2023.

SECRETARIAT GENERAL GENERAL SECRETARIAT

Executive Directorate Legal Affairs
General Secretariat
INTERPOL

Commission de Contrôle des Fichiers de l'O.I.P.C. - INTERPOL
Commission for the Control of INTERPOL's Files
Comisión de Control de los Ficheros de la OIPC-INTERPOL
لجنة الرقابة على محفوظات المنظمة الدولية للشرطة الجنائية (الإنتربول)
*INTERPOL's Independent Authority for the Control and Protection of Personal Data*

9 March 2023

**By e-mail only**

Our ref: CCF/124/R1298.22

Subject: Request for access to and correction/deletion of data concerning Mr Xuefeng Dai

Dear Madam,

Following our correspondence of 2 November 2022, we would like to inform you that the Commission carried out the appropriate checks concerning your request in accordance with its functions.

As a result, please note that the Commission has been authorized by the INTERPOL National Central Bureau (NCB) in China to inform you that your client is currently subject to a red notice issued at the request of the aforementioned NCB on 16 September 2022:

- on the basis of an arrest warrant (no. SG(J)BZ[2019]00001) issued on 26 October 2018 by the Shenzhen municipal public security Bureau;
- for the charges of "*Duty encroachment*";
- the maximum penalty possible is fifteen (15) years' imprisonment.

Furthermore, we would like to inform you that as a precautionary measure in certain cases, access by INTERPOL member countries to specific data can be provisionally blocked. This means INTERPOL member countries do not have access to the data concerned that are registered in INTERPOL's Files, pending a conclusion of the review of the compliance of these files with INTERPOL's rules and regulations. During that time, all international police cooperation via INTERPOL's channels on these cases would be in violation of INTERPOL's Constitution and Rules.

In light of the elements provided, the Commission found that these elements raised questions concerning the compliance of the data challenged with INTERPOL's rules, and prevented it from concluding, at this stage, that the data challenged meet the required criteria to be compliant with INTERPOL's rules.

As a result, the Commission decided that access by INTERPOL member countries to the data concerning your client and provided by China shall be blocked pending further study of his file. This decision was forwarded to the INTERPOL General Secretariat, which blocked on 16 November 2022 access by INTERPOL member countries to your client's file.

Please note that after the study of your request is complete, the access to the data concerning your client could either be unblocked, if found to comply with INTERPOL's rules, or otherwise deleted.

Finally, note that the procedure described in our letter dated 02 November 2022 continues to be applied to your request, and that the Commission is in the process of examining the information provided with utmost care. However, should you wish to share any additional information with the Commission in the interest of your client, we invite you to do so within one month from the date of the present letter.

We will keep you informed of further developments in due course.

Yours faithfully,

pp [signature]

Secretariat to the Commission
for the Control of INTERPOL's Files

*Encl. (2)*

Ms Sandra Grossman
Grossman Young & Hammond, LLC
4922 Fairmont Avenue, Suite 200
Bethesda, MD 20814
United States of America

PCS44032018112600000000736209605

深圳市公安局

# 逮捕证

深公(经)捕字［2019］00001 号

根据《中华人民共和国刑事诉讼法》第八十条之规定，经深圳市人民检察院批准/~~决定~~，兹由我局对涉嫌职务侵占罪的代雪峰（性别男，出生日期1975年10月04日，住址深圳市福田区广东省深圳市福田区福中路318号黄埔雅苑翠悠园1期3栋3AF）执行逮捕，送深圳市第二看守所羁押。

深圳市公安局

二〇一八年十二月二十六日

本证已于________年____月____日____时向我宣布。

被逮捕人：

本证副本已收到，被逮捕人__________已于________年____月____日送至我所。（如先行拘留的，填写拘留后羁押时间）。

接收民警：

年 月 日

此联附卷

Shenzhen Municipal Public Security Bureau

## Warrant of Arrest

*No.SG(J)BZ[2019]00001*

Pursuant to Article 80 of the *Criminal Procedure Law of the People's Republic of China*, as approved by the Shenzhen People's Procuratorate, this Bureau hereby carries out the arrest of DAI Xuefeng (gender: male, date of birth: 4 October 1975, address: 3AF, Building 3, Phase 1, Cuiyou Garden, Huangpu Yayuan, No.318 Fuzhong Road, Futian District, Shenzhen City, Guangdong Province, who is suspected of duty encroachment, and sends him to No. 2 Detention Center of Shenzhen City for custody.

Shenzhen Municipal Public Security Bureau (seal)
26 December 2018

The Warrant of Arrest is announced to me on ______, ______, ______.
The arrested:

A copy of this Warrant is received, and the arrested_______is taken into custody on________, _______, _______. (In case of detention in advance, fill in the detention time after detention.)

Receiving police:

Detention center (seal)

Date:

Files attached

Commission de Contrôle des Fichiers de l'O.I.P.C. - INTERPOL
Commission for the Control of INTERPOL's Files
Comisión de Control de los Ficheros de la OIPC-INTERPOL
لجنة الرقابة على محفوظات المنظمة الدولية للشرطة الجنائية (الإنتربول)
*INTERPOL's Independent Authority for the Control and Protection of Personal Data*

**By e-mail only**

02 November 2022

Our ref: CCF/123/R1298.22

Subject: Request for access to and correction/deletion of data concerning Mr DAI Xuefeng

Dear Madam,

We acknowledge receipt of your correspondence dated 24 October 2022 addressed to the Commission for the Control of INTERPOL's Files and received on 26 October 2022.

Insofar as you have provided the required documents, your request is admissible and the following procedure applies to its processing:

- The Commission first checks whether any data concerning the Applicant are being processed in INTERPOL's Information System. If so, the Commission examines the compliance of the processing of these data with INTERPOL's rules, on the basis of the information available to it. In this context, it considers all elements and documents provided by the Applicant in support of his/her request.

- In accordance with Article 34 of its Statute, the Commission may seek additional information or clarification from the Applicant, from the source of the data being challenged, from the INTERPOL General Secretariat or from other entities concerned by the request.

- When the Commission considers that it has received sufficient information to reach a conclusion on a request, it decides on the request.

Please note that in accordance with article 35 (2) of the Statute of the Commission for the Control of INTERPOL's Files, the Commission shall consult the country concerned by your request, namely China, prior to disclosing any data that could be registered in INTERPOL's Information System.

Consequently, we invite you to indicate whether you authorize the Commission to share the following information with the INTERPOL National Central Bureau in China:

- The name, forename, date of birth and nationality of your client,
- The fact that your client submitted a request for access to the INTERPOL Information System.

Yours faithfully,

Secretariat to the Commission
for the Control of INTERPOL's Files

Ms GROSSMAN Sandra
Grossman Young & Hammond, LLC
4922 Fairmont Avenue, Suite 200
Bethesda, MD 20814
United States of America

# EXHIBIT C

Gmail

Eric Dai <eric.xuefeng.dai@gmail.com>

# Fw: Email to Brian Sun

**eric.dai** <eric.dai@khanfunds.com> Sun, Oct 2, 2022 at 10:04 AM
To: eric001 <eric.xuefeng.dai@gmail.com>

Eric Xuefeng Dai

Khan Funds Management America, Inc.
CEO & President

One World Trade Center, Suite 83K
New York, NY 10007

---

**From:** FREDERICKS, BRIAN <brian@frederickslawpc.com>
**Sent:** Tuesday, June 14, 2022 6:33 PM
**To:** KENNETH FERARU <KFeraruesq@aol.com>
**Subject:** Fwd: Email to Brian Sun

Dear Mr. Sun et al.,

Thank you for your correspondence and the proposal to schedule a meeting concerning settlement. As set forth in the complaint, our clients have suffered horrible wrongs and sustained significant damages resulting from defendants' unlawful conduct in this case. Our clients are indeed confident in the merits of their claims, and further invite you to gain better understanding of the facts substantiating the allegations as set forth in the complaint.

First, to gain a better understanding of Mr. Dai's background, annexed as Exhibit A are two news articles published about him in 2005 and 2008.

Concerning the relevant events in the United States, please find attached:

1. The espionage efforts of Nations Technologies in the U.S.: a letter issued by the FBI and a letter issued by Mr. Dai's psychiatrist as Exhibit B;
2. The U.S. government indictment of Nations Technologies' associate and culpable non-party Yaping Chen, and judgement of Nations Technologies' associate and culpable non-party Yichi Shih annexed as Exhibit C;
3. Defendants' money laundering activities and Nations' business activities in the U.S.: Exhibit D, an excerpt of the recording of defendant Luo; and
4. Defendants' extortion demands and other threats: Exhibit E, an excerpt of the recording of defendant Luo.

Concerning relevant PRC background events, please find attached:

1. Our clients' application submitted to the Shenzhen Intermediate People's Court for retrial, annexed as Exhibit F;
2. Recent news articles published in China concerning this case, annexed as Exhibits G;
3. Mr. Dai's email to Nations' PRC legal counsel, annexed as Exhibit H; and
4. Mr. Dai's report to CCDI and other PRC government organizations, annexed as Exhibit I.

Concerning your client and its parent company, please find attached:

1. Nations Technologies' evolution from ZTE, annexed as Exhibit J, and the punishment issued by the U.S. government against ZTE, annexed as Exhibit K;
2. The punishment issued by CSRC against Nations Technologies for each year since 2018, annexed as Exhibit L;
3. Punishment issued by the Foreign Exchange Administration against Nations Technologies, , annexed as Exhibit M; and
4. Mr. Dai's report to PRC government organization CSRC, annexed as Exhibit N.

Concerning relevant Singapore events, please find attached:

a. Evidence of the burglary committed by defendants of plaintiffs' affiliated offices in Singapore, annexed as Exhibit O.

Returning to our discussion of settlement, the simple analysis is the amount of compensation defendants are to pay to plaintiffs. There are three scenarios:

1. Defendants Yingtong Sun and Junjie Yu and culpable non-party Yaping Chen all attend the settlement meeting in-person and personally participate in these discussions; provided arrangements are made for their personal appearance, plaintiffs would only request a modest amount in settlement.
2. Defendants Zhaoxue Luo and Baoxing Huang both attend the settlement meeting in-person and personally participate in these discussions; provided arrangements can be made for their personal appearance, plaintiffs would further reduce their modest settlement demand to account for the appearances of defendants Luo and Huang.
3. If none of the foregoing scenarios occur and if the relevant parties are not made available as requested and settlement discussions consist of defendants' lawyers only, then the amount demanded by our clients as set forth in the complaint will remain plaintiffs' settlement demand. Still, defendants would benefit from avoiding anticipated treble damages awarded at trial.

In the event you are rejecting plaintiffs' settlement demand at this time, then please propose a counteroffer. Prior to the time the parties are able to arrive at a mutually agreeable settlement amount, there is no good reason to meet as this is a sensitive matter, and one cannot know who else is monitoring this case.

Please note that two attorneys will be appointed by plaintiffs to oversee the execution of the settlement documents: Macros Jimenez, another legal counsel to our clients, and a Washington DC-based attorney of plaintiffs. Plaintiffs request that all settlement documents be executed at the offices of their Washington DC counsel, contact details to be provided upon the parties reaching a mutually agreeable settlement amount.

Finally, please be advised that our clients decline to accept any settlement proceeds directly paid from defendants' bank accounts, and request that all settlement proceeds be paid from defendants' law firm or any other duly appointed entity. Appointed Washington DC counsel will provide further clarification in this regard.

---

**15 attachments**

**Exhibit A-Publications.pdf**
1739K

**Exhibit B-FBI and doctor letter.pdf**
1470K

**Exhibit C-Chen Indictment and Shih sentence.pdf**
677K

**Exhibit D-about money laundering and activities.pdf**
164K

**Exhibit E-Record excerpt.pdf**
188K

**Exhibit F-Retrial.pdf**
3502K

**Exhibit G- Recent news article.pdf**
2952K

**Exhibit H-email to Nations' Chinese counsel.pdf**
276K

**Exhibit I-Report to CCDI and other agencies.pdf**
1279K

**Exhibit J-Nations' evolution from ZTE.pdf**
1339K

**Exhibit K-ZTE Corporation Agrees to Plead Guilty and Pay Over $430.4 Million for Violating U.S. Sanctions by Sending U.S.-Origin Items to Iran _ OPA _ Department of Justice.pdf**
124K

**Exhibit L-Punishement on Nations.pdf**
1234K

**Exhibit M- Punishment by Foreign Exchange Association.pdf**
589K

**Exhibit N-Report to CSRC.pdf**
102K

**Exhibit O-Singapore burglary.pdf**
1124K

# EXHIBIT D

AUSA: Jane Yumi Chong

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**24 MAG 3056**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>YUANJUN TANG,<br><br>Defendant. | **SEALED COMPLAINT**<br><br>Violations of 18 U.S.C. §§ 371, 951, 1001, and 2<br><br>COUNTY OF OFFENSE: MANHATTAN |

SOUTHERN DISTRICT OF NEW YORK, ss.:

JOSHUA RAY WILLIS, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

**COUNT ONE**

(Conspiracy to Act as an Agent of a Foreign Government Without Prior Notice to the Attorney General)

1. From at least in or about 2018, up to and including at least in or about June 2023, in the Southern District of New York, and elsewhere, YUANJUN TANG, the defendant, and others known and unknown, knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, acting as an agent of a foreign government without prior notification to the Attorney General, as required by law, in violation of Title 18, United States Code, Section 951(a).

2. It was a part and an object of the conspiracy that YUANJUN TANG, the defendant, and others known and unknown, knowingly acted in the United States as an agent of a foreign government, to wit, the People's Republic of China ("PRC"), without prior notification to the Attorney General, as required by law, in violation of Title 18, United States Code, Section 951(a).

Overt Acts

3. In furtherance of the conspiracy and to effect the illegal object thereof, YUANJUN TANG, the defendant, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York, and elsewhere:

a. In or about 2022, at the direction of an intelligence officer of the PRC's Ministry of State Security ("MSS Officer-1"), TANG video-recorded a campaign event organized in Manhattan on behalf of a PRC dissident and human rights activist who was then running for U.S. congressional office in New York City (the "Congressional Candidate") and transmitted the video to MSS Officer-1 by uploading the video to an email account used by both TANG and MSS Officer-1 (the "MSS Officer-1 Account").

b. In or about April 2022, at the direction of MSS Officer-1, TANG met with MSS Officer-1 in mainland China, where the MSS installed TANG's phone with what TANG believed to be a "bug" that caused all photographs and videos captured on the phone to be transmitted to the MSS (the "Compromised Phone"). Subsequently, on or about June 2, 2023, in Manhattan, TANG used the Compromised Phone to take a photograph of an event program from the opening of the June 4th Memorial Museum, established in remembrance of the Tiananmen Square massacre, and transmitted the photograph to the MSS.

(Title 18, United States Code, Section 371.)

**COUNT TWO**
(Acting as an Agent of a Foreign Government
Without Prior Notice to the Attorney General)

4. From at least in or about 2018, up to and including at least in or about June 2023, in the Southern District of New York, and elsewhere, YUANJUN TANG, the defendant, knowingly acted in the United States as an agent of a foreign government, to wit, the PRC, without prior notification to the Attorney General, as required by law.

(Title 18, United States Code, Sections 951(a) and 2.)

**COUNT THREE**
(False Statements)

5. On or about July 12, 2023, in the Southern District of New York and elsewhere, YUANJUN TANG, the defendant, willfully and knowingly did make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of the United States, to wit, during a meeting with Special Agents from the FBI, TANG stated that, on July 11, 2023, he was unable to access an email account through which he regularly exchanged communications with the MSS when, in truth and fact, had TANG successfully logged into the account on July 11, 2023.

(Title 18, United States Code, Section 1001.)

The bases for my knowledge and for the foregoing charges, are, in part, as follows:

6. I am a Special Agent with the FBI, and, as such, I have participated in numerous counterintelligence investigations. Among other things, my duties with the FBI have included investigations involving agents working at the direction of foreign governments without prior notification to the United States. Based on my training and experience, I have become knowledgeable about criminal activity, particularly violations of the federal statutes governing the conduct of foreign agents. I have been personally involved in the investigation of this matter.

7. This affidavit is based upon my own knowledge, my conversations with others, including other law enforcement agents, and my examination of reports and records. Because this Complaint is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**Overview**

8. As detailed below, from at least in or about 2018, up to and including at least in or about June 2023, YUANJUN TANG, the defendant, completed tasks at the direction of the PRC's MSS, the PRC's principal civilian intelligence agency. The MSS is responsible for, among other things, the PRC's foreign intelligence, counterintelligence, espionage, and political security functions. MSS intelligence officers have, among other things, targeted and recruited individuals to act on behalf of the PRC in the United States by, among other things, providing information and assistance to the PRC. A photograph of TANG is set forth below:



9. Specifically, TANG regularly provided information TANG had gathered about individuals and groups viewed by the PRC as potentially adverse to the PRC's interests, particularly U.S.-based Chinese democracy activists and dissidents ("PRC Dissidents"), to MSS Officer-1.

10. As part of his work at the direction of the MSS, YUANJUN TANG, the defendant, (i) traveled twice to Macau and once to mainland China between in or about 2019 and in or about 2023 for face-to-face meetings with members of the MSS; (ii) accepted payments from the MSS; (iii) collected information about PRC Dissidents and pro-democracy events in the United States and provided this information to MSS Officer-1; (iv) activated a U.S. phone number for the MSS in or about 2021 and used the number to

help the MSS infiltrate a group chat on Messaging Platform-1 that numerous PRC Dissidents used to communicate about pro-democracy issues; and (v) video-recorded a June 2020 call commemorating the anniversary of the Tiananmen Square massacre in the PRC, conducted by PRC Dissidents using the U.S.-based videoconferencing platform Zoom.

11. The FBI searched six cellphones (the "Tang Phones") and two computers (the "Tang Computers") belonging to YUANJUN TANG, the defendant. The FBI also searched the MSS Officer-1 Account and TANG's personal email accounts (the "Tang Accounts"). The Tang Phones, Tang Computers, MSS Officer-1 Account, and Tang Accounts each contained contact information for MSS Officer-1, communications with MSS Officer-1, and/or information about PRC Dissidents, of the type that TANG admitted providing to his MSS handler.

12. According to database checks run by the U.S. Department of Justice's Foreign Agents Registration Act ("FARA") Unit in or about June 2023 and in or about August 2024, YUANJUN TANG, the defendant, has never notified the Attorney General, pursuant to 18 U.S.C. § 951 and its implementing regulations, 28 C.F.R. § 73.3(a), that he has been acting as an agent of a foreign government.

## **TANG's Background**

13. Based on my review of news articles and other open-source information, and records maintained by U.S. Citizenship and Immigration Services, the New York Department of State, and bank records, I have learned the following, in substance and in part:

a. YUANJUN TANG, the defendant, is a former PRC citizen who was imprisoned in the PRC for his activities as a dissident opposing the one-party authoritarian political system controlled by the Chinese Communist Party ("CCP"), the PRC's sole ruling party. Among other things, in 1989, TANG participated in the Tiananmen Square protests, a series of student-led demonstrations calling for democracy and political reform that culminated in a deadly military crackdown on June 4.[1]

b. In or about 2002, TANG defected to Taiwan and was subsequently granted political asylum in the United States. TANG has since resided in New York City as a naturalized U.S. citizen and has organized regular public demonstrations against the CCP,

---

[1] *See, e.g.*, US Grants China Dissident Asylum, Taipei Times, Dec. 1, 2022, https://www.taipeitimes.com/News/taiwan/archives/2002/12/01/0000185468 (describing Tang's activism as a confirmed Tiananmen Square dissident, his escape to Taiwan, and the United States' grant of political asylum in 2002); Country Reports on Human Rights Practices (China), Feb. 23, 2001, U.S. Dept of State, https://2009-2017.state.gov/j/drl/rls/hrrpt/2000/eap/684.htm ("Government harassment prevents Tiananmen Square massacre-era activist Tang Yuanjun and other present and former dissidents and their relatives from obtaining and keeping steady employment.").

including monthly protests in front of the Chinese consulate in Manhattan,[2] and has published commentary criticizing the CCP.

c. TANG serves as the listed contact for the Chinese Democracy Party Eastern US Headquarters Inc. ("CDP"), which has been a registered New York not-for-profit organization since in or about 2009.

d. TANG is the sole authorized signatory on a checking and savings account held in the name of the CDP and has identified himself as the president of CDP in connection with these accounts.

**<u>TANG's Work for the MSS</u>**

14. Based on my participation in this investigation and others, voluntary statements made by YUANJUN TANG, the defendant, during law enforcement interviews, and my review of law enforcement reports, bank records, and border-crossing records maintained by U.S. Customs and Border Protection ("CBP"),[3] I have learned the following, in substance and in part:

a. In or about 2018, TANG, who could not freely travel to mainland China because of his status as a PRC Dissident, began searching for a way to travel to mainland China to visit family members. An acquaintance ("CC-1") then arranged TANG's virtual introduction to MSS Officer-1 by providing TANG with the MSS Officer-1 Account and the account passcode so that TANG and MSS Officer-1 could begin communicating.

b. TANG believed MSS Officer-1 to be an MSS intelligence officer and began communicating with MSS Officer-1 through draft emails on the MSS Officer-1 Account. Through the MSS Officer-1 Account, and through phone calls, video calls, audio messages and text messages, MSS Officer-1 tasked TANG with collecting information about PRC Dissidents, pro-democracy events, and the political asylum process, and transmitting this information to MSS Officer-1.[4] For example:

---

[2] *See* A Chinese Revolutionary, Reinventing Himself in American Exile, *N.Y. Times*, Mar. 21, 2018, https://www.nytimes.com/2018/03/21/books/patriot-number-one-lauren-hilgers-review.html (book review that includes details on TANG's background and connection to other PRC Dissidents based in Flushing, Queens).

[3] Unless otherwise indicated, descriptions of communications, conversations, and documents are set forth in substance and in part. Some of these descriptions of communications are based on draft translations prepared by FBI linguists fluent in Mandarin and English and are subject to change.

[4] Based on my training, experience, and participation in this investigation, I know that individuals seeking to reduce the risk of interception often will compose and save "draft" emails for access by multiple people through a single account, rather than transmitting emails between separate accounts. These individuals then share log-in details for one

i. In or about 2019, MSS Officer-1 asked TANG for information about U.S.-based immigration lawyers with whom TANG was acquainted. MSS Officer-1 also asked TANG about the process by which PRC Dissidents were able to gain political asylum in the United States and expressed an interest in obtaining asylum for people selected by the MSS. In response, TANG scanned and sent to MSS Officer-1 the business cards of at least 10 Chinese-American immigration lawyers.

ii. In or about June 2021, MSS Officer-1 asked TANG for information about events planned in connection with the June 4th anniversary of the Tiananmen Square massacre. In response, TANG provided write-ups on speakers scheduled to participate in a discussion panel at a restaurant in Flushing, Queens.

iii. In or about 2022, MSS Officer-1 asked TANG to conduct research into the Congressional Candidate and to report to MSS Officer-1 about the Congressional Candidate's campaign finances and activities. In response, TANG provided information about the Congressional Candidate's campaign team and fundraising.

c. On at least three occasions, TANG met with MSS Officer-1 and other MSS intelligence officers in Macau or mainland China, traveling each time through intermediary countries. Specifically, in or about January 2019, TANG traveled to Macau through Taipei, Taiwan; in or about April 2022, TANG traveled to mainland China through Incheon, South Korea; and in or about April 2023, TANG traveled again to Macau through Taipei. During the meetings, after being polygraphed, TANG provided MSS Officer-1 information about specific PRC Dissidents, including information from one of TANG's phones.

d. During the meeting in mainland China, in or about April 2022, MSS Officer-1 informed TANG that the MSS had installed a "bug" on his cellphone (the "Compromised Phone"), which caused any photo, screenshot, or voice memorandum generated or captured on the Compromised Phone to be immediately transmitted to MSS Officer-1 for review.

e. At the direction of MSS Officer-1, TANG helped MSS Officer-1 infiltrate communications exchanged among PRC Dissidents. Specifically, in or about February 2020, TANG started a group chat on Messaging Platform-1 with the Chinese-language display name "中国民主党之," which translates in English to "Friends of the Chinese Democracy Party." The group consisted of approximately 140 members, including confirmed PRC Dissidents such as the Congressional Candidate and a known PRC Dissident based in Flushing ("PRC Dissident-1"). In or about January 2021, TANG assisted MSS Officer-1 in creating a profile on Messaging Platform-1 linked to a U.S. phone number (the "MSS Group Chat Number"), and then added MSS Officer-1 to the "Friends of the Chinese Democracy Party" group.

---

account and review the "draft" emails, and are thus able to communicate without ever transmitting a communication that they believe may be intercepted.

f. At the direction of MSS Officer-1, TANG recorded a June 4, 2020 Zoom video conference (the "2020 Zoom Call") in which PRC Dissidents convened virtually from the United States, Taiwan, and Germany in remembrance of the Tiananmen Square protests. The 2020 Zoom Call was repeatedly disrupted by the PRC government and then suddenly ended.

g. After TANG began working with MSS Officer-1, the MSS made payments to TANG's family members residing in mainland China.

**The MSS Officer-1 Account**

15. Based on my review of subscriber records and data obtained from the MSS Officer-1 Account, I have learned the following, in substance and in part:

a. The MSS Officer-1 Account was created on or about April 23, 2018.

b. The MSS Officer-1 Account contains approximately dozens of screenshots of communications between PRC Dissidents and photographs and videos of both PRC Dissidents and pro-democracy events, including chats from the group chat that YUANJUN TANG, the defendant, helped the MSS infiltrate depicting group members' criticisms of the PRC. For example, the items include the following:

i. An audio-recording of the second day of a human rights conference held in or about May 2019 in Cologne, Germany, for which TANG served as one of the two presiders and in which conference participants discussed, among other things, the CCP's effort to undermine Taiwanese democracy through misinformation.

ii. Numerous screenshots of messages exchanged through the Friends of the Chinese Democracy Party group chat, including criticisms of the CCP authored by PRC Dissident-1. Based on my interview of PRC Dissident-1, I have learned that, in or about June 2023, the PRC government approached one of PRC Dissident-1's family members in mainland China and told the family member to instruct PRC Dissident-1 to not say anything against the CCP or the Ministry of Public Security ("MPS").[5]

iii. Information about the Congressional Candidate, including campaign event videos captured in Manhattan and elsewhere and an audio recording of a campaign strategy meeting.

**The Compromised Phone**

16. Based on my review of data extracted from the Compromised Phone, the cellphone that YUANJUN TANG, the defendant, stated the MSS had planted with a "bug" with a particular name (the "Installed Software"), *see supra* ¶ 14.d, I have learned the following, in substance and in part:

[5] The MPS is the principal national police authority in the PRC.

a. The Compromised Phone contained image and video files that TANG confirmed he transmitted to the MSS and which contained metadata associated with the Installed Software. For example, these items include:

i. A photograph of an event program from the June 2, 2023 opening of the June 4th Memorial Museum (commemorating the Tiananmen Square massacre) listing the names of PRC Dissidents who participated in the event, with metadata showing that the photograph was taken on June 2, 2023 in Manhattan, at location coordinates approximately 140 feet from the museum.

ii. Two videos that depict protests in Manhattan and Flushing, respectively; and

iii. A video of a Zoom meeting hosted by CDP.

b. The Compromised Phone contains additional photographs that TANG confirmed he sent to the MSS and which contain metadata showing they were last modified after the MSS placed the Installed Software on the Compromised Phone. For example, these items include:

i. Three photographs of the Congressional Candidate, last modified on or about July 19, 2022, August 6, 2022, and July 26, 2023, respectively; and

ii. Two photographs of a U.S. House Representative at a public event, both last modified on or about July 26, 2023.

c. The Compromised Phone also contains evidence of TANG's communications with MSS Officer-1. For example, these items include:

i. Messages TANG exchanged with the MSS Group Chat Number;

ii. An email regarding two-step verification for the MSS Officer-1 Account;

iii. WeChat contact information for a user that TANG addressed, in a text message, as "Brother [MSS Officer-1]" (the "MSS Officer-1 WeChat Account"); and

iv. Audio messages from the MSS Officer-1 WeChat Account in which MSS Officer-1 asked TANG for specific information about TANG's new party members and urged TANG to send information quickly. Specifically, on or about May 18, 2023, the MSS Officer-1 WeChat Account sent a message to TANG, asking, "What's the new policy's impact on your newly developed party members? How do they feel about it?" On or about June 2, 2023, the MSS Officer-1 WeChat Account sent a message to TANG, instructing, "My old classmate, when you are done over there, send stuff over immediately; the list of name [sic] will be fine and acceptable." And on or about June 3, 2023, the MSS Officer-1 WeChat Account sent a message to TANG, instructing, "You have to work harder

Case 1:24-cr-00412-JRK Document 1 Filed 08/20/24 Page 9 of 53

this month. Work harder this month. You have to send over some new stuff with utmost priority."

d. The Compromised Phone also contains a Chinese-language copy of the FBI's Transnational Repression Threat Intimidation Guide, created and publicly disseminated by the FBI in 61 languages to educate the public on identifying and reporting forms of transnational repression.[6]

## TANG's Devices

17. Based on my review of data extracted from five of the Tang Phones, not including the Compromised Phone, I have learned that each of the Tang Phones contains one or more of the following, in substance and in part:

a. Contact information for an individual saved under the name by which YUANJUN TANG, the defendant, knows MSS Officer-1;

b. Text or audio messages that TANG exchanged with MSS Officer-1 through WeChat or Messaging Platform-1; and

c. Communications with the MSS Group Chat Number.

18. Based on my review of data extracted from the Tang Computers, I have learned that the Tang Computers contain the following, in substance and in part:

a. Text files describing the activities of specific PRC Dissidents, including a summary of the travel schedule and finances of the Congressional Candidate and a list of attendees at the Congressional Candidate's book press conference;

b. Scanned business cards of, among others, Flushing-based immigration lawyers; and

c. Photographs and videos similar to those recovered from the MSS Officer-1 Account and the Compromised Phone, depicting pro-democracy events in the United States and elsewhere, such as a march in Flushing in which participants wore t-shirts printed with the phrase "FREE HONG KONG," a speech by the Congressional Candidate in front of a sign for the "United Headquarters of China Democracy Party," and a protest at

[6] As explained on the FBI's website, "transnational repression" refers to efforts by "foreign governments [to] reach beyond their borders to intimidate, silence, coerce, harass, or harm members of their diaspora and exile communities." Further, "[f]oreign governments may use transnational repression tactics to silence the voices of their citizens (or non-citizens connected to the country), get information from them, or coerce them to return to the country of origin." Transnational Repression, Fed. Bureau of Investigation, available at https://www.fbi.gov/investigate/counterintelligence/transnational-repression.

an unidentified location in which participants held up a large sign criticizing the "CCP's Inhumane Removal of Migrant Workers Away from Beijing."

**<u>TANG's False Statements</u>**

19. Based on my personal participation in this investigation, my conversations with other law enforcement agents, and my review of subscriber records, I have learned the following about false statements that YUANJUN TANG, the defendant, made to the FBI, in substance and in part:

a. A user with an internet protocol address ("the IP Address") located in the vicinity of TANG's residence successfully logged into the MSS Officer-1 Account on the evening of July 11, 2023. Provider records show that, on numerous prior occasions, the same IP Address was used to log into two of the Tang Accounts and a social media account on which TANG is the listed subscriber. Based on these facts, I believe TANG is the user who accessed the MSS Officer-1 Account on July 11, 2023.

b. On or about July 12, 2023, during a voluntary interview with FBI agents in Manhattan, after being warned that making false statements to federal law enforcement agents or obstructing a federal investigation is a federal crime, TANG stated, falsely, that he could not access the MSS Officer-1 Account when he tried to log in on July 11, 2023, and that he believed that MSS Officer-1 must have changed the password.

WHEREFORE, the deponent prays that a warrant be issued for the arrest of YUANJUN TANG, the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.

s/ Joshua Ray Willis / otw
Joshua Ray Willis, Special Agent
Federal Bureau of Investigation

Sworn to me through the transmission of this
Complaint by reliable electronic means, pursuant to
Federal Rule of Criminal Procedure 4.1, this
20th day of August 2024

THE HONORABLE ONA T. WANG
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK